## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

HANCOCK FABRICS, INC., et al., [1]
a Delaware corporation,
               Debtors.

Chapter 11

Case No. 16-_____  (____)

Joint Administration Proposed

## DECLARATION OF DENNIS LYONS IN SUPPORT OF
## CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Dennis Lyons, hereby declare:

1.      I am the Senior Vice President and Chief Administrative Officer of Hancock Fabrics, Inc., a Delaware Corporation (with its affiliated entities listed in Note 1 below, "**Hancock**" or the "**Company**"), and specialty retailer operating 263 stores in 37 states as well as an internet store at the domain name hancockfabrics.com.  My duties for Hancock include responsibility for overseeing the daily business and administrative operations of the Company, and in this capacity I am familiar with the Company's day-to-day operations, finances, business records and business affairs.  I have served as Senior Vice President and Chief Administrative Officer of the Company since August 2014.  Prior to that time, I served as Senior Vice President, Store Operations from January 2012 to July 2014.  I am very familiar with Hancock's business and financial affairs and its related agreements and contracts.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563).  The Debtors' corporate headquarters is located at One Fashion Way, Baldwin, MS 38824.

2.      I submit this Declaration in connection with the voluntary chapter 11 petitions and first-day motions of the Company in the above-captioned chapter 11 cases.  Any capitalized term not expressly defined herein shall have the meaning ascribed to such term in the relevant first-day motion or application.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by people who report to me, upon information supplied to me by the Company's professionals and consultants, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Company's operations, financial condition and related business issues.  The documents attached hereto, referenced herein or otherwise relied upon by me for purposes of this declaration are the business records of the Company, prepared and kept in ordinary and regularly conducted business activity of the Company, and used by me for those purposes.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Company.

3.      Part I of this Declaration describes Hancock's business and the relevant background preceding the filing of its chapter 11 petitions.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Company concurrently herewith.

## I.      BACKGROUND

### A.      Overview

4.      The Company was founded in 1957 in Baldwyn, Mississippi.  It operated as a private company until 1972 when it was acquired by, and became a wholly owned subsidiary of, Lucky Stores, Inc., a Delaware corporation (**"Lucky"**).  Hancock Fabrics, Inc. was incorporated as a successor to the retail and wholesale fabric business of Hancock Textile Co., Inc., a Mississippi corporation.    The Company became publicly owned as a result of the

distribution of shares of common stock to Lucky's shareholders on May 4, 1987. The Company's 263 stores operate under the name of "Hancock Fabrics" and are primarily comprised of stores averaging approximately 13,000 square feet and located in strip shopping centers.

5.     The Company is one of the largest fabric retailers in the United States of America, with 2014 sales of more than $283 million. It is a specialty retailer offering an extensive selection of high-quality fashion and home decorating textiles, sewing accessories, needlecraft supplies and sewing machines, along with in-store sewing advice.

6.     Hancock owns and operates a 650,000 square foot warehouse and distribution facility, a 28,000 square foot manufacturing facility and an 80,000 square foot corporate headquarters facility, all located in Baldwyn, Mississippi. These facilities, which are located on 64 acres of land, are owned by the Company. All of the Company's retail stores are leased.

7.     Hancock employs approximately 4,500 full time and part time employees, approximately 4,150 of whom work in the Company's retail stores. The remaining employees work in the Company's corporate headquarters, warehouse and distribution facility. As with other retailers, the Company's retail sales are subject to seasonal fluctuations, with the Company's annual sales being greatest in the fourth fiscal quarter (November 1 through January 31).[2]

8.     The corporate structure of the Company's entities is depicted in the chart below.

---

[2] The Company's fiscal year ends on the Saturday nearest to January 31.



9.      On March 21, 2007, the Company (including all of its then-affiliated entities) filed petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" or "Court"). The bankruptcy cases were jointly administered under Case No. 07-10353 (BLS) (the **"2007 Bankruptcy Cases"**).[3] The chapter 11 plan of reorganization was confirmed on July 22, 2008 [Docket No. 2996] and was effective as of August 1, 2008 [Docket No. 3019]. The 2007 Bankruptcy Cases were closed as of September 9, 2010 and were briefly reopened in September 2011 to seek Bankruptcy Court approval of the settlement of a litigation matter. Following the Bankruptcy Court's approval of the settlement [Docket No. 3479], the 2007 Bankruptcy Cases were again closed on November 15, 2011.

---

[3] The Company's common stock was delisted from the New York Stock Exchange effective May 4, 2007 and now trades on the OTC markets under the symbol "HKFI".

10.     The Company's restructuring under the 2007 Bankruptcy Cases resulted in an economic benefit to its many employees and shareholders, and permitted the Company to continue to serve its extensive loyal customer base in 37 states.

11.     In recent years, however, the Company has experienced a challenging business environment and has been burdened by significant legacy costs.  In 2014 alone, the Company's noncontributory qualified defined benefit pension program and supplemental retirement benefit plan costs increased by approximately $4 million and the total amount by which the plan was underfunded increased from $28.4 million to $43.8 million.

12.     Due to these and other factors, the Company has been forced to rely on bank borrowing to fund its working capital needs, its required cash contribution to the Company's pension plan, capital expenditures and its operations.  These expenses plus ongoing cash needs have created a leverage situation that is unsustainable for the future.

13.     Moreover, the Company posted disappointing sales for the third and fourth quarters of its current fiscal year.  Holiday sales, which typically comprise almost half of the Company's annual sales, were more than $8 million below forecast.  These losses were driven, in part, by significant discounts offered by some of the Company's principal competitors and other market conditions affecting retail businesses.  Moreover, certain of the Company's underperforming stores represent a disproportionate share of its costs.  As a result, the Company lacked the necessary liquidity for its operations.

14.     The above factors have combined to result in the Company's need to file the instant cases to reorganize its debt structure in the current economic climate and to align its operations to future business needs based on what its customers prefer, including store locations

and format. The Company is committed to continuing to offer the same high quality and service for which it has been known since its founding in 1957.

15.    The Company intends to use these cases to (i) gain access to liquidity, (ii) reduce pension and operational costs, (iii) realign its store locations and format and (iv) execute on one or more options to create value for stakeholders (including a sale of assets or other transaction with a third party investor). The Company is considering all possible options for maximizing stakeholder value. Among other things, it will focus on the sale of certain portions or all of its business as a going concern as well as other third party investments and asset disposition options.

16.    The Company believes that it has secured sufficient funds to execute on its plan to maximize stakeholder value. As described below, Wells Fargo Bank, N. A. ("**Wells Fargo**") and GACP Finance Co., LLC ("**GACP**"), the agents under the Debtors' Prepetition Senior Obligations, have consented to the Company's use of cash collateral. The Company has further secured a commitment for debtor in possession financing ("**DIP Financing**") from Wells Fargo, as administrative agent and collateral agent, GACP, as term agent, and the "Lenders" from time to time party thereto. The proposed postpetition financing arrangement (the "**DIP Loan Facility**") contemplates a sale of the Company's business within less than forty-five (45) days following the Company's "**Petition Date**"—February 2, 2016.

17.    As explained below, the Company has agreed to terms with a national liquidator to serve as a "back-up bid" for the Company's assets while the Company continues to seek higher and better offers for the sale of the Company's assets, including through a potential going concern sale. The Company, pursuant to the terms of the DIP Loan Facility, seeks to implement its sale process under the following timeline (the "Sale Timeline"):

| Proposed Sale Timeline | |
|---|---|
| Sale Notice Publication Deadline | February 18, 2016, at 5:00 p.m. (ET) |
| Deadline to Serve Sale Notice | February 18, 2016, at 5:00 p.m. (ET) |
| Deadline to Serve Notice of Assumption and Assignment | February 25, 2016, at 5:00 p.m. (ET) |
| Assumption and Assignment Objection Deadline | March 7, 2016, at 4:00 p.m. (ET) |
| Sale Objection Deadline | March 7, 2016, at 4:00 p.m. (ET) |
| Bid Deadline | March 9, 2016, at 5:00 p.m. (ET) |
| Deadline to Notify Qualified Bidders | March 10, 2016, at 5:00 p.m. (ET) |
| Auction (if necessary) | March 11, 2016, at 9:30 a.m. (ET) |
| Sale Reply Deadline | March 11, 2016, at 5:00 p.m. (ET) |
| Deadline to File/Notice Auction Results | March 12, 2016, at 5:00 p.m. (ET) |
| Sale Hearing | March 14, 2016, at 10:00 a.m. (ET) |

18.    To further its restructure plans, the Company has retained the Clear Thinking Group LLC ("**CTG**") as its financial advisor, Lincoln International LLC ("**Lincoln**") as its investment banker and Retail Consulting Services, Inc. d/b/a RCS Real Estate Advisors ("**RCS**") as its real estate advisor. Each of CTG, Lincoln and RCS has served as the Company's professionals in their respective areas of expertise prior to the Petition Date and is very familiar

with the Company.  CTG and Lincoln have been critical to the Debtors' prepetition efforts in soliciting sale interest from investors and potential buyers.  The Company believes that the DIP Loan Facility gives it the liquidity to execute on its sale effort.

**B.     The Company's Sale Strategy and Events Leading Up to the Sale Transaction**

19.     On or about October 15, 2015, Lincoln was engaged by Hancock to conduct a strategic alternatives process inclusive of possible joint ventures, strategic partnerships or alliances, a sale of the Company or assets of the Company or other possible transactions.  In the weeks following its engagement, Lincoln utilized information provided by Hancock to prepare multiple marketing documents, including a single page summary of the Company (the "**Teaser**") and a 44-page description of Hancock's operations, management, industry, and key financial information (the "**Confidential Information Presentation**").

20.     During the period between October 23, 2015 and December 4, 2015 (the "**Initial Marketing Period**"), Lincoln contacted 69 parties including strategic purchasers, financial purchasers and persons who had contacted either the Company or Lincoln.  The parties Lincoln contacted included logical strategic buyers as well as financial investors with a history of investing in the retail industry and in situations involving operational underperformance and potential liquidity challenges.   Of the 69 parties contacted, 28 executed confidentiality agreements with Hancock and subsequently received the Confidential Information Presentation.  On November 6, 2015, Lincoln distributed a letter (the "**Process Letter**") to parties that had shown continued interest in acquiring the Company. The Process Letters requested parties to submit a written indication of interest by November 18, 2015 or, for certain parties who were delayed in executing a confidentiality agreement, by December 4, 2015.   Despite this broad marketing effort, no written indications of interest were received.  The primary reasons parties declined to pursue a transaction were (i) the Company's recent operational performance, (ii) the

need to rationalize costs and the store base to create a smaller, more profitable core group of stores and (iii) the legacy liabilities and leveraged capital structure encumbering the Company.

21.    The results of the process were provided telephonically by Lincoln to the members of Hancock's Board of Directors (the "**Board**") during a conference call on December 9, 2015. After subsequent discussions on December 16, 2015, the Board instructed Lincoln to (i) solicit interest from parties to serve as a stalking horse bidder in a contemplated sale process pursuant to Bankruptcy Code section 363 and to (ii) solicit interest from liquidation firms to assist the Company with store closing or going-out-of-business ("**GOB**") sales involving stores identified by management for closure as part of the Store Closing Analysis (defined below). As further described below, since December 16, 2015, Lincoln has contacted or re-contacted approximately 36 parties, of whom 28 were contacted during the Initial Marketing Period. Parties that were contacted included the following: (1) parties that indicated interest in an alternative transaction structure during the Initial Marketing Period; (2) existing stakeholders of the Company including parties representing a majority of the principal amount of the Company's existing Senior Secured Notes due 2017 (the "**Noteholders**"); and (3) firms whose primary business is monetization of assets through GOB sales. As described below, the process has contemporaneously sought to maximize value through a going concern sale while also ensuring that the value of the assets will be maximized if a going concern sale is not able to be completed.

22.    In order to facilitate and explore going concern bids for the Company under a section 363 sale and determine the relative benefit that a chapter 11 process could generate for the Company's stakeholders, the Company's management and advisors conducted an extensive analysis of each stores' profitability, the costs of carrying inventory in the stores, and the impact that closing certain stores may have on advertising and distribution costs (the

"**Store Closing Analysis**").  After extensive analysis and discussion, management ultimately determined that seventy (70) stores (the "**Closing Stores**") should be immediately closed and GOB sales conducted with the assistance of a national liquidation firm in order to reduce outstanding debt and focus the Company on a smaller but higher margin store base.  In order to expedite these closings, Lincoln solicited proposals from national liquidation firms to act as a consultant to the Company under a fee arrangement.  After receiving four (4) proposals and negotiating such proposals with the various liquidation firms, the Company determined that the proposal from Great American Group ("**Great American**") (the "**GA Fee Proposal**") represented the most favorable terms to the Company. The GA Fee Proposal has an incentive-based commission structure that aligns Great American's interest with maximizing value while capping certain sale related expenses at budgeted amounts agreed to by Great American. Furthermore, given Great American's extensive prior experience with the Company, having managed numerous store closing sales for the Company in the recent past, I believe that using Great American will generate the highest recovery possible for the Company's stakeholders. The key terms of the GA Fee Proposal are summarized in the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Prepetition Consulting Agreement, (II) Authorizing Store Closing Sales Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief.*

   23. At the same time that the Store Closing Analysis was being finalized, the Company's advisors conducted numerous telephonic and in-person meetings with a variety of financial and strategic parties in order to cultivate interest in a going concern sale of substantially all of the Company's assets.  Such meetings included extensive discussions regarding a restructuring with the Noteholders.  On January 20, 2016, the Company, Lincoln, the

Noteholders, and a strategic party interested in acquiring the Company's business attended a meeting to discuss the preliminary terms pursuant to which the strategic party and the Noteholders would form an entity to serve as a going concern bidder for the Company' business. Discussions between the Noteholders and the strategic party are ongoing, including development of a term sheet describing the material parameters of a potential transaction with the Company. Both the Noteholders and the strategic parties with whom they are working have an extensive knowledge of the Company and its operations, which should enable them to quickly develop an actionable proposal. Although the Company has not yet received this proposal, it is optimistic that the Noteholders (or, potentially, other interested investors) will tender a going concern offer for the Company's business. In addition to these ongoing discussions, several other parties have expressed interest in potentially participating in or leading a transaction involving the acquisition of the Company pursuant to an auction under Bankruptcy Code section 363. All of these discussions remain ongoing. To help facilitate these potential transactions, Lincoln has solicited financing proposal from new lenders and existing creditors and has received several financing proposals from third parties.

     24.     While the Company is hopeful that a going concern offer will be finalized and presented, in order to ensure that Debtors' proposed auction process is robust, in early January, Lincoln was directed to and began solicitation of back-up liquidation "equity" bids for the 185 stores not identified for closure as part of the Store Closing Analysis (the "**Remaining Stores**"). Lincoln solicited bids from national liquidation firms with the financial resources to complete such a transaction and received four (4) proposals. After analyzing the proposals and competitively negotiating the terms thereof with each of the firms that submitted proposals, the Company has accepted a back-up bid from Great American through an equity agency agreement

(the "**Back-up Bid**") to monetize the inventory of the Remaining Stores, inventory in the Company's distribution center and store fixtures. The Back-up Bid will set a floor for the Debtors' postpetition marketing and auction process in the event that a going concern bid has not been fully developed in accordance with the proposed Sale Timeline set forth above.

25.     The Back-up Bid includes a guaranteed amount equal to 108% of the cost value of inventory (the "**Guaranteed Amount**") regardless of the ultimate success of the GOB sales. 85% of the Guaranteed Amount will be paid to the Company by the Back-up Bidder upon the commencement of the proposed GOB sales, with the remainder of the Guaranteed Amount paid at the completion of the sales. Additional proceeds will be realized through the sale of furniture, fixtures and equipment (the "**FF&E**"), which the Back-up Bidder may undertake in exchange for a fee payable to the Company. The Guaranteed Amount is subject to certain downward adjustments that may negatively impact the proceeds actually received by the Company. These adjustments include the difference between the cost and retail price of the Company's inventory and the overall level of inventory at the time the GOB sales are commenced.

26.     Further, after payment to the Company of the Guaranteed Amount and after payment to the Back-up Bidder of all sale expenses and a fee equal to 10% of the cost value of the inventory, the Company will participate equally with the Back-up Bidder in any further sale proceeds. The Back-up Bid is described in more detail in the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 for (I) Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Related Notices and Relief, and (II) Order Approving (A) Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Assumption,*

*Assignment, and Sale of Executory Contracts and Unexpired Leases Under Bankruptcy Code Section 363 and 365, and (C) Related Relief.*

27.    In addition to the economic terms described above, the Back-up Bidder has agreed to accept a significantly lower break-up fee in the event the Company is able to designate a going concern bidder as the **"Initial Highest Bidder"** for the sale of Company's assets on a going concern basis prior to the Auction, allowing the company to complete the going concern transaction without incurring excessive additional cost. The Back-up Bid also assures the senior secured creditors that sale process will maximize the value of their collateral while limiting potential risks.

## C.    The Company's Financial Status and Operations

28.    For the 2014 fiscal year (ending January 31, 2015), Hancock posted a loss of revenues of approximately $3.2 million and earnings before taxes, depreciation and amortization ("**EBITDA**") of approximately $6.8 million. For fiscal year 2015 (ending January 30, 2016), the Company expects to have revenues of approximately $269 million and a loss of approximately $3 million on an EBITDA basis, based upon the actual results through January 2, 2016. The results for fiscal year 2016 were impacted by a very challenging retail environment as well as significantly increasing costs related to the Company's pension obligations for its retirees. The Company is working diligently to reduce its costs and realize the benefit from capital expenditures made over the last year on new stores and other investments.

## D.    The Company's Prepetition Indebtedness.

### 1.    Prepetition Senior Obligations

29.    As of the Petition Date, the Company had outstanding secured debt to various lenders pursuant to that certain Credit Agreement dated as of April 22, 2015 (as amended, modified and supplemented from time to time, the "**Prepetition Senior Credit**

**Agreement**" and together with all related documents, guaranties and agreements, the "**Prepetition Senior Credit Documents**"), by and among (a) Hancock Fabrics, Inc. (the "**Lead Borrower**"), (b) the other Borrowers party thereto from time to time, (c) the guarantors party thereto from time to time, (d) Wells Fargo Bank, as administrative agent and collateral agent (in such capacities, the "**Prepetition Senior Agent**") for its own benefit and the benefit of the other "Credit Parties" (as defined therein), (e) GACP, as term agent (in such capacity, the "**Prepetition Term Agent**"), and (f) the lenders from time to time party thereto (the "**Prepetition Senior Lenders**" and each a "**Prepetition Senior Lender**"; the Prepetition Senior Agent, the Prepetition Term Agent, the Prepetition Senior Lenders and the other "Credit Parties" under the Prepetition Senior Credit Documents are collectively referred to herein as the "**Prepetition Senior Creditors**").

 30. As of the Petition Date, the aggregate outstanding amount owed by the Debtors under the Prepetition Senior Credit Documents was not less than $79.9 million, consisting of revolving credit loans in the outstanding principal amount of $55.5 million (the "**Prepetition Revolving Credit Loans**"), issued and outstanding letters of credit in the amount of $6.7 million, and a term loan in the outstanding principal amount of $17.5 million (the "**Prepetition Term Loan**") (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Credit Documents, and further including all "Obligations" as described in the Prepetition Senior Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Senior Obligations**").  As more fully set forth in the Prepetition Senior Credit Documents, prior to the Petition Date, the Debtors granted first priority

security interests in and liens on substantially all their personal and real property including, without limitation, owned real estate, accounts, inventory, equipment and general intangibles (collectively, the "**Prepetition Collateral**"), to the Prepetition Senior Agent (collectively, the "**Prepetition Senior Liens**") to secure repayment of the Prepetition Senior Obligations.

31.    The availability under the Prepetition Revolving Credit Loans was based on a borrowing base formula and included certain reserves.  Substantially all of the Company's cash from retail operations is swept into a concentration account and applied to the loans outstanding.  In order to re-borrow, the Company was required to satisfy a borrowing base formula tied to its inventory, certain accounts receivable and other assets pledged to the Prepetition Senior Creditors, and to maintain certain reserves.    As described below, the Prepetition Senior Creditors have agreed to consent to the use of cash collateral and provide debtor in possession financing.

### 2.    Prepetition Subordinated Indenture

32.    As of the Petition Date, the Company had outstanding secured debt to the Noteholders pursuant to that certain Indenture dated as of November 20, 2012 (as amended, modified and supplemented from time to time, including pursuant to that certain Supplemental Indenture dated as of April 22, 2015, the "**Prepetition Subordinated Indenture**" and together with all related documents, guaranties and agreements, the "**Prepetition Subordinated Indenture Documents**"), by and between (a) Hancock, as the issuer, and (b) Deutsche Bank National Trust Company, as indenture trustee (in such capacity, the "**Prepetition Indenture Trustee**"; the Prepetition Indenture Trustee and the Prepetition Subordinated Noteholders are collectively referred to herein as the "**Prepetition Subordinated Creditors**").  The Prepetition Senior Creditors and the Prepetition Subordinated Creditors are collectively referred to herein as

the "**Prepetition Secured Creditors**" and the Prepetition Senior Credit Documents and the Prepetition Subordinated Indenture Documents are collectively referred to herein as the "**Prepetition Credit Documents.**"

33.    As of the Petition Date, the outstanding principal amount owed by the Debtors under the Prepetition Subordinated Indenture Documents was not less than $8,204,000 (together with any amounts paid, incurred or accrued, including but not limited to interest, fees and expenses, prior to the Petition Date in accordance with the Prepetition Subordinated Indenture Documents, the "**Prepetition Subordinated Obligations**"; the Prepetition Senior Obligations and the Prepetition Subordinated Obligations are collectively referred to herein as the "**Prepetition Secured Obligations**"). As more fully set forth in the Prepetition Subordinated Indenture Documents, prior to the Petition Date, the Debtors granted second-priority security interests in and liens on the Prepetition Collateral to the Prepetition Indenture Trustee (the "**Prepetition Subordinated Liens**") to secure repayment of the Prepetition Subordinated Obligations.    The Prepetition Subordinated Liens and the Prepetition Senior Liens are collectively referred to herein as the "**Prepetition Liens.**"

34.    Pursuant to the terms of the Prepetition Subordinated Indenture, including, without limitation, Article XI of the Prepetition Subordinated Indenture, (a) the Prepetition Subordinated Obligations are subordinated in all respects to the prior payment in full of the Prepetition Senior Obligations and (b) the Prepetition Subordinated Liens are subordinate and junior in all respects to the Prepetition Senior Liens (collectively, such terms are referred to herein as the "**Indenture Subordination Provisions**").    I am informed and believe that the Indenture Subordination Provisions are a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code.    The DIP Agent has advised the Company that its

16

willingness to provide the DIP Loan Facility is conditioned on, among other things, the DIP Agent (in addition to the Prepetition Senior Agent) having all of the rights of the Prepetition Senior Agent under the subordination provisions set forth in the Prepetition Subordinated Indenture.

35.    The Company is conducting a review of all secured claims and reserves the right to challenge the validity and perfection of any such liens.

**12.    Unsecured Claims**

36.    The Company owes its trade vendors approximately $21.2 million as of January 31, 2016. These claims are for the delivery of goods and services to the Company. The Company is working with its vendors to assure that it continues to receive merchandise on a timely basis.

37.    Hancock maintained a noncontributory qualified defined benefit retirement plan and an unfunded nonqualified Supplemental Retirement Benefit Plan ("**SERP**"), which afforded certain benefits that could not be provided by the qualified plan, through December 31, 2008, at which time both plans were frozen such that participants no longer accrue additional benefits for service. Together, these plans provided eligible full-time employees with pension and disability benefits based primarily on years of service and employee compensation. The accumulated benefit obligation as of January 31, 2015 was $105.9 million for the retirement plan and $1.0 million for the SERP.

38.    Additionally, the Company maintained an unfunded postretirement medical/dental/life insurance plan for all full-time employees and retirees hired before January 1, 2003. Eligibility for the plan was limited to employees completing fifteen (15) years of credited service while being eligible for the Company's employee medical benefit program. Effective

December 31, 2008, Hancock revised its policy respecting postretirement benefits. Retirees who are Medicare-eligible no longer receive medical benefits, and all eligible present or future retirees must pay the estimated cost of medical/dental/life insurance coverage provided by the Company.

39.    The Company currently contributes to the plan as medical and dental benefits are paid for all eligible present or future retirees electing to pay the estimated cost of medical/dental/life insurance coverage provided by the Company. Claims vary greatly by fiscal year and have ranged from $37,000 to $377,000 (net of employee contributions) during the last three (3) fiscal years. These claims include, in the case of postretirement life benefits, net premiums paid to a life insurance company and, in the case of medical and dental benefits, actual claims paid by the Company on a self-insured basis.

**E.    Debtor In Possession Financing and Use of Cash Collateral**

40.    Wells Fargo, as administrative agent and collateral agent, GACP, as term agent, and the "Lenders" from time to time party to the DIP Loan Facility have agreed to provide postpetition financing to the Company and consented to the use of cash collateral. The proposed DIP Loan Facility will provide the Company with cash advances and other extensions of credit in an aggregate principal amount not to exceed $100 million.

## II.    FIRST-DAY MOTIONS

41.    The Company has requested various types of relief in "first-day" motions (collectively, the **"First Day Motions"**) in order to minimize the adverse effects of the commencement of the Company's chapter 11 cases on the Company's business. I believe that a critical and necessary element in successfully reorganizing the Company is the approval of the First Day Motions. The factual background of and support for each First Day Motion is set forth below and in the general discussion above.

**A.     Debtor's Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Debtor to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) To Utilize Cash Collateral; (II) Granting Liens and Providing Super Priority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying Automatic Stay; and (V) Scheduling Interim and Final Hearings**

42.     The Company is seeking an  order through the above-referenced motion (the "**DIP Motion**") authorizing the (a) incurrence of post-petition indebtedness, (b) granting of security interests and superpriority administrative expenses and (c) consensual use of cash collateral.  Attached to the DIP Motion as **Exhibit A** is a budget related to the DIP Financing (the "**Budget**").  The Budget runs through the week commencing March 5, 2016.  I participated in the preparation of the Budget in conjunction with other Company employees and personnel from CTG.  This Budget sets forth the Company's critical expenditures that it must make in order to continue to operate as a viable going concern.

43.     The Company has obtained the express consent of Prepetition Senior Creditors to use cash collateral on and subject to the terms summarized above and as more particularly set forth in the order submitted in connection with the DIP motion.  The Company has also secured a commitment for debtor in possession financing on the terms pursuant to that certain *Debtor-In-Possession Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among (a) Hancock, as the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the guarantors party thereto from time to time, (d) Wells Fargo Bank, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**") for its own benefit and the benefit of the other Credit Parties, (e) GACP, as term agent (in such capacity, the "**DIP Term Agent**"), and (f) the Lenders from time to time party thereto (the "**DIP Lenders**"; the DIP Agent, the DIP Term Agent, the DIP Lenders and the other Credit Parties under the DIP Loan Documents (as

defined below) are collectively referred to herein as the "**DIP Credit Parties**") and those "**DIP Loan Documents**" (as defined in the DIP Credit Agreement).

44. All of the Company's cash from its prepetition ordinary course operations and sale of inventory was subject to a prepetition cash sweep under the Prepetition Senior Credit Documents. While the Company has previously sold (and may hereafter sell) assets outside of the ordinary course of business, it does not believe that such sales (or use of cash collateral alone) would be a superior alternative. To the extent of any shortfall in such receipts postpetition, the Company would be unable to operate its business or execute on its sale effort. Moreover, the Company's forecasts suggest that it would not be able to replenish the collateral it would use to generate cash for operations during the post-petition period if it attempted to simply live off of post-petition inventory sales. If sales fell or other expected receipts were not as forecast, the Company's restructuring efforts might be imperiled.

45. The DIP Loan Facility gives the Company appropriate flexibility. The Company needs this cash and working capital financing, and its estate and creditors will greatly benefit from approval of the DIP Credit Agreement. In conjunction with CTG, the Company considered whether it could operate using only the cash generated from its postpetition operations. It determined that it could do so only for a limited period of time and then only if the Company refrained from making the purchases and payments that I believe are critical to the success of these chapter 11 cases. These chapter 11 cases are commencing at the slowest annual period for retail sales, but the Company's expenditures during this period (such as payroll and other essential payments) cannot be reduced to account for the lower sales volume.

46. Moreover, the availability of postpetition financing will provide more than just the necessary cash for the Company to operate its business. Any buyer seeking to acquire

the Company as a going concern will want to ensure that the Company's operations remain stable and contain fresh inventory. An additional important consideration is the sense of confidence that the financing will instill in the Company's suppliers, customers and employees. The failure of the Company's suppliers and employees to provide goods and services to the Company at this time, and the corresponding loss of customer patronage, could have a deeply negative effect on the Company's ability to seek bids for the business as a going concern.

47.     If cash is not available to maintain operations during the post-filing period, the Company faces a substantial and devastating loss of revenue and other irreparable harm from the loss of employees, degraded employee morale and deteriorating relationships with suppliers – all of which will adversely affect the value of the Company's business. The Company's ability to remain a viable operating entity depends on obtaining the interim and final relief requested in the DIP Motion.

48.     The Prepetition Senior Creditors and the DIP Credit Parties have indicated that the DIP Loan Facility sets forth the only terms under which they would consent to use of cash collateral. Of course, an effort to use the Prepetition Senior Creditors' cash collateral without its consent might be unsuccessful. For the reasons discussed above, the Company does not believe that such a path is prudent.

49.     Before agreeing to enter into the DIP Loan Facility, the Company, with its advisors Lincoln and CTG, made extensive inquiries regarding potential alternatives for DIP financing and solicited proposals for debtor in possession financing from other financial institutions. These included members of the existing syndicate of banks, other financial institutions that historically provide debtor in possession financing, and the Company's prepetition investors. The Company contacted 22 potential lenders, including its prepetition

21

lenders. No lender other than the Prepetition Senior Creditors was willing to provide the necessary financing without the type of protections afforded under the DIP Loan Documents. None offered superior terms and substantially all declined to provide financing on any terms. Additionally, the Prepetition Senior Creditors are familiar with the Company, providing the ability to act more quickly. This is a crucial factor in light of the Company's present need for liquidity.

50.    As negotiated, the DIP Loan Facility will enable the Company to pay operating expenses, compensate its employees and purchase inventory and otherwise maximize the value of its business. As noted above, the Company is considering all possible options for maximizing stakeholder value, including the sale of certain portions or all of its business as part of these chapter 11 cases as well as other third party investments. The DIP Loan Facility includes milestones (set forth above and included in the DIP Motion) to which the Company has agreed regarding this prospective sale.

51.    The Company negotiated the terms of the DIP Loan Facility with the Prepetition Senior Creditors at arms' length and in good faith, with all parties represented by counsel. I believe that the negotiated terms are the best available under the circumstances. Indeed, the terms and conditions of the financing to be provided by the DIP Credit Parties are at least as favorable, if not more favorable, to the Company (on the basis of price and other factors) than those available from other lenders.

**B.    Debtors' Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing the Debtors (A) to Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs and (B) to Honor Certain Other Prepetition Obligations Necessary to Maintain the Existence of Customer Programs**

52.    The Company seeks authority to (a) perform and honor its prepetition obligations related to its return, gift card, customer rewards and other similar programs, practices

and commitments directed at customers (collectively, the "**Customer Programs**") in the ordinary course of business, and (b) continue, modify, replace and/or terminate any existing Customer Programs and/or implement such new Customer Programs as the Company deems appropriate, in each case in the reasonable exercise of the Company's business judgment and without further application to the Court.

53.     Based on my review of the Company's books and records, I believe that approximately $2.4 million in gift cards and merchandise-only cards have been issued but have not yet been redeemed. "Merchandise-only" cards represent store credits issued to customers in exchange for returned merchandise.   The typical monthly redemption of gift cards and merchandise-only cards is approximately $152,000, with higher redemption rates during the holiday season and lower redemption rates during the non-holiday season.  Because gift cards and merchandise-only cards are paid for by customers in advance of redemption, these programs involve little or no actual cost to the Company.  This, plus the substantial benefit conferred on the Company by such programs, justifies granting the relief that the Company is requesting.

54.     The Company has a number of Customer Programs that generally cost little, if anything, to the Company out-of-pocket, but generate significant benefits by rewarding customer loyalty and otherwise promoting sales.   The Company's approximate annualized monthly cost of these programs is $1.8 million and generates approximately $11 million per month in sales. The Customer Programs include:

(a)     Return Policy. This program provides that customers who return unopened new merchandise with a valid register receipt within 60 days from the date of purchase may obtain other equivalent value merchandise, full value store credit, or a full refund in the same form as their original payment (or, in the case of cash or debit card purchases of $100 or greater, refund by mailed check). Customers may return or exchange opened, cut, used, washed, soiled or damaged merchandise only if the merchandise is defective. Special orders must be paid in full at the time the order is placed and may be returned only if the merchandise is defective.

Customers without a valid register receipt or who seek to return merchandise more than 60 days from the date of purchase may return new, unopened merchandise for a store credit, in the form of a merchandise card, at the lowest sale price for such merchandise within the immediately preceding 30 days prior to the return. Merchandise cards are valid for one year from the date of activation and are not replaceable if lost or damaged. Purchases from the Company's on-line stores, hancockfabrics.com, must be returned to the on-line store.

(b)    <u>Gift Cards</u>. The Company sells and redeems plastic gift cards, in denominations of $5 to $500, providing store "credit" towards future purchases. Gift cards are sold at the Company's retail stores and online at the Company's website, hancockfabrics.com, and are redeemable in stores only (not online). Gift cards are for product only (and not cash) and are not replaceable if lost or damaged. It is the Company's policy to provide customers with cash if and to the extent that applicable law in the jurisdiction in which a gift card is being tendered so requires. After an extended period of inactivity, a $2 service fee is assessed each month against the remaining card balance.

(c)    <u>Preferred Customer Card Program</u>. The Company offers periodic discount mailers to customers who enroll in the Preferred Customer program. These discount coupons are for one-time use and may not be combined with any other discounts. The Company estimates that the Preferred Customer program costs approximately $20.6 million per year in discounts and generates approximately $124 million per year in sales associated with such discounts.

(d)    <u>Mobile Club</u>. The Company also offers periodic electronic discount "coupons" through text messaging to customers who enroll in the Mobile Club program. These discount coupons are for one-time use and may not be combined with any other discounts. The Company estimates that the Mobile Club program costs approximately $1.1 million per year in discounts and generates approximately $5.2 million per year in sales associated with such discounts.

(e)    <u>Designer Deals</u>. The Company offers, pursuant to a contract with Trilegiant Corporation ("**Trilegiant**"), a membership program in which customers 18 years and older may enroll and pay a monthly fee of $9.99. Customers receive a 10% discount on their first purchase made as a Designer Deals member and receive rebates of up to $250 per year for Hancock Fabrics purchases. (Customers pay cancel their membership at any time and the Designer Deals program is not offered in Iowa.) Rebates are issued in the form of Hancock Fabrics gift cards. Trilegiant pays the Company a commission of 37% of the net membership revenue (approximately $1.2 million per year) and fully reimburses the Company for all related discounts.

(f)    <u>On-Line Wholesale Volume Program</u>. The Company offers volume discount pricing for customers who (i) are business owners

with a valid tax identification number, (ii) purchase in minimum increments of $500, (iii) commit to purchasing a monthly average of $1,000 in merchandise, excluding seasonal and licensed items and (iv) complete certain customer profile forms.

(g)   Affiliate Program. Fabric and crafting affiliates, upon application to and acceptance by the Company, join the Company's affiliate referral program, which pays a percentage of online sales generated by customers "clicking through" the affiliate entity's website to the Company's website. The Company estimates that the affiliate program costs approximately $78,000 per year in commissions and generates approximately $1.2 million per year in sales associated with such commissions.

55.    The Company desires to continue during the postpetition period those Customer Programs that were beneficial to its business and cost-effective during the prepetition period. I believe that such relief is necessary during the postpetition period to preserve the Company's critical business relationships and goodwill for the benefit of the Company's estates

56.    The success of the Company's business operations and relationship with their customers is directly tied to building and maintaining customer loyalty. Continuing to offer the Customer Programs is an important and cost-effective goodwill measure that is essential to the Company's ability to maintain its customer base in a competitive marketplace, as well as to attract new customers. The Customer Programs, therefore, are integral to the Company's present restructuring.

57.    In the ordinary course of its business, the Company engages in certain practices designed to develop and sustain a positive reputation in the marketplace for its goods and services. A cadre of loyal customers looks to the Company to provide quality products with the promotions and loyalty programs that have long been the hallmark of the Company's operations, and the Customer Programs encourage and incentivize new customers to continue their relationship with the Company. The filing of the instant cases has the potential to adversely

affect customer perceptions, and it is important to the Company's ongoing business relationships that it be able to continue, as it deems appropriate, the Customer Programs.

58.     Moreover, maintaining and honoring the Customer Programs postpetition will have no detrimental impact on the Company's business.  The Customer Programs provide incentives to customers to purchase the Company's merchandise and to build and reward shoppers' loyalty.  In a competitive marketplace, these programs are essential.  Additionally, I am informed and believe that certain state statutes may require gift cards to be honored regardless of whether the issuer is a debtor in possession.  I believe that the entry of an order granting the relief requested herein is appropriate and, indeed, essential to the Company's business relationship with its customers.

**C.     Debtors' Motion for an Order Authorizing the Debtors to Satisfy Prepetition Claims of Certain Common Carriers and Sales and Shipping Processors Pursuant to Section 105(a) of the Bankruptcy Code**

59.     The Company seeks authority to pay in its sole discretion the valid prepetition claims or any portion thereof of (i) certain reputable domestic and international common carriers, shippers, freight forwarders and trucks (collectively, the "**Common Carriers**") that the Company uses in the ordinary course of business for shipment, transport and delivery of goods and (ii) certain sales and shipping processors (the "**Sales and Shipping Processors**") that the Company uses in the ordinary course of business that are critical to the sale of merchandise and the timely shipping and delivery of goods used and sold in the ordinary course of the Company's business.

60.     The Company receives goods through various forms of shipment, and much of the Company's pricing policies, marketing strategies and fundamental business operations rely on its ability to obtain and sell goods at competitive prices.  The sale of fabric,

home decorating textiles, crafts, sewing accessories and needlecraft supplies (the "**Retail Merchandise**") is the essence of the Company's business.

61.    The Company's ability to timely receive, distribute and fulfill sales depends on the maintenance of a successful and efficient system of transportation, and any disruption of the delivery or return of Retail Merchandise would have an immediate and devastating impact on the Company's operations.  Likewise, any disruption in the Company's ability to sell Retail Merchandise would have an equally immediate and devastating impact on the Company's operations.  Thus, the Company's business operations and the success of its reorganization depend on the maintenance of reliable and efficient transportation and sale processing systems for Retail Merchandise, and these two related and important systems involve the use of the Common Carriers and Sales and Shipping Processors.  Obviously, the Company needs immediate access to its cash receipts.

62.    The Company must ensure that these chapter 11 cases do not present a reason for third parties such as the Common Carriers and Sales and Shipping Processors to cease performing timely services, because the Company is in many cases dependent on the services of such third parties.  If the Company is unable to ship, receive and sell deliveries of Retail Merchandise on a timely and uninterrupted basis (and use cash receipts), its operations will be immediately and substantially impeded and its business will suffer irreparable damage.

63.    Prior to the Petition Date, the Company performed an analysis of (i) the identities of the core and indispensable Common Carriers and Sales and Shipping Processors, (ii) the Retail Merchandise that was in transit or needed to be shipped by the Common Carriers, (iii) the anticipated amount of payments that would be necessary for the Company to receive the Retail Merchandise in transit and (iv) the anticipated amount of payments that would be

necessary for the Company to continue receiving the services provided by the Common Carriers and Sales and Shipping Processors. The Company has identified a core group of Common Carriers, attached to the common carrier motion as Exhibit B, that it has determined is absolutely necessary to the continued shipping, delivery and return of goods used or sold in the ordinary course of the Company's business.

64.     Retail Merchandise is currently being shipped for order fulfillment and returns processing at, to or from the Company's approximately 260 retail stores and its distribution center. The total estimated amount owed to all Common Carriers and the maximum amount required to obtain or deliver the Retail Merchandise is approximately $1.2 million. Further, the Company intends to negotiate with the Common Carriers and Sales and Shipping Processors to obtain continued services with less than full payment to such Common Carriers and Sales and Shipping Processors, although the Company seeks Court approval for payments of all amounts related to the services provided by Common Carriers and Sales and Shipping Processors.

**D.     Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Prepetition Consulting Agreement, (II) Authorizing Store Closing Sales Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief**

65.     The Company is requesting (i) authority to commence and continue store closing or similar themed sales in accordance with that certain *Consulting Agreement* dated as of January 23, 2016 (the "**Consulting Agreement**"), by and between Great American, as consultant, and Hancock, as merchant, a copy of which is attached as Exhibit 1 to the Company's related proposed order, (ii) authority to conduct store closing or similar themed sales in accordance with the Consulting Agreement, with such sales to be free and clear of all liens, claims, encumbrances, and other interests, (iii) approval of the store closing sale guidelines (the

"**Sale Guidelines**") attached as Exhibit 2 to the Company's related proposed order, which guidelines will apply to all store closing or similar themed sales conducted during the course of these chapter 11 cases, (iv) granting certain related relief on an interim basis (collectively, the "**Store Closing Relief**"), and (v) following service of the applicable motion and after an opportunity to be heard at a final hearing, granting the Store Closing Relief on a final basis and authorizing the assumption of the Consulting Agreement.

66.    After completion of the Store Closing Analysis, the Company's management identified seventy (70) stores (the Closing Stores) as underperforming stores that should be closed at the outset of the chapter 11 cases, in connection with the Company's overall sale strategy and to ease certain of the liquidity restraints that the Company currently faces, by means of a store closing or similar themed sales (the "**Store Closing Sales**"). A list of the Closing Stores is attached as Schedule A to the Consulting Agreement. The terms and conditions of the Consulting Agreement were negotiated at arms' length and in good faith.

67.    In order to maximize the value of the inventory to be included in the Store Closing Sales at the Closing Stores (the "**Merchandise**") and the owned furniture, fixtures, and equipment in the Closing Stores (the "**Owned FF&E**," and together with the Merchandise, the "**Liquidation Assets**"), the Company seeks to retain Great American, a national liquidation firm that specializes in, among other things, the large scale liquidation of merchandise and FF&E of this type and scale. Through the retention of the Consultant, the Company will ensure the most feasible, economical, and efficient means of achieving the disposition of the Liquidation Assets. In light of the Company's financial circumstances, the Company intends to commence and continue the Store Closing Sales by February 8, 2016.

68.     The Company seeks to assume the Consulting Agreement so that it may leverage Great American's experience and resources of Great American in performing large-scale liquidations while retaining control over the sale process.  I believe that this will provide the maximum benefit to the bankruptcy estates.

69.     Closing the Closing Stores and the sale of the Liquidation Assets through Closing Store Sales are key components of the Company's continuing efforts to preserve and maximize estate value, to reduce administrative expenses, to rationalize its cost structure moving forward, and to successfully emerge from these chapter 11 proceedings.  Furthermore, after engaging in extensive, arms'-length negotiations with certain nationally-recognized liquidators regarding the Store Closing Sales and conducting reasonable diligence, the Company determined and I believe that entering into the Consulting Agreement would provide the greatest return to the Company's estates for the Merchandise and Owned FF&E.  Additionally, I believe that the terms set forth in the Consulting Agreement are fair and equitable and present the best path forward with respect to the Closing Stores

70.     If the Store Closing Sales are not permitted to go forward on an interim basis and the Consulting Agreement is not ultimately assumed, the Company would lose the benefit of the efforts that it and Great American have already been expended toward commencing and continuing these sales. I believe that any delay in conducting the Store Closing Sales would result in a loss of value achieved and increase the Company's administrative expenses.

71.     Most importantly, timely commencement of the Store Closing Sales is a critical element of the Debtors' cash flow and Budget.  Without these proceeds, the Debtors will

be at serious risk of having insufficient cash flow to continue their operations. These proceeds account for fully $30 million of the total proceeds during the thirteen week cash flow.

**E.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain, Continue and Renew Their Prepetition Insurance Policies and Pay All Obligations in Respect Thereof and (II) Granting Related Relief**

72.     The Company is requesting authority to maintain, supplement, amend, extend, renew, or replace its Insurance Policies (as defined below) on an uninterrupted basis, and to pay, in its discretion, any obligations, whether arising before or after the Petition Date, under the Insurance Policies, including without limitation premiums, deductibles, self-insured retention amounts, broker fees, and administrative fees (collectively, the "**Insurance Obligations**").

73.     Further, the Company is requesting authority for all applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts prior to the Petition Date for Insurance Obligations (or to re-issue such checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts, as may be necessary), and authorization for banks and financial institutions to rely on the Company's representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts are subject to the insurance motion, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

74.     In connection with the operation of its businesses and the management of its properties, the Company maintains approximately nineteen (19) insurance policies (each an "**Insurance Policy**" and collectively, the "**Insurance Policies**") through a variety of insurance carriers. The Company obtains certain of its Insurance Policies through Marsh Insurance

Services ("**Marsh**").[4] The Insurance Policies currently in effect and the associated premiums, carriers, and policy terms are listed on Exhibit C to the insurance motion.

75. The Company also maintains multiple general liability policies, which insure the Company against, among other things, automobile liability, general commercial liability, commercial umbrella liability, cargo liability and commercial crime liability. In addition, the Company maintains policies protecting against directors and officers liability and cyber-crimes and network liability. The Insurance Policies are essential to the preservation of the Company's business, properties and assets. Moreover, in many cases, such insurance coverage is required by various regulations, laws and contracts that govern the Company's business conduct.

76. It is essential that the Company maintain its Insurance Policies throughout these cases because any lapse in coverage would leave the Company exposed to significant— potentially crippling—liability. To preserve and maximize the value of the Company, it is therefore critical that the Court authorize the Company to continue, maintain, supplement, amend, extend, renew, or replace its Insurance Policies during these chapter 11 cases and to pay all obligations thereunder in the ordinary course of business.

77. The Insurance Obligations that the Company requests authority to pay fall into two general categories. First, the Company seeks authority to pay all premiums for the Insurance Policies in the ordinary course. Second, the Company seeks authority to pay deductibles and self-insured retention amounts required to maintain coverage under certain Insurance Policies.

### 1. Premium Obligations

---

[4] While Marsh sells and collects the premium payments on the Insurance Policies, actual underwriting is performed by other insurance carriers. Because these policies are provided by other carriers, the Company has not listed Marsh

78.    The Company estimates that the aggregate yearly premiums for all of its insurance policies is approximately $1.2 million.   The Company is current on all premium obligations for the Insurance Policies as of the Petition Date and seeks only to continue paying premiums in the ordinary course.

### 2.    Other Insurance Policy Obligations

79.    Certain Insurance Policies require the Company to pay deductibles or self-insured retention amounts.   Under the laws of the various states in which the Company operates, the Company is required to maintain workers' compensation liability policies and to provide employees with workers' compensation coverage for claims arising from or related to employment with the Company.   The Company's workers' compensation policies are among those listed on Exhibit C to the Company's insurance motion.   In addition to the annual premium shown on Exhibit C, the Company is liable for a self-insured deductible portion of the claims made against the workers' compensation policies.   While the Company is current in its payments of insurance premiums as of the Petition Date, it is likely that it will be required to reimburse the insurers on a monthly basis for deductible payments made under the workers' compensation policies.   These deductibles may relate to the period prior to the Petition Date.   The Company anticipates that the next such payment will be due on or about February 29, 2016 and such payments typically average between $60,000 and $150,000 per month.

80.    The Company also maintains commercial general liability and automobile policies, which are among those listed on Exhibit C to the Company's insurance motion.   The Company pays a fixed annual premium regardless of the number or amount of claims made under the policies.   However, the Company is liable for a self-insured deductible portion of the

---

on Exhibit C of the insurance motion.

claims made against these policies. While the Company is current in its payments of insurance premiums as of the Petition Date, it is likely that it will be required to reimburse the insurers on a monthly basis for deductible payments made under these policies. These deductibles may relate to the period prior to the Petition Date. The Company anticipates that the next such payment will be due on or about February 2, 2016 and such payments typically average between $10,000 and $30,000 per month.

81.    Additionally, the Company currently maintains two (2) stand-by letters of credit for insurance policy-related purposes:  (i) one in the amount of $180,531 for which ACE Insurance (which insures the Company's cargo and cyber-crimes liability) is the beneficiary and (ii) one in the amount of $826,419 for which National Union (which insures the Company's workers' compensation liability) is the beneficiary. The Company presently does not anticipate draws against these letters of credit.

### 3.    Obligations Due During the First 21 Days of These Cases

82.    The Company anticipates that approximately $150,000 in Insurance Obligations, consisting of claims and payments as described above, will be due during the first 21 days of these cases. Accordingly, by the insurance motion, the Company requests authority to pay the Insurance Obligations in an amount not to exceed $150,000 on or before entry of a final order approving the Company's insurance motion.

**F.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Transfers**

83.    The Company seeks authority, in the exercise of its business judgment, as deemed necessary to continue to operate and preserve value, to (a) pay all prepetition wages, salaries, commissions, other compensation, and related administration and other incidental costs

(all as described below and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits (all as described below and collectively, the "**Employee Benefit Obligations**"), (b) withhold all federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations as required by applicable law, (c) pay all employment, unemployment, Social Security, and similar federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Company to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments, and voluntary deductions (all as described below and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**," and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"), and (d) honor and continue its prepetition programs, policies, and practices as described in the employee wages and benefits motion with respect to the Prepetition Employee Obligations in the ordinary course of business. The Company is also seeking authority for all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Company's accounts[5] in satisfaction of the Prepetition Employee Obligations.

84.     As of the Petition Date, the Company estimates that the Prepetition Employee Obligations total approximately $2.4 million, all of which will become due and owing during the 21 days following the Petition Date (the "**Interim Amount**"). To fulfill these commitments, the Company requests entry of an interim order, authorizing the Company to pay Prepetition Employee Obligations in an aggregate amount not to exceed the Interim Amount,

---

[5] The Company has concurrently herewith filed a motion for authority to continue using its cash management system.

followed by entry of a final order authorizing the Company to pay all other Prepetition Employee Obligations.

85.     Further, the Company requests that this Court authorize all applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts prior to the Petition Date for Prepetition Employee Obligations (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts, as may be necessary), and authorize the banks and financial institutions to rely on the Company's representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts are subject to the employee wages and benefits motion, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

### 1.     The Company's Employees

86.     As of the Petition Date, the Company employs approximately 4,522 employees throughout the country.  Of these employees, approximately 377 are salaried (the "**Salaried Employees**"), of whom 14 hold the position of vice president or above, and approximately 4,145 are paid on an hourly basis (the "**Hourly Employees**," together with the Salaried Employees the "**Employees**").

### 2.     Wage and Salary Obligations

87.     Before the Petition Date and in the ordinary course of its business, the Company typically paid Employee Compensation Obligations to its Hourly Employees weekly and to its Salaried Employees bi-weekly.  The Company estimates that its accrued but unpaid weekly gross payroll as of the Petition Date is approximately $800,000 and its bi-weekly gross

payroll is approximately $790,000, for a total of accrued but unpaid gross wages of approximately $1,590,000.

### 3.   Payroll Taxes

88.   The Company withholds funds from Employees' wages and salaries and also make certain Payroll Tax payments from its own funds.   As of the Petition Date, the Company estimates that it has approximately $250,000 in accrued Payroll Taxes for salaried Employees and $140,000 in accrued Payroll Taxes for hourly Employees, including amounts outstanding and amounts withheld from the Employees and not yet remitted, all of which will become due and owing during the 21 days following the Petition Date.

### 4.   Garnishments

89.   In the ordinary course of processing payroll checks for its Employees, the Company may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered obligations (collectively, the "**Garnishments**").   When required, the Company withholds Garnishments from certain Employees' paychecks, and remits the same to the appropriate governmental authorities on a weekly basis with respect to hourly employees and on a bi-weekly basis with respect to salaried employees.   As of the Petition Date, the Company estimates that approximately $6,000 in Garnishments will have been withheld from the Employees and not yet remitted to the appropriate governmental authorities.

### 5.   Leave Policies

90.   The Company offers certain eligible Employees other forms of compensation, including vacation days, holidays, civic duty leave and bereavement days.   These forms of compensation are usual, customary, and necessary if the Company is to retain qualified

Employees to operate their businesses. Failure to provide these benefits could harm Employee morale and encourage the premature departure of essential Employees. The Company therefore requests authority to continue these programs in the ordinary course of business during these chapter 11 cases.

91.     All Full-Time Employees are entitled to vacation and sick leave as set forth in the applicable tables included in the employee wage and benefits motion, and part-time employees in California and Oregon are entitled to sick leave pursuant to applicable state law. Employees are paid for their accrued but unused vacation pay upon any termination of employment; accrued but unused sick leave is paid to Employees who retire or who are laid off from their employment.

92.     The Company offers certain holiday days to Employees. Employees at the Company's retail stores observe Christmas Day, and Employees at the Company's corporate headquarters and distribution center generally observe the holidays listed on the applicable chart included in the employee wage and benefits motion.

93.     Employees who are obligated to perform certain civic duties, including jury duty and witness duty, or who need time off to exercise their right to vote, are granted leave to fulfill these obligations.

94.     With some exceptions, each Employee is entitled to take up to three paid bereavement days per year in the event of an immediate family member's death.

**6.     Health and Welfare Benefits**

95.     The Company offers its eligible Employees various standard employee benefits, which include medical coverage, pharmaceutical benefits, dental insurance, vision coverage, COBRA coverage, workers' compensation coverage, and other benefit programs

provided to Employees in the ordinary course of business (collectively, the "**Health and Welfare Benefits**").

96.    The Company offers medical benefits to eligible Employees and eligible members of Employees' families (collectively, the "**Plan Participants**") through health care coverage administered by Anthem Blue Cross.  The cost of the Employees' medical insurance is borne primarily by the Company, but Employees also contribute to their insurance plans through payroll deductions that help fund claim payments.  Employees are offered high- and low-deductible preferred provider option (PPO) plans, as well as a high-deductible health reimbursement account plan, with the Company paying covered expenses after an out-of-pocket limit has been reached.  The Company also pays co-insurance at varying percentages depending on the deductible selected by the Employee and whether the covered patient obtains medical treatment in-network or out-of-network.  The Company estimates that approximately $175,000 in prepetition medical claims (including those related to the Pharmaceutical Plan, as defined below), plus related administrative fees, will come due during the first 21 days of the case.

97.    The Company offers eligible Employees prescription drug coverage (the "**Pharmaceutical Plan**") administered by Anthem Blue Cross.  The costs of the Pharmaceutical Plan is borne primarily by the Company, but Employees also contribute to the plans through payroll deductions that help fund claim payments.  The Company pays claims for current Employees on a monthly basis and retired Employees on a quarterly basis.  Because of the changing composition of the Company's workforce and the nature of the claim-based pharmaceutical plan, claim amounts can fluctuate significantly.  The prepetition medical claims amount shown above includes the Company's best estimate for prepetition accrued but unpaid claims on account of the Pharmaceutical Plan.

98.     The Company offers eligible Employees dental insurance (the "**Dental Plan**") administered by Delta Dental.   The cost of the Dental Plan is borne primarily by the Company, but Employees also contribute to the Dental Plan through payroll deductions that help fund claim payments.   Employees are offered high- and low-deductible preferred provider option (PPO) plans, with the Company paying covered expenses after an out-of-pocket limit has been reached.   The Company also pays co-insurance at varying percentages depending on the deductible selected by the Employee and whether the covered patient obtains dental treatment in-network or out-of-network.   The Company estimates that approximately $5,000 in prepetition claims on account of the Dental Plan, plus related administrative fees, will come due during the first 21 days of the case.

99.     The Company offers vision coverage to Employees through a fully insured vision care plan with Vision Service Plan, also known as "VSP" (the "**Vision Plan**").   As of the Petition Date, the Vision Plan has approximately 331 participants.   The average monthly cost of premiums for the Vision Plan is approximately $16,000, the entirety of which is paid by Employees.   The Company pays $4,000 per month in administrative fees for the Vision Plan.

100.     The Company also offers eligible Employees the option to retain COBRA medical, dental and vision coverage at such Employees' own expense, for to up to 18 months after termination of employment.

101.     The Company maintains workers' compensation insurance for Employees at the statutorily required level in all states in which the Company conducts business (the "**Workers' Compensation Program**").   All Employees who work in those states are entitled to participate in the Workers' Compensation Program.   The Workers' Compensation Program is fully insured, so the Company does not incur any additional costs on account of claims brought

40

under the Workers' Compensation Program. The Workers' Compensation Program is maintained through Liberty Mutual Insurance Company ("**Liberty Mutual**") and runs through May 4, 2016. The Company pays approximately $320,188 in annual premiums (including related fees and assessments) to Liberty Mutual for maintaining the Workers' Compensation Program. The Company presently does not owe any fees to Liberty Mutual on account of the Workers' Compensation Program.

102. The Company must continue the claim assessment, determination, adjudication, and payment process under the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Company complies with applicable workers' compensation laws and requirements. The Company accordingly seeks authority to continue to maintain the Workers' Compensation Program in the ordinary course of business.

### 7. Other Benefits Programs

103. The Company also offers other customary benefits to its Employees, including without limitation: basic Employee and dependent life and accidental insurance coverage, short-term and long-term disability insurance and pet insurance (which is a plan that provides discounted insurance premiums that are paid in full by the Employees selecting such coverage directly to the insurance provider with no contribution by the Company). The Company pays a monthly average of $40,000 on behalf of these benefit programs. The Company estimates that approximately $34,000 in prepetition claims on account of these customary benefit programs will come due during the first 21 days of the case.

104. The Company also provides limited awards to Employees based on years of service. Milestone anniversaries for long-term Employees are recognized with gift cards, for

which the Company pays an average of less than $2,000 per month. Eligible Employees are also provided merchandise discounts.

105.    The Company also offers the Employees Flexible Spending Accounts (the "FSA Plan") administered through United Healthcare ("**United Healthcare**"). The Company maintains Employees' FSA contributions in the Company's bank accounts, and participating Employees are issued prefunded debit cards for their FSA balances. Employees also have the option of submitting written claims for covered expenses, which are paid by the Company by check or direct deposit into the Employee's bank account.

106.    The Company does not believe that it holds any amounts that remain owing and unpaid to United Healthcare on account of services provided under the FSA Plan prior to the Petition Date. The Company also does not believe that it holds any amounts collected from participating Employees that remains unpaid under the FSA Plan prior to the Petition Date

107.    Certain senior Employees use company-owned vehicles and company credit cards to pay for gasoline and other business-related expenses. The Company seeks authority to continue permitting these Employees to continue this benefit as part of the ordinary course of the Company's business.

### 8.    401(k) Plan

108.    The Company sponsors a retirement investment plan and withholds from the wages of participating Employees contributions toward the Hancock Fabrics 401(k) Plan (the "**401(k) Plan**"). Eligible Employees may make pre-tax or post-tax contributions to the 401(k) Plan ranging from 0% to 100% of their annual compensation, up to the maximum amount allowed by the Internal Revenue Service. The Company does not offer any matching program

for Employees who participate in the 401(k) Plan.  As of the Petition Date, 568 Employees participate in the 401(k) Plan (the "**Participating Employees**").

109.   On average, the Company withholds approximately $48,000 per month from Participating Employees' paychecks for the 401(k) Plan and an additional $7,000 from certain of the Participating Employees' paychecks to repay loans those Employees drew against the 401(k) Plan, which is then forwarded to the 401(k) Plan administrator, Great-West Life and Annuity Insurance Company ("**Great-West**").  As of the Petition Date, the Company holds approximately $22,000 in contributions under the 401(k) Plan, which have been collected from the Employees and remain unpaid to Great-West.

110.   The Company pays certain custodial and other professional fees to Great-West for maintaining the 401(k) Plan.  The Company pays approximately $28,000 in annual fees to Great-West on account of the 401(k) Plan.  The Company estimates that approximately $2,300 in prepetition fees will come due during the first 21 days of the case.

### 9.    The Company's Reimbursement Obligations

111.   Certain Employees incur expenses in the course of performing their jobs, including without limitation travel, mobile phone, and meal expenses (the "**Travel and Communications Expenses**").  The Company also incurs certain ordinary course business expenses for which a credit card is required, including without limitation to ensure service continuity for certain on-line vendors (the "**Credit Card Expenses**" and, with the Travel and Communications Expenses, the "**Business-Related Expenses**").  As the Company does not maintain corporate credit card accounts, the Company pays the Credit Card Expenses by reimbursing designated individual employees for charges that are made to the credit cards held by and in the names of these individual employees.  These Credit Card expenses average

approximately $50,000 per month. It is essential to the continued operation of the Company's business that the Company is permitted to continue reimbursing, or making direct payments for, Business-Related Expenses. Moreover, if the Company does not reimburse the Credit Card Expenses, the individual employees in whose names the credit cards are held risk personal liability exposure. This would have a profound adverse effect on the Company, as the on-line and other important services for which the Credit Card Expenses are incurred would be terminated, the Company would be subject to claims from the employees in whose names the cards are held, and there would be a devastating effect on employee morale during the reorganization period. As has been the Company's custom and policy, no Employee travel will be reimbursed without advance approval from the Company's management.

112.    The Company estimates that as of the Petition Date it owes approximately $25,000 in accrued but unpaid Business-Related Expenses, excluding the Credit Card Expenses, which average approximately $50,000 per month.

113.    As of the Petition Date, there are three (3) Employees with accrued unpaid wages exceeding the $12,475 prepetition priority wage cap that I am informed and believe is established in Bankruptcy Code section 507(a)(4)(A).

## G.    Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Granting Related Relief

114.    The Company is seeking authority to pay in full, and in cash, of prepetition sales, use, income, and property taxes, annual report fees and regulatory fees, and all other similar obligations (collectively, the "**Prepetition Taxes**"), to various federal, state, and local authorities (collectively, the "**Taxing Authorities**") in the ordinary course of the Company's business, in an amount not to exceed $2, 975,000 (the "**Prepetition Taxes Cap**").

115.    The Company also seeks the authority to pay all Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date, in an amount not to exceed the applicable Prepetition Taxes Cap.

116.    Further, the Company requests that this Court authorize all applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts prior to the Petition Date for Prepetition Taxes (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts, as may be necessary), and authorize the banks and financial institutions to rely on the Company's representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Company's bank accounts are subject to the taxes motion, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

117.    As corporate entities, the Company incurs various tax liabilities and fees and in the past has generally paid such tax liabilities and fees to the relevant Taxing Authority in the ordinary course of business.    A schedule identifying the Taxing Authorities appears as Exhibit B to the taxes motion.    Certain Prepetition Taxes are currently outstanding or will become due and payable in the ordinary course of business during the postpetition period.    The Company seeks authority to pay $2,975,000 of such Prepetition Taxes, which the Company seeks authority to pay during the first 21 days of these cases.

118.    The Company is subject to the following taxes:[6]

---

[6] In the ordinary course of business, the Company sometimes undergoes audits and reviews conducted by the various Taxing Authorities. Although the current estimate is based on a good faith assessment of the existing amounts due on a prepetition basis, there is a possibility—because of audit rights—that one or more of the various Taxing Authorities may determine at a later date that the Company owes additional prepetition sales or use taxes. The Company requests authority to pay any undisputed amounts that are later determined to be due.

(a) <u>Sales and Use Taxes</u>.  During the ordinary course of business, the Company collects and remits certain taxes related to the sale, use, and consumption of goods and services arising from the sale, use, and purchase of products, inventory, supplies, or other goods in the Company's business.  Specifically, the Company collects and remits sales and consumption taxes to the Taxing Authorities in connection with the operation of its business. The Company also incurs use taxes when it purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided.  In this circumstance, the vendors are not obligated to charge or remit sales taxes.  As a purchaser, however, the Company must self-assess and pay the use taxes, when applicable, to the appropriate Taxing Authority.  The Company estimates that as of the Petition Date, approximately $2,150,000 in sales and use taxes has accrued and remains unpaid for the prepetition period.

(b) <u>Property Taxes</u>.  Where the Company has operations and real and personal property, the Company is subject to property tax levied by state and local governments.  The Company typically pays property taxes for the prior year or quarter depending on how the relevant tax is assessed.  The Company estimates that as of the Petition Date, approximately $750,000 in property taxes has accrued and remains unpaid for the prepetition period.

(c) <u>Federal and State Income Taxes</u>.  The Company incurs federal and state income tax liabilities.  These corporate income taxes are assessed on the income of each entity of the Company and either withheld and remitted monthly or paid annually to the applicable Taxing Authority depending on the jurisdiction.  The Company estimates that as of the Petition Date, there are no accrued and unpaid income taxes.

(d) <u>State Franchise Taxes; Business License, Reporting, and Regulatory Fees</u>.  Many state and local Taxing Authorities require the payment of certain franchise taxes, as well as business license, reporting, and regulatory fees, for the Company to remain in good standing for purposes of conducting business within the applicable jurisdiction.  The Company estimates that as of the Petition Date, approximately $60,000 in franchise taxes and business license, reporting, and regulatory fees has accrued and remains unpaid for the prepetition period.

(e) <u>Unemployment Taxes</u>.  Federal and state Taxing Authorities impose unemployment taxes for employer-funded unemployment and compensation programs.  The Taxing Authorities calculate the unemployment taxes based on various tax rates assessed against the amount of wages

paid in those jurisdictions in which the Company operates. The Company estimates that as of the Petition Date, approximately $15,000 in unemployment taxes has accrued and remains unpaid for the prepetition period.

119.    By paying Prepetition Taxes where feasible on their normal due dates, the Company will ultimately preserve the estates' resources and going-concern values. If the Company does not make timely payments, it may have to spend time and money resolving a multitude of issues related to these obligations, including whether (i) the obligations are priority, secured, or unsecured; (ii) the obligations are pro-ratable or fully prepetition or postpetition; and (iii) penalties, interest, attorneys' fees, and costs can continue to accrue on a postpetition basis, and if so, whether the penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured. Where possible, the Company understandably wants to avoid these unnecessary potential disputes.

**H.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions and (IV) Granting Related Relief.**

120.    The Company is seeking an (i) authorizing it to continue to use its centralized cash management system (the "**Cash Management System**") and bank accounts, as set forth below; (ii) waiving certain bank account and related requirements of the Office of the United States Trustee (the "**U.S. Trustee**"); (iii) authorizing the Company to continue its existing deposit practices under the Cash Management System (subject to certain reasonable changes to the Cash Management System that the Company may implement, including as required under the DIP Agreement (as discussed in the cash management motion)); (iv) extending time to comply with Bankruptcy Code section 345(b); and (v) authorizing Intercompany Transactions (as defined below) consistent with historical practice.

121.    Specifically, the Company seeks authority to (i) maintain and continue to use the bank accounts listed on Exhibit C to the cash management motion (the "**Debtor Bank Accounts**"), in the same manner and with existing account numbers, styles, and document forms; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, automated clearinghouse transfer, draft, electronic fund transfer, or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("**DIP Accounts**").

122.    To maintain the efficient operation of the Cash Management System during these cases, the Company also requests its banks be authorized to continue to administer, service, and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, wires, automated clearinghouse transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts (collectively, the "**Disbursements**") on account of any claim arising before the Petition Date that this Court has granted the Company approval to pay, and in reliance on the Company's representations of such authority, provided the applicable Debtor Bank Accounts contain sufficient funds.

123.    Continuity of the Cash Management System is critical, but so is a measure of flexibility.  To that end, the Company also requests authority to implement reasonable changes to the Cash Management System that it deems necessary or appropriate in the ordinary course, including closing any Debtor Bank Account, and that the applicable banks be authorized to honor such changes.

124.    In the cash management and other first-day motions, the Company seeks authority to pay certain prepetition obligations.  For some of these obligations, the Company issued checks before the Petition Date that have yet to clear.  For others, the Company will issue a Disbursement once it has Court authority to do so.  The Company requests that their banks be authorized and directed to accept and honor all representations from the Company as to which of these Disbursements should be honored.  If any banks nevertheless dishonor Court-approved Disbursements, the Company requests authority to issue replacement Disbursements consistent with the orders of this Court.  Because the banks are not in position to independently verify or audit whether they may honor a particular Court-approved prepetition Disbursement, the Company further requests that the Court's orders specify that no bank will be liable to the Company or the estates, or otherwise be in violation of such orders, for honoring a prepetition Disbursement or other Disbursement at the Company's direction.

125.    The Company also requests authority to continue, in the ordinary course, certain transactions between and among the entities comprising the Company (the "**Intercompany Transactions**").  The Intercompany Transactions, as described in the cash management motion, are necessary to maintaining control over cash management among the Company entities and avoiding substantial disruption to the Company's business, and provide substantial benefits to the Company and the estates.

126.    I believe that the Company will suffer immediate and irreparable harm if the relief requested in the cash management motion is not granted.

**1.    Overview of the Cash Management System**

127.    The Cash Management System is an integrated network of bank accounts that is critical to the Company's operations during these cases and, in turn, maximizing the value

of the estates. The Company uses the Cash Management System to collect cash from operations and to make cash disbursements—primarily payroll and payments to vendors—to manage its businesses. The Cash Management System also serves a strategic function, facilitating the Company's cash monitoring, forecasting, and reporting, and enabling the Company to control administration of its bank accounts. The Company takes care to record all collections, transfers, and disbursements made through the Cash Management System as and when made.

128.    The Debtor Bank Accounts are the hub of the Cash Management System. The Debtor Bank Accounts and other important features of the Cash Management System below. A diagram illustrating the Cash Management System is attached as Exhibit D to the cash management motion.

### 2.    The Company's Bank Accounts.

129.    The Company maintains eight (8) corporate bank accounts at Bancorp South and 260 individual store accounts as shown in Exhibit C to the cash management motion. I am informed and believe that each Debtor Bank Account is insured by the Federal Deposit Insurance Corporation ("**FDIC**") up to the federally insured amounts.

130.    *The Concentration Account.* The main depository account of the Cash Management System is the Company's concentration account (the "**Concentration Account**"), which receives most revenue generated by the Company, including without limitation (i) daily cash and check deposits and automated clearing house and electronic transfers from the Company's retail stores,[7] (ii) receipts from American Express[8] and Discover credit card sales at the Company's retail stores, (iii) credit cards receipts from Mastercard and Visa sales at the

---

[7] The Company maintains petty cash in an approximate average amount of less than $500 at each retail location for register drawer cash and de minimis store operating expenses.

[8] The Company maintains a merchant processing account with the American Express Travel Related Services Company, Inc. and reserve all rights, claims and defenses with respect thereto.

Company's retail stores, which receipts are deposited from the retail locations directly into the Company's merchant processor account maintained at Bancorp South pursuant to the Company's Payment Device Processing Agreement with merchant processor Elavon, Inc.[9] (the "**Elavon Account**") and then deposited from the Elavon Account into the Concentration Account net of holdbacks, processing fees and other charges and (iv) insurance and other proceeds.   The Concentration Account is swept daily via electronic transfer to repay the Prepetition Senior Creditors pursuant to the terms of the Prepetition Senior Credit Documents.   In order to fund the Company's business operations, funds requested by the Company for the purposes described below are now transferred from Prepetition Senior Obligations into the Operating Account (as defined below) upon request by the Company and acceptance of such request by the Prepetition Senior Creditors.

131.    *The Operating Account*:  The Company's primary operating account (the "**Operating Account**"), held by Hancock Fabrics, Inc., serves critical functions.   First, the Company uses the Operating Account to disburse funds into the Payroll Accounts and the Disbursement Account (each defined below) and make related tax payments.   Electronic payments are made directly from the Operating Account; where vendors or suppliers present hard-copy checks issued by the Company, those checks are honored via funds transferred from the Operating Account to linked Bancorp South checking accounts.   Additionally, as described more fully below, the Company uses the Operating Account to make Intercompany Transactions between and among certain Company entities.

132.    *The Payroll Accounts*:  The Company funds payroll and payroll taxes from two dedicated accounts (one for salaried employees and one for hourly employees) maintained

---

[9] The Company reserves all rights, claims and defenses with respect thereto, including without limitation entitlement to the Company's funds in the approximate amount of $200,000. which Elavon, Inc. is presently holding as a

by debtor Hancock Fabrics, Inc. at Bancorp South (collectively, the "**Payroll Accounts**"). To make these payments, the Company initiates electronic transfers or issue manual disbursements to employees and taxing authorities from the applicable Payroll Account. Funds are automatically transferred from the Operating Account to the Payroll Accounts as requests for payment are presented.

133. *The Disbursement Account*: The Company maintains a disbursement account (the "**Disbursement Account**") for payment of vendor accounts payable, other non-payroll-related payments, and disbursements related to their business operations, including non-payroll distribution center activities.

134. *Pension Benefits and Services Accounts*: The Company maintains two separate bank accounts with respect to pension plan benefits and services (the "**Pension Benefits and Services Accounts**"). The Company acts solely as a disbursing agent with respect to the Pension Benefits and Services Accounts; the balances maintained therein are funded solely by the pension plans.

135. *HF Enterprises and HF Resources Accounts*: Company entities HF Enterprises, Inc. ("**HF Enterprises**") and HF Resources, Inc. ("**HF Resources**") maintain separate Bancorp South checking accounts. The funds that comprise the balances within these checking accounts are generated by certain intercompany transfers wherein (i) Hancock Fabrics, Inc. ("**HFI**") pays royalties from the Operating Account to HF Enterprises for the licensed use of certain trade names, (ii) HF Enterprises issues a dividend to HF Resources, (iii) HF Resources issues loans to HFI and (iv) HFI makes interest payments to HF Resources in connection with the loans. These accounts have limited activity.

---

claimed security reserve.

136.    *Inactive Deposit Account*:    Finally, the Company also maintains six inactive deposit accounts at Wells Fargo.

### 3.    Bank Fees

137.    The Company pays, honors, or allows the deduction from the Debtor Bank Accounts service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**").  The Company estimates that it pays average monthly Bank Fees of approximately $55,000 and that it owes prepetition Bank Fees of approximately $30,000. The Company's inability to pay prepetition or post-petition Bank Fees in the ordinary course could disrupt the Cash Management System and harm the estates.

### 4.    Waiver of Certain Requirements of the United States Trustee

138.    The Company requests that this Court grant a waiver of certain bank account and related U.S. Trustee requirements.  I am informed and believe that the U.S. Trustee has established operating guidelines for debtors in possession to supervise the administration of chapter 11 cases, and that these guidelines require a chapter 11 debtor to, among other things (the requirements set forth in (1) through (5) below collectively, the "**UST Requirements**")

(a)    close all existing bank accounts;

(b)    open new bank accounts in a depositary approved by the U.S. Trustee that are designated as DIP Accounts, with separate DIP Accounts established for an operating account, a tax account, and a payroll account;

(c)    obtain and utilize new checks for all DIP Accounts that bear the designation "Debtor In Possession" and contain other information about the debtor's chapter 11 case;

(d)    deposit all business revenues into the general operating DIP Account, with amounts needed to fund the other accounts being transferred to those accounts as necessary; and

(e)    deposit to the tax DIP Account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll.

139.    The Company seeks a waiver of the UST Requirements that it close the Debtor Bank Accounts and open new DIP Accounts.  As discussed above, continued use of the Debtor Bank Accounts is essential to maximizing value of the estates and is in the best interests of all parties.  Among other things, the continued use of the Debtor Bank Accounts prevents disruption to direct customer payments into these accounts and facilitates speed of collection for accounts receivables.  The Company does, however, request the authority to open any new bank accounts or close any existing bank accounts as it may deem necessary and appropriate in the ordinary course, provided that the Company give notice within fifteen (15) days after such opening of a new bank account or closing of an existing bank account to the U.S. Trustee and any statutory committees appointed in the chapter 11 cases, and provided further that the Company open any such new bank account at banks that have executed a Uniform Depositary Agreement with the U.S. Trustee, or at such banks willing to immediately execute such an agreement.

140.    The Company also seeks a waiver of the UST Requirement to establish specific DIP Accounts for payroll and for tax payments and to deposit into the tax accounts sufficient funds to pay any payroll tax liability (when incurred).  I believe that the Company's payroll and tax obligations are most efficiently met through the Debtor Bank Accounts in accordance with existing practices, and that requiring new payroll and tax DIP Accounts would be both unnecessary and highly disruptive to the Company's business.  The Company is—and expects to remain—current on all payroll taxes.  Requiring the Company to change its existing practices and deposit sufficient funds to pay any tax liability associated with the Company's payroll would, therefore, be unnecessary and inefficient.  Further, the Company will ensure that the U.S. Trustee can appropriately monitor that the Company's payroll taxes are satisfied.

141.   To minimize expense, the Company seeks authority to continue using checks, substantially in the forms existing immediately prior to the Petition Date without reference to the Company's status as debtors in possession.  The Company also seeks authority to use all correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately before the Petition Date without reference to the Company's status as debtors in possession.

142.   I am informed and believe that the Company is required to, and will, provide notice of the commencement of these cases to creditors and parties in interest.  Parties doing business with the Company, therefore, should be aware of the Company's status as debtors in possession.  Changing the Company's existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the estates.  Further, I believe that such changes would be disruptive to the Company's business operations and would not confer any benefit upon those dealing with the Company.  For these reasons, the Company requests that it be authorized to use existing check stocks and all correspondence and business forms without being required to label them "Debtor In Possession;" provided that once the Company's existing checks have been used, the Company will, when reordering checks, require the designation "Debtor in Possession" and the corresponding bankruptcy case number on all checks; provided further that, with respect to electronic checks that the Company or its agents print themselves, the Company will begin printing the "Debtor in Possession" legend on such items within 10 days of entry of the Interim Order.

143.   The Cash Management System is an ordinary course and essential business practice.  I believe that compelling the Company to alter its current cash management

practices and to modify the Cash Management System to comply with the UST Requirements outlined above would risk disruption to the Company's business and jeopardize the Company's ability to maximize value for any parties in interest.

### 12.    The Company Seeks Authority to Continue Its Current Deposit Practices

144.    I am informed and believe that Bankruptcy Code section 345(a) governs a debtor's deposit of cash during a chapter 11 case and authorizes deposits of estate money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit" and that, if a deposit is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," Bankruptcy Code section 345(b) requires the debtor to obtain from the entity with which the money is deposited a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.   I am further informed and believe that alternatively, the estate may require the entity to deposit governmental securities under 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation.

145.    While I am informed and believe that the Company is in compliance with Bankruptcy Code section 345(b), to the extent it is not, I believe that given the Company's limited liquidity and need to conserve cash, incurring administrative expense complying with section 345(b) would unnecessarily drain scarce resources.

146.    I am informed and believe that each of the Debtor Bank Accounts is insured by the FDIC (up to the federally insured amounts) and, as such, complies with Bankruptcy Code section 345(b).   I also am informed and believe that, under the Company's

investment practices, all deposits and investments are made into deposit accounts, money market accounts, and other investment vehicles that in turn invest only in assets, securities or other instruments insured or guaranteed or collateralized by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States.

147.   To the extent that any banks in which the Company maintains accounts have not signed a Uniform Depositary Agreement with the U.S. Trustee and to the extent the Company as of the Petition Date does not otherwise comply with deposit and investment guidelines under Bankruptcy Code section 345(b), the Company requests a 30-day extension (or such further extension as the U.S. Trustee may agree to) to do so.  During the extension period, the Company proposes to engage the U.S. Trustee in discussions to determine if compliance with section 345(b)—to the extent not already met—and other U.S. Trustee requirements (to the extent not waived) is necessary or appropriate.

148.   I believe that the benefits of the requested extension far outweigh any harm to the estates.  During the extension period, the Company will contact each of its banks that is a party to a Uniform Depository agreement with the U.S. Trustee, provide such banks with each of the Company's tax identification numbers, and identify each of its bank accounts at the banks as being held by a debtor in possession.  For banks that are not party to a Uniform Depository agreement with the U.S. Trustee, the Company will use good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee. The Company's deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds deposited or invested, taking into account the safety of such

deposits and investments. The Company operates sophisticated businesses and holds its funds at reputable, stable banking institutions and monitor its cash flows and positions on a daily basis.

### 6. The Company Seeks Authority to Continue Intercompany Transactions in the Ordinary Course

149.    Historically, the Company has engaged in intercompany transactions (the "**Intercompany Transactions**"), including without limitation those related to the HF Resources and HF Enterprises Accounts, largely to centralize cash management and maintain control over the funds moving between the debtor entities. The Intercompany Transactions are made between and among the Company's entities in the ordinary course. As a result, at any given time there may be intercompany claims between the Company's entities. The Company engages in the Intercompany Transactions regularly and I am informed and believe that such transactions are common among enterprises such as the Company. The Company seeks authority to engage in such transactions post-petition.

150.    I believe that ordinary-course Intercompany Transactions are integral to ensure the Company is able to operate its businesses as debtors in possession and to preserve valuable estate assets. Absent the Intercompany Transactions, the Cash Management System would be severely disrupted, and the Company's businesses in turn would be materially harmed. The Company would be unable to centralize and control cash management, exposing the Company to the risks of cash leakage and misallocation of critical resources. Moreover, the Intercompany Transactions provide the Company access to liquidity that may be necessary to fund ongoing operations. Accordingly, I believe that the authority to make Intercompany Transactions in the ordinary course is in the best interest of the estates.

I.    **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Putative Consignment Vendors and Granting Related Relief**

151.    In the ordinary course of the Company's business, the Company has incurred prepetition obligations of certain vendors, suppliers, and similar entities that provide goods, asserted by such vendors to be provided to the Company on putative consignment or similar arrangements (the "**Subject Goods**"), that are critical to the ongoing operation of the Company's business (the "**Subject Vendors**," whose claims are the "**Subject Vendor Claims**"). The Company seeks authority to pay such Subject Vendor claims in an amount not to exceed $1.5 million ($1.25 million of which the Company seeks authority to pay on an interim basis) without further order of the Bankruptcy Court.

152.    Delivery of the Subject Goods for resale from the Subject Vendors is necessary to operate the Company's business and maximize value for all creditors.  If granted discretion to satisfy Subject Vendor Claims, the Company will assess, on a case by case basis in real time, the benefits to the estates of paying Subject Vendor Claims and pay such claims only to the extent that the estates will benefit.  Without this relief, I believe that the Subject Vendors may cease providing Subject Goods to the Company or otherwise take action that would have a significant adverse effect on the Company's restructuring efforts, to the detriment of the estates and their creditors, including without limitation disputes concerning their putative consignment rights.

153.    In the ordinary course of business, the Company routinely receives delivery of Subject Goods, including without limitation plush fabric and accessories, sewing machines, patterns, books, gift items, magazines, greeting cards and calendars from the Subject Vendors for resale at the Company's retail stores.  Without these Subject Goods, the Company would experience significant loss in sales volume, disrupting the Company's business and

jeopardizing their restructuring efforts. To prevent any such interruption to the Company's business during these chapter 11 cases, it is essential that Company maintain its relationships with, and honor their outstanding payment obligations to, the Subject Vendors. The Company seeks authority to pay such claims to prevent interruption to their businesses.

154.   The Company has presently identified approximately ten (10) Subject Vendors, on which the Company depends for availability of the Subject Goods on favorable terms in order to offer a full range of retail goods to their customers. The events leading up to and the commencement of these chapter 11 cases may have caused some uncertainty among the Subject Vendors with respect to the Subject Vendor Claims that may impair future shipments of Subject Goods to the Company.

155.   Each of the Subject Vendors may assert that the Subject Goods with which it supplies the Company is provided to the Company on a consignment basis. The Company does not believe that such Subject Goods meet the legal requirements to be true consignment goods, and reserve the right to challenge such claims. However, due to the importance of the Subject Goods to the Company's business, and concomitantly to the Company's restructuring efforts, the Company proposes to pay the Subject Vendor Claims as and pursuant to the terms set forth herein, while reserving the right to challenge putative consignment claims.

156.   If authorized to pay the Subject Vendor Claims, Company will use commercially reasonable efforts to require the applicable Subject Vendors to provide favorable trade terms that are no less favorable to the Company than historical practice. The Company is therefore requesting authority, but not direction, to condition payment on such party's agreement to continue providing Subject Goods to the Company in accordance with trade terms consistent

with those practices and programs in place during the twelve months immediately preceding Company's filing of their chapter 11 petitions (the "**Customary Trade Terms**").

157. To ensure each Subject Vendor's agreement to continue providing supplies or services on Customary Trade Terms for the duration of these chapter 11 cases, the Company may elect to execute trade agreements, as proposed in the form attached as Exhibit 1 to the proposed interim order approving the relief requested in the applicable motion (each a "**Trade Agreement**"). Such Trade Agreements, once agreed to and accepted by a Subject Vendor, will be a legally binding contract between the parties governing their commercial relationship.

158. The Company is also seeking limited authority to pay the Subject Vendor Claims in the event that no Trade Agreement has been executed. The Company would exercise this authority only if its determines that a formal Trade Agreement is unnecessary to ensure a Subject Vendor's continued performance on Customary Trade Terms; provided, that, if a Subject Vendor accepts payment and does not continue supplying goods or services to the Company in accordance with Customary Trade Terms or as otherwise set forth in a Trade Agreement, then, so long as the Subject Vendor receives notice and opportunity for a hearing: (i) such payment will be deemed an improper postpetition transfer on account of a prepetition claim and therefore immediately recoverable by the Company in cash on written request; (ii) upon recovery by the Company, any prepetition claim of such Subject Vendor will be reinstated as if the payment had not been made; and (iii) if there exists an outstanding postpetition balance due from the Company to such Subject Vendor, the Company may elect to recharacterize and apply any payment made to that outstanding postpetition balance, thus reducing such Subject Vendor's administrative claim, and such Subject Vendor will be required to repay to the Company those

61

paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

159.   The relief the Company is requesting with respect to the Subject goods and Subject Vendors is premised on the assumption that the Subject Vendors have taken the necessary steps to properly perfect their interests in the Subject Goods, as is inherent in the Subject Vendors' assertion that the Subject Goods are consignment goods.  In the event that a Subject Vendor accepts payment on account of a Subject Vendor Claim and it is later determined that such Subject Vendor has not properly perfected its interests in the Subject Goods, then the Company reserves the right to seek to have the payment recharacterized as an improper postpetition transfer on account of a prepetition claim and to seek to either (i) recover such improper postpetition transfer or (ii) have the improper postpetition transfer applied to any outstanding postpetition balance relating to such Subject Vendor.

160.   Payment of the Subject Vendor Claims is necessary to ensure that the Company continues to receive delivery of Subject Goods for resale to their customers and, in turn, preserve and enhance the value of the Company's estates.  The Company has carefully reviewed whether the Subject Goods provided by the Subject Vendors are essential to ongoing operations.  I have concluded that, without the Subject Vendors' services through provision of the Subject Goods, the Company would suffer severe losses in sales volume and be required to search for substitute vendors, if any even exist, and the Debtors could be forced to forego existing favorable trade terms.

161.   The Company has developed procedures that, if and when implemented will ensure that the Subject Vendors receiving payment of their Subject Vendor Claims will continue to provide goods to the Company based on the Customary Trade Terms, or such other

trade terms as may be agreed to by the Company and the Subject Vendors. The retention and reinstatement of the Customary Trade Terms will enable the Company to maximize the value of its business.

162.    Further, I believe that payment of the Subject Vendor Claims as the Company is requesting authority to complete is a sound exercise of the Company's and its officers' and directors' business judgment. First, it is critical that the Company deal with the Subject Vendors because the Subject Vendors provide Subject Goods necessary to Company's operations and, in many instances, the  Subject Vendors could potentially assert and seek to perfect liens against Company's property (subject to the Company's rights and defenses thereto). Second, I believe that the Subject Vendors would otherwise refuse to, or might be unable to, provide Subject Goods to the Company on a postpetition basis if their prepetition balances are not paid. Accordingly, not paying the Subject Vendor Claims harms the Company financially because losing access postpetition to the Subject Goods provided by the Subject Vendors would result in a loss of sales volume for the Company. Third, the Company has examined other options short of payment of the Subject Vendor Claims and has determined that, to avoid any unexpected or inopportune interruptions to its business operations, there may be no practical alternative to paying the Subject Vendor Claims consistent with the applicable caps being proposed with respect to the relief requested in the bankruptcy court.

163.    Finally, the Company is also requesting authority for all banking institutions and all other applicable financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds relating to the Subject Vendor Claims, whether such checks were presented before or after the Petition Date. Under the Company's existing cash management system, checks or wire transfer requests can be readily identified as relating to an

authorized payment of the Subject Vendor Claims. Given those controls, the Company believes that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Company also seeks authority to issue new postpetition checks or effect new electronic fund transfers on account of the Subject Vendor Claims, or to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of these chapter 11 cases. Finally, I am informed and believe that the Company has sufficient liquidity to pay such amounts as they become due in the ordinary course of the Company's business.

**J.      Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance Payment to Utilities and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance**

164.    In connection with the operation of its business and the management of its properties, the Company buys electricity, water, waste disposal, telephone and internet services, including mobile and satellite communications services, and other similar services (collectively, the "**Utility Services**") by certain utility companies (collectively, the "**Utility Companies**"). A nonexclusive list of substantially all of Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached to the utility motion as Exhibit C (the "**Utility Services List**").[10]

165.    Generally, payments for Utility Services are made by the Company in arrears. To the best of my knowledge, the Company has incurred few arrearages or past due

---

[10] Although the Company has undertaken thorough and good faith efforts to identify all their Utility Companies, there is a possibility that some Utility Companies currently providing Utility Services to the Debtors may have been unintentionally omitted from the Utility Services List. To the extent that the Company identifies additional Utility Companies, the Company will promptly amend the Utility Services List, provide additional notice described in the motion, and increase the amount of the Utility Deposit by an amount equal to one-half of the Company's approximate monthly payment for Utility Services provided by such newly-identified Utility Company, based on the Company's average expenses over the past twelve (12) months.

amounts on its undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of the Company's chapter 11 cases. Over the past twelve (12) months, the Company paid an average of $820,000 per month for Utility Services. I estimate that the Company's cost for Utility Services during the twenty-one (21) days following the Petition Date (not including any deposits to be paid) will be approximately $820,000.

166.    I anticipate that the Company will have sufficient cash on hand to timely pay in full, and in cash, all undisputed postpetition obligations owed to Utility Companies during these chapter 11 cases. Nevertheless, within thirty (30) days after the Petition Date, the Company proposes to provide additional "assurance of payment" to each Utility Company listed on the Utility Services List for postpetition Utility Services. The Company proposes to place a cash deposit equal to one-half of the Company's approximate monthly payment for all Utility Services (the "**Utility Deposit**"), based on the Company's average expenses over the past twelve (12) months, into a newly created, interest-bearing segregated account (the "**Utility Deposit Account**") for the benefit of any Utility Company. The Utility Deposit Account will be held in escrow pending further order of the Court, and the Company's creditors will have no interest in, or lien on, any Utility Deposit or the Utility Deposit Account.

167.    Based on the average Utility Services monthly cost and the amounts already held by Utility Companies in the form of deposits, I estimate that the aggregate Utility Deposit will be approximately $410,000. The Company proposes that the portion of the Utility Deposit attributable to each Utility Company be returned to Company on the earlier of (i) the Company's termination of services from such Utility Company, (ii) entry of an order of the Court authorizing the return of such Utility Deposit to the Company, or (iii) the effective date of a chapter 11 plan in Company's cases. The Company also seeks authority to reduce the Utility

Deposit to the extent it includes an amount for a Utility Company that the Company subsequently determine should be removed from the Utility Services List. I do not believe that any other or further assurance of payment to the Utility Company for postpetition Utility Services beyond that proposed in the utility motion is necessary.

**K.**   **Motion of the Debtor and Debtor in Possession for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent**

168.   The Company seeks  entry of an order authorizing the employment and retention of Kurtzman Carson Consultants LLC ("**KCC**") as Claims and Noticing Agent in the chapter 11 cases, effective *nunc pro tunc* to the Petition Date.

169.   The terms of KCC's retention are set forth in the engagement agreement, dated as of December 22, 2015, between KCC and the Company (the "**KCC Engagement Agreement**"), provided as Exhibit B to the application to employ KCC submitted concurrently herewith (the "**KCC Retention Application**").

170.   I believe that the most effective and efficient manner of noticing the creditors and parties in interest involved in these chapter 11 cases, and to transmit, receive, docket, maintain, photocopy, and scan claims, is for the Company to engage an independent third party to act as the notice and claims agent. The Company will also require the services of an agent to administer votes regarding a plan of reorganization.  Accordingly, the Company seeks to employ Kurtzman Carson Consultants LLC ("**KCC**") as notice, claims, and balloting agent, *inter alia*, to assist the Company in distributing notices, as necessary, and to process other information pertaining to the chapter 11 case

171.   I am informed and believe that KCC is a leading provider of administrative support services whose professional team has experience in both the legal and administrative aspects of large, complex chapter 11 cases, and that KCC's professionals have

experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases, including in matters of this size and complexity. I understand that KCC's professionals have acted as official claims and noticing agent in many large bankruptcy cases.

172.   The Company seeks to retain KCC as their Claims and Noticing Agent, under the Engagement Agreement, to provide, to the extent requested by the Company, the bankruptcy administration services (the "**Claims and Noticing Services**") set forth in the KCC Retention Application.

173.   The Company selected KCC in a competitive bidding process that included two other nationally recognized firms for the above services, from which KCC emerged as the cost-effective choice. I am informed and believe that KCC is well-qualified to serve in this capacity and that KCC's retention is in the best interests of the estates and their creditors.

174.   The Company requests that the undisputed fees and expenses incurred by KCC in the performance of the Claims and Noticing Services be treated as administrative expenses of the chapter 11 estates and be paid in the ordinary course of business without further application to or order of the Court. I am informed and believe that KCC agrees to maintain records of all services showing dates, categories of services, fees charged, and expenses incurred, and to serve monthly invoices as set forth in the KCC Retention Application. If any dispute arises relating to the Engagement Agreement or monthly invoices, I understand that the parties shall meet and confer in an attempt to resolve the dispute and, if they are unable to achieve resolution on their own, the parties may seek the Court's intervention.

175.   Prior to the Petition Date, the Company provided to KCC, and replenished as required, a retainer in the amount of $50,000. I am informed and believe that KCC seeks to

apply the retainer to all prepetition invoices and then have the retainer replenished to its original amount, and thereafter, to hold the retainer under the Engagement Agreement during these chapter 11 cases as security for the payment of fees and expenses incurred under the Engagement Agreement.

## III.    CONCLUSION

176.    The Company's goal in the pending case is to preserve and maximize the value of its business.  I believe that, if the Court grants the relief requested in each First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the estates, their creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 2nd day of February 2016 at Baldwyn, Mississippi.

*/s/ Dennis Lyons*
Dennis Lyons
Senior Vice President and
Chief Administrative Officer
Hancock Fabrics, Inc.