# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

HANCOCK FABRICS, INC., et al., [1]
a Delaware corporation,
                    Debtors.

Chapter 11

Case No. 16-_____ (___)

Joint Administration Proposed

## DEBTORS' MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING

Hancock Fabrics, Inc. ("**Hancock**" or the "**Company**"), and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "**Debtors**") hereby move this Court (the "**Motion**") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for:

(i)     authorization to obtain, as co-borrowers (collectively, the "**Borrowers**") secured, superpriority post-petition loans, advances and other financial accommodations (the "**DIP Facility**"), pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**")[2] by and among (a) Hancock, as the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the guarantors party thereto from time to time, (d) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

[2] Certain exhibits of the DIP Agreement are not included in the attachments to this Motion.

such capacities, the "**DIP Agent**") for its own benefit and the benefit of the other Credit Parties, (e) GACP Finance Co., LLC, as term agent (in such capacity, the "**DIP Term Agent**"), and (f) the Lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"; the DIP Agent, the DIP Term Agent, the DIP Lenders and the other Credit Parties under the DIP Loan Documents (as defined below) are collectively referred to herein as the "**DIP Credit Parties**");[3]

(ii)     authorization to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)    until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and the Interim Order (as defined below), authorization, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $80 million at any one time outstanding (the "**Interim Financing**"), and upon entry of the Final Order, increasing the extensions of credit available under the DIP Facility, including the DIP Term Loan (as defined below), to an amount not to exceed the aggregate principal amount of $100 million;

(iv)     entry of an order substantially in the form attached hereto as Exhibit A and Exhibit B (collectively, the "**Interim Order**"), approving the Interim Financing;[4]

(v)      the granting of allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases (and any cases under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including all obligations with respect to letters of credit issued or deemed issued under the DIP Credit Agreement, respectively, and, together, the "**DIP Obligations**"), subject to the priorities set forth in the Interim Order;

(vi)     authorization to use "**Cash Collateral**," as defined in section 363(a) of the Bankruptcy Code, that the Debtors are holding or may obtain, pursuant to sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004 on the terms and conditions set forth in the DIP Loan Documents and the Interim Order;

---

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the DIP Credit Agreement.

[4] Exhibit B reflects the terms on which the Prepetition Subordinated Creditors have consented to the use of the Cash Collateral.

(vii)    the granting to the DIP Agent, for the benefit of the DIP Credit Parties, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth in the Interim Order;

(viii)    authorization to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, continuing commitment fees, upfront fees, closing fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Credit Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents;

(ix)    authorization to pay in full the Prepetition Senior Obligations (as defined herein) upon the entry of the Final Order and as set forth in the Interim Order, subject to the "Challenge" rights of parties in interest under the Interim Order;

(x)    the provision of adequate protection to the Prepetition Secured Creditors (as defined herein) to the extent set forth in the Interim Order;

(xi)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(xii)    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in this Motion, the entry of an order (a "**Final Order**") approving the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xiii)    granting related relief.

In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Dennis Lyons in Support of Chapter 11 Petitions and Request for First Day Relief* (the "**Lyons Declaration**"), which was filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

RLF1 13827775v.1

U.S.C. § 157(b).[5]  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363,

364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local

Rule 4001-2.

## BACKGROUND

### I.    GENERAL BACKGROUND

2.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced a

voluntary case under chapter 11 of Bankruptcy Code with the United States Bankruptcy Court

for the District of Delaware (the "**Bankruptcy Court**").  Pursuant to sections 1107(a) and 1108

of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors

in possession.

3.    Contemporaneously herewith, the Debtors filed a motion seeking joint

administration of their chapter 11 cases (the "**Chapter 11 Cases**") pursuant to Bankruptcy

Rule 1015(b) and Local Rule 1015-1.  As of the date hereof, the Office of the United States

Trustee (the "**U.S. Trustee**") has not appointed any official committee of unsecured creditors in

these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Committee**").  No

trustee, examiner, or other statutory committee has been appointed in these Chapter 11 Cases.

4.    The Debtors operate more than 260 stores in 37 states under the name of

"Hancock Fabrics," a large national fabric and specialty retailer offering an extensive selection

of high-quality fashion and home decorating textiles, sewing accessories, needlecraft supplies

and sewing machines, along with in-store sewing advice.  Founded in 1957, the Debtors'

---

[5] Pursuant to Local Rule 9013-1(f), the Debtors hereby expressly confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

corporate headquarters and national distribution center are located in Baldwyn, Mississippi. Additional information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the Lyons Declaration.

## II.    THE DEBTORS' SECURED PREPETITION INDEBTEDNESS

### A.    Prepetition Senior Facility

5.    *Prepetition Senior Credit Documents.*  As of the Petition Date, the Debtors had outstanding secured debt to various lenders pursuant to that certain Credit Agreement dated as of April 22, 2015 (as amended, modified and supplemented from time to time, the "**Prepetition Senior Credit Agreement**" and together with all related documents, guaranties and agreements, the "**Prepetition Senior Credit Documents**"), by and among (a) Hancock (the "**Lead Borrower**"), (b) the other Borrowers party thereto from time to time, (c) the guarantors party thereto from time to time, (d) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "**Prepetition Senior Agent**") for its own benefit and the benefit of the other "Credit Parties" (as defined therein), (e) GACP Finance Co., LLC, as term agent (in such capacity, the "**Prepetition Term Agent**"), and (f) the lenders from time to time party thereto (the "**Prepetition Senior Lenders**" and each a "**Prepetition Senior Lender**"; the Prepetition Senior Agent, the Prepetition Term Agent, the Prepetition Senior Lenders and the other "Credit Parties" under the Prepetition Senior Credit Documents are collectively referred to herein as the "**Prepetition Senior Creditors**").

6.    *Prepetition Senior Obligations.*  As of the Petition Date, the aggregate outstanding amount owed by the Debtors under the Prepetition Senior Credit Documents was not less than $82,000,000, consisting of revolving credit loans in the outstanding principal amount of approximately  $57,125,000  (the  "**Prepetition  Revolving  Credit  Loans**"),  issued  and

outstanding letters of credit in the approximate amount of $6,700,000; and a term loan in the outstanding principal amount of approximately $18,300,000 (the "**Prepetition Term Loan**") (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Credit Documents, and further including all "Obligations" as described in the Prepetition Senior Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Senior Obligations**"). As more fully set forth in the Prepetition Senior Credit Documents, prior to the Petition Date, the Debtors granted first priority security interests in and liens on substantially all personal and real property of the Debtors, including, without limitation, owned real estate, accounts, inventory, equipment and general intangibles (collectively, the "**Prepetition Collateral**"), to the Prepetition Senior Agent (collectively, the "**Prepetition Senior Liens**") to secure repayment of the Prepetition Senior Obligations.

**B.    Prepetition Subordinated Indenture**

7.    *Prepetition Subordinated Indenture Documents.* As of the Petition Date, the Debtors had outstanding secured debt to various noteholders (collectively, the "**Prepetition Subordinated Noteholders**") pursuant to that certain Indenture dated as of November 20, 2012 (as amended, modified and supplemented from time to time, including pursuant to that certain Supplemental Indenture dated as of April 22, 2015, the "**Prepetition Subordinated Indenture**" and together with all related documents, guaranties and agreements, the "**Prepetition Subordinated Indenture Documents**"), by and between (a) Hancock, as the issuer, and (b) Deutsche Bank National Trust Company, as indenture trustee (in such capacity, the "**Prepetition Indenture Trustee**"; the Prepetition Indenture Trustee and the Prepetition Subordinated Noteholders are collectively referred to herein as the "**Prepetition Subordinated**

6

Creditors"). The Prepetition Senior Creditors and the Prepetition Subordinated Creditors are collectively referred to herein as the "**Prepetition Secured Creditors**" and the Prepetition Senior Credit Documents and the Prepetition Subordinated Indenture Documents are collectively referred to herein as the "**Prepetition Credit Documents**."

8.    *Prepetition Subordinated Obligations.* As of the Petition Date, the outstanding principal amount owed by the Debtors under the Prepetition Subordinated Indenture Documents was not less than $8,204,000 (together with any amounts paid, incurred or accrued, including but not limited to interest, fees and expenses, prior to the Petition Date in accordance with the Prepetition Subordinated Indenture Documents, the "**Prepetition Subordinated Obligations**"; the Prepetition Senior Obligations and the Prepetition Subordinated Obligations are collectively referred to herein as the "**Prepetition Secured Obligations**"). As more fully set forth in the Prepetition Subordinated Indenture Documents, prior to the Petition Date, the Debtors granted second-priority security interests in and liens on the Prepetition Collateral to the Prepetition Indenture Trustee (the "**Prepetition Subordinated Liens**") to secure repayment of the Prepetition Subordinated Obligations. The Prepetition Subordinated Liens and the Prepetition Senior Liens are collectively referred to herein as the "**Prepetition Liens**."

9.    *Subordination Provisions.* Pursuant to the terms of the Prepetition Subordinated Indenture, including, without limitation, Article XI of the Prepetition Subordinated Indenture, (a) the Prepetition Subordinated Obligations are subordinated in all respects to the prior payment in full of the Prepetition Senior Obligations, and (b) the Prepetition Subordinated Liens are subordinate and junior in all respects to the Prepetition Senior Liens (collectively, such terms are referred to herein as the "**Indenture Subordination Provisions**"). The Indenture Subordination provisions are a "subordination agreement" within the meaning of section 510(a) of the

Bankruptcy Code. The DIP Agent has advised the Debtors that its willingness to provide the DIP Facility is conditioned on, among other things, the DIP Agent (in addition to the Prepetition Senior Agent) having all of the rights of the Prepetition Senior Agent under the subordination provisions set forth in the Prepetition Subordinated Indenture.

## III.    DIP FINANCING OVERVIEW

### A.    Prepetition Marketing Efforts

10.    Prior to the Petition Date, the Debtors engaged Lincoln Partners Advisors LLC ("**Lincoln**") and Clear Thinking Group LLC ("**CTG**") to assist it in evaluating strategic and financial alternatives to improve liquidity. The efforts of the Debtors, Lincoln and CTG to raise new capital are described in the Lyons Declaration. Before agreeing to enter into the DIP Credit Agreement, the Debtors made extensive inquiry into their alternatives for financing and solicited proposals for debtor in possession financing from other financial institutions. These included members of the existing syndicate of banks, other financial institutions who historically provide debtor in possession financing, and the Company's prepetition investors. The Company contacted twenty-seven (27) potential lenders, including its prepetition lenders.

### B.    No Credit Available on More Favorable Terms

11.    The Debtors were unable to find any DIP financing other than the proposed DIP Facility, and the DIP Credit Parties have agreed to provide debtor in possession financing on the terms set forth in this Motion. Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Credit Parties on terms more favorable than the DIP Facility. Of the lenders contacted, no lender was willing to provide the necessary financing without the type of protections afforded under the DIP Facility. None offered terms that were superior. Additionally, the DIP Credit Parties are

familiar with the Debtors, giving them the ability to act more quickly, which is crucial in light the Debtors' need for liquidity as discussed further below.

12.     The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the Prepetition Liens. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of the DIP Credit Parties, (1) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth in the Interim Order, (2) superpriority claims, and (3) the other protections set forth in the Interim Order.

**C.      Immediate Need for Postpetition Financing and Use of Cash Collateral**

13.     The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates. As other retailers, Hancock's retail sales are subject to seasonal fluctuations, with the Company's annual sales being greatest in the fourth fiscal quarter (November 1st through January 31st). However, Hancock posted disappointing sales for the third and fourth quarters of its current fiscal year. Holiday sales, which typically comprise almost half of Hancock's annual sales, were more than $8 million below forecast. These losses were driven, in part, by significant discounts offered by some of Hancock's principal competitors and other market conditions affecting retail businesses. Moreover, certain

of Hancock's underperforming stores represent a disproportionate share of its costs. As a result, Hancock lacked the necessary liquidity for its operations leading up to the Petition Date.

14.    These factors, among others discussed in the Lyons Declaration, have combined to result in the Debtors' need to file the instant cases to reorganize their debt structure in the current economic climate and to align their operations to future business needs based on what their customers prefer, including store locations and format. The Company is committed to continuing to offer the same high quality and service for which it has been known since its founding in 1957.

15.    The Debtors intend to use these cases to (i) gain access to liquidity, (ii) reduce pension and operational costs, (iii) realign their store locations and format, and (iv) execute on one or more options to create value for stakeholders (including a sale of assets or other transactions with a third party investor). The Debtors are considering all possible options for maximizing stakeholder value. Among other things, they will focus on the sale of certain portions or all of their business as a going concern as well as other third party investments and asset disposition options.

16.    In conjunction with their financial advisor, Clear Thinking Group, the Debtors considered whether it could operate using only the cash generated from its post-petition operations. The Debtors determined that they could do so only for a limited period of time and then only if they refrained from making purchases and payments that are critical to the success of this case. The case is commencing at the slowest period for retail sales. However, the Debtors' expenditures during this period (such as payroll and other essential payments) cannot be reduced to account for the lower sales volume.

RLF1 13827775v.1

17.     The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets, and otherwise finance their operations and pursue a strategy to maximize value for their creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful administration of these Chapter 11 Cases. It is also critical that the Debtors have access to sufficient cash to be able to pay their postpetition rent obligations for their retail stores—all of which are leased. Also important is the consideration that any buyer looking to acquire the Debtors as a going concern will want to make sure that the Debtors' operations remain stable and contain fresh inventory. A failure of the Debtors' suppliers and employees to provide goods and services to the Debtors at this time, and the corresponding loss of customer patronage, could have a deeply negative effect on the Debtors' ability to seek bids for the business as a going concern.

18.     The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business—let alone pursue the various options available to create value for stakeholders— without the DIP Facility and authorized use of Cash Collateral. The DIP Credit Parties are willing to provide liquidity on the terms provided in the DIP Loan Documents and the Interim Order.

**D.      Priming of the Prepetition Liens**

19.     The priming of each of the Prepetition Liens on the Prepetition Collateral (other than the Prepetition Permitted Liens,[6] Senior Agency Agreement Liens, and the DIP Carve Out)

---

[6] **"Prepetition Permitted Liens"** means liens that were permitted by the Prepetition Credit Documents to the extent such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the

by the DIP Liens (as defined herein) will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors. Each Prepetition Secured Creditor has consented to such priming liens under the terms and conditions set forth in the Interim Order and the Payoff Letter and is entitled to receive adequate protection of its interests as more fully described below.

### E.    Use of Proceeds of the DIP Facility

20.    As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Credit Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used (a) for the repayment in full in cash of all remaining Prepetition Senior Obligations upon the entry of the Final Order (other than contingent indemnification obligations) as provided in that certain payoff letter prepared by the Prepetition Senior Agent (the "**Payoff Letter**", a copy of which has been approved by the Debtors, the Prepetition Senior Agent, Prepetition Term Agent, the DIP Agent and the DIP Term Agent), (b) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as Exhibit C hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents and the Interim Order or Final Order, and subject to such variances as may be permitted thereby, the "**Budget**") solely for (i) post-petition operating expenses and other working capital and general corporate purposes, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Cases, including prior to the delivery of

---

Prepetition Liens and otherwise had priority over any and all other liens on the Prepetition Collateral. Nothing herein shall constitute an admission that any such Prepetition Permitted Liens are valid, binding, enforceable, properly perfected, non-avoidable or senior in priority to the Prepetition Liens. Moreover, nothing herein shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the DIP Agent, the DIP Term Agent and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest.

a Carve-Out Trigger Notice (as defined below), to fund the DIP Carve Out through deposits into the Professional Fee Escrow Account, (iv) Prepetition Senior Credit Adequate Protection Payments, and (v) as otherwise permitted under the DIP Loan Documents, and (c) after the delivery of a Carve-Out Trigger Notice, to fund the Post Trigger Notice Carve-Out Amount (as defined below), and, solely from the proceeds of a Permitted Sale, the Success Fee.

21.    The repayment of the Prepetition Senior Obligations in accordance with the Interim Order, Final Order and the Payoff Letter is necessary, as the Prepetition Senior Creditors have not otherwise consented to the use of Cash Collateral or the subordination of the Prepetition Senior Agent's liens to the DIP Liens (as defined herein), and the DIP Credit Parties are not willing to provide the DIP Facility unless the Prepetition Senior Obligations (other than contingent indemnification obligations) are paid in full upon the entry of the Final Order (subject to the terms of the Payoff Letter) and as otherwise set forth in the Interim Order. Such payments will not prejudice the Debtors or their estates, because payment of such amounts is subject to the "Challenge" rights of parties in interest under the Interim Order.

**F.    Application of Proceeds of DIP Collateral**

22.    As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtors, the DIP Agent and the DIP Term Agent have agreed that all cash amounts received by any Loan Party from any source, on account of any type of transaction or event, and all payments received by the DIP Agent shall be transferred and credited to the Concentration Account maintained by the Debtors at Wells Fargo Bank, National Association. The amounts therein and all proceeds from any Disposition of DIP Collateral shall be applied as set forth in the DIP Loan Documents as follows (absent an Event of Default and subject to certain exceptions set forth therein, including with respect to the Net Proceeds received by a Loan Party from the sale or other disposition of the

Baldwyn Real Estate, which such Net Proceeds shall be applied in accordance with Section 2.05(h) of the DIP Credit Agreement):

(i)    *first*, to pay any fees, indemnities, or expense reimbursements then due to the DIP Agent, Revolving Lenders and Issuing Bank from any Borrower or Guarantor;

(ii)   *second*, to pay interest then due in respect of any Prepetition Revolving Credit Loans;

(iii)  *third*, to pay principal in respect of Permitted Overadvances;

(iv)   *fourth*, to pay principal in respect of the Prepetition Revolving Credit Loans;

(v)    *fifth*, to pay interest then due in respect of Committed Revolving Loans (and including any Permitted Overadvances) and Letter of Credit Obligations;

(vi)   *sixth*, to pay principal in respect of the Committed Revolving Loans;

(vii)  *seventh*, if a Default or Event of Default has occurred and is continuing Cash Collateralize the Letter of Credit Obligations (upon request of the DIP Agent);

(viii) *eighth*, to pay any fees or expense reimbursements then due to the DIP Term Agent or DIP Term Lenders from any Borrower or Guarantor;

(ix)   *ninth*, to pay interest then due with respect to the DIP Term Loan; and

(x)    *tenth*, so long as no Default or Event of Default has occurred and is continuing, to the Borrowers' operating account.

23.    Further, prior to the irrevocable payment in full of the DIP Obligations and the Prepetition Senior Obligations, the Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest or other amount payable in respect of any indebtedness prior to its scheduled maturity, other than the DIP Obligations and the Prepetition Senior Obligations (each in accordance with the DIP Loan Documents, the Payoff Letter, the Interim Order, and the Final Order) and obligations authorized by an order of the Court.

RLF1 13827775v.1

## DESCRIPTION OF DIP FACILITY

24.     Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of

the DIP Term Loans, as follows:[7]

| Material Provision | Brief Summary |
|---|---|
| **Borrowers** | Hancock Fabrics, Inc., HF Merchandising, Inc., Hancock Fabrics of MI, Inc., Hancock Fabrics, LLC, and Hancockfabrics.com, Inc. |
| **Guarantors** | HF Enterprises, Inc., HF Resources, Inc., and each of the Borrowers' direct and indirect subsidiaries |
| **DIP Administrative Agent and Collateral Agent** | Wells Fargo Bank, National Association |
| **DIP Term Agent** | GACP Finance Co., LLC |
| **DIP Lenders** | Wells Fargo Bank, National Association (the "**DIP Revolving Lender**"), and GACP I, LP (the "**DIP Term Lender**") |
| **DIP Facility** | The DIP Facility shall consist of— <br><br> (a)  a revolving credit facility in a maximum principal amount of up to $80 million (the "**DIP Revolving Loans**"), and <br><br> (b)  a term loan facility in the aggregate principal amount of $18,290,416.47 (the "**DIP Term Loan**"), which will be advanced upon the entry of the Financing Order and used by the Borrowers to repay all existing obligations with respect to the Prepetition Term Loan. <br><br> All letters of credit issued under the Prepetition Credit Agreement shall be deemed to be issued under the DIP Facility. |
| **"Creeping" Roll-Up** | All cash actually received (in available form) by the Borrowers on or after the Petition Date (other than proceeds of DIP Revolving Loans, subject to the cash dominion provisions) shall be used to repay the Prepetition Senior Obligations in respect of the Prepetition Revolving Credit Loans outstanding under the Prepetition Credit Agreement and, after all obligations thereunder have been paid in full, the DIP Credit Agreement. <br><br> Upon the entry of the Final Order, all outstanding amounts under the |

---

[7] This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Credit Agreement, the Interim Order, and the Final Order.  The summary herein is qualified in its entirety by reference to such documents and such orders.  Interested parties are strongly encouraged to read the operative documents and such orders.  This is a summary only, and the terms of the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable, shall control in all respects.

| Material Provision | Brief Summary |
|---|---|
| | Prepetition Credit Agreement shall be refinanced in full with the proceeds of the DIP Revolving Loans (in the case of the Prepetition Revolving Credit Loans) and the DIP Term Loan (in the case of the Prepetition Term Loan). |
| **Interest Rate**<br><br>DIP Credit Agmt. § 2.08 | DIP Revolving Loans:  Base Rate + 1.50%<br><br>DIP Term Loan:  Base Rate + 1.50% |
| **Default Interest**<br><br>DIP Credit Agmt. § 2.08 | Upon any Event of Default under the DIP Facility, an additional 2.00% per annum. |
| **Fees And Expenses**<br><br>DIP Credit Agmt. § 2.09 | DIP Revolving Loans:  $800,000, $400,000 payable upon entry of the Interim Order, and the balance payable only if all obligations due to the DIP Revolving Lenders and Prepetition Revolving Credit Loan Lenders have not been irrevocably paid in full on or before March 18, 2016.<br><br>DIP Term Loans:  $182,904.16<br><br>Collateral Monitoring Fee: $25,000 per annum payable on the entry of the Interim Order. |
| **Maturity**<br><br>DIP Credit Agmt. § 1.01 | The maturity date of the DIP Facility (the "**Maturity Date**") shall be the earliest of—<br><br>(i) six (6) months after the Petition Date, subject to extension by mutual consent, but in no event later than nine (9) months after the Petition Date,<br><br>(ii) thirty (30) calendar days after the Petition Date if the Final Order is not entered,<br><br>(iii) the effective date of a chapter 11 plan of reorganization,<br><br>(iv) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code,<br><br>(v) the date of acceleration of the loans and the termination of the DIP commitments upon the occurrence of an Event of Default under the DIP Facility, and<br><br>(vi) the filing of a motion by the Debtors seeking dismissal of the Chapter 11 Cases, the dismissal of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the |

16

| Material Provision | Brief Summary |
|---|---|
| | Chapter 11 Cases. |
| **Milestones**<br><br>DIP Credit Agmt.<br>§§ 6.22, 6.24, 6.26 | The DIP Credit Agreement also contains the following milestones (the "**Milestones**"):<br><br>(i)   on the **Petition Date**, the Debtors shall have filed the following motions and applications:<br><br>    o  an application to retain the Financial Consultant and an application to retain the Sale Consultant, which such applications shall be approved by the Bankruptcy Court no later than thirty-five (35) days after the Petition Date;<br><br>    o  a motion (the "**Bidding Procedures Motion**"), requesting an order from the Bankruptcy Court approving bidding procedures relating to the Interim Contingent Sale and the Agency Agreement and approving the Liquidation Stalking Horse Bid with respect thereto, including the bidding protections set forth therein;<br><br>    o  a motion (the "**Sale Order Motion**") (which may be combined with the Bidding Procedures Motion) requesting an order from the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code authorizing the Debtors to consummate the Permitted Sale (which may be a Permitted Interim Contingent Sale) and, if applicable, authorizing the conduct of "going out of business" sales at the Debtors' applicable locations pursuant to the Liquidation Stalking Horse Bid; and<br><br>    o  a motion (the "**Store Closing Motion**") requesting an order from the Bankruptcy Court pursuant to section 363 and 365 of the Bankruptcy Code authorizing the Debtors to assume and perform under the that certain Initial Store Closing Agreement by and between Hancock and Great American Group, LLC, dated as of January 23, 2016, as amended or modified with the prior written consent of the DIP Agent (the "**Initial Store Closing Agreement**") and conduct the closing of approximately 70 stores in accordance with the Initial Store Closing Agreement;<br><br>(ii)  on or before **February 8, 2016**, the Bankruptcy Court shall have entered an order approving the Initial Store Closing Agreement as requested in the Store Closing Motion;<br><br>(iii) on or before **February 12, 2016**, the Debtors shall have filed a motion on terms and conditions reasonably satisfactory to the DIP Agent and the DIP Term Agent seeking to retain the Real Estate Consultant, which such motion shall be granted by the |

| Material Provision | Brief Summary |
|---|---|
| | Bankruptcy Court no later than thirty (30) days after its filing; |
| | (iv)  on or before **thirty-five (35) days after the Petition Date**, the Bankruptcy Court shall have issued an order authorizing the retention by the Debtors of the Sale Consultant and Financial Consultant; |
| | (v)  on or before **thirty-five (35) days after the Petition Date**, the Debtors shall have filed a motion seeking an order (the "**Lease Extension Order**") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before **seventy-five (75) days after the Petition Date**, the Bankruptcy Court shall have entered the Lease Extension Order; |
| | (vii)  on or before **February 16, 2016**, the Bankruptcy Court shall have entered an order (the "**Bidding Procedures Order**") approving the bidding procedures set forth in the Bidding Procedures Motion and approving the Liquidation Stalking Horse Bid; |
| | (viii)  on or before **March 9, 2016**, the Debtors shall have received qualifying bids in accordance with the Bidding Procedures Order; |
| | (ix)  to the extent any qualifying bids are received, on or before **March 11, 2016**, the Debtors shall have completed an auction for a Permitted Sale of substantially all of the assets of the Debtors; |
| | (x)  on or before **March 14, 2016**, the Bankruptcy Court shall have entered one or more orders (together, the "**Sale Order**") approving a Permitted Sale as requested in the Sale Order Motion, which Sale Order shall be in form and substance acceptable to the DIP Agent and, if applicable, authorizing the conduct of "going out of business" sales at the Debtors' applicable locations pursuant to the applicable Initial Store Closing Agreement; and |
| | (xi)  on or before **March 15, 2016**, the Debtors shall have closed on the Permitted Sale approved pursuant to the Sale Order. |
| | (xii)  In the event that the Permitted Sale approved pursuant to the Sale Order does not provide for the sale of the Debtors' owned Real Property, then, on or before **June 30, 2016**, the Debtors shall have consummated a sale of the Real Property on terms satisfactory to the DIP Agent. |
| **Liens, Collateral,** | Effective immediately upon the entry of the Interim Order, pursuant to |

| Material Provision | Brief Summary |
|---|---|
| **and Priority**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi)**<br><br>Interim Order ¶¶ 6-8 | sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) will be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and thereafter acquired assets and real and personal property of the Debtors (the "**DIP Collateral**").<br><br>The DIP Collateral includes, effective upon the entry of the Final Order, the proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (the "**Avoidance Actions**").<br><br>More specifically, the DIP Facility shall—<br><br>(a)   be secured, subject to the DIP Carve Out, the Prepetition Permitted Liens and the Senior Agency Agreement Liens, by (i) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) second priority perfected liens and security interests in all of the Debtors' assets that are subject to Prepetition Permitted Liens pursuant to section 364(c)(3) of the Bankruptcy Code, and (iii) priming first-priority perfected liens and security interests that are senior to the liens and security interest in all of the Debtors' assets that constitute collateral securing the obligations under the Prepetition Senior Credit Agreement pursuant to sections 364(c)(2) and (d)(1) of the Bankruptcy Code, subject to the DIP Carve Out; and<br><br>(b)   constitute (without the need to file a proof of claim) an allowed joint and several superpriority administrative expense claim against each of the Debtors pursuant to section 364(c)(1) of the Bankruptcy Code (the "**DIP Superpriority Claim**"), senior to any pre- or post-petition claims, with priority over all other costs and expenses of administration of any kind, with recourse to all of the Debtors' assets (including, only upon entry of the Final Order, the proceeds of Avoidance Actions), subject, in each case, only to the DIP Carve Out, the DIP Liens, the Senior Agency Agreement Liens, and the Prepetition Permitted Liens. |
| **DIP Carve Out;**<br><br>**Professional Fee Escrow Account**<br><br>DIP Credit Agmt. | The "**DIP Carve Out**" means, collectively, the sum of—<br><br>(i)   all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) and section 3717 of title 31 of the United States Code; |

| Material Provision | Brief Summary |
|---|---|
| §§ 1.01, 7.19<br><br>Interim Order ¶ 30 | (ii)  the aggregate amount of unpaid fees and expenses of the Debtors' and any Committee's professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a) or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), which amount under this clause (ii) shall not exceed the sum of: (x) commencing with the week ending February 6, 2016, an aggregate amount per week limited to the amount set forth in the Budget for such week for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice, which amount shall be funded into the Professional Fee Escrow Account on Wednesday of each week (or such other day of the week selected by the Debtors) in accordance with the Budget provided that (I) the Debtors have sufficient Availability on such date, (II) the Termination Date has not occurred, and (III) no Event of Default has occurred and is continuing, plus (y) $100,000 for Allowed Professional Fees incurred from and after the delivery of a Carve-Out Trigger Notice (the "**Post Trigger Notice Carve Out Amount**"); and<br><br>(iii) the Success Fees.<br><br>*Professional Fee Escrow Account.* Until an Event of Default or the Termination Date has occurred, the Debtors shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) of the immediately preceding paragraph for the Case Professionals, subject to there being sufficient Availability for such borrowings. The Debtors also shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Date has occurred. The aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtors prior to the delivery of a Carve-Out Trigger Notice from amounts funded into the Professional Fee Escrow Account pursuant to clause (x) of the immediately preceding paragraph (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Budget.<br><br>Notwithstanding anything to the contrary contained in the Interim Order, the Budget, or the DIP Loan Documents, none of the DIP Credit Parties |

| Material Provision | Brief Summary |
|---|---|
|  | or the Prepetition Secured Creditors shall be responsible for funding into the Professional Fee Escrow Account any of the Transaction Fees payable to the Sale Consultant or any other "success" fees payable to any other investment banker, and subject to the immediately succeeding sentence, in no event shall any such amounts be paid out of the DIP Carve Out or any funds in the Professional Fee Escrow Account. Notwithstanding the foregoing, the Success Fee shall be deemed part of the DIP Carve Out; provided that the Success Fees shall be paid solely from the proceeds of a Permitted Sale and not from the Professional Fee Escrow Account and shall not reduce the amounts available in the Budget for the DIP Carve Out or the Post Trigger Notice Carve Out Amount.  No Plan shall fail to provide for the payment in full of any outstanding Transaction Fees on the effective date thereof.  No Financing Transaction (as defined in the Sale Consultant Agreement) shall fail to provide for payment in full of the Financing Success Fee (as defined in the Sale Consultant Agreement) on the closing date thereof. For the avoidance of doubt, none of the provisions of this Agreement or any other Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers paid prior to the Petition Date and held by such Case Professional.  Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Agent, which amounts shall be applied to the DIP Obligations in the order proscribed in Section 8.03 of the DIP Credit Agreement. |
| **Events of Default**<br><br>DIP Credit Agmt. § 8.01 | Customary events of default for financings of this type, subject to certain exceptions, grace periods and cure periods (each, an "**Event of Default**"), including, without limitation—<br><br>(i)     failure to achieve any Milestone,<br><br>(ii)    except in connection with a Permitted Sale, any Debtor, without the DIP Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Debtor's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Prepetition Senior Obligations and DIP Obligations on the closing of such sale;<br><br>(iii)   other than in connection with the payment in full or refinancing of the Prepetition Senior Obligations and the DIP Obligations, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Debtor in the Chapter 11 Cases: (A) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP |

21

| Material Provision | Brief Summary |
|---|---|
| | Credit Agreement; (B) to grant any lien other than Permitted Encumbrances upon or affecting any DIP Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use Cash Collateral under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Agent; (D) that seeks to prohibit the DIP Agent, the DIP Term Agent or DIP Lenders from credit bidding on any or all of the Debtors' assets during the pendency of the Chapter 11 Cases; or (E) any other action or actions adverse to the interest of the DIP Agent, the DIP Term Agent, or the DIP Lenders or their rights and remedies under the DIP Credit Agreement or their interests in the DIP Collateral; *provided* that seeking of relief from the Bankruptcy Court during the Remedies Notice Period shall not constitute an Event of Default; |
| | (iv)  (A) other than in connection with the payment in full or refinancing of the Prepetition Senior Obligations and the DIP Obligations on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Debtor or any other Person to which the DIP Agent and the DIP Term Agent do not consent or otherwise agree to treatment of the respective claims of the DIP Agent and the DIP Lenders; (B) the entry of an order terminating the Debtors' exclusive right to file a plan of reorganization without the consent of the DIP Agent and the DIP Term Agent, or (C) the expiration of the Debtors' exclusive right to file a plan of reorganization without the consent of the DIP Agent or the DIP Term Agent; |
| | (v)  the entry of an order in the Chapter 11 Cases confirming a plan that (A) is not acceptable to the DIP Agent and DIP Term Agent in their discretion (it being agreed that a plan that satisfies the DIP Obligations and the Prepetition Senior Obligations (if any) in full in cash on the effective date thereof is acceptable to the DIP Agent and the DIP Term Agent) or (B) does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Prepetition Senior Obligations and the DIP Obligations under the DIP Credit Agreement on or before the effective date of such plan or plans; |
| | (vi)  the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Documents, the Prepetition Senior Credit Agreement or the Interim Order, the Final Order or the Cash Management Order without the written consent of the DIP Agent or the filing of a |

| Material Provision | Brief Summary |
|---|---|
| | motion for reconsideration with respect to the Interim Order or the Final Order, or the Interim Order, the Final Order or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the DIP Agent or DIP Term Agent; |
| | (vii)  the Final Order is not entered prior to the expiration of the Interim Order, and in any event within thirty (30) days of the Petition Date; |
| | (viii)  except as set forth in any motions which have been delivered to and are acceptable to the DIP Agent and as contemplated by the Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any prepetition Indebtedness or prepetition claim without the DIP Agent's prior written consent; |
| | (ix)  the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the DIP Agent, any other DIP Credit Party or any of the DIP Collateral; |
| | (x)  the filing of a motion by any Loan Party or any holder of the Specified Subordinated Indebtedness or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors; or, other than a Permitted Sale the sale without the DIP Agent's consent, of all or substantially all of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Prepetition Senior Obligations and the DIP Obligations, and termination of the Commitments on the effective date of such plan or the closing of such sale; |
| | (xi)  the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or any Debtor files a motion or other pleading seeking the dismissal of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise; |
| | (xii)  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on any DIP Collateral having a value of |

RLF1 13827775v.1

| Material Provision | Brief Summary |
|---|---|
| | $100,000 (or $500,000 in the aggregate) or more, or (B) with respect to any lien or the granting of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority; |
| | (xiii) the commencement of a suit or action against the DIP Agent, any DIP Lender or any other DIP Credit Party by or on behalf of any Debtor, or its bankruptcy estates; |
| | (xiv) the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under the DIP Credit Agreement or the other DIP Loan Documents or the Prepetition Senior Credit Agreement; |
| | (xv) the failure of any Debtor to perform any of its obligations under the Interim Order, the Final Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court; |
| | (xvi) the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the DIP Agent may otherwise agree), grant an order extending the time period of the Debtors to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date; |
| | (xvii) the entry of an order in the Chapter 11 Cases granting any other super-priority administrative claim or lien equal or superior to that granted to the DIP Agent, the DIP Lenders and the Prepetition Senior Agent except as set forth in the Interim Order and Final Order; or |
| | (xviii) the failure of any Debtor or other person to perform any of its obligations under the Agency Agreement, the Bidding Procedures Order or the Sale Order. |
| **Automatic Stay**<br><br>**Bankruptcy Rule 4001 (c)(1)(B) (iv)**<br><br>Interim Order ¶ 24 | The Interim Order and the Final Order shall include relief from the automatic stay with respect to the exercise of rights and remedies upon the occurrence of an Event of Default, subject to a five Business Day notice period. |
| **Limitation On Challenges to the Prepetition Secured Obligations**<br><br>**Bankruptcy Rule 4001(c)(1)(b) (vii),** | The stipulations, findings, representations and releases contained in the Interim Order, the Payoff Letter, and the DIP Loan Documents with respect to the Prepetition Secured Creditors and the Prepetition Secured Obligations shall be binding upon all parties-in-interest, any trustee appointed in these cases and any statutory committee (each, a "**Challenge Party**"), unless and solely to the extent that (i) the Debtors or, subject to the provisions of the Interim Order, any other Challenge |

| Material Provision | Brief Summary |
|---|---|
| **(viii)**<br><br>Interim Order ¶¶ 31, 33–34 | Party initiates an action or adversary proceeding relating to a Challenge (defined below) during the Challenge Period (defined below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge. |
| | "**Challenge**" means any claim or cause of action against any of the Prepetition Secured Creditors on behalf of the Debtors, their estates or the Debtors' creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtors' stipulations set forth in the Interim Order, including, but not limited to those in relation to: (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Secured Creditor; (ii) the validity, allowability, priority, or amount of any of the Prepetition Secured Obligations (including any fees included therein); (iii) the secured status of any of the Prepetition Secured Obligations; (iv) any liability of any of the Prepetition Secured Creditors with respect to anything arising from any of the respective Prepetition Credit Documents; or (v) the releases set forth in the DIP Loan Documents. |
| | "**Challenge Period**" means (i) with respect to any party in interest other than the Committee, the period from the Petition Date until the date that is seventy-five (75) calendar days after the entry of the Interim Order and (ii) with respect to the Committee, the period from the date such Committee is formed until the date that is sixty (60) calendar days thereafter. |
| | No more than an aggregate of $50,000 of the proceeds of the DIP Facility under the DIP Credit Agreement, the DIP Collateral, the Prepetition Collateral (including Cash Collateral) or the DIP Carve Out may be used by the Committee during the Challenge Period to investigate the claims and liens of the Prepetition Secured Creditors (and other potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Creditors). |
| **Limitation On Use of Proceeds**<br><br>**Bankruptcy Rule 4001 (c)(1)(B)(viii)**<br><br>DIP Credit Agmt. §§ 6.11, 7.11<br><br>Interim Order ¶¶ 10, 31 | Proceeds of the DIP Facility shall be used—<br><br>   (a)  for the repayment in full in cash of all remaining Prepetition Senior Obligations upon the entry of the Final Order (other than contingent indemnification obligations) as provided in the Payoff Letter,<br><br>   (b)  in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Budget or as otherwise permitted by the DIP Agent, and<br><br>   (c)  for the payment of the Post Trigger Notice Carve Out Amount. |
| **Indemnification Bankruptcy Rule** | The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Term Agent and each other DIP Credit Party, and each of their respective |

| Material Provision | Brief Summary |
|---|---|
| **4001(c)(1)(B)(ix)**<br><br>DIP Credit Agmt. §§ 3.01(c), 10.04(b)<br><br>Interim Order ¶ 27(b) | shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, the DIP Facility or the transactions contemplated thereby and by the Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and in the Interim Order, or in connection with these Chapter 11 Cases, any plan, or any action or inaction by the Debtors; *provided*, that such indemnity shall not, as to any indemnified party, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted directly from the gross negligence or willful misconduct of such indemnified party. |
|  | The indemnity includes indemnification for the DIP Agent's and the DIP Term Agent's exercise of discretionary rights granted under the DIP Facility. |
|  | In all such litigation, or the preparation therefor, each of the DIP Agent, the DIP Term Agent and each other DIP Credit Party shall be entitled to select its own counsel and, in addition to the aforementioned indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel. |
|  | Upon the conclusion of the Remedies Notice Period, the Debtors shall pay $250,000 from proceeds of the DIP Collateral into an indemnity account (the "**DIP Indemnity Account**") subject to first priority liens of the DIP Agent, for the benefit of the DIP Credit Parties. The DIP Indemnity Account shall be released and the funds applied in accordance with the Interim Order upon the receipt by the DIP Agent, the DIP Term Agent and each other DIP Credit Party of releases from the Debtors and their estates, with respect to any claims arising out of or related to the DIP Credit Agreement and the DIP Loan Documents, acceptable to the DIP Agent, the DIP Term Agent and each other DIP Credit Party in their sole discretion. |

## ADEQUATE PROTECTION

25.    In consideration of their consent to the Debtors' use of Cash Collateral and in respect of the diminution in value of their interests in the Prepetition Collateral, the Debtors have

RLF1 13827775v.1

agreed to pay to the Prepetition Senior Creditors the amounts required under the Payoff Letter upon the entry of the Final Order and as otherwise set forth in the Interim Order. The Prepetition Senior Creditors also shall receive adequate protection in the form of—

(i)     payment of the Prepetition Senior Obligations from the proceeds of DIP Collateral; and

(ii)    payments of interest (which shall be payable at the default rate under the Prepetition Senior Credit Agreement), fees, costs, expenses (including reasonable attorneys' fees and expenses (including the reasonable attorneys' fees of Choate Hall & Stewart, as counsel to the Prepetition Senior Agent, Paul Hastings LLP, as counsel to the Prepetition Term Agent, and local counsel to each of the Prepetition Senior Agent and Prepetition Term Agent)), indemnities and other amounts with respect to the Prepetition Senior Obligations in accordance with the Prepetition Senior Credit Documents (collectively, the "**Prepetition Senior Creditor Adequate Protection Payments**").

26.     To the extent of any diminution in value of their respective Prepetition Liens on the Prepetition Collateral, each of the Prepetition Senior Agent (for the benefit of itself and the other Prepetition Senior Creditors) and the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) shall be granted, subject to the priorities set forth in the Interim Order, valid and perfected replacement and additional security interests in, and liens on all of the Debtors' right, title, and interest in, to, and under all DIP Collateral (the "**Adequate Protection Liens**").

27.     The Adequate Protection Liens granted to the Prepetition Senior Agent shall secure Prepetition Senior Obligations (including, without limitation, the Surviving Obligations) and will be senior in all respects to the Adequate Protection Liens granted to the Prepetition Indenture Trustee. The Adequate Protection Liens will be subordinate and subject only to (i) the DIP Liens, (ii) the Prepetition Permitted Liens, (iii) the DIP Carve Out, and (iv) the Senior Agency Agreement Liens.

28.     As further adequate protection of the interests of (i) the Prepetition Senior Agent and the other Prepetition Senior Creditors with respect to the Prepetition Senior Obligations and (ii) the Prepetition Indenture Trustee and the other Prepetition Subordinated Creditors with respect to the Prepetition Subordinated Obligations, each of the Prepetition Senior Agent (for the benefit of itself and the other Prepetition Senior Creditors) and the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) shall be granted, subject to the priorities set forth in the Interim Order, an allowed administrative claim against the Debtors' estates under sections 503 and 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Senior Agent's interests in the Prepetition Collateral.

29.     The Adequate Protection Superpriority Claim granted to the Prepetition Senior Agent will be senior in all respects to the Adequate Protection Superpriority Claim granted to the Prepetition Indenture Trustee. The Adequate Protection Superpriority Claims granted to each of the Prepetition Senior Agent and the Prepetition Indenture Trustee will be junior to the DIP Carve Out, the Prepetition Permitted Liens, the DIP Liens, the DIP Superpriority Claim, the Senior Agency Agreement Liens and the Senior Agency Agreement Claim. The Adequate Protection Liens and will otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

## LOCAL RULE 4001-2(A)(I) STATEMENTS

30.     In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP Facility are highlighted below:

(a)  *Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.*

As noted in clause (e) below, prior to the Final Hearing, all cash actually received (in available form) by the Borrowers on or after the Petition Date (other than proceeds of DIP Revolving Loans, subject to the cash dominion provisions) shall be used to repay the Prepetition Senior Obligations in respect of the Prepetition Revolving Credit Loans. Upon entry of the Final Order, all outstanding amounts under the Prepetition Credit Agreement shall be refinanced in full or "rolled-up" with the proceeds of the DIP Revolving Loans (in the case of the Prepetition Revolving Credit Loans) and the DIP Term Loan (in the case of the Prepetition Term Loan).

(b)  *Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.*

There are no such provisions.

(c)  *Provisions that seek to waive, without notice, whatever rights the Debtors' estates may have under 11 U.S.C. § 506(c).*

Upon entry of the Final Order, each of the DIP Credit Parties and each Prepetition Secured Creditor is entitled to the benefits of a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(d)  *Provisions that immediately grant to the prepetition secured creditors liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.*

Liens will be granted on the proceeds from Avoidance Actions to the extent such liens are approved in the Final Order.

(e)  *Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).*

Prior to the Final Hearing, all cash actually received (in available form) by the Borrowers on or after the Petition Date (other than proceeds of DIP Revolving Loans, subject to the cash dominion provisions) shall be used to repay the Prepetition Senior Obligations in respect of the Prepetition Revolving Credit Loans outstanding under the Prepetition Senior Credit Agreement and, after all obligations thereunder have been paid in full, the DIP Credit Agreement.

Upon entry of the Final Order, all outstanding amounts under the Prepetition Credit Agreement shall be refinanced in full or "rolled-up" with the proceeds of the DIP Revolving Loans (in the case of the Prepetition Revolving Credit Loans) and the DIP Term Loan (in the case of the Prepetition Term Loan).

The Debtors believe that repayment of the amounts outstanding under the Prepetition Senior Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates. The validity, enforceability, and priority of the liens granted by the Debtors under the Prepetition Senior Credit Documents are subject to the "challenge" rights of third parties, including any Committee. Moreover, the DIP Lenders are otherwise unwilling to lend, and the Debtors have been unable to obtain other financing on reasonable terms sufficient to provide needed liquidity. Thus, insofar as the satisfaction of the Prepetition Senior Obligations is premised upon the validity of the blanket liens granted by the Debtors thereunder, the Committee will have an opportunity to examine the propriety of such repayment, and to clawback such repayment to the extent that the underlying liens are avoided.

All payments made to the Prepetition Senior Creditors will be subject to recovery if a timely challenge is successfully prosecuted by a third-party, including the Committee, but the Debtors waive the right to pursue any such challenge.

(f)    *Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.*

Pursuant to the Interim Order, each professional employed by the Debtors and any Committee will be entitled to DIP Carve Out protections to the extent, with respect to the period prior to the delivery of a Carve-Out Trigger Notice, their Allowed Professional Fees are set forth in the Budget. The Budget reflects estimated fees that are commensurate with such professional's anticipated efforts in the Chapter 11 Cases; but, in recognition of the fact that the Debtors' professionals are expected to perform more work in connection with the Chapter 11 Cases, the dollar amounts in the Budget for the Debtors' professionals are higher than the dollar amounts set forth in the Budget for the professionals retained by any Committee.

(g)    *Provisions that prime any secured lien absent consent of the affected lienor.*

The liens securing the DIP Obligations will prime the Prepetition Liens of the Prepetition Secured Creditors, but the Prepetition Secured Creditors have consented to this priority. The DIP Liens will not prime the Prepetition Permitted Liens, if any.

(h)    *Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).*

Upon entry of the Final Order, each of the DIP Credit Parties and each Prepetition Secured Creditor is entitled to the benefits of a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

31.    The provisions of the DIP Facility and the Interim Order were extensively negotiated and are the most favorable that the Debtors were able to negotiate. The DIP Facility enables the Debtors to obtain the financing necessary to maintain their operations, and pursue a sale or reorganization that will maximize the value of their estates.

## RELIEF REQUESTED

32.    The Debtors seek entry of an order (a) authorizing the Debtors to, among other things, (i) enter into the DIP Facility on the terms described in the Interim Order, the Final Order, and the DIP Loan Documents, (ii) repay the remaining Prepetition Senior Obligations upon the entry of the Final Order and as otherwise set forth in the Interim Order, (iii) use Cash Collateral on the terms described in the Interim Order and Final Order to administer their Chapter 11 Cases and fund their operations, and (iv) grant the Prepetition Secured Creditors adequate protection of their interests in the Prepetition Collateral, and (b) scheduling and establishing deadlines relating to the Final Hearing and order authorizing the Debtors to obtain postpetition financing.

## BASIS FOR RELIEF REQUESTED

I.    **The Court Should Authorize the Debtors to Provide Adequate Protection to the Prepetition Secured Creditors**

33.    The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the

31

> estate in the ordinary course of business without notice or a
> hearing.

11 U.S.C. § 363(c)(1).

34.    To the extent any prepetition secured creditor has a lien on a Debtor's assets and does not consent to the Debtor's use of those assets, such creditor will be adequate protected. The propriety of adequate protection is determined on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

35.    Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Beker Indus., 58 B.R. at 736; In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

36.    Adequate protection is not expressly defined in the Bankruptcy Code. Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection. The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party. *See Swedeland*, 16 F.3d 552, 564 (3d Cir. 1994). Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361.

37.    The Debtors are providing the Prepetition Secured Creditors with adequate protection for their consent to the priming liens as follows: by the provision of Adequate Protection Liens and Adequate Protection Superpriority Claims to the Prepetition Secured Creditors; and by the provisions of the Prepetition Senior Creditor Adequate Protection Payments to the Prepetition Senior Creditors. The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Prepetition Collateral and the Prepetition Secured Creditors' right to adequate protection under the Bankruptcy Code. As a result, the Debtors submit that the proposed terms of the Debtors' use of Prepetition Collateral should be approved in their entirety.

## II.    Approval of the DIP Credit Agreement Is Appropriate Under Section 364 of the Bankruptcy Code

38.    The Debtors are authorized to operate their businesses under section 1108 of the Bankruptcy Code. As part of that operation, the Debtors may incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession. Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property. 11 U.S.C. § 364(c), (d).

39.    The business necessity for obtaining the DIP Facility has been fully described above. The Debtors will not have the cash needed to pay their current operating expenses absent the DIP Facility. Even if the Debtors obtained this Court's authorization to use every dollar of

33

cash collateral generated from the Debtors' assets over the objections of the Prepetition Secured Creditors, the Debtors' projected gross cash collections would be insufficient to fund current operating expenses during the pendency of the Chapter 11 Cases. During the Chapter 11 Cases, the Debtors' current operating expenses will exceed their cash collections. The Debtors can operate without drastic cuts in operations only with new financing.

40.     Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available. *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). This is true especially when time is of the essence. *See e.g., id.; In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987). Here, as described in the Lyons Declaration, the Debtors have searched for debtor in possession financing on the most favorable terms. No potential lender is willing to provide such financing on an unsecured basis or secured only by junior liens, and, accordingly, the DIP Lenders have proposed the needed financing on the most favorable terms.

41.     As a condition to extending the DIP Facility that the Debtors need, the DIP Credit Parties require the protections contained in subsections 364(c) and (d) of the Bankruptcy Code, which the facts in these Chapter 11 Cases support. Specifically, the DIP Obligations will be secured, in each case subject to the DIP Carve Out, the Prepetition Permitted Liens and the Senior Agency Agreement Liens, by (i) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) second priority perfected liens and security interests in all of the Debtors' assets that are subject to Prepetition Permitted Liens pursuant to section 364(c)(3) of the Bankruptcy Code, and

34

(iii) priming first-priority perfected liens and security interests in all of the Debtors' assets that constitute Prepetition Collateral pursuant to sections 364(c)(2) and (d)(1) of the Bankruptcy Code.

42.    In addition, the DIP Credit Parties will receive a DIP Superpriority Claim for any unpaid DIP Obligations. The DIP Superpriority Claim will be subordinate only to the DIP Liens, the DIP Carve Out, Prepetition Permitted Liens, and the Senior Agency Agreement Liens and will otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

43.    The DIP Facility provides the funding needed to get to a sale of substantially all of the Debtors' operating assets. Without the DIP Facility, the Debtors would be required to terminate some or all of their operations (depending on whether the Court authorized the Debtors to use cash collateral), which would destroy at least a substantial portion of the going concern value of the Debtors' operations. Preservation of value generally constitutes the "adequate protection" needed to prime existing liens. *See, e.g.,* Norton, et al., 2 *Norton Bankruptcy Law and Practice 2d.* § 38:7, p.38-17 (1994) (addressing the § 364(d) determination, "Factors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Snowshoe,* 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is transferred into value. "This value will serve as adequate protection. . . ."); *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin,* 185 B.R. 376, 378 (Bankr. M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority

35

status to replace air-conditioning unit, boiler, and hot water heaters because such expenses were necessary to preserve value and maintain operations). In any event, the only parties that the Debtors are aware of whose liens are being primed are the Prepetition Secured Creditors, and they have consented to the priming lien to preserve the going concern value of their collateral.

### III. Approval of the DIP Facility Is Supported by the Exercise of Sound Business Judgment

44. Generally, courts give broad deference to business decisions of a debtor in possession. *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds. As the court noted in *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990):

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

45. In the present case, the Debtors' decision to obtain the DIP Facility represents an exercise of sound business judgment in the continued effort to maximize the value of their operating business. Without such credit the Debtors would be unable to operate and the value of their business as a going concern would be destroyed.

46. In particular, the Debtors believe that repayment of the amounts outstanding under the Prepetition Senior Credit Documents is appropriate under the circumstances and will not prejudice the Debtors or their estates.

47.     The validity, enforceability, and priority of the liens granted by the Debtors under the Prepetition Senior Credit Documents are subject to the "Challenge" rights of third parties, as set forth in the Interim Order, including any Committee. Thus, insofar as the satisfaction of the Prepetition Senior Obligations is premised upon the validity of the blanket liens granted by the Debtors thereunder, the Committee will have an opportunity to examine the propriety of such repayment, and to clawback such repayment to the extent that the underlying liens are avoided.

48.     Hence, there should be no prejudice from the proposed repayment to other creditors of these estates because the Prepetition Senior Creditors already assert security interests in the assets that the Debtors propose to pledge to the DIP Lenders that are providing the funds to satisfy the Prepetition Senior Obligations with the DIP Loans. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that administrative expense claims allowable under section 503(b) of the Bankruptcy Code "do not have priority over secured claims").

49.     Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured. As the United States District Court for the District of Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up."
> Most simply, a [roll up] is the payment of a pre-petition debt with
> the proceeds of a post-petition loan. Roll-ups most commonly
> arise where a pre-petition secured creditor is also providing a post-
> petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code. The proceeds of the DIP loan are used to pay
> off or replace the pre-petition debt, resulting in a post-petition debt
> equal to the pre-petition debt plus any new money being lent to the
> debtor. As a result, the entirety of the pre-petition and post-
> petition debt enjoys the post-petition protection of section 364(c)
> and/or (d) as well as the terms of the DIP order. In both a
> refinancing and a roll-up, the pre-petition secured claim is paid

37

through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (quoting *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)). *See also, e.g., In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

## IV.    Immediate Relief Is Justified

50.    Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced less than fourteen days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate. Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing to consider approval of the Debtors' request to obtain financing through the DIP Facility on a final basis pursuant to the terms of the Final Order.

51.    As described above and in the Lyons Declaration, without access to the DIP Facility, the Debtors will have no ability to operate their business. In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to

support immediate DIP Facility availability pending the entry of the Final Order. Accordingly, to forestall the immediate and irreparable harm that would inure to the Debtors' estates, creditors and parties in interest absent Court approval of this Motion, the Debtors respectfully request that the Court grant the relief requested herein.

## REQUEST FOR WAIVER OF STAY

52.    To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein. Accordingly, ample cause exists to justify a waiver of any fourteen-day stay imposed by Bankruptcy Rule 6004(h).

53.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## NOTICE

54.    The Debtors will provide notice of this Motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (iii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iv) counsel to Wells Fargo Bank, National Association, as Administrative and Collateral Agent under the prepetition credit facility; (v) counsel to GACP Finance Company, LLC, as Term Agent under the prepetition credit facility; (vi) counsel to Deutsche Bank National Trust Company, as trustee under the indenture for the Floating Rate Series A Secured Notes due 2017;

(vii) John A. Bicks, Esq., K&L Gates, as counsel to certain secured noteholders, and (viii) all parties entitled to notice pursuant to Local Rule 9013-1(m). Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these chapter 11 cases. A copy of the Motion is also available on the Debtors' case website at https://www.kccllc.net/hancockfabrics.com. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[remainder of page intentionally left blank]*

RLF1 13827775v.1

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    February 2, 2016
           Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* pending)
Karen Rinehart (*pro hac vice* pending)
Michael S. Neumeister (*pro hac vice* pending)
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407

Proposed Attorneys for the
Debtors and Debtors in Possession

# EXHIBIT A

**Interim DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>HANCOCK FABRICS, INC., <u>et al.</u>, [1]<br>a Delaware corporation,<br>Debtors. | Chapter 11<br><br>Case No. 16-_____ (____)<br><br>Joint Administration Requested |

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING

This matter having come before the Court upon the motion (the "**Motion**") by Hancock Fabrics, Inc., a Delaware corporation (the "**Lead Borrower**"), HF Merchandising, Inc., a Delaware corporation, Hancock Fabrics of MI, Inc., a Delaware corporation, Hancock Fabrics, LLC, a Delaware limited liability company, hancockfabrics.com, Inc., a Delaware corporation, HF Enterprises, Inc., a Delaware corporation, and HF Resources, Inc., a Delaware corporation, each as a debtor and debtor in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101, *et seq.*, as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for:

(i)    authorization, under Sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), to obtain, as co-borrowers (collectively, the "**Borrowers**"), secured,

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

superpriority post-petition loans, advances and other financial accommodations (the "**DIP Facility**"), pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among (a) the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the Guarantors[2] party thereto from time to time, (d) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities herein, the "**DIP Agent**") for its own benefit and the benefit of the other Credit Parties, (e) GACP Finance Co., LLC, as term agent (in such capacity, the "**DIP Term Agent**"), and (f) the Lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"; the DIP Agent, the DIP Term Agent, the DIP Lenders and the other Credit Parties under the DIP Loan Documents (as defined below) are collectively referred to herein as the "**DIP Credit Parties**"), substantially in the form of Exhibit A attached hereto; and

(ii)     authorization to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents; and

(iii)     until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and this Interim Order, authorization, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $80,000,000 at any one time outstanding (the "**Interim Financing**"); and

---

[2] Capitalized terms used by not defined have the meanings given to them in the DIP Loan Documents.

(iv)     entry of this "**Interim Order**" approving the Interim Financing; and

(v)     the granting of allowed superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in each of the Cases and any Successor Cases (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including all obligations with respect to letters of credit issued or deemed issued under the DIP Credit Agreement, respectively, and, together, the "**DIP Obligations**"), subject to the priorities set forth herein; and

(vi)     authorization to use "**Cash Collateral**," as defined in Section 363(a) of the Bankruptcy Code, that the Debtors are holding or may obtain, pursuant to Bankruptcy Code Section 361 and 363 and Bankruptcy Rules 4001(b) and 6004 on the terms and conditions set forth in the DIP Loan Documents and this Interim Order; and

(vii)     the granting to the DIP Agent, for the benefit of the DIP Credit Parties, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth herein; and

(viii)     authorization to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, continuing commitment fees, upfront fees, closing fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Credit Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents; and

3

(ix)     authorization to pay in full the Prepetition Senior Obligations (as defined herein) upon the entry of the Final Order (as defined herein) and as set forth herein, subject to the "Challenge" rights of parties in interest described in paragraphs 33 and 34 of this Interim Order; and

(x)     the provision of adequate protection to the Prepetition Secured Creditors (as defined herein) to the extent set forth herein; and

(xi)     vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(xii)     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion, the entry of an order (a "**Final Order**") approving the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing;

(xiii)     granting related relief.

The Court having considered the Motion, the *Declaration of Dennis Lyons in Support of Chapter 11 Petitions and Request for First Day Relief*, including the Motion, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014, and Local Bankruptcy Rule 9013-1; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and

4

irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW: [3]

B.      *Petition Date*.  On February 2, 2016 (the "**Petition Date**"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, (the "**Court**"), commencing these Cases.

C.      *Debtors in Possession*.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

D.      *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rule 4001-2.

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

E.    *Committee Formation*. As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not appointed any official committee of unsecured creditors in these Cases pursuant to Section 1102 of the Bankruptcy Code (a "**Committee**").

F.    *Debtors' Stipulations*. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraphs 33 and 34 herein, the Debtors (on behalf of and for themselves) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(x) below are referred to herein as the "**Debtors' Stipulations**"):

(i)    *Prepetition Senior Credit Documents*. As of the Petition Date, the Debtors had outstanding secured debt to various lenders pursuant to that certain Credit Agreement dated as of April 22, 2015 (as amended, modified and supplemented from time to time, the "**Prepetition Senior Credit Agreement**" and together with all related documents, guaranties and agreements, the "**Prepetition Senior Credit Documents**"), by and among (a) the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the Guarantors party thereto from time to time, (d) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities herein, the "**Prepetition Senior Agent**") for its own benefit and the benefit of the other "Credit Parties" (as defined therein), (e) GACP Finance Co., LLC, as term agent (in such capacity, the "**Prepetition Term Agent**") and (f) the Lenders from time to time party thereto (the "**Prepetition Senior Lenders**" and each a "**Prepetition Senior Lender**"; the Prepetition Senior Agent, the Prepetition Term Agent, the Prepetition Senior Lenders and the other "Credit Parties" under the Prepetition Senior Credit Documents are collectively referred to herein as the "**Prepetition Senior Creditors**").

(ii)     *Prepetition Senior Obligations.*  As of the Petition Date, the aggregate outstanding amount owed by the Debtors under the Prepetition Senior Credit Documents was not less than $82,000,000, consisting of revolving credit loans in the outstanding principal amount of approximately $57,125,000 (the **"Prepetition Revolving Credit Loans"**), issued and outstanding letters of credit in the approximate amount of $6,700,000; and a term loan in the outstanding principal amount of approximately $18,300,000 (the "**Prepetition Term Loan**") (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Credit Documents, and further including all "Obligations" as described in the Prepetition Senior Credit Agreement, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "**Prepetition Senior Obligations**").  As more fully set forth in the Prepetition Senior Credit Documents, prior to the Petition Date, the Debtors granted first-priority security interests in and liens on substantially all personal and real property of the Debtors, including, without limitation, owned real estate, accounts, inventory, equipment and general intangibles (collectively, the "**Prepetition Collateral**"), to the Prepetition Senior Agent (collectively, the "**Prepetition Senior Liens**") to secure repayment of the Prepetition Senior Obligations.

(iii)     *Prepetition Subordinated Indenture Documents.*  As of the Petition Date, the Debtors had outstanding secured debt to various noteholders (collectively, the "**Prepetition Subordinated Noteholders**") pursuant to that certain Indenture dated as of November 20, 2012 (as amended, modified and supplemented from time to time, including pursuant to that certain Supplemental Indenture dated as of April 22, 2015, the "**Prepetition Subordinated Indenture**" and together with all related documents, guaranties and agreements, the "**Prepetition**

7

**Subordinated Indenture Documents**"), by and between (a) the Lead Borrower and (b) Deutsche Bank National Trust Company, as indenture trustee (in such capacity, the "**Prepetition Indenture Trustee**"; the Prepetition Indenture Trustee and the Prepetition Subordinated Noteholders are collectively referred to herein as the "**Prepetition Subordinated Creditors**"). The Prepetition Senior Creditors and the Prepetition Subordinated Creditors are collectively referred to herein as the "**Prepetition Secured Creditors**" and the Prepetition Senior Credit Documents and the Prepetition Subordinated Indenture Documents are collectively referred to herein as the "**Prepetition Credit Documents**".

(iv)    *Prepetition Subordinated Obligations.*    As of the Petition Date, the outstanding principal amount owed by the Debtors under the Prepetition Subordinated Indenture Documents was not less than $8,204,000 (together with any amounts paid, incurred or accrued, including but not limited to interest, fees and expenses, prior to the Petition Date in accordance with the Prepetition Subordinated Indenture Documents, the "**Prepetition Subordinated Obligations**"; the Prepetition Senior Obligations and the Prepetition Subordinated Obligations are collectively referred to herein as the "**Prepetition Secured Obligations**"). As more fully set forth in the Prepetition Subordinated Indenture Documents, prior to the Petition Date, the Debtors granted second-priority security interests in and liens on the Prepetition Collateral to the Prepetition Indenture Trustee (the "**Prepetition Subordinated Liens**") to secure repayment of the Prepetition Subordinated Obligations. The Prepetition Subordinated Liens and the Prepetition Senior Liens are collectively referred to herein as the "**Prepetition Liens.**"

(v)    *Subordination Provisions.*    Pursuant to the terms of the Prepetition Subordinated Indenture, including, without limitation, Article XI of the Prepetition Subordinated Indenture, (A) the Prepetition Subordinated Obligations are subordinated in all respects to the

prior payment in full of the Prepetition Senior Obligations, and (B) the Prepetition Subordinated Liens are subordinate and junior in all respects to the Prepetition Senior Liens (collectively, such terms are referred to herein as the **"Indenture Subordination Provisions"**).  The Indenture Subordination provisions are a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code.  The DIP Agent has advised the Debtors that its willingness to provide the DIP Facility is conditioned on, among other things, the DIP Agent (in addition to the Prepetition Senior Agent) having all of the rights of the Prepetition Senior Agent under the subordination provisions set forth in the Prepetition Subordinated Indenture.

(vi)    *Validity, Perfection and Priority of Prepetition Liens and Obligations.* The Debtors (without limiting the rights of other parties in interest under paragraphs 33 and 34 of this Interim Order), and the Prepetition Secured Creditors acknowledge and agree that:  (a) the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) the Prepetition Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the **"Prepetition Permitted Liens"**) and otherwise had priority over any and all other liens on the Prepetition Collateral;[4] (c) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code; (d) no offsets,

---

[4] For purposes of this Interim Order, Prepetition Permitted Liens shall include only liens that were valid, senior, enforceable, nonavoidable, and perfected under applicable law and in existence as of the Petition Date.  Nothing herein shall constitute a finding or ruling by this Court that any such Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the DIP Agent, the DIP Term Agent and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest.

challenges, objections, defenses, claims, impairment or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, recoupment, reductions, setoff or subordination (whether equitable, contractual or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, counterclaims, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Secured Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Credit Documents; (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Senior Obligations exceeded the amount of those obligations, and accordingly the Prepetition Senior Obligations are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code, together with accrued and unpaid and hereafter accruing interest, fees (including, without limitation, attorneys' fees and related expenses), costs and other charges, and contingent indemnification obligations arising under or related to the Prepetition Senior Credit Documents.

(vii)   *Cash Collateral.*   The Debtors acknowledge and stipulate that all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute Cash Collateral and is Prepetition Collateral of the Prepetition Secured Creditors.

(viii)    *Default by the Debtors.*  The Debtors acknowledge and stipulate that the Debtors are in default under each of the Prepetition Senior Credit Documents and the Prepetition Subordinated Indenture Documents.

(ix)    *No Other Liens.*  As of the Petition Date, other than the Prepetition Permitted Liens or as permitted by the Prepetition Senior Credit Documents, there were no security interests or liens on the Prepetition Collateral other than the Prepetition Liens.

(x)    *Release.*  The Debtors hereby forever, unconditionally and irrevocably release, discharge and acquit the Prepetition Senior Agent, the Prepetition Term Agent, the DIP Agent, the DIP Credit Parties and the Prepetition Secured Creditors, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "**Releasees**") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition Credit Documents, the Prepetition Liens and/or the transactions contemplated hereunder or thereunder including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the DIP Liens, DIP Obligations, Prepetition Credit Documents, Prepetition Secured Obligations and the Prepetition Liens; provided that the foregoing release shall not constitute a release of any rights of the Debtors arising under the DIP

11

Loan Documents.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order and, if applicable, the Final Order.

        G.      *Findings Regarding the Postpetition Financing*.

        (i)      *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, (b) repay the remaining Prepetition Senior Obligations upon the entry of the Final Order and as otherwise set forth herein, and (c) use Cash Collateral on the terms described herein to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Agent and the DIP Term Agent.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

        (ii)      *Priming of the Prepetition Liens*.  The priming of each of the Prepetition Liens on the Prepetition Collateral by the DIP Liens will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors. Each Prepetition Secured Creditor has consented to such priming liens under the terms and conditions set forth in this Interim Order and the Payoff Letter (as defined below) and is entitled to receive adequate protection of its interests as more fully described below.

        (iii)      *Immediate Need for Postpetition Financing and Use of Cash Collateral*. The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is

RLF1 13827754v.1

immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful administration of these Cases. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms.*    Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Credit Parties on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit:   (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of the DIP Credit Parties, (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(v)     *Use of Proceeds of the DIP Facility.* As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Credit Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used (a) for the repayment in full in cash of all remaining Prepetition Senior Obligations upon the entry of the Final Order (other than contingent indemnification obligations) as provided in that certain payoff letter prepared by the Prepetition Senior Agent (the "**Payoff Letter**", a copy of which has been approved by the Debtors, the Prepetition Senior Agent, Prepetition Term Agent, the DIP Agent and the DIP Term Agent and a copy of which is attached as Exhibit B hereto), (b) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as Exhibit C hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "**Budget**") solely for (i) post-petition operating expenses and other working capital and general corporate purposes, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Cases, including prior to the delivery of a Carve-Out Trigger Notice (as defined below), to fund the DIP Carve Out through deposits into the Professional Fee Escrow Account, (iv) Prepetition Senior Creditor Adequate Protection Payments, and (v) as otherwise permitted under the DIP Loan Documents, and (c) after the delivery of a Carve-Out Trigger Notice to fund the Post Trigger Notice Carve-Out Amount (as defined below), and, solely from the proceeds of a Permitted Sale, the Success Fee.   The repayment of the Prepetition Senior Obligations in accordance with this Interim Order and the Payoff Letter is necessary, as the Prepetition Senior Creditors have not otherwise consented to the use of Cash Collateral or the subordination of the Prepetition Senior Agent's liens to the DIP Liens (as defined herein), and the DIP Credit Parties

14

are not willing to provide the DIP Facility unless the Prepetition Senior Obligations (other than contingent indemnification obligations) are paid in full upon the entry of the Final Order (subject to the terms of the Payoff Letter) and as otherwise set forth herein. Such payments will not prejudice the Debtors or their estates, because payment of such amounts is subject to the rights of parties in interest under paragraphs 33 and 34 herein.

(vi)    *Application of Proceeds of DIP Collateral.* As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtors, the DIP Agent and the DIP Term Agent have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 18(a) of this Interim Order.

H.    *Adequate Protection.* The Prepetition Senior Creditors and Prepetition Subordinated Creditors are entitled to receive adequate protection on account of their interests in the Prepetition Collateral pursuant to sections 361, 362, and 363 of the Bankruptcy Code to the extent of any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral) resulting from the subordination to the DIP Carve Out, the Senior Agency Agreement Lien (as defined in the DIP Credit Agreement), and to the DIP Liens (each as defined herein), the Debtor's use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, to the extent of any such diminution in value, the "Diminution in Value"). Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate protection, the Prepetition Senior Creditors shall receive (i) solely to the extent of any Diminution in Value, Adequate Protection Liens and Superpriority Claims, as more fully set forth in paragraphs 12 and 13 herein, and (ii) the Prepetition Senior Creditor Adequate Protection Payments. The Prepetition Subordinated Creditors shall receive, subject to the priorities set forth

in paragraphs 12 and 13 below and solely to the extent of any Diminution in Value, the Adequate Protection Liens and the Adequate Protection Superpriority Claims.  For the avoidance of doubt, the Adequate Protection Liens and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens, the DIP Carve Out, the Prepetition Permitted Liens, the Senior Agency Agreement Liens, and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim (as defined herein) and the Senior Agency Agreement Claims.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral.

I.       *Sections 506(c) and 552(b)*.   In light of (i) the DIP Agent's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out (as defined herein), the Prepetition Permitted Liens, the Senior Agency Agreement Liens and the Senior Agency Agreement Claims and agreement to fund the Budget in accordance with the terms of the DIP Loan Documents; and (ii) each Prepetition Secured Creditor's agreement to subordinate the Adequate Protection Superpriority Claims and the Adequate Protection Liens to the DIP Carve Out, the Prepetition Permitted Liens, the Senior Agency Agreement Liens, the Senior Agency Agreement Claims, the DIP Liens, and the DIP Superpriority Claim, in each case as applicable, and to consent to the use of Cash Collateral, upon entry of the Final Order, each of the DIP Credit Parties and each Prepetition Secured Creditor is entitled to the benefits of a waiver of (a) the provisions of Section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under Section 552(b) of the Bankruptcy Code.

16

J.    *Good Faith of the DIP Agent and the DIP Term Agent.*

(i)    *Willingness to Provide Financing.*  Each of the DIP Credit Parties has indicated a willingness to provide financing to the Debtors subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents and the payoff of the Prepetition Senior Obligations as contemplated by this Interim Order and the Payoff Letter; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that each of the DIP Credit Parties is extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that each of the DIP Credit Parties' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  The extension of credit under the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors and the DIP Credit Parties.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and each of the DIP Credit Parties is therefore entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

K.  *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee for the District of Delaware; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel to each of the Prepetition Senior Agent and the Prepetition Term Agent; (vi) counsel to the Prepetition Indenture Trustee; (vii) the Pension Benefit Guaranty Corporation; and (viii) those parties, if any, who have filed a notice of appearance and request for service of pleadings in these Cases pursuant to Bankruptcy Rule 2002. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required except as set forth in paragraph 48 below.

L.  *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.  Interim Financing Approved.  The Motion is granted on an interim basis, the Interim Financing (as defined herein) is authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.  Objections Overruled.  All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

18

**DIP Facility Authorization**

3.    <u>Authorization of the DIP Financing, DIP Loan Documents and Payoff Letter</u>.  The Debtors are expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents and the Payoff Letter, (ii) to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents, the Payoff Letter and the Budget, (iii) to deliver all instruments and documents that may be necessary or required for performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents, and (iv) subject to the rights of third parties pursuant to paragraphs 33 and 34 below and the entry of the Final Order, to pay and perform all obligations under the Payoff Letter in accordance with the terms set forth therein, including to provide for (x) the releases in favor of each of the Prepetition Senior Creditors and their related parties and (y) repayment in full in cash of the Prepetition Senior Obligations (other than the Surviving Obligations).  The Debtors are hereby authorized to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment fees, upfront fees, administrative fees, any additional fees set forth in the DIP Loan Documents, and the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, whether or not the transactions contemplated hereby are consummated, all to the extent provided in the DIP Loan Documents, with invoices to be provided in accordance with paragraph 26 below.   All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding, and joint and several, obligations of the Debtors,

enforceable against each of the Debtors and their estates in accordance with their terms.  Upon

execution and delivery, the Payoff Letter shall represent a valid and binding obligation of the

Debtors, enforceable against each of the Debtors and their estates in accordance with their terms,

but subject only to the rights of third parties pursuant to paragraphs 33 and 34 below.

Notwithstanding anything to the contrary in the Indenture Subordination Provisions, upon the

entry of this Interim Order, the Prepetition Senior Agent may deliver to the DIP Agent any

possessory collateral in the Prepetition Senior Agent's possession, without regard to whether the

Prepetition Subordinated Creditors have any rights thereunder or has obtained additional rights

under any other similar agreement.

4.    Authorization to Borrow.  Until the Termination Date (as defined in the DIP

Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves

set forth in the DIP Loan Documents, the DIP Facility and this Interim Order, and in order to

prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby

authorized, prior to the entry of the Final Order, to request extensions of credit under the DIP

Facility up to an aggregate principal amount of $80,000,000 at any one time outstanding.

5.    DIP Obligations.  The DIP Loan Documents and this Interim Order shall

constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which

DIP Obligations shall be enforceable against the Debtors, their estates and any successors

thereto, including without limitation, any trustee or other estate representative appointed in the

Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the

Cases (collectively, "**Successor Cases**").  Upon entry of this Interim Order, the DIP Obligations

will include all loans and any other indebtedness or obligations, contingent or absolute, which

may now or from time to time be owing by any of the Debtors to any of the DIP Credit Parties

under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents, and shall be joint and several obligations of the Debtors in all respects.

6.    <u>Postpetition Liens and Collateral</u>.

(a)    Effective immediately upon the entry of this Interim Order, pursuant to Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following (the "**DIP Collateral**"): [5]

(i)    all Accounts;

(ii)    all Goods, including Equipment, Inventory and Fixtures;

(iii)    all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)    all Securities Collateral;

(vi)    all Investment Property;

(vii)    all Intellectual Property Collateral;

(viii)    all Commercial Tort Claims;

(ix)    all General Intangibles (including, without limitation, all Payment Intangibles);

---

[5] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

(x)     all Deposit Accounts (including, without limitation, the Concentration Account);

(xi)    all Supporting Obligations;

(xii)   all money, cash or cash equivalents;

(xiii)  all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution from or for the account of any Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)   all proceeds of leases of real property;[6]

(xv)    all owned real property;

(xvi)   effective upon the entry of the Final Order, all proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and Section 724(a) of the Bankruptcy Code (the "**Avoidance Actions**");

(xvii)  effective upon the entry of the Final Order, the Debtors' rights under Section 506(c) and Section 550 of the Bankruptcy Code and the proceeds thereof;

(xviii) to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of any Debtor;

(xix)   all books, records, and information relating to any of the foregoing and/or to the operation of any Debtor's business, and all rights of access to such books, records, and

---

[6] For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtors' leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

information, and all property in which such books, records and information are stored, recorded and maintained; and

(xx)    to the extent not otherwise covered by clause (i) through (xix) above, all other personal property of each Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided that the DIP Collateral shall not include Excluded Property.

(b)    Effective upon the entry of the Interim Order, (i) all DIP Liens and the DIP Carve Out shall each be and remain at all times senior to the Prepetition Liens, (ii) all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgements, credit card agreements, collateral access agreements, landlord agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs broker agency agreements, subordination agreements (including any intercompany subordination agreements), and freight forwarder agreements constituting Prepetition Senior Credit Documents, and all existing Uniform Commercial Code filings and all existing filings with the United States Patent and Trademark Office or the United States Copyright Office with respect to the recordation of an interest in the intellectual property of the Debtors, which in each case were filed by the Prepetition Senior Agent, shall in each case be deemed to be delivered and/or filed in connection with the DIP Facility, shall constitute DIP Credit Documents and shall remain in full force and effect without any further action by the Debtors, the DIP Agent, the DIP Term Agent or any other person, and in each case the DIP Agent shall be deemed to be a party thereto, (iii) any and all references in any such agreements

23

or documents referred to in clause (ii) above to the "Credit Agreement" shall hereafter be deemed to mean and refer to the Prepetition Credit Agreement and the DIP Credit Agreement, and (iv) any and all references in any such agreements or documents referred to in clause (ii) above to the "Loan Documents" shall hereafter be deemed to mean and refer to the Prepetition Senior Credit Documents and the DIP Credit Documents, in each case as amended, modified, supplemented or restated and in effect from time to time. The DIP Agent is hereby deemed to have all of the rights and remedies accorded to the "Credit Facility Agent" under the Indenture Subordination Provisions, the DIP Credit Agreement (in addition to the Prepetition Senior Credit Agreement) shall be deemed to be a "Credit Facility Loan Agreement" under the Prepetition Subordinated Indenture, and the DIP Obligations (in addition to the Prepetition Senior Obligations) shall be deemed to be "Credit Facility Debt" under the Prepetition Subordinated Indenture. Except as set forth in this Interim Order, nothing in this Interim Order shall be deemed to impair or otherwise modify the rights of the Prepetition Senior Agent or the Prepetition Term Agent under any such agreements or documents as in effect prior to the date hereof.

       7.    <u>DIP Lien Priority</u>.

       (a)    *DIP Liens*. The DIP Liens shall be junior only to the (i) DIP Carve Out, (ii) the Prepetition Permitted Liens, and (iii) the Senior Agency Agreement Liens, if any, and shall otherwise be senior in priority and superior to the Prepetition Liens, the Adequate Protection Liens (as defined herein) and Adequate Protection Superpriority Claims (as defined herein) and any other security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral. Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any

Successor Cases. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to cases under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of any of the Cases or Successor Cases. The DIP Liens shall not be subject to challenge under Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(b)      *Prepetition Liens.* For the avoidance of doubt, the Prepetition Liens shall be junior to the (i) DIP Carve Out; (ii) DIP Liens; (iii) the Adequate Protection Liens described in paragraph 12 below; and (iv) the Adequate Protection Superpriority Claims.

8.      DIP Superpriority Claim.

(a)      *DIP Agent Superpriority Claim.* Upon entry of this Interim Order, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations. The DIP Superpriority Claim shall be subordinate only to the DIP Liens, the DIP Carve Out, Prepetition Permitted Liens and the Senior Agency Agreement Claims, and shall otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.

(b)      *Priority of DIP Superpriority Claim.* The DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP

25

Carve Out and amounts secured by the Prepetition Permitted Liens to the extent paid from identifiable proceeds of the assets subject to such Prepetition Permitted Liens. Upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to the proceeds of Avoidance Actions.

9.  No Obligation to Extend Credit. No DIP Credit Party shall have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit or the issuance of such letter of credit under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent, in its sole discretion.

10. Use of DIP Facility Proceeds. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents and the Payoff Letter, and in compliance with the Budget (including, without limitation, to make Prepetition Senior Creditor Adequate Protection Payments), a copy of which has been delivered to the DIP Agent, the DIP Term Agent, the Prepetition Senior Agent, the Prepetition Term Agent and the Prepetition Indenture Trustee; provided that the use of the Post Trigger Notice Carve Out Amount and the Success Fee (which shall be paid solely from the proceeds of a Permitted Sale) shall not be subject to the Budget.

**Authorization to Use Cash Collateral**

11. Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the Termination Date; provided, however, that during the Remedies Notice Period (as defined herein) the Debtors may use Cash Collateral solely to (a) meet payroll (other than severance) and to pay expenses critical to the preservation of the Debtors and their estates as agreed by the DIP Agent in its sole discretion, in each case in

26

accordance with the terms and provisions of the Budget; and (b) to fund the Post-Trigger Notice Carve-Out Amount and, solely from the proceeds of a Permitted Sale, the Success Fee.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business (which shall be subject to further Orders of this Court), or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents, and in accordance with the Budget.

12.     Payoff Letter, Adequate Protection Payments and Adequate Protection Liens.

(a)     *Payoff Letter*.  Each of the Debtors and the Prepetition Senior Creditors shall comply with the terms and provisions of the Payoff Letter.  The Debtors' residual interest in any amounts potentially payable to any of them under the terms of the Payoff Letter shall be subject to the DIP Liens in accordance with the priorities set forth in this Interim Order and the DIP Loan Documents.

(b)     *Adequate Protection Payments*.  The Prepetition Senior Creditors shall receive adequate protection including in the form of: (i) payment to the Prepetition Senior Creditors of the amounts required under the Payoff Letter upon the entry of the Final Order and as otherwise set forth herein; (ii) payment of the Prepetition Senior Obligations from the proceeds of DIP Collateral as set forth in paragraph 18(a) below; and (iii) payments of interest (which shall be payable at the default rate under the Prepetition Senior Credit Agreement), fees, costs, expenses (including attorneys' fees and expenses (including the attorneys' fees of Choate Hall & Stewart, as counsel to the Prepetition Senior Agent, Paul Hastings LLP, as counsel to the Prepetition Term Agent, and local counsel to each of the Prepetition Senior Agent and Prepetition Term Agent)), indemnities and other amounts with respect to the Prepetition Senior

Obligations, in each case, in accordance with the Prepetition Senior Credit Documents (collectively, the "**Prepetition Senior Creditor Adequate Protection Payments**").

        (c)      *Creation of Adequate Protection Liens.*  To the extent of any Diminution in Value, each of the Prepetition Senior Agent (for the benefit of itself and the other Prepetition Senior Creditors) and the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) is hereby granted, pursuant to Sections 361, 363 and 364(d) of the Bankruptcy Code, valid and perfected replacement and additional security interests in, and liens on all of the Debtors' right, title and interest in, to and under all DIP Collateral (the "**Adequate Protection Liens**").  The Adequate Protection Liens granted to the Prepetition Senior Agent shall secure Prepetition Senior Obligations (including, without limitation, the Surviving Obligations) and shall be senior in all respects to the Adequate Protection Liens granted to the Prepetition Indenture Trustee.  The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject only to (i) the DIP Liens, (ii) the Prepetition Permitted Liens, (iii) the DIP Carve Out, and (iv) the Senior Agency Agreement Liens.

        (d)      *Treatment of Adequate Protection Liens.*  Other than as set forth herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to cases under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of any of the Cases or Successor Cases.

13.    Adequate Protection Superpriority Claims.

(a)    *Superpriority Claim of Prepetition Senior Agent and Prepetition Indenture Trustee*. As further adequate protection of the interests of (i) the Prepetition Senior Agent and the other Prepetition Senior Creditors with respect to the Prepetition Senior Obligations (including, without limitation, the Surviving Obligations) and (ii) the Prepetition Indenture Trustee and the other Prepetition Subordinated Creditors with respect to the Prepetition Subordinated Obligations, each of the Prepetition Senior Agent (for the benefit of itself and the other Prepetition Senior Creditors) and the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) is hereby granted an allowed administrative claim against the Debtors' estates under Sections 503 and 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Senior Agent's and the Prepetition Indenture Trustee's respective interests in the Prepetition Collateral.

(b)    *Priority of Adequate Protection Superpriority Claims.* The Adequate Protection Superpriority Claim granted to the Prepetition Senior Agent shall be senior in all respects to the Adequate Protection Superpriority Claim granted to the Prepetition Indenture Trustee. The Adequate Protection Superpriority Claims granted to each of the Prepetition Senior Agent and the Prepetition Indenture Trustee shall be junior to the DIP Carve Out, the Prepetition Permitted Liens, the DIP Liens, the DIP Superpriority Claim, the Senior Agency Agreement Liens and the Senior Agency Agreement Claim. The Adequate Protection Liens and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code.

RLF1 13827754v.1

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.    <u>Amendments</u>.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:   (i) in the reasonable judgment of the Debtors and the DIP Agent, the amendment, modification, or supplement (A) is in accordance with the DIP Loan Documents, (B) is not prejudicial in any material respect to the rights of third parties, and (C) has been consented to by the DIP Agent, and (ii) a copy (which may be provided through electronic mail or facsimile) of the form of amendment, modification or supplement is provided to counsel for any Committee, the Prepetition Indenture Trustee and the U.S. Trustee at least one (1) Business Day prior to the effective date of the amendment, modification or supplement.

15.    <u>Budget Maintenance</u>.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Agent and the DIP Term Agent and approved by the DIP Agent and the DIP Term Agent, each in their Permitted Discretion.  The Debtors shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the DIP Agent and the DIP Term Agent and approved by the DIP Agent and the DIP Term Agent, each in their Permitted Discretion).   On or before Wednesday of each week, the Debtors shall deliver to the DIP Agent and the DIP Term Agent an Approved Budget Variance Report (with delivery of the same to the United States Trustee and the Committee, if any, each week after delivery to the DIP Agent and the DIP Term Agent). During the tenth (10th) week of the initial Budget, the Debtors shall submit a budget for the next successive thirteen week period to the DIP Agent and the DIP Term Agent, which budget shall be in form and substance reasonably acceptable to the DIP Agent and the DIP Term Agent and approved by the DIP Agent and the DIP Term Agent, each in their Permitted Discretion.

RLF1 13827754v.1

16.    _Modification of Automatic Stay._   The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; and (b) authorize the Debtors to pay, and the DIP Credit Parties and Prepetition Senior Creditors to retain and apply, payments made in accordance with the terms of this Interim Order and the Payoff Letter.

17.    _Perfection of DIP Liens and Adequate Protection Liens._

(a)    *Automatic Perfection of Liens.*  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Credit Parties or the Prepetition Secured Creditors to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent is authorized to file, as it in its Permitted Discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be

31

necessary or required in order to create, perfect or enforce the DIP Liens. The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, control agreements, notices and other documents as the DIP Agent and/or the DIP Term Agent may reasonably request. The DIP Agent, in its Permitted Discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

18.    Application of Proceeds of DIP Collateral.

(a)    All payments received by the DIP Agent and all funds transferred and credited to the "Concentration Account" maintained by the Debtors at Wells Fargo Bank, National Association and all proceeds from any Disposition of DIP Collateral, shall be applied as set forth in the DIP Loan Documents.

(b)    As between the DIP Agent, the DIP Term Agent, the DIP Lenders and the other DIP Credit Parties, nothing provided herein shall be deemed to modify the allocation of the proceeds of DIP Collateral set forth in the DIP Loan Documents.

(c)    Prior to the irrevocable payment in full of the DIP Obligations and the Prepetition Senior Obligations, the Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest or other amount payable in respect of any indebtedness prior to its scheduled maturity, other than the DIP Obligations and the Prepetition Senior Obligations (each in accordance with the DIP Loan Documents, the Payoff Letter and this Interim Order) and obligations authorized by an order of the Court.

19.    Proceeds of Subsequent Financing. If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently

32

appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to Sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full in cash of all Prepetition Senior Obligations and all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to any or all of the Debtors and the Debtors' estates, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in paragraph 18(a) herein.

20.     Maintenance of DIP Collateral.  Until the payment in full in cash of all Prepetition Senior Obligations and all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Loan Documents, as provided therein, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system which has been agreed to by the DIP Agent or as otherwise required by the DIP Loan Documents.

21.     Disposition of DIP Collateral.   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral except as permitted by the DIP Loan Documents.  Nothing provided herein shall limit the right of any DIP Credit Party or any Prepetition Senior Creditor to object to any proposed disposition of the DIP Collateral.

22.     Termination Date.  On the Termination Date, (i) all DIP Obligations shall be immediately due and payable, (ii) all commitments to extend credit under the DIP Facility will terminate, and (iii) all authority to use Cash Collateral shall cease, provided, however, that during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely as set forth in paragraph 11 herein.

23.    <u>Events of Default</u>. The occurrence of an "Event of Default" under the DIP Credit Agreement shall constitute an event of default under this Interim Order (each, an "**Event of Default**").

24.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    *DIP Facility Termination.*    Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Agent may in its discretion (or shall in accordance with the DIP Loan Documents) (i) declare the DIP Facility terminated (such declaration, a "**Termination Declaration**") or (ii) send a reservation of rights notice to the Debtors, which notice may advise the Debtors that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent and/or DIP Lenders. Upon the issuance of a Termination Declaration to the Debtors in accordance with the DIP Credit Agreement: (I) all or any portion of the Commitments of the DIP Credit Parties to make loans or otherwise extend credit may be suspended or terminated in accordance with the DIP Loan Documents; (II) all DIP Obligations may be deemed immediately due and payable in accordance with the DIP Loan Documents; (III) after expiration of the Remedies Notice Period, the DIP Agent and the DIP Lenders may exercise all other rights and remedies available to them under Section 8.02 of the DIP Credit Agreement; and (IV) any right or ability of the Debtors to use any Cash Collateral may be terminated, reduced or restricted by the DIP Agent, provided that, during the Remedies Notice Period, the Debtors may use Cash Collateral solely to (a) meet payroll (other than severance) and to pay expenses critical to the preservation of the Debtors and their estates as agreed by the DIP Agent in its sole discretion, in each case in accordance with the terms and provisions of the Budget; and (b) to fund the Post-Trigger Notice Carve-Out Amount and, solely from the proceeds of a Permitted Sale, the Success Fee. With respect to the DIP Collateral,

34

following the Termination Declaration, subject to the Remedies Notice Period, the DIP Credit Parties and the Prepetition Senior Creditors may exercise all rights and remedies available to them under the DIP Loan Documents or the Prepetition Senior Credit Documents, as applicable, or applicable law against the DIP Collateral and without limiting the foregoing, the DIP Credit Parties and the Prepetition Senior Creditors may, subject to the Remedies Notice Period, (i) enter onto the premises of any Debtor in connection with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and remedies provided under the DIP Loan Documents or the Prepetition Senior Credit Documents, as applicable, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order and the Final Order. For the avoidance of doubt, no party-in-interest (other than the DIP Credit Parties and the Prepetition Senior Creditors) may at any time exercise any rights and remedies available to them against the DIP Collateral until the DIP Obligations and the Prepetition Senior Obligations are paid in full in cash. Following the termination of the Remedies Notice Period, the DIP Agent may require the Debtors to seek authority from the Court to retain an Approved Liquidator for the purpose of conducting a liquidation or "going out of business" sale and/or the orderly liquidation of the DIP Collateral and, if the Debtors refuse to seek such authority, the DIP Agent shall be entitled to seek such authority directly.

(b)     *Notice of Termination.*  Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtors, counsel to each Prepetition Secured Creditor, counsel to any Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**"). The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination

35

Declaration Date, except as provided in paragraphs 11 and 24 of this Interim Order. Any automatic stay otherwise applicable to the DIP Credit Parties and the Prepetition Senior Creditors is hereby modified so that five (5) business days after the Termination Declaration Date (the "**Remedies Notice Period**") the DIP Credit Parties and the Prepetition Senior Creditors shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents or the Prepetition Senior Credit Documents, as applicable, and this Interim Order, and shall be permitted to satisfy the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Superpriority Claims, subject only to the DIP Carve Out, Prepetition Permitted Liens and the Senior Agency Agreement Liens. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing with the Court for the purpose of, among other things, contesting whether an Event of Default has occurred. Unless the Court orders otherwise during the Remedies Notice Period, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Credit Parties and the Prepetition Senior Creditors shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents, the Prepetition Senior Credit Documents, and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under Sections 105 or 362 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to (x) the DIP Agent and the DIP Term Agent with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents or this Interim Order and (y) the Prepetition Senior Agent and the Prepetition Term

Agent with respect thereto pursuant to the Prepetition Senior Credit Agreement, the other Prepetition Senior Credit Documents or this Interim Order.

(c)    *Access to Leased Premises.*  The DIP Agent's exercise of its remedies pursuant to this paragraph 24 shall be subject to:  (w) any agreement in writing between the DIP Agent or Prepetition Senior Agent and any applicable landlord, (x) pre-existing rights of the DIP Agent and any applicable landlord under applicable nonbankruptcy law, (y) consent of the applicable landlord, or (z) further order of the Court following notice and a hearing.

25.    Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Credit Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court, or any other court, the DIP Credit Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Agent and the DIP Term Agent at the time the advances were made or the liens, claims or priorities were authorized and/or created.  Any liens or claims granted to the DIP Credit Parties hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the

Interim Order was not stayed by court order after due notice had been given to the DIP Agent and the DIP Term Agent at the time the advances were made or the liens, claims or priorities were authorized and/or created.

26.    _DIP and Other Expenses._  The Debtors are authorized to pay all reasonable and documented out-of-pocket expenses (and the Prepetition Senior Agent or the DIP Agent, as applicable, are authorized to make advances or charges against the applicable loan account to pay such expenses) of (x) the DIP Credit Parties in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents, and (y) the Prepetition Senior Creditors (including, without limitation, expenses incurred prior to the Petition Date) as provided in the Prepetition Senior Credit Documents, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses, upon the Debtors' receipt of invoices for the payment thereof.  Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Credit Parties and the Prepetition Senior Creditors shall not be required to comply with the U.S. Trustee fee guidelines.  The professionals for the DIP Credit Parties and the Prepetition Senior Creditors shall deliver a copy of their respective invoices to counsel for any Committee and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein.  Any objections raised by the Debtors, the U.S. Trustee or any Committee with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court.  In the event of any objection, the provisions of Section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure shall apply.  Pending such resolution, the undisputed portion of any such

invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date all reasonable fees, costs and expenses of the DIP Agent, the DIP Lenders and the Prepetition Senior Agent incurred on or prior to such date without the need for any professional engaged by the DIP Agent, the DIP Lenders or the Prepetition Senior Agent to first deliver a copy of its invoice as provided for herein.

27.    Indemnification.

(a)    *Generally.* The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Term Agent and each other DIP Credit Party, and each of their respective shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with these Cases, any plan, or any action or inaction by the Debtors; provided, that such indemnity shall not, as to any indemnified party, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted directly from the gross negligence or willful misconduct of such indemnified party. The indemnity includes indemnification for the DIP Agent's and the DIP Term Agent's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, each of the DIP

Agent, the DIP Term Agent and each other DIP Credit Party shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

(b)    *DIP Indemnity Account.*  Upon the conclusion of the Remedies Notice Period, the Debtors shall pay $250,000 from proceeds of the DIP Collateral into an indemnity account (the "**DIP Indemnity Account**") subject to first priority liens of the DIP Agent, for the benefit of the DIP Credit Parties.  The DIP Indemnity Account shall be released and the funds applied in accordance with paragraph 18(a) of this Interim Order upon the receipt by the DIP Agent, the DIP Term Agent and each other DIP Credit Party of releases from the Debtors and their estates, with respect to any claims arising out of or related to the DIP Credit Agreement and the DIP Loan Documents, acceptable to the DIP Agent, the DIP Term Agent and each other DIP Credit Party in their sole discretion.

28.    Proofs of Claim.  None of the DIP Credit Parties, the Prepetition Senior Creditors or the Prepetition Subordinated Creditors will be required to file proofs of claim or requests for approval of administrative expenses in any of the Cases or Successor Cases, and the provisions of this Interim Order relating to the amount of the DIP Obligations, the DIP Superpriority Claim, the Prepetition Senior Obligations and the Prepetition Subordinated Obligations shall constitute timely filed proofs of claim and/or administrative expense requests in each of the Cases.

29.    Rights of Access and Information.  Without limiting the rights of access and information afforded the DIP Credit Parties under the DIP Loan Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and the DIP Term Agent reasonable access to the Debtors' premises and their books and records in accordance with the DIP Loan Documents, and shall reasonably cooperate, consult with, and

40

provide to such persons all such information as may be reasonably requested. In addition, the

Debtors authorize their independent certified public accountants, financial advisors, investment

bankers and consultants to cooperate, consult with, and provide to the DIP Agent and the DIP

Term Agent all such information as may be reasonably requested with respect to the business,

results of operations and financial condition of any Debtor.

      30.    <u>DIP Carve Out</u>.

      (a)    *DIP Carve Out*. As used in this Interim Order, the "**DIP Carve Out**"

means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy

Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a) and Section

3717 of title 31 of the United States Code; (ii) the aggregate amount of unpaid fees and expenses

of the Debtors' and any Committee's professionals, in each case retained by final order of the

Court (which order has not been reversed, vacated or stayed unless such stay is no longer

effective) under Sections 327(a) or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"),

to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of

the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"),

which amount under this clause (ii) shall not exceed the sum of: (x) commencing with the week

ending February 6, 2016, an aggregate amount per week limited to the amount set forth in the

Budget for such week for Allowed Professional Fees incurred prior to the delivery of a Carve-

Out Trigger Notice, which amount shall be funded into the Professional Fee Escrow Account on

Wednesday of each week (or such other day of the week selected by the Debtors) in accordance

with the Budget provided that (I) the Debtors have sufficient Availability on such date, (II) the

Termination Date has not occurred, and (III) no Event of Default has occurred and is continuing,

plus (y) $100,000 for Allowed Professional Fees incurred from and after the delivery of a Carve-Out Trigger Notice (the "**Post Trigger Notice Carve Out Amount**"); and (iii) the Success Fees.

(b)     *Professional Fee Escrow.*  No portion of the DIP Carve Out, nor any cash collateral or proceeds of the Loans may be used in violation of this Interim Order, including paragraph 31 hereof.  Notwithstanding anything to the contrary contained in this Interim Order, (A) until an Event of Default or the Termination Date has occurred, the Debtors shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) of the immediately preceding paragraph, subject to there being sufficient Availability for such borrowings, (B) the Debtors shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Date has occurred, and (C) the aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtors prior to the delivery of a Carve-Out Trigger Notice from any amounts funded into the Professional Fee Escrow Account pursuant to clause (x) of the immediately preceding paragraph (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Budget. None of the provisions of this Interim Order or any DIP Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers held by such Case Professional.  Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Agent, which amounts shall be applied to the DIP Obligations

42

in the order proscribed in Section 8.03 of the DIP Credit Agreement. The DIP Liens are hereby deemed to attach to the Debtors' residual interest in such excess.

(c)    *No Direct Obligation to Pay Professional Fees or Committee Expenses.* Except for funding the Professional Fee Escrow Account as provided herein, none of the DIP Credit Parties or the Prepetition Secured Creditors shall be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Credit Parties or the Prepetition Secured Creditors in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing in this Interim Order or otherwise shall be construed to increase the DIP Carve Out if actual Allowed Professional Fees of any Case Professional are higher in fact than the estimated fees and disbursements reflected in the Budget; provided that use of the Post Trigger Notice Carve Out Amount and the Success Fee (which solely from the proceeds of a Permitted Sale) shall not be subject to the Budget. Notwithstanding anything to the contrary contained in this Interim Order, the Budget, or the DIP Loan Documents, none of the DIP Credit Parties or the Prepetition Secured Creditors shall be responsible for funding into the Professional Fee Escrow Account any of the Transaction Fees payable to the Sale Consultant or any other "success" fees payable to any other investment banker, and, subject to the immediately succeeding sentence, in no event shall any such amounts be paid out of the DIP Carve Out or any funds in the Professional Fee Escrow Account. Notwithstanding the foregoing, the Success Fee shall be deemed part of the DIP Carve Out, provided that the Success Fees shall be paid solely from the proceeds of a Permitted Sale and not from the Professional Fee Escrow Account and shall not reduce the amounts available in

43

the Budget for the DIP Carve Out or the Post Trigger Notice Carve Out Amount. No Plan shall

fail to provide for the payment in full of any outstanding Transaction Fees on the effective date

thereof. No Financing Transaction (as defined in the Sale Consultant Agreement) shall fail to

provide for payment in full of the Financing Success Fee (as defined in the Sale Consultant

Agreement) on the closing date thereof.

(d)     *Payment of DIP Carve Out.* The funding of the DIP Carve Out with the

proceeds of the DIP Financing shall be added to and made a part of the DIP Obligations and

secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim

Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

31.     Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the

Case Professionals DIP Carve Out. The DIP Facility, the DIP Collateral, the Cash Collateral and

the DIP Carve Out may not be used:  (a) in connection with or to finance in any way any action,

suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or

against the interests of the DIP Credit Parties or the Prepetition Secured Creditors or their rights

or remedies under the DIP Loan Documents, the Prepetition Credit Documents or this Interim

Order or the Final Order, including, without limitation, for the payment of any services rendered

by the professionals retained by the Debtors or any Committee in connection with the assertion

of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection,

defense or other contested matter, the purpose of which is to seek, or the result of which would

be to obtain, any order, judgment determination, declaration or similar relief, (ii) invalidating,

setting aside, avoiding or subordinating, in whole or in part, any DIP Obligations or Prepetition

Senior Obligations or Prepetition Subordinated Obligations, (iii) for monetary, injunctive or

other affirmative relief against the DIP Credit Parties, the Prepetition Senior Creditors or the

44

Prepetition Subordinated Creditors or their respective collateral, (iv) preventing, hindering or otherwise delaying the exercise by the DIP Credit Parties, the Prepetition Senior Creditors or Prepetition Subordinated Creditors of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, the Prepetition Senior Credit Documents, the Prepetition Subordinated Indenture Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent upon any of the DIP Collateral or by the Prepetition Senior Agent with respect to its Adequate Protection Liens, (v) asserting that the value of the Prepetition Collateral is less than the Prepetition Senior Obligations, or (vi) to pursue litigation against the Prepetition Senior Agent, the Prepetition Term Agent or any other Prepetition Senior Creditor or against the Prepetition Indenture Trustee or any other Prepetition Subordinated Creditor; (b) to make any distribution under a plan of reorganization or liquidation in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body to the extent not expressly permitted under the DIP Loan Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors other than as expressly permitted under the DIP Loan Documents; (e) objecting to, contesting, or interfering with, in any way, the DIP Credit Parties' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations or the Prepetition Senior Obligations remain outstanding in a manner inconsistent with the Budget except after the delivery of a Carve-Out Trigger Notice to fund the

Post Trigger Notice Carve Out Amount or to pay, solely from the proceeds of a Permitted Sale, the Success Fee; (g) using or seeking to use any insurance proceeds constituting DIP Collateral, without the consent of the DIP Agent; (h) incurring Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business, except as permitted under the DIP Loan Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Credit Parties, the Prepetition Senior Creditors or the Prepetition Subordinated Creditors; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Credit Parties, the Prepetition Senior Creditors or the Prepetition Subordinated Creditors; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Prepetition Senior Obligations, the Prepetition Subordinated Obligations, the DIP Liens, the Prepetition Senior Liens or the Prepetition Subordinated Liens or any other rights or interests of the DIP Credit Parties, the Prepetition Senior Creditors or the Prepetition Subordinated Creditors; *provided* that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the proceeds of the DIP Facility under the DIP Credit Agreement, DIP Collateral, Prepetition Collateral (including Cash Collateral) or the DIP Carve Out may be used by the Creditors' Committee during the Challenge Period to investigate the claims and liens of the Prepetition Secured Creditors (and other potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Creditors).

32.    Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of any party to object to the allowance and payment of such fees and expenses.

46

33.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    The stipulations, findings, representations and releases contained in this Interim Order, the Payoff Letter and the DIP Loan Documents with respect to the Prepetition Secured Creditors and the Prepetition Secured Obligations shall be binding upon all parties-in-interest, any trustee appointed in these cases and any Committee (each, a "**Challenge Party**"), unless and solely to the extent that (i) the Debtors or, subject to clause (b) below, any other Challenge Party initiates an action or adversary proceeding relating to a Challenge (defined below) during the Challenge Period (defined below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge. For purposes of this paragraph 33: (a) "**Challenge**" means any claim or cause of action against any of the Prepetition Secured Creditors on behalf of the Debtors, their estates or the Debtors' creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtors' Stipulations set forth herein, including, but not limited to those in relation to: (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Secured Creditor; (ii) the validity, allowability, priority, or amount of any of the Prepetition Secured Obligations (including any fees included therein); (iii) the secured status of any of the Prepetition Secured Obligations; (iv) any liability of any of the Prepetition Secured Creditors with respect to anything arising from any of the respective Prepetition Credit Documents; or (v) the releases set forth in the DIP Loan Documents; and (b) "**Challenge Period**" means (i) with respect to any party-in-interest other than the Committee, the period from the Petition Date until the date that is seventy five (75) calendar days after the entry of this Interim Order and (ii) with respect to the Committee, the period from the date such Committee is formed until the date that is sixty (60) calendar days thereafter.

RLF1 13827754v.1

(b)     During the Challenge Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists.  If a Challenge Party identifies a basis to assert a Challenge, it must notify the Debtors, the DIP Agent, the DIP Term Agent and the Prepetition Secured Creditors during the Challenge Period of its demand that the Debtors initiate an action or adversary proceeding relating thereto, and from the date that the Debtors, the DIP Agent, the DIP Term Agent and the Prepetition Secured Creditors are so notified, the Debtors shall have five (5) days to notify the Challenge Party of whether the Debtors intend to initiate such action (or a settlement in lieu of an adversary) and ten (10) days to initiate such action.  If the Debtors notify such Challenge Party that the Debtors do not intend to initiate an action, settlement, or adversary proceeding, the Challenge Party shall have ten (10) days from the receipt of such notice to seek standing to initiate an action or adversary proceeding.  Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court.  The Debtors, if timely notified of a potential Challenge and if such Challenge is commenced in a timely manner as set forth herein, shall retain authority to prosecute, settle or compromise such Challenge in the exercise of their business judgment and subject to any applicable further order of court.

(c)     Upon the expiration of the Challenge Period without the filing of a Challenge (the "**Challenge Period Termination Date**"):  (A) any and all such Challenges and objections by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, and all findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to

48

the priority, extent, and validity as to each Prepetition Secured Creditors' claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases; and (C) any and all claims or causes of action against any of the Debtors or the Prepetition Secured Creditors relating in any way to the Debtors or the Prepetition Credit Documents shall be forever waived and released by the Debtors' estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases.

34.    Reservation of Rights: Notwithstanding anything to the contrary contained in this Interim Order, in the event there is a timely and successful Challenge by any party in interest (in accordance with paragraph 33 hereof), this Court may unwind the repayment of the applicable Prepetition Secured Obligations and order the repayment of such amount to the extent that such payment resulted in the payment of any Prepetition Secured Obligations consisting of an unsecured claim or other amount not allowable under Section 502 of the Bankruptcy Code. Notwithstanding the foregoing, a successful Challenge shall not in any way affect the validity, enforceability or priority of the DIP Obligations or the DIP Liens.

35.    No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

36.    Section 506(c) Claims.    Subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Credit Parties or the DIP Collateral or the Prepetition Secured Creditors or the Prepetition Senior Liens or Prepetition Subordinated Liens pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

37.    <u>No Marshaling/Applications of Proceeds</u>. Subject to the entry of the Final Order, none of the DIP Credit Parties or the Prepetition Secured Creditors shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

38.    <u>Section 552(b)</u>. The DIP Agent and the other DIP Credit Parties shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code. Subject to the entry of the Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Credit Parties or the Prepetition Secured Creditors with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

39.    <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Loan Documents.

40.    <u>Discharge Waiver</u>. The Debtors expressly stipulate, and the Court finds and adjudicates that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. Subject to entry of the Final order, the Debtors expressly stipulate, and the Court finds and adjudicates that, none of the Adequate Protection Liens or Adequate Protection Superpriority Claims shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the Adequate Protection Superpriority Claims and claims secured by the Adequate Protection Liens have been paid in full

in cash on or before the effective date of a confirmed plan of reorganization. It shall constitute an Event of Default under the DIP Credit Agreement if any of the Debtors shall propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all DIP Obligations and Adequate Protection Superpriority Claims.

41.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) DIP Credit Parties' or the Prepetition Secured Creditors' right to seek any other or supplemental relief in respect of the Debtors (including the right to seek additional adequate protection, including, without limitation, in the form of reimbursement of fees and expenses of counsel to the Prepetition Secured Creditors); (b) the rights of any of the Prepetition Secured Creditors to seek the payment by the Debtors of post-petition interest or fees pursuant to Section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Credit Parties or the Prepetition Secured Creditors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Credit Parties and the Prepetition Secured Creditors are preserved.

42.    <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Credit Parties to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan

Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Credit Parties.

43.    Binding Effect of Interim Order.    Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Credit Parties, the Prepetition Secured Creditors, all other creditors of any of the Debtors, any Committee or any other court appointed committee, appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.    Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

44.    No Modification of Interim Order.    Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Agent and the DIP Term Agent (i) any reversal, modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claim, other than the DIP Carve Out; (b) any

52

order allowing use of Cash Collateral resulting from DIP Collateral; and (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent and the DIP Term Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the DIP Term Agent.

45.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

46.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Credit Parties and Prepetition Secured Creditors pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been paid in full and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions in this Interim Order concerning the indemnification shall continue in the Cases and in any Successor Cases, following dismissal of the Cases or any

53

Successor Cases, following termination of the DIP Loan Documents and/or the repayment of the DIP Obligations.

47.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____ __, 2016 at ___:__ _.m. (Eastern Time) before the Honorable _____, United States Bankruptcy Judge, Courtroom ___, at the United States Bankruptcy Court for the District of Delaware located at

_____.

48.    <u>Notice of Final Hearing</u>:  On or before February __, 2016, the Debtors shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the thirty (30) largest unsecured creditors of the Debtors at their last known addresses; (e) Choate, Hall & Stewart LLP (Attn: Kevin J. Simard, Esq. and Sean M. Monahan, Esq.) and Womble Carlyle (Attn: Steven Kortanek), attorneys for the DIP Agent and the Prepetition Senior Agent; (f) Paul Hastings LLP (Attn: Leslie Plaskon, Esq.), and Ashby & Geddes, P.A. (Attn: William P. Bowden) attorneys for the DIP Term Agent and the Prepetition Term Agent; (g) Emmet, Marvin & Martin, LLP (Attn: Margery A. Colloff, Esq.), attorneys for the Prepetition Indenture Trustee, (h) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; and (i) counsel for any Committee.

49.    <u>Objection Deadline</u>:  Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Bankruptcy Court, and personally served upon (a) O'Melveny & Myers LLP (Attn: Steve Warren, Esq. and Jennifer Taylor, Esq.) and Richards,

Layton & Finger, P.A. (Attn: Mark D. Collins, Esq. and Michael J. Merchant, Esq.), counsel for the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to any Committee; (d) Choate, Hall & Stewart LLP (Attn: Kevin J. Simard, Esq. and Sean M. Monahan, Esq.) and Womble Carlyle (Attn: Steven Kortanek), attorneys for the DIP Agent and the Prepetition Senior Agent; (e) Paul Hastings LLP (Attn: Leslie Plaskon, Esq.), attorneys for the DIP Term Agent and the Prepetition Term Agent and Ashby & Geddes, P.A. (Attn: William P. Bowden), and (f) Emmet, Marvin & Martin, LLP (Attn: Margery A. Colloff, Esq.), attorneys for the Prepetition Indenture Trustee, so that such objections are filed with the Court and received by said parties on or before ___:___ p.m. (Eastern Time) on _____ ___, 2016 with respect to entry of the Final Order.

50.    Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

51.    Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2016
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 13827754v.1

**Exhibit A**
**(DIP Credit Agreement)**

**Execution Version**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of February 2, 2016

among

**HANCOCK FABRICS, INC.,**

as the Lead Borrower

for

the Borrowers Named Herein,

the Guarantors Named Herein,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

as Administrative Agent, Collateral Agent and Swing Line Lender,

**GACP FINANCE CO., LLC,**

as Term Agent,

and

the Lenders Party Hereto

Table of Contents

| | | Page |
|---|---|---|
| Article I DEFINITIONS AND ACCOUNTING TERMS | | 1 |
| 1.01 | Defined Terms | 2 |
| 1.02 | Other Interpretive Provisions | 59 |
| 1.03 | Accounting Terms | 60 |
| 1.04 | Reserved | 60 |
| 1.05 | Times of Day | 60 |
| 1.06 | Letter of Credit Amounts | 60 |
| 1.07 | Currency Equivalents Generally | 60 |
| Article II THE COMMITMENTS AND CREDIT EXTENSIONS | | 61 |
| 2.01 | Loans; Reserves | 61 |
| 2.02 | Borrowings, Conversions and Continnations of Loans | 62 |
| 2.03 | Letters of Credit | 64 |
| 2.04 | Swing Line Loans | 73 |
| 2.05 | Prepayments; Pre-Petition Obligations | 76 |
| 2.06 | Termination or Reduction of Commitments | 78 |
| 2.07 | Repayment of Loans | 79 |
| 2.08 | Interest | 79 |
| 2.09 | Fees | 80 |
| 2.10 | Computation of Interest and Fees | 80 |
| 2.11 | Evidence of Debt | 80 |
| 2.12 | Payments Generally; Agent's Clawback | 81 |
| 2.13 | Sharing of Payments by Lenders | 83 |
| 2.14 | Settlement Amongst Lenders | 84 |
| 2.15 | Release | 84 |
| 2.16 | Waiver of any Priming Rights | 85 |
| Article III TAXES, YIELD PROTECTION AND ILLEGALITY;  APPOINTMENT OF LEAD BORROWER | | 85 |
| 3.01 | Taxes | 85 |
| 3.02 | Illegality | 88 |
| 3.03 | Inability to Determine Rates | 88 |
| 3.04 | Increased Costs; Reserves on LIBO Rate Loans | 88 |
| 3.05 | Compensation for Losses | 90 |

Table of Contents

Page

3.06    **Mitigation Obligations; Replacement of Lenders** ................................ 91

3.07    **Survival** .................................................................................................. 91

3.08    **Designation of Lead Borrower as Borrowers' Agent** ........................ 91

Article IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ................................ 92

4.01    **Conditions of Initial Credit Extension** ............................................ 92

4.02    **Conditions to all Credit Extensions** ................................................ 95

Article V REPRESENTATIONS AND WARRANTIES ................................................. 97

5.01    **Existence, Qualification and Power** .................................................. 97

5.02    **Authorization; No Contravention** .................................................... 97

5.03    **Governmental Authorization; Other Consents** ................................ 97

5.04    **Binding Effect** ...................................................................................... 98

5.05    **Financial Statements; No Material Adverse Effect** .......................... 98

5.06    **Litigation** .............................................................................................. 99

5.07    **No Default** ............................................................................................ 99

5.08    **Ownership of Property; Liens** ............................................................ 99

5.09    **Environmental Compliance** .............................................................. 100

5.10    **Insurance** ............................................................................................ 101

5.11    **Taxes** .................................................................................................... 101

5.12    **ERISA Compliance** ............................................................................ 101

5.13    **Subsidiaries; Equity Interests** ........................................................ 102

5.14    **Margin Regulations; Investment Company Act** .............................. 102

5.15    **Disclosure** ............................................................................................ 102

5.16    **Compliance with Laws** ...................................................................... 103

5.17    **Intellectual Property; Licenses, Etc** ................................................ 103

5.18    **Labor Matters** .................................................................................... 103

5.19    **Security Documents** .......................................................................... 104

5.20    **Reserved** .............................................................................................. 105

5.21    **Deposit Accounts; Credit Card Arrangements** .................................. 105

5.22    **Brokers** ................................................................................................ 105

5.23    **Customer and Trade Relations** ........................................................ 105

5.24    **Material Contracts** ............................................................................ 105

5.25    **Casualty** .............................................................................................. 105

7143386v10

Table of Contents

|  |  | Page |
|---|---|---|
| **5.26** | **Bankruptcy Matters** | 106 |
| Article VI AFFIRMATIVE COVENANTS | | 106 |
| **6.01** | **Financial Statements** | 107 |
| **6.02** | **Certificates; Other Information** | 108 |
| **6.03** | **Notices** | 110 |
| **6.04** | **Payment of Obligations** | 112 |
| **6.05** | **Preservation of Existence, Etc** | 112 |
| **6.06** | **Maintenance of Properties** | 112 |
| **6.07** | **Maintenance of Insurance** | 113 |
| **6.08** | **Compliance with Laws** | 114 |
| **6.09** | **Books and Records; Accountants** | 114 |
| **6.10** | **Inspection Rights** | 115 |
| **6.11** | **Use of Proceeds** | 116 |
| **6.12** | **Additional Loan Parties** | 116 |
| **6.13** | **Cash Management** | 117 |
| **6.14** | **Information Regarding the Collateral** | 119 |
| **6.15** | **Physical Inventories** | 119 |
| **6.16** | **Environmental Laws** | 120 |
| **6.17** | **Further Assurances** | 120 |
| **6.18** | **Compliance with Terms of Leaseholds** | 121 |
| **6.19** | **Material Contracts** | 121 |
| **6.20** | **Designation of Senior Debt** | 121 |
| **6.21** | **Credit Card Processors** | 121 |
| **6.22** | **Retention of Consultants; Communication with Accountants and Other Financial Advisors** | 122 |
| **6.23** | **Performance within Budget** | 123 |
| **6.24** | **Permitted Sales Process; Agency Agreement** | 123 |
| **6.25** | **Additional Bankruptcy Related Affirmative Covenants** | 125 |
| **6.26** | **Leases** | 125 |
| **6.27** | **Financing Orders** | 125 |
| Article VII NEGATIVE COVENANTS | | 125 |
| **7.01** | **Liens** | 126 |
| **7.02** | **Investments** | 126 |

Table of Contents

|  |  | Page |
|---|---|---|
| 7.03 | **Indebtedness; Disqualified Stock** | 126 |
| 7.04 | **Fundamental Changes** | 126 |
| 7.05 | **Dispositions** | 126 |
| 7.06 | **Restricted Payments** | 126 |
| 7.07 | **Prepayments of Indebtedness and Payments of Specified Subordinated Indebtedness** | 126 |
| 7.08 | **Change in Nature of Business** | 126 |
| 7.09 | **Transactions with Affiliates** | 126 |
| 7.10 | **Burdensome Agreements** | 127 |
| 7.11 | **Use of Proceeds** | 127 |
| 7.12 | **Amendment of Material Documents** | 127 |
| 7.13 | **Fiscal Year** | 128 |
| 7.14 | **Deposit Accounts; Credit Card Processors** | 128 |
| 7.15 | **Reserved** | 128 |
| 7.16 | **Designation of Senior Debt** | 128 |
| 7.17 | **Reclamation Claims** | 128 |
| 7.18 | **Bankruptcy Related Negative Covenants** | 128 |
| 7.19 | **Professional Fee Escrow Account** | 129 |
| Article VIII EVENTS OF DEFAULT AND REMEDIES | | 129 |
| 8.01 | **Events of Default** | 129 |
| 8.02 | **Remedies Upon Event of Default** | 135 |
| 8.03 | **Application of Funds** | 135 |
| Article IX THE AGENT | | 138 |
| 9.01 | **Appointment and Authority** | 138 |
| 9.02 | **Rights as a Lender** | 138 |
| 9.03 | **Exculpatory Provisions** | 138 |
| 9.04 | **Reliance by the Agent and the Term Agent** | 139 |
| 9.05 | **Delegation of Duties** | 140 |
| 9.06 | **Resignation of Agent** | 140 |
| 9.07 | **Non-Reliance on Agent or Term Agent and Other Lenders** | 141 |
| 9.08 | **Reserved** | 141 |
| 9.09 | **Reserved** | 141 |
| 9.10 | **Collateral and Guaranty Matters** | 142 |

iv

Table of Contents

|  |  | Page |
|---|---|---|
| **9.11** | **Notice of Transfer** | 142 |
| **9.12** | **Reports and Financial Statements** | 142 |
| **9.13** | **Agency for Perfection** | 143 |
| **9.14** | **Indemnification of Agent and Term Agent** | 143 |
| **9.15** | **Relation among Lenders** | 144 |
| **9.16** | **Defaulting Lender** | 144 |
| Article X MISCELLANEOUS | | 147 |
| **10.01** | **Amendments, Etc** | 147 |
| **10.02** | **Notices; Effectiveness; Electronic Communications** | 149 |
| **10.03** | **No Waiver; Cumulative Remedies** | 151 |
| **10.04** | **Expenses; Indemnity; Damage Waiver** | 151 |
| **10.05** | **Payments Set Aside** | 153 |
| **10.06** | **Successors and Assigns** | 153 |
| **10.07** | **Treatment of Certain Information; Confidentiality** | 158 |
| **10.08** | **Right of Setoff** | 159 |
| **10.09** | **Interest Rate Limitation** | 159 |
| **10.10** | **Counterparts; Integration; Effectiveness** | 159 |
| **10.11** | **Survival** | 160 |
| **10.12** | **Severability** | 160 |
| **10.13** | **Replacement of Lenders** | 160 |
| **10.14** | **Governing Law; Jurisdiction; Etc** | 161 |
| **10.15** | **Waiver of Jury Trial** | 162 |
| **10.16** | **No Advisory or Fiduciary Responsibility** | 162 |
| **10.17** | **USA PATRIOT Act Notice** | 163 |
| **10.18** | **Foreign Asset Control Regulations** | 163 |
| **10.19** | **Time of the Essence** | 164 |
| **10.20** | **Designation of Senior Debt** | 164 |
| **10.21** | **Press Releases** | 164 |
| **10.22** | **Additional Waivers** | 164 |
| **10.23** | **No Strict Construction** | 166 |
| **10.24** | **Attachments** | 166 |
| **10.25** | **Keepwell** | 166 |

v

Table of Contents

Page

**10.26   Conflict** ....................................................................................... 166

7143386v10

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 1.03 | Interlender Provisions |
| 1.04 | Rollover Letters of Credit |
| 1.05 | Block Relief Amount |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties; Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.11 | Federal, State and Other Material Tax Returns and Reports |
| 5.13 | Subsidiaries; Equity Interests |
| 5.17 | Intellectual Property Matters |
| 5.18 | Labor Matters |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Swing Line Loan Notice |
| C-1 | Revolving Note |
| C-2 | Swing Line Note |
| C-3 | Term Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Borrowing Base Certificate |
| G | Credit Card Notification |
| H | DDA Notification |
| I | Cash Management Order |
| J | Interim Financing Order |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of February __, 2016, among HANCOCK FABRICS, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Lead Borrower"), the Persons named on Schedule 1.01 hereto (collectively, together with the Lead Borrower, the "Borrowers"), the Persons named on Schedule 1.02 hereto (collectively, the "Guarantors"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), WELLS FARGO BANK, NATIONAL ASSOCIATION, as Agent and Swing Line Lender, and GACP FINANCE CO., LLC, as Term Agent.

On February 2, 2016 (the "Petition Date"), the Lead Borrower and the other Loan Parties commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case number(s) [_____] (collectively, the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Lead Borrower and the other Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrowers have requested, and the Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a senior secured credit facility in an aggregate principal amount not to exceed $100,000,000 in order to (a) repay the Pre-Petition Obligations as provided herein, (b) fund the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance), (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrowers and the other Loan Parties during the pendency of the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance).

The Borrowers and the other Loan Parties desire to secure the Obligations under the Loan Documents by granting to the Agent, on behalf of itself and the other Credit Parties, a security interest in and liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and in the Interim Financing Order (or the Final Financing Order when applicable).

All Obligations of the Loan Parties to the Agent and the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, secured by the Agent's security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral and entitled to super-priority administrative claim status under the Bankruptcy Code as provided herein and in the Financing Orders.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which (i) is not an Affiliate of the Approved Foreign Vendor or any Loan Party and (ii) is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent in its Permitted Discretion, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent), and (e) is on terms otherwise reasonably acceptable to the Agent.

"Accommodation Payment" as defined in Section 10.22(d).

"Account" means "accounts" as defined in the UCC and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger, amalgamation or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person or of any business unit of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Adjusted LIBO Rate" means:

(a)    for any Interest Period with respect to any LIBO Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (i) the LIBO Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate; and

-2-

(b)       for any interest rate calculation with respect to any Base Rate Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of one percent) equal to (i) the LIBO Rate for an Interest Period commencing on the date of such calculation and ending on the date that is thirty (30) days thereafter multiplied by (ii) the Statutory Reserve Rate.

The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

"Adjusted Revolving Borrowing Base" means the Revolving Borrowing Base, without giving effect to the Availability Block and the Term Loan Push Down Reserve.

"Administrative Agent" means Wells Fargo in its capacity as Administrative Agent under any of the Loan Documents, or any successor thereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (b) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (c) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (d) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agency Agreement" means that certain Agency Agreement entered into by and between the Lead Borrower and Great American Group, LLC, with respect to the "going out of business" sales with respect to 185 stores dated as of January 26, 2016, as amended or modified with the prior written consent of the Agent after consultation with the Term Agent.

"Agent" means Wells Fargo in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto, in such capacities.

"Agent Parties" shall have the meaning specified in Section 10.02(c).

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the Revolving Lenders. As of the Closing Date, the Aggregate Revolving Commitments are $80,000,000.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Allocable Amount" has the meaning specified in Section 10.21(d).

7143386v10

"Applicable Commitment Fee Percentage" means one half of one percent (0.50%).

"Applicable Lenders" means the Required Lenders, the Required Revolving Lenders, the Required Term Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means:

| Applicable Margin for Base Rate Loans | Letter of Credit Fee |
|---|---|
| 1.50% | 2.50% |

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Commitment at such time, (b) with respect to any Term Lender at any time, the portion of the Term Loan represented by the outstanding principal balance of such Term Lender's Term Loan at such time, or (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment and the outstanding principal balance of such Lender's Term Loan at such time, in each case as the context provides. If the commitment of each Lender to make Loans and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender shall be determined based on the Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraisal Percentage" means ninety percent (90%).

"Appraised Value" means, with respect to Eligible Inventory, Eligible Domestic In-Transit Inventory and Eligible Foreign In-Transit Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory, Eligible Domestic In-Transit Inventory or Eligible Foreign In-Transit Inventory, as applicable, as set forth in the inventory stock ledger of the Borrowers, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent, which appraisal is in form and substance reasonably satisfactory to the Agent.

"Approved Budget" shall mean the debtor-in-possession thirteen (13) week budget prepared by the Lead Borrower and furnished to the Agent and the Term Agent on or before the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(f) which budget shall include a weekly cash budget, including information on a line item basis as to (w) projected Inventory amounts,

(x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Agent, the Term Agent and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), and (z) a calculation of Availability.

"Approved Budget Variance Report" shall mean a weekly report provided by the Lead Borrower to the Agent and Term Agent in accordance with Section 6.01(f): (i) showing by line item actual receipts for both inventory and revenues, actual disbursement amounts, cash on hand, actual invoiced and unpaid professional fees (other than counsel for the Agent, the Term Agent and the Lenders) and Availability as of Sunday of each week on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis at all times thereafter, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include or be accompanied by explanations for all material variances, and (ii) certified by a Responsible Officer of the Lead Borrower.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its Permitted Discretion, (b) has received timely payment or performance of all obligations owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in full compliance with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Liquidator" shall mean a professional liquidator, broker or other advisor acceptable to the Agent it being agreed that each of the professional liquidators contacted in connection with the Initial Store Closings are acceptable to Agent.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a

balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries for the Fiscal Year ended January 25, 2014, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Lead Borrower and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

> (a)    the Revolving Loan Cap
>
> minus
>
> (b)    the Total Revolving Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable are being paid within stated invoice terms or as permitted in the ordinary course of Borrowers' business consistent with past practices (absent which the Agent may establish a Reserve therefor).

"Availability Block" means the greater of (a) ten percent (10%) of the Adjusted Revolving Borrowing Base and (b) $7,500,000.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Revolving Lender to make Committed Revolving Loans and of the obligation of the Issuing Bank to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (i) to reflect the impediments to the Agent's ability to realize upon the Collateral, (ii) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, including without limitation, amounts entitled to priority under Section 503(b) of the Bankruptcy Code, as reasonably determined by the Agent, (iii) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (iv) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (A) rent to the extent claims in respect thereof may have priority over the interests of the Agent in the Collateral; (B) customs duties, and other costs to release Inventory which is being imported into the United States; (C) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (D) salaries, wages and benefits due to

-6-

employees of any Borrower; (E) Customer Credit Liabilities; (F) Customer Deposits; (G) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (H) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (I) amounts due to vendors on account of consigned goods or on account of purchase money or "floor plan financing" payables; (J) royalties payable in respect of licensed merchandise; (K) Cash Management Reserves; (L) Bank Product Reserves; (M) Realty Reserves; (N) the Carve-Out Reserve; and (O) Consultant Fee Reserve.

"Average Daily Availability" means, as of any date of determination, the average daily Availability for the immediately preceding calendar month.

"Baldwyn Real Estate" shall mean the Real Estate of Lead Borrower located at One Fashion Way, Baldwyn, Mississippi.

"Bank Products" means any services of facilities provided to any Loan Party by the Agent, any Revolving Lender or any of their respective Affiliates or branches (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, (e) credit or debit cards, (f) purchase cards, and (g) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Product Reserves" means such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate for an Interest Period of three (3) months plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo as its "prime rate." The "prime rate" is a rate set by Wells Fargo based upon various factors including Wells Fargo's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Wells Fargo shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Bidding Procedures Motion" has the meaning provided in Section 6.25(a)(i).

"Bidding Procedures Order" has the meaning provided in Section 6.25(b).

"Block Relief Amount" means the dollar amount for the then applicable week as set forth on Schedule 1.05 annexed hereto.

7143386v10

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Revolving Credit Borrowing, a Swing Line Borrowing or the Term Borrowing, as the context may require.

"Borrowing Base" means each of the Revolving Borrowing Base and the Term Loan Borrowing Base.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit F hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent and the Term Agent.

"Business" means a retailer of fashion and home decorating textiles, crafts, sewing accessories, needlecraft supplies and sewing machines.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means, collectively, the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C.

-8-

§1930(a) and Section 3717 of title 31 of the United States Code, plus (ii) the aggregate amount of unpaid fees and expenses of the Debtors' and Statutory Committee's professionals, in each case retained in the Chapter 11 Case by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327(a) or 1103(a) of the Bankruptcy Code, to the extent such fees and expenses are (A) allowed and payable pursuant to an order of the Bankruptcy Court (which order has not been reversed, vacated or stayed), (B) incurred prior to the delivery of a Carve-Out Trigger Notice, and (C) limited to the amounts set forth in the Approved Budget as of any applicable date of determination, to the extent such amounts have been funded into the Professional Fee Escrow Account prior to the delivery of the Carve-Out Trigger Notice, plus (iii) $100,000 for fees, costs and expenses of such professionals from and after the delivery of a Carve-Out Trigger Notice (the "Post Trigger Notice Carve Out Amount"), plus (iv) the Success Fee.

"Carve-Out Reserve" means the amount set forth in clause (iii) of the definition of Carve-Out plus the Success Fee (in an amount determined by the Agent in its Permitted Discretion).

"Carve-Out Trigger Notice" means a written notice by the Agent to lead counsel for the Loan Parties, any Statutory Committee and the U.S. Trustee following the occurrence of an Event of Default, expressly stating that no additional Committed Revolving Loans may be requested to fund the Carve-Out.

"Case Professionals" means the Loan Parties' and any Statutory Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Collateral Account" means a blocked, non-interest bearing account established by one or more of the Loan Parties with Wells Fargo, and under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(k) or Section 8.02(c).

"Cash Collateralize" has the meaning specified in Section 2.03(k). Derivatives of such term have corresponding meanings.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent after consultation with the Term Agent in its Permitted Discretion, which, among other matters, authorizes the Loan Parties to use their cash management system, substantially in the form of Exhibit I or another form satisfactory to the Agent.

"Cash Management Reserves" means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

-9-

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by the Agent, any Revolving Lender or any of their respective Affiliates or branches in respect of (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, and (c) credit card processing services.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     (x) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of more than fifty percent (50%) of the economic interests of the Lead Borrower or of the Equity Interests of the Lead Borrower entitled to vote for members of the board of directors or equivalent governing body of the Lead Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right) and (y) such event shall result in a such person or group affecting a change in the governance or management of the Company that is adverse to the interests of the Lenders as determined by the Agent in its Permitted Discretion; or

-10-

(b)     during any period of twenty-four (24) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Lead Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     the Lead Borrower fails at any time to own, directly or indirectly, one hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances and Liens in favor of the Agent), except where such failure is as a result of a transaction expressly permitted by the Loan Documents.

"Chapter 11 Case" has the meaning specified in the Recitals hereto.

"Closing Date" means the first date all the conditions precedent in Sections 4.01 and 4.02 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" and "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent, provided that "Collateral" shall not include any Excluded Property.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party with respect to the applicable Collateral.

"Collateral Agent" means Wells Fargo, acting in such capacity for its own benefit and the ratable benefit of the other Credit Parties, or any successor thereto.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the Issuing Bank.

"Commitment" means, as to each Lender, such Lender's Revolving Commitment or Term Commitment, as applicable.

"Committed Loan Notice" means a notice of (a) a Revolving Credit Borrowing AND/OR Term Borrowing, (b) a conversion of Committed Revolving Loans and/or Term Loans, from one Type to the other, or (c) a continuation of LIBO Rate Loans, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit A.

"Committed Revolving Loan" has the meaning specified in Section 2.01.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Concentration Account" has the meaning provided in Section 6.13(d).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of ten (10) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender's giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consultant Fee Reserve" means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated fees and expenses due to the Great American Group, LLC pursuant to the Initial Store Closing Agreement.

"Consultants" means the Financial Consultant, Sale Consultant and Real Estate Consultant, as applicable.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers'

-12-

purchase journals or the Borrowers' stock ledger. "Cost" includes inventory capitalization costs for imports, but does not include other inventory capitalization costs or other non purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Advance Rate" means ninety percent (90%).

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Receivables" means collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit card or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the credit card agreements.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Term Agent, (iv) each Issuing Bank, (v) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vi) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vii) the snccessors and permitted assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agent, the Term Agent and their respective Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) counsel for the Term Agent, (C) outside consultants for the Agent, (D) appraisers, (E) commercial finance examinations, and (F) all such out-of-pocket expenses incurred during any workout, restructuring

-13-

or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents, instruments and agreements executed and delivered in connection therewith, or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, or (D) any workout, restructuring or negotiations in respect of any Obligations; (b) with respect to the Issuing Bank, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; (c) all customary fees and charges (as adjusted from time to time) of the Agent and the Term Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith; and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent, the Term Agent, the Issuing Bank or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case such Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrowers, and (c) liabilities in connection with frequent shopping programs of the Borrowers.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services and (b) layaway obligations of the Borrowers.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, the Term Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in Section 6.13(b).

"Debtor Relief Laws" means each of (a) the Bankruptcy Code and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium,

-14-

rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees and the Term Loan, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans, plus (iii) two percent (2%) per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus two percent (2%) per annum, (b) when used with respect to Letter of Credit Fees, a rate equal to the rate otherwise applicable thereto plus two percent (2%) per annum, and (c) when used with respect to the Term Loan, an interest rate equal to the Term Loan Interest Rate plus two percent (2%) per annum.

"Defaulting Lender" means any Revolving Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement on the date that it is required to do so under this Agreement (including the failure to make available to the Agent amounts required pursuant to Section 2.14 or to make a required payment in connection with a payment made by the Issuing Bank pursuant to a Letter of Credit), (b) notified the Borrowers, the Agent, or any other Revolving Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Agent) under which it has committed to extend credit, (d) failed, within one (1) Business Day after written request by the Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund any amounts required to be funded by it under this Agreement, (e) otherwise failed to pay over to the Agent or any other Revolving Lender any other amount required to be paid by it under this Agreement on the date that it is required to do so under this Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Revolving Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person

(or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is one hundred and eighty (180) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Lead Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Domestic In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a location inside of the continental United States to either (i) a location of a Borrower that is within the continental United States, or (ii) another location within the continental United States subject to arrangements that comply with the applicable requirements of this Agreement.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"Elavon" means Elavon, Inc. (formerly Nova Information Systems, Inc.), as processor under the Elavon Processor Agreement.

-16-

"Elavon Deposit Account" means that certain deposit account maintained with Bancorp South Bank, with account number ending in -2803 in the name of Lead Borrower, or any replacement account therefor expressly agreed to in advance in writing by the Agent, which replacement account shall be a Blocked Account.

"Elavon Member" means, as of the date hereof, U.S. Bank, National Association, in its capacity as "Member" under the Elavon Processor Agreement and any replacement "Member" thereunder.

"Elavon Processor Agreement" means that certain Payment Device Processing Agreement, dated as of January 6, 2012, among Lead Borrower, Elavon, as processor, and Elavon Member, together with all other agreements, documents and instruments now or at any time hereafter executed and/or delivered in connection therewith.

"Elavon Reserve Account" means that "Reserve Account" identified in the Elavon Processor Agreement as in effect on the date hereof.

"Eligible Assignee" means (a) a Credit Party or any of its branches or Controlled Affiliates; (b) in the case of an assignment of (i) a Revolving Commitment, a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000 or (ii) Term Loans or Term Commitments, a bank, insurance company, or company engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of business; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of credit facilities, and (e) any other Person (other than a natural person) approved by (i) in the case of an assignment of a Revolving Commitment, the Agent, the Issuing Bank and the Swing Line Lender and (ii) subject to the Interlender Provisions, in the case of an assignment of a portion of the Term Loan, the Agent and the Term Agent; provided, that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' branches, Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower or in connection with sales to consumers as part of the Initial Store Closing, and (ii) in each case is acceptable to the Agent in its Permitted Discretion based on, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to, any of clauses (a) through (j) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances

-17-

(including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.  Credit Card Receivables which would otherwise constitute Eligible Credit Card Receivables pursuant to this Section will not be deemed ineligible solely by virtue of the agreements with respect thereto having been entered into by any Guarantor, for the benefit of Borrowers.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

> (a)     Credit Card Receivables that do not arise from the actual and bona fide sale and delivery of goods or rendition of services by such Borrower in the ordinary course of the business of such Borrower which transactions are completed in accordance with the terms and provisions contained in any agreements binding on such Borrower or the other party or parties related thereto;

> (b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

> (c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than (x) Liens granted to the Agent pursuant to the Security Documents, (y) Liens permitted pursuant to clauses (p) and (s) of the definition of Permitted Encumbrances, and (z) Liens with respect to which the Agent has implemented Reserves in its Permitted Discretion);

> (d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

> (e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

> (f)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor of the applicable credit card which is the subject of a proceeding under any Debtor Relief Law;

> (g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

> (h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

-18-

(i)     Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j)     Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible Domestic In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, Domestic In-Transit Inventory:

(a)     which has been shipped from a domestic location for receipt by a Borrower, but which has not yet been delivered to such Borrower, which Domestic In-Transit Inventory has been in transit for ten (10) calendar days or less from the date of shipment of such Inventory;

(b)     for which the purchase order is in the name of a Borrower and title and risk of loss has passed to such Borrower;

(c)     which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(d)     for which payment of the purchase price has been made by the Borrower in cash in advance; and

(e)     which otherwise would constitute Eligible Inventory;

provided, that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible Domestic In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation or stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Foreign In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, Foreign In-Transit Inventory:

(a)     which has been shipped from a foreign location for receipt by a Borrower, but which has not yet been delivered to such Borrower, which Foreign In-Transit Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(b)     for which the purchase order is in the name of a Borrower and title and risk of loss has passed to such Borrower;

(c)     for which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of

-19-

title which evidence ownership of the subject Inventory pursuant to a Customs Broker/Carrier Agreement;

(d)    which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(e)    the Foreign Vendor with respect to such Foreign In-Transit Inventory is an Approved Foreign Vendor;

(f)    for which payment of the purchase price has been made by the Borrower or the purchase price is supported by a Commercial Letter of Credit; and

(g)    which otherwise would constitute Eligible Inventory;

provided, that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible Foreign In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation or stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible Domestic In-Transit Inventory, Eligible Foreign In-Transit Inventory, and (ii) items of Inventory of a Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrowers' business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by a Borrower or a Borrower does not have good and valid title thereto;

(b)    Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party, including without limitation consigned patterns;

(c)    Inventory (other than Eligible Foreign In-Transit Inventory) that is not located in the United States of America (excluding territories or possessions of the United States);

(d)    Inventory (other than Eligible Domestic In-Transit Inventory and Eligible Foreign In-Transit Inventory) that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit for 7 days or less between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrowers have furnished the Agent with (A) any UCC financing

7143386v10

statements or other documents that the Agent may reasonably determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

(e)    Inventory that is located:  (i) in a warehouse or distribution center leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location in its Permitted Discretion, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work in process, remnants, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) has been packed away for sale in the subsequent season; (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)    Inventory that is not subject to a perfected first priority security interest in favor of the Agent;

(h)    Inventory that is not insured in compliance with the provisions of <u>Section 5.10</u> hereof;

(i)    Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit; or

(k)    Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement unless the Agent has implemented a Reserve in its Permitted Discretion with respect thereto.

"Eligible Real Estate" means Real Estate deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Revolving Borrowing Base and Term Loan Borrowing Base and which, except as otherwise agreed by Agent, in its Permitted Discretion, satisfies all of the following conditions:

(a)    a Borrower owns such Real Estate in fee simple absolute;

(b)    the Interim Financing Order or the Final Financing Order, as applicable shall have been entered and create valid first and subsisting Liens (subject only to Permitted Encumbrances (other than Liens securing Indebtedness) which may have priority over the Lien of the Agent by operation of Law) on such Real Estate;

-21-

(c)    the Agent and the Term Agent shall have received an appraisal setting forth the Fee Simple Value and Leased Value of such Real Estate by a third party professional appraiser reasonably acceptable to the Agent and otherwise in form and substance reasonably satisfactory to the Agent;

(d)    the Real Estate Eligibility Requirements have been satisfied.

Notwithstanding the foregoing only the Baldwyn Real Estate (other than the 11.11 acres of vacant land located at One Fashion Way, Baldwyn Mississippi) shall constitute Eligible Real Estate unless otherwise agreed by the Agent and Term Agent. Any Real Estate that is not Eligible Real Estate shall nevertheless be part of the Collateral.

"Eligible Store Closing Inventory" means Eligible Inventory located at any Stores subject to the Initial Store Closing Agreement.

"Environmental Compliance Reserve" means, with respect to Eligible Real Estate, any reserve which the Agent, from time to time in its Permitted Discretion establishes as to the Revolving Borrowing Base for estimable amounts that are reasonably likely to be expended by any of the Loan Parties in order for such Loan Party and its operations and property (a) to comply with any notice from a Governmental Authority asserting non-compliance with Environmental Laws, or (b) to correct any such non-compliance with Environmental Laws or to provide for any Environmental Liability.

"Environmental Laws" means any and all federal, state, provincial, territorial, municipal, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests),

-22-

and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Lead Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (b) a complete or partial withdrawal by the Lead Borrower or any ERISA Affiliate from a Multiemployer Plan or notification to the Lead Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (c) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (d) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Lead Borrower or any ERISA Affiliate; or (f) any other event or condition with respect to a Plan that could reasonably be expected to result in liability, other than Unfunded Pension Liability, of any Loan Party in excess of $2,000,000.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Events and Circumstances" has the meaning assigned to such term in the definition of "Material Adverse Effect".

"Excess Real Estate Proceeds" has the meaning provided therefor in Section 2.05(h).

"Excluded Property" has the meaning assigned to such term in the Security Agreement.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap

-23-

Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Agent, the Term Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (c) Other Connection Taxes, (d) in the case of a Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Lender's failure or inability (other than solely as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to Section 3.01(a), (e) any U.S. federal, state or local backup withholding Tax, and (f) any U.S. federal withholding Tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan revisions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments, in each case not received in the ordinary course of business.

"Facility Guaranty" means each Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in a form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Factored Receivables" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with Wells Fargo or any of its Affiliates pursuant to a factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"FATCA" means current Section 1471 through 1474 of the Code, including any intergovernmental agreements enacted with respect thereto, or any amended version or successor provision that is substantively similar and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal

-24-

Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Wells Fargo on such day on such transactions as determined by the Agent.

"Fee Simple Value" means, as of the date of determination, the fair market value of Eligible Real Estate as set forth in the most recent appraisal of Eligible Real Estate as determined from time to time by an independent professional appraiser engaged by the Agent in accordance with Section 6.10(d) based upon a fee simple "go-dark" methodology which appraisal shall assume, among other things, a marketing period of no more than twelve (12) months (provided that the Fee Simple Value of Eligible Real Estate shall in no event exceed the maximum amount of the Obligations at any time specified to be secured by a Mortgage, if any, thereon). As of the Closing Date, the Fee Simple Value of the Baldwyn Real Estate is $12,250,000.

"Final Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent and the Term Agent, in their Permitted Discretion and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent and the Term Agent, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur the Obligations (including, without limitation, the Term Loan), and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financial Consultant" means Clear Thinking Group LLC, or another party reasonably acceptable to the Agent and Lead Borrower.

"Financing Orders" means the Interim Financing Order and Final Financing Order, as applicable.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the Saturday nearest to the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarter shall generally end on the Saturday nearest to the last day of each April, July, October and January of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

7143386v10

"Fiscal Year" means the fiscal year ending January 30, 2016 and any subsequent period of fifty-two (52) or fifty-three (53) consecutive weeks ending on the Saturday nearest to January 31 of each calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of a Borrower from a location outside of the continental United States to either (i) a location of a Borrower that is within the continental United States, or (ii) another location within the continental United States subject to arrangements that comply with the applicable requirements of this Agreement.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells Foreign In-Transit Inventory to a Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to Foreign In-Transit Inventory of a Borrower purchased from such Foreign Vendor.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GA Fee Letter" means the letter agreement, dated as of the Closing Date, among the Borrowers and the Term Agent.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, local, provincial, territorial or municipal, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) the provision of any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or the provision of any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" has the meaning specified in the introductory paragraph hereto and includes each Subsidiary of the Lead Borrower that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

-27-

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business), including any "earn-outs" or similar purchase price adjustments;

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest), valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any Loan Party under any Loan Document.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Indenture" shall mean that certain Indenture dated as of November 20, 2012 between Deutsche Bank National Trust Company, as trustee, and the Lead Borrower, as issuer, in respect of the Floating Rate Series A Secured Notes Due 2017.

"Information" has the meaning specified in Section 10.07.

"Initial Store Closing" means the closing of 70 Stores and the sale of Inventory and Equipment located at such Stores in accordance with the Initial Store Closing Agreement.

"Initial Store Closing Agreement" means that certain Consulting Agreement entered into by and between the Lead Borrower and Great American Group, LLC dated as of January 23, 2016, with respect to the Initial Store Closing as amended or modified with the prior written consent of the Agent.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service

-28-

marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights; unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; mask works; customer lists, license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercompany Royalty Accounts" shall mean, collectively, the following bank accounts maintained at Wells Fargo Bank: (a) the bank account of HF Resources, Inc. bearing account number ending in -3008 and (b) the bank account of HF Enterprises, Inc. bearing account number ending in -2999.

"Intercompany Subordination Agreement" shall mean the Intercompany Subordination Agreement executed by the Lead Borrower and each of its Subsidiaries from time to time and in form and substance reasonably satisfactory to the Agent.

"Interest Payment Date" means, (a) as to any LIBO Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided, however, that if any Interest Period for a LIBO Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan), the first day after the end of each month and the Maturity Date.

"Interest Period" means, as to each LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter, as selected by the Lead Borrower in its Committed Loan Notice; provided, that:

     (i)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

     (ii)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

     (iii)     no Interest Period shall extend beyond the Maturity Date; and

(iv)    notwithstanding the provisions of clause (iii), no Interest Period shall have a duration of less than one (1) month, and if any Interest Period applicable to a LIBO Borrowing would be for a shorter period, such Interest Period shall not be available hereunder.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, substantially in the form attached hereto as Exhibit J and/or otherwise in form and substance satisfactory to the Agent and the Term Agent in their discretion, together with all extension, modifications, and amendments thereto approved by the Agent and Term Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Interlender Provisions" means the interlender provisions set forth on <u>Schedule 1.03</u> dated as of the date hereof among the Agent, the Term Agent and the Credit Parties, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

(a)    obsolescence;

(b)    seasonality;

(c)    shrink;

-30-

(d)     change in Inventory mix;

(e)     markdowns (both permanent and point of sale);

(f)     retail markons and markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(g)     out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person of or in another Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, net of any cash returns actually received by such Person on account of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the Issuing Bank and a Borrower (or any Subsidiary thereof) or in favor of the Issuing Bank and relating to any such Letter of Credit.

"Issuing Bank" means Wells Fargo in its capacity as issuer of Letters of Credit hereunder or any successor issuer of Letters of Credit hereunder (which successor may only be a Revolving Lender selected by the Lead Borrower and reasonably acceptable to the Agent in its discretion) and Wells Fargo with respect to the Rollover Letters of Credit.  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of the Issuing Bank and/or for such Affiliate or branch to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "Issuing Bank" shall include any such Affiliate or branch with respect to Letters of Credit issued by such Affiliate or branch.

"Joinder" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

7143386v10

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, federal, state, provincial, municipal and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"Lead Borrower" has the meaning assigned to such term in the preamble to this Agreement.

"Lease" means any agreement in respect of Real Estate, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Extension Order" has the meaning assigned to such term in Section 6.26(b).

"Leased Value" means, as of the date of determination, the fair market value of Eligible Real Estate as set forth in the most recent appraisal of Eligible Real Estate as determined from time to time by an independent professional appraiser engaged by the Agent in accordance with Section 6.10(d) based upon a leased value methodology which appraisal shall assume, among other things, a marketing period of no more than twelve (12) months (provided that the Leased Value of Eligible Real Estate shall in no event exceed the maximum amount of the Obligations at any time specified to be secured by a Mortgage, if any, thereon). As of the Closing Date, the Leased Value of the Baldwyn Real Estate is $19,500,000.

"Lender" means, individually, a Revolving Lender or a Term Lender (and, as the context requires, the Swing Line Lender), and, collectively, all such Persons.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder and each Rollover Letter of Credit.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Issuing Bank.

"Letter of Credit Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

-32-

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(i).

"Letter of Credit Indemnified Costs" has the meaning specified in Section 2.03(f).

"Letter of Credit Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Letter of Credit Related Person" has the meaning specified in Section 2.03(f).

"Letter of Credit Sublimit" means an amount equal to $15,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments. A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Revolving Commitments.

"LIBO Borrowing" means a Revolving Credit Borrowing or Term Borrowing comprised of LIBO Rate Loans.

"LIBO Rate" means the rate per annum rate as reported on Reuters Screen LIBOR01 Page (or any successor page) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with the Agreement (and, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero), which determination shall be made by Agent and shall be conclusive in the absence of manifest error. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Wells Fargo and with a term equivalent to such Interest Period would be offered to Wells Fargo by major banks in the London interbank Eurodollar market in which Wells Fargo participates at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period. With respect to all Term Loans, the LIBO Rate shall not be less than 1.70%.

-33-

"LIBO Rate Loan" means a Committed Revolving Loan or portion of the Term Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent regarding the Collateral, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Liquidation Stalking Horse Bid" means the bid submitted by Great American Group, LLC as set forth in the Agency Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Revolving Loan, a Swing Line Loan or a Term Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the GA Fee Letter, the Wells Fargo Fee Letter, the Post-Closing Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Interlender Provisions, the Intercompany Subordination Agreement, each Facility Guaranty, the Financing Orders and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any Cash Management Services and Bank Products provided by the Agent or any of its Affiliates or branches, each as amended and in effect from time to time.

"Loan Parties" means, collectively, each Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Loan Party or the Lead Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent, the Term Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual

-34-

event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court), (ii) events specifically described in the Declaration of Dennis Lyons in Support of Chapter 11 Petitions and First Day Motions, dated on or about the date hereof and (iii) the incurrence of any claim or liability that is Pre-Petition, unsecured and junior in priority to the Obligations (each of the foregoing clauses (i), (ii) and (iii), collectively, the "Events and Circumstances"), will each not be deemed to have a Material Adverse Effect.

"Material Contract" means, with respect to any Person, (a) each contract or other agreement (other than the Loan Documents), written or oral, to which such Person is a party involving aggregate consideration payable to or by such Person of $1,000,000 or more in any Fiscal Year and (b) any other contract or other agreement (other than the Loan Documents), whether written or oral, to which such Person is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $750,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the earliest of (a) six (6) months after the Petition Date, subject to extension by consent of Lead Borrower, each Lender, the Agent and the Term Agent, but in no event later than nine (9) months after the Petition Date, (b) thirty (30) calendar days after the Petition Date if the Final Financing Order is not entered, (c) the effective date of a Chapter 11 plan of reorganization, (d) the date of consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (e) the date of acceleration of the loans and the termination of the DIP Commitments upon the occurrence of an Event of Default, and (f) the filing of a motion by the Loan Parties seeking dismissal of the Chapter 11 cases, the dismissal of the Chapter 11 cases, the filing of a motion by the Loan Parties seeking to convert the Chapter 11 cases to a case under Chapter 7, the conversion of the Chapter 11 cases to Chapter 7, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 cases.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means each and every fee and leasehold mortgage or deed of trust, security agreement and assignment by and between the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Agent.

-35-

"Mortgage Policy" has the meaning specified in the definition of Real Estate Eligibility Requirements.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior or pari passu to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates) and (C) taxes paid in connection with such transaction; and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) (x) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith and (y) taxes paid in connection therewith.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Note" means (a) a Revolving Note, (b) a Term Note and (c) the Swing Line Note, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such

-36-

proceeding, and (b) any Other Liabilities; <u>provided</u> that the Obligations shall not include any Excluded Swap Obligations.

"Organization Documents" means, (a) with respect to any corporation, the certificate and/or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity; and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to any recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Liabilities" means any obligation on account of (a) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (b) any transaction with the Agent, any Lender or any of their respective Affiliates or branches that arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to any assignment.

"Outstanding Amount" means (i) with respect to Committed Revolving Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Revolving Loans and Swing Line Loans, as the case may be, occurring on such date; (ii) with respect to any Letter of Credit Obligations on any date, the amount of such Letter of Credit Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the Letter of Credit Obligations as of such date, and (iii) with respect to Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of Term Loans occurring on such date.

7143386v10

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in <u>Section 10.06(d)</u>.

"Participant Register" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable (from the perspective of a secured, asset-based revolving lender in the retail industry or a secured, asset-based term loan lender, as applicable) business judgment.

"Permitted Disposition" means any of the following:

      (a)     Dispositions of inventory in the ordinary course of business;

      (b)     reserved;

      (c)     reserved;

      (d)     licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business and existing as of the Closing Date;

      (e)     Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

      (f)     reserved;

      (g)     sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

      (h)     sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party;

      (i)     as long as no Default or Event of Default then exists or would arise therefrom, sales of Real Estate of any Loan Party (or sales of any Person or Persons created to hold such Real Estate or the Equity Interests in such Person or Persons), as long as, (i) the Borrowers shall provide the Agent and the Term Agent with at least ten

-38-

(10) days' prior written notice (or such shorter period as may be agreed upon in writing by the Agent and the Term Agent) of the closing date of the proposed sale, (ii) such sale is made for at least the fair market value of such Real Estate, (iii) the Borrowers shall have delivered to the Agent and the Term Agent no less than five days prior to the disposition of such Real Estate true and complete copies of the most current drafts of any documents, instruments or other similar agreements to be entered into or completed by the applicable Borrower(s) in connection with such disposition, such documentation to be in form and substance reasonably acceptable to the Agent and the Term Agent, (iv) with respect to any Eligible Real Estate, the Net Proceeds paid in cash are in an amount at least equal to the sum of the Real Estate Component and clause (B)(iii) of the Term Loan Borrowing Base, (v) the proceeds of such sale are utilized to repay the Obligations in accordance with Section 2.05(h), (vi) the Agent and the Term Agent shall have received from the Borrowers a revised Borrowing Base Certificate, determined as of last Business Day of the weekly or monthly period then most recently completed on a pro forma basis, as applicable pursuant to Section 6.02(c), eliminating therefrom the line items relating to the Real Estate Component and clause (B)(iii) of the Term Loan Borrowing Base and revising the amount of the then outstanding Loans to reflect the prepayment of the Loans with Net Proceeds of such sale-leaseback transaction in accordance with the terms hereof;

(j)     Permitted Sales;

(k)     the Initial Store Closing; and

(l)     subleases of Leases by any Loan Party in the ordinary course of business.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     reserved;

(f)     easements, servitudes, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any

7143386v10

monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by title commitments or current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)     Liens existing on the Closing Date and listed on Schedule 7.01;

(h)     reserved;

(i)     Liens in favor of the Agent on its own behalf or on behalf of the Lenders and other Credit Parties hereunder;

(j)     Pre-Petition Liens;

(k)     statutory Liens of landlords and lessors in respect of rent not in default;

(l)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)     Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)     reserved;

(o)     Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(p)     Pre-Petition liens and adequate protection liens of the trustee for the holders of the Specified Subordinated Indebtedness securing the Specified Subordinated Indebtedness, provided that such liens are junior in rank to the security interests and liens of the Agent and are subject to the Subordination Provisions set forth in Article XI of the Indenture or substantially identical Subordination Provisions;

(q)     zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower, Guarantor or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property which may be subject thereto;

-40-

(r)     liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrowers in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements (as in effect on the date hereof) to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks; and

(s)     adequate protection liens granted under the Financing Orders; and

(t)     Liens in favor of the agent under an agency agreement in connection with a Permitted Sale under clause (ii) of the definition thereof (i) solely with respect to the merchandise and proceeds thereof subject to such Permitted Sale; (ii) which Lien arises solely after payment of the "initial guaranty amount" and the posting of any letter of credit as and when required under such agency agreement; and (iii) which Lien is on terms acceptable to the Agent and Term Agent in their Permitted Discretion.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists at the time of, or would arise from, the incurrence thereof:

(a)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03;

(b)     Indebtedness of any Loan Party to any other Loan Party; provided, that (i) such Indebtedness shall be subject to, and subordinate in right of payment to, the right of the Credit Parties to receive the prior final payment and satisfaction in full of all of the Obligations pursuant to the Intercompany Subordination Agreement or otherwise on terms and conditions acceptable to Agent, (ii) such Loan Parties shall join the Intercompany Subordination Agreement pursuant to a joinder agreement in form and substance reasonably satisfactory to the Agent, and (iii) such Indebtedness shall not be evidenced by a promissory note or other instrument unless the single original of such note or other instrument is promptly delivered to the Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as the Agent may reasonably require;

(c)     reserved;

(d)     reserved;

(e)     Pre-Petition contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business;

(f)     reserved;

(g)     reserved;

(h)     reserved;

(i)     the Obligations;

-41-

(j)        unsecured Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $100,000 at any time outstanding and in each case on terms reasonably acceptable to the Agent;

(k)        Guarantees (other than Liens) of any Indebtedness of any Loan Party that constitutes Permitted Indebtedness;

(l)        Subordinated Indebtedness; and

(m)        the Pre-Petition Obligations.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists at the time of, or would arise from, the making of such Investment:

(a)        reserved;

(b)        reserved;

(c)        reserved;

(d)        reserved;

(e)        reserved;

(f)        Investments existing on the Closing Date and set forth on <u>Schedule 7.02</u>, but not any consensual increase in the amount thereof or any other consensual modification of the terms thereof;

(g)        (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments (x) by any Loan Party and its Subsidiaries in Loan Parties (other than the Lead Borrower) (provided that, in each case, any such Investments comprised of loans or advances shall be subject to the Intercompany Subordination Agreement) and (y) by any Subsidiaries that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(h)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)        Guarantees constituting Permitted Indebtedness;

(j)        reserved;

(k)        advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business for travel, entertainment, relocation and

analogous ordinary business purposes in an aggregate amount not to exceed $250,000 at any time outstanding; and

(l)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)    the Agent determines to be reasonably necessary or desirable directly or indirectly (i) to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents, including to preserve the Loan Parties' business assets and infrastructure (such as payment of insurance premiums, taxes, necessary supplies, rent and payroll) or which is otherwise for the benefit of the Credit Parties; (ii) to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; (iii) in connection with a Liquidation or the exercise of any rights and remedies, (iv) to fund an orderly liquidation or wind-down of the Loan Parties' assets or business or fund amounts set forth in the Approved Budget (subject to the Permitted Variance), or (v) to pay any other amount chargeable to any Loan Party hereunder; and

(b)    except as set forth in the Interlender Provisions, together with all other Permitted Overadvances then outstanding, shall not (i) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days unless the Required Revolving Lenders otherwise agree, or (ii) exceed at any time five percent (5%) of the Adjusted Revolving Borrowing Base;

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations with respect to Letters of Credit or Section 2.04 regarding the Revolving Lenders' obligations with respect to Swing Line Loans, or (ii) result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; and provided, further, that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"Permitted Prior Liens" means, collectively, Liens permitted by the Pre-Petition Credit Agreement (to the extent any such permitted Liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the obligations under the Pre-Petition Credit Agreement as of the Petition Date) other than, for the avoidance of doubt, Liens securing the Specified Subordinated Indebtedness.

"Permitted Sales" means (i) the sale of all or substantially all of the Loan Parties' business assets (other than those subject to the Initial Store Closing) as a going concern as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code; provided that any going concern sale shall either (x) be for cash consideration to be paid at the

closing of such sale in an amount in excess of all outstanding Obligations and all Pre-Petition Obligations and shall not be subject to any financing contingencies, or (y) be consented to in writing by the Agent and the Term Agent, or (ii) a transaction or transactions combining the sale of all or substantially all of the Loan Parties' Equipment and Inventory and the permanent closing of all or a portion of the Loan Parties' Stores and the sale of all Collateral located therein through the retention by the Loan Parties of one or more Approved Liquidators, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, which transaction shall be (x) upon terms and conditions of the Agency Agreement, or an overbid received at the auction conducted in accordance with the Bidding Procedures Order, which overbid is substantially on the same terms as the Agency Agreement other than the increased purchase price (y) in the form of an "equity bid" including a payment at closing in an amount in excess of all outstanding Obligations and all Pre-Petition Obligations or (z) consented to in writing by the Agent and the Term Agent. In the case of clauses (i) and (ii) above, all of the proceeds thereof (in an amount up to the outstanding balance of the Pre-Petition Obligations and the Obligations) shall be paid to the Agent for application in accordance with terms and conditions of this Agreement and the Financing Orders.

"Permitted Variance" has the meaning provided in <u>Section 6.23</u>.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Lead Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning specified in <u>Section 6.02</u>.

"Post-Closing Letter" means that certain side letter dated as of the Closing Date among the Loan Parties and the Agent.

"Post-Petition" means the period following the commencement of the Chapter 11 Case.

"Post-Petition Obligations" means Indebtedness of any Loan Party that was incurred or accrued after the commencement of the Chapter 11 Case.

"Pre-Petition" means the period prior to the commencement of the Chapter 11 Case.

"Pre-Petition Agent" means the "Agent" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of April 22, 2015, among the Borrowers, the Guarantors, Wells Fargo Bank, National Association, as administrative agent, collateral agent and swing line lender, GACP Finance Co., LLC, as term

7143386v10

agent, and the lenders from time to time party thereto, as amended prior to and in effect on the Petition Date.

"Pre-Petition Indebtedness" means Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Pre-Petition Liens" means Liens in favor of the Wells Fargo as collateral agent for its benefit and the benefit of the lenders) and other credit parties under the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means all "Obligations" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Reserve" and "Pre-Petition Revolving Loan Balance" each mean, at any date of determination, an amount equal to the outstanding aggregate amount of the "Total Revolver Outstandings", as such term is defined in the Pre-Petition Credit Agreement, plus all interest on and fees related thereto.

"Pre-Petition Term Lender" means the "Term Lender" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Term Loan" means the "Term Loan", as such term is defined in the Pre-Petition Credit Agreement, plus all interest on and fees related thereto.

"Prepayment Event" means:

(a)    any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party other than to another Loan Party (other than Dispositions of the type described in clauses (a), (g) and (h) of the definition of "Permitted Disposition"), including pursuant to a Permitted Sale or Initial Store Closing;

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)    the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan) in the ordinary course of business;

(d)    the incurrence by a Loan Party of any Indebtedness for borrowed money; or

(e)    the receipt by any Loan Party of any Extraordinary Receipts.

-45-

"Professional Fee Escrow Account" means an escrow account established and maintained by the Borrowers solely for the purpose of collecting and paying the Carve-Out as provided in this Agreement, the Financing Orders and orders regarding the payment of fees and expenses of Case Professionals issued by the Bankruptcy Court.

"pro forma" means a pro forma basis in accordance with GAAP and Regulation S-X under the Securities Act of 1933, as amended.

"Public Lender" has the meaning specified in Section 6.02.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Real Estate Advance Rate" means, as of any date of determination:

| Date of Determination | Rate |
| --- | --- |
| On or before April 21, 2016 | 60% |
| On or after April 22, 2016 and before the Maturity Date | 50% |

"Real Estate Component" means the lesser of (a) the lesser of (i) the Real Estate Advance Rate multiplied by the Fee Simple Value of Eligible Real Estate and (ii) thirty-five percent (35%) multiplied by the Leased Value of Eligible Real Estate, and (b) $7,500,000.

"Real Estate Consultant" means an independent third party real estate advisor reasonably acceptable to the Agent and the Term Agent.

"Real Estate Eligibility Requirements" means, collectively, each of the following:

(a)    (i) the Agent's Lien thereon has been perfected pursuant to the Interim Financing Order or the Final Financing Order, as applicable, and (ii) if required by the Agent the applicable Loan Party has executed and delivered to the Agent a Mortgage reasonably acceptable to the Agent and the Term Agent with respect to any Real Estate intended, by such Loan Party, to be included in Eligible Real Estate;

-46-

(b)    such Real Estate is used by a Loan Party for offices or as a distribution center;

(c)    as to any particular property, (i) the Loan Party is in compliance in all material respects with the covenants of such Loan Party set forth in any Mortgage relating to such Real Estate requested by the Agent, and (ii) the Loan Party's representations and warranties set forth in any Mortgage relating to such Real Estate requested by the Agent are true and correct in all material respects, in each case subject to applicable notice and cure periods;

(d)    with respect to any Real Estate owned by a Borrower or any other Loan Party (excluding interests as lessee under a Lease) which is intended by such Borrower or such other Loan Party to be included in Eligible Real Estate, (i) the Agent shall have received fully paid American Land Title Association Lender's Extended Coverage title insurance policies (or marked-up title insurance commitments having the effect of a policy of title insurance) (the "Mortgage Policies") in form and substance, with the endorsements reasonably required by the Agent and the Term Agent (to the extent available at commercially reasonable rates) and in amounts reasonably acceptable to the Agent and the Term Agent, issued, coinsured and reinsured (to the extent reasonably required by the Agent and the Term Agent) by title insurers reasonably acceptable to the Agent and the Term Agent, insuring the Mortgages to be valid first and subsisting Liens on the property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Encumbrances having priority over the Lien of the Agent under applicable Law or Liens otherwise reasonably acceptable to the Agent and the Term Agent or (ii) the Agent, in its Permitted Discretion, shall be satisfied that substantially equivalent protections have been granted pursuant to the Interim Financing Order or the Final Financing Order, as applicable;

(e)    with respect to any Real Estate owned by a Borrower or any other Loan Party (excluding interests as lessee under a Lease) which is intended by such Borrower or such other Loan Party to be included in Eligible Real Estate and as to which Agent has requested a Mortgage, the Agent and the Term Agent shall have received American Land Title Association/American Congress on Surveying and Mapping form surveys (or such other form of survey as is customarily delivered to secured lenders in the jurisdiction in which such Real Estate is located), for which all necessary fees (where applicable) have been paid, certified to the Agent and the Term Agent and the issuer of the Mortgage Policies in a manner reasonably satisfactory to the Agent and the Term Agent by a land surveyor duly registered and licensed in the states in which the property described in such surveys is located and reasonably acceptable to the Agent and the Term Agent, showing all buildings and other improvements, the location of any easements, parking spaces, rights of way, building set-back lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects reasonably acceptable to the Agent and the Term Agent; provided, however, such requirement shall be met should the applicable Borrower provide a survey and any other such requirements to the title insurer such that

-47-

the Mortgage Policy includes endorsements or such other coverage acceptable to Agent insuring over all general survey exceptions;

(f)     with respect to any Real Estate intended by any Borrower or other Loan Party to be included in Eligible Real Estate as to which the Agent has requested a Mortgage, the Agent and the Term Agent shall have received a Phase I Environmental Site Assessment in accordance with ASTM Standard E1527-05, in form and substance reasonably satisfactory to the Agent and the Term Agent, from an environmental consulting firm reasonably acceptable to the Agent and the Term Agent, which report shall identify recognized environmental conditions and shall to the extent possible quantify any related costs and liabilities associated with such conditions and the Agent and the Term Agent shall be satisfied with the nature and amount of any such matters. The Agent and the Term Agent may, upon the receipt of a Phase I Environmental Site Assessment require the delivery of further environmental assessments or reports to the extent such further assessments or reports are recommended in the Phase I Environmental Site Assessment;

(g)     upon request therefor, the applicable Loan Party shall have delivered to the Agent and the Term Agent either (i) flood certificates certifying that such Real Estate is not in a flood zone or (ii) evidence of flood insurance naming the Agent as mortgagee as required by the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended and in effect, which shall be reasonably satisfactory in form and substance to the Agent and the Term Agent; and

(h)     the applicable Loan Party shall have delivered such other information and documents as may be reasonably requested by the Agent and the Term Agent, including, without limitation, such as may be necessary to comply with FIRREA.

"Realty Reserves" means such reserves as to the Revolving Borrowing Base as the Agent from time to time determines in the Agent's Permitted Discretion as being appropriate to reflect the impediments to the Agent's ability to realize upon any Eligible Real Estate or to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon any Eligible Real Estate. Without limiting the generality of the foregoing, Realty Reserves may include (but are not limited to) (i) Environmental Compliance Reserves, (ii) reserves for (A) municipal taxes and assessments, (B) insurance premiums, (C) utilities, (D) repairs and maintenance and (E) remediation of title defects, and (iii) reserves for Indebtedness secured by Liens on such Real Estate having priority over the Lien of the Agent.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" means Burr Pilger Mayer, Inc. or such other firm reasonably acceptable to Agent, in each case as specified by the Securities Laws and independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

-48-

"Released Parties" has the meaning provided in Section 2.15.

"Releasing Parties" has the meaning provided in Section 2.15.

"Remedies Notice Period" has the meaning provided in the Interim Financing Order or the Final Financing Order, as applicable.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Committed Revolving Loans or the Term Loan (or a portion thereof), a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the Issuing Bank, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the sum of the Aggregate Revolving Commitments and the then aggregate outstanding principal balance of the Term Loans or, if the Aggregate Revolving Commitments and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than 50% of the sum of the Total Outstandings (with the aggregate amount of each Revolving Lender's risk participation and funded participation in Letter of Credit Obligations being deemed "held" by such Revolving Lender for purposes of this definition); provided that the Revolving Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Revolving Lenders" means, as of any date of determination, at least two Lenders holding more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the commitment of each Revolving Lender to make Committed Revolving Loans and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolving Outstandings (with the aggregate amount of each Revolving Lender's risk participation and funded participation in Letter of Credit Obligations and Swing Line Loans being deemed "held" by such Revolving Lender for purposes of this definition); provided, that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders.

"Required Term Lenders" means, as of any date of determination, a Lender or Lenders holding more than fifty percent (50%) of the then outstanding principal balance of the Term Loan.

"Reserves" means all Inventory Reserves, Availability Reserves and Sale-Leaseback Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, vice president of finance or treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of equity capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments in respect of any capital stock or other Equity Interest made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Reuters Screen LIBOR01 Page" means the display page LIBOR01 on the Reuters service or any successor display page, other published source, information vendor or provider that has been designated by the sponsor of Reuters Screen LIBOR01 page.

"Revolving Borrowing Base" means, at any time of calculation, an amount equal to:

(a)     the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate;

plus

(b)     the Cost of Eligible Inventory, other than Eligible Domestic In-Transit Inventory and Eligible Store Closing Inventory, net of Inventory Reserves, multiplied by the Appraisal Percentage, multiplied by the Appraised Value of such Eligible Inventory provided, that in no event shall Eligible Foreign In-Transit Inventory included in Eligible Inventory exceed $7,500,000);

plus

(c)     the Real Estate Component;

plus

(d)     the Cost of Eligible Domestic In-Transit Inventory net of Inventory Reserves, multiplied by the Appraisal Percentage, multiplied by the Appraised Value of such Eligible Inventory; provided, that in no event shall Eligible Domestic In-Transit Inventory included in this clause (d) exceed the then applicable Block Relief Amount;

-50-

<u>plus</u>

(e) the Cost of Eligible Store Closing Inventory, net of Inventory Reserves, <u>multiplied by</u>, the Store Closing Revolving Advance Rate <u>multiplied by</u> the Appraised Value of such Eligible Store Closing Inventory;

<u>minus</u>

(f)     the Term Loan Push Down Reserve;

<u>minus</u>

(g)     the then amount of all other Availability Reserves;

<u>minus</u>

(h)     the Availability Block <u>minus</u> the amount (if such amount is a positive number) equal to (x) Block Relief Amount for the applicable week <u>minus</u> (y) availability created under clause (d) above at such time of calculation.

"Revolving Commitment" means, as to each Revolving Lender, its obligation to (a) make Committed Revolving Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in Letter of Credit Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Committed Revolving Loans of the same Type and, in the case of LIBO Rate Loans which are Committed Revolving Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to <u>Section 2.01</u>.

"Revolving Lender" means each Lender having a Revolving Commitment as set forth on <u>Schedule 2.01</u> hereto or in the Assignment and Acceptance by which such Person becomes a Revolving Lender.

"Revolving Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Revolving Borrowing Base, in each case minus the Pre-Petition Reserve, other than on account of any amounts pursuant to the Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter).

"Revolving Note" means a promissory note made by the Borrowers in favor of a Revolving Lender evidencing the Committed Revolving Loan made by such Revolving Lender, substantially in the form of Exhibit C-1.

"Rollover Letters of Credit" means the Letters of Credit issued and outstanding under the Pre-Petition Credit Agreement including those set forth on Exhibit 1.04.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Consultant" means Lincoln International or another party reasonably acceptable to the Agent, the Term Agent and the Lead Borrower.

"Sale Consultant Agreement" means the Sale Consultant's engagement letter dated as of December 30, 2015 as in effect on the Closing Date with the Lead Borrower, in the form delivered to the Agent on or before the Petition Date.

"Sale-Leaseback Reserve" means a reserve in the amount equal to $2,500,000, which the Term Agent, in its discretion, shall have the right to direct the Agent to implement and maintain against the Term Loan Borrowing Base.

"Sale Order" has the meaning set forth in <u>Section 6.24</u>.

"Sale Order Motion" has the meaning set forth in <u>Section 6.24</u>.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002, as amended.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means, collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Mortgages, the DDA Notifications, the Credit Card Notifications, the Financing Orders and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Senior Agency Agreement Liens" means Liens permitted under clause (t) of the definition of Permitted Encumbrances entitled to priority over the Liens granted to the Agent under the Security Documents solely with respect to the merchandise and proceeds thereof subject to the applicable Permitted Sale, securing amounts and on terms acceptable to the Agent and Term Agent each in their discretion.

"Senior Agency Agreement Claims" means superpriority administrative expense claims in favor of the agent under an agency agreement in connection with a Permitted Sale under clause (ii) of the definition thereof which claim arises solely after payment of the "initial guaranty amount" and the posting of any letter of credit as and when required under such agency

agreement; and (ii) which claim is on terms acceptable to the Agent and Term Agent in their Permitted Discretion.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Specified Subordinated Indebtedness" shall mean the Indebtedness incurred in connection with the Floating Rate Series A Secured Notes Due 2017 issued by the Lead Borrower on November 20, 2012, which as of the Closing Date was in the aggregate principal amount of $8,204,000.

"Specified Subordinated Indebtedness Documents" shall mean, collectively, (a) the Indenture, (b) each of the "Notes" issued pursuant to and as defined under the Indenture, (c) each of the "Collateral Documents" entered into pursuant to and under the Indenture, and (d) each of the Indenture Documents as defined in the Indenture as in effect on the date hereof.

"Spot Rate" has the meaning given to such term in Section 1.07 hereof.

"Standard Letter of Credit Practice" means, for the Issuing Bank, any domestic or foreign Law or letter of credit practices applicable in the city in which the Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such Laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the Issuing Bank.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

-53-

"Statutory Committee" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing Motion" has the meaning specified in Section 6.24(a)(iii).

"Store Closing Revolving Advance Rate" means the Appraisal Percentage multiplied the inverse of the projected prevailing discount for the following week applied to such Eligible Inventory, as determined by the Agent in its Permitted Discretion.

"Store Closing Term Advance Rate" means the Term Inventory Advance Rate multiplied the inverse of the projected prevailing discount for the following week applied to such Eligible Inventory, as determined by the Agent in its Permitted Discretion.

"Subordinated Debt Documents" shall mean, collectively, any and all agreements, documents and instruments evidencing or otherwise related to Subordinated Indebtedness permitted under this Agreement, including, without limitation the Specified Subordinated Indebtedness Documents.

"Subordinated Indebtedness" means (a) the Specified Subordinated Indebtedness and (b) all other Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent and the Term Agent.

"Subordination Provisions" means the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, including Article XI of the Indenture.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

7143386v10

"Success Fee" means the "Sale Success Fee" or "Liquidation Fee" as defined in the Sale Consultant Agreement.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate or branch of a Lender).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Lender" means Wells Fargo, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in Section 2.04(a).

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"Swing Line Note" means the promissory note of the Borrowers substantially in the form of Exhibit C-2, payable to the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $10,000,000 and (b) the Aggregate Revolving Commitments. The Swing Line Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Agent" means GACP Finance Co., LLC, in such capacity, or any successor thereto in such capacity.

"Term Borrowing" means the borrowing of the Term Loan made by each of the Term Lenders on the Term Loan Funding Date pursuant to Section 2.01(a).

"Term Commitment" means, as to each Term Lender, its obligation to make a portion of the Term Loan available to the Borrowers on the Closing Date pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable. As of the Closing Date, the aggregate amount of Term Commitments shall be the lesser of (x) $18,290,416.47, or (y) the outstanding amount of the Pre-Petition Term Loan as of the Term Loan Funding Date.

"Term Inventory Advance Rate" means fifteen percent (15%).

"Term Lender" means each Lender having a Term Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which such Person becomes a Term Lender, or after the making of the Term Loan, each Lender holding any portion of the Term Loan.

"Term Loan" means the term loan made by the Term Lenders to the Borrowers on the Term Loan Funding Date pursuant to Section 2.01(a).

"Term Loan Applicable Margin" means twelve percent (12.00%).

"Term Loan Borrowing Base" means, at any time of calculation, an amount equal to the lesser of:

(A) $18,290,416.67 minus the then amount of the Sale-Leaseback Reserve, if any; or

(B) the sum of:

-56-

(i)      the face amount of Eligible Credit Card Receivables multiplied by five percent (5%);

plus

(ii)      the Cost of Eligible Inventory, other than Eligible Domestic In-Transit Inventory and Eligible Store Closing Inventory, net of Inventory Reserves, multiplied by the Term Inventory Advance Rate, multiplied by the Appraised Value of such Eligible Inventory (provided, that in no event shall Eligible Foreign In-Transit Inventory included in Eligible Foreign Inventory exceed $7,500,000);

plus

(iii) the Cost of Eligible Store Closing Inventory, net of Inventory Reserves, multiplied by, the Store Closing Term Advance Rate multiplied by the Appraised Value of such Eligible Store Closing Inventory;

plus

(iv)      the lesser of (a) the lesser of (i) twenty-five point sixty-four percent (25.64%) multiplied by the Leased Value of Eligible Real Estate and (ii) $5,000,000 and (b) $11,600,000 minus the Real Estate Component, provided that at no time shall the sum of the advance rates for the Leased Value of Eligible Real Estate for the Revolving Borrowing Base and the Term Loan Borrowing Base exceed fifty-nine and one-half percent (59.5%);

minus

(v)      the then amount of the Sale-Leaseback Reserve, if any.

"Term Loan Funding Date" means the date, on or no later than one Business Day after the Final Order Entry Date, that the Term Loan is funded pursuant to Section 2.01(a).

"Term Loan Push Down Reserve" means the amount, if any, by which (i) on or before the Term Loan Funding Date, the aggregate outstanding principal balance of the Pre-Petition Term Loan exceeds the Term Loan Borrowing Base, or (ii) on any date after the Term Loan Funding Date, the aggregate outstanding balance of the Term Loan exceeds the Term Loan Borrowing Base as calculated by the Agent based upon the most recent Borrowing Base Certificate delivered to the Agent by the Borrowers.

"Term Note" means a promissory note made by the Borrowers in favor of a Term Lender evidencing the Term Loan made by such Term Lender, substantially in the form of Exhibit C-3.

"Termination Date" means the earliest to occur of (i) the Maturity Date,  (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Revolving Commitments in accordance with the provisions of Section 2.06(a) or (e) hereof.

7143386v10

"Total Outstandings" means the aggregate outstanding principal balance of the Term Loan plus the Total Revolving Outstandings.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Committed Revolving Loans, all Swing Line Loans and all Letter of Credit Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Transaction Fees" means the "Transaction Fees" as defined in the Sale Consultant Agreement.

"Type" means, with respect to a Committed Revolving Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided, further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued).

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, increase in Reserves or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

7143386v10

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes and directs the Loan Parties to pay certain Pre-Petition wages, benefits and other amounts owing to employees.

"Wells Fargo" means Wells Fargo Bank, National Association and its successors.

"Wells Fargo Fee Letter" means the letter agreement, dated as of the Closing Date, among the Borrowers and the Agent.

**1.02    Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, refinanced, replaced or otherwise modified (subject to any restrictions on such amendments, supplements, refinancings, replacements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in

cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts), providing Cash Collateralization or other collateral as may be requested by the Agent) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, (ii) any Obligations relating to Bank Products (other than Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or Cash Collateralized or otherwise collateralized as may be requested by the Agent, and (iii) any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable provider of such Swap Contracts to remain outstanding without being required to be repaid.

**1.03    Accounting Terms**.

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Term Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent, the Term Agent, and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such requirement made before and after giving effect to such change in GAAP.

**1.04    Reserved**.

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Letter of Credit Amounts**.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**1.07    Currency Equivalents Generally**.  Any amount specified in this Agreement (other than in <u>Article II</u>, <u>Article IX</u> and <u>Article X</u>) or any of the other Loan Documents to be in

-60-

Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this Section 1.07, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; provided that the Agent may obtain such Spot Rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

### 2.01    Loans; Reserves.

(a)    Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make a loan to the Borrowers on the Term Loan Funding Date in a principal amount not to exceed the Term Commitment of such Term Lender. Amounts repaid in respect of the Term Loans may not be reborrowed, and upon each Term Lender's making of such Term Loans, the Term Commitment of such Term Lender shall be terminated. The proceeds of the Term Loan shall be used to refinance and pay off in full the Pre-Petition Term Loan. For the avoidance of doubt, the making of Term Loans and pay off in full the Pre-Petition Term Loan shall be a cash less roll.

(b)    Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Committed Revolving Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Revolving Lender's Applicable Percentage of the Revolving Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Revolving Credit Borrowing, the Total Revolving Outstandings shall not exceed the Revolving Loan Cap,

(ii)    after giving effect to any Revolving Credit Borrowing, the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed the lesser of (x) such Lender's Revolving Commitment and (y) such Lender's Applicable Percentage of the Revolving Borrowing Base, and

(iii)    The Outstanding Amount of all Letter of Credit Obligations shall not at any time exceed the Letter of Credit Sublimit.

7143386v10

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow Committed Revolving Loans under this Section 2.01.

(c)    The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(d)    Subject to the Interlender Provisions and Section 10.01 hereof, the Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves; provided that the Agent shall be obligated to implement and maintain at all times (i) the Term Loan Push Down Reserve and (ii) the Sale-Leaseback Reserve.

**2.02    Borrowings, Conversions and Continuations of Loans.**

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, all Loans shall be Base Rate Loans and the Borrowers shall not have any option to borrow or convert to LIBO Rate Loans.

(b)    Each Revolving Credit Borrowing, each conversion of Committed Revolving Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon the Lead Borrower's irrevocable notice to the Agent, which may be given by telephone. Each such notice must be received by the Agent not later than 1:00 p.m. (i) two (2) Business Days prior to the requested date of any Borrowing, conversion to or continuation of LIBO Rate Loans or of any conversion of LIBO Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Lead Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Each Borrowing of, conversion to (in the case of Committed Revolving Loans only) or continuation of LIBO Rate Loans shall be (x) with respect to any Committed Revolving Loan, in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof and (y) with respect to any portion of the Term Loan, in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Lead Borrower is requesting a Revolving Credit Borrowing, a conversion of Committed Revolving Loans from one Type to the other, or a continuation of LIBO Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Committed Revolving Loans to be borrowed, or the principal amount of Committed Revolving Loans to be converted or the principal amount of Committed Revolving Loans or the Term Loan (or portion thereof) to be continued, (iv) the Type of Committed Revolving Loans to be borrowed or to which existing Committed Revolving Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Lead Borrower fails to specify a Type of Committed Revolving Loan in a Committed Loan Notice or if the Lead Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Committed Revolving Loans shall be made as, or converted to,

7143386v10

Base Rate Loans and the applicable portions of the Term Loan shall be continued as a LIBO Rate Loan with and Interest Period of one (1) month. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans. If the Lead Borrower requests a Borrowing of, conversion to, or continuation of LIBO Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. Notwithstanding anything to the contrary herein, a Swing Line Loan may not be converted to a LIBO Rate Loan.

(c)    Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans or the Term Loan (or portion thereof), and if no timely notice of a conversion or continuation is provided by the Lead Borrower, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans (in the case of Committed Revolving Loans) or continuation as LIBO Rate Loans with an Interest Period of one (1) month (in the case of a portion of the Term Loan) described in <u>Section 2.02(b)</u>. In the case of a Committed Revolving Borrowing, each Lender shall make the amount of its Committed Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in <u>Section 4.02</u> (and, if such Borrowing is the initial Credit Extension, <u>Section 4.01</u>), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent either by (i) crediting the account of the Lead Borrower on the books of Wells Fargo with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(d)    The Agent, without the request of the Lead Borrower, may advance as a Revolving Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under <u>Section 2.05(d)</u>. Any amount which is added to the principal balance of the Loan Account as provided in this <u>Section 2.02(d)</u> shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(e)    Each Borrowing of Committed Revolving Loans (other than Swing Line Loans and Extended Loans) shall be made by the Revolving Lenders <u>pro rata</u> in accordance with their respective Applicable Percentage. The failure of any Revolving Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(f)    Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan. During the existence of a Default or an Event of Default, no Committed Revolving Loans may be requested

-63-

as, converted to or continued as LIBO Rate Loans without the Consent of the Required Revolving Lenders.

(g)    The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(h)    After giving effect to all Revolving Credit Borrowings, all conversions of Committed Revolving Loans from one Type to the other, and all continuations of Committed Revolving Loans or portions of the Term Loan as the same Type, there shall not be more than five (5) Interest Periods in effect with respect to LIBO Rate Loans.

(i)    The Agent, the Revolving Lenders, the Swing Line Lender and the Issuing Bank shall have no obligation to make any Revolving Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the Issuing Bank and the Borrowers and each Lender and Issuing Bank shall be bound thereby. Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Revolving Loan which is a Base Rate Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(d). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Revolving Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.04 regarding the Revolving Lenders' obligations to purchase participations with respect to Swing Line Loans. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

(a)    Subject to the terms and conditions of this Agreement, upon the request of the Lead Borrower made in accordance herewith, and prior to the Maturity Date, the Issuing Bank agrees to issue a requested Letter of Credit for the account of the Loan Parties. By submitting a request to the Issuing Bank for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that the Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing pursuant to a Letter of Credit Application by a Responsible Officer and delivered to the Issuing Bank and the Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the Issuing Bank not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and the Issuing Bank may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment, renewal, or extension. Each such request shall be

-64-

in form and substance reasonably satisfactory to the Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Agent or the Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the Issuing Bank generally requests for Letters of Credit in similar circumstances.  The Agent's records of the content of any such request will be conclusive.

(b)    The Issuing Bank shall have no obligation to issue a Letter of Credit if, after giving effect to the requested issuance, (i) the Total Revolving Outstandings would exceed Revolving Loan Cap, (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Revolving Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans would exceed such Lender's Revolving Commitment, or (iii) the Outstanding Amount of the Letter of Credit Obligations would exceed the Letter of Credit Sublimit;

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to Section 9.16(b), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers cash collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with Section 9.16(b).  Additionally, the Issuing Bank shall have no obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any Law applicable to the Issuing Bank or any request or directive (whether or not having the force of Law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit or request that the Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally, or (C) if the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Agent may agree) or all the Lenders have approved such expiry date.

(d)    Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify the Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank issued any Letter of Credit; provided that (i) until the Agent advises any such Issuing Bank that the provisions of Section 4.02 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as

7143386v10

shall be agreed by the Agent and such Issuing Bank, such Issuing Bank shall be required to so notify the Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Agent and such Issuing Bank may agree. Each Letter of Credit shall be in form and substance reasonably acceptable to the Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars; provided that if the Issuing Bank, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate. If the Issuing Bank makes a payment under a Letter of Credit, the Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Committed Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 4.02 hereof) and, initially, shall bear interest at the rate then applicable to Committed Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Committed Revolving Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the Issuing Bank shall be automatically converted into an obligation to pay the resulting Committed Revolving Loan. Promptly following receipt by the Agent of any payment from the Borrowers pursuant to this paragraph, the Agent shall distribute such payment to the Issuing Bank or, to the extent that the Lenders have made payments pursuant to Section 2.03(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear. The Borrowers and the Loan Parties hereby acknowledge and agree that all Rollover Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Rollover Letters of Credit were issued by the Issuing Bank at the request of the Borrowers on the Closing Date.

(e)      Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.03(d), each Revolving Lender agrees to fund its Applicable Percentage of any Committed Revolving Loan deemed made pursuant to Section 2.03(d) on the same terms and conditions as if the Borrowers had requested the amount thereof as a Committed Revolving Loan and the Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Revolving Lenders. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of the Issuing Bank or the Revolving Lenders, the Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by the Issuing Bank, in an amount equal to its Applicable Percentage of such Letter of Credit, and each such Lender agrees to pay to the Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of any Letter of Credit Disbursement made by the Issuing Bank under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each Letter of Credit Disbursement made by the Issuing Bank and not reimbursed by Borrowers on the date due as provided in Section 2.03(d), or of any reimbursement payment that is required to be refunded (or that the Agent or the Issuing Bank elects, based upon the advice of counsel, to refund) to the Borrowers for any reason. Each Revolving Lender acknowledges and agrees that its obligation

-66-

to deliver to the Agent, for the account of the Issuing Bank, an amount equal to its respective Applicable Percentage of each Letter of Credit Disbursement pursuant to this Section 2.03(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of a Default or Event of Default or the failure to satisfy any condition set forth in Section 4.02 hereof. If any such Lender fails to make available to the Agent the amount of such Lender's Applicable Percentage of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Agent (for the account of the Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each Credit Party (including the Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by Law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by Section 3.01) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

(i)     any Letter of Credit or any pre-advice of its issuance;

(ii)     any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)     any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)     any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)     any unauthorized instruction or request made to the Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)     an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)     any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

-67-

(viii)    the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)    the Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. The Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.03(f). If and to the extent that the obligations of the Borrowers under this Section 2.03(f) are unenforceable for any reason, the Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable Law. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)    The liability of the Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that are caused directly by the Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. The Issuing Bank shall be deemed to have acted with due diligence and reasonable care if the Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. The Borrowers' aggregate remedies against the Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrowers to the Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.03(d), plus interest at the rate then applicable to Base Rate Loans hereunder. The Borrowers shall take action to avoid and mitigate the amount of any damages claimed against the Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by the Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the Issuing Bank to effect a cure.

(h)    The Borrowers shall be responsible for preparing or approving the final text of the Letter of Credit as issued by the Issuing Bank, irrespective of any assistance the Issuing Bank may provide such as drafting or recommending text or by the Issuing Bank's use or refusal to use text submitted by the Borrowers. The Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, the Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want such Letter of Credit to be renewed, the Borrowers will so notify the Agent and the Issuing Bank at least 15 calendar days before the Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)    The Borrowers' reimbursement and payment obligations under this Section 2.03 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)    any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)    the Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)    the Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)    the existence of any claim, set-off, defense or other right that any Loan Party or any of their Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, the Issuing Bank or any other Person;

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.03(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the Issuing Bank, the beneficiary or any other Person; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing;

-69-

provided, however, that subject to Section 2.03(g) above, the foregoing shall not release the Issuing Bank from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to the Issuing Bank arising under, or in connection with, this Section 2.03 or any Letter of Credit.

(j)    Without limiting any other provision of this Agreement, the Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and the Issuing Bank's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse the Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)    honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)    acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrowers;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

7143386v10

(viii)   assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)   payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)   acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)   honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the Issuing Bank if subsequently the Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)   dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)   honor of a presentation that is subsequently determined by the Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)   Upon the request of the Agent, (i) if the Issuing Bank has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an Letter of Credit Obligation that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any Letter of Credit Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all Letter of Credit Obligations. Sections 2.05 and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.03, Section 2.05 and Section 8.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the Issuing Bank and the Revolving Lenders, as collateral for the Letter of Credit Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all Letter of Credit Obligations (other than Letter of Credit Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which Letter of Credit Obligations shall be Cash Collateralized in an amount equal to 115% of the Outstanding Amount of such Letter of Credit Obligations), pursuant to documentation in form and substance reasonably satisfactory to the Agent and the Issuing Bank (which documents are hereby Consented to by the Lenders). The Borrowers hereby grant to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in a Cash Collateral Account. If at any time the Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all Letter of Credit Obligations, the Borrowers will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding

Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the Issuing Bank and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(l)     The Borrowers shall pay to the Agent, for the account of each Revolving Lender in accordance with its Applicable Percentage, a Letter of Credit fee (the "Letter of Credit Fee") (i) for each Standby Letter of Credit, equal to the Applicable Margin with respect thereto times the daily Stated Amount under each such Standby Letter of Credit (whether or not such maximum amount is then in effect under such Standby Letter of Credit) for the period during which such Standby Letter of Credit is outstanding, and (ii) for each Commercial Letter of Credit, equal to Applicable Margin with respect thereto times the daily Stated Amount under each such Commercial Letter of Credit (whether or not such maximum amount is then in effect under such Commercial Letter of Credit) for the period during which such Commercial Letter of Credit is outstanding. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) due and payable on the first day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in Section 2.08(b) hereof.

(m)     In addition to the Letter of Credit Fees as set forth in Section 2.03(l) above, the Borrowers shall pay immediately upon demand to the Agent for the account of the Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.02(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.03(m)): (i) a fronting fee which shall be imposed by the Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, the Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(n)     Unless otherwise expressly agreed by the Issuing Bank and the Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(o)     The Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of

7143386v10

Credit as fully as if the term "Agent" as used in Article IX included the Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Bank.

(p)     In the event of a direct conflict between the provisions of this Section 2.03 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03 shall control and govern.

### 2.04     Swing Line Loans.

(a)     The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender may, in reliance upon the agreements of the other Revolving Lenders set forth in this Section 2.04, make loans (each such loan, a "Swing Line Loan") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Revolving Loans and Letter of Credit Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Revolving Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Revolving Outstandings shall not exceed Revolving Loan Cap, and (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Revolving Commitment or such Lender's Applicable Percentage of the Revolving Borrowing Base; provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04.  Each Swing Line Loan shall bear interest only at the rate applicable to Base Rate Loans.  Immediately upon the making of a Swing Line Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage multiplied by the amount of such Swing Line Loan.  The Swing Line Lender shall have all of the benefits and immunities (A) provided to the Agent in Article IX. with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it or proposed to be made by it as if the term "Agent" as used in Article IX. included the Swing Line Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Swing Line Lender.

(b)     Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Agent, which may be given by telephone. Each such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which

-73-

shall be a Business Day. Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Agent (by telephone or in writing) that the Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Agent (by telephone or in writing) of the contents thereof. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Agent at the request of the Required Revolving Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender may, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Lead Borrower on the books of the Swing Line Lender in immediately available funds.

      (c)    <u>Refinancing of Swing Line Loans</u>.

      (i)    The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Revolving Lender make a Base Rate Loan in an amount equal to such Revolving Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Revolving Loan Cap and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Lead Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Agent. Each Revolving Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Agent in immediately available funds for the account of the Swing Line Lender at the Agent's Office not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount. The Agent shall remit the funds so received to the Swing Line Lender.

      (ii)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Lender's payment to the Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

-74-

(iii)    If any Revolving Lender fails to make available to the Agent for the account of the Swing Line Lender any amount required to be paid by such Revolving Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Revolving Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in the relevant Revolving Credit Borrowing or funded participation in the relevant Swing Line Loan, as the case may be.  A certificate of the Swing Line Lender submitted to any Revolving Lender (through the Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Lender's obligation to make Committed Revolving Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or an Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Revolving Lender's obligation to make Committed Revolving Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Revolving Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Revolving Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount

-75-

is returned, at a rate per annum equal to the Federal Funds Rate. The Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Interest for Account of Swing Line Lender. The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans. Until each Revolving Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Revolving Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)    Payments Directly to Swing Line Lender. The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**2.05    Prepayments; Pre-Petition Obligations.**

(a)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Committed Revolving Loans in whole or in part without premium or penalty; provided, that (i) such notice must be received by the Agent not later than 1:00 p.m. (A) three (3) Business Days prior to any date of prepayment of LIBO Rate Loans and (B) on the date of prepayment of Base Rate Loans; and (ii) any prepayment of LIBO Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Committed Revolving Loans to be prepaid and, if LIBO Rate Loans, the Interest Period(s) of such Committed Revolving Loans. The Agent will promptly notify each Revolving Lender of its receipt of each such notice, and of the amount of such Revolving Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the Committed Revolving Loans of the Revolving Lenders in accordance with their respective Applicable Percentages.

(b)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Swing Line Lender (with a copy to the Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided, that (i) such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)    Reserved.

-76-

(d)    If for any reason the Total Revolving Outstandings (including any Permitted Overadvances) at any time exceed the Revolving Loan Cap as then in effect, the Borrowers shall immediately prepay the Committed Revolving Loans, the Swing Line Loans and/or Cash Collateralize the Letter of Credit Obligations in an aggregate amount equal to such excess; provided, however, that the Borrowers shall not be required to Cash Collateralize the Letter of Credit Obligations pursuant to this Section 2.05(d) unless, after the prepayment in full of the Committed Revolving Loans, the Total Revolving Outstandings (including any Permitted Overadvances) exceed the Revolving Loan Cap as then in effect.

(e)    The Borrowers shall, in accordance with Section 2.05(g)] prepay the Pre-Petition Revolving Loan Balance, the Committed Revolving Loans and the Swing Line Loans and Cash Collateralize the Letter of Credit Obligations (upon the request of the Agent), with the proceeds and collections received pursuant to the provisions of Section 6.13 hereof.

(f)    The Borrowers shall, in accordance with Section 2.05(g), prepay the Committed Revolving Loans and the Swing Line Loans and, if a Default or an Event of Default has occurred and is continuing, Cash Collateralize the Letter of Credit Obligations (upon the request of the Agent) in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event not relating to the Baldwyn Real Estate Sale-Leaseback permitted hereunder.

(g)    Prepayments made pursuant to Section 2.05 (e), (f) and (i) and from the Excess Real Estate Proceeds, shall be applied as follows: first, to pay any fees, indemnities or expense reimbursements then due to Agent, Revolving Lenders and Issuing Bank from any Borrower or Guarantor; second, to pay interest then due in respect of any Pre-Petition Revolving Loans; third, to pay principal in respect of Permitted Overadvances; fourth, to pay principal in respect of the Pre-Petition Revolving Loans; fifth, to pay interest then due in respect of Committed Revolving Loans (and including any Permitted Overadvances) and Letter of Credit Obligations; sixth, to pay principal in respect of the Committed Revolving Loans; seventh, if a Default or Event of Default has occurred and is continuing Cash Collateralize the Letter of Credit Obligations (upon request of Agent); eighth, to pay any fees or expense reimbursements then due to Term Agent or Term Lenders from any Borrower or Guarantor; ninth, to pay interest then due with respect to the Term Loan; and tenth, so long as no Default or Event of Default has occurred and is continuing, to the Borrowers' operating account.  Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the Issuing Bank or the Lenders, as applicable.

(h)    The Borrowers shall prepay the Loans with the Net Proceeds received by a Loan Party from the sale or other disposition of the Baldwyn Real Estate, which Net Proceeds shall be applied in the following order: first, to the outstanding Committed Revolving Loans in an amount equal to the Real Estate Component included in the Revolving Borrowing Base, second, to the Term Loan in an amount equal to the amount set forth in clause (B)(iii) of the Term Loan Borrowing Base, and, third, the amount remaining, if any, (the "Excess Real Estate Proceeds"), in accordance with Section 2.05(g).

(i)     Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the Issuing Bank or the Lenders, as applicable.

(j)     No later than one (1) Business Day after the Final Order Entry Date, the Borrowers shall pay in full (i) with the proceeds of Committed Revolving Loans hereunder, the total outstanding amount of the Pre-Petition Revolving Loan Balance, and (ii) with the proceeds of the Term Loan, the total outstanding amount of the Pre-Petition Term Loan together with additional amounts due under Section 2.09 of the Pre-Petition Credit Agreement.

**2.06    Termination or Reduction of Commitments.**

(a)     Subject to <u>Section 2.09(b)</u>, the Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, terminate the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; <u>provided</u>, that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof, and (iii) the Borrowers shall not terminate or reduce (A) the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of Letter of Credit Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit.

(b)     If, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Revolving Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

(c)     The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit or the Aggregate Revolving Commitments under this <u>Section 2.06</u>. Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Applicable Percentage of such reduction amount. All fees (including, without limitation, commitment fees, Letter of Credit Fees and fees under <u>Section 2.09(b)</u>) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

(d)     The Term Commitment of each Term Lender shall automatically terminate upon such Term Lender's funding of its portion of the Term Loan, which shall occur no later than the Term Loan Funding Date.

-78-

(e)     The Revolving Commitment of each Revolving Lender shall automatically terminate upon the consummation of a Permitted Sale.

**2.07    Repayment of Loans**.

(a)     The Borrowers shall repay to the Revolving Lenders on the Termination Date the aggregate principal amount of Committed Revolving Loans outstanding on such date.

(b)     To the extent not previously paid, the Borrower shall repay the outstanding balance of the Swing Line Loans on the Termination Date.

(c)     Subject to clause (d) below, the Borrowers shall repay to the Term Lenders on the Termination Date the aggregate principal amount of the Term Loan outstanding on such date, along with accrued but unpaid interest and all other Obligations outstanding with respect to the Term Loan, including fees under Section 2.09(b).

(d)     Except as set forth in Section 8.03 or Section 2.05, the Borrowers shall not make any principal payments on account of the Term Loan until Borrowers' Obligations to the Pre-Petition Revolving Lenders and the Revolving Lenders shall have been paid in full in immediately available funds and the Revolving Commitments as to all Revolving Lenders shall have been terminated.

**2.08    Interest**.

(a)     Subject to the provisions of Section 2.08(b) below, (i) each Committed Revolving Loan which is a LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Margin; (ii) each Committed Revolving Loan which is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin; (iii) each portion of the Term Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Term Loan Applicable Margin; and (iv) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)

(i)     If any Event of Default exists, then (A) the Agent may, and upon the request of the Required Revolving Lenders shall, notify the Lead Borrower that all Committed Revolving Loans and all other Obligations with respect thereto shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws, and (B) the Term Agent may, and upon the request of the Required Term Lenders shall, notify the Lead Borrower that the Term Loan and all other Obligations with respect thereto shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter

-79-

such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.09    Fees**. In addition to certain fees described in subsections (l) and (m) of Section 2.03:

(a)    Commitment Fee. The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Applicable Percentage, a commitment fee equal to the Applicable Commitment Fee Percentage times the actual daily amount by which the Aggregate Revolving Commitments exceed the Total Revolving Outstandings (other than Swing Line Loans). The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be calculated and due and payable monthly in arrears on the first day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.

(b)    Other Fees. The Borrowers shall pay to the Agent and the Term Agent fees in the amounts and at the times specified in the Wells Fargo Fee Letter and the GA Fee Letter, respectively. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees**. All computations of fees and interest with respect to the LIBO Rate shall be made on the basis of a 360-day year and actual days elapsed. All other computations of fees and interest shall be computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided, that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt**.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of

7143386v10

the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Revolving Loans or portion of the Term Loan, as applicable, in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     In addition to the accounts and records referred to in Section 2.11(a), each Revolving Lender and the Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Revolving Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Revolving Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

(c)     Agent shall render monthly statements regarding the Loan Account to the Lead Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Credit Parties unless, within thirty (30) days after receipt thereof by the Lead Borrower, the Lead Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback.**

(a)     General. All payments to be made by the Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)

-81-

(i)      Funding by Revolving Lenders; Presumption by Agent. Unless the Agent shall have received notice from a Revolving Lender prior to the proposed date of any Revolving Credit Borrowing of LIBO Rate Loans (or in the case of any Revolving Credit Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Revolving Lender will not make available to the Agent such Revolving Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Revolving Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Revolving Credit Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Revolving Lender has not in fact made its share of the applicable Revolving Credit Borrowing available to the Agent, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Revolving Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Committed Revolving Loans comprising Base Rate Loans. If the Borrowers and such Revolving Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Revolving Lender pays its share of the applicable Revolving Credit Borrowing to the Agent, then the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in such Revolving Credit Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to the Agent.

(ii)      Payments by Borrowers; Presumptions by Agent. Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the Issuing Bank, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)  <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of <u>Section 4.02</u> hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)  <u>Obligations of Lenders Several</u>.  The obligations of the Term Lenders hereunder to make the Term Loan and the obligations of the Revolving Lenders hereunder to make Committed Revolving Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments hereunder are several and not joint.  The failure of any Term Lender to make its portion of the Term Loan or of any Revolving Lender to make any Committed Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Term Lender or Revolving Lender (as applicable) of its corresponding obligation to do so on such date, and no Term Lender or Revolving Lender (as applicable) shall be responsible for the failure of any other Term Lender or Revolving Lender (as applicable) to so make its portion of the Term Loan or its Committed Revolving Loan (as applicable), to purchase its participation or to make its payment hereunder.

(e)  <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in (a) any Revolving Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein, or (b) a Term Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of the Term Loan greater than its pro rata share thereof as provided herein, (including, in each case, as in contravention of the priorities of payment set forth in <u>Section 8.03</u>), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Revolving Lenders or Term Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in <u>Section 8.03</u>; provided, that:

(i)  if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)  the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of

-83-

or sale of a participation in any of its portion of the Term Loan, its Committed Revolving Loans or subparticipations in Letter of Credit Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

### 2.14   Settlement Amongst Lenders.

(a)     The amount of each Revolving Lender's Applicable Percentage of outstanding Committed Revolving Loans (including outstanding Swing Line Loans) shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans (including Swing Line Loans) and repayments of Committed Revolving Loans (including Swingline Loans) received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)     The Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans and Swing Line Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day.  The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Revolving Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15   Release.**   Subject to the terms of the Interim Financing Order or the Final Financing Order, as applicable, each Loan Party hereby acknowledges that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Loan Parties' liability to repay the Credit Parties as provided in this Agreement and the Pre-Petition Credit

-84-

7143386v10

Agreement or to seek affirmative relief or damages of any kind or nature from any Credit Party or any "Credit Party" (as defined in the Pre-Petition Credit Agreement). Subject to the terms of the Interim Financing Order or the Final Financing Order, as applicable, each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Credit Party and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Pre-Petition Credit Agreement and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, in each case other than the obligations of the Released Parties arising under this Agreement and the other Loan Documents.

**2.16     Waiver of any Priming Rights.**  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations or Pre-Petition Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations or Pre-Petition Obligations, or to approve a claim of equal or greater priority than the Obligations or Pre-Petition Obligations, other than as set forth in a Financing Order.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01     Taxes.**

(a)     <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent, the Term Agent, the

-85-

applicable Lender or the Issuing Bank, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay and remit the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)     <u>Payment of Other Taxes by the Loan Parties</u>.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay and remit any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)     <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent, the Term Agent, each Lender and the Issuing Bank, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or remitted by the Agent, the Term Agent, such Lender or the Issuing Bank, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment, remittance or liability delivered to the Lead Borrower by a Lender or the Issuing Bank (with a copy to the Agent), or by the Agent or the Term Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)     <u>Evidence of Payments</u>.  As soon as practicable after any payment or remittance of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, the Lead Borrower shall deliver to the Agent and the Term Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or remittance, a copy of the return reporting such payment or remittance or other evidence of such payment reasonably satisfactory to the Agent or the Term Agent, as applicable.

(e)     <u>Status of Lenders.</u>  Any Foreign Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which any Loan Party is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender, if requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and

-86-

from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

     (i)     duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States is a party,

     (ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

     (iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable,

     (iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, Form W-9, and/or other certification from each beneficial owner as applicable, or

     (v)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made.

     (f)     <u>FATCA</u>.  If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Agent (A) a certification signed by an authorized person and/or (B) other documentation reasonably requested by the Lead Borrower and the Agent sufficient for the Agent and the Lead Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such applicable reporting requirements.

     (g)     <u>Treatment of Certain Refunds</u>.  If the Agent, the Term Agent, any Lender or the Issuing Bank determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid or remitted additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, the Term Agent, such Lender or the Issuing Bank, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund),

provided that the Loan Parties, upon the request of the Agent, the Term Agent, such Lender or the Issuing Bank, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent, the Term Agent, such Lender or the Issuing Bank in the event the Agent, the Term Agent, such Lender or the Issuing Bank is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Agent, the Term Agent, any Lender or the Issuing Bank to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**. If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Lead Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Revolving Credit Borrowing of Base Rate Loans in the amount specified therein.

**3.04    Increased Costs; Reserves on LIBO Rate Loans**.

(a)    <u>Increased Costs Generally</u>. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for

the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or the Issuing Bank;

(ii)    subject any Lender or the Issuing Bank to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or the Issuing Bank in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the Issuing Bank); or

(iii)    impose on any Lender or the Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount), then, upon request of such Lender or the Issuing Bank, the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any Lending Office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error. The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

7143386v10

(d)    Delay in Requests.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Lead Borrower shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**3.05    Compensation for Losses**.  Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Lead Borrower; or

(c)    any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to Section 10.13;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at

the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

**3.06    Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to indemnify any Lender or pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 10.13.

**3.07    Survival.**  All of the Loan Parties' obligations under this Article III shall survive termination of the Aggregate Revolving Commitments and repayment of the Term Loan, the Committed Revolving Loans, the Swing Line Loans, and all other Obligations hereunder.

**3.08    Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension. Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension.** The obligation of the Issuing Bank and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's and the Term Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent, the Term Agent and the Lenders:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Agent, the Term Agent, each Lender and the Lead Borrower;

(ii)    a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)    customary opinions, in each case addressed to the Agent, the Term Agent and each Lender, of O'Melveny & Myers LLP, counsel to the Loan Parties, as to such matters concerning the Loan Parties and the Loan Documents as the Agent and the Term Agent may reasonably request;

(vi)    a certificate (or certificates) signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that except with respect to the filing of the Chapter 11 Case and those resulting from the Events and Circumstances, there has been no event or circumstance since the date of the Current Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)    Reserved;

(ix)    the Security Agreement and certificates evidencing any Equity Interests being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(x)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xi)    appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent and the Term Agent of all Inventory of the Loan Parties, the results of which are satisfactory to the Agent and the Term Agent;

(xii)    results of searches or other evidence reasonably satisfactory to the Agent and the Term Agent (in each case dated as of a date reasonably satisfactory to the Agent and the Term Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent and the Term Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent and the Term Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xiii)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and the Financing Orders, and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent; and

(xiv)    such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)      After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby and (iii) all Letters of Credit to be issued at, or immediately subsequent to, such establishment, Availability (without giving effect to the Availability Block) shall be not less than $5,990,416.

(c)      The Agent and the Term Agent shall have received a Borrowing Base Certificate dated the Closing Date and giving effect to the transactions contemplated to occur on the Closing Date, with Collateral relating to the period ended on the immediately preceding Saturday, and executed by a Responsible Officer of the Lead Borrower.

(d)      Reserved.

(e)      Reserved.

(f)      The Agent and the Term Agent shall have received and be reasonably satisfied with (i) the initial Approved Budget and (ii) such other information (financial or otherwise) reasonably requested by the Agent and the Term Agent.

(g)      Reserved.

(h)      There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)      There shall not have occurred any default of any Material Contract of any Loan Party, other than defaults under Material Contracts arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code.

(j)      The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(k)      All fees and reasonable and documented expenses required to be paid to the Agent and the Term Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(l)      The Borrowers shall have paid all reasonable and documented fees, charges and disbursements of counsel to the Agent and counsel to the Term Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers, the Agent and the Term Agent).

(m)      The Agent, the Term Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know

your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(n)    Reserved.

(o)    The Agent and the Lenders shall have received evidence that the Loan Parties filed a motion on the Petition Date seeking to retain the Financial Consultant and Sale Consultant on terms reasonably satisfactory to the Agent.

(p)    (i) The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order, (ii) none of such orders shall have been stayed, vacated or reversed (in whole or in part), (iii) the Cash Management Order shall not have been amended or modified other than with the consent of the Agent in consultation with the Term Agent, in their Permitted Discretion, and (iv) the Interim Financing Order and the Wage Order shall not have been amended or modified other than with the consent of the Agent, in its Permitted Discretion.

(q)    The Bidding Procedures Motion and Sale Order Motion shall have been filed.

(r)    The Agent shall have received evidence that the Lead Borrower has entered into the Agency Agreement and Initial Store Closing Agreement each on terms reasonably satisfactory to the Agent.

(s)    The Agent and the Lenders shall have received evidence that the Loan Parties filed a motion on the Petition Date seeking approval of the Initial Store Closing Agreement.

(t)    The Closing Date shall have occurred on or before February 4, 2016.  The Agent shall notify the Lead Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding on the Loan Parties.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Revolving Loans to the other Type, or a continuation of LIBO Rate Loans) and each Issuing Bank to issue each Letter of Credit is subject to the following conditions precedent:

(a)    The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on

-95-

and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01;

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)     The Agent and, if applicable, the Issuing Bank or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)     The Agent shall have received the most-recent Borrowing Base Certificate delivered in accordance with the terms hereof, updated to reflect such proposed Credit Extension;

(e)     No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred or would result from such proposed Credit Extension;

(f)     No Overadvance shall result from such Credit Extension;

(g)     Neither the Interim Financing Order nor the Final Financing Order, as applicable, shall have been (i) stayed, vacated or reversed (in whole or in part), or (iii) amended or modified other than with the consent of the Agent and the Term Agent, in their Permitted Discretion; and

(h)     Each Credit Extension shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance) and to fund the Post Trigger Carve Out Amount when and if due.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Revolving Loans to the other Type or a continuation of LIBO Rate Loans) submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but, until the Required Revolving Lenders otherwise direct the Agent to cease making Committed Revolving Loans and direct the Issuing Bank to cease issuing Letters of Credit, the Revolving Lenders will fund their Applicable Percentage of all Committed Revolving Loans and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

-96-

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation (b) subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the Interim Financing Order and the Final Financing Order, as applicable has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state (or country, province or territory) of incorporation or organization, its state (or country, province or territory) of incorporation or organization and the state (or country, province or territory) of the location of its chief executive office, organization type, organization number, if any, issued by its state (or province or territory) of incorporation or organization, and its federal employer identification number or similar number(s).

**5.02    Authorization; No Contravention.**  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents.**  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security

-97-

Documents (including the first priority nature thereof), or (b) filings with the SEC pursuant to the Securities Laws or (c) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**. This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect**.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Lead Borrower and its Subsidiaries as of the date thereof to the extent required by GAAP, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited Consolidated balance sheet of the Lead Borrower and its Subsidiaries dated October 25, 2014, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Reserved.

(d)    To the best knowledge of the Lead Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent, the Term Agent or the Lenders, (ii) of the Borrowing Base, or (iii) of the assets, liabilities, financial condition or results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis.

(e)    The Consolidated forecasted balance sheet, statements of income, cash flows and Availability model that the Lead Borrower and its Subsidiaries delivered pursuant to Section 6.01(c) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable and fair in light of the conditions existing at the time of delivery of such forecasts.

**5.06    Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and since the Closing Date, there has been no material adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on Schedule 5.06.

**5.07    No Default.** No Loan Party or any Subsidiary is in default under or with respect to any material provision of any Material Contract or any Material Indebtedness, other than defaults under Material Contracts or any Material Indebtedness arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code or that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens.**

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, subject to Permitted Encumbrances. Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state, province or territory) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon, in each case as of the Closing Date. Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof, in each case except as could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(c)    Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries as of the Closing Date, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances, or such Liens set forth on Schedule 7.01.

(d)      Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date (other than intercompany Investments and Investments having a value of less than $50,000), showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e)      Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date (other than intercompany Indebtedness and Indebtedness not in excess of $250,000 in principal amount), showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance.**

(a)      Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, in each case, which adversely affects or could reasonably be expected to adversely affect in any material respect any Loan Party or its or their business, operations or assets or any properties at which such Loan Party has transported, stored or disposed of any Hazardous Materials.

(c)      Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

-100-

**5.10    Insurance.** The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiaries operate. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.** The Loan Parties and their Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed other than those specifically disclosed on Schedule 5.11, and unless the failure to do so is permitted by the Bankruptcy Code and no Lien could arise as a result of the failure to make such payment have paid all federal, state and other material Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed, registered or recorded and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance.**

(a)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Lead Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b)    There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    Except as could not reasonably be expected to result in material liability to any Loan Party, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a

Multiemployer Plan; and (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests**. As of the Closing Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances. Except as set forth in Schedule 5.13, as of the Closing Date there are no outstanding rights to purchase any Equity Interests in any Subsidiary. As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act**.

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**. Each Loan Party has disclosed to the Agent, the Term Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent, the Term Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under

which they were made, not misleading; provided, that with respect to projected financial information and the Approved Budget, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws**. Except to the extent non-performance thereof is permitted by the Bankruptcy Code, each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.17    Intellectual Property; Licenses, Etc.** The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person in any material respect. To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person in any material respect. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters**. There are no significant strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened, except as could not reasonably be expected to have a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, provincial, territorial, municipal, local or foreign Law dealing with such matters in all material respects. No Loan Party or any of its Subsidiaries has incurred any significant liability or obligation under the Worker Adjustment and Retraining Act or similar federal, state, provincial, territorial, municipal, local or foreign Law. All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or employment agreement (other than employment agreements which are not required to be filed with the SEC pursuant to the Securities Laws). As of the Closing Date there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. As of the Closing Date there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be

-103-

filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents**.

(a)    The Financing Orders create in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement). The financing statements, releases and other filings are in appropriate form and have been filed in the offices specified in Schedule II of the Security Agreement. Upon entry of the Interim Financing Order (and the subsequent entry of the Final Financing Order) the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made), in each case prior and superior in right to any other Person. Assuming the entry of the Financing Orders, filings of UCC-1 financing statements and/or the obtaining of "control" (as defined in the UCC) of Collateral is not required to create or perfect a legal, valid, continuing and enforceable security interest in the Collateral.

(b)    Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, when the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office, as applicable (or any substitute or successor agency), and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property of the Loan Parties in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

(c)    Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the Mortgages, if any, create in favor of the Agent, for the benefit of the Secured Parties referred to herein and subject to Permitted Encumbrances, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Subject to the entry of the Interim Financing Order, upon the filing or recording of the Mortgages with the

-104-

appropriate Governmental Authorities, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Mortgaged Property that may be perfected by such filing (including without limitation the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person other than Liens permitted pursuant to clause (q) of the definition of Permitted Encumbrances.

**5.20    Reserved.**

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)    Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)    Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers.**  No broker or finder brought about the obtaining, making or closing of the Loans or financing transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations.**  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any adverse modification or change in the business relationship of any Loan Party with any supplier, in each case except as could not reasonably be expected to have a Material Adverse Effect.

**5.24    Material Contracts.**  <u>Schedule 5.24</u> sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent and the Term Agent on or before the Closing Date.  The Loan Parties have not received any notice of the intention of any other party thereto to terminate any Material Contract as a result of a breach or default by a Loan Party thereunder (other than any notice as to a termination that would be voided or invalidated under the bankruptcy code).

**5.25    Casualty.**  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

7143386v10

**5.26    Bankruptcy Matters**.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Borrowers shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)    After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than the Carve-Out up to, at any date of determination, the amounts in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve and Senior Agency Agreement Claims, if any) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to the Carve-Out up to, at any date of determination, the amounts actually in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve, the Senior Agency Agreement Liens and the Permitted Prior Liens.

(d)    The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to the Final Order Entry Date) or the Final Financing Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Credit Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, under the other Loan Documents or under applicable law, without further application to or order by the Bankruptcy Court.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification

7143386v10

obligations for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

    **6.01**    **Financial Statements.**  Deliver to the Agent and the Term Agent, in form and detail satisfactory to the Agent and the Term Agent:

        (a)    Reserved;

        (b)    as soon as available, but in any event within forty-five (45) days after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter, and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

        (c)    as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Months of each fiscal year of the Lead Borrower, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, and cash flows for such Fiscal Month, and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous fiscal year, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

        (d)    as soon as available, but in any event no more than thirty (30) days after the end of each Fiscal Year of the Lead Borrower, forecasts prepared by management of the Lead Borrower, which are reasonably satisfactory to the Agent and the Term Agent, of Consolidated balance sheets and statements of income or operations and cash flows of the Lead Borrower and its Subsidiaries on a monthly basis for such Fiscal Year (including the Fiscal Year in which the Maturity Date occurs), and, as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.

        (e)    Reserved.

-107-

(f)    (i)    The Approved Budget may be updated, modified or supplemented (with the consent and/or at the reasonable request of the Agent and Term Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Agent and Term Agent in their Permitted Discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the tenth (10th) week of the initial Approved Budget, the Debtors shall submit a budget for the next successive thirteen week period to the Agent and the Term Agent, which budget shall be in form and substance reasonably acceptable to the Agent and the Term Agent and approved by the Agent and the Term Agent, each in their Permitted Discretion; provided, further, that in the event that the Agent and the Term Agent, on the one hand, and the Borrowers, on the other hand, cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated. Each Approved Budget delivered to the Agent and the Term Agent shall be accompanied by such supporting documentation as requested by the Agent and the Term Agent in their Permitted Discretion. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to the Agent and the Term Agent in their Permitted Discretion.

(ii)    On or before Wednesday of each week, commencing with the first week following the Closing Date, the Lead Borrower shall deliver to the Agent and Term Agent an Approved Budget Variance Report.

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of the Lead Borrower and its Subsidiaries by furnishing the Lead Borrower's Form 10-K or 10-Q, as applicable, filed with the SEC (provided, that such documents shall be deemed furnished if made available on the internet via EDGAR, or any successor system of the SEC, or via the Lead Borrower's website on the Internet at http://www.hancockfabrics.com/), to the extent the required information is contained in such filings.

**6.02    Certificates; Other Information**. Deliver to the Agent and the Term Agent, in form and detail satisfactory to the Agent and the Term Agent:

(a)    concurrently with the delivery of the financial statements referred to in Sections 6.01(b) and (c), (i) a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP and (ii) a copy of management's discussion and analysis with respect to such financial statements delivered pursuant to Sections 6.01(a) and (b);

(b)    on Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business on the immediately preceding Saturday, (provided that the Appraised Value percentage applied to the Eligible Inventory and the Fee Simple Value or Leased Value percentage, as applicable, applied to the Eligible Real Estate set forth in each Borrowing Base

-108-

Certificate shall be the percentage set forth in the most recent appraisals obtained by the Agent pursuant to Section 6.10 hereof for the applicable week in which such Borrowing Base Certificate is delivered), and each Borrowing Base Certificate is to be certified as complete and correct by a Responsible Officer of the Lead Borrower and accompanied by the most-recent reports of Eligible Credit Card Receivables and Eligible Inventory prepared by the Borrowers (which reports shall be updated on a weekly basis);

(c)     promptly and in any event within three (3) Business Days after receipt thereof by any Loan Party, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(d)     promptly and in any event within three (3) Business Days after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(e)     the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(f)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement, in each case constituting Material Indebtedness, and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(g)     as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, the Term Agent or any Lender through the Agent, may reasonably specify;

(h)     promptly and in any event within three (3) Business Days after the Agent's or the Term Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(i)     promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or

-109-

any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect;

(j)      as soon as available, but in any event within forty-five (45) days after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower, a report describing in reasonable detail any Intellectual Property which during such Fiscal Quarter was acquired, registered or for which applications for registration were filed by any Loan Party or any Subsidiary thereof and any statement of use or amendment to allege use with respect to intent-to-use trademark applications, in each case in the United States or in any foreign jurisdiction; and

(k)      promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent, the Term Agent or any Lender through the Agent may from time to time reasonably request.

The Loan Parties hereby acknowledge that (a) the Agent and/or the Term Agent may make available to the Lenders and the Issuing Bank materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Agent, the Term Agent, the Issuing Bank and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent and the Term Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

**6.03    Notices**. Promptly notify the Agent and the Term Agent:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      of any material breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof, other than breaches or defaults arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;

-110-

(d)     of any material dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any material litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)     of the occurrence of any ERISA Event or the determination that any Pension Plan is considered to be an "at-risk" plan, or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 or 305 of ERISA;

(f)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)     of any change in any Loan Party's chief executive officer or chief financial officer;

(h)     of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)     of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)     of the filing of any Lien for unpaid Taxes in excess of $100,000 against any Loan Party;

(k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)     of any failure by any Loan Party to pay rent or any other amounts due at (A) any distribution centers or warehouses; or (B) any of such Loan Party's locations when such rent or such other amounts first came due Post-Petition, unless such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(m)     in advance in writing of any proposed material amendment to the Elavon Processor Agreement (it is understood and agreed that any amendment to Section 4 of the Elavon Processor Agreement, any grant of the security interests and liens made by Lead Borrower thereunder or in respect thereof or the obligations secured by such security interests and liens shall be deemed to be a material amendment to the Elavon Processor Agreement) and/or replacement of the Elavon Member;

(n)     the receipt or delivery of any notice (including, without limitation, any notice of any breach or alleged breach) under the Initial Store Closing Agreement, Agency Agreement or  any agency agreement, asset purchase agreement or other contract relating to a Permitted Sale by any party thereto; and

-111-

(o)    the termination, discharge or resignation of any of the Consultants.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations.**

(a)    Subject to the provisions of the Bankruptcy Code, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (i) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (ii) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (iii) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (v) the validity or amount thereof is being contested in good faith by appropriate proceedings, (w) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (x) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (y) no Lien has been filed with respect thereto and (z) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement. For the avoidance of doubt, nothing herein requires payment of any obligation subject to the automatic stay of the Bankruptcy Code.

(b)    Within one (1) Business Day after the Final Order Entry Date, pay in full all of the Pre-Petition Obligations in accordance with Section 2.05(j).

**6.05    Preservation of Existence, Etc.**  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Sections 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties.**  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

-112-

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent and the Term Agent not Affiliates of the Loan Parties insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent and the Term Agent.

(b)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent and the Term Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent or Term Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies, if any, to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Term Agent or any other Credit Party shall be a co-insurer and (iii) such other provisions as the Agent or the Term Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)    Deliver to the Agent and the Term Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent and the Term Agent, including an insurance binder) together with evidence satisfactory to the Agent and the Term Agent of payment of the premium therefor.

(g)    If at any time the area in which any Eligible Real Estate is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as is reasonable and customary for companies engaged in the Business, and otherwise

-113-

comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as is reasonable and customary for companies engaged in the Business.

(h)    Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will, upon request by the Agent or the Term Agent, furnish the Agent and the Term Agent certificates evidencing renewal of each such policy.

(i)    Permit any representatives that are designated by the Agent and the Term Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby, upon reasonable notice and at reasonable times.

(j)    None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws.** Except to the extent non-compliance is permitted under the Bankruptcy Code, comply (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18.

**6.09    Books and Records; Accountants.**

(a)    (i) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity

with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)     At all times retain a Registered Public Accounting Firm and instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent.

**6.10    Inspection Rights**.

(a)     Permit representatives and independent contractors of the Agent and the Term Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent (and the Term Agent may accompany the Agent) or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or an Event of Default exists the Agent and the Term Agent (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice and as often as may be desired.

(b)     Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including field examiners, investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such commercial finance examinations as the Agent in its Permitted Discretion deems necessary or appropriate.

(c)     Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to inventory appraisals as the Agent in its Permitted Discretion deems necessary or appropriate. The appraisals shall be in form, scope and methodology acceptable to the Agent in its Permitted Discretion.

(d)     Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals retained by the Agent, to conduct appraisals of the Real Estate included in the Revolving Borrowing Base and Term Loan Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to appraisals of each parcel of Real Estate included in the Revolving Borrowing Base and Term Loan Borrowing Base. The

-115-

appraisals shall be in form, scope and methodology acceptable to the Agent in its Permitted Discretion.

(e)     Permit the Agent, from time to time, to engage a geohydrologist, an independent engineer or other qualified consultant or expert, reasonably acceptable to the Agent, at the expense of the Loan Parties, to undertake Phase I environmental site assessments during the term of this Agreement of the Eligible Real Estate, provided that such assessments may only be undertaken (i) during the continuance of a Default or an Event of Default or (ii) if a Loan Party receives any notice or obtains knowledge of (A) any potential or known release of any Hazardous Materials at or from any Eligible Real Estate, notification of which must be given to any Governmental Authority under any Environmental Law, or notification of which has, in fact, been given to any Governmental Authority, or (B) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental health or safety matter affecting any Loan Party or any Eligible Real Estate from any Person (including, without limitation, the Environmental Protection Agency). Environmental assessments may include detailed visual inspections of the Real Estate, including, without limitation, any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as are reasonably necessary for a determination of the compliance of the Real Estate and the use and operation thereof with all applicable Environmental Laws. The Borrowers will, and will cause each of their Subsidiaries to, cooperate in all respects with the Agent and such third parties to enable such assessment and evaluation to be timely completed in a manner reasonably satisfactory to the Agent.

**6.11    Use of Proceeds.** Use the proceeds of the Credit Extensions (a) on the Closing Date, for the payment of transaction expenses in connection with this Agreement; and (b) after the Closing Date (i) to finance the payoff of the Pre-Petition Obligations in accordance with Section 2.05(j) on the Final Order Entry Date, (ii) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business and subject to the Approved Budget (subject to the Permitted Variance) or as otherwise approved by the Lenders, (iii) prior to the delivery of a Carve-Out Trigger Notice, to fund the Carve-Out through deposits into the Professional Fee Escrow Account, and (iv) for general corporate purposes of the Loan Parties, in each case to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance) and the Loan Documents.

**6.12    Additional Loan Parties.** Notify the Agent at the time that any Person becomes a Subsidiary and, in each case promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC or a Subsidiary of a CFC, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets (other than Excluded Property) of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in this clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge

-116-

such Equity Interests and promissory notes evidencing such Indebtedness as Collateral (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary to be pledged may be limited to 66% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary and if such Subsidiary is a Subsidiary of a CFC, no Equity Interests may be pledged, and such time period may be extended based on local law or practice), in each case in form, content and scope reasonably satisfactory to the Agent and the Term Agent.  In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

### 6.13    Cash Management.

(a)    Upon and to the extent requested by the Agent:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit G which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b); and

(ii)    enter into a Blocked Account Agreement reasonably satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "Blocked Accounts").

(b)    At the request of the Agent, deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as Exhibit H which have been executed on behalf of such Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

(c)    The Loan Parties shall ACH or wire transfer to a Blocked Account:

(i)    no less frequently than daily (and whether or not there are then any outstanding Obligations), all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(ii)    no less frequently than daily, all payments due from Credit Card Issuers and Credit Card Processors and proceeds of all credit card charges;

(iii)    no less frequently than daily, all available cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)    no less frequently than daily, all proceeds of Accounts; and

(v)    no less frequently than daily, all Net Proceeds, and all other cash payments of any kind received by a Loan Party from any Person or from any source or on

account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(d)    Each Blocked Account Agreement (other than the Blocked Account Agreement(s) applicable to the Concentration Account) shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Lead Borrower at Wells Fargo or another financial institution acceptable to the Agent (the "Concentration Account"), all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

(i)    the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank);

(ii)    all amounts required to be deposited into Blocked Accounts pursuant to clause (c) above; and

(iii)    any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event.

(e)    The Concentration Account and the Elavon Deposit Account shall at all times be under the sole dominion and control of the Agent. The Agent shall cause all funds on deposit in the Concentration Account and the Elavon Deposit Account to be applied to the Obligations in the order proscribed in either Section 2.05(g), Section 2.05(i) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account and the Elavon Deposit Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations. In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or the Elavon Deposit Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(f)    Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(g)    If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

-118-

(h)     Each Borrower shall cause Elavon Processor to deposit into the Elavon Deposit Account or the Concentration Account all amounts payable by Elavon Processor to any Borrower, such deposits to occur at least twice per calendar week by wire transfer or other electronic funds transfer. All amounts in the Elavon Deposit Account in excess of $200,000 in the aggregate shall be transferred by wire transfer or other electronic funds transfer on each Business Day to the Concentration Account as provided in Section 6.13(c).

(i)     Borrowers shall, and shall cause each of their Subsidiaries to, transfer any funds released from the Elavon Reserve Account, on the day such funds are released therefrom, to the Concentration Account as provided in Section 6.13(c), by wire transfer or other electronic funds transfer.

(j)     All amounts in each Intercompany Royalty Account shall be sent by wire transfer or other electronic funds transfer on each Business Day to the Concentration Account as provided in Section 6.13(c).

(k)     Notwithstanding anything to the contrary herein, during the period between the Closing Date and payment in full of the Total Revolver Outstandings, all funds on deposit in the Concentration Account shall be applied to the Pre-Petition Revolving Loan Balance.

**6.14    Information Regarding the Collateral.** Furnish to the Agent and the Term Agent at least ten (10) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's registered office, chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state or jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

**6.15    Physical Inventories.**

(a)     Cause not less than one (1) physical inventory to be undertaken at the expense of the Loan Parties (i) at each Store, every twelve (12) to fourteen (14) month period conducted by a nationally recognized firm satisfactory to the Agent, (ii) at the distribution center, every twelve (12) month period conducted by a nationally recognized firm or other Person satisfactory to the Agent in its Permitted Discretion, provided, that employees of the Loan Parties may conduct physical inventories unless the Agent in its Permitted Discretion requires the Loan Parties to retain a third party to conduct same and (iii) periodic cycle counts at all other locations conducted by the Borrowers, in each case consistent with past practices, and following such methodology as is consistent with the methodology used in the immediately preceding inventory

-119-

or as otherwise may be satisfactory to the Agent. The Agent and the Term Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Lead Borrower, within fifteen (15) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)    Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

**6.16    Environmental Laws.** (a) Conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof and other than Excluded Assets), notify the Agent and the Term Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed

-120-

to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(d)    Upon the request of the Agent, cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds.**  Except as otherwise expressly permitted hereunder or to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Case and the effect thereof, (a) make all payments of Post-Petition Obligations other than amounts being contested in good faith by appropriate proceedings being diligently conducted and, subject to the Bankruptcy Code, otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, and, except following completion of the Initial Store Closing and Permitted Sales, keep such Leases in full force and effect, (b) except in connection with the Initial Store Closing and Permitted Sales, not allow such Leases to lapse (other than in the ordinary course of business) or be terminated (other than in the ordinary course of business) or any rights to renew such Leases to be forfeited or cancelled (other than in the ordinary course of business), (c) notify the Agent of any material default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts.**  Except to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Case and the effect thereof, (a) perform and observe all of the material Post-Petition Obligations of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect except to the extent such Material Contract terminates in the ordinary course of business, (c) enforce each such Material Contract in accordance with its terms as deemed appropriate by its Responsible Officer in its reasonable business judgment, (d) take all such action to such end as may be from time to time reasonably requested by the Agent, (e) upon reasonable request of the Agent or the Term Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20    Designation of Senior Debt.**  Designate all Obligations as "Credit Facility Debt", and the credit facility provided hereunder as the "Credit Facility", in each case under, and as defined in, the Indenture and all supplemental indentures thereto.

**6.21    Credit Card Processors.**  The Lead Borrower will, and will cause its Subsidiaries to (a) comply in all material respects with all obligations of such Person under each credit card processing agreement to which such Person is a party, (b) maintain each credit card processing agreement set forth on Schedule 5.21(b) and each credit card processing agreement

-121-

entered into after the Effective Date in full force and effect (except to the extent such Person elects to terminate the same and so notifies the Agent) and take or cause to be taken all actions necessary to maintain, preserve and protect the rights and interests of the Agent in all material respects with respect to all such agreements, and (c) promptly notify the Agent of the entry by such Person into any credit card processing agreement with any Credit Card Processor or Credit Card Issuer after the Effective Date and deliver a Credit Card Notification with respect to each such Credit Card Processor or Credit Card Issuer contemporaneously with the entry by such Person into such credit processing agreement.

**6.22    Retention of Consultants; Communication with Accountants and Other Financial Advisors.**

(a)    The Agent and the Term Agent shall have received evidence by no later than (i) the Petition Date, that the Loan Parties have filed motions seeking to retain the Financial Consultant and Sale Consultant; and (ii) on or before February 12, 2016, the Loan Parties shall have filed motions on terms and conditions reasonably satisfactory to the Agent and Term Agent seeking to retain the Real Estate Consultant. The terms and scope of the engagement of and responsibilities of the Consultants shall be acceptable to the Agent in its Permitted Discretion and, without limiting the foregoing, the engagement shall grant the Agent and Term Agent the right to communicate directly with the Consultants and authorize and direct the Consultants to communicate directly with the Agent or Term Agent and to furnish the Agent and Term Agent with such information as the Agent or Term Agent may reasonably request, together with copies of all material written materials provided to the board of directors of the Loan Parties by such Consultant. Subject to Bankruptcy Court approval, to be obtained by no later than thirty five (35) days after the Petition Date in the case of the Financial Consultant and Sale Consultant, and no later than thirty (30) days after the filing of the motion referred to in clause (ii) above in the case of the Real Estate Consultant, the Loan Parties shall continue to retain the Consultants, the scope and terms of each such engagement to be reasonably satisfactory to the Agent. There shall be no material modifications to the terms (excluding any decreases in compensation but including any other modification in compensation) of the engagement of the Consultants without the Consent of the Agent and Term Agent. Until such time as all Pre-Petition Obligations and all Obligations have been repaid in full (or Cash Collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Lead Borrower shall continue to retain (i) the Financial Consultant and Sale Consultant to assist the Loan Parties with a Permitted Sale, with the preparation of the Approved Budget and the other financial and Collateral reporting required to be delivered to the Agent pursuant to this Agreement, and approval of all requests for Borrowing and all disbursements by the Borrowers, and (ii) the Real Estate Consultant to assist the Loan Parties in connection with real estate matters (including, without limitation, negotiations in respect of leases and sales of owned Real Property).

(b)    The Lead Borrower authorizes the Agent and the Term Agent to communicate directly with the Loan Parties' independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Consultants), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agent and Term Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party. The

-122-

Lead Borrower acknowledges and agrees that (i) the Loan Parties and their representatives will cooperate fully with the Consultants and any Lender Group Consultant, if any, (ii) the Consultants and any Lender Group Consultant shall be granted full and complete access to the Loan Parties' books and records, (iii) the Agent, Term Agent and the Lenders are authorized to communicate directly with the Consultants and the Consultants are authorized to communicate directly with the Agent, Term Agent and the Lenders, regarding all matters relating to the services to be rendered by the Consultants to the Loan Parties, including, without limitation, to discuss all financial reports, business information, findings and recommendations of such Consultant, and (v) the Consultants are authorized to provide the Agent and Term Agent aud the Lenders with all reports and other information (including, without limitation, all marketing materials and indications of interest) prepared or reviewed by the Consultants. If requested by the Agent, the Consultants shall provide the Agent with a weekly update regarding the status of its efforts on behalf of the Loan Parties.

(c)     Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Agent, the Term Agent, Issuing Bank and the Lenders, as the Agent may determine to be necessary or appropriate, in its sole discretion. Each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation with any Lender Group Consultant (including, without limitation, providing unfettered access to such Loan Party's business, books and records and senior management; (ii) all costs and expenses of any such Lender Group Consultant shall be expenses required to be paid by the Loan Parties under Section 10.04 hereof; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

**6.23    Performance within Budget**. At all times following the Closing Date, strictly perform in accordance with the Approved Budget, including having made all scheduled payments to the Pre-Petition Lenders and Lenders as applicable as and when required, subject to the following (the "Permitted Variance"): (a) the Borrowers' actual sales and cash receipts shall not be less than 85% of the projected amounts set forth in the Approved Budget, (b) the Borrowers' actual expenses and cash expenditures shall not be greater than 115% of the projected amounts set forth in the Approved Budget on an aggregate basis (other than with respect to professional fees and expenses, which shall be tested on a separate aggregate basis), and (c) the Borrowers' Inventory shall not be less than 90% of the projected amounts set forth in the Approved Budget. Each of the foregoing covenants shall be tested on Sunday of each week (commencing with the first (1st) week after the Petition Date) on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis, pursuant to the Approved Budget Variance Report delivered by the Lead Borrower to the Agent in accordance with Section 6.01(d).

**6.24    Permitted Sales Process; Agency Agreement.**

(a)     On the Petition Date, the Loan Parties shall have filed the following motions in the Chapter 11 Case with the Bankruptcy Court, each in form and substance acceptable to the Agent:

-123-

(i)      A motion (the "Bidding Procedures Motion") requesting an order from the Bankruptcy Court approving bidding procedures relating to the Agency Agreement and approving the Liquidation Stalking Horse Bid with respect thereto, including the bidding protections set forth therein;

(ii)     A motion (the "Sale Order Motion") (which may be combined with the Bidding Procedures Motion) requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Loan Parties to consummate the Permitted Sale and, if applicable, authorizing the conduct of "going out of business" sales at the Loan Parties' applicable locations pursuant to the Liquidation Stalking Horse Bid; and

(iii)    A motion (the "Store Closing Motion") requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Loan Parties to enter into the Initial Store Closing Agreement and conduct the Initial Store Closings.

(b)      On or before thirty five (35) days after the Petition Date, the Bankruptcy Court shall have issued an order authorizing the retention by the Loan Parties of the Sale Consultant and Financial Consultant.

(c)      On or before February 16, 2016, the Bankruptcy Court shall have entered an order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures Motion and approving the Liquidation Stalking Horse Bid, which Bidding Procedures Order shall be in form and substance acceptable to the Agent and the Term Agent;

(d)      On or before March 9, 2016, the Loan Parties shall have received qualifying bids in accordance with the Bidding Procedures Order;

(e)      To the extent any qualifying bids are received, on or before March 11, 2016, the Loan Parties shall have completed an auction for a Permitted Sale of substantially all of the assets of the Loan Parties;

(f)      On or before March 14, 2016, the Bankruptcy Court shall have entered one or more orders (the "Sale Order") approving a Permitted Sale as requested in the Sale Order Motion, which Sale Order shall be in form and substance acceptable to the Agent and, if applicable, authorizing the conduct of "going out of business" sales at the Loan Parties' applicable locations pursuant to the applicable Initial Store Closing Agreement; and

(g)      On or before March 15, 2016, the Loan Parties shall have closed on the Permitted Sale approved pursuant to the Sale Order.

(h)      In the event that the Permitted Sale approved pursuant to the Sale Order does not provide for the sale of the Loan Parties' owned Real Property, then on or before June 30, 2016, the Loan Parties shall have consummated a sale of the Real Property on terms satisfactory to the Agent.

7143386v10

(i)    On or before February 8, 2016 the Bankruptcy Court shall have entered an order approving the Initial Store Closing Agreement as requested in the Store Closing Motion, which order shall be in form and substance acceptable to the Agent.

**6.25    Additional Bankruptcy Related Affirmative Covenants.**

(a)    The Loan Parties shall provide the Agent and the Term Agent with a status report and such other updated information relating to a Permitted Sale as may be reasonably requested by the Agent or the Term Agent, in form and substance reasonably acceptable to the Agent and the Term Agent.

(b)    If an Event of Default has occurred and is continuing and the Agent has accelerated the repayment of the Obligations pursuant to Section 8.02, at the request of the Agent, the Loan Parties shall promptly engage an Approved Liquidator or Approved Liquidators on terms and conditions acceptable to the Agent in its Permitted Discretion.

(c)    The Loan Parties shall fund the Professional Fee Escrow Account on a weekly basis in accordance with the Approved Budget.

**6.26    Leases.**

(a)    The Loan Parties shall pay all Post-Petition Obligations under the leases of real property and licenses of Intellectual Property, if any, as required by the Bankruptcy Code or the Bankruptcy Court, except to the extent (i) any Loan Party is contesting any such obligations in good faith by appropriate proceedings, (ii) such Loan Party has established proper reserves as required under GAAP, and (iii) the nonpayment of which does not result in the imposition of a Lien. No Loan Party may reject any of its leases without the prior written consent of the Agent and the Term Agent (such consent not to be unreasonably withheld or delayed). The assumption or rejection of any lease shall be conducted in a manner consistent with a maximization of the value of the assets of the Loan Parties.

(b)    On or before the date that is 35 days after the Petition Date, the Loan Parties shall have filed a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before 75 days after the Petition Date, the Bankruptcy Court shall have entered the Lease Extension Order.

**6.27    Financing Orders.** The Loan Parties shall comply with the Financing Orders, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Agent and the Term Agent.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

-125-

**7.01    Liens.** Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments.** Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock.** (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness or (b) issue Disqualified Stock.

**7.04    Fundamental Changes.** Merge, amalgamate, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing).

**7.05    Dispositions.** Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments.** Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party, and each Loan Party may make Restricted Payments to the Lead Borrower;

(b)    reserved; and

(c)    reserved.

**7.07    Prepayments of Indebtedness and Payments of Specified Subordinated Indebtedness.** Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than (x) Indebtedness under the Pre-Petition Credit Agreement in accordance with the terms and conditions herein, (y) the Committed Revolving Loans and all Obligations related thereto), and (z) as set forth in the Approved Budget (subject to the Permitted Variance) or make any payment in violation of any subordination terms of any Subordinated Indebtedness.

**7.08    Change in Nature of Business.** Engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.** Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary

course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Lead Borrower to any officer, director, employee or consultant of the Lead Borrower or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Lead Borrower or any of its Subsidiaries, (f) any issuances of securities of the Lead Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Lead Borrower) of the Lead Borrower or any of its Subsidiaries, and (g) transactions permitted under Section 7.04, 7.06 and 7.07.

    **7.10    Burdensome Agreements**. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or the Pre-Petition Credit Agreement) that limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

    **7.11    Use of Proceeds**. Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

    **7.12    Amendment of Material Documents**. Amend, modify, supplement, alter or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties in any material respect, (b) any Subordinated Debt Document (other than the Specified Subordinated Indebtedness Documents) in a manner adverse to the Credit Parties, or (c) any Material Contract or any Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder) to the extent that such amendment, alteration, modification or waiver of such Material Contract or Material Indebtedness would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect; or (d) the Specified Subordinated Indebtedness Documents, without the prior written consent of the Agent.

7143386v10

**7.13   Fiscal Year.**  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14   Deposit Accounts; Credit Card Processors.**   Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(b) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent. No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 and 6.21 hereof.

**7.15   Reserved.**

**7.16   Designation of Senior Debt.**  Designate any Indebtedness (other than the Indebtedness under the Loan Documents) of any Loan Party or any of its Subsidiaries as "Credit Facility Debt" (or any similar term) or designate any other credit facility (other than the credit facility under the Loan Documents) of any Loan Party or any of its Subsidiaries as the "Credit Facility" (or any similar term), in each case under, and as defined in, the Indenture or any supplemental indentures thereto.

**7.17   Reclamation Claims.**  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or agree to allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $10,000, except for returns with respect to Inventory that is (x) subject to a valid consignment agreement, (y) that does not constitute Eligible Inventory, and (z) to the extent consented to by the Agent.

**7.18   Bankruptcy Related Negative Covenants.**  No Loan Party shall seek, consent to, or permit to exist any of the following:

(a)   Any order which authorizes the rejection or assumption of any Leases (other than the "dark stores" or locations of the Initial Store Closing or in connection with a Permitted Sale) of any Loan Party without the Agent's prior consent;

(b)   Any modification, stay, vacation or amendment to the Financing Orders to which the Agent and the Term Agent have not consented in writing;

(c)   A priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations and the Pre-Petition Obligations except as set forth in the Financing Orders;

7143386v10

(d)     Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations or Pre-Petition Liens including any adequate protection Liens except as set forth in the Financing Orders;

(e)     Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(f)     Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Obligations and Pre-Petition Indebtedness reflected in the Approved Budget (subject to the Permitted Variance)) incurred prior to the Petition Date or except as set forth in the Financing Orders the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(g)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**7.19    Professional Fee Escrow Account.** Until all of the Pre-Petition Obligations and the Obligations have been paid in full, in cash, and all applicable Commitments to lend have terminated, pay the fees and expenses (other than the Transaction Fees, which shall be paid as set forth below) of the any Case Professionals from any source other than (i) the Professional Fee Escrow Account or (ii) any retainers paid prior to the Petition Date and held by such Case Professional or (iii) Post Trigger Notice Carve Out Amount to the extent not previously funded into the Professional Fee Escrow Account. Notwithstanding anything to the contrary contained in this Agreement, any other Loan Documents or the Approved Budget, as applicable, none of the Credit Parties shall be responsible for funding into the Professional Fee Escrow Account any of the Transaction Fees or similar fees payable to the Sale Consultant or any other "success" fees payable to any investment banker, and, subject to the immediately succeeding sentence, in no event shall any such amounts be paid out of the Carve-Out or any funds in the Professional Fee Escrow Account. Notwithstanding the foregoing, the Success Fee shall be deemed part of the Carve-Out, provided that the Success Fees shall be paid solely from the proceeds of a Permitted Sale and not from the Professional Fee Escrow Account and shall not reduce the amounts available in the Budget for the Carve-Out or the Post Trigger Notice Carve Out Amount. No Plan shall fail to provide for the payment in full of any outstanding Transaction Fees on the effective date thereof. No Financing Transaction (as defined in the Sale Consultant Agreement) shall fail to provide for payment in full of the Financing Success Fee (as defined in the Sale Consultant Agreement) on the closing date thereof. For the avoidance of doubt, none of the provisions of this Agreement or any other Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers paid prior to the Petition Date and held by such Case Professional.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01    Events of Default.** Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>. The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any Letter of Credit Obligation, or deposit any funds as Cash Collateral in respect of Letter of Credit Obligations or of any of the Pre-Petition Obligations, or (ii) any interest on any Loan, on any Letter of Credit Obligation or on any Pre-Petition Obligation, or (iii) any fee due hereunder, or any other amount payable hereunder or under any other Loan Document or the Interim Financing Order or Final Financing Order; or

(b)    <u>Specific Covenants</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.14</u>, <u>6.22</u>, <u>6.23</u>, <u>6.24</u>, <u>6.25</u>, <u>6.26</u>, <u>6.27</u>, <u>6.28</u>, or <u>Article VII</u>; or

(c)    <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) days; or

(d)    <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-petition or unstayed Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) after giving effect to any grace period, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is, after giving effect to any grace period, to cause, or to permit the holder or holders of such post-petition or unstayed Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $750,000; or

(f)    Reserved; or

-130-

(g)    Attachment.  Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person; or

(h)    Judgments; Settlements.  (i) There is entered against any Loan Party or any Subsidiary thereof (A) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $750,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (B) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (I) enforcement proceedings are commenced by any creditor upon such judgment or order, or (II) there is a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect, or (ii) any Loan Party or any Subsidiary thereof enters into one or more settlements that results in the payment of money by such Loan Party or Subsidiary in an aggregate amount (as to all such settlements) exceeding $750,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the claim and does not dispute coverage); or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount resulting in any liability to any Loan Party which would reasonably likely result in a Material Adverse Effect; or

(j)    Invalidity of Loan Documents.  (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations and the Pre-Petition Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral with a fair market value in excess of $250,000 with the perfection and priority required by the applicable Security Document; or

(k)    Change of Control.  There occurs any Change of Control; or

(l)    Cessation of Business.  Except as otherwise expressly permitted hereunder, any Loan Party shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

-131-

(m)    Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)    Indictment.  The indictment or institution of any legal process or proceeding against any Loan Party or any Subsidiary thereof, under any federal, state, provincial, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(o)    Guaranty.  The termination or attempted termination or revocation of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(p)    Elavon Offset.  Elavon or Elavon Member shall exercise any right of offset, deduction, chargeback or withdraw against any deposit account or securities account of any Borrower or any Guarantor other than from the Elavon Deposit Account or the Elavon Reserve Account (except any of the foregoing that is voided or stayed pursuant to the automatic stay); or

(q)    Enforceability of Subordination Provisions.  (i) The Subordination Provisions shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

(r)    Chapter 11 Case.  The occurrence of any of the following in the Chapter 11 Case:

(i)    except in connection with a Permitted Sale, any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Pre-Petition Obligations and the Obligations on the closing of such sale;

(ii)    other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to

-132-

prohibit Agent, the Term Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case; or (E) any other action or actions adverse to the interest of the Agent the Term Agent, the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral; provided that seeking relief specifically set forth in the Financing Orders from the Bankruptcy Court during the "Remedies Notice Period" shall not constitute an Event of Default under this clause (r)(ii);

(iii)    (A) other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent and the Term Agent do not consent or otherwise agree to treatment of the respective claims of the Agent and the Lenders, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent and the Term Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent and the Term Agent;

(iv)    the entry of an order in the Chapter 11 Case confirming a plan that (A) is not acceptable to the Agent and Term Agent in their discretion (it being agreed that a plan that satisfies the Obligations and the Pre-Petition Obligations (if any) in full in cash on the effective date thereof is acceptable to the Agent and Term Agent) or (B) does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Pre-Petition Obligations and the Obligations under this Agreement on or before the effective date of such plan or plans;

(v)    the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Credit Agreement or the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the Agent or the Term Agent;

(vi)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within 30 days of the Petition Date;

(vii)    except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by the Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;

(viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

-133-

(ix)     the filing of a motion by a Loan Party or any holder of the Specified Subordinated Indebtedness or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or, other than a Permitted Sale, the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Pre-Petition Obligations and the Obligations, and termination of the Commitments on the effective date of such plan or the closing of such sale;

(x)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 (or $500,000 in the aggregate) or more, or (2) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xii)     the commencement of a suit or action against the Agent, any Lender or any other Credit Party by or on behalf of any Loan Party, or its bankruptcy estates;

(xiii)     the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Pre-Petition Credit Agreement;

(xiv)     the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court;

(xv)     the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Agent may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date;

(xvi)     the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent, the Lenders and Pre-Petition Agent except as set forth in the Financing Orders; or

(xvii)   the failure of any Loan Party or other Person to perform any of its obligations under the Agency Agreement, the Bidding Procedures Order or the Sale Order.

**8.02    Remedies Upon Event of Default.**  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions upon the expiration of the "Remedies Notice Period" referred to in the Financing Orders:

(a)    declare the Revolving Commitments of each Revolving Lender to make Committed Revolving Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, whereupon such Revolving Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, and all Pre-Petition Obligations, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Loan Parties Cash Collateralize the Letter of Credit Obligations; and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents, the Pre-Petition Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or the Pre-Petition Loan Documents or any instrument pursuant to which the Obligations or the Pre-Petition Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds.**  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

First, to the payment in full of the Pre-Petition Revolving Loan Balance including funding of the indemnity accounts;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts

-135-

(including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent, in its capacity as such and Credit Party Expenses of the Term Agent after the commencement of proceeding under any Debtor Relief Law in an amount not to exceed $100,000 in the aggregate or such greater amounts approved by Agent;

Third, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Revolving Lenders and the Issuing Bank (including Credit Party Expenses to the respective Revolving Lenders and the Issuing Bank and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Third payable to them;

Fourth, to the extent not previously reimbursed by the Revolving Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances and Unintentional Overadvances;

Fifth, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

Sixth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations (other than the Other Liabilities and Obligations owing to the Term Lenders), and fees (including Letter of Credit Fees), ratably among the Revolving Lenders and the Issuing Bank in proportion to the respective amounts described in this clause Sixth payable to them;

Seventh, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

Eighth, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to the Agent for the account of the Issuing Bank, to Cash Collateralize that portion of Letter of Credit Obligations comprised of the aggregate undrawn amount of Letters of Credit;

Tenth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations for which a claim has been asserted against the Agent, the Issuing Bank or a Revolving Lender), but excluding (i) the Term Loan, (ii) any Other Liabilities, and (iii) Overadvances that are not Permitted Overadvances or Unintentional Overadvances), ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them;

Eleventh, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured by the Security Documents, ratably among

-136-

the Credit Parties in proportion to the respective amounts described in this clause Eleventh held by them;

Twelfth, to payment of that portion of the obligations arising from Bank Products but excluding Bank Products in excess of $500,000 or to the extent a Bank Product Reserve has not been implemented;

Thirteenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Pre-Petition Term Loan and other Obligations and fees owing to the Term Lenders (excluding principal of the Pre-Petition Term Loan), ratably among the Pre-Petition Term Lenders in proportion to the respective amounts described in this clause Thirteenth payable to them;

Fourteenth, to payment of that portion of the Obligations constituting unpaid principal of the Pre-Petition Term Loan and all other Obligations related to the Pre-Petition Term Loan, ratably among the Pre-Petition Term Lenders in proportion to the respective amounts described in this clause Fourteenth held by them;

Fifteenth, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Term Agent and amounts payable under Article III) payable to the Term Agent, in its capacity as such;

Sixteenth, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Term Lenders (including Credit Party Expenses to the respective Term Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Sixteenth payable to them;

Seventeenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loan and other Obligations and fees owing to the Term Lenders, ratably among the Term Lenders in proportion to the respective amounts described in this clause Seventeenth payable to them;

Eighteenth, to payment of that portion of the Obligations constituting unpaid principal of the Term Loan and all other Obligations related to the Term Loan, ratably among the Term Lenders in proportion to the respective amounts described in this clause Eighteenth held by them;

Nineteenth, to payment of that portion of the obligations arising from Bank Products not paid pursuant to clause Twelfth; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Ninth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as

-137-

Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

# ARTICLE IX
# THE AGENT

## 9.01    Appointment and Authority.

(a)    Each of the Lenders and the Swing Line Lender hereby irrevocably appoints Wells Fargo to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations and appearing in the Chapter 11 Case on behalf of the Lenders), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent, the Term Agent, the Lenders and the Issuing Bank, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b)    Each of the Term Lenders hereby irrevocably appoints GACP Finance Co., LLC to act on its behalf as the Term Agent hereunder and under the other Loan Documents and authorizes the Term Agent to take such actions on its behalf and to exercise such powers as are delegated to the Term Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Term Agent and the Term Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

## 9.02    Rights as a Lender.  The Person serving as the Agent or the Term Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent or the Term Agent and the terms "Revolving Lender" or "Revolving Lenders" and "Term Lender" or "Term Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent or the Term Agent, as applicable, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

## 9.03    Exculpatory Provisions.  Neither the Agent nor the Term Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent and the Term Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or

by the other Loan Documents that the Agent or the Term Agent is required to exercise as directed in writing by the Applicable Lenders, provided that neither the Agent nor the Term Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent or the Term Agent to liability or that is contrary to any Loan Document or applicable law; and

        (c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or the Term Agent or any of their respective Affiliates in any capacity.

        Neither the Agent nor the Term Agent shall be liable for any action taken or not taken by it (i) with the Consent or at the request of the Applicable Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent or the Term Agent, as applicable, shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

        Neither the Agent nor the Term Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent or the Term Agent, as applicable, by the Loan Parties, a Lender or the Issuing Bank. Upon the occurrence of a Default or Event of Default, the Agent or the Term Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent or the Term Agent shall have received such direction, the Agent or the Term Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent or the Term Agent be required to comply with any such directions to the extent that the Agent or the Term Agent believes that its compliance with such directions would be unlawful.

        Neither the Agent nor the Term Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent or the Term Agent.

        **9.04**    **Reliance by the Agent and the Term Agent**. The Agent and the Term Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not

limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent and the Term Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Agent and the Term Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Agent or the Term Agent shall have received written notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Agent and the Term Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05   Delegation of Duties**. The Agent and the Term Agent may perform any and all of their respective duties and exercise their respective rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent or the Term Agent. The Agent or the Term Agent, and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent, the Term Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent or the Term Agent.

**9.06   Resignation of Agent**. The Agent or the Term Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation (a) from the Agent, the Required Lenders shall have the right, in consultation with the Lead Borrower (other than after the occurrence and during the continuance of an Event of Default), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or (b) from the Term Agent, the Required Term Lenders shall have the right, in consultation with the Lead Borrower (other than after the occurrence and during the continuance of an Event of Default), to appoint a successor, which shall be a Term Loan Lender, or an Affiliate of any such Term Loan Lender or which would qualify as an Eligible Assignee. If no such successor shall have been so appointed by the Required Revolving Lenders or the Required Term Lenders, as applicable, and shall have accepted such appointment within thirty (30) days after the retiring Agent or Term Agent gives notice of its resignation, then the retiring Agent or Term Agent may, on behalf of the Revolving Lenders and the Issuing Bank (in the case of the Agent) or on behalf of the Term Lenders (in the case of the Term Agent), appoint a successor Agent or Term Agent, as applicable, meeting the qualifications set forth above; provided, that if the Agent or the Term Agent, as applicable, shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent or Term Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the Issuing Bank under any of the Loan Documents, the retiring Agent shall continue to hold such

-140-

collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent or the Term Agent, as applicable, shall instead be made by or to each Lender and the Issuing Bank directly, until such time as the Applicable Lenders appoint a successor Agent or Term Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent or Term Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent of Term Agent, and the retiring Agent or Term Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent or Term Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's or Term Agent's resignation hereunder (including pursuant to Section 8.02(b) and this Section 9.06) and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent or Term Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent or Term Agent was acting in such capacity hereunder.

Any resignation by Wells Fargo as Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender and the resignation of Wells Fargo as Issuing Bank. Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and Swing Line Lender, (b) the retiring Issuing Bank and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

**9.07    Non-Reliance on Agent or Term Agent and Other Lenders.** Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Agent, the Term Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent, the Term Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    Reserved.**

**9.09    Reserved.**

**9.10    Collateral and Guaranty Matters.** The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any transfer or sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)    to release any Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11    Notice of Transfer.** The Agent and the Term Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.12    Reports and Financial Statements.** By signing this Agreement, each Lender:

(a)    agrees to furnish the Agent at such frequency as the Agent may reasonably request with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender;

(b)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

-142-

(c)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Term Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of Loans or Letters of Credit; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Term Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent, the Term Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13    Agency for Perfection.**  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent, the Term Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession.  Should the Term Agent or any Lender (other than the Agent) obtain possession of any such Collateral, the Term Agent or such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent and Term Agent.**

(a)    Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent, the Issuing Bank and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, the Issuing Bank and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, the Issuing Bank and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

expenses or disbursements resulting from the Agent's, the Issuing Bank's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

(b)     Without limiting the obligations of the Loan Parties hereunder, the Term Lenders hereby agree to indemnify the Term Agent and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Term Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Term Agent and its Related Parties in connection therewith; provided, that no Term Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Term Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

**9.15    Relation among Lenders**. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent and the Term Agent) authorized to act for, any other Lender.

**9.16    Defaulting Lender**.

(a)     Notwithstanding the provisions of Section 2.14 hereof, the Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Agent shall transfer any such payments (i) first, to the Swing Line Lender to the extent of any Swing Line Loans that were made by the Swing Line Lender and that were required to be, but were not, paid by the Defaulting Lender, (ii) second, to the Issuing Bank, to the extent of the portion of a payment on account of Letters of Credit that was required to be, but was not, paid by the Defaulting Lender, (iii) third, to each Non-Defaulting Lender ratably in accordance with their Revolving Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Committed Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (iv) to the Cash Collateral Account, the proceeds of which shall be retained by the Agent and may be made available to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of the Committed Revolving Loans (or other funding obligations) hereunder, and (v) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender. Subject to the foregoing, the Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Applicable Percentages

in connection therewith) and for the purpose of calculating the fee payable under <u>Section 2.09(a)</u>, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Revolving Commitment shall be deemed to be zero; <u>provided</u>, that the foregoing shall not apply to any of the matters governed by <u>Section 10.01(a)</u> through <u>(c)</u>. The provisions of this <u>Section 9.16</u> shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Agent, the Issuing Bank, and the Borrowers shall have waived, in writing, the application of this <u>Section 9.16</u> to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by the Agent pursuant to <u>Section 9.16(b)</u> shall be released to the Borrowers). The operation of this <u>Section 9.16</u> shall not be construed to increase or otherwise affect the Revolving Commitment of any Revolving Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Agent, the Issuing Bank, the Swing Line Lender, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Agent, to arrange for a substitute Revolving Lender to assume the Revolving Commitment of such Defaulting Lender, such substitute Revolving Lender to be reasonably acceptable to the Agent. In connection with the arrangement of such a substitute Revolving Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Revolving Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Applicable Percentage of its participation in the Letters of Credit); <u>provided</u>, that any such assumption of the Revolving Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this <u>Section 9.16</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 9.16</u> shall control and govern.

(b)     If any Swing Line Loan or Letter of Credit is outstanding at the time that a Revolving Lender becomes a Defaulting Lender then:

(i)     such Defaulting Lender's participation interest in any Swing Line Loan or Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (x) the Outstanding Amount sum of all Non-Defaulting Lenders' Credit Extensions after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders'

-145-

Revolving Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(ii)    if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrowers shall within one (1) Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's participation in any outstanding Swing Line Loans (after giving effect to any partial reallocation pursuant to clause (b)(i) above) and (y) second, cash collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause (b)(i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such Letter of Credit Obligations are outstanding; provided, that the Borrowers shall not be obligated to cash collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also the Issuing Bank;

(iii)    if the Borrowers cash collateralize any portion of such Defaulting Lender's participation in Letters of Credit pursuant to this Section 9.16(b), the Borrowers shall not be required to pay any Letter of Credit Fees to the Agent for the account of such Defaulting Lender pursuant to Section 2.03 with respect to such cash collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is cash collateralized;

(iv)    to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this Section 9.16(b), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.03 shall be adjusted in accordance with such reallocation;

(v)    to the extent any Defaulting Lender's participation in Letters of Credit is neither cash collateralized nor reallocated pursuant to this Section 9.16(b), then, without prejudice to any rights or remedies of the Issuing Bank or any Revolving Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.03 with respect to such portion of such participation shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's participation is cash collateralized or reallocated;

(vi)    so long as any Revolving Lender is a Defaulting Lender, the Swing Line Lender shall not be required to make any Swing Line Loan and the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Applicable Percentage of such Swing Line Loans or Letter of Credit cannot be reallocated pursuant to this Section 9.16(b) or (y) the Swing Line Lender or the Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Lender or the Issuing Bank, as applicable, and the Borrowers to eliminate the Swing Line Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Line Loans or Letters of Credit; and

(vii)    The Agent may release any cash collateral provided by the Borrowers pursuant to this Section 9.16(b) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Applicable Percentage of any Letter of Credit disbursement that is not reimbursed by the Borrowers pursuant to Section 2.03.

## ARTICLE X
## MISCELLANEOUS

**10.01  Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    (as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (v) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that (i) only the Consent of the Required Revolving Lenders shall be necessary to waive any obligation of the Borrowers to pay interest on the Committed Revolving Loans and the Swing Line Loans or Letter of Credit Fees at the Default Rate and (ii) only the Consent of the Required Term Lenders shall be necessary to waive any obligation of the Borrowers to pay interest on the Term Loan at the Default Rate;

(d)    (i) as to any Lender, change Section 2.12(a) or Section 2.13 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender or (ii) change Section 8.03 or Schedule 1.03 without the written Consent of each Lender;

(e)    change any provision of this Section 10.01 or the definition of "Applicable Lenders", "Required Lenders", "Required Revolving Lenders", "Required Term Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender included in any such definition;

-147-

(f)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)    except as set forth in the Interlender Provisions, release all or substantially all of the Collateral from the Liens of the Security Documents (including, without limitation, in connection with the exercise of remedies pursuant to Section 8.02 or otherwise) without the written Consent of each Lender;

(h)    increase the Aggregate Revolving Commitments or increase the principal amount of the Term Loan without the written Consent of each Lender;

(i)    subject to the Interlender Provisions change the definition of the terms "Borrowing Base", "Revolving Borrowing Base" "Term Loan Borrowing Base" or "Availability Block" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender; provided, that subject to the Interlender Provisions the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves other than the Term Loan Push Down Reserve and Sale Leaseback Reserve;

(j)    modify the definition of Permitted Overadvance or Unintentional Overadvance so as to increase the amount thereof or the time period for which a Permitted Overadvance or Unintentional Overadvance may remain outstanding without the written Consent of each Lender;

(k)    except as expressly permitted herein, in any other Loan Document or in accordance with the Interlender Provisions, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents to any other Indebtedness or Lien, as the case may be, without the written Consent of each Lender; and

(l)    without the consent of the Required Revolving Lenders and Required Term Lenders:

(i)    reserved;

(ii)    amend the definition of Eligible Assignees, Permitted Disposition (subject to the Interlender Provisions) or Pre-Petition Reserve, Pre-Petition Revolving Loan Balance or Sale-Leaseback Reserve;

(iii)    amend Section 2.01(a), Section 2.05, Section 2.16, Section 5.26, Section 6.23, Section 6.24, Section 6.25, Section 6.26, Section 6.27, Section 6.28, Section 7.05, clauses (b) or (c) of Section 7.07, Section 7.17, Section 7.18, Section 7.19, Section 9.14 (in a manner adverse to any Term Lender), Section 9.16 (in a manner adverse to any Term Lender), Section 10.04 (in a manner adverse to any Term Lender), Section 10.06(a), or clauses (i)(B) and (iii) of Section 10.06(b);

provided, further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the Issuing Bank in addition to the Lenders required above, affect the rights or duties of the

-148-

Issuing Bank under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Term Agent in addition to the Lenders required above, affect the rights or duties of the Term Agent under this Agreement or any other Loan Document; (v) the GA Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto; (vi) the Wells Fargo Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto; and (vii) the provisions of this Section 10.01 shall not (subject to the Interlender Provisions) limit the discretion of the Agent to change, establish or eliminate any Reserves or abrogate the obligation of the Agent to maintain the Term Loan Push Down Reserve and Sale-Leaseback Reserve, if any, in accordance with the terms hereof. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in its capacity as a Lender, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

### 10.02  Notices; Effectiveness; Electronic Communications.

(a)     Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Loan Parties, the Agent, the Term Agent, the Issuing Bank or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be

-149-

deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Loan Parties, the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Article II if such Lender or the Issuing Bank, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent, the Term Agent or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

-150-

(d)     Change of Address, Etc. Each of the Loan Parties, the Agent, the Term Agent, the Issuing Bank and the Swing Line Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agent, the Term Agent, the Issuing Bank and the Swing Line Lender. In addition, each Lender agrees to notify the Agent and the Term Agent from time to time to ensure that the Agent and the Term Agent each has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent, Issuing Bank and Lenders. The Agent, the Term Agent, the Issuing Bank and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, the Term Agent, the Issuing Bank, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties. All telephonic notices to and other telephonic communications with the Agent or the Term Agent may be recorded by the Agent or the Term Agent, and each of the parties hereto hereby consents to such recording.

**10.03   No Waiver; Cumulative Remedies.** No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04   Expenses; Indemnity; Damage Waiver.**

(a)     Costs and Expenses. The Borrowers shall pay all Credit Party Expenses.

(b)     Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent, the Term Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan

-151-

Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent and the Term Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any Related Party of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee or its Related Party for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    <u>Reimbursement by Lenders</u>. Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, and each Term Lender severally agrees to pay to the Term Agent or such Related Party (or any such sub-agent thereof) such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent), the Term Agent (or any such sub-agent), or the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent), the Term Agent (or any such sub-agent), or the Issuing Bank in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

-152-

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arisiug from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments. All amounts due under this Section shall be payable on demand therefor.

(f)    Survival. The agreements in this Section shall survive the resignation of any Agent, the Term Agent and the Issuing Bank, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or auy other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, (b) each Revolving Lender and the Issuing Bank severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Revolving Commitments or the Committed Revolving Loans so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect, and (c) each Term Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Term Loan so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders and the Issuing Bank under clauses (b), (c) and (d) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns**.

(a)    Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors

-153-

and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent, the Term Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of subsection <u>Section 10.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this <u>Section 10.06(b)</u>, participations in Letter of Credit Obligations and in Swing Line Loans) at the time owing to it); <u>provided</u>, that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    In any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $10,000,000 and minimum increments of $1,000,000 in excess thereof with respect to Committed Revolving Loans, and not less than $1,000,000 and minimum increments of $1,000,000 in excess thereof with respect to the Term Loan, unless each of the Agent, the Term Agent (with respect to the Term Loan) and, so long as no Default or Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitments assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    reserved; and

(B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Revolving Commitment and/or Committed Revolving Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consent of the Issuing Bank (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding);

(D)    the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignments in respect of the assignment of any Revolving Commitment and/or Committed Revolving Loans; and

(E)    the consent of the Term Agent and the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of the Term Loan (or any portion thereof) if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which shall be paid by the assigning Lender), provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; provided, further, that no such fee shall be due in connection with an assignment to a Lender, an Affiliate of a Lender or an Approved Fund. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights

-155-

and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 10.06(d)</u>.

(c)     <u>Register</u>.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent, the Term Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower, the Term Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in Letter of Credit Obligations and/or Swing Line Loans) owing to it); <u>provided,</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Term Agent, the Lenders and the Issuing Bank shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in <u>Section 10.07</u> as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; <u>provided,</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 10.01</u> that affects such Participant.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u> and <u>3.05</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 10.06(b)</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.13</u> as though it were a Lender.

7143386v10

In the event that a Lender sells participations to any Person, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register on which it enters the name of all participants in the Loans held by it (and the principal amount and stated interest thereon) and the portion of such Loans that is subject to such participations (the "Participant Register"). A Loan (and the note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register

(e)        Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)        Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)        Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)        Resignation as Issuing Bank or Swing Line Lender after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Wells Fargo (or any other Issuing Bank) assigns all of its Revolving Commitment and Committed Revolving Loans pursuant to subsection (b) above, (i) upon thirty (30) days' notice to the Lead Borrower and the Revolving Lenders, Wells Fargo (or such other Issuing Bank, as applicable) may resign as Issuing Bank and/or (ii) upon thirty (30) days' notice to the Lead Borrower, Wells Fargo may resign as Swing Line Lender.  In the event of any such resignation as Issuing Bank or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Revolving Lenders a successor Issuing Bank or Swing Line Lender hereunder in accordance with the terms hereof; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Wells Fargo (or such other Issuing Bank, as applicable) as Issuing Bank or Wells Fargo as Swing Line Lender, as the case may be.  If Wells Fargo (or such other Issuing

-157-

Bank, as applicable) resigns as Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit issued by it outstanding as of the effective date of its resignation as Issuing Bank and all Letter of Credit Obligations with respect thereto (including the right to require the Revolving Lenders to make Base Rate Loans pursuant to Section 2.03(c)). If Wells Fargo resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Revolving Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the appointment of a successor Issuing Bank and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank or Swing Line Lender, as the case may be, and (b) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Wells Fargo (or such other Issuing Bank, as applicable) to effectively assume the obligations of Wells Fargo (or such other Issuing Bank, as applicable) with respect to such Letters of Credit.

**10.07  Treatment of Certain Information; Confidentiality**. Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the

7143386v10

same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08   Right of Setoff.**   If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, the Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the Issuing Bank or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Bank, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the Issuing Bank shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or the Issuing Bank different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.  Each Lender and the Issuing Bank agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation.**   Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent, the Term Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent, the Term Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness.**   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties

-159-

relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent or the Term Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 10.04.

**10.12  Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13  Replacement of Lenders**. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

7143386v10

(a)     the Agent shall have been paid the assignment fee specified in Section 10.06(b);

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14  Governing Law; Jurisdiction; Etc.**

(a)     GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)     SUBMISSION TO JURISDICTION. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURTS. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

7143386v10

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT OR THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15  Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16  No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and

-162-

conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17  USA PATRIOT Act Notice.**  Each Lender that is subject to the Act (as hereinafter defined) and the Agent and the Term Agent (in each case for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender, the Agent or the Term Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**10.18  Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by

-163-

Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19  Time of the Essence.**  Time is of the essence of the Loan Documents.

**10.20  Designation of Senior Debt.**  All Obligations shall be "Credit Facility Debt", and the credit facility provided herein shall be the "Credit Facility", in each case for purposes of and as defined in the Indenture and all supplemental indentures thereto.

**10.21  Press Releases.**

(a)  Each Credit Party and each Loan Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent, the Term Agent, any other Credit Party or their respective Affiliates when referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent, the Term Agent or such other Credit Party, as applicable, and without the prior written consent of the Agent, the Term Agent or such other Credit Party, as applicable, unless (and only to the extent that) such Credit Party, Loan Party or Affiliate thereof is required to do so under applicable Law and then, in any event, such Credit Party, Loan Party or Affiliate thereof will consult with the Agent, the Term Agent or such other Credit Party, as applicable, before issuing such press release or other public disclosure other than as required by applicable Law.

(b)  Each Loan Party consents to the publication by the Agent, the Term Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent or the Term Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent, the Term Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. Each of the Agent and the Term Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.22  Additional Waivers.**

(a)  The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

7143386v10

(b)     The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several

-165-

obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.23   No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24   Attachments**. The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.25   Keepwell**. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Facility Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.25 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.25, or otherwise under the Facility Guaranty, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Section 10.25 constitute, and this Section 10.25 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**10.26   Conflict**. The Loan Parties, the Agent, the Term Agent and the Lenders acknowledge that the exercise of certain of the Agent's and the Term Agent's rights and remedies hereunder may be subject to, and restricted by, the Interlender Provisions. Except as specified herein, nothing contained in the Interlender Provisions shall be deemed to modify any requirement or shall be deemed to modify any of the provisions of this Agreement and the other

7143386v10

Loan Documents, which, among the Loan Parties, the Agent, the Term Agent and the Lenders shall remain in full force and effect.  In the event of any conflict between the terms of this Agreement and the Interlender Provisions, the terms of the Interlender Provisions shall govern and control.

[Signature Pages Follow.]

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWERS:**

**HANCOCK FABRICS, INC.**
**HF MERCHANDISING, INC.**
**HANCOCK FABRICS OF MI, INC.**

By: _____
Name: Dennis Lyons
Title:   Senior Vice President and Chief
          Administrative Officer

**HANCOCK FABRICS, LLC**

By: _____
Name: Dennis Lyons
Title:   Manager

**HANCOCKFABRICS.COM, INC.**

By: _____
Name: Dennis Lyons
Title:   President

**GUARANTORS:**

**HF ENTERPRISES, INC.**
**HF RESOURCES, INC.**

By: _____
Name: Rebecca Flick
Title:   Vice President and Assistant Secretary

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as Agent

By: _____
Name: Joseph Burt
Title: Director

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as Issuing Bank, as a
Revolving Lender and Swing Line Lender

By: _____
Name: Joseph Burt
Title: Director

**GACP FINANCE CO., LLC**
as Term Agent

By: _____

Name:    Grace Wang
Title:    Senior Vice President

**GACP I, LP,**
as a Term Lender

By: _____
Name:    Grace Wang
Title:    Senior Vice President

**Schedule 1.03**

<u>**Interlender Provisions**</u>

Notwithstanding anything contained in the Agreement to the contrary, the Agent, Term Agent the Lenders and Loan Parties hereby agree with respect to certain of their respective rights and obligations under the Agreement as follows:

1.    <u>**Purchase Option with Respect to the Revolving Loan Claims**</u>.

(a)    Subject to Section 2(g) of this Schedule 1.03 to the Agreement, if (i) the Agent shall notify the Term Agent of its intention to (by itself or at the direction of the Required Lenders), sell, lease, license or dispose of a Material Portion of the Collateral whether by private or public sale (any of the foregoing referred to herein as a "<u>**Sale**</u>"), in accordance with Section 4 of this Schedule 1.03 to the Agreement; provided that any notice from the Agent to the Term Agent of the Agent's intention to conduct such a Sale shall be delivered by the Agent to the Term Agent no less than 10 days prior to the commencement of any such Sale, (ii) the principal amount of the Obligations shall have been accelerated, (iii) a Collateral Enforcement Action shall have occurred that is not otherwise set forth in clauses (i) through (ii) (each of the foregoing events described in clauses (i) through (iii) herein above referred to herein as a "<u>**Purchase Option Event**</u>"), or (iv) the Agent does not exercise its enforcement rights and remedies as directed by the Term Agent in accordance with the terms set forth in Section 6 of this Schedule 1.03 to the Agreement as a result of a determination that such actions are not permitted by the Loan Documents or applicable law or would result in liability to the Agent or the Lenders to any Loan Party or other Person, in each case as further described in clauses (a) and (b) of Section 6 of this Schedule 1.03 to the Agreement (the "<u>**Agent Determinations**</u>" and together with the Purchase Option Events, each a "<u>**Revolving Loan Purchase Option Event**</u>"), the Term Lenders shall have the opportunity to purchase all (but not less than all) of the Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement; provided, that such option shall expire if the applicable Term Lenders fail to deliver a written notice (a "<u>**Purchase Notice**</u>") to the Agent within ten (10) days following the first date the Term Agent obtains knowledge of the occurrence of a Revolving Loan Purchase Option Event, which Purchase Notice shall (A) be signed by the applicable Term Lenders committing to such purchase (the "<u>**Purchasing Creditors**</u>") and indicate the percentage of the Revolving Loan Claims to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the Revolving Loan Claims) and (B) state that (1) it is a Purchase Notice delivered pursuant to this Section 1 of Schedule 1.03 to the Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Purchase Notice by the Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) days after the Purchase Notice was received by the Agent (such ten (10) day period, the "<u>**Purchase Period**</u>") to purchase all (but not less than all) of the Revolving Loan

Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement (the date of such purchase, the "**Purchase Date**").

(b)   On the Purchase Date, the Agent and the other Revolving Loan Secured Parties shall, subject to any required approval of any Governmental Authority, in each case then in effect, if any, sell to the Purchasing Creditors all (but not less than all) of the Revolving Loan Claims. On such Purchase Date, the Purchasing Creditors shall (i) pay to the Agent, for the benefit of the Revolving Loan Secured Parties, as directed by the Agent, in immediately available funds the full amount (at par) of all Revolving Loan Claims then outstanding together with all accrued and unpaid interest and fees thereon (excluding any prepayment fee, prepayment premium or early termination fee not then due under the Loan Documents other than as provided below), all in the amounts specified by the Agent and determined in good faith in accordance with the Loan Documents or other applicable documents, (ii) furnish such amount of cash collateral in immediately available funds as the Agent determines is reasonably necessary to secure the Revolving Loan Secured Parties on terms reasonably satisfactory to the Agent in connection with any (x) Asserted Indemnification Claims and (y) all Letter of Credit Obligations but not in any event in an amount greater than 105% of the Outstanding Amount of all Letter of Credit Obligations (other than Letter of Credit Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which Letter of Credit Obligations shall be cash collateralized in an amount equal to 115% of the Outstanding Amount of such Letter of Credit Obligations), and (iii) agree to reimburse the Revolving Loan Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the Revolving Loan Claims under the Agreement and as to which the Agent and Revolving Loan Secured Parties have not yet received final payment as of the Purchase Date. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the Agent (for the benefit of the applicable Revolving Loan Secured Parties) as the Agent shall have specified in writing to the Term Agent. Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the applicable Purchasing Creditors to the bank account designated by the Agent are received in such bank account prior to 1:00 p.m., Eastern time, and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the Agent are received in such bank account after 1:00 p.m., Eastern time.

(c)   Any purchase pursuant to the purchase option set forth in this Section 1 of Schedule 1.03 to the Agreement shall, except as provided below, be expressly made without representation or warranty of any kind by the Agent or the other Revolving Loan Secured Parties as to the Revolving Loan Claims, the Collateral or otherwise, and without recourse to the Agent and the other Revolving Loan Secured Parties as to the Revolving Loan Claims, the Collateral or otherwise, except that the Agent and each of the Revolving Loan Secured Parties, as to itself

- 2 -

only, shall represent and warrant only as to (i) the principal amount of the Revolving Loan Claims being sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Revolving Loan Claims being sold by it, and (iii) that such Person has the right to assign the Revolving Loan Claims being assigned by it and its assignment agreement has been duly authorized by it.

(d)     In connection with any purchase of Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement, each Revolving Loan Secured Party agrees to enter into and deliver to the Purchasing Creditors on the Purchase Date, as a condition to closing, an assignment agreement in a form reasonably acceptable to the Agent and the Term Agent and, at the expense of the Loan Parties, each of the Revolving Loan Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or note powers), then in such Revolving Loan Secured Party's possession or in the possession of its agent or bailee, or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Revolving Loan Secured Party or its agent or bailee then has control, as the case may be, to any Person designated by the Term Agent to act as the successor Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to any Person designated by the Term Agent to act as the successor Agent. Upon the consummation of the purchase of the Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement, the Agent shall be deemed to have resigned as an "agent" or "administrative agent" or "collateral agent" (or any similar role) for the Secured Parties under the Loan Documents; provided that the Agent (and all other agents under the Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" under the Agreement.

(e)     Notwithstanding the foregoing purchase of the Revolving Loan Claims by the Purchasing Creditors, the Revolving Loan Secured Parties shall retain, on an unsecured basis, those contingent indemnification obligations and other obligations under the Loan Documents which by their express terms would survive any repayment of the Revolving Loan Claims.

(f)     Anything contained in this Section 1 of Schedule 1.03 to the Agreement to the contrary notwithstanding, in the event that any Purchasing Creditor receives any prepayment fee, prepayment premium or early termination fee under the Loan Documents (as in effect on the date hereof) or otherwise, in cash, within 180 days following the Purchase Date, then such Purchasing Creditor shall pay a supplemental purchase price in respect of its purchase of the Revolving Loan Claims under this Section 1 of Schedule 1.03 to the Agreement in an amount equal to the portion of such prepayment fee, prepayment premium, or early termination fee to which the Revolving Loan Secured Parties would have otherwise been entitled had the purchase under this Section 1 of Schedule 1.03 to the Agreement not occurred. The Purchasing Creditors agree not to amend or waive the terms of the Loan Documents as in effect on the Purchase Date in

- 3 -

respect of any prepayment fee, prepayment premium or early termination fee contained therein or assign any rights to such prepayment fee, prepayment premium or early termination fee following any purchase by the Purchasing Creditors of the Revolving Loan Claims pursuant to the terms hereof.

(g)     In the event that (A) all Letters of Credit are terminated or returned to the Issuing Bank for cancellation and all of the un-reimbursed obligations in respect of the Letters of Credit are paid and satisfied in full in cash (or other consideration acceptable to the Revolving Loan Secured Parties) after purchase by the Purchasing Creditors of the Revolving Loan Claims, the Agent, on behalf of the Revolving Loan Secured Parties, shall return to such Purchasing Creditors any remaining cash collateral referred to in Section 1(b)(y) of this Schedule 1.03 to the Agreement and (B) all Asserted Indemnification Claims are (x) waived, dismissed or otherwise cease to exist to the reasonable satisfaction of the Agent, or (y) paid and satisfied in full in cash (or other consideration acceptable to the Revolving Loan Secured Parties) after the purchase by the Purchasing Creditors of the Revolving Loan Claims, the Agent, on behalf of the Revolving Loan Secured Parties, shall return to such Purchasing Creditors any remaining cash collateral referred to in Section 1(b)(x) of this Schedule 1.03 to the Agreement.

(h)     Anything contained in this Section 1 of Schedule 1.3 of the Agreement to the contrary notwithstanding, each Term Secured Party agrees that no Term Secured Party shall have the right to exercise the purchase option set forth in this Section 1 of Schedule 1.3 unless, simultaneously with the consummation of such purchase on the Purchase Date, the "Purchasing Creditors" (as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) purchase 100% of the "Revolving Loan Claims" (as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) in accordance with Section 1 of Schedule 1.3 to the Pre-Petition Credit Agreement.

2.     **Purchase Option with Respect to the Term Loan**.

(a)     If any Purchase Option Event shall occur, the Revolving Lenders shall have the opportunity to purchase all (but not less than all) of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement; provided, that such option shall expire if the applicable Revolving Lenders fail to deliver a written notice (a "**Term Purchase Notice**") to the Term Agent within ten (10) days following the first date the Agent obtains knowledge of the occurrence of a Purchase Option Event, which Term Purchase Notice shall (A) be signed by the applicable Revolving Lenders committing to such purchase (the "**Term Purchasing Creditors**") and indicate the percentage of the Term Loan Claims to be purchased by each Term Purchasing Creditor (which aggregate commitments must add up to 100% of the Term Loan Claims) and (B) state that (1) it is a Term Purchase Notice delivered pursuant to this Section 2 of Schedule 1.03 to the Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Term Purchase Notice by the Term Agent, the Term Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10)

7143386v10

days after the Term Purchase Notice was received by the Term Agent (such ten (10) day period, the "**Term Purchase Period**") to purchase all (but not less than all) of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement (the date of such purchase, the "**Term Purchase Date**").

(b)     On the Term Purchase Date, the Term Secured Parties shall, subject to any required approval of any Governmental Authority, in each case then in effect, if any, sell to the Term Purchasing Creditors all (but not less than all) of the Term Loan Claims. On such Term Purchase Date, the Term Purchasing Creditors shall (i) pay to the Term Agent, for the benefit of the applicable Term Secured Parties, as directed by the Term Agent, in immediately available funds the full amount (at par) of all Term Loan Claims then outstanding together with all accrued and unpaid interest and fees thereon (excluding any prepayment fee, prepayment premium or early termination fee not then due under the Loan Documents other than as provided below), all in the amounts specified by the Term Agent and determined in good faith in accordance with the Loan Documents or other applicable documents. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the Term Agent (for the benefit of the applicable Term Secured Parties) as the Term Agent shall have specified in writing to the Agent. Interest and fees shall be calculated to but excluding the Term Purchase Date if the amounts so paid by the applicable Term Purchasing Creditors to the bank account designated by the Term Agent are received in such bank account prior to 1:00 p.m., Eastern time, and interest shall be calculated to and including such Term Purchase Date if the amounts so paid by the Term Purchasing Creditors to the bank account designated by the Term Agent are received in such bank account after 1:00 p.m., Eastern time.

(c)     Any purchase pursuant to the purchase option set forth in this Section 2 to Schedule 1.03 to the Agreement shall, except as provided below, be expressly made without representation or warranty of any kind by the Term Secured Parties as to the Term Loan Claims, the Collateral or otherwise, and without recourse to the Term Secured Parties as to the Term Loan Claims, the Collateral or otherwise, except that the Term Agent and each Term Secured Party, as to itself only, shall represent and warrant only as to (i) the principal amount of the Term Loan Claims sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Term Loan Claims being sold by it, and (iii) that such Person has the right to assign the Term Loan Claims being assigned by it and its assignment agreement has been duly authorized by it.

(d)     In connection with any purchase of Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement, each Term Secured Party agrees to enter into and deliver to the Term Purchasing Creditors on the Term Purchase Date, as a condition to closing, an assignment agreement in a form reasonably acceptable to the Agent and the Term Agent and, at the expense of the Loan Parties, each of the Term Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock

- 5 -

powers or note powers), then in such Term Secured Party's possession or in the possession of its agent or bailee (if any), or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Term Secured Party or its agent or bailee then has control, as the case may be, to any Person designated by the Agent to act as the successor Term Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to any Person designated by the Agent to act as the successor Term Agent. Upon the consummation of the purchase of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement, the Term Agent shall be deemed to have resigned as an "agent" (or any similar role) for the Term Lenders under the Loan Documents; provided that the Term Agent (and all other agents under the Agreement) shall be entitled to all of the rights and benefits of a former "agent", if any, under the Agreement.

(e)     Notwithstanding the foregoing purchase of the Term Loan Claims by the Term Purchasing Creditors, the Term Secured Parties shall retain, on an unsecured basis, those contingent indemnification obligations and other obligations under the Loan Documents which by their express terms would survive any repayment of the Term Loan Claims.

(f)     Anything contained in this Section 2 of Schedule 1.03 to the Agreement to the contrary notwithstanding, in the event that any Term Purchasing Creditor receives any prepayment fee, prepayment premium or early termination fee under the Loan Documents (as in effect on the date hereof), or otherwise, in cash, within 180 days following the Term Purchase Date, then such Term Purchasing Creditor shall pay a supplemental purchase price in respect of its purchase of the Term Loan Claims under this Section 2 of Schedule 1.03 to the Agreement in an amount equal to the portion of such prepayment premium to which the Term Secured Parties would have otherwise been entitled had the purchase under this Section 2 of Schedule 1.03 to the Agreement not occurred. The Term Purchasing Creditors agree not to amend or waive the terms of the Loan Documents as in effect on the Term Purchase Date in respect of any prepayment fee, prepayment premium or early termination fee contained therein following or assign any rights to such prepayment fee, prepayment premium or early termination fee following any purchase by the Term Purchasing Creditors of the Term Loan Claims pursuant to the terms hereof.

(g)     In the event that a Term Purchase Notice and a Purchase Notice are both delivered within the applicable required time periods set forth in Sections 1 and 2 of this Schedule 1.03 to the Agreement, the Term Purchase Notice shall receive priority and a Term Purchase Period shall be deemed to have commenced in accordance with the terms set forth in Section 2(a) of this Schedule 1.03 to the Agreement, such that the right to exercise the purchase option with respect to any other Secured Party's Obligations (as applicable) shall vest solely in the Term Purchasing Creditors pursuant to the terms set forth in this Section 2 of

7143386v10

Schedule 1.03 of the Agreement and the Purchase Notice that shall have been delivered shall be deemed null and void and of no force and effect.

3.   **Insolvency Proceedings**.

    (a)    General Application. The terms set forth in this Schedule 1.03 to the Agreement shall be applicable to the Chapter 11 Case and all converted or succeeding cases in respect thereof, and all references herein to any Borrower or other Loan Party shall be deemed to apply to the trustee for any such Borrower or Loan Party and such Borrower or Loan Party as a debtor-in-possession. The relative rights of the Secured Parties in or to any distributions from or in respect of any Collateral or proceeds of Collateral shall continue after the institution of any case under any Debtor Relief Law, including without limitation, the Chapter 11 Case, involving any Borrower or any other Loan Party, including without limitation, all converted or succeeding cases in respect thereof, on the same basis as prior to the date of such institution, subject to any court order approving the financing of, or use of cash collateral by, any Borrower or any other Loan Party as debtor-in-possession.

    (b)    Reserved.

    (c)    Relief from Stay. Each Term Secured Party agrees not to (i) seek (or support any other person seeking) relief from the automatic stay or any other stay in any case under Debtor Relief Law in respect of the Collateral, without the prior written consent of the Agent, or (ii) oppose any request by the Agent or any Revolving Lender to seek relief from the automatic stay or any other stay in any case under Debtor Relief Law in respect of the Collateral.

    (d)    Reorganization Securities. Notwithstanding anything herein to the contrary, Term Secured Parties may receive and retain Permitted Reorganization Securities under a confirmed plan of reorganization or similar dispositive restructuring plan (each, a "**Plan**") if the Revolving Loan Secured Parties have received Debt Reorganization Securities or other consideration acceptable to the Revolving Loan Secured Parties in their sole discretion of a value determined by the Agent as of the effective date of a Plan equal to the allowed amount of the Revolving Loan Secured Claims as determined by the Agent. Each Term Secured Party hereby agrees that such Term Secured Party shall not propose or support any Plan that is inconsistent with the priorities set forth in the Agreement (including this Schedule 1.03).

4.   **Release of Liens and Collateral**. Notwithstanding Section 10.01 of the Agreement or anything else to the contrary in the Agreement, the Term Agent on behalf of itself and each Term Secured Party, agrees in its capacity as a secured creditor that neither it nor they will raise any objection to, or oppose, and shall be deemed to have consented to any private or public sale of all or any portion of the Collateral (and any post-petition or post-filing assets subject (whether conducted by the Agent or a Loan Party with the consent of the Agent) to adequate protection Liens or comparable Liens under any Debtor Relief

7143386v10

Law in favor of the Agent) free and clear of any Liens and other claims (a) at any time after the occurrence and during the continuance of an Event of Default under the Agreement and with the consent of the Agent; provided, however that after the occurrence and during the continuance of an Event of Default under the Agreement and prior to the commencement of any case under Debtor Relief Law (including without limitation, the Chapter 11 Case), any (x) material sale of Inventory not in the ordinary course of business shall be conducted by a nationally recognized liquidator of recognized standing approved by the Agent and (y) sale of all or substantially all of the Borrowers' assets and businesses as a "going concern" shall be (1) conducted on not less than 10 days' prior written notice to the Term Agent, and (2) in no event shall the purchaser in such going concern sale be any Loan Party or any of their respective Affiliates, (b) under Section 363 of the Bankruptcy Code or other similar Debtor Relief Law if the Agent has consented to such sale or disposition of such Collateral, and in connection with each of the foregoing clauses (a) and (b) herein above, each Term Secured Party hereby irrevocably authorizes the Agent to release any Lien on any of the Collateral; provided that, (i) any Lien of the Agent on such Collateral attaches to the net cash proceeds of such sale or other disposition and (ii) such net cash proceeds are applied to repayment of the Obligations in accordance with <u>Section 8.03</u> of the Agreement. Notwithstanding the foregoing, after the commencement of a case under Debtor Relief Law (including without limitation, the Chapter 11 Case) any Term Secured Party may raise any objections to any such sale or disposition of assets that could be raised by any other creditor of the applicable Loan Party whose claims are not secured by any Liens on the Collateral; provided, that such objections are not based on their status as secured creditors (without limiting the foregoing, no Term Secured Party may raise any objection based on the rights afforded by Section 363(e) and (f) of the Bankruptcy Code to secured creditors with respect to Liens granted to the Agent in respect of such assets or on the basis of any rights of the Term Secured Parties as a secured creditor, if any, whether directly or indirectly, with respect to the Liens held for their benefit by the Agent).

5.  **<u>Reserves; Discretionary Rights; Calculation of the Borrowing Base; Permitted Overadvances and Assignments</u>**.

    (a)   As among the Lenders, the Agent and the Term Agent, nothing contained herein shall limit, restrict or impair the discretionary rights and ability of the Agent to impose or establish any and all Reserves and to thereafter reduce or eliminate such Reserves or to determine the eligibility of Collateral for inclusion in the calculation of the Revolving Borrowing Base or Term Loan Borrowing Base (or any component definition thereof). With respect to all Reserves in effect on the Closing Date, the Agent agrees (unless the Term Agent otherwise agrees) to impose a methodology no less restrictive than that used as of the Closing Date in determining such Reserves (and, for the avoidance of doubt, it being understood that notwithstanding the preservation of a methodology that is no less restrictive, the Dollar amount of such Reserves may fluctuate from time to time after the Closing Date). The Agent, unless otherwise agreed by the Term Agent, shall implement and maintain the Term Loan Push Down Reserve, the Sale Lease Back Reserve and the Carve-Out Reserve, if any, in accordance with the terms and

- 8 -

conditions of the Agreement. With respect to other Reserves implemented after the Closing Date, prior to the reduction or termination of such Reserve, the Agent shall consult with the Term Agent at least two (2) Business Days prior to such reduction or termination, provided further that if Wells Fargo or one of its Affiliates is no longer the Agent the successor Agent shall not remove or decrease any Reserve imposed after the Closing Date unless (i) the circumstance which gave rise to such Reserve no longer exists or (ii) the reduction is due to mathematical calculations in the amount of such Reserve, without the consent of the Term Agent which consent shall not be unreasonably withheld or delayed.

(b)     Each of the parties hereto agrees that (i) in all cases, the determination of the Revolving Borrowing Base (and all component definitions thereof), the Term Loan Borrowing Base (and all component definitions thereof), the Permitted Overadvances (and all component definitions thereof) shall be based upon the most recent Borrowing Base Certificate received by the Agent pursuant to the Agreement prior to the funding of any Committed Revolving Loan, Swing Line Loan or the issuance, renewal or amendment of a Letter of Credit (it being understood and agreed that the use of cash collateral in any case under any Debtor Relief Law (including, without limitation, the Chapter 11 Case) shall not constitute a funding of a Loan or other advance) and (ii) the Agent shall have a two (2) Business Day period of time to implement such Borrowing Base Certificate.

(c)     Reserved.

(d)     Notwithstanding anything contained in the Agreement to the contrary, if at any time Wells Fargo or its Affiliate is not the Agent, the amount of the Permitted Overadvances permitted by clause (b)(ii) of the definition thereof shall be equal to one (1%) percent of the Revolving Borrowing Base.

(e)     Notwithstanding Section 10.06(b)(iii)(E) of the Agreement, the consent of the Agent shall not be required in connection with the assignment of the Term Loan (or any portion thereof ) at any time Wells Fargo or its Affiliate (i) is not the Agent; and (ii) does not hold more than fifty (50%) percent of (x) the Aggregate Revolving Commitments or (y) if the Aggregate Revolving Commitments have been terminated, the Total Outstandings.

6.     **Exercise of Remedies**.  Upon the satisfaction of the Directed Enforcement Conditions, the Term Agent may direct the Agent to (and the Agent shall, upon such direction), commence and diligently pursue in good faith the exercise of the Agent's enforcement rights or remedies against, and take action to enforce its Liens on, the Collateral, to the extent that the Agent is permitted to exercise such rights and remedies by the terms of the Loan Documents and/or under applicable law; provided that, in the case of each of the foregoing, (a) in the good faith determination of the Agent, taking such enforcement action is permitted under the terms of the Loan Documents and applicable law, (b) in the good faith determination of the Agent, taking such enforcement action will not result in any liability of the Agent or the Lenders to any Loan Party or any other Person, and

- 9 -

(c) the Agent shall be entitled to all of the benefits of <u>Sections 9.03, 9.05, 9.14 and 10.04</u> of the Agreement in connection with taking such enforcement action.

7.  **Credit Bid**.  Each of the parties hereto hereby agrees that the Term Agent on behalf of itself and the other Term Secured Parties may direct the Agent to, on behalf of the Term Secured Parties, credit bid the Term Loan Claims in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of any other Debtor Relief Law), and the Agent agrees to take such direction from the Term Agent and not object thereto, in each case so long as the Revolving Loan Claims (together with all "Revolving Loan Claims" as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) shall be paid in full in cash upon the effectiveness of any such sale under Section 363 of the Bankruptcy Code. In addition, the Agent on behalf of itself and the other Revolving Loan Secured Parties may credit bid the Revolving Loan Claims in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Law) and the Term Secured Parties agree not to object to such credit bid, so long as such credit bid does not exceed the amount of the obligations consisting of the Revolving Loan Claims (it being acknowledged and agreed that, in connection therewith, the Agent may also credit bid any "Revolving Loan Claims" as defined in Schedule 1.3 to the Pre-Petition Credit Agreement).  The parties hereto agree that in the event the Agent takes any action to credit bid the Term Loan Claims upon the direction of the Term Agent on behalf of itself and the other Term Loan Secured Parties, that the Agent shall be entitled to all of the benefits of <u>Sections 9.03, 9.14 and 10.04</u> of the Agreement in connection with such action.

8.  **Standing**.  The Agent and the other Revolving Secured Parties each agree that, in any case under Debtor Relief Law (including, without limitation, the Chapter 11 Case), the Term Secured Parties shall have standing to take any action not expressly prohibited hereunder or otherwise inconsistent herewith, and in furtherance thereof, that in connection with any case under Debtor Relief Law (including, without limitation, the Chapter 11 Case), the Agent shall not, on its behalf or on behalf of the Required Lenders, raise any objection on the grounds of a lack of standing of the Term Secured Parties (other than to the extent such action is expressly prohibited hereunder or otherwise inconsistent herewith) (a) in the assertion by the Term Secured Parties of any rights or remedies available to unsecured creditors (including, without limitation, the right to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Loan Parties arising under the Loan Documents, any case under Debtor Relief Law or applicable non-bankruptcy law), (b) under Section 4 of this Schedule 1.03 to the Agreement, and (c) to vote on any plan of reorganization, arrangement or compromise or any proposal, file any proof of claim, make other filings and make any arguments and motions in any case under Debtor Relief Law.  In the event that any Term Secured Party or the Term Agent becomes a judgment lien creditor in respect of any Collateral securing the Obligations as a result of the enforcement of its rights as an unsecured creditor, such judgment lien shall be subordinated to any Lien on such Collateral securing the Revolving Loan Claims on the same basis and to the same extent as the Liens on the Collateral of the Agent securing the Term Loan Claims are subordinated (including with respect to the Proceeds thereof being subject to <u>Sections</u>

2.05 and 8.03 to those Liens securing the Revolving Loan Claims under the Agreement and this Schedule 1.03 to the Agreement.

9.    **Avoidance; Reinstatement of Obligations; Clawback**.    If a Revolving Loan Secured Party or a Term Secured Party received payment or property on account of a Revolving Loan Claim or Term Loan Claim, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside or otherwise required to be transferred to a trustee, receiver or the estate of any Loan Party (in each instance, to the extent required by law, a "**Recovery**"), then, to the extent of the Recovery, the Revolving Loan Secured Parties or the Term Secured Parties intended to have been satisfied by the payment will be reinstated as the Revolving Loan Claims or the Term Loan Claims, as applicable, on the date of Recovery, and no payment with respect to, or discharge of the Revolving Loan Claims or the Term Loan Claims, as applicable, will be deemed to have occurred for all purposes hereunder.    If the Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Loan Parties from the date of reinstatement.    Upon such reinstatement of the Obligations, each Term Secured Party will deliver to the Agent on behalf of each Revolving Loan Secured Party any Collateral or proceeds thereof received between the payment or discharge of the Obligations to effect the reinstatement required pursuant to the terms hereof.    No Term Secured Party may benefit from a Recovery, and subject to Section 3(d) of this Schedule 1.03 to the Agreement with respect to any Term Secured Party's receipt of any Permitted Reorganization Securities, any distribution made to a Term Secured Party as a result of a Recovery will be paid over to the Agent for application to the Revolving Loan Claims in accordance with Section 8.03 of the Agreement.

If in connection with any Permitted Sale under clause (ii) of the definition thereof, the agent under any agency agreement with respect to such Permitted Sale is entitled to recover from the Agent or any Lender any amounts paid by such agent in accordance with any agency agreement (a "**Clawback**"), the Term Lender acknowledges and agrees that it shall be responsible for refunding such amounts up to the amount of any payments received by the Term Lender with respect to the Term Loan as of the date of such Clawback.

10.    **Resignation of Agent**

Upon irrevocable payment in full of the Total Revolving Outstandings  and the Total Revolving Outstandings  under the Pre-Petition Credit Agreement, in each case, in accordance with the terms of this Agreement and the pre-Petition Credit Agreement, as applicable : (i) Wells Fargo shall be deemed to have resigned as the Agent and the Term Agent shall be deemed to be the successor Agent for all purposes, in each case, without any action by any party hereto; (ii) the Term Agent shall receive any further agency fees for acting as Agent under the Loan Documents; (iii) the Loan Parties hereby waive any notice requirement provided for under the Loan Documents in respect of such automatic resignation or appointment; (iv) the Borrower hereby consents to such automatic appointment of the Term Agent as successor Agent; (v) the Term Agent hereby accepts

- 11 -

such automatic appointment; (vi) each party hereto agrees to execute any documentation reasonably necessary to evidence such succession (provided that the Term Agent shall bear no responsibility for any actions taken or omitted to be taken by the Wells Fargo); (viii) the parties hereto acknowledge and agree that the Term Agent shall bear no responsibility for any actions taken or omitted to be taken by the Wells Fargo; (ix) the parties hereto hereby confirm that the Term Agent would succeed to the rights and obligations of the Administrative Agent and shall become vested with all of the rights, powers, privileges and duties of the Administrative Agent under each of the Loan Documents, and Wells Fargo will be discharged from all of its duties and obligations as Administrative Agent; and (xi) Wells Fargo shall continue to be entitled to the provisions of Section 9.14 and 10.04 of the Agreement. Immediately upon the occurrence of a Recovery with respect to a Revolving Loan Secured Party Wells Fargo shall automatically and without further action of any party be deemed to be the Agent hereunder for all purposes and the Term Agent shall automatically be deemed to have resigned as Agent, in such case Well Fargo shall have no responsibility for any actions taken or omitted to be taken by the Term Agent.

11. **Amendments to this Schedule 1.03 to the Agreement; Third Party Beneficiaries**.

(a)     No amendment or waiver of the specific terms set forth in this Schedule 1.03 to the Agreement, nor any consent to any departure by any of the Agent, the Revolving Loan Secured Parties, the Term Agent or the Term Secured Parties shall be effective, unless it is in a written agreement executed by the Agent and the Term Agent and then such waiver or consent shall only be effective in the specific instance and for the specific purpose for which given; provided that such amendment or agreement solely with respect to this Schedule 1.03 to the Agreement as between the Agent and the Term Agent shall not operate to modify or amend any provision of the Agreement, unless any Borrower otherwise agrees.

(b)     The terms set forth on this Schedule 1.03 to the Agreement are solely for the benefit of the Revolving Loan Secured Parties and the Term Secured Parties. No other Person (including any Loan Party, any Subsidiary of any Loan Party or any Affiliate of any Loan Party) shall be deemed to be a third party beneficiary of the terms set forth in this Schedule 1.03 to the Agreement.

*[Remainder of Page Intentionally Left Blank.]*

## Definitions for Purposes of Schedule 1.03 to the Agreement

Unless otherwise defined in Schedule 1.03 or herein, terms used in this Schedule 1.03 or herein shall have the meaning ascribed to such terms in the Agreement. In addition, as used in Schedule 1.03 or herein the following terms shall have the following meanings:

"Agent Determinations" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Asserted Indemnification Claim" shall mean any matters or circumstances for which notice has been furnished to, demand has been made upon, or asserted against the applicable Agent or any Secured Party, whether in writing or threatened orally, that the applicable Agent has determined could reasonably be expected to result in direct or actual damages and expenses to the applicable Agent or any applicable Secured Party and which are subject to indemnification by the Loan Parties pursuant to the terms of the Agreement.

"Collateral Enforcement Action" shall mean any of (i) the date of termination of the Commitments or acceleration pursuant to Section 8.02 or the Maturity Date (ii) the taking of any action to enforce or realize upon any Lien with respect to a material portion of the Collateral, including without limitation, the institution or conduct of any private or judicial foreclosure or sale proceedings or the noticing of any public or private sale or other disposition pursuant to Article 9 of the UCC in each case with respect to a material portion of the Collateral, or (iii) the sale or disposition of all or substantially all of the Collateral.

"Debt Reorganization Securities" means Reorganization Securities that consist of debt obligations of the reorganized debtor.

"Directed Enforcement Conditions" shall mean, each of the following conditions: (a) an Event of Default has occurred and is continuing under the Agreement and such Event of Default has not been waived by the Agent or the Required Lenders in accordance with the terms of the Agreement or this Schedule 1.03 to the Agreement, (b) the Inaction Period shall have expired, and (c) the Agent shall not have commenced and be diligently pursuing in good faith the exercise of its enforcement rights and remedies against all or a material portion of the Collateral (including, without limitation, any action to enforce its Liens on the Collateral) pursuant to, and in accordance with the terms of the Agreement and the other Loan Documents.

"Inaction Period" shall mean the period of time commencing upon the date of the Agent's receipt of a written notice (in accordance with the notice provisions in the Agreement) from the Term Agent that an Event of Default has occurred and is continuing under the Agreement and has not been waived in accordance with the terms of this Agreement or this Schedule 1.03 to the Agreement and ending on the date which is (a) so long as Wells Fargo or its Affiliate is the Agent, sixty (60) days or (b) any other time, thirty (30) days, in each case after the date of receipt of such notice; provided that such Inaction Period shall be tolled for any period that the Secured Parties are stayed or otherwise prohibited by law or court order from exercising remedies with respect to the Collateral. Such written notice from the Term Agent to the Agent shall reference the Agreement and declare that the "Inaction Period" has commenced.

"Material Portion" shall mean Collateral with an aggregate book value as set forth in the Borrowers' ledger as determined from time to time in accordance with an independent appraisal satisfactory to the Agent exceeding an amount equal to fifty percent (50%) of the book value of the Collateral immediately prior to such sale.

"Non-Debt Reorganization Securities" means Reorganization Securities which are not Debt Reorganization Securities.

"Permitted Reorganization Securities" means (a) Debt Reorganization Securities that are subject to an intercreditor agreement or agreement among lenders that is substantially consistent with the terms and substance of this Agreement (including, this Schedule 1.03 to the Agreement and Section 10.01 of the Credit Agreement), and (b) Non-Debt Reorganization Securities.

"Plan" has the meaning set forth in Section 3(d) of this Schedule 1.03 to the Agreement.

"Purchase Date" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Notice" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Option Event" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Period" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchasing Creditors" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Recovery" has the meaning set forth in Section 9 of this Schedule 1.03 to the Agreement.

"Reorganization Securities" means any notes, equity interests, or other securities (whether debt, equity, or otherwise) issued by a reorganized debtor that are distributed pursuant to a Plan on account of the Obligations in any case under any Debtor Relief Law of a Loan Party (including, without limitation, the Chapter 11 Case).

"Revolving Loan Claims" shall mean any and all Obligations owing by any Loan Party to any of the Revolving Secured Parties arising under the Loan Documents or any agreement with respect to Bank Products or any Cash Management Services, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law.

"Revolving Loan Purchase Option Event" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

7143386v10

"Revolving Loan Secured Claims" shall mean any portion of the Revolving Loan Claims that would not be an unsecured claim under Section 506(a) of the Bankruptcy Code (or any similar provision of other Debtor Relief Law) assuming that the Revolving Loan Claims are secured by Liens on the Collateral that are prior to the Liens securing the Term Loan Secured Claims.

"Revolving Loan Secured Parties" shall mean, collectively, (a) the Agent, (b) the Revolving Lenders, (c) Swing Line Lender, (d) the Issuing Bank, (e) the Agent, any Revolving Lender or any of their Affiliates who provide Cash Management Services or Bank Products.

"Sale" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Secured Parties" shall mean (x) Revolving Loan Secured Parties, and (y) Term Secured Parties as applicable.

"Term Loan Claims" shall mean all Obligations owing by any Loan Party to any of the Term Secured Parties arising under the Loan Documents.

"Term Loan Secured Claims" shall mean any portion of the Term Loan Claims that would not be an unsecured claim under Section 506(a) of the Bankruptcy Code (or any similar provision of other Debtor Relief Law) assuming that the Revolving Loan Claims are secured by Liens on the Collateral that are prior to the Liens securing the Term Loan Claims.

"Term Purchasing Creditors" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Date" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Notice" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Period" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Secured Parties" shall mean the Term Agent and the Term Lenders.

7143386v10

February 2, 2016

Hancock Fabrics, Inc.
One Fashion Way
Baldwyn, MS 38824

Debtor-In-Possession Credit Agreement

<u>WELLS FARGO FEE LETTER</u>

Ladies and Gentlemen:

Reference is made to the Debtor-In-Possession Credit Agreement dated as of February 2, 2016 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "<u>Credit Agreement</u>"), by and among (i) Hancock Fabrics, Inc., a Delaware corporation, for itself and as Lead Borrower (in such capacity, the "<u>Lead Borrower</u>") for the other Borrowers party thereto from time to time (individually, a "<u>Borrower</u>" and, collectively, the "<u>Borrowers</u>"), (ii) the Borrowers party thereto from time to time, (iii) the Guarantors party thereto from time to time, (iv) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "<u>Agent</u>") for its own benefit and the benefit of the other Credit Parties referred to therein, (v) Wells Fargo Bank, National Association, as Swing Line Lender, (vi) GACP Finance Co., LLC, as term agent (in such capacity, the "<u>Term Agent</u>"), and (vii) the lenders from time to time party thereto (individually, a "<u>Lender</u>" and, collectively, the "<u>Lenders</u>"). All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

This letter is the "Wells Fargo Fee Letter" referred to in the Credit Agreement. In connection with, and in consideration of the agreements contained in, the Credit Agreement and the other Loan Documents, the Lead Borrower, on behalf of itself and the other Borrowers, and the Agent hereby agree as follows:

1. <u>DIP Closing Fee</u>. The Borrowers shall pay to the Agent for the account of the Revolving Lenders, a closing fee in the amount of $800,000 (the "<u>DIP Closing Fee</u>"), which shall be fully earned by the Agent from the Borrowers on the Closing Date. $400,000 of the DIP Closing Fee shall be due and payable in full by the Borrowers to the Agent on the Closing Date and the remaining $400,000 shall be due and payable in full by the Borrowers to the Agent upon the earlier of (a) March 18, 2016 and (b) upon the consummation of a Permitted Sale, <u>provided</u>, that the payment of such remaining $400,000 shall be waived in the event that each of the following conditions have been satisfied on or prior to March 18, 2016: irrevocable payment in full in cash of (i) the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) plus all interest on and fees related thereto, (ii) the Total Revolving Outstandings, and all interest accrued and unpaid thereon, and (iii) any other Obligations related to the foregoing.

2. <u>Collateral Monitoring Fee</u>.  The Borrowers shall pay a collateral monitoring fee of $25,000 per annum, payable to the Agent in advance on the Closing Date and annually on the first day of the month following each anniversary thereof for so long as any obligation shall be outstanding under the Credit Agreement or the other Loan Documents or any Lender shall have any commitment thereunder. The Collateral Monitoring Fee shall be fully earned on the Closing Date and payable in accordance with the terms hereof.

3. <u>Revolver Early Termination Fee</u>.  The Borrowers hereby acknowledge and agree that, (a) the Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter (as defined in the Pre-Petition Credit Agreement)) in the amount of $2,000,000 (the "<u>Revolver Early Termination Fee</u>") is fully earned, due and payable and (b) prior to the Petition Date, the Borrowers shall be deemed to have paid to the Pre-Petition Agent for the account of each Revolving Lender (as defined in the Pre-Petition Credit Agreement), the Revolver Early Termination Fee from the proceeds of a Committed Revolving Loan (as defined in the Pre-Petition Credit Agreement) made by the Pre-Petition Agent pursuant to Section 2.02(d) of the Pre-Petition Credit Agreement. The Pre-Petition Agent, on behalf of itself and each Revolving Lender (as defined in the Pre-Petition Credit Agreement), hereby agrees that, on and as of the date of the entry of the Final Financing Order satisfying the conditions below, the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) shall be reduced by $750,000 of such Revolver Early Termination Fee in the event that each of the following conditions have been satisfied (as determined by the Pre-Petition Agent) on or prior to March 5, 2016:  (x) the entry by the Bankruptcy Court of the Final Financing Order, (y) the irrevocable payment in full in cash of the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) (which may occur pursuant to the roll up of the Pre-Petition Committed Revolving Loans and Letters of Credit into the Obligations under the Credit Agreement) plus all interest on and fees related thereto, and (z) pursuant to such Final Financing Order, the Borrowers and any Committee (as defined in the Final Financing Order) shall (A) agree that any and all Challenges (as defined in the Final Financing Order) shall be deemed to be forever waived, released and barred, (B) agree that all findings, Debtors' Stipulations (as defined in the Final Financing Order), waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Senior Creditors' (as defined in the Final Financing Order) claims, liens, and interests shall be of full force and effect and forever binding upon the Borrowers, the Borrowers' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Cases and any Successor Cases (each as defined in the Interim Financing Order or the Final Financing Order, as applicable); (C) agree that any and all claims or causes of action against any of the Borrowers or the Prepetition Senior Creditors relating in any way to the Borrowers or the Prepetition Senior Credit Documents (as defined in the Final Financing Order) shall be forever waived and released by the Borrowers' estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases; and (D) release, discharge and acquit the Agent and each other Credit Party and their affiliates, directors, agents and employees and their respective assigns, from all obligations to the Loan Parties (and their respective successors and assigns) and from any and all claims, demands, debts, accounts contracts, liabilities, actions and

Wells Fargo Bank, National Association, as Agent
Page 3

causes of actions, whether in law or in equity, arising out of any action taken in connection with the Credit Agreement and the other Loan Documents.

4. <u>General</u>. All fees payable under this Wells Fargo Fee Letter constitute compensation for services rendered and do not constitute interest or a charge for the use of money. Except as expressly provided herein, all fees payable hereunder will be paid in immediately available funds, shall be non-refundable in all circumstances, and shall not be subject to any rebate or reduction by way of setoff or counterclaim. All fees received by the Agent for the Agent's benefit hereunder may be shared among the Agent and its affiliates as it may determine in its sole discretion.

Prior to the filing of the Chapter 11 Case, the Borrowers agree to keep the terms of this Wells Fargo Fee Letter confidential and not to disclose the same to any other person, without the prior written consent of the Agent, other than to (a) Borrowers' officers, directors, employees, accountants, attorneys, and other advisors, agents and representatives, and then only on a confidential basis in connection with the transactions contemplated hereby (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of the terms of this Wells Fargo Fee Letter and instructed to keep such terms confidential, and the Borrowers shall be responsible for any breach of such confidentiality by any person described in this clause (a), and (b) as required by applicable laws or compulsory legal process (in which case Borrowers agree, to the extent permitted, to inform the Agent promptly thereof). Notwithstanding the foregoing, in connection with the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, the Borrowers may disclose the amounts of the fees herein, terms of this letter and parties hereto to the parties in interest in the Chapter 11 Case and to the Bankruptcy Court.

This Wells Fargo Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. **THIS WELLS FARGO FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.** This Wells Fargo Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Wells Fargo Fee Letter by electronic transmission shall be effective as delivery of a manually executed counterpart of this Wells Fargo Fee Letter. Section headings used herein are for convenience of reference only, are not part of this Wells Fargo Fee Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Wells Fargo Fee Letter.

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Wells Fargo Fee Letter shall become a binding agreement between us.

**[SIGNATURE PAGES FOLLOW]**

Very truly yours,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent

By: _____
Name: Joseph Burt
Title: Director

ACCEPTED AND AGREED TO
as of the date first above written:

**HANCOCK FABRICS, INC.**

By: _____

Name:  Dennis Lyons
Title:    Senior Vice President and Chief
           Administrative Officer

**EXECUTION VERSION**

SECURITY AGREEMENT

by

HANCOCK FABRICS, INC.

as Lead Borrower

and

THE OTHER BORROWERS AND GUARANTORS PARTY HERETO
FROM TIME TO TIME

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Collateral Agent

Dated as of February 2, 2016

TABLE OF CONTENTS

Page

PREAMBLE.................................................................................................. 1

RECITALS ................................................................................................... 1

AGREEMENT .............................................................................................. 2

ARTICLE I DEFINITIONS AND INTERPRETATION.

SECTION 1.1.    Definitions.................................................................................2
SECTION 1.2.    Interpretation.............................................................................6
SECTION 1.3.    Information Certificate.............................................................6

ARTICLE II GRANT OF SECURITY AND SECURED OBLIGATIONS.

SECTION 2.1.    Pledge; Grant of Security Interest..........................................7
SECTION 2.2.    Secured Obligations..................................................................8
SECTION 2.3.    Security Interest.. ......................................................................8

ARTICLE III PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES; USE OF
COLLATERAL.

SECTION 3.1.    Delivery of Certificated Securities Collateral...........................9
SECTION 3.2.    Perfection of Uncertificated Securities Collateral.. ................10
SECTION 3.3.    Financing Statements and Other Filings; Maintenance of
                Perfected Security Interest..............................................10
SECTION 3.4.    Other Actions..........................................................................11
SECTION 3.5.    Supplements; Further Assurances............................................13
SECTION 3.6.    Joinder of Additional Grantors.. .............................................13

ARTICLE IV REPRESENTATIONS, WARRANTIES AND COVENANTS.

SECTION 4.1.    Title........................................................................................14
SECTION 4.2.    Limitation on Liens; Defense of Claims; Transferability of
                Collateral.....................................................................14
SECTION 4.3.    Chief Executive Office; Change of Name; Jurisdiction of
                Organization.................................................................14
SECTION 4.4.    Location of Inventory and Equipment.. ...................................15
SECTION 4.5.    Condition and Maintenance of Equipment.. .............................15
SECTION 4.6.    Due Authorization and Issuance.. .............................................15
SECTION 4.7.    No Conflicts, Consents, etc.....................................................16

Page

SECTION 4.8.    Collateral..................................................................................16
SECTION 4.9.    Insurance..................................................................................16
SECTION 4.10.   [Reserved].................................................................................17
SECTION 4.11.   [Reserved].................................................................................17

ARTICLE V CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL.

SECTION 5.1.    Pledge of Additional Securities Collateral...............................17
SECTION 5.2.    Voting Rights; Distributions; etc..............................................17
SECTION 5.3.    Organization Documents. ..........................................................18
SECTION 5.4.    Defaults, Etc...............................................................................18
SECTION 5.5.    Certain Agreements of Grantors As Issuers and Holders of Equity
                Interests..................................................................................18

ARTICLE VI CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY
COLLATERAL.

SECTION 6.1.    Grant of License.........................................................................19
SECTION 6.2.    Registrations. .............................................................................19
SECTION 6.3.    No Violations or Proceedings.....................................................20
SECTION 6.4.    Protection of Collateral Agent's Security..................................20
SECTION 6.5.    After-Acquired Property. ...........................................................21
SECTION 6.6.    Modifications. ............................................................................21
SECTION 6.7.    Litigation....................................................................................21
SECTION 6.8.    Third Party Consents..................................................................22

ARTICLE VII CERTAIN PROVISIONS CONCERNING ACCOUNTS.

SECTION 7.1.    Special Representations and Warranties.....................................22
SECTION 7.2.    Maintenance of Records. ............................................................22
SECTION 7.3.    Legend.........................................................................................23
SECTION 7.4.    Modification of Terms, Etc.........................................................23
SECTION 7.5.    Collection....................................................................................24

ARTICLE VIII REMEDIES.

SECTION 8.1.    Remedies......................................................................................24
SECTION 8.2.    Notice of Sale..............................................................................26
SECTION 8.3.    Waiver of Notice and Claims......................................................26
SECTION 8.4.    Certain Sales of Collateral. .........................................................26
SECTION 8.5.    No Waiver; Cumulative Remedies. .............................................27
SECTION 8.6.    Certain Additional Actions Regarding Intellectual Property..................28
SECTION 8.7.    Application of Proceeds...............................................................28

Page

ARTICLE IX MISCELLANEOUS.

    SECTION 9.1.    Concerning Collateral Agent.. ..................................................28
    SECTION 9.2.    Collateral Agent May Perform; Collateral Agent Appointed
                        Attorney-in-Fact.................................................................29
    SECTION 9.3.    Expenses.. ..................................................................................30
    SECTION 9.4.    Continuing Security Interest; Assignment.................................30
    SECTION 9.5.    Termination; Release.. ................................................................30
    SECTION 9.6.    Modification in Writing.. ...........................................................31
    SECTION 9.7.    Notices.. .....................................................................................31
    SECTION 9.8.    GOVERNING LAW....................................................................32
    SECTION 9.9.    CONSENT TO JURISDICTION; SERVICE OF PROCESS;
                        WAIVER OF JURY TRIAL............................................32
    SECTION 9.10.   Severability of Provisions...........................................................33
    SECTION 9.11.   Execution in Counterparts; Effectiveness...................................33
    SECTION 9.12.   No Release.. ................................................................................33
    SECTION 9.13.   Obligations Absolute.. ................................................................34
    SECTION 9.14.   Credit Agreement and Agreement Among Lenders.. ..............................34

SIGNATURES

EXHIBIT 1         Form of Securities Pledge Amendment
SCHEDULE I      Intercompany Notes
SCHEDULE II     Filings, Registrations and Recordings
SCHEDULE III    Pledged Interests

## SECURITY AGREEMENT

This SECURITY AGREEMENT dated as of February 2, 2016 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Security Agreement"), is made by (i) HANCOCK FABRICS, INC., a Delaware corporation having an office at One Fashion Way, Baldwyn, Mississippi, MS 38824 as lead borrower for itself and the other Borrowers (as defined below) (the "Lead Borrower"), (ii) THE OTHER BORROWERS LISTED ON THE SIGNATURE PAGES HERETO (together with the Lead Borrower, the "Original Borrowers") OR FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Borrowers," and together with the Original Borrowers, the "Borrowers"), and (iii) THE GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO (the "Original Guarantors") AND THE OTHER GUARANTORS FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Guarantors," and together with the Original Guarantor, the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, having an office at One Boston Place, 18th Floor, Boston, Massachusetts 02108, in its capacity as collateral agent for the Credit Parties (as defined in the Credit Agreement defined below) pursuant to the Credit Agreement (as defined below), as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Collateral Agent").

## R E C I T A L S :

A.    The Borrowers, the Guarantors, the Lenders (as defined in the Credit Agreement) from time to time party thereto, the Collateral Agent, Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Administrative Agent") and as Swing Line Lender and GACP Finance Co., LLC, as Term Agent, in connection with the execution and delivery of this Security Agreement, have entered into that certain Debtor-In-Possession Credit Agreement dated as of the date hereof  (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

B.    The Guarantors have, pursuant to that certain Guaranty dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty"), among other things, unconditionally guaranteed the Guaranteed Obligations (as defined in the Guaranty).

C.    The Borrowers and the Guarantors will receive substantial benefits from the execution, delivery and performance of the Obligations and the Guaranteed Obligations (as defined in the Guaranty) and each is, therefore, willing to enter into this Security Agreement.

D.    This Security Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Credit Parties to secure the payment and performance of all of the Secured Obligations (as hereinafter defined).

E.    It is a condition to the obligations of the Lenders to make the Loans under the Credit Agreement and a condition to the Issuing Bank issuing Letters of Credit under the Credit Agreement that each Grantor execute and deliver the applicable Loan Documents, including this Security Agreement.

A G R E E M E N T :

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Collateral Agent hereby agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.    Definitions.

(a)    Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b)    Capitalized terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

(c)    The following terms shall have the following meanings:

"Additional Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Administrative Agent" shall have the meaning assigned to such term in Recital A hereof.

"Avoidance Actions" shall have the meaning assigned to such term in the Interim Financing Order or Final Financing Order, as applicable and then in effect.

"Borrowers" shall have the meaning assigned to such term in the Preamble hereof.

"Claims" shall mean any and all property taxes and other taxes, assessments and special assessments, levies, fees and all governmental charges imposed upon or assessed against, and all claims (including, without limitation, landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law) against, all or any portion of the Collateral.

"Collateral" shall have the meaning assigned to such term in SECTION 2.1 hereof.

2

"Collateral Agent" shall have the meaning assigned to such term in the Preamble hereof.

"Control" shall mean (i) in the case of each DDA, "control," as such term is defined in Section 9-104 of the UCC, and (ii) in the case of any security entitlement, "control," as such term is defined in Section 8-106 of the UCC.

"Control Agreements" shall mean, collectively, the Blocked Account Agreements and the Securities Account Control Agreements.

"Copyrights" shall mean, collectively, with respect to each Grantor, all copyrights (whether statutory or common Law, whether established or registered in the United States or any other country or any political subdivision thereof whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Grantor, in each case, whether now owned or hereafter created or acquired by or assigned to such Grantor, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Distributions" shall mean, collectively, with respect to each Grantor, all Restricted Payments from time to time received, receivable or otherwise distributed to such Grantor in respect of or in exchange for any or all of the Pledged Interests or Intercompany Notes.

"Excluded Property" shall mean the following:

(a)    any license, contract or permit held by any Grantor (i) that validly prohibits the creation by such Grantor of a security interest therein or thereon or (ii) to the extent that applicable Law prohibits the creation of a security interest therein or thereon; and

(b)    any Intellectual Property Collateral consisting of intent-to-use trademark applications, for which the creation by a Grantor of a security interest therein is prohibited without the consent of third party or by applicable Law;

provided, however, that in each case described in clauses (a) and (b) of this definition, such property shall constitute "Excluded Property" only to the extent and for so long as such license, contract, permit, or applicable Law validly prohibits the creation of a Lien on such property in favor of the Collateral Agent and, upon the termination of such prohibition (howsoever occurring), such property shall cease to constitute "Excluded Property"; provided further, that "Excluded Property" shall not include (i) any assets that

3

are of the type that may be eligible for inclusion in the Borrowing Base, or (ii) the right to receive any proceeds arising therefrom or any other rights referred to in Sections 9-406(f), 9-407(a), 9-408(a) or 9-409 of the UCC or any Proceeds, substitutions or replacements of any Excluded Property (unless such Proceeds, substitutions or replacements would otherwise constitute Excluded Property).

"Goodwill" shall mean, collectively, with respect to each Grantor, the goodwill connected with such Grantor's business including, without limitation, (i) all goodwill connected with the use of and symbolized by any of the Intellectual Property Collateral in which such Grantor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any Person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Grantor's business.

"Grantor" shall have the meaning assigned to such term in the Preamble hereof.

"Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Guaranty" shall have the meaning assigned to such term in Recital B hereof.

"Information Certificate" shall mean that certain information certificate dated as of the date hereof, executed and delivered by the Grantors in favor of the Collateral Agent for the benefit of the Credit Parties, and each other Information Certificate (which shall be in form and substance reasonably acceptable to the Collateral Agent) executed and delivered by the applicable Borrower or Guarantor in favor of the Collateral Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of a Joinder executed in accordance with SECTION 3.6 hereof, in each case, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time in accordance with the Credit Agreement.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Licenses and Goodwill associated with the foregoing.

"Intercompany Notes" shall mean, with respect to each Grantor, all intercompany notes described on Schedule I hereto and each intercompany note hereafter acquired by such Grantor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Lead Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"Letters of Credit" unless the context otherwise requires, shall have the meaning given to such term in the UCC.

4

"Licenses" shall mean, collectively, with respect to each Grantor, all license and distribution agreements with any other Person with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Grantor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"Patents" shall mean, collectively, with respect to each Grantor, all patents issued or assigned to and all patent applications made by such Grantor (whether established or registered or recorded in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Pledged Interests" shall mean, collectively, with respect to each Grantor, all Equity Interests owned by such Grantor in any issuer now existing or hereafter acquired or formed, including, without limitation, all such Equity Interests in such issuer described in Schedule III hereof, and all such Equity Interests in any successor corporation or interests or certificates of any successor limited liability company, partnership or other entity formed by or resulting from any consolidation, merger or amalgamation in which any Person listed in Section I of the Information Certificate is not the surviving entity (other than in connection with a Permitted Disposition under the Credit Agreement), together with all rights, privileges, authority and powers of such Grantor relating to such Equity Interests issued by any such issuer or any such successor Person under the Organization Documents of any such issuer or any such successor Person, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Grantor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Grantor in any manner, and all other Investment Property owned by such Grantor that represents intercompany Indebtedness or Equity Interests in any Subsidiary of such Grantor; provided, however, that to the extent applicable, Pledged Interests shall not include any Equity Interests constituting more than 66% of the total combined voting power or control of all classes of Equity Interests entitled to vote of any CFC to the extent such pledge would result in a material adverse tax consequence to such Grantor.

"Secured Obligations" shall mean the Obligations (as defined in the Credit Agreement) and the Guaranteed Obligations (as defined in the Guaranty).

"Securities Account Control Agreement" shall mean an agreement in form and substance satisfactory to the Collateral Agent with respect to any Securities Account of a Grantor.

"Securities Act" means the Securities Exchange Act of 1934 and the applicable regulations promulgated by the Securities and Exchange Commission pursuant to such Act.

"Securities Collateral" shall mean, collectively, the Pledged Interests, the Intercompany Notes and the Distributions.

"Security Agreement" shall have the meaning assigned to such term in the Preamble hereof.

"Trademarks" shall mean, collectively, with respect to each Grantor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URLs), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Grantor and all registrations and applications for the foregoing (whether statutory or common Law and whether established or registered in the United States or any other country or any political subdivision thereof), including, without limitation, the Goodwill associated therewith and the registrations and applications listed in Section III of the Information Certificate, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including, without limitation, damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 (unless expressly stated otherwise); provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

SECTION 1.2.    Interpretation. The rules of interpretation specified in Article I of the Credit Agreement shall be applicable to this Security Agreement.

SECTION 1.3.    Information Certificate. The Collateral Agent and each Grantor agree that the Information Certificate, and all schedules, amendments and supplements thereto are and shall at all times remain a part of this Security Agreement.

6

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.    Pledge; Grant of Security Interest.  As collateral security for the payment and performance in full of all the Secured Obligations, subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), each Grantor hereby pledges, collaterally assigns and grants to the Collateral Agent its successors and permitted assigns, for its benefit and on behalf of and for the ratable benefit of the other Credit Parties, a lien on and security interest in and to all of the right, title and interest of such Grantor in, to and under all personal property and interests in such personal property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "Collateral"), including, without limitation:

      (i)    all Accounts;

      (ii)    all Goods, including Equipment, Inventory and Fixtures;

      (iii)    all Documents, Instruments and Chattel Paper;

      (iv)    all Letters of Credit and Letter-of-Credit Rights;

      (v)    all Securities Collateral;

      (vi)    all Investment Property;

      (vii)    all Intellectual Property Collateral;

      (viii)    all Commercial Tort Claims, including, without limitation, those described in Section IV of the Information Certificate;

      (ix)    all General Intangibles, including, without limitation, payment intangibles;

      (x)    all Deposit Accounts;

      (xi)    all Supporting Obligations;

      (xii)    all money, cash or cash equivalents;

      (xiii)    all credit balances, deposits and other property now or hereafter held or received by or in transit to the Collateral Agent or at any other depository or other institution from or for the account of any Loan Party, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

      (xiv)    all proceeds of leases of real property and all owned real property;

7

(xv)      effective upon the entry of the Final Financing Order, proceeds of all Avoidance Actions;

(xvi)      effective upon the entry of the Final Financing Order, each Grantor's rights under Sections 506(c) and 550 of the Bankruptcy Code;

(xvii)      to the extent not covered by clauses (i) through (xvi) of this sentence, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of any Grantor;

(xviii)      all books, records, and information relating to the Collateral and/or to the operation of any Grantor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xix)      to the extent not covered by clauses (i) through (xviii) of this sentence, all other personal property of such Grantor, whether tangible or intangible and all Proceeds and products of each of the foregoing (including, without limitation, all Proceeds of any Real Estate) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Each category of Collateral set forth above shall have the meaning set forth in the UCC (to the extent such term is defined in the UCC), it being the intention of Grantors that the description of the Collateral set forth above be construed to include the broadest possible range of assets.

Notwithstanding anything to the contrary contained in clauses (i) through (xix) above, the security interest created by this Security Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property, and the Grantors shall from time to time at the request of the Collateral Agent give written notice to the Collateral Agent identifying in reasonable detail the Excluded Property and shall provide to the Collateral Agent such other information regarding the Excluded Property as the Collateral Agent may reasonably request.

SECTION 2.2.    Secured Obligations. This Security Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due of the Secured Obligations.

SECTION 2.3.    Security Interest. (a) Each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including, without limitation, (i) the type of organization and any organizational identification number issued to such Grantor, (ii) a description of the Collateral as "all assets of the Debtor, wherever located, whether now owned or hereafter acquired" and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which

8

such Collateral relates.  Each Grantor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request, to perfect and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(b)     Each Grantor hereby ratifies its prior authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements or amendments thereto relating to the Collateral if filed prior to the date hereof.  Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Security Agreement without the prior written consent of the Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

(c)     Each Grantor hereby further authorizes the Collateral Agent to file filings with the United States Patent and Trademark Office and United States Copyright Office (or any successor office or any similar office in any other country) or other necessary documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by such Grantor hereunder in any Intellectual Property Collateral, without the signature of such Grantor, and naming such Grantor, as debtor, and the Collateral Agent, as secured party.

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF COLLATERAL

SECTION 3.1.     Delivery of Certificated Securities Collateral.  Each Grantor represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the date hereof have been delivered to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and that the Collateral Agent has a perfected first priority security interest therein.  Each Grantor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by such Grantor after the date hereof, shall promptly (and in any event within five (5) Business Days) upon receipt thereof by such Grantor be delivered to and held by or on behalf of the Collateral Agent pursuant hereto.  All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent.  The Collateral Agent shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder.  In addition, the Collateral Agent shall have the right with written notice to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations, accompanied by instruments of transfer or assignment and letters of direction duly executed in blank.

9

SECTION 3.2.    Perfection of Uncertificated Securities Collateral. Each Grantor represents and warrants that the Collateral Agent has a perfected first priority security interest in all uncertificated Pledged Interests pledged by it hereunder that are in existence on the date hereof and that the applicable Organization Documents do not require the consent of the other shareholders, members, partners or other Person to permit the Collateral Agent or its designee to be substituted for the applicable Grantor as a shareholder, member, partner or other equity owner, as applicable, thereto. Each Grantor hereby agrees that if any of the Pledged Interests are at any time not evidenced by certificates of ownership, then each applicable Grantor shall, to the extent permitted by applicable Law and upon the request of the Collateral Agent, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute customary pledge forms or other documents necessary or reasonably requested to complete the pledge and give the Collateral Agent the right to transfer such Pledged Interests under the terms hereof and, provide to the Collateral Agent (for the benefit of the Credit Parties) an opinion of counsel, in form and substance reasonably satisfactory to the Collateral Agent, confirming such pledge and perfection thereof.

SECTION 3.3.    Financing Statements and Other Filings; Maintenance of Perfected Security Interest. Each Grantor represents and warrants that, subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), as of the date hereof, the only filings, registrations and recordings necessary and appropriate to create, preserve, protect, publish notice of and perfect the security interest granted by each Grantor to the Collateral Agent (for the benefit of the Credit Parties) pursuant to this Security Agreement in respect of the Collateral are listed on Schedule II hereto. Each Grantor represents and warrants that all such filings, registrations and recordings have been delivered to the Collateral Agent in completed and, to the extent necessary or appropriate, duly executed form for filing in each governmental, municipal or other office specified in Schedule II. Each Grantor agrees that at the sole cost and expense of the Grantors, (i) such Grantor will maintain the security interest created by this Security Agreement in the Collateral as a perfected first priority security interest and shall defend such security interest against the claims and demands of all Persons (other than with respect to Permitted Encumbrances), (ii) such Grantor shall furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail and (iii) at any time and from time to time, upon the written request of the Collateral Agent, such Grantor shall promptly and duly execute and deliver, and file and have recorded, such further instruments and documents and take such further action as the Collateral Agent may reasonably request, including the filing of any financing statements, continuation statements and other documents (including this Security Agreement) under the UCC (or other applicable Laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Collateral Agent and in such offices (including, without limitation, the United States Patent and Trademark Office and the United States Copyright Office) wherever required by applicable Law in each case to perfect, continue and maintain a valid, enforceable, first priority security interest in the Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against the Grantors and third parties (other than with respect to Permitted Encumbrances), with respect to the Collateral.

10

SECTION 3.4.    Other Actions.  In order to further evidence the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Collateral, each Grantor represents, warrants and agrees, in each case at such Grantor's own expense, with respect to the following Collateral that:

(a)    Instruments and Tangible Chattel Paper.  As of the date hereof, no amount payable under or in connection with any of the Collateral is evidenced by any Instrument or Tangible Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, the Grantor acquiring such Instrument or Tangible Chattel Paper shall promptly endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may reasonably request from time to time.

(b)    Investment Property.

(i)    As of the date hereof (1) it has no Securities Accounts, and (2) it does not hold, own or have any interest in any certificated securities or uncertificated securities other than those constituting Pledged Interests with respect to which the Collateral Agent has a perfected first priority security interest in such Pledged Interests.

(ii)    If any Grantor shall at any time hold or acquire any certificated securities, other than any securities of any CFC not required to be pledged hereunder, such Grantor shall promptly (a) notify the Collateral Agent thereof and endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank, all in form and substance reasonably satisfactory to the Collateral Agent or (b) deliver such securities into a Securities Account with respect to which a Securities Account Control Agreement is in effect in favor of the Collateral Agent.  If any securities now or hereafter acquired by any Grantor, other than any securities of any CFC not required to be pledged hereunder, are uncertificated, such Grantor shall promptly notify the Collateral Agent thereof and pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (a) grant Control to the Collateral Agent and cause the issuer to agree to comply with instructions from the Collateral Agent as to such securities, without further consent of any Grantor or such nominee, (b) cause a security entitlement with respect to such uncertificated security to be held in a Securities Account with respect to which the Collateral Agent has Control or (c) arrange for the Collateral Agent to become the registered owner of the securities. Grantor shall not hereafter establish and maintain any Securities Account with any Securities Intermediary unless (1) the applicable Grantor shall have given the Collateral Agent ten (10) Business Days' prior written notice of its intention to establish such new Securities Account with such Securities Intermediary, (2) such Securities Intermediary shall be reasonably acceptable to the Collateral Agent and (3) such Securities Intermediary and such Grantor shall have duly executed and delivered a Control Agreement with respect to such Securities Account.  Each Grantor shall accept any cash and Investment Property which are proceeds of the Pledged Interests in trust for the benefit of the Collateral Agent and promptly upon receipt thereof, deposit any cash received by it into an account in which the Collateral Agent has Control, or with respect to any Investment Properties or additional securities, take such actions as required above

11

with respect to such securities. No Grantor shall grant control over any Pledged Interests to any Person other than the Collateral Agent.

        (iii)      As between the Collateral Agent and the Grantors, the Grantors shall bear the investment risk with respect to the Investment Property and Pledged Interests, and the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Interests, whether in the possession of, or maintained as a security entitlement or deposit by, or subject to the control of, the Collateral Agent, a Securities Intermediary, any Grantor or any other Person; provided, however, that nothing contained in this SECTION 3.4(b) shall release or relieve any Securities Intermediary of its duties and obligations to the Grantors or any other Person under any Control Agreement or under applicable Law. Each Grantor shall promptly pay all Claims and fees of whatever kind or nature with respect to the Pledged Interests pledged by it under this Security Agreement. In the event any Grantor shall fail to make such payment contemplated in the immediately preceding sentence, the Collateral Agent may do so for the account of such Grantor and the Grantors shall promptly reimburse and indemnify the Collateral Agent for all costs and expenses incurred by the Collateral Agent under this SECTION 3.4(b) and under SECTION 9.3 hereof.

        (c)      <u>Electronic Chattel Paper and Transferable Records</u>. As of the date hereof, no amount payable under or in connection with any of the Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction). If any amount payable under or in connection with any of the Collateral shall be evidenced by any Electronic Chattel Paper or any transferable record, the Grantor acquiring such Electronic Chattel Paper or transferable record shall promptly notify the Collateral Agent thereof and shall take such action as the Collateral Agent may reasonably request to vest in the Collateral Agent control under UCC Section 9-105 of such Electronic Chattel Paper or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Collateral Agent agrees with such Grantor that the Collateral Agent will arrange, pursuant to procedures reasonably satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for the Grantor to make alterations to the Electronic Chattel Paper or transferable record permitted under UCC Section 9-105 or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Grantor with respect to such Electronic Chattel Paper or transferable record.

        (d)      <u>Letter-of-Credit Rights</u>. If such Grantor is at any time a beneficiary under a Letter of Credit, in excess of $100,000 in face amount, now or hereafter issued in favor of such Grantor (which, for the avoidance of doubt, shall not include any Letter of Credit issued pursuant to the Credit Agreement), such Grantor shall promptly notify the Collateral Agent thereof and such Grantor shall, at the request of the Collateral Agent, pursuant to an agreement in form and

substance reasonably satisfactory to the Collateral Agent, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Collateral Agent of, and to pay to the Collateral Agent, the proceeds of any drawing under the Letter of Credit or (ii) arrange for the Collateral Agent to become the beneficiary of such Letter of Credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided in the Credit Agreement.

(e)     Commercial Tort Claims.  As of the date hereof, it holds no Commercial Tort Claims.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim in excess of $250,000 in value, such Grantor shall immediately notify the Collateral Agent in writing signed by such Grantor of the brief details thereof and grant to the Collateral Agent in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.

SECTION 3.5.     Supplements; Further Assurances.  Each Grantor shall take such further actions, and execute and deliver to the Collateral Agent such additional assignments, agreements, supplements, powers and instruments, as the Collateral Agent may in its reasonable judgment deem necessary or appropriate, wherever required by Law, in order to perfect, preserve and protect the security interest in the Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm unto the Collateral Agent or permit the Collateral Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent from time to time upon reasonable request such lists, descriptions and designations of the Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments.  If an Event of Default has occurred and is continuing, the Collateral Agent may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Collateral Agent may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Collateral.  All of the foregoing shall be at the sole cost and expense of the Grantors.  The Grantors and the Collateral Agent acknowledge that this Security Agreement is intended to grant to the Collateral Agent for the benefit of the Credit Parties a security interest in and Lien upon the Collateral and shall not constitute or create a present assignment of any of the Collateral.

SECTION 3.6.     Joinder of Additional Grantors.  The Grantors shall cause each direct or indirect Subsidiary of any Loan Party which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of the Credit Parties pursuant to the provisions of the Credit Agreement, to execute and deliver to the Collateral Agent an Information Certificate and a Joinder, in each case, within fifteen (15) Business Days of the date on which it was acquired or created and, upon such execution and delivery, such Subsidiary shall constitute a "Grantor" for all purposes hereunder with the same force and effect

13

as if originally named as a Grantor herein, including, but limited to, granting the Collateral Agent a security interest in all Securities Collateral of such Subsidiary. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND COVENANTS

In addition to, and without limitation of, each of the representations, warranties and covenants set forth in the Credit Agreement and the other Loan Documents, each Grantor represents, warrants and covenants as follows:

SECTION 4.1. <u>Title</u>. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Collateral Agent pursuant to this Security Agreement or the "Security Agreement" (as defined in the Pre-Petition Credit Agreement) or as are permitted by the Credit Agreement. No Person other than the Collateral Agent has control or possession of all or any part of the Collateral, except as permitted by the Credit Agreement.

SECTION 4.2. <u>Limitation on Liens; Defense of Claims; Transferability of Collateral</u>. Each Grantor is as of the date hereof, and, as to Collateral acquired by it from time to time after the date hereof, such Grantor will be, the sole direct and beneficial owner of all Collateral pledged by it hereunder free from any Lien or other right, title or interest of any Person other than (i) the Liens and security interest created by this Security Agreement, (ii) Permitted Encumbrances, and (iii) the Carve-Out. Each Grantor shall, at its own cost and expense, defend title to the Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Collateral Agent and the priority thereof against all claims and demands of all Persons, at its own cost and expense, at any time claiming any interest therein adverse to the Collateral Agent or any other Credit Party other than Permitted Encumbrances and the Carve-Out. Other than the commencement and pendency of the Chapter 11 Case, there is no agreement, and no Grantor shall enter into any agreement or take any other action, that would restrict the transferability of any of the Collateral or otherwise impair or conflict with such Grantors' obligations or the rights of the Collateral Agent hereunder. Without limiting the generality of the foregoing, no restrictions on the transferability of the Equity Interests of any issuer described on <u>Schedule III</u> hereof have been imposed by any board of directors of such issuer, whether pursuant to such issuer's Organization Documents or otherwise, and no such restrictions shall hereafter be so imposed without the Collateral Agent's prior written consent.

SECTION 4.3. <u>Chief Executive Office; Change of Name; Jurisdiction of Organization</u>. (a) The exact legal name, type of organization, jurisdiction of organization, federal taxpayer identification number, organizational identification number and chief executive office of such Grantor is indicated next to its name in Sections I.A. and I.B. of the Information Certificate. Without limitation or duplication of the provisions of Section 6.14 of the Credit Agreement, each Grantor shall furnish to the Collateral Agent at least ten (10) days' prior written

14

notice of any change in (i) its legal name, (ii) the location of its chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) its identity or type of organization or corporate structure, (iv) its federal taxpayer identification number or organizational identification number or (v) its jurisdiction of organization (in each case, including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction). Such Grantor agrees (A) not to effect or permit any such change unless all filings have been made under the UCC or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral (subject to, with respect to priority, Permitted Encumbrances having priority by operation of law) and (B) to take all action reasonably satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Credit Parties in the Collateral intended to be granted hereunder. Each Grantor agrees to promptly provide the Collateral Agent with certified Organization Documents reflecting any of the changes described in the preceding sentence.

(b)     The Collateral Agent may rely on opinions of counsel as to whether any or all UCC financing statements of the Grantors need to be amended as a result of any of the changes described in SECTION 4.3(a). If any Grantor fails to provide information to the Collateral Agent about such changes on a timely basis, the Collateral Agent shall not be liable or responsible to any party for any failure to maintain a perfected security interest in such Grantor's property constituting Collateral, for which the Collateral Agent needed to have information relating to such changes. The Collateral Agent shall have no duty to inquire about such changes if any Grantor does not inform the Collateral Agent of such changes, the parties acknowledging and agreeing that it would not be feasible or practical for the Collateral Agent to search for information on such changes if such information is not provided by any Grantor.

SECTION 4.4.     Location of Inventory and Equipment. As of the Closing Date, all Equipment and Inventory of such Grantor is located at the chief executive office or such other location listed in Schedule 5.08(b)(1) and Schedule 5.08(b)(2) of the Credit Agreement.

SECTION 4.5.     Condition and Maintenance of Equipment. The Equipment of such Grantor is in good repair, working order and condition, reasonable wear and tear excepted. Each Grantor shall cause the Equipment to be maintained and preserved in good repair, working order and condition, reasonable wear and tear excepted, and shall as quickly as commercially reasonable make or cause to be made all repairs, replacements and other improvements which are necessary in the conduct of such Grantor's business.

SECTION 4.6.     Due Authorization and Issuance. All of the Pledged Interests have been, and to the extent any Pledged Interests are hereafter issued, such shares or other equity interests will be, upon such issuance, duly authorized, validly issued and, to the extent applicable, fully paid and non-assessable. All of the Pledged Interests have been fully paid for, and there is no amount or other obligation owing by any Grantor to any issuer of the Pledged Interests in exchange for or in connection with the issuance of the Pledged Interests or any Grantor's status as a partner or a member of any issuer of the Pledged Interests. None of the

15

Pledged Interests were issued in violation of any preemptive rights or any agreement by which any Grantor or any issuer thereof is bound.

SECTION 4.7.   No Conflicts, Consents, etc.  Subject to the entry of the Interim Financing Order or Final Financing Order, as applicable, no consent of any party (including, without limitation, equity holders or creditors of such Grantor) and no consent, authorization, approval, license or other action by, and no notice to or filing (other than filings with the SEC pursuant to the Securities Laws) with, any Governmental Authority or regulatory body or other Person is required (A) for the grant of the security interest by such Grantor in the Collateral pledged by it pursuant to this Security Agreement or for the execution, delivery or performance hereof by such Grantor, (B) for the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement or (C) for the exercise by the Collateral Agent of the remedies in respect of the Collateral pursuant to this Security Agreement except, in each case, for such consents which have been obtained prior to the date hereof.  Following the occurrence and during the continuation of an Event of Default, if the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Security Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Collateral Agent, such Grantor agrees to use commercially reasonable efforts to assist and aid the Collateral Agent to obtain as soon as commercially practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 4.8.   Collateral.  All information set forth herein, including the schedules annexed hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Credit Party in connection with this Security Agreement, in each case, relating to the Collateral, is accurate and complete in all material respects.  The Collateral described on the schedules annexed hereto constitutes all of the property of such type of Collateral owned or held by the Grantors.

SECTION 4.9.   Insurance.  Such Grantor shall (i) maintain or shall cause to be maintained such insurance as is required pursuant to Section 6.07 of the Credit Agreement; (ii) maintain such other insurance as may be required by applicable Law; and (iii) furnish to the Collateral Agent, upon written request, reasonable information as to the insurance carried.  Each Grantor hereby irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent (and attorney-in-fact), exercisable only after the occurrence and during the continuance of an Event of Default, for the purpose of making, settling and adjusting claims in respect of the Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.  In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or in part relating thereto, the Collateral Agent may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Default or Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Collateral Agent deems advisable.  All sums disbursed by the Collateral Agent in connection with this SECTION 4.9, including

16

reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by the Grantors to the Collateral Agent and shall be additional Secured Obligations secured hereby.

SECTION 4.10.    [Reserved].

SECTION 4.11.    [Reserved].

ARTICLE V

CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.    Pledge of Additional Securities Collateral.  Each Grantor shall, upon obtaining any Pledged Interests or Intercompany Notes of any Person required to be pledged hereunder, accept the same in trust for the benefit of the Collateral Agent and promptly deliver to the Collateral Agent a pledge amendment, duly executed by such Grantor, in substantially the form of Exhibit 1 annexed hereto (each, a "Pledge Amendment"), and the certificates and other documents required under SECTION 3.1 and SECTION 3.2 hereof in respect of the additional Pledged Interests or Intercompany Notes which are to be pledged pursuant to this Security Agreement, and confirming the attachment of the Lien hereby created on and in respect of such additional Pledged Interests or Intercompany Notes.  Each Grantor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Security Agreement and agrees that all Pledged Interests or Intercompany Notes listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder be considered Collateral.

SECTION 5.2.    Voting Rights; Distributions; etc.

(a)    So long as no Event of Default shall have occurred and be continuing, each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the Credit Agreement or any other Loan Document evidencing the Secured Obligations.  The Collateral Agent shall be deemed without further action or formality to have granted to each Grantor all necessary consents relating to voting rights and shall, if necessary, upon written request of any Grantor and at the sole cost and expense of the Grantors, from time to time execute and deliver (or cause to be executed and delivered) to such Grantor all such instruments as such Grantor may reasonably request in order to permit such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to this SECTION 5.2(a).

(b)    Upon the occurrence and during the continuance of any Event of Default, all rights of each Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to SECTION 5.2(a) hereof without any action or the giving of any notice shall immediately cease, and all such rights shall, upon the expiration of the Remedies Notice Period, become vested in the Collateral Agent, which shall thereupon have the sole right

17

to exercise such voting and other consensual rights; <u>provided</u> that the Collateral Agent shall have the right, in its sole discretion, from time to time following the occurrence and during the continuance of an Event of Default to permit such Grantor to exercise such rights under SECTION 5.2(a). After such Event of Default is no longer continuing, each Grantor shall have the right to exercise the voting, managerial and other consensual rights and powers that it would otherwise be entitled to pursuant to SECTION 5.2(a) hereof.

(c)   All rights of each Grantor to receive and retain any and all Distributions are hereby terminated and all such rights are hereby vested in the Collateral Agent, which has the sole right to receive and hold as Collateral such Distributions and apply such Distributions to the Obligations in accordance with the Credit Agreement.

(d)   All Distributions which are received by any Grantor contrary to the provisions of Section 5.2(c) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Grantor and shall immediately be delivered or paid over to the Collateral Agent as Collateral in the same form as so received (with any necessary endorsement).

(e)   Each Grantor shall, at its sole cost and expense, from time to time execute and deliver to the Collateral Agent appropriate instruments as the Collateral Agent may reasonably request in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise pursuant to SECTION 5.2(b) hereof and to receive all Distributions which it is entitled to receive under SECTION 5.2(c) hereof.

SECTION 5.3.   <u>Organization Documents</u>. Each Grantor has delivered to the Collateral Agent true, correct and complete copies of its Organization Documents. The Organization Documents are in full force and effect. No Grantor will terminate or agree to terminate any Organization Documents or make any amendment or modification to any Organization Documents (including electing to treat any Pledged Interests of such Grantor as a security under Section 8-103 of the UCC) except as permitted under the Credit Agreement.

SECTION 5.4.   <u>Defaults, Etc</u>. Such Grantor is not in default in the payment of any portion of any mandatory capital contribution, if any, required to be made under any agreement to which such Grantor is a party relating to the Pledged Interests pledged by it, and such Grantor is not in violation of any other provisions of any such agreement to which such Grantor is a party, or otherwise in default or violation thereunder. No Securities Collateral pledged by such Grantor is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Grantor by any Person with respect thereto, and as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organization Documents and certificates, if any, delivered to the Collateral Agent) which evidence any Pledged Interests of such Grantor.

SECTION 5.5.   <u>Certain Agreements of Grantors As Issuers and Holders of Equity Interests</u>.

18

(a)     In the case of each Grantor which is an issuer of Securities Collateral, such Grantor agrees to be bound by the terms of this Security Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)     In the case of each Grantor which is a partner in a partnership, limited liability company or other entity, such Grantor hereby consents to the extent required by the applicable Organization Documents to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Interests in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Interests to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner or a limited partner or member, as the case may be.

## ARTICLE VI

### CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY COLLATERAL

SECTION 6.1.    Grant of License.  Without limiting the rights of the Collateral Agent as the holder of a Lien on the Intellectual Property Collateral, for the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under Article VIII hereof at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty, rent or other compensation to such Grantor) or other right to use, assign, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Grantor (including, but not limited to, any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, and advertising matter, whether owned by any Grantor or with respect to which any Grantor has rights under license, sublicense, or other agreements (including any License (to the extent permitted by such License))) and to occupy any Real Estate owned or leased by such Grantor, wherever the same may be located, including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.  Upon the reasonable request of the Collateral Agent, in order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office, each Grantor shall execute and deliver to the Collateral Agent one or more short forms of this Security Agreement to further evidence the Collateral Agent's Lien on such Grantor's Patents, Trademarks, or Copyrights.

SECTION 6.2.    Registrations.  Except pursuant to licenses and other user agreements entered into by any Grantor in the ordinary course of business that are listed in Section III of the Information Certificate, on and as of the date hereof (i) each Grantor owns and possesses the right to use, and has done nothing to authorize or enable any other Person to use, any material Trademark listed in Section III of the Information Certificate, and (ii) all material

registrations listed in Section III of the Information Certificate are valid and in full force and effect.

SECTION 6.3.    No Violations or Proceedings.    To each Grantor's knowledge, on and as of the date hereof, there is no violation by others of any right of such Grantor with respect to any Trademark listed in Section III of the Information Certificate, respectively, pledged by it under the name of such Grantor and there are no pending, or to any Grantor's knowledge, threatened infringement, misappropriation or other violation claims or proceedings pending against any Grantor, and no Grantor has received any notice or other communication of any actual or alleged infringement, misappropriation or other violation of any rights of any Person with respect to any Trademark listed in Section III of the Information Certificate, in each case except as could not reasonably be expected to have or result in a Material Adverse Effect. To each Grantor's knowledge, on and as of the date hereof, no holding, decision or judgment has been rendered against such Grantor by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property in any material respect.

SECTION 6.4.    Protection of Collateral Agent's Security.    On a continuing basis, each Grantor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Collateral Agent of (A) any adverse determination in any proceeding in the United States Patent and Trademark Office or the United States Copyright Office with respect to any Patent, Trademark or Copyright necessary for the conduct of business of such Grantor or (B) the institution of any proceeding or any adverse determination in any federal, state or local court or administrative body regarding such Grantor's claim of ownership in or right to use any of the Intellectual Property Collateral material to the use and operation of the Collateral, its right to register such Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain and protect the Intellectual Property Collateral necessary for the conduct of business of such Grantor, (iii) not permit to lapse or become abandoned any Intellectual Property Collateral necessary for the conduct of business of such Grantor, and not settle or compromise any pending or future litigation or administrative proceeding with respect to such Intellectual Property Collateral, in each case except as shall be consistent with commercially reasonable business judgment and, if any Event of Default has occurred and is continuing, with the prior approval of the Collateral Agent (such approval not to be unreasonably withheld), (iv) upon such Grantor's obtaining knowledge thereof, promptly notify the Collateral Agent in writing of any event which may be reasonably expected to materially and adversely affect (A) the value or utility of the Intellectual Property Collateral or any portion thereof material to the use and operation of the Collateral, (B) the ability of such Grantor or the Collateral Agent to dispose of the Intellectual Property Collateral or any portion thereof or (C) the rights and remedies of the Collateral Agent in relation thereto including, without limitation, a levy or threat of levy or any legal process against the Intellectual Property Collateral or any portion thereof, (v) not license the Intellectual Property Collateral other than licenses entered into by such Grantor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the material licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of the Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral intended to be granted to the Collateral Agent for the benefit of the Credit Parties,

20

without the consent of the Collateral Agent, (vi) until the Collateral Agent exercises its rights to make collection, diligently keep adequate records respecting the Intellectual Property Collateral and (vii) furnish to the Collateral Agent from time to time upon the Collateral Agent's reasonable request therefor detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to the Intellectual Property Collateral as the Collateral Agent may from time to time request. Notwithstanding the foregoing, nothing herein shall prevent any Grantor from selling, licensing, disposing of or otherwise using any Intellectual Property Collateral as permitted under the Credit Agreement.

SECTION 6.5.    After-Acquired Property.    If any Grantor shall, at any time before this Security Agreement shall have been terminated in accordance with SECTION 9.4(a), (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, the provisions hereof shall automatically apply thereto and any such item enumerated in clause (i) or (ii) of this SECTION 6.5 with respect to such Grantor shall automatically constitute Intellectual Property Collateral if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Security Agreement without further action by any party. With respect to any federally registered Intellectual Property Collateral, each Grantor within forty-five (45) days of the end of each calendar quarter in which such Intellectual Property Collateral is acquired (a) provide to the Collateral Agent written notice of any of the foregoing and (b) confirm the attachment of the Lien and security interest created by this Security Agreement to any rights described in clauses (i) and (ii) of the immediately preceding sentence of this SECTION 6.5 by execution of an instrument in form reasonably acceptable to the Collateral Agent.

SECTION 6.6.    Modifications. Each Grantor authorizes the Collateral Agent to modify this Security Agreement by amending Section III of the Information Certificate to include any Intellectual Property Collateral acquired or arising after the date hereof of such Grantor including, without limitation, any of the items listed in SECTION 6.5 hereof.

SECTION 6.7.    Litigation.    Unless there shall occur and be continuing any Event of Default, each Grantor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Grantors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall have the right but shall in no way be obligated to file applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Grantor, the Collateral Agent or the other Credit Parties to enforce the Intellectual Property Collateral and any license thereunder. In the event of such suit, each Grantor shall, at the reasonable request of the Collateral Agent, do any and all lawful acts and execute any and all documents requested by the Collateral Agent in aid of such enforcement and the Grantors shall promptly reimburse and indemnify the Collateral

21

Agent, as the case may be, for all costs and expenses incurred by the Collateral Agent in the exercise of its rights under this SECTION 6.7 in accordance with SECTION 9.3 hereof. In the event that the Collateral Agent shall elect not to bring suit to enforce the Intellectual Property Collateral, each Grantor agrees, at the request of the Collateral Agent, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by others and for that purpose agrees to diligently maintain any suit, proceeding or other action against any Person so infringing necessary to prevent such infringement.

        SECTION 6.8.    Third Party Consents. Each Grantor shall use commercially reasonable efforts to obtain the consent of third parties to the extent such consent is necessary or desirable to create a valid, perfected security interest in favor of the Collateral Agent in any Intellectual Property Collateral.

## ARTICLE VII

## CERTAIN PROVISIONS CONCERNING ACCOUNTS

        SECTION 7.1.    Special Representations and Warranties. As of the time when each of its Accounts or Credit Card Receivables is included in the Borrowing Base, each Grantor shall be deemed to have represented and warranted that such Account or Credit Card Receivable and all records, papers and documents relating thereto (i) are genuine and correct and in all material respects what they purport to be, (ii) represent the legal, valid and binding obligation of the account debtor, Credit Card Issuer or Credit Card Processor, as applicable, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, evidencing indebtedness unpaid and owed by such account debtor, Credit Card Issuer or Credit Card Processor arising out of the performance of labor or services or the sale, lease, license, assignment or other disposition and delivery of the goods or other property listed therein or out of an advance or a loan, and (iii) are in all material respects in compliance and conform with all applicable material federal, state and local Laws and applicable Laws of any relevant foreign jurisdiction.

        SECTION 7.2.    Maintenance of Records. Each Grantor shall keep and maintain at its own cost and expense materially complete records of each Account and Credit Card Receivable, in a manner consistent with prudent business practice, including, without limitation, records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto. Each Grantor shall, at such Grantor's sole cost and expense, upon the Collateral Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Accounts and Credit Card Receivables, including, without limitation, all documents evidencing Accounts and Credit Card Receivables and any books and records relating thereto to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Grantor). Upon the occurrence and during the continuance of any Event of Default, and subject

22

to the Remedies Notice Period, the Collateral Agent may transfer a full and complete copy of any Grantor's books, records, credit information, reports, memoranda and all other writings relating to the Accounts and Credit Card Receivables to and for the use by any Person that has acquired or is contemplating acquisition of an interest in the Accounts and Credit Card Receivables or the Collateral Agent's security interest therein in accordance with applicable Law without the consent of any Grantor. The Collateral Agent shall have the right at any time or times, in the Collateral Agent's name or in the name of a nominee of the Collateral Agent, to verify the validity, amount or any other matter relating to any Accounts, Credit Card Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

SECTION 7.3.   Legend. Each Grantor shall legend, at the request of the Collateral Agent made at any time after the occurrence and during the continuance of any Event of Default and in form and manner reasonably satisfactory to the Collateral Agent, the Accounts and the other books, records and documents of such Grantor evidencing or pertaining to the Accounts with an appropriate reference to the fact that the Accounts have been collaterally assigned to the Collateral Agent for the benefit of the Credit Parties and that the Collateral Agent has a security interest therein.

SECTION 7.4.   Modification of Terms, Etc. No Grantor shall rescind or cancel any indebtedness evidenced by any Account or Credit Card Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such indebtedness except in the ordinary course of business consistent with prudent business practice or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Account or Credit Card Receivable or interest therein except in the ordinary course of business consistent with prudent business practice or in accordance with the Credit Agreement without the prior written consent of the Collateral Agent, not to be unreasonably withheld. Grantors shall notify the Collateral Agent promptly of any assertion of (i) any claims, offsets, defenses or counterclaims by any account debtor, Credit Card Issuer or Credit Card Processor or any disputes with any of such Persons or any settlement, adjustment or compromise thereof, to the extent any of the foregoing exceeds $250,000 in any one case or $500,000 in the aggregate, (ii) all material adverse information relating to the financial condition of any material account debtor, or any Credit Card Issuer or Credit Card Processor and (iii) any event or circumstance which, to the best of any Grantor's knowledge, which would cause the Collateral Agent to consider any then-existing Accounts or Credit Card  Receivables as no longer eligible for inclusion in the Borrowing Base. Grantors shall notify the Collateral Agent of (i) any notice of a material default by such Grantor under any agreement with an account debtor, Credit Card Issuer or Credit Card Processor or of any default which has a reasonable likelihood of resulting in any material account debtor, or any Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to such Grantor, (ii) any notice from any material account debtor, or any Credit Card Issuer or Credit Card Processor that such Person is ceasing or suspending, or will cease or suspend, any present or future payments due or to become due to any Grantor from such Person, or that such Person is terminating or will terminate any of its agreements with any Grantor and (iii) the failure of such Grantor to comply with any material terms of an agreement with any account debtor, Credit Card Issuer or Credit Card Processor or any terms thereof which have a reasonable

23

likelihood of resulting in any material account debtor, or any Credit Card Issuer or Credit Card Processor ceasing or suspending payments to such Grantor.

SECTION 7.5.   Collection.  Each Grantor shall cause to be collected from the account debtor, Credit Card Issuer or Credit Card Processor, as applicable, of each of the Accounts or Credit Card Receivables, as and when due in the ordinary course of business consistent with prudent business practice (including, without limitation, Accounts or Credit Card Receivables that are delinquent, such Accounts or Credit Card Receivables to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Account or Credit Card Receivable, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or Credit Card Receivable.  The costs and expenses (including, without limitation, attorneys' fees) of collection, in any case, whether incurred by any Grantor, the Collateral Agent or any other Credit Party, shall be paid by the Grantors.

ARTICLE VIII
REMEDIES

SECTION 8.1.   Remedies.  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may, subject to the Remedies Notice Period, and at the direction of the Required Lenders as set forth in Section 8.02 of the Credit Agreement, shall, from time to time in respect of the Collateral, in addition to the other rights and remedies provided for herein, under applicable Law or otherwise available to it:

(a)   Personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from any Grantor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Grantor's premises where any of the Collateral is located, remove such Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Grantor;

(b)   Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including, without limitation, instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to any Grantor, prior to receipt by any such obligor of such instruction, such Grantor shall segregate all amounts received pursuant thereto in trust for the benefit of the Collateral Agent and shall promptly pay such amounts to the Collateral Agent;

(c)   Sell, assign, grant a license to use or otherwise liquidate, or direct any Grantor to sell, assign, grant a license to use or otherwise liquidate, any and all investments made

24

in whole or in part with the Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(d)     Take possession of the Collateral or any part thereof, by directing any Grantor in writing to deliver the same to the Collateral Agent at any place or places so designated by the Collateral Agent, in which event such Grantor shall at its own expense: (A) forthwith cause the same to be moved to the place or places designated by the Collateral Agent and therewith delivered to the Collateral Agent, (B) store and keep any Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent and (C) while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition. Each Grantor's obligation to deliver the Collateral as contemplated in this SECTION 8.1 is of the essence hereof. Upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by any Grantor of such obligation;

(e)     Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Grantor constituting Collateral for application to the Secured Obligations as provided in SECTION 8.7 hereof;

(f)     Retain and apply the Distributions to the Secured Obligations as provided in ARTICLE V hereof and the Credit Agreement;

(g)     Exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Collateral; and

(h)     Exercise all the rights and remedies of a secured party under the UCC, and the Collateral Agent may also in its sole discretion, without notice except as specified in SECTION 8.2 hereof, sell, assign or grant a license to use the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable. The Collateral Agent or any other Credit Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of any or all of the Collateral at any such sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such Person as a credit on account of the purchase price of any Collateral payable by such Person at such sale. Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives, to the fullest extent permitted by Law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so

25

adjourned.  To the fullest extent permitted by Law, each Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree.

SECTION 8.2.    Notice of Sale.  Each Grantor acknowledges and agrees that, to the extent notice of sale or other disposition of Collateral shall be required by applicable Law and unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Collateral Agent shall provide such Grantor such advance notice as may be practicable under the circumstances), ten (10) days' prior notice to such Grantor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters.  No notification need be given to any Grantor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying (as permitted under Law) any right to notification of sale or other intended disposition.

SECTION 8.3.    Waiver of Notice and Claims.  Each Grantor hereby waives, to the fullest extent permitted by applicable Law, notice or judicial hearing in connection with the Collateral Agent's taking possession or the Collateral Agent's disposition of any of the Collateral, including, without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Grantor would otherwise have under law, and each Grantor hereby further waives, to the fullest extent permitted by applicable Law: (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable Law.  The Collateral Agent shall not be liable for any incorrect or improper payment made pursuant to this Article VIII in the absence of gross negligence or willful misconduct.  Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Grantor therein and thereto, and shall be a perpetual bar both at law and in equity against such Grantor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through or under such Grantor.

SECTION 8.4.    Certain Sales of Collateral.

(a)    Each Grantor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority.  Each Grantor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable Law, the Collateral Agent shall have no obligation to engage in public sales.

26

(b)    Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act, and applicable state securities Laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Securities Collateral and Investment Property, to limit purchasers to Persons who will agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities Laws, even if such issuer would agree to do so.

(c)    If the Collateral Agent determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Grantor shall from time to time furnish to the Collateral Agent all such information as the Collateral Agent may reasonably request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Collateral Agent as exempt transactions under the Securities Act and the rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d)    Each Grantor further agrees that a breach of any of the covenants contained in this SECTION 8.4 will cause irreparable injury to the Collateral Agent and the other Credit Parties, that the Collateral Agent and the other Credit Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this SECTION 8.4 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing.

SECTION 8.5.    No Waiver; Cumulative Remedies.

(a)    No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. The remedies herein provided are cumulative and are not exclusive of any remedies provided by law.

(b)    In the event that the Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Security Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case, the Grantors, the Collateral Agent and each other Credit Party shall be restored to their respective

former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Collateral Agent and the other Credit Parties shall continue as if no such proceeding had been instituted.

SECTION 8.6.   Certain Additional Actions Regarding Intellectual Property. If any Event of Default shall have occurred and be continuing, subject to the Remedies Notice Period, upon the written demand of Collateral Agent, each Grantor shall execute and deliver to Collateral Agent an assignment or assignments of the registered Patents, Trademarks and/or Copyrights and such other documents as are necessary or appropriate to carry out the intent and purposes hereof to the extent such assignment does not result in any loss of rights therein under applicable Law. Within five (5) Business Days of written notice thereafter from Collateral Agent, each Grantor shall make available to Collateral Agent, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of the Event of Default as Collateral Agent may reasonably designate to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Grantor under the registered Patents, Trademarks and/or Copyrights, and such Persons shall be available to perform their prior functions on Collateral Agent's behalf.

SECTION 8.7.   Application of Proceeds. The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Security Agreement, in accordance with and as set forth in Section 8.03 of the Credit Agreement.

ARTICLE IX

MISCELLANEOUS

SECTION 9.1.   Concerning Collateral Agent.

(a)   The Collateral Agent has been appointed as collateral agent pursuant to the Credit Agreement. The actions of the Collateral Agent hereunder are subject to the provisions of the Credit Agreement. The Collateral Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of the Collateral), in accordance with this Security Agreement and the Credit Agreement. The Collateral Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact. The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the Credit Agreement. Upon the acceptance of any appointment as the Collateral Agent by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Security Agreement, and the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under this Security Agreement. After any retiring Collateral Agent's

28

resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Security Agreement while it was the Collateral Agent.

(b)     The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Collateral Agent, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Collateral Agent nor any of the other Credit Parties shall have responsibility for, without limitation (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Collateral Agent or any other Credit Party has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral. In no event shall the Collateral Agent's or any other Credit Party's responsibility for the custody and preservation of the Collateral in its possession extend to matters beyond the control of such Person, including, without limitation, acts of God, war, insurrection, riot, governmental actions or acts of any corporate or other depository.

(c)     The Collateral Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all matters pertaining to this Security Agreement and its duties hereunder, upon advice of counsel selected by it.

(d)     If any item of Collateral also constitutes collateral granted to Collateral Agent under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, Collateral Agent, in its sole discretion, shall select which provision or provisions shall control.

SECTION 9.2.   Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact. If any Grantor shall fail to perform any covenants contained in this Security Agreement or in the Credit Agreement (including, without limitation, such Grantor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay Claims, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any other obligations of such Grantor with respect to any Collateral) or if any warranty on the part of any Grantor contained herein shall be breached, the Collateral Agent may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that Collateral Agent shall in no event be bound to inquire into the validity of any tax, lien, imposition or other obligation which such Grantor fails to pay or perform as and when required hereby. Any and all amounts so expended by the Collateral Agent shall be paid by the Grantors in accordance with the provisions of SECTION 9.3 hereof. Neither the provisions of this SECTION 9.2 nor any action taken by Collateral Agent pursuant to the provisions of this SECTION 9.2 shall prevent any such failure to observe any covenant contained in this Security Agreement nor any breach of warranty from constituting an Event of Default. Each Grantor hereby appoints the Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, or otherwise,

29

from time to time after the occurrence and during the continuation of an Event of Default in the Collateral Agent's discretion to take any action and to execute any instrument consistent with the terms of the Credit Agreement and the other Security Documents which the Collateral Agent may deem necessary to accomplish the purposes hereof. The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. Each Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 9.3.    Expenses. Each Grantor will upon demand pay to the Collateral Agent and the other Credit Parties the amount of any and all amounts required to be paid pursuant to Section 10.04 of the Credit Agreement.

SECTION 9.4.    Continuing Security Interest; Assignment. This Security Agreement shall create a continuing security interest in the Collateral and shall (i) subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, be binding upon the Grantors, their respective successors and assigns, and (ii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and the other Credit Parties and each of their respective successors, transferees and assigns. For the avoidance of doubt, upon the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all Liens created by the Security Documents in favor of the Collateral Agent shall be perfected as set forth in such Interim Financing Order or the Final Financing Order, as applicable, notwithstanding any failure to make (or the terms of) any filings in any jurisdiction listed on Schedule II or elsewhere. No other Persons (including, without limitation, any other creditor of any Grantor) shall have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), any Credit Party may assign or otherwise transfer any indebtedness held by it secured by this Security Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Credit Party, herein or otherwise, subject, however, to the provisions of the Credit Agreement.

(a)    Termination; Release. This Security Agreement, the Lien in favor of the Collateral Agent (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall terminate with respect to all Secured Obligations when (i) the Commitments shall have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Secured Obligations shall have been indefeasibly paid in full in cash, and (iii) all Letters of Credit (as defined in the Credit Agreement) shall have (A) expired or terminated and have been reduced to zero, (B) been Cash Collateralized to the extent required by the Credit Agreement, or (C) been supported by another letter of credit in a manner reasonably satisfactory to the Issuing Bank and the Administrative Agent; provided, however, that (A) this Security Agreement, the Lien in favor of the Collateral Agent (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall be immediately and automatically reinstated if at any time payment, or any part thereof, of any Secured Obligation is rescinded or must otherwise be restored by any Credit Party or any Grantor upon the bankruptcy or reorganization of any Grantor or otherwise, and (B) in connection with the termination of this Security Agreement, the Collateral Agent may require such indemnities and cash collateral as it

30

shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Secured Obligations that may subsequently be reversed or revoked, (y) any obligations that the Collateral Agent reasonably believes may thereafter arise with respect to the Other Liabilities, and (z) any Secured Obligations that the Collateral Agent reasonably believes may thereafter arise under Section 10.04 of the Credit Agreement.

(b)     The Collateral shall be released from the Lien of this Security Agreement in accordance with the provisions of the Credit Agreement. Upon termination hereof or any release of Collateral in accordance with the provisions of the Credit Agreement, the Collateral Agent shall, upon the request and at the sole cost and expense of the Grantors, assign, transfer and deliver to the Grantors, against receipt and without recourse to or warranty by the Collateral Agent, such of the Collateral to be released (in the case of a release) or all of the Collateral (in the case of termination of this Security Agreement) as may be in possession of the Collateral Agent and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements or releases) acknowledging the termination hereof or the release of such Collateral, as the case may be.

(c)     At any time that the respective Grantor desires that the Collateral Agent take any action described in clause (b) of this (a), such Grantor shall, upon request of the Collateral Agent, deliver to the Collateral Agent an officer's certificate certifying that the release of the respective Collateral is permitted pursuant to clause (a) or (b) of this (a). The Collateral Agent shall have no liability whatsoever to any other Credit Party as the result of any release of Collateral by it as permitted (or which the Collateral Agent in good faith believes to be permitted) by this (a).

SECTION 9.5.    Modification in Writing. No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Grantor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement and unless in writing and signed by the Collateral Agent and the Grantors. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Grantor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Security Agreement or any other document evidencing the Secured Obligations, no notice to or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

SECTION 9.6.    Notices. Unless otherwise provided herein or in the Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any Grantor, addressed to it at the address of the Lead Borrower set forth in the Credit Agreement and as to the Collateral Agent, addressed to it at the address set forth in the Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other parties hereto complying as to delivery with the terms of this SECTION 9.6.

31

SECTION 9.7.    <u>GOVERNING LAW</u>.  THIS SECURITY AGREEMENT
SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS
OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF
CONFLICTS OF LAWS THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW
YORK GENERAL OBLIGATIONS LAW AND, TO THE EXTENT APPLICABLE, THE
BANKRUPTCY CODE.

SECTION 9.8.    <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS;</u>
<u>WAIVER OF JURY TRIAL</u>.

(a)    EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY
SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION
OF THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE,
OR ABSTAINS FROM EXERCISING, JURISDICTION, TO THE UNITED STATES
DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND, IN EACH
CASE, ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR
PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR
ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF
ANY JUDGMENT, AND EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY
AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING
MAY BE HEARD AND DETERMINED, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, IN SUCH FEDERAL COURTS.  EACH GRANTOR AGREES THAT A
FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE
CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE
JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS
SECURITY AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT
ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY
ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT OR ANY
OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE
COURTS OF ANY JURISDICTION.

(b)    EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY
WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY
OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE
OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS
SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT
REFERRED TO IN PARAGRAPH (A) OF THIS SECTION.  EACH GRANTOR HEREBY
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE
LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF
SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH GRANTOR AGREES THAT ANY ACTION COMMENCED BY
ANY GRANTOR ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR
IN CONNECTION WITH THIS SECURITY AGREEMENT OR ANY OTHER LOAN
DOCUMENT SHALL BE BROUGHT SOLELY TO THE BANKRUPTCY COURT OR, IF
THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING,
JURISDICTION, MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT OF

THE SOUTHERN DISTRICT OF NEW YORK AS THE COLLATERAL AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

     (d)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.6. NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

     (e)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND WHETHER INITIATED BY OR AGAINST ANY SUCH PERSON OR IN WHICH ANY SUCH PERSON IS JOINED AS A PARTY LITIGANT). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

     SECTION 9.9.   Severability of Provisions.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

     SECTION 9.10.  Execution in Counterparts; Effectiveness.  This Security Agreement may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Security Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Security Agreement.

     SECTION 9.11.  No Release.  Nothing set forth in this Security Agreement shall relieve any Grantor from the performance of any term, covenant, condition or agreement on such Grantor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Collateral Agent or any other Credit Party to perform or observe any such term, covenant, condition or agreement on such Grantor's part to be so performed or observed or shall impose any liability on the Collateral Agent or any other Credit Party for any act or omission on the part of such Grantor relating thereto or for any breach of any representation or warranty on the part of such Grantor contained in this Security Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Collateral or made in connection herewith or

therewith.  The obligations of each Grantor contained in this SECTION 9.11 shall survive the termination hereof and the discharge of such Grantor's other obligations under this Security Agreement, the Credit Agreement and the other Loan Documents.

SECTION 9.12.  Obligations Absolute.  Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor;

(b)    any lack of validity or enforceability of the Credit Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(i)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument relating thereto;

(c)    any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(d)    any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of SECTION 9.5 hereof; or

(e)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Grantor (other than the termination of this Security Agreement in accordance with SECTION 9.4(a) hereof).

SECTION 9.13.  Credit Agreement and Agreement Among Lenders. Notwithstanding anything herein to the contrary, the security interest granted to the Collateral Agent, for the benefit of the Credit Parties, herein and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the Credit Agreement, including, but not limited to, the Interlender Provisions.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Grantors and the Collateral Agent have caused this Security Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

HANCOCK FABRICS, INC.
HF MERCHANDISING, INC.
HANCOCK FABRICS OF MI, INC.

By: _____
Name: Dennis Lyons
Title:   Senior Vice President and Chief
         Administrative Officer


HANCOCK FABRICS, LLC

By: _____
Name: Dennis Lyons
Title:   Manager


HANCOCKFABRICS.COM, INC.

By: _____
Name: Dennis Lyons
Title:   President


HF ENTERPRISES, INC.
HF RESOURCES, INC.

By: _____
Name: Rebecca Flick
Title:   Vice President and Assistant Secretary


[Signature Page to Security Agreement]

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Collateral Agent

By: _____
Name: Joseph Burt
Title: Director

EXHIBIT 1

[Form of]

SECURITIES PLEDGE AMENDMENT

This Securities Pledge Amendment, dated as of _____, is delivered pursuant to SECTION 5.1 of that certain Security Agreement dated as of February __, 2016 (as amended, amended and restated, restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), made by (i) HANCOCK FABRICS, INC., a Delaware corporation, as lead borrower for itself and the other Borrowers (as defined below) (the "Lead Borrower"), (ii) THE BORROWERS party thereto from time to time (together with the Lead Borrower, the "Borrowers"), and (iii) THE GUARANTORS party thereto from time to time (the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, having an office at One Boston Place, 18th Floor, Boston, Massachusetts 02108, in its capacity as collateral agent for the Credit Parties, as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Collateral Agent").  The undersigned hereby agrees that this Securities Pledge Amendment may be attached to the Security Agreement and that the Pledged Interests and/or Intercompany Notes listed on this Securities Pledge Amendment shall be deemed to be and shall become part of the Collateral and shall secure all Secured Obligations.

PLEDGED INTERESTS

| ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES OR INTERESTS | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|

INTERCOMPANY NOTES

| ISSUER | PRINCIPAL AMOUNT | DATE OF ISSUANCE | INTEREST RATE | MATURITY DATE |
|--------|------------------|------------------|---------------|---------------|

[_____],
as Grantor

By: _____
    Name:
    Title:


AGREED TO AND ACCEPTED:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Collateral Agent


By: _____
    Name:
    Title:

## SCHEDULE I
### Intercompany Notes

$42,028,000 Note dated February 2, 1998, as amended, made by HF Merchandising, Inc. for the benefit of HF Resources, Inc.; maturity date February 2, 2016, automatically extends for one-year periods.

$171,368,000 Loan Agreement dated December 22, 1997, as amended, between Hancock Fabrics, Inc. and HF Resources, Inc.; maturity date December 22, 2015, automatically extends for one-year periods.

SCHEDULE II
Filings, Registrations and Recordings

| Grantor Name | Filing Office |
|---|---|
| Hancock Fabrics, Inc. | Delaware |
| HF MERCHANDISING, INC. | Delaware |
| HANCOCK FABRICS OF MI, INC. | Delaware |
| HANCOCKFABRICS.COM, INC. | Delaware |
| Hancock Fabrics, LLC | Delaware |
| HF Resources, Inc. | Delaware |
| HF Enterprises, Inc. | Delaware |

SCHEDULE III
Pledged Interests

| Grantor | Issuer | Type of Organization | # of Shares Owned | Total Shares Outstanding | % of Interest Pledged | Certificate No. (if un-certificated, please so indicate) |
|---|---|---|---|---|---|---|
| Hancock Fabrics, Inc. | Hancock Fabrics of MI, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| Hancock Fabrics, Inc. | hancockfabrics.com, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| Hancock Fabrics, Inc. | HF Resources, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Resources, Inc. | HF Enterprises, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Resources, Inc. | HF Merchandising, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Enterprises, Inc. | Hancock Fabrics, LLC | Limited Liability Company | 1 | 1 | 100 | Uncertificated |

## GUARANTY

GUARANTY (this "Guaranty"), dated as of February 2, 2016, is by each of HF ENTERPRISES, INC., a Delaware corporation and HF RESOURCES, INC., a Delaware corporation (each such Person, individually, a "Guarantor" and, collectively, the "Guarantors") in favor of (a) WELLS FARGO BANK, NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "Administrative Agent") for its own benefit and the benefit of the other Credit Parties (as defined in the Credit Agreement referred to below), (b) WELLS FARGO BANK, NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "Collateral Agent") for its own benefit and the benefit of the other Credit Parties, and (c) the other Credit Parties.

## WITNESSETH

WHEREAS, reference is made to that certain Debtor-In-Possession Credit Agreement, dated as of February 2, 2016 (as amended, modified, supplemented or restated hereafter, the "Credit Agreement"), by and among, among others, (i) Hancock Fabrics, Inc., a Delaware corporation (the "Lead Borrower"), (ii) the other Borrowers party thereto, (iii) the Guarantors party thereto, (iv) the Administrative Agent, (v) the Collateral Agent, (vi) GACP Finance Co., LLC, as the Term Agent and (vii) the lenders party thereto (the "Lenders"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

WHEREAS, the Lenders have agreed to make Loans to the Borrowers, and the Issuing Bank has agreed to issue Letters of Credit for the account of the Borrowers, pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement.

WHEREAS, each Guarantor acknowledges that it is an integral part of a consolidated enterprise and that it will receive direct and indirect benefits from the availability of the credit facility provided for in the Credit Agreement, from the making of the Loans by the Lenders, and the issuance of the Letters of Credit by the Issuing Bank.

WHEREAS, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit are each conditioned upon, among other things, the execution and delivery by the Guarantors of a guaranty in the form hereof. As consideration therefor, and in order to induce the Lenders to make Loans and the Issuing Bank to issue Letters of Credit, the Guarantors are willing to execute this Guaranty.

Accordingly, each Guarantor hereby agrees as follows:

SECTION 1.  Guaranty.  Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), each Guarantor irrevocably and unconditionally guaranties, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrowers of all Obligations (collectively, the "Guaranteed Obligations"), including all such Guaranteed Obligations which shall or may become due but for the operation of the Bankruptcy Code. Each Guarantor further agrees that

the Guaranteed Obligations may be extended or renewed or amended or restated, in whole or in part, without notice to or further assent from it, and that it will remain bound upon this Guaranty notwithstanding any extension or renewal or amendment or restatement of any Guaranteed Obligation.

SECTION 2. Guaranteed Obligations Not Affected. To the fullest extent permitted by applicable Law, each Guarantor waives presentment to, demand of payment from, and protest to, any Loan Party of any of the Guaranteed Obligations, and also waives notice of acceptance of this Guaranty, notice of protest for nonpayment and all other notices of any kind. To the fullest extent permitted by applicable Law, the obligations of each Guarantor hereunder shall not be affected by (a) the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any Loan Party under the provisions of the Credit Agreement, any other Loan Document or otherwise or against any other party with respect to any of the Guaranteed Obligations, (b) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Guaranty, any other Loan Document or any other agreement, with respect to any Loan Party, any other Person or with respect to the Guaranteed Obligations, (c) the failure to perfect any security interest in, or the release of, any of the Collateral held by or on behalf of the Collateral Agent or any other Credit Party, or (d) the lack of legal existence of any Loan Party or legal obligation to discharge any of the Guaranteed Obligations by any Loan Party for any reason whatsoever, including, without limitation, in any insolvency, bankruptcy or reorganization of any Loan Party.

SECTION 3. Security. Each of the Guarantors hereby acknowledges and agrees that the Collateral Agent and each of the other Credit Parties may (a) take and hold security for the payment of this Guaranty and the Guaranteed Obligations and exchange, enforce, waive and release any such security, (b) apply such security and direct the order or manner of sale thereof as they in their sole discretion may determine, and (c) release or substitute any one or more endorsees, the Borrowers, other Guarantors or other obligors, in each case without affecting or impairing in any way the liability of any Guarantor hereunder.

SECTION 4. Guaranty of Payment. Each of the Guarantors further agrees that this Guaranty constitutes a guaranty of payment and performance when due of all Guaranteed Obligations and not of collection and, to the fullest extent permitted by applicable Law, waives any right to require that any resort be had by the Collateral Agent or any other Credit Party to any of the Collateral or other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of any Agent or any other Credit Party in favor of any Loan Party or any other Person or to any other guarantor of all or part of the Guaranteed Obligations. Any payment required to be made by the Guarantors hereunder may be required by any Agent or any other Credit Party on any number of occasions and shall be payable to the Administrative Agent, for the benefit of the Agent and the other Credit Parties, in the manner provided in the Credit Agreement.

SECTION 5. Indemnification. Without limiting any of their indemnification obligations under the Credit Agreement or the other Loan Documents, and without duplication of any indemnification provided for under the Credit Agreement or the other Loan Documents, each of the Guarantors, jointly and severally, shall indemnify the Credit Parties and each of their Subsidiaries and Affiliates, and each of their respective stockholders, directors, officers, employees, agents, attorneys, and advisors (each such Person being called an "Indemnitee"),

against, and hold each Indemnitee harmless from, any and all damages, actual out-of-pocket losses, claims, actions, causes of action, settlement payments, obligations, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of, (i) the execution or delivery of this Guaranty, the Credit Agreement or any other Loan Document or any other agreement or instrument contemplated hereby, the performance by the Guarantors of their respective obligations thereunder, or the consummation of the transactions contemplated by the Credit Agreement and the other Loan Documents or any other transactions contemplated hereby or thereby, or (ii) any actual or prospective claim, litigation, investigation or proceeding relating to or arising from any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided, however, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  In connection with any indemnified claim hereunder, the Indemnitee shall be entitled to select its own counsel and the Guarantors shall promptly pay the reasonable fees and expenses of such counsel.

SECTION 6.  No Discharge or Diminishment of Guaranty.  The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Guaranteed Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the Guaranteed Obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Guaranty, the Credit Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 7.  Defenses of Loan Parties Waived.  To the fullest extent permitted by applicable Law, each of the Guarantors waives any defense based on or arising out of any defense of any Loan Party or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Loan Party, other than the indefeasible payment in full in cash of the Guaranteed Obligations.  Each Guarantor hereby acknowledges that the Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept

an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Loan Party, or exercise any other right or remedy available to them against any Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent that the Guaranteed Obligations have been indefeasibly paid in full in cash. Pursuant to, and to the extent permitted by, applicable Law, each of the Guarantors waives any defense arising out of any such election and waives any benefit of and right to participate in any such foreclosure action, even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any Loan Party, as the case may be, or any security. Each Guarantor agrees that it shall not assert any claim in competition with any Agent or any other Credit Party in respect of any payment made hereunder in any bankruptcy, insolvency, reorganization, or any other proceeding.

SECTION 8. <u>Agreement to Pay; Subordination.</u> In furtherance of the foregoing and not in limitation of any other right that the Agent or any other Credit Party has at law or in equity against any Guarantor by virtue hereof, subject to the entry of the Interim Financing Order or Final Financing Order as applicable, upon the failure of any Loan Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each of the Guarantors hereby promises to and will forthwith pay, or cause to be paid, to the Agent or such other Credit Party as designated thereby in cash the amount of such unpaid Guaranteed Obligations. Upon payment by any Guarantor of any sums to any Agent or any other Credit Party as provided above, all rights of such Guarantor against any Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Guaranteed Obligations. In addition, any indebtedness of the Borrowers or any other Loan Party now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior indefeasible payment in full in cash of all of the Guaranteed Obligations. Notwithstanding the foregoing, prior to the occurrence of an Event of Default, the Borrowers or any other Loan Party may make payments to any Guarantor on account of any such indebtedness. After the occurrence and during the continuance of an Event of Default, none of the Guarantors will demand, sue for, or otherwise attempt to collect any such indebtedness until the indefeasible payment in full in cash of the Guaranteed Obligations, termination or expiration of the Commitments, and termination of the Issuing Bank's obligation to issue Letters of Credit under the Credit Agreement. If any amount shall erroneously be paid to any Guarantor on account of (a) such subrogation, contribution, reimbursement, indemnity or similar right or (b) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Agent and the other Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement.

SECTION 9. <u>Limitation on Guaranty of Guaranteed Obligations</u>. In any action or proceeding with respect to any Guarantor involving any state corporate law, the Bankruptcy Code or any other state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of such Guarantor under SECTION 1 hereof would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under said SECTION

1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Credit Party, any Agent or any other Person, be automatically limited and reduced to the highest amount which is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

SECTION 10. Information. Each of the Guarantors assumes all responsibility for being and keeping itself informed of each Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Agent or the other Credit Parties will have any duty to advise any of the Guarantors of information known to it or any of them regarding such circumstances or risks.

SECTION 11. Termination. This Guaranty (a) shall terminate when (i) the Commitments shall have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Guaranteed Obligations shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated or been cash collateralized or backstopped by a letter of credit reasonably acceptable to the Administrative Agent and the Issuing Bank to the extent provided in the Credit Agreement, and (iv) all Letter of Credit Obligations shall have been paid in full, and (b) shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by any Credit Party or any Guarantor upon the bankruptcy or reorganization of any Loan Party or otherwise.

SECTION 12. Costs of Enforcement. Without limiting any of their obligations under the Credit Agreement or the other Loan Documents, and without duplication of any fees or expenses provided for under the Credit Agreement or the other Loan Documents, the Guarantors, jointly and severally, agree to pay on demand all Credit Party Expenses in connection with (i) the administration, negotiation, documentation or amendment of this Guaranty, and (ii) the Agent's and any other Credit Party's efforts to collect and/or to enforce any of the Guaranteed Obligations of the Guarantors hereunder and/or to enforce any of the rights, remedies, or powers of any Agent or any other Credit Party against or in respect of the Guarantors (whether or not suit is instituted by or against any Agent or any other Credit Party).

SECTION 13. Binding Effect; Several Agreement; Assignments. Whenever in this Guaranty any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the Guarantors that are contained in this Guaranty shall bind and inure to the benefit of each of the Guarantors and its respective successors and assigns. Subject to the entry of the Interim Financing Order or the Final Financing Order as applicable, this Guaranty shall be binding upon each of the Guarantors and their respective successors and assigns, and shall inure to the benefit of the Agent and the other Credit Parties, and their respective successors and assigns, except that no Guarantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such attempted assignment or transfer shall be void), except as expressly permitted by this Guaranty or the Credit Agreement. This Guaranty shall be construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

SECTION 14. <u>Waivers; Amendment.</u>

(a)     The rights, remedies, powers, privileges, and discretions of the Agent or any other Credit Party hereunder and under applicable Law (herein, the "<u>Agents' Rights and Remedies</u>") shall be cumulative and not exclusive of any rights or remedies which they would otherwise have. No delay or omission by the Agent or any other Credit Party in exercising or enforcing any of the Agents' Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Agent or any other Credit Party of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Agents' Rights or Remedies, and no express or implied agreement or transaction of whatever nature entered into between the Agent or any other Credit Party and any Person, at any time, shall preclude the other or further exercise of the Agents' Rights and Remedies. No waiver by the Agent or any other Credit Party of any of the Agents' Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. The Agents' Rights and Remedies may be exercised at such time or times and in such order of preference as the Agent or any other Credit Party may determine. The Agents' Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Guaranteed Obligations. No waiver of any provisions of this Guaranty or any other Loan Document or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor or any other Guarantor to any other or further notice or demand in the same, similar or other circumstances.

(b)     Neither this Guaranty nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Agent or any other Credit Party and the Guarantor or Guarantors with respect to whom such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

SECTION 15. <u>Copies and Facsimiles.</u>  This instrument and all documents which have been or may be hereinafter furnished by the Guarantors to the Agent or any other Credit Party may be reproduced by the Agent or any other Credit Party by any photographic, microfilm, xerographic, digital imaging, or other process. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business). Any facsimile or other electronic transmission which bears proof of transmission shall be binding on the party which or on whose behalf such transmission was initiated and likewise so admissible in evidence as if the original of such facsimile or other electronic transmission had been delivered to the party which or on whose behalf such transmission was received.

SECTION 16. <u>Governing Law.</u>  THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT

INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 17. Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement, provided that communications and notices to the Guarantors may be delivered to the Lead Borrower on behalf of each of the Guarantors.

SECTION 18. Survival of Agreement; Severability.

(a)     All covenants, agreements, indemnities, representations and warranties made by the Guarantors herein and in the certificates or other instruments delivered in connection with or pursuant to this Guaranty, the Credit Agreement or any other Loan Document shall be considered to have been relied upon by the Agent and the other Credit Parties and shall survive the execution and delivery of this Guaranty, the Credit Agreement and the other Loan Documents and the making of any Loans by the Lenders and the issuance of any Letters of Credit by the Issuing Bank, regardless of any investigation made by any Agent or any other Credit Party or on their behalf and notwithstanding that the Administrative Agent or other Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended, and shall continue in full force and effect until terminated as provided in SECTION 11 hereof.  The provisions of SECTION 5 and SECTION 12 hereof shall survive and remain in full force and effect regardless of the repayment of the Guaranteed Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Guaranty or any provision hereof.

(b)     Any provision of this Guaranty held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 19. Counterparts.  This Guaranty may be executed in counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Guaranty by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Guaranty.

SECTION 20. Rules of Interpretation.  The rules of interpretation specified in Sections 1.02 through 1.05 of the Credit Agreement shall be applicable to this Guaranty.

SECTION 21. Jurisdiction; Consent to Service of Process.

(a)      Each of the Guarantors agrees that any suit for the enforcement of this Guaranty or any other Loan Document shall be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have, or abstains from exercising, jurisdiction, may be brought in the United States District Court of the Southern District of New York, as the Agent may elect in its sole discretion, and consents to the non-exclusive jurisdiction of such courts. Each party to this Guaranty hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.    Each Guarantor irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the Bankruptcy Court or the United States District Court of the Southern District of New York, and in each case, any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty or any other Loan Document, or for recognition or enforcement of any judgment, and each Guarantor hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined, to the fullest extent permitted by applicable law, in such federal court. Each Guarantor hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this Guaranty or in any other Loan Document shall affect any right that the Agent or any other Credit Party may otherwise have to bring any action or proceeding relating to this Guaranty or any other Loan Document against any Guarantor or its properties in the courts of any jurisdiction.

(b)      Each of the Guarantors agrees that any action commenced by any Guarantor asserting any claim or counterclaim arising under or in connection with this Guaranty or any other Loan Document shall be brought solely in the Bankruptcy Court or, if the Bankruptcy Court does not have, or abstains from exercising, jurisdiction, solely in the United States District Court of the Southern District of New York, as the Agent may elect in its sole discretion, and consents to the exclusive jurisdiction of such courts with respect to any such action.

(c)      Each party to this Guaranty irrevocably consents to service of process in the manner provided for notices in SECTION 17.  Nothing in this Guaranty or any other Loan Document will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.

SECTION 22. Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND WAIVES THE RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM IN RESPECT OF, AND ALL STATUTES OF LIMITATIONS WHICH MAY BE RELEVANT TO, SUCH ACTION OR PROCEEDING; AND WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR

ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT THE AGENT AND THE OTHER CREDIT PARTIES HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION 22.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Guarantors have duly executed this Guaranty as of the day and year first above written.

**GUARANTORS:**

**HF ENTERPRISES, INC.**
**HF RESOURCES, INC.**

By: _____
Name: Rebecca Flick
Title:   Vice President and Assistant Secretary

[Signature Page to Guaranty]

**Exhibit B**
**(Payoff Letter)**

February 1, 2016

**VIA ELECTRONIC MAIL**
**AND OVERNIGHT COURIER**

Hancock Fabrics, Inc.
One Fashion Way
Baldwyn, Mississippi 38824

Re:   **Events of Default; Notice of Acceleration**

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of April 22, 2015 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), by and among (i) Hancock Fabrics, Inc., for itself and as Lead Borrower (in such capacity, the "Lead Borrower") for the other Borrowers party thereto from time to time (each, individually, a "Borrower" and, collectively, the "Borrowers"), (ii) the Borrowers party thereto from time to time, (iii) the Guarantors party thereto from time to time, (iv) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "Agent") for its own benefit and the benefit of the other Credit Parties referred to therein, (v) Wells Fargo Bank, National Association, as Swing Line Lender, (vi) GACP Finance Co., LLC, as Term Agent and (vii) the lenders from time to time party thereto (each, individually, a "Lender" and, collectively, the "Lenders"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

The Lead Borrower has informed the Agent that the Borrowers and Guarantors intend imminently to file for relief under chapter 11 of the United States Bankruptcy Code. As you know, one or more Events of Default have occurred and continue to exist under the Credit Agreement.

Please take NOTICE that as a result of the occurrence of the existing Events of Default (a) the Agent hereby declares the Revolving Commitment of each Revolving Lender to make Committed Revolving Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, (b) the Agent hereby declares the unpaid principal amount of all outstanding Committed Revolving Loans, and all interest accrued and unpaid thereon, and any other Obligations related to the foregoing, to be immediately due and payable, and (c) the Term Agent hereby declares the unpaid principal amount of the Term Loan, and all interest accrued and unpaid thereon, and any other Obligations related to the foregoing, to be immediately due and payable.

Please take further NOTICE that, as a result of the occurrence of the Termination Date, the Borrowers are required to pay to the Agent (a) for the account of each Revolving Lender, a Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter) equal to $2,000,000, which amount shall be paid from the proceeds of a Committed Revolving Loan made by the Agent pursuant to Section 2.02(d) of the Credit Agreement in an amount equal to such Revolver

Early Termination Fee, and (b) for the account of each Term Lender, a Term Loan Prepayment Fee (as defined in the GA Fee Letter) equal to $700,000, which amount shall be paid by adding such amount to the unpaid principal amount of the outstanding Term Loan.

Due to the occurrence of the existing Events of Default and the termination of the Revolving Commitments, please be advised that the Lenders do not intend to fund further advances to the Borrowers under the Credit Agreement. Please note that, to the extent any Lender makes additional extensions of credit to any Loan Party, such credit extensions are strictly discretionary and shall be made in each Lender's sole discretion, shall not establish a course of dealing and shall be without prejudice to such Lender's right to cease making loans or otherwise extend credit to the Loan Parties, and without prejudice to the rights of the Agent to exercise all available rights and remedies under the Loan Documents and applicable law.

**Under the terms of the Loan Documents, the Agent for the benefit of the Lenders, has various rights and remedies that are available following the occurrence of an Event of Default. The Borrowers are hereby notified that Agents and Lenders have not abandoned, waived or deferred any rights or remedies of Agent under the Loan Documents or otherwise at law as a result of the existing Events of Default, and any negotiations and other actions or inaction undertaken in connection with such existing Event of Default shall not constitute a waiver of such existing Events of Default or of the Agents' and Lenders' rights or remedies under the Loan Documents. To the extent that the Agent has delivered any notices of default to the Borrowers, or hereafter delivers any such notices, such notices shall be fully effective and no cure periods, notice periods, or other time periods shall be deemed to be tolled or suspended unless the Agent agrees otherwise in writing. The Agent reserves the right to exercise any rights or remedies under the Loan Documents at any time or from time to time, for any reason whatsoever and notwithstanding the status of any discussions that may have occurred or may occur between the Borrowers, Agents and Lenders.**

**No waiver of the existing Events of Default shall be imputed to the Agents and Lenders, or shall be deemed to exist or arise, by reason of any failure of the Agent to exercise any right or enforce any remedy that it may have as a result of the occurrence of the existing Events of Default or any delays or discussions related thereto, and no modification, amendment, termination or waiver of any of the provisions of the Credit Agreement shall exist or arise or be or become enforceable unless executed by the Agents and Lenders. Neither the "day by day" forbearance nor anything in this letter agreement or in any ongoing discussions or negotiations between the Borrowers, Agents and Lenders shall directly or indirectly (i) defer any enforcement action, (ii) constitute a consent or waiver of any past, present or future Event of Default or other violation of any provisions of the Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Loan Documents or any right, power or remedy of the Agent, or (iv) constitute a course of dealing or other basis for altering any Obligations of the Loan Parties under the Loan Documents.**

.

The Agent expressly reserves all of its rights, powers and remedies under the Loan Documents or applicable law, including, without limitation, the right at any time (i) to assert the existence of any and all Events of Defaults, (ii) to commence any legal or other action to collect any or all of the Obligations owing under the Loan Documents from the Borrowers, (iii) foreclose or otherwise realize on any or all of the Collateral and/or appropriate, setoff or apply to the payment of any or all of the Obligations under the Loan Documents owing to the Lenders, or (iv) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by the Loan Documents or applicable law.

The above is not a full statement by the undersigned of all the facts, claims or rights involved, all of which are hereby expressly reserved.

[signature pages follow]

Sincerely,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** as Administrative Agent and as Collateral Agent

By:_____

Name: Joseph Burt

Title: Director

**GACP FINANCE CO., LLC,** as Term Agent

By: _____

Name: Robert A. Louzan

Title: Managing Director

cc:    Sung Pak, Esq. (via e-mail spak@omm.com)
       O'Melveny & Myers LLP
       Times Square Tower
       7 Times Square
       New York, New York 10036

       Sanjay Thapar, Esq. (via email: sanjaythapar@paulhastings.com)
       Paul Hastings LLP
       75 East 55th Street
       New York, New York 10022

[Signature Page to Termination Letter]

**Exhibit C**
**(Budget)**

Excerpt:  Subject to full Budget 13-week cash flow

HANCOCK FABRICS
Forecast DIP Cash Flow v16.3 (2/1/16)

Post/Petition
Filing 2/2/16

| | Fiscal Period | 1 | 1 | 1 | 1 | 2 |
|---|---|---|---|---|---|---|
| | 4-5-4 Month | Feb | Feb | Feb | Feb | Mar |
| | Week Ending | 2/6/2016 | 2/13/2016 | 2/20/2016 | 2/27/2016 | 3/5/2016 |
| | Fiscal Week # | 1 | 2 | 3 | 4 | 5 |
| | Forecast/Actual | Forecast | Forecast | Forecast | Forecast | Forecast |

**I. CASH FLOW**

Cash Receipts
| | | | | | |
|---|---|---|---|---|---|
| Payment to Wells Fargo | 4,023,841 | 4,485,251 | 4,003,338 | 3,869,519 | 3,826,279 |
| 70 Store Liquidation Sales | | 643,271 | 2,420,359 | 2,226,186 | 2,922,575 |
| **Total Cash Receipts** | **4,023,841** | **5,128,522** | **6,423,694** | **6,095,705** | **6,748,854** |

Other Asset Recovery
| | | | | | |
|---|---|---|---|---|---|
| Asset Recovery - 333 Sale | | | | - | |
| Liquidator Reimbursements | | | | - | |
| **Total Other Asset Recovery** | **-** | **-** | **-** | **-** | **-** |

Cash Disbursements
Operating
| | | | | | |
|---|---|---|---|---|---|
| Vendor Payments - Trade | (1,791,391) | (3,296,725) | (3,779,332) | (2,540,843) | (552,696) |
| Vendor Payments - Expense | (325,128) | (486,611) | (500,000) | (947,656) | (1,270,000) |
| Rent and Occupancy | | | | | (2,287,000) |
| Payroll - Stores | (395,264) | (377,926) | (377,925) | (377,925) | (377,925) |
| Payroll - Admin | (546,148) | | (546,148) | | (546,148) |
| Benefits | (152,361) | (184,872) | (99,731) | (141,613) | (122,076) |
| Pension Fund Contribution | | | | | |
| Sales Tax | (7,474) | (179,390) | (1,138,735) | (228,187) | (16,004) |
| Payroll and Other Tax Payments | (305,504) | (149,614) | (327,209) | (166,433) | (318,457) |
| Professional Fees - BK | | | | | |
| Professional Fees - To Escrow | (405,000) | (295,000) | (295,000) | (295,000) | (157,000) |
| Conform/Bank Fees | | | (5,539) | (42,918) | |
| Import Draws/Fees/SBLC | (37,211) | | (22,288) | (46,403) | |
| Liquidator Expenses - 70 Stores | | | (95,209) | (94,974) | (96,218) |
| Other Disbursements | (150,000) | | (451,469) | | |
| Bank Funding | | | | | |
| **Total Operating Cash Disbursements** | **(4,116,478)** | **(4,970,037)** | **(7,636,555)** | **(4,979,951)** | **(5,853,526)** |

Financing
| | | | | | |
|---|---|---|---|---|---|
| Principal | | | | - | - |
| Interest | | | | (593,552) | |
| Fees - Wells Fargo | (425,000) | | | - | 750,000 |
| Fees - GA | (87,500) | | | - | |
| Miscellaneous | | (2,233,965) | | - | |
| **Total Financing Cash Disbursements** | **(512,500)** | **(2,233,965)** | **-** | **(593,552)** | **750,000** |

| | | | | | |
|---|---|---|---|---|---|
| **Total Cash Disbursements** | **(4,628,978)** | **(7,204,002)** | **(7,636,555)** | **(5,573,503)** | **(5,103,526)** |

| | | | | | |
|---|---|---|---|---|---|
| **Net Cash Flow From Operations** | **(605,137)** | **(2,075,480)** | **(1,214,861)** | **522,202** | **1,645,328** |

**II. REVOLVER - PRE PETITION**

| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | (57,269,711) | (53,245,869) | (48,117,348) | (41,693,654) | (35,597,949) |
| Add: Borrowings | | | | | |
| Less: Repayments | 4,023,841 | 5,128,522 | 6,423,694 | 6,095,705 | 8,746,854 |
| Fees/Adjustments | | | | | 26,849,095 |
| **Ending Revolver Balance** | **(53,245,869)** | **(48,117,348)** | **(41,693,654)** | **(35,597,949)** | **-** |

**III. REVOLVER - POST PETITION**

| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | | (4,628,978) | (11,832,980) | (19,471,535) | (25,045,038) |
| Add: Borrowings | (4,628,978) | (7,204,002) | (7,638,555) | (5,573,503) | (5,103,526) |
| Less: Repayments | | | | | |
| Fees/Adjustments | | | | | (28,849,095) |
| **Ending Revolver Balance** | **(4,628,978)** | **(11,832,980)** | **(19,471,535)** | **(25,045,038)** | **(58,997,658)** |

**IV. TERM LOAN**

| | | | | | |
|---|---|---|---|---|---|
| Starting Term Loan Balance | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) |
| Add: Borrowings | | | | - | - |
| Less: Repayments | | | | - | - |
| **Ending Term Loan Balance** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** |

**V. CASH IN BANK**

| | | | | | |
|---|---|---|---|---|---|
| Starting Cash in Bank | - | - | - | - | - |
| Add: Cash Receipts | - | - | - | - | - |
| Less: Disbursements | - | - | - | - | - |
| Other | - | - | - | - | - |
| **Ending Cash In Bank** | **-** | **-** | **-** | **-** | **-** |

**IV. BORROWING BASE**

| | | | | | |
|---|---|---|---|---|---|
| Accounts receivable | 1,826,410 | 1,487,062 | 2,413,190 | 1,743,407 | 1,928,781 |
| Inventory | 65,547,125 | 64,446,754 | 63,605,707 | 64,127,574 | 63,596,751 |
| Property | 6,825,000 | 6,825,000 | 6,825,000 | 6,825,000 | 6,825,000 |
| Reserves | (6,394,097) | (7,320,330) | (7,491,336) | (7,204,310) | (7,290,552) |
| Borrowing Base (week in arrears) | 70,502,938 | 65,438,487 | 65,442,550 | 65,491,672 | 65,059,980 |

| | | | | | |
|---|---|---|---|---|---|
| Less: Letters Of Credit | | | | | |
| SBLC | 6,536,915 | 4,301,950 | 4,301,950 | 4,301,950 | 4,301,950 |
| Documentary | 101,660 | 101,660 | 79,392 | 32,989 | 32,989 |
| Less: Block | 5,885,900 | 980,000 | (210,000) | 400,000 | 1,800,000 |
| Less: Loan Balance | 57,874,847 | 59,950,328 | 61,165,158 | 60,642,986 | 58,997,658 |
| **Ending Revolver Availability** | **104,517** | **104,549** | **106,029** | **113,747** | **118,363** |

| | | | | | |
|---|---|---|---|---|---|
| MEMO 1: Pro Fee Escrow Account Balance | 405,000 | 700,000 | 995,000 | 1,290,000 | 1,347,000 |

FOOTNOTE: In the event that a higher alternative
liquidation bid is accepted by the Company, the
parties will discuss in good faith additional
payments to GACP.

**The accompanying financial information is based on
information provided by Hancock Fabrics, Inc. Clear Thinking
Group has not audited or otherwise verified the information
provided to us, nor will we provide any assurance concerning
the reliability, accuracy, or completeness of any materials
provided by or on behalf of Hancock Fabrics, Inc.

**Hancock Fabrics, Inc.**
**Professional Fees Schedule**
*(in 000's)*

Excerpt: Subject to
full Budget
13-week cash flow

| Weekly | Feb-16 | Mar-16 |
|---|---|---|
| **PROFESSIONAL FEES/EXP INCURRED:** | Post Petition | |
| Debtor Legal Counsel | 730 | 540 |
| Debtor Financial Advisor | 285 | 220 |
| Privacy Ombudsman | 15 | 15 |
| Accountants - Tax | - | - |
| Legal-Other | - | - |
| Legal-Sr. Secured - Wells | 101 | 101 |
| Legal-Jr. Secured - Term Loan GA | 75 | 75 |
| Investment Banker | 100 | 350 |
| Real Estate Professional | - | - |
| Bank Audits/Field Exams | 35 | - |
| Creditor Counsel & Financial Adv. | 315 | 210 |
| Note Holders Counsel & Adv | - | - |
| Ch. 11 Liquidating Trustee | - | - |
| United States Trustee | 30 | - |
| Noticing Agent | 110 | 110 |
| **Total Pro Fees - Bankruptcy Related** | **1,796** | **1,621** |

> **The accompanying financial information is based on information
> provided by Hancock Fabrics, Inc. Clear Thinking Group has not audited
> or otherwise verified the information provided to us, nor will we provide
> any assurances concerning the reliability, accuracy, or completeness of
> any materials provided by or on behalf of Hancock Fabrics, Inc.

## EXHIBIT B

### Interim Cash Collateral Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

HANCOCK FABRICS, INC., et al., [1]
a Delaware corporation,
                              Debtors.

Chapter 11

Case No. 16-_____  (____)

Joint Administration Requested

## INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, AND 507 (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF

This matter having come before the Court upon the motion (the "**Motion**")[2] by Hancock Fabrics, Inc., a Delaware corporation ("**Hancock**"), HF Merchandising, Inc., a Delaware corporation, Hancock Fabrics of MI, Inc., a Delaware corporation, Hancock Fabrics, LLC, a Delaware limited liability company, hancockfabrics.com, Inc., a Delaware corporation, HF Enterprises, Inc., a Delaware corporation, and HF Resources, Inc., a Delaware corporation, each as a debtor and debtor in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), pursuant to Sections 105, 361, 362, 363, and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101, *et seq.*, as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for:

(i)       entry of this "**Interim Order**"; and

(ii)      authorization to use "Cash Collateral," as defined in Section 363(a) of the Bankruptcy Code, that the Debtors are holding or may obtain, pursuant to Bankruptcy Code

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Section 361 and 363 and Bankruptcy Rules 4001(b) and 6004 on the terms and conditions set forth in this Interim Order; and

(iii)     the provision of adequate protection to the Prepetition Subordinated Creditors (as defined herein) to the extent set forth herein; and

(iv)     vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code in accordance with the provisions hereof to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(v)     scheduling a final hearing (the **"Final Hearing"**) to consider the relief requested in the Motion, the entry of an order (the **"Final Order"**) approving the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(vi)     granting related relief.

The Court having considered the Motion, the *Declaration of Dennis Lyons in Support of Chapter 11 Petitions and Request for First Day Relief* in support of the Chapter 11 petitions and first day motions, including the Motion, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the **"Interim Hearing"**); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014, and Local Bankruptcy Rule 9013-1; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their

creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

A.    *Petition Date*.  On February 2, 2016 (the "**Petition Date**"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, (the "**Court**"), commencing these Cases.

B.    *Debtors in Possession*.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rule 4001-2.

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

3

D.    *Committee Formation*.  As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not appointed any official committee of unsecured creditors in these Cases pursuant to Section 1102 of the Bankruptcy Code (a "**Committee**").

E.    *Debtors' Stipulations*.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraphs 15 and 16 herein, the Debtors (on behalf of and for themselves) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(vi) below are referred to herein as the "**Debtors' Stipulations**"):

(i)    *Prepetition Indenture Documents*.  As of the Petition Date, the Debtors had outstanding secured debt to various noteholders (collectively, the "**Prepetition Subordinated Noteholders**") pursuant to that certain Indenture dated as of November 20, 2012 (as amended, modified and supplemented from time to time, including pursuant to that certain Supplemental Indenture dated as of April 22, 2015, the "**Prepetition Subordinated Indenture**" and together with all related documents, guaranties and agreements, the "**Prepetition Subordinated Indenture Documents**"), by and between (a) Hancock and (b) Deutsche Bank National Trust Company, as indenture trustee (in such capacity, the "**Prepetition Indenture Trustee**"; the Prepetition Indenture Trustee and the Prepetition Subordinated Noteholders are collectively referred to herein as the "**Prepetition Subordinated Secured Creditors**").

(ii)    *Prepetition Subordinated Obligations*.  As of the Petition Date, the outstanding principal amount owed by the Debtors under the Prepetition Subordinated Indenture Documents was not less than $8,204,000 (together with any amounts paid, incurred or accrued, including but not limited to interest, fees and expenses, prior to the Petition Date in accordance with the Prepetition Subordinated Indenture Documents, the "**Prepetition Subordinated**

**Secured Obligations**"). As more fully set forth in the Prepetition Subordinated Indenture Documents, prior to the Petition Date, the Debtors granted second-priority security interests in and liens on substantially all personal and real property of the Debtors, including, without limitation, owned real estate, accounts, inventory, equipment and general intangibles (collectively, the "**Prepetition Collateral**"), to the Prepetition Indenture Trustee (the "**Prepetition Subordinated Liens**") to secure repayment of the Prepetition Subordinated Obligations.

(iii)    *Subordination Provisions.*    Pursuant to the terms of the Prepetition Subordinated Indenture, including, without limitation, Article XI of the Prepetition Subordinated Indenture, (A) the Prepetition Obligations are subordinated in all respects to the prior payment in full of all "Obligations" as described in the that certain Credit Agreement dated as of April 22, 2015 (as amended, modified and supplemented from time to time, the "**Prepetition Senior Credit Agreement**" and together with all related documents, guaranties and agreements, the "**Prepetition Senior Credit Documents**"), by and among (a) Hancock, (b) the other Debtors party thereto from time to time, (c) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities herein, the "**Prepetition Senior Agent**") for its own benefit and the benefit of the other "Credit Parties" (as defined therein), (e) GACP Finance Co., LLC, as term agent (the "**Prepetition Term Agent**") and (f) the lenders from time to time party thereto (together with the Prepetition Agent and Prepetition Agent, the "**Prepetition Senior Creditors**"; the Prepetition Senior Creditors together with the Prepetition Subordinated Creditors, the "**Prepetition Secured Creditors**"), and (B) the Prepetition Subordinated Liens are subordinate and junior in all respects to the liens on the Prepetition Collateral granted to the Prepetition Senior Agent to secured repayment of the Prepetition Senior Obligations

(collectively, such terms are referred to herein as the "**Indenture Subordination Provisions**"). The Indenture Subordination Provisions are a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code.

(iv)        *Validity, Perfection and Priority of Prepetition Subordinated Liens and Obligations.* The Debtors and the Prepetition Subordinated Secured Creditors acknowledge and agree that:    (a) the Prepetition Subordinated Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) the Prepetition Subordinated Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to valid, binding, enforceable, properly perfected, and non-avoidable liens as of the Petition Date (the "**Prepetition Permitted Liens**") that otherwise had priority over the Prepetition Subordinated Liens on the Prepetition Collateral;[4] (c) the Prepetition Subordinated Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and constitute "allowed claims" within the meaning of section 502 of the Bankruptcy Code; (d) no offsets, challenges, objections, defenses, claims, impairment or counterclaims of any kind or nature to any of the Prepetition Subordinated Liens or the Prepetition Subordinated Secured Obligations exist, and no portion of the Prepetition Subordinated Liens or the Prepetition Subordinated Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, recoupment, reductions, setoff or subordination (whether equitable, contractual or otherwise) pursuant to the Bankruptcy

---

[4] For purposes of this Interim Order, Prepetition Permitted Liens shall include all liens that were valid, senior, enforceable, nonavoidable, and perfected under applicable law as of the Petition Date. Nothing herein shall constitute a finding or ruling by this Court that any such Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, any Committee and the Prepetition Subordinated Creditors to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest.

Code or applicable non-bankruptcy law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, counterclaims, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Subordinated Secured Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Subordinated Indenture Documents.

(v) *Cash Collateral.* The Debtors acknowledge and stipulate that all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute Cash Collateral and is Prepetition Collateral of the Prepetition Subordinated Secured Creditors.

(vi) *Release.* The Debtors hereby forever, unconditionally and irrevocably release, discharge and acquit the Prepetition Subordinated Secured Creditors, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "**Releasees**") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Prepetition Subordinated Indenture Documents, the Prepetition Subordinated Liens and/or the transactions contemplated hereunder or thereunder including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity,

priority, perfection or avoidability of the Prepetition Subordinated Indenture Documents, Prepetition Subordinated Secured Obligations and the Prepetition Subordinated Liens.    The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Subordinated Secured Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order and, if applicable, the Final Order.

       F.      *Findings Regarding the Use of Cash Collateral and the Collateral.*

       (i)      *Request for Use of Cash Collateral.*    The Debtors seek authority to use Cash Collateral on the terms described herein to administer their Cases and fund their operations. The Prepetition Subordinated Secured Creditors have consented to the use of their Cash Collateral on the terms set forth in this Interim Order.    At the Final Hearing, the Debtors may seek final approval of the use of Cash Collateral arrangements pursuant to the Final Order. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

       (ii)      *Immediate Need for Use of Cash Collateral.*    The Debtors' need to use Cash Collateral is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.    The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and otherwise finance their operations requires the use of Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful administration of these Cases. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses

or to maintain their properties in the ordinary course of business without the authorized use of Cash Collateral.

G. *Adequate Protection*. The Prepetition Subordinated Secured Creditors are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to §§ 361, 362, 363 and 364 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral. The Prepetition Subordinated Secured Creditors reserve the right to seek additional adequate protection beyond the adequate protection provided in this Interim Order after the DIP Obligations and Prepetition Senior Obligations owed, in each case, to the Prepetition Senior Creditors or their permitted successors and assigns have been paid in full, and the entry of this Interim Order shall not prejudice such reservation of rights.

H. *Sections 506(c) and 552(b)*. In light of the Prepetition Subordinated Secured Creditors' agreement to subordinate the Adequate Protection Superpriority Claims (as defined below) and the Adequate Protection Liens (as defined below) to the Carve Out (as defined below), the Prepetition Permitted Liens, the Senior Agency Agreement Liens, the Senior Agency Agreement Claims, the DIP Liens, and the DIP Superpriority Claim, in each case as applicable, upon entry of the Final Order, each of the Prepetition Subordinated Secured Creditors is entitled to the benefits of a waiver of (a) the provisions of Section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under Section 552(b) of the Bankruptcy Code.

I.     *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee for the District of Delaware; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel to each of the Prepetition Senior Agent and the Prepetition Term Agent; (vi) counsel to the Prepetition Indenture Trustee; (vii) the Pension Benefit Guaranty Corporation; and (viii) those parties, if any, who have filed a notice of appearance and request for service of pleadings in these Cases pursuant to Bankruptcy Rule 2002.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required except as set forth in paragraph 25 below.

J.     *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     *Motion Approved*.  The Motion is granted on an interim basis and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.     *Objections Overruled*.  All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

3.      *Authorization to Use Cash Collateral*.  Subject to the terms, conditions, and limitations set forth in this Interim Order, the Debtors are hereby authorized to use the Cash Collateral until the Termination Declaration Date (as defined below); provided, however, that during the Remedies Notice Period (as defined below) the Debtors may use Cash Collateral solely (a) in the ordinary course of business, including, without limitation, to meet payroll (other than severance), (b) to fund the Carve Out, and (c) as otherwise agreed by the Prepetition Indenture Trustee.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business (which shall be subject to further Orders of this Court).

4.      *Adequate Protection Liens*.

(a)      *Creation of Adequate Protection Liens*.  To the extent of any diminution in value of their respective Prepetition Subordinated Liens on the Prepetition Collateral, the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) is hereby granted, pursuant to Sections 361, 363 and 364(d) of the Bankruptcy Code, valid and perfected replacement and additional security interests in, and liens on (the "**Adequate Protection Liens**") all of the Debtors' right, title and interest in, to and the following   (the "**Adequate Protection Collateral**"):[5]

(i)      all Accounts;

(ii)      all Goods, including Equipment, Inventory and Fixtures;

(iii)      all Documents, Instruments and Chattel Paper;

(iv)      all Letters of Credit and Letter-of-Credit Rights;

---

[5] All defined terms in the description of Collateral shall have the meanings ascribed thereto in the Prepetition Subordination Indenture Documents.  All terms not specifically defined in the Prepetition Subordination Indenture Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

(v)      all Securities Collateral;

(vi)      all Investment Property;

(vii)      all Intellectual Property;

(viii)      all Commercial Tort Claims;

(ix)      all General Intangibles (including, without limitation, all Payment Intangibles)

(x)      all Deposit Accounts;

(xi)      all Supporting Obligations;

(xii)      all money, cash or cash equivalents;

(xiii)      all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution from or for the account of any Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)      all proceeds of leases of real property;

(xv)      all owned real property;

(xvi)      effective upon the entry of the Final Order, all proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and Section 724(a) of the Bankruptcy Code (the "**Avoidance Actions**");

(xvii)      effective upon the entry of the Final Order, the Debtors' rights under Section 506(c) and Section 550 of the Bankruptcy Code and the proceeds thereof;

(xviii)      to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of any Debtor;

(xix)      all books, records, and information relating to any of the foregoing and/or to the operation of any Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xx)        to the extent not otherwise covered by clause (i) through (xix) above, all other personal property of each Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided that the Adequate Protection Collateral shall not include Excluded Property (as defined in the Prepetition Subordinated Indenture).

The Adequate Protection Liens granted to the Prepetition Indenture Trustee shall secure Prepetition Subordinated Obligations. The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject only to (i) the DIP Liens, (ii) the Prepetition Permitted Liens, (iii) any adequate protection liens granted to the Prepetition Senior Agent, (iv) the Carve Out, and (v) the Senior Agency Agreement Liens.

(b)      *Treatment of Adequate Protection Liens.* Other than as set forth herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases (as defined below). The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to cases under Chapter 7 of the Bankruptcy Code (collectively, the "**Successor Cases**"), and/or upon the dismissal of any of the Cases or Successor Cases.

5.      *Adequate Protection Superpriority Claims.*

(a)      *Superpriority Claim of Prepetition Indenture Trustee.* As further adequate protection of the interests of the Prepetition Indenture Trustee and the other Prepetition Subordinated Creditors with respect to the Prepetition Subordinated Obligations, the Prepetition Indenture Trustee (for the benefit of itself and the other Prepetition Subordinated Creditors) is hereby granted an allowed administrative claim against the Debtors' estates under Sections 503

13

and 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Indenture Trustee's interests in the Prepetition Collateral.

(b)    *Priority of Adequate Protection Superpriority Claims.*    The Adequate Protection Superpriority Claims granted to the Prepetition Indenture Trustee shall be junior to the Carve Out, the Prepetition Permitted Liens, the DIP Liens, the DIP Superpriority Claim, the Senior Agency Agreement Claims, and any adequate protection claim granted to the Prepetition Senior Agent.    The Adequate Protection Liens and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code.

6.    *Carve-Out.*

(a)    As used in this Interim Order, the "**Carve Out**" means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a) and Section 3717 of title 31 of the United States Code plus interest at the statutory rate; (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) the aggregate amount of unpaid fees, costs and expenses of the Debtors' and any Committee's professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327(a) or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), incurred prior to the Termination Declaration Date (whether or not allowed by the Court prior to or after the delivery of a Termination Declaration); (iv) the

Success Fee; and (v) $150,000 (the "**Post Termination Declaration Date Carve-Out Amount**") for Allowed Professional Fees incurred from and after the Termination Declaration Date.

(b)    Notwithstanding the foregoing, the Success Fee shall be deemed part of the Carve Out, provided that the Success Fees shall be paid solely from the proceeds of a Permitted Sale and shall not reduce the Post Termination Declaration Carve Out Amount. No Plan shall fail to provide for the payment in full of any outstanding Transaction Fees on the effective date thereof. No Financing Transaction (as defined in the Sale Consultant Agreement) shall fail to provide for payment in full of the Financing Success Fee (as defined in the Sale Consultant Agreement) on the closing date thereof.

7.    *No Direct Obligation to Pay Professional Fees or Committee Expenses*.  None of the Prepetition Subordinated Secured Creditors shall be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Subordinated Secured Creditors in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

8.    *Modification of Automatic Stay*.  The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to permit the Debtors to grant the Adequate Protection Liens and the Adequate Protection Superpriority Claims.

9.    *Automatic Perfection of Liens*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including

the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Subordinated Creditors to the priorities granted herein.

10.     *Termination Date*.

(c)     On the Termination Declaration Date, subject to the expiration of the five (5) business day period after the Termination Declaration Date (the "**Remedies Notice Period**"), all authority to use Cash Collateral shall cease, provided, however, that during the Remedies Notice Period, the Debtors may use Cash Collateral solely as set forth in paragraph 3 herein.

(d)     As used in this Interim Order, "Termination Event" means any of the events specified below:

(i)     any of the Cases is dismissed or converted to a Chapter 7 or a Chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in any of the Cases; or

(ii)     any of the Debtors propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all Adequate Protection Superpriority Claims; or

(iii)    the Debtors fail to comply in any material respect with any covenant, agreement, obligation or requirement specified in this Interim Order, and in each case such failure shall continue unremedied for more than three (3) business days after written notice thereof; or

(iv)    the Debtors fail to provide any additional adequate protection ordered by the Court and such failure shall continue unremedied for more than three (3) days after written notice thereof.

11.    Notice of Termination.  Unless the Court orders otherwise during the Remedies Notice Period, upon the expiration of the Remedies Notice Period after the occurrence and during the continuance of a Termination Event and solely after the Discharge (as defined in the Prepetition Subordinated Indenture) of all Prepetition Senior Obligations and the DIP Obligations owed to the Prepetition Senior Creditors or their permitted successors and assigns, the Prepetition Indenture Trustee may in its discretion declare the consensual use of Cash Collateral terminated (such declaration, a "**Termination Declaration**").  Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtors, counsel to each Prepetition Secured Creditor, counsel to any Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**").  The use of Cash Collateral shall automatically cease on the Termination Declaration Date except as provided in paragraph 3.

12.    Proofs of Claim.  None of the Prepetition Subordinated Creditors or the Prepetition Subordinated Creditors will be required to file proofs of claim or requests for approval of administrative expenses in any of the Cases or Successor Cases, and the provisions of this Interim Order relating to the amount of the Prepetition Subordinated Obligations shall

constitute timely filed proofs of claim and/or administrative expense requests in each of the Cases.

13.    Limitations on the Cash Collateral and the Case Professionals Carve Out.    The Cash Collateral and the Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) for the payment of any services rendered by the professionals retained by the Debtors or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief, invalidating, setting aside, avoiding or subordinating, in whole or in part, any Prepetition Subordinated Obligations, (ii) for monetary, injunctive or other affirmative relief against the Prepetition Subordinated Creditors or their respective collateral, or (iii) preventing, hindering or otherwise delaying the exercise by the Prepetition Subordinated Creditors of any rights and remedies under this Interim Order or the Final Order; (b) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the Prepetition Subordinated Creditors; (c) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Prepetition Subordinated Creditors; or (d) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Subordinated Obligations, the Prepetition Subordinated Liens or any other rights or interests of the Prepetition Subordinated Creditors; *provided* that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the proceeds of the Prepetition Collateral (including Cash Collateral) or the Carve Out may be used

by the Committee during the Challenge Period to investigate the claims and liens of the Prepetition Secured Creditors (and other potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Creditors); *provided further* that the foregoing shall not prohibit the use of Cash Collateral and the Carve Out for the purpose of seeking non-consensual use of cash collateral (subject to the right of the Prepetition Subordinated Creditors to seek additional adequate protection in connection therewith).

14.    <u>Payment of Compensation</u>.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of any party to object to the allowance and payment of such fees and expenses.

15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(e)    The stipulations, findings, representations and releases contained in this Interim Order with respect to the Prepetition Subordinated Creditors and the Prepetition Subordinated Obligations shall be binding upon all parties-in-interest, any trustee appointed in these cases and any Committee (each, a **"Challenge Party"**), unless and solely to the extent that (i) the Debtors or, subject to clause (b) below, any other Challenge Party initiates an action or adversary proceeding relating to a Challenge (defined below) during the Challenge Period (defined below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  For purposes of this paragraph 15:  (a) **"Challenge"** means any claim or cause of action against any of the Prepetition Subordinated Creditors on behalf of the Debtors, their estates or the Debtors' creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtors' Stipulations set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Subordinated Creditor; (ii) the validity, allowability, priority, or

amount of any of the Prepetition Subordinated Obligations (including any fees included therein); (iii) the secured status of any of the Prepetition Subordinated Obligations; or (iv) any liability of any of the Prepetition Subordinated Creditors with respect to anything arising from any of the respective Prepetition Subordinated Indenture Documents; and (b) **"Challenge Period"** means (i) with respect to any party-in-interest other than the Committee, the period from the Petition Date until the date that is seventy five (75) calendar days after the entry of this Interim Order and (ii) with respect to the Committee, the period from the date such Committee is formed until the date that is sixty (60) calendar days thereafter.

(f)     During the Challenge Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists. If a Challenge Party identifies a basis to assert a Challenge, it must notify the Debtors and the Prepetition Subordinated Creditors during the Challenge Period of its demand that the Debtors initiate an action or adversary proceeding relating thereto, and from the date that the Debtors and the Prepetition Subordinated Creditors are so notified, the Debtors shall have five (5) days to notify the Challenge Party of whether the Debtors intend to initiate such action (or a settlement in lieu of an adversary) and ten (10) days to initiate such action. If the Debtors notify such Challenge Party that the Debtors do not intend to initiate an action, settlement, or adversary proceeding, the Challenge Party shall have ten (10) days from the receipt of such notice to seek standing to initiate an action or adversary proceeding. Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court. The Debtors, if timely notified of a potential Challenge and if such Challenge is commenced in a timely manner as set forth herein, shall retain authority to prosecute, settle or compromise such Challenge in the exercise of their business judgment and subject to any applicable further order of court.

(g)     Upon the expiration of the Challenge Period without the filing of a Challenge (the "**Challenge Period Termination Date**"):  (A) any and all such Challenges and objections by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, and all findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Subordinated Creditors' claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases; and (C) any and all claims or causes of action against any of the Debtors or the Prepetition Subordinated Creditors relating in any way to the Debtors or the Prepetition Subordinated Indenture Documents shall be forever waived and released by the Debtors' estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases.

16.    <u>Reservation of Rights</u>:  Notwithstanding anything to the contrary contained in this Interim Order, in the event there is a timely and successful Challenge by any party in interest (in accordance with paragraph 15 hereof), this Court may unwind the repayment of the applicable Prepetition Subordinated Obligations and order the repayment of such amount to the extent that such payment resulted in the payment of any Prepetition Subordinated Obligations consisting of an unsecured claim or other amount not allowable under Section 502 of the Bankruptcy Code.

17.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

18.    Section 506(c) Claims.  Subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Subordinated Creditors or the Prepetition Subordinated Liens pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

19.    Section 552(b).  Subject to the entry of the Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Subordinated Creditors with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

20.    Discharge Waiver.  Subject to the entry of the Final Order, the Debtors expressly stipulate, and the Court finds and adjudicates that, none of the Adequate Protection Liens or Adequate Protection Superpriority Claims shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the Adequate Protection Superpriority Claims and claims secured by the Adequate Protection Liens have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  It shall constitute a Termination Event if the Debtors propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all Adequate Protection Superpriority Claims.

21.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) the Prepetition Subordinated Creditors' right to seek any other or supplemental relief in respect of the Debtors (including the right to seek additional adequate protection); (b) the rights of any of the Prepetition Subordinated Creditors to seek the payment by the Debtors of post-petition interest or fees pursuant to Section 506(b) of the Bankruptcy Code; or (c) any of the rights of the Prepetition Subordinated Creditors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the Prepetition Subordinated Creditors are preserved.

22.    <u>Binding Effect of Interim Order</u>.    Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Subordinated Creditors, all other creditors of any of the Debtors, any Committee or any other court appointed committee, appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.  Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

23.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of

reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the Prepetition Subordinated Creditors pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases.

24.    <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the Motion is scheduled for _____ __, 2016 at ___: __ _.m. (Eastern Time) before the Honorable _____, United States Bankruptcy Judge, Courtroom ___, at the United States Bankruptcy Court for the District of Delaware located at _____.

25.    <u>Notice of Final Hearing</u>: On or before _____ __, 2016, the Debtors shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the thirty (30) largest unsecured creditors of the Debtors at their last known addresses; (e) Choate, Hall & Stewart LLP (Attn: Kevin J. Simard, Esq. and Sean M. Monahan, Esq.), attorneys for the DIP Agent and the Prepetition Senior Agent; (f) Paul Hastings LLP (Attn: Leslie Plaskon, Esq.), attorneys for the DIP Term Agent and the Prepetition Term Agent; (g) Emmet, Marvin & Martin, LLP (Attn: Margery A. Colloff, Esq.), attorneys for the Prepetition Indenture Trustee, (h) K&L Gates LLP (Attn: John A. Bicks, Esq.), as counsel to certain Prepetition Subordinated

Noteholders, (i) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; and (j) counsel for any Committee.

26.    Objection Deadline: Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Bankruptcy Court, and personally served upon (a) O'Melveny & Myers LLP (Attn: Steve Warren, Esq. and Jennifer Taylor, Esq.) and Richards, Layton & Finger, P.A. (Attn: Mark D. Collins, Esq. and Michael J. Merchant, Esq., co-counsel for the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to any Committee; (d) Choate, Hall & Stewart LLP (Attn: Kevin J. Simard, Esq. and Sean M. Monahan, Esq.), attorneys for the DIP Agent and the Prepetition Senior Agent; (e) Paul Hastings LLP (Attn: Leslie Plaskon, Esq.), attorneys for the DIP Term Agent and the Prepetition Term Agent, (f) Emmet, Marvin & Martin, LLP (Attn: Margery A. Colloff, Esq.), attorneys for the Prepetition Indenture Trustee, and (g) K&L Gates LLP (Attn: John A. Bicks, Esq.), as counsel to certain Prepetition Subordinated Noteholders so that such objections are filed with the Court and received by said parties on or before __:___ p.m. (Eastern Time) on _____, 2016 with respect to entry of the Final Order.

27.    Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

28.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

29.    Conflict.  In the event of any conflict between this Interim Order and the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition*

*Financing, (II) Authorizing Use Of Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Granting Related Relief, and (VII) Scheduling a Final Hearing* solely with respect to the treatment of the Prepetition Subordinated Creditors and the use of their Cash Collateral, this Interim Order shall govern.

Dated: _____, 2016
    Wilmington, Delaware

    _____
    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

## Excerpts of Budget

**HANCOCK FABRICS**
Forecast DIP Cash Flow v15.3 (2/1/16)

| | Post Petition Filing 2/2/16 | | | | |
|---|---|---|---|---|---|
| Fiscal Period | 1 | 1 | 1 | 1 | 2 |
| 4-5-4 Month | Feb | Feb | Feb | Feb | Mar |
| Week Ending | 2/6/2016 | 2/13/2016 | 2/20/2016 | 2/27/2016 | 3/5/2016 |
| Fiscal Week # | 1 | 2 | 3 | 4 | 5 |
| Forecast/Actual | Forecast | Forecast | Forecast | Forecast | Forecast |

**I. CASH FLOW**

| | | | | | |
|---|---|---|---|---|---|
| **Cash Receipts** | | | | | |
| Payment to Wells Fargo | 4,023,841 | 4,485,251 | 4,003,336 | 3,869,519 | 3,826,279 |
| 70 Store Liquidation Sales | | 643,271 | 2,420,359 | 2,226,186 | 2,922,575 |
| **Total Cash Receipts** | **4,023,841** | **5,128,522** | **6,423,694** | **6,095,705** | **6,748,854** |
| | | | | | |
| **Other Asset Recovery** | | | | | |
| Asset Recovery - 363 Sale | | | | - | |
| Liquidator Reimbursements | | | | | |
| **Total Other Asset Recovery** | - | - | - | - | - |
| | | | | | |
| **Cash Disbursements** | | | | | |
| Operating | | | | | |
| Vendor Payments - Trade | (1,791,391) | (3,296,725) | (3,778,332) | (2,640,843) | (582,696) |
| Vendor Payments - Expense | (325,126) | (486,511) | (500,000) | (947,656) | (1,270,000) |
| Rent and Occupancy | | | | | (2,287,000) |
| Payroll - Stores | (395,264) | (377,925) | (377,925) | (377,925) | (377,925) |
| Payroll - Admin | (546,148) | | (546,148) | | (546,148) |
| Benefits | (152,361) | (184,872) | (99,731) | (141,613) | (122,078) |
| Pension Fund Contribution | | | | | |
| Sales Tax | (7,474) | (179,390) | (1,138,735) | (228,187) | (16,004) |
| Payroll and Other Tax Payments | (309,504) | (149,614) | (327,200) | (155,433) | (319,457) |
| Professional Fees - BK | | | | | |
| Professional Fees - To Escrow | (405,000) | (295,000) | (295,000) | (295,000) | (157,000) |
| Customs/Bank Fees | | | (5,539) | (42,915) | |
| Import Draws/Fees/SBLC | (37,211) | | (22,268) | (46,403) | |
| Liquidator Expenses - 70 Stores | | | (95,209) | (94,974) | (96,218) |
| Other Disbursements | (150,000) | | (451,459) | | |
| Bank Funding | | | | | |
| **Total Operating Cash Disbursements** | **(4,116,476)** | **(4,970,037)** | **(7,638,565)** | **(4,979,951)** | **(5,853,526)** |
| Financing | | | | | |
| Principal | - | - | - | - | - |
| Interest | - | - | - | (593,552) | - |
| Fees - Wells Fargo | (425,000) | - | - | - | 750,000 |
| Fees - GA | (87,500) | | | | |
| Miscellaneous | | (2,233,985) | | | |
| **Total Financing Cash Disbursements** | **(512,500)** | **(2,233,985)** | **-** | **(593,552)** | **750,000** |
| **Total Cash Disbursements** | **(4,628,976)** | **(7,204,022)** | **(7,638,565)** | **(5,573,503)** | **(5,103,526)** |
| | | | | | |
| **Net Cash Flow From Operations** | **(605,137)** | **(2,075,480)** | **(1,214,861)** | **522,202** | **1,645,328** |

**II. REVOLVER - PRE PETITION**

| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | (57,269,711) | (53,245,869) | (48,117,348) | (41,693,654) | (35,597,949) |
| Add: Borrowings | | | | | |
| Less: Repayments | 4,023,841 | 5,128,522 | 6,423,694 | 6,095,705 | 6,748,854 |
| Fees/Adjustments | | | | | 28,849,095 |
| **Ending Revolver Balance** | **(53,245,869)** | **(48,117,348)** | **(41,693,654)** | **(35,597,949)** | **-** |

**III. REVOLVER - POST PETITION**

| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | - | (4,628,976) | (11,832,980) | (19,471,535) | (25,045,038) |
| Add: Borrowings | (4,628,976) | (7,204,002) | (7,638,565) | (5,573,503) | (5,103,526) |
| Less: Repayments | | | | | |
| Fees/Adjustments | | | | | (28,849,095) |
| **Ending Revolver Balance** | **(4,628,976)** | **(11,832,980)** | **(19,471,535)** | **(25,045,038)** | **(58,997,658)** |

**IV. TERM LOAN**

| | | | | | |
|---|---|---|---|---|---|
| Starting Term Loan Balance | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) |
| Add: Borrowings | - | - | - | - | - |
| Less: Repayments | - | - | - | - | - |
| **Ending Term Loan Balance** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** | **(18,290,417)** |

**V. CASH IN BANK**

| | | | | | |
|---|---|---|---|---|---|
| Starting Cash in Bank | - | - | - | - | - |
| Add: Cash Receipts | - | - | - | - | - |
| Less: Disbursements | - | - | - | - | - |
| Other | - | - | - | - | - |
| **Ending Cash in Bank** | **-** | **-** | **-** | **-** | **-** |

**IV. BORROWING BASE**

| | | | | | |
|---|---|---|---|---|---|
| Accounts receivable | 1,525,410 | 1,487,062 | 2,413,180 | 1,743,407 | 1,929,761 |
| Inventory | 68,547,125 | 64,446,754 | 63,665,707 | 64,127,574 | 63,568,751 |
| Property | 6,825,000 | 6,825,000 | 6,825,000 | 6,825,000 | 6,825,000 |
| Reserves | (6,394,697) | (7,320,330) | (7,461,338) | (7,204,310) | (7,280,552) |
| Borrowing Base (week in arrears) | 70,502,838 | 65,438,487 | 65,442,550 | 65,491,672 | 65,050,960 |
| | | | | | |
| Less: Letters Of Credit | | | | | |
| SBLC | 6,535,915 | 4,301,950 | 4,301,950 | 4,301,950 | 4,301,950 |
| Documentary | 101,680 | 101,660 | 79,392 | 32,989 | 32,989 |
| Less: Block | 6,885,899 | 680,000 | (210,000) | 400,000 | 1,600,000 |
| Less: Loan Balance | 57,974,847 | 59,950,328 | 61,165,188 | 60,642,986 | 58,997,658 |
| **Ending Revolver Availability** | **104,517** | **104,549** | **106,020** | **113,747** | **118,363** |
| | | | | | |
| MEMO 1: Pro Fee Escrow Account Balance | 405,000 | 700,000 | 995,000 | 1,290,000 | 1,347,000 |

FOOTNOTE: In the event that a higher alternative
liquidation bid is accepted by the Company, the
parties will discuss in good faith additional
payments to GACP.

**The accompanying financial information is based on
information provided by Hancock Fabrics, Inc. Clear Thinking
Group has not audited or otherwise verified the information
provided to us, nor will we provide any assurances concerning
the reliability, accuracy, or completeness of any materials
provided by or on behalf of Hancock Fabrics, Inc.

**Hancock Fabrics, Inc.**
**Professional Fees Schedule**
*(in 000's)*

Excerpt:  Subject to
full Budget
13-week cash flow

| Weekly | Feb-16 | Mar-16 |
|---|---|---|
| **PROFESSIONAL FEES/EXP INCURRED:** | Post Petition | |
| Debtor Legal Counsel | 730 | 540 |
| Debtor Financial Advisor | 285 | 220 |
| Privacy Ombudsman | 15 | 15 |
| Accountants - Tax | - | - |
| Legal-Other | - | - |
| Legal-Sr. Secured - Wells | 101 | 101 |
| Legal-Jr. Secured - Term Loan GA | 75 | 75 |
| Investment Banker | 100 | 350 |
| Real Estate Professional | - | - |
| Bank Audits/Field Exams | 35 | - |
| Creditor Counsel & Financial Adv. | 315 | 210 |
| Note Holders Counsel & Adv | - | - |
| Ch. 11 Liquidating Trustee | - | - |
| United States Trustee | 30 | - |
| Noticing Agent | 110 | 110 |
| **Total Pro Fees - Bankruptcy Related** | **1,796** | **1,621** |

**The accompanying financial information is based on information
provided by Hancock Fabrics, Inc. Clear Thinking Group has not audited
or otherwise verified the information provided to us, nor will we provide
any assurances concerning the reliability, accuracy, or completeness of
any materials provided by or on behalf of Hancock Fabrics, Inc.