## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                         :        Chapter 11

                             :

HANCOCK FABRICS, INC., *et al.*,[1]   :       Case No. 16-_____ (___)

                             :

                Debtors.         :

                             :        Joint Administration Requested

                             :

------------------------------------------------------------- x

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING THE DEBTORS TO ASSUME THE PREPETITION CONSULTING
### AGREEMENT, (II) AUTHORIZING STORE CLOSING SALES FREE AND CLEAR OF
### ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND
### (III) GRANTING RELATED RELIEF

Hancock Fabrics, Inc. ("**Hancock**") and its affiliated debtors and debtors in possession

(collectively, the "**Debtors**" or the "**Company**") hereby submit this motion (the "**Motion**")

pursuant to sections 105, 363, 365, and 554 of title 11 of the United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), for the entry of (a) an interim order in the form attached

hereto as Exhibit A (the "**Interim Order**") (i) authorizing the Debtors to commence and

continue store closing or similar themed sales in accordance with that certain Consulting

Agreement dated as of January 23, 2016 (the "**Consulting Agreement**"), by and between Great

American Group, LLC ("**Great American**" or the "**Consultant**"), as consultant, and Hancock,

as merchant, a copy of which is attached as Exhibit 1 to the Interim Order, (ii) authorizing the

Debtors to conduct store closing or similar themed sales in accordance with the Consulting

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

Agreement, with such sales to be free and clear of all liens, claims, encumbrances, and other interests, (iii) approving the store closing sale guidelines (the "**Sale Guidelines**") attached as Exhibit 2 to the Interim Order, and (iv) granting certain related relief on an interim basis (collectively, the "**Store Closing Relief**"), and (b) after an opportunity to be heard at a final hearing (the "**Final Hearing**"), a final order (the "**Final Order**") (i) granting the Store Closing Relief on a final basis and (ii) authorizing the assumption of the Consulting Agreement.  In support of the Motion, the Debtors respectfully represent as follows:

**JURISDICTION & VENUE**

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b).[2]

**BACKGROUND**

2.    On February 2, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors ("**Committee**") has been appointed in the Debtors' cases.

3.    The Debtors operate more than 260 stores in 37 states under the name of "Hancock Fabrics," a large national fabric and specialty retailer offering an extensive selection of high-quality fashion and home decorating textiles, sewing accessories, needlecraft supplies

---

[2] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

2

and sewing machines, along with in-store sewing advice.  Founded in 1957, the Debtors'
corporate headquarters and national distribution center are located in Baldwyn, Mississippi.

4.    Additional information on the Debtors' business and capital structure, as
well as a description of the reasons for filing these cases and the Debtors' goals for these cases,
is set forth in the *Declaration of Dennis Lyons in Support of the Debtors' Chapter 11 Petitions
and First Day Pleadings* (the "**First Day Declaration**").[3]

## A.    Overview of the Debtors' Business

5.    Hancock employs approximately 4,500 full time and part time employees,
approximately 4,150 of whom work in the Company's retail stores.  The remaining employees
work in the Company's corporate headquarters, warehouse and distribution facility.  As is the
case with other retailers, Hancock's retail sales are subject to seasonal fluctuations, with the
Company's annual sales being greatest in the fourth fiscal quarter (November 1st through
January 31st).[4]

6.    In recent years, however, the Company has experienced a challenging
business environment and has been burdened by significant legacy costs.  In 2014 alone, the
Company's noncontributory qualified defined benefit pension program and supplemental
retirement benefit plan costs increased by approximately $4 million and the total amount by
which the plan was underfunded increased from $28.4 million to $43.8 million.

7.    Due to these and other factors, the Company has been forced to rely on
bank borrowing to fund its working capital needs, its required cash contribution to the
Company's pension plan, capital expenditures and its operations.  These expenses plus ongoing
cash needs have created a leverage situation that is unsustainable for the future.

---

[3] Capitalized terms not otherwise defined in this Motion have the meanings used in the First Day Declaration.

[4] The Company's fiscal year ends on the Saturday nearest to January 31st.

8.      Moreover, the Company posted disappointing sales for the third and fourth quarters of its current fiscal year.  Holiday sales, which typically comprise almost half of the Company's annual sales, were more than $8 million below forecast.  These losses were driven, in part, by significant discounts offered by some of the Company's principal competitors and other market conditions affecting retail businesses.  Exacerbating matters, certain of the Company's underperforming stores represent a disproportionate share of its costs.  As a result, the Company lacked the necessary liquidity for its operations.

9.      The above factors have combined to result in the Company's need to file the instant cases to reorganize its debt structure in the current economic climate and to align its operations to future business needs based on what its customers prefer, including store locations and format.  The Company is committed to continuing to offer the same high quality and service for which it has been known since its founding in 1957.

10.     The Company intends to use these cases to (i) gain access to liquidity, (ii) reduce pension and operational costs, (iii) realign its store locations and format and (iv) execute on one or more options to create value for stakeholders (including a sale of assets or other transaction with a third party investor).  The Company is considering all possible options for maximizing stakeholder value.

**B.      The Store Closing Sales; Selection of the Consultant**

11.     In furtherance of the foregoing goals, the Debtors intend to close a limited number of uneconomic and underperforming retail stores and to pursue a sale of the balance of their business through an auction process—ideally on a going-concern basis.[5]  In furtherance of this strategy, the Debtors' management, working closely with the Debtors' proposed investment

---

[5] The sale of the majority of the Debtors' assets through an auction process will be the subject of a separate motion.

4

banker, Lincoln International LLC ("**Lincoln**"), undertook a comprehensive review of the performance of each store and market in which the Debtors operate and identified a total of 70 stores (each a "**Closing Store**," and collectively, the "**Closing Stores**") as underperforming stores that should be closed immediately and at the outset of these chapter 11 cases in connection with the overall sale strategy and to ease certain of the liquidity restraints that the Debtors currently face by means of a store closing or similar themed sales (the "**Store Closing Sales**"). A list of the Closing Stores is attached as Exhibit A to the Consulting Agreement.

12.     In order to maximize the value of the inventory to be included in the Store Closing Sales at the Closing Stores (the "**Merchandise**") and the owned furniture, fixtures, and equipment in the Closing Stores (the "**Owned FF&E**," and together with the Merchandise, the "**Liquidation Assets**"), the Debtors seek to retain the Consultant, one of the national liquidation firms that specializes in, among other things, the large scale liquidation of merchandise and FF&E of this type and scale. Through the retention of the Consultant, the Debtors will ensure the most feasible, economical, and efficient means of achieving the disposition of the Liquidation Assets.

13.     Prior to the Petition Date, the Debtors contacted a number of national liquidation firms, obtained signed confidentiality agreements, and provided substantial due diligence materials. The Debtors, through Lincoln, solicited proposals and initial bids from national liquidation firms to act as a consultant to the Debtors under a fee arrangement in connection with the Store Closing Sales. The Debtors received four proposals (the "**Initial Proposals**") from liquidation firms. Based upon a review of the Initial Proposals, and certain improvements made with respect thereto as a result of subsequent discussions between the Debtors and the liquidation firms, the Debtors determined that it was in the best interests of their

OMM_US:74751601.12
RLF1 13827772v.1

estates to enter into the Consulting Agreement, a copy of which is attached as <u>Exhibit 1</u> to the proposed Interim Order.

14.     The Company's management believes that entry into the Consulting Agreement with Great American will generate the highest recovery possible for the Company's stakeholders. The Consulting Agreement provides an incentive-based commission structure that aligns Great American's interests with maximizing value for the benefit of the Debtors' estates while capping certain sale-related expenses at budgeted amounts agreed to by Great American. In addition to being the most economically attractive option, Great American has handled previous store closings for the Company and is very familiar with Company and its operations.

15.     In light of the Debtors' financial circumstances, the Debtors intend to commence and continue the Store Closing Sales by February 8, 2016.

**C.      The Consulting Agreement and Sale Guidelines**

16.     Under the terms of the Consulting Agreement, subject to this Court's approval of the attached Interim Order and Final Order, the Consultant will serve as the exclusive agent to the Debtors for the purpose of conducting a sale of certain Merchandise and Owned FF&E at the Closing Stores using the procedures outlined in the Sale Guidelines.

17.     The Debtors seek to assume the Consulting Agreement so that they may leverage the experience and resources of the Consultant in performing large-scale liquidations while retaining control over the sale process, which the Debtors believe will provide the maximum benefit to their estates.

18.     The material terms of the Consulting Agreement are described in the summary chart below:[6]

---

[6] Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to such terms in the Consulting Agreement. The summary of the Consulting Agreement provided herein is intended to be

6

| Provision | Description |
|---|---|
| **Sale Term**<br><br>Consulting Agreement §§ 1.5, 1.8, 1.9. | On or around February 8, 2016, to May 30, 2016 |
| **Consultant's Undertakings**<br><br>Consulting Agreement § 2.2. | (i) Provide qualified Supervisors to implement the Merchandise liquidation strategy in the Stores;<br><br>(ii) Oversee the Sale of the Merchandise from the Stores in an effort to sell all of the Merchandise during the Sale Term;<br><br>(iii) Determine and recommend appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with a "Store Closing" theme;<br><br>(iv) Determine the appropriate pricing, display and discounting of Merchandise, as well as recommend appropriate staffing levels for the Stores (including Store Employees);<br><br>(v) Sell all owned FF&E in the Stores pursuant to section 11.8 of the Consulting Agreement;<br><br>(vi) Coordinate accounting functions, including evaluation of sales of Merchandise, using Merchant's infrastructure; and<br><br>(vii) Provide such other related services deemed necessary or prudent by Merchant and Consultant under the circumstances giving rise to the Sale. |
| **Merchant's Undertakings**<br><br>Consulting Agreement §§ 9.1, 9.2, 9.4. | (i) Merchant shall be solely liable for, and shall pay when due, all Sale Expenses as well as all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Stores, Store Employees and Merchant's business operations during the Sale.<br><br>(ii) Merchant shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes for the Stores to the appropriate taxing authorities. Merchant shall collect all sales taxes and Merchant shall pay the same to the appropriate taxing authorities in accordance with the applicable law.<br><br>(iii) Merchant shall use all reasonable efforts to cause all Store Employees, and all other representatives and agents of Merchant to cooperate fully with Consultant and its Supervisor in connection with the Sale during the Sale Term. |

descriptive only. To the extent there are any inconsistencies between this summary and the Consulting Agreement, the terms of the Consulting Agreement shall govern.

OMM_US:74751601.12
RLF1 13827772v.1

| Provision | Description |
|---|---|
| **Consultant's Fees and Expenses**<br><br>Consulting Agreement §§ 2.3, 3.1, 4.1, 4.2. | Consultant shall receive a fee for net sales results that meet or exceed certain thresholds of sales as a percentage of cost.[7] The incentive fee will be determined in accordance with Exhibit C to the Consulting Agreement: If net sales are less than 145% of cost, the Consultant shall not earn a fee; if net sales are equal to or greater than 145% but less than 150% of cost, the Consultant shall earn a fee of 0.20%; if net sales are equal to or greater than 150% but less than 155% of cost, the Consultant shall earn a fee of 0.40%; and if net sales are equal to or greater than 155% of cost, the Consultant shall earn a fee of 0.60%.<br><br>In connection with the Sale, Merchant shall be responsible for the payment of all expenses incurred in operating the Stores and conducting the Sale, subject to a cap on certain expenses listed on Exhibit B to the Consulting Agreement. |
| **FF&E**<br><br>Consulting Agreement § 11.8. | If Merchant elects, Consultant shall sell furniture, fixtures and equipment in the Stores (the "**FF&E**") for a 15% commission subject to the provision outlined as consultant services, of the proceeds generated from the sale of such assets.  Consultant shall have the right to abandon any unsold fixtures at the Stores at the conclusion of the Sale. |
| **Indemnification**<br><br>Consulting Agreement §§ 8.1, 9.3, 9.5. | Subject to the provision of the Interim Order and Final Order, Merchant shall indemnify and hold Consultant and its agents, employees, principals and Supervisor harmless from and against any and all damages, fines, penalties, losses, claims or expenses (including, without limitation, reasonable attorneys' fees) that Consultant may incur or sustain arising out of Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law or to pay any liability referred to in Section 10.1 of the Consulting Agreement.  Merchant shall indemnify and hold Consultant and its agents, employees, principals and Supervisor harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to the (i) negligent acts or omissions of Merchant or its agents, employees, in connection with the |

---

[7] Sales of each item and the cost of each item will be determined by the "Gross Rings Method" on the basis of 101% of cost to account for shrinkage. "Gross Rings Method" under the Consulting Agreement is defined to mean that the Consultant and Hancock "shall jointly keep a strict count of gross register receipts for each item of Merchandise sold less applicable Sales Taxes but excluding any prevailing Sale discounts offered by [the Consultant]."

8

| Provision | Description |
|---|---|
| | Sale, or (ii) the breach by Merchant of any of its obligations under the Consulting Agreement. |
| | Consultant shall reimburse, indemnify, defend and hold Merchant and its officers, directors, agents, and employees, harmless from and against any damage, loss, expense (including reasonable attorneys' fees) or penalty, or any claim or action therefor, by or on behalf of any person, arising out of the performance or failure of performance of the Consulting Agreement, or due to any acts or omissions by the Consultant or its employees, Supervisor or other agents ("*Employees*"), including but not limited to breaches or violations of human rights legislation and, the Consultant's Employees' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), unemployment compensation claims, or actions taken by Consultant or its Employees. |

## RELIEF REQUESTED

19.     By this Motion, the Debtors seek the entry of (a) the Interim Order authorizing (i) the commencement and continuation of the Store Closing Sales in accordance with the Consulting Agreement and the Sale Guidelines and (ii) granting the related Store Closing Relief, and (b) the Final Order (i) granting the Store Closing Relief on a final basis and (ii) authorizing the assumption of the Consulting Agreement.

## BASIS FOR RELIEF REQUESTED

### A.    Assumption of the Agreement Is Authorized Under Section 365(a)

20.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The United States Court of Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable

9

property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

21.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

22.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See In re Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business

10

judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

23.    Here, the Debtors have exercised their sound business judgment in determining that assumption of the Consulting Agreement is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease. *See, e.g., In re Phila. Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Penn. 2010).

24.    As a key component of the Debtors' continuing efforts to preserve and maximize estate value, to reduce administrative expenses, to rationalize their cost structure moving forward, and to successfully emerge from these chapter 11 proceedings, the Debtors have concluded, in their business judgment, that the assumption of the Consulting Agreement is

OMM_US:74751601.12
RLF1 13827772v.1

beneficial to the Debtors' estates.  In consultation with Lincoln, the Debtors determined that the Closing Stores are incredibly burdensome to their current cost structure and, thus, that the Merchandise and Owned FF&E should be liquidated for the benefit of the Debtors' estates and their creditors.  Furthermore, after engaging in extensive, arms'-length negotiations with certain nationally-recognized liquidators regarding the Store Closing Sales and conducting reasonable diligence, the Debtors determined that entering into the Consulting Agreement would provide the greatest return to the Debtors' estates for the Merchandise and Owned FF&E.  Additionally, the Debtors believe that the terms set forth in the Consulting Agreement are fair and equitable and present the best path forward with respect to the Closing Stores.

25.    In particular, the Consultant's extensive expertise in conducting liquidation sales allow it to oversee and implement the Store Closing Sales, with the assistance of the Debtors' management, in an efficient and cost effective manner.[8]  Assumption of the Consulting Agreement and the immediate commencement and continuation of the Store Closing Sales will present tremendous cost savings that will certainly inure to the benefit of the Debtors' estates and all stakeholders.  Accordingly, the Debtors have already dedicated substantial resources toward the Store Closing Sales.

26.    If the Store Closing Sales are not permitted to go forward on an interim basis, and the Consulting Agreement is not ultimately assumed, the Debtors' estates would lose the benefit of the efforts that have already been expended by the Debtors and the Consultant toward commencing and continuing the Store Closing Sales.  Any delay in conducting the Store Closing Sales would result in increased administrative expenses and the loss of value.

---

[8] The Debtors believe that Great American is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.  In support, the *Declaration of Scott K. Carpenter in Connection with Submission of Consulting Agreement* is attached hereto as Exhibit B.

OMM_US:74751601.12
RLF1 13827772v.1

27.     Therefore, the Debtors request that this Court authorize the assumption of the Consulting Agreement.

**B.     Sufficient Business Justification Exists for Store Closing Sales Under Section 363(b)**

28.     Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . .

11 U.S.C. § 363(b)(1); *see also In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by section 363(b)).

29.     To obtain court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a store closing sale, the Debtors must articulate a business reason for the proposed action. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).

30.     As set forth above, the demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656.

31.     Accordingly, similar store closing or liquidation sales are routinely approved by Courts in this district in chapter 11 cases involving retail debtors. *See, e.g., Ames Dept. Stores*, 136 B.R. at 359 (stating that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); *In re Anchor Blue Holding Corp.*, Case No. 11-10110 (PJW) (Bankr. D. Del. Jan. 13, 2011); *In re Samsonite Co. Stores, LLC*, Case No. 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009); *In re Sportsman's Warehouse, Inc.*, Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); *In re Goody's, LLC*, Case No. 09-10124 (CSS) (Bankr. D. Del. Jan. 21, 2009).

32.     The Debtors' decision to conduct the Store Closing Sales represents the best path forward to maximizing recoveries to the Debtors' estates with respect to the Merchandise and Owned FF&E, is based upon their sound business judgment, and, therefore, should be approved under section 363(b) of the Bankruptcy Code.  As part of the Debtors' overall restructuring strategy (which includes the sale of substantially all of the Debtors' assets), the Debtors have determined to close the Closing Stores by means of the Store Closing Sales and begin liquidating the Liquidation Assets.  Time is of the essence to preserve and maximize the value of the Debtors' assets before the Merchandise significantly declines in value, and to reduce ongoing administrative expenses.  Each of the Closing Stores contains significant levels of Merchandise that will be included in the Store Closing Sales.  The realization of fair value for these assets as promptly as possible will inure to the benefit of all parties in interest.  The Consultant, as a nationally recognized liquidation firm, has the experience necessary to assist the

Debtors in monetizing the Merchandise and Owned FF&E through an efficient and orderly process, and any interruption in the Store Closing Sales would harm the Debtors' ability to successfully monetize the Merchandise and Owned FF&E.

33.    Moreover, the Closing Stores continuously suffer negative sale levels, thereby presenting a significant drain on the Debtors' liquidity.    Indeed, upon the sale of the Merchandise and FF&E and the termination of operations at the Closing Stores, the Debtors expect to realize an immediate benefit in terms of financial liquidity.    Accordingly, the Debtors request that this Court approve the Debtors' commencement and continuation of the Store Closing Sales in accordance with the terms of the Consulting Agreement.    The Debtors further believe that liquidating the Closing Stores will make the remaining chain more attractive to potential going concerns bidders, who will have a right-sized business to step into.

C.    **The Sale of the Liquidation Assets Free and Clear of All Claims, Liens, Encumbrances, and Other Interests Is Authorized Under Section 363(f) of the Bankruptcy Code**

34.    A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

OMM_US:74751601.12
RLF1 13827772v.1

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

35.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Liquidation Assets and commencement and continuation of the Store Closing Sales "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

36.     The Debtors submit that it is appropriate to sell the Merchandise and Owned FF&E on a final "as is" basis, free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to the sale of the Merchandise and Owned FF&E. In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lenders, who are secured by, among other things, the Liquidation Assets, have consented to the sale of the Liquidation Assets. With respect to any other party asserting a lien, claim, encumbrance, or other interest against the Merchandise or the Owned FF&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the Liquidation

16

Assets pursuant to the terms and conditions of the Consulting Agreement, the Debtors propose that any liens, claims, encumbrances, and other interests asserted against the Merchandise and Owned FF&E be transferred to and attach to the amounts received by the Debtors in the sale or otherwise payable to the Debtors under the Consulting Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

37.    Accordingly, the Debtors propose that section 363(f) authorizes the transfer and conveyance of the Merchandise and Owned FF&E free and clear of any such liens, claims, encumbrances, or other interests.

D.    **The Court Should Approve the Proposed Sale Guidelines**

38.    As set forth in greater detail below, many Liquidation Laws (as defined below) require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing and liquidation sales. Therefore, although the Debtors intend to comply fully with applicable state and local health and safety and consumer protection laws in connection with the Store Closing Sales, the Debtors seek a waiver of compliance with the Liquidation Laws and instead request the authority to conduct such sales in accordance with the Sale Guidelines attached as Exhibit 2 to the proposed Interim Order, which procedures and guidelines are typical of and consistent with the procedures approved in other chapter 11 cases.

39.    The Debtors developed the Sale Guidelines with the intent to provide a means of controlling the administrative burdens on their estates that are associated with complying with the Liquidation Laws, while at the same time protecting the interests of their landlords and the applicable governmental agencies enforcing such laws. Accordingly, the Debtors submit that the Sale Guidelines adequately address any concerns that their landlords or

17

the governmental agencies may raise with respect to the Store Closing Sales, and therefore, the requested relief below seeking the waiver of Liquidation Laws should be approved.

E.     **Strict Compliance with the Liquidation Laws Should Be Waived**

40.     Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "**Liquidation Laws**"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized, however, then a company need not comply with these Liquidation Laws.

41.     The Debtors, therefore, request that the Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Laws. Because the Debtors and their assets are subject to this Court's jurisdiction, see 28 U.S.C. § 1334, this Court will be able to supervise the Store Closing Sales. The Store Closing Sales are legitimate methods by which the Debtors can maximize the return from the sale of the Merchandise and Owned FF&E for the benefit of their estates and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

42.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under

18

section 363 of the Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe* (*In re Shenango Grp., Inc.*), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code.' . . . '[A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

43.    While preemption of state law is not always appropriate, preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.[9]  *See Baker & Drake, Inc. v. Public Serv. Comm'n of Nev.* (*In re Baker & Drake, Inc.*), 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.*, 91 B.R. 190, 196–97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety).  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Laws.  *See* 11 U.S.C. § 105(a).

44.    In the instant cases, the Liquidation Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of creditors.

---

[9] Subject to the terms of the Interim Order and the Final Order, the Debtors will comply with applicable state and local public health and safety laws ("**Safety Laws**"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**").

OMM_US:74751601.12
RLF1 13827772v.1

45.     Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. *See, e.g.*, *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bank. D. Del. Oct. 15, 2015); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) (ordering that that the debtors were authorized to conduct store closing sales in accordance with the order "without the necessity of further showing compliance" with liquidation laws); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that that the debtor was authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

46.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtors only request that this Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various

20

state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as store closings or similar type sales. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as the Safety Laws and General Laws.

47.    It is also necessary that any action by any lessor or any federal, state, or local agency, department, or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined. *See Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981), *cert. denied*, 454 U.S. 1162 (1982) (holding that an attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

48.    The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales. The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales. As noted above and as set forth in the Interim Order and the Final Order, the Debtors fully intend to be bound by and comply with all Safety Laws and General Laws and will require that the Consultant do the same.

F.    **The Court Should Waive any Restrictions in the Leases as Unenforceable**

49.    Certain of the leases governing the premises of the Closing Stores (the "**Leases**") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that

21

enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); *In re R. H. Macy & Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct going-out-of-business sale).

50.    In addition, this Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

51.    As such, to the extent that such provisions or restrictions exist in any of the Leases of the Closing Stores, such landlords may not interfere with or otherwise seek to restrict the Debtors and/or the Consultant from conducting the Store Closing Sales. Accordingly,

22

the Debtors request that the Court authorize the Debtors and/or the Consultant to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

G. **The Abandonment of Certain Property in Connection with the Store Closing Sales Is Justified**

52.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a debtor in possession "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." *See Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); *In re Grossinger's Assoc.*, 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Protection*, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards . . . . This exception to the abandonment power . . . is a narrow one."); *In re Bryson*, 53 B.R. 3, 4–5 (Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

53.     The Debtors intend to sell all Merchandise and Owned FF&E remaining in the Closing Stores.  However, in the event that the Debtors are unable to sell or dispose of any Merchandise or Owned FF&E following the Store Closing Sales, or determine that the costs associated with holding or selling certain Merchandise or Owned FF&E exceeds the proceeds that will be realized upon its sale or that such Merchandise or Owned FF&E is not sellable at all, it would be costly and burdensome to the Debtors' estates to retain such Merchandise or Owned FF&E.  Thus, to the extent that the Consultant does not sell any Merchandise or Owned FF&E,

23

the Debtors request that they be authorized upon the conclusion of the Store Closing Sales to abandon the same without incurring liability to any person or entity in order to maximize the value of the Debtors' assets and to minimize the costs to the estates.

54.    Notwithstanding the foregoing, the Debtors and the Consultant will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

H.    **The Store Closing Sales Should Be Exempt from Any "Fast Pay" Laws**

55.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The sweeping nature of the Store Closing Sales contemplated by this Motion will result in a substantial numbers of employees being terminated during the Store Closing Sales.  The Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

56.    As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

57.    Under ordinary circumstances, the Debtors were often able to pay individual store-level employees from the register at a store location upon termination and

reconcile the payment amount after-the-fact. However, given the number of employees that will be terminated during the Store Closing Sales, this will be impossible. Thus, it will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Store Closing Sales, this process could easily take several days.

58.     To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. If the Debtors are required to comply with these state laws and regulations, their efforts to wind down their operations and stem unnecessary payroll costs will be hampered tremendously. Indeed, if forced to comply, the Debtors will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Store Closing Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates. Both of these choices will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Store Closing Sales.

59.     Accordingly, the Debtors respectfully submit that in this instance, the Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements. *See, e.g., Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); *Filene's Basement, LLC*, Case No. 11-13511(KJC) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same); *see also In re Borders Grp., Inc.*, Case No. 11-10614

OMM_US:74751601.12
RLF1 13827772v.1

(MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

I.     **Appointment of a Consumer Privacy Ombudsman**

60.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally identifiable information in the course of the Store Closing Sales.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

61.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  There is no question that the Debtors' failure to commence and continue the Store Closing Sales without interruption would likely result in immediate and irreparable harm to the Debtors' estates by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

62.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

63.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

26

entry of the order, unless the court orders otherwise." As set forth above, the Debtors are facing significant liquidity constraints. Given this liquidity crisis and the common goal of maximizing the value received for the Merchandise and Owned FF&E, the Debtors anticipate that the purchasers of the Liquidation Assets will want to close on their transactions as soon as possible. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day (14-day) stay imposed by Bankruptcy Rules 6004(h), to the extent that such applies.

<b><u>NOTICE</u></b>

64.    The Debtors will provide notice of this Motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (iii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iv) counsel to Wells Fargo Bank, National Association, as administrative and collateral agent under the prepetition credit facility and debtor-in-possession credit facility; (v) counsel to GACP Finance Company, LLC, as term agent under the prepetition credit facility and debtor-in-possession credit facility; (vi) counsel to Deutsche Bank National Trust Company, as trustee under the indenture for the Floating Rate Series A Secured Notes due 2017; (vii) counsel to certain secured noteholders, K&L Gates LLP, 599 Lexington Avenue, New York, New York 10022-6030 (Attn: John A. Bicks, Esq.); (viii) all parties entitled to notice pursuant to Local Rule 9013-1(m); (ix) the Attorney General's office (to the division of consumer protection or similar authority) for each state where the Store Closing Sales are being held; and (x) the Debtors' landlords of the Closing Stores. Following entry of the Interim Order, a copy of this Motion and the Interim Order will be served on the foregoing parties and all parties having filed

requests for notice in these chapter 11 cases.  A copy of the Motion is also available on the Debtors' case website at https://www.kccllc.net/hancockfabrics.com.

65.    The Debtors submit that no other or further notice is necessary under the circumstances.

## NO PRIOR MOTION

66.    The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

OMM_US:74751601.12
RLF1 13827772v.1

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting on an interim basis, (a) the Store Closing Relief and (b) such other and further relief to the Debtors as the Court may deem proper, (ii) set a date for a Final Hearing on the Store Closing Relief sought in this Motion, (iii) establish objection and reply deadlines for the Final Hearing, and (iv) grant such other relief as the Court deems just and proper.

Dated:    February 2, 2016
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* pending)
Karen Rinehart (*pro hac vice* pending)
Michael S. Neumeister (*pro hac vice* pending)
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407

Proposed Attorneys for the
Debtors and Debtors in Possession

OMM_US:74751601.12
RLF1 13827772v.1

# EXHIBIT A

## PROPOSED INTERIM ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

In re:                                          :        Chapter 11
                                                :
HANCOCK FABRICS, INC., *et al.*,[1]             :        Case No. 16-_____ ( ___ )
                                                :
                         Debtors.               :
                                                :        Joint Administration Requested
                                                :
                                                :

---------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING STORE CLOSING SALES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (II) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")[2] of the Debtors for entry of an interim order (the "**Interim Order**"), pursuant to sections 105, 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, and 6004, (a) authorizing the Debtors to commence and continue store closing or similar themed sales in accordance with that certain Consulting Agreement dated as of January 23, 2016 (the "**Consulting Agreement**"), by and between Great American Group, LLC (the "**Consultant**"), as consultant, and Hancock, as merchant, a copy of which is attached as Exhibit 1 to this Interim Order, (b) authorizing the Debtors to commence and continue store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "**Sale Guidelines**") attached as Exhibit 2 to this Interim Order, with such sales to be free and clear of all liens, claims, encumbrances, and other interests, and (c) granting certain related relief on an interim basis (collectively, the "**Store**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**Closing Relief**"), and the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at the hearing before the Court (the "**Hearing**"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtors' reorganization and such relief is in the best interests of the Debtors, their estates and their creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby

**FOUND AND DETERMINED THAT**:[3]

A.    The Debtors have advanced sound business reasons for entering into the Consulting Agreement, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and entering into the Consulting Agreement is a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors and their estates.

B.    The conduct of the Store Closing Sales will provide an efficient means for the Debtors to maximize recoveries of their estates with respect to the Merchandise and/or the Owned FF&E.

C.    The Consulting Agreement was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

2

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.      The Store Closing Sales are in the best interest of the Debtors' estates.

F.      The Debtors have represented that they are neither selling nor leasing personally identifiable information pursuant to the Motion, although the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

G.      The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby

**ORDERED THAT**:

1.      The Motion is GRANTED, on an interim basis, as provided herein.

2.      On _____, 2016, at ____:_____ ____.m. (Eastern Standard Time), a hearing (the "**Final Hearing**") will be held before this Court to consider the Store Closing Relief requested in the Motion, on a final basis. All objections, if any, to the Motion shall be in writing and filed with this Court and served on (i) proposed co-counsel to the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, California 90071 (Attn: Stephen H. Warren, Esq., and Jennifer Taylor, Esq.), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.), (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801; (iii) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (iv) counsel to Wells Fargo Bank, National Association, as administrative and collateral agent under the prepetition credit

3

facility and debtor-in-possession credit facility, Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin J. Simard, Esq.); (vi) counsel to GACP Finance Company, LLC, as term agent under the prepetition credit facility, Paul Hastings LLP, 75 East 55th Street, New York, New York 10022 (Attn: Andrew V. Tenzer, Esq.); (vii) counsel to Deutsche Bank National Trust Company, as trustee under the indenture for the Floating Rate Series A Secured Notes due 2017, Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, New York 10271 (Attn: Margery A. Colloff, Esq.); (viii) counsel to certain secured noteholders, K&L Gates LLP, 599 Lexington Avenue, New York, New York 10022-6030 (Attn: John A. Bicks, Esq.), and (ix) the Consultant, c/o Great American Group, 21860 Burbank Blvd., Suite 300 South, Woodland Hills, California 91367 (Attn: Scott K. Carpenter) (collectively, the "**Notice Parties**"), as to be received on or before _____, 2016, at ____:____ ___.m. (Eastern Standard Time). Any reply(s) to such objections shall be filed on or before _____, 2016, at ____:____ ___.m. (Eastern Standard Time) and shall be served on the Notice Parties.

3.    The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order. The failure to include specifically any particular provision of the Consulting Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments and transactions, be authorized and approved as and to the extent provided for in this Interim Order.

4.    To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Consulting Agreement, the terms of this Interim Order shall control over all other documents and the Sale Guidelines shall control over the Consulting Agreement.

4

5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

6.      The Consulting Agreement, a copy of which is attached to this Interim Order as <u>Exhibit 1</u>, is operative and effective on an interim basis during the interim period.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement.

7.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and the Consultant hereby are authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Store Closing Sales; and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Agreement and/or the Store Closing Sales prior to the date of this Interim Order, hereby are approved and ratified.

**A.      Authority to Engage in Store Closing Sales**

8.      The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to section 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct Store Closing Sales at the Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement.

9.      The Sale Guidelines are approved in their entirety on an interim basis for the purpose of the Store Closing Sales.

10.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

5

11.    All entities that are presently in possession of some or all of the Merchandise or Owned FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Interim Order are hereby directed to surrender possession of such Merchandise or Owned FF&E to the Debtors or the Consultant.

12.    Subject to the provisions herein in paragraphs 14, 15, 17, and 27, neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

**B.    Conduct of the Store Closing Sales**

13.    All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Store Closing Sales and the sale of Merchandise and Owned FF&E pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and Owned FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement.

14.    Nothing in this Interim Order or the Consulting Agreement releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Consulting Agreement shall in any way (i) diminish the obligation of any entity to

6

comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Consultant is an operator with respect to any environmental law or regulation. Moreover, the sale of the Merchandise and Owned FF&E shall not be exempt from, and the Consultant shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**"). Nothing in this Interim Order shall alter or affect the Debtors' and Consultant's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Consultant's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to paragraph 27 hereunder. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

15. Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the interim sale period, the Debtors and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the sale without necessity of further order

7

of this Court as provided in the Consulting Agreement or the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Closing Stores, and at enclosed mall Closing Stores to the extent the applicable Closing Store entrance does not require entry into the enclosed mall common area), use of sign-walkers and street signage.

16.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and Owned FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Consultant are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

17.     Except as expressly provided in the Consulting Agreement, the sale of the Merchandise and Owned FF&E shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection of leases, abandonment of assets, or "going dark" provisions. The Consultant and landlords of the Closing Stores are authorized to enter into agreements ("**Side Letters**") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be

8

binding as among the Consultant and any such landlords, provided that nothing in such Side Letters affects the provisions of paragraphs 16, 17, and 27 of this Interim Order. In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

18.     Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which paragraphs 14, 16, 17, and 27 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or the sale of Merchandise or Owned FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closing Sales and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sales or sale of the Merchandise or Owned FF&E or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

19. In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to paragraphs 14, 16, 17, and 27 of this Interim Order.

20. The Consultant shall accept the Debtors' validly-issued gift certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date (as defined in the Agreement) in accordance with the Debtors' gift certificate and gift card policies and procedures as they existed on the Petition Date, and accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price offered by the Consultant.

21. All sales of Merchandise or Owned FF&E shall be "as is" and final. However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." Further, as to the Closing Stores only, the Debtors and/or the Consultant shall accept return of any goods purchased during the Store Closing Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven (7) days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. Signs stating that "Refunds may be made only

for merchandise having a latent defect, when returned with a receipt within 7 days of purchase." will be posted at the cash register areas of the Closing Stores. Returns, if permitted, related to the purchase of Merchandise and Owned FF&E shall not be accepted at stores that are not participating in the Store Closing Sales, except in the situation where a customer experiences a latent defect and returns the Merchandise and Owned FF&E within the seven (7) day time period and provides information that the point of purchase store has closed in the meantime. Information on stores remaining open will be maintained on the Debtors' website through the end of the Store Closing Sales.

22.    The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Store Closing Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Consultant shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Consulting Agreement. This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.    Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell and all sales of Merchandise or Owned FF&E

pursuant to the Store Closing Sales, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, or other interests ("**Encumbrances**"); *provided, however*, that any such Encumbrances shall attach to the proceeds of the Store Closing Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and Owned FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto.

24.    To the extent that the Debtors propose to sell or abandon Owned FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "**Confidential Information**"), the Debtors shall remove the Confidential Information from such items of Owned FF&E before such sale or abandonment.

25.    The Debtors and/or the Consultant (as the case may be) are authorized and empowered to transfer Merchandise and Owned FF&E among the Closing Stores.    The Consultant is authorized to sell the Debtors' Owned FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement.

## C.    Dispute Resolution Procedures With Governmental Units

26.    To the extent that the sale of Merchandise or Owned FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "**GOB Law**," and collectively, the "**GOB Laws**"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions, or any fast pay laws that would otherwise apply solely to the sale of the Merchandise or Owned

12

FF&E in the interim sale period (collectively, the "**Liquidation Laws**"), the dispute resolution procedures in this section shall apply.

27.    Provided that the Store Closing Sales and the sale of Merchandise and Owned FF&E are conducted in accordance with the terms of this Interim Order, the Consulting Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to paragraphs 14, 16, 17, and 26 herein, are authorized to conduct the Store Closing Sales in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

28.    Within three (3) business days of entry of this Interim Order, the Debtors shall serve copies of this Interim Order, the Consulting Agreement and the Sale Guidelines via facsimile, e-mail, overnight delivery or hand delivery on the Attorney General's office (to the division of consumer protection or similar authority) for each state where the Store Closing Sales are being held.

29.    To the extent that during between the Petition Date and the date of the Final Hearing there is a dispute arising from or relating to the Store Closing Sales, this Interim Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute which such Reserved Dispute will be heard at the Final Hearing, absent a party obtaining expedited relief. Nothing in this Interim Order shall constitute a ruling with respect to any issues to be raised with respect to a Reserved Dispute. Any Governmental Unit may assert a Reserved Dispute by sending a notice (the "**Dispute Notice**") explaining the

nature of the dispute to: O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, California 90071 (Attn: Stephen H. Warren, Esq., and Jennifer Taylor, Esq.), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.), proposed co-counsel to the Debtors.

**D.    Other Provisions**

30.    The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement and subject to the immediately succeeding paragraph.

31.    Notwithstanding anything to the contrary herein, the indemnification obligations of the Debtors set forth in the Consulting Agreement are approved, subject during the pendency of these chapter 11 cases to the following:

(a)    Consultant shall not be entitled to indemnification, contribution or reimbursement pursuant to the Consulting Agreement for services, unless such services and the indemnification, contribution or reimbursement therefore are approved by the Court;

(b)    The Debtors shall have no obligation to indemnify Consultant, or provide contribution or reimbursement to Consultant, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from Consultant's gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith or self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of Consultant's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Company, et al.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to Consultant's gross negligence, willful misconduct, breach of fiduciary duty, or bad faith or self-dealing but determined by this Court, after notice and a hearing to be a claim or expense for which Consultant should not receive indemnity, contribution or reimbursement under the terms of the Consulting Agreement as modified by this Order;

(c)    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11

14

cases, Consultant believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Consulting Agreement (as modified by this Order), including without limitation the advancement of defense costs, Consultant must file an application therefore in this Court, and the Debtors may not pay any such amounts to Consultant before the entry of an order by this Court approving the payment.    This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Consultant for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Consultant. All parties in interest shall retain the right to object to any demand by Consultant for indemnification, contribution or reimbursement; and

(d)     Any limitation of liability or limitation on any amounts to be contributed by the parties to the Consulting Agreement under the terms of the Consulting Agreement shall be eliminated.

32.     Except with respect to any Governmental Unit (as to which the provisions of paragraphs 14, 16, 17, and 27 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Consulting Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the Store Closing Sales, (iii) any other disputes related to the Store Closing Sales, and (iv) to protect the Debtors and/or the Consultant against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Consultant, the landlords or the Store Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2016     _____
          Wilmington, Delaware              UNITED STATES BANKRUPTCY JUDGE

16

# EXHIBIT 1

CONSULTING AGREEMENT

## CONSULTING AGREEMENT

This Consulting Agreement, dated as of January 23, 2016 (together with all Schedules, Exhibits and attachments hereto, collectively, the "Agreement"), is made by and between Great American Group, LLC, a California limited liability company, with a principal place of business at 21860 Burbank Blvd., Woodland Hills, CA 91367 (the "Consultant") and Hancock Fabrics, Inc. with a principal place of business at 1 Fashion Way, Baldwyn MS, 38824 (the "Merchant").

### WITNESSETH:

WHEREAS, Merchant operates retail store locations and desires to retain Consultant to provide consulting services to Merchant with respect to the management and disposition of the Merchandise (as defined below) in the context of a "Store Closing Sale" (the "Sale") at stores listed on Schedule A (the "Store(s)").

WHEREAS, Consultant is willing to serve as Merchant's consultant for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      DEFINITIONS

      For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

1.1     "Gross Rings Method" Agent and Merchant shall jointly keep a strict count of gross register receipts for each item of Merchandise sold less applicable Sales Taxes but excluding any prevailing Sale discounts offered by Agent ("Gross Rings").

1.2     "Lease" shall mean the lease, occupancy agreement, reciprocal easement or similar agreement pursuant to which Merchant has the right to occupy or utilize the Stores.

1.3     "Merchandise" shall mean all items of merchandise located in the Stores throughout the Sale term, and for greater certainty does not include any furniture, fixtures (trade or other) or equipment.

1.4     "Proceeds" shall mean the aggregate of the total amount (in dollars) of all sales of Merchandise made under this Agreement to retail consumers, exclusive of Sales Taxes.

1.5     "Sale Commencement Date" shall mean on or around February 16, 2016.

1.6     "Sale" shall have the meaning set forth in the recitals hereof.

1.7     "Sale Expenses" shall mean Store-level operating expenses incurred in connection with the Sale, limited to (i) advertising and signage and (ii) Supervisor fees and costs associated with performing the Services.

1.8     "Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

1.9     "Sale Termination Date" shall mean May 30, 2016, or such other date mutually determined by Merchant and Consultant to terminate the Sale.

1.10    "Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

1.11    "Store Employees" shall mean those individuals who Merchant employs and retains in the Stores to conduct the Sale.

1.12    "Supervisor" shall mean the individual whom Consultant shall engage to provide Services in the Stores to Merchant in connection with the Sale.

2.    CONSULTING

2.1    Merchant hereby retains Consultant and Consultant hereby agrees to serve as an independent consultant to Merchant in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Consultant shall serve as Merchant's sole and exclusive consultant relative thereto throughout the Sale Term;

2.2    On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, Consultant shall provide Merchant with the following Services with respect to the conduct of the Sale;

(i)    Provide qualified Supervisors to implement the Merchandise liquidation strategy in the Stores;

(ii)    Oversee the Sale of the Merchandise from the Stores in an effort to sell all of the Merchandise during the Sale Term;

(iii)    Determine and recommend appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with a "Store Closing" theme;

(iv)    Determine the appropriate pricing, display and discounting of Merchandise, as well as recommend appropriate staffing levels for the Stores (including Store Employees);

(v)    Sell all owned FF&E in the Stores pursuant to section 11.8 below;

(vi)    Coordinate accounting functions, including evaluation of sales of Merchandise, using Merchant's infrastructure; and

(vii)    Provide such other related services deemed necessary or prudent by Merchant and Consultant under the circumstances giving rise to the Sale.

2.3    In connection with the Sale, Consultant shall directly retain and engage the Supervisors. The Supervisors are an independent contractor engaged by Consultant and is not and shall not be deemed to be an employee or agent of Merchant in any manner whatsoever; nor shall the Supervisor have any relationship with Merchant by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Merchant for the Supervisors. During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Store opening and subsequent to the Store closing as required in connection with the Sale in Consultant's discretion.

2.4    Title to all Merchandise shall remain with Merchant at all times during the Sale Term until such Merchandise is sold by or on behalf of Merchant. All sales of Merchandise in the Stores shall be made on behalf of Merchant.

2.5    Should Merchant seek protection under Title 11 of the United States Code (the "Bankruptcy Code") by commencing a chapter 11 case in the United States Bankruptcy Court for the District of Delaware or other appropriate district (such court, the "Bankruptcy Court"), Merchant shall file a motion (the "Assumption Motion") in the Bankruptcy Court as soon as possible but in no event later than fourteen (14) days following the filing of such chapter 11 case (the "Petition Date") seeking entry of an order on or before thirty-five (35) days following the Petition Date (the "Approval Order") (1) authorizing and approving Merchant and Consultant to continue to conduct the Sale pursuant to the terms of this Agreement through the assumption by Merchant of this Agreement pursuant to section 365 of the Bankruptcy Code, or, to the extent applicable, such other provisions of the Bankruptcy Code or otherwise applicable law *nunc pro tunc* to the Petition Date, and (2) authorizing   Merchant to continue to promote the Sale as a "Going Out of Business Sale," "Liquidation Sale," or "Store Closing Sale" as applicable.  Should circumstances so require, Merchant agrees to  seek such relief on an emergency basis.

3.    EXPENSES

3.1    In connection with the Sale, Merchant shall be responsible for the payment of all expenses incurred in operating the Stores and conducting the Sale, including all occupancy expenses for the Stores and all Sale Expenses; provided, however, that with respect to Sale Expenses of the type listed on Attachment B, Merchant's responsibility shall be capped at the aggregate amount set forth for such Sale Expenses on Attachment B unless mutually agreed, in writing between Merchant and Agent.

4.    CONSULTANT'S FEES

4.1    Consultant shall receive a fee for net sales results that meet or exceed a certain threshold of sales as a percentage of cost. Sales of each item and the cost of each item will be determined by the Gross Rings Method, provided that cost shall be determined on the basis of 101% of aggregate cost to account for shrinkage.  The fee will be determined in accordance with **Exhibit C** and the applicable fee shall be applied from the first dollar of aggregate net sales.

4.2    Consultant shall submit invoices to Merchant every week beginning the week of February 16th, 2016, setting forth any Sale Expenses that have been incurred directly by Consultant during the prior one-week period.  Within five business days of the submission of such invoices, such invoices shall be paid in full by Merchant via wire transfer to the extent Merchant is responsible therefor pursuant to Section 3.1 hereof.

5.    STORE EMPLOYEES

5.1    Consultant shall consult with Merchant, and Merchant shall select and retain all Store Employees to be utilized as part of the Sale during the Sale Term.

5.2    Merchant has applied, and Merchant shall through the Sale Commencement Date continue to apply, historic practices and policies regarding its Store Employees, including, without limitation, as to hiring, termination, promotion and compensation.  Merchant agrees to use its reasonable best efforts to insure that as of the Sale Commencement Date the Stores will be staffed with historical levels of Store Employees.

5.3    Subject to paragraph 8.1 hereof, Consultant shall have no liability to the Store Employees (including any of Merchant's former employees) of any kind or nature whatsoever, including

without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, or any other expenses or liability arising from Merchant's employment of such Store Employees prior to, during, and subsequent to the Sale.

6.    REPRESENTATION AND WARRANTIES OF CONSULTANT

    6.1    Consultant hereby represents warrants and covenants in favor of merchant as follows:

        (a)    Consultant has taken all necessary action required to authorize the execution, performance and delivery of this agreement, and to consummate the transactions contemplated hereby.

        (b)    This Agreement is a valid binding obligation of Consultant enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

        (c)    No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

        (d)    Consultant is a "disinterested person" as that term is defined in section 101(14) of the United States Bankruptcy Code (the "Bankruptcy Code), as modified by Bankruptcy Code section 1107(b). Consultant has no connection with Merchant, its creditors, the U.S. Trustee for the District of Delaware, or any person employed in the office of the U.S. Trustee for the District of Delaware; is not a creditor, equity security holder, or insider of Merchant; is not and was not, within two years before the date hereof, a director, officer or employee of Merchant; and does not have an interest materially adverse to the interests of Merchant or any class of creditors or equity security holders thereof, by reason of any direct or indirect relationship to, connection with or interest in, Merchant.

7.    REPRESENTATIONS AND WARRANTIES OF MERCHANT

    7.1    Merchant hereby represents warrants and covenants in favor of Consultant as follows:

        (a)    Merchant has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

        (b)    This Agreement is a valid and binding obligation of Merchant enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

        (c)    No action or proceeding has been instituted or, to Merchant's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

8.    AFFIRMATIVE DUTIES OF CONSULTANT

    8.1    Consultant shall reimburse, indemnify, defend and hold Merchant and its officers, directors, agents, and employees, harmless from and against any damage, loss, expense (including reasonable attorneys' fees) or penalty, or any claim or action therefor, by or on behalf of any person, arising out of the performance or failure of performance of this Agreement, or due to any

acts or omissions by the Consultant or its employees, Supervisor or other agents ("Employees"), including but not limited to breaches or violations of human rights legislation and, the Consultant's Employees' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), unemployment compensation claims, or actions taken by Consultant or its Employees.

8.2 At the conclusion of the Sale, Consultant shall leave the Stores in broom clean condition, except for existing unsold fixtures.

9.  AFFIRMATIVE DUTIES OF MERCHANT

9.1 Merchant shall be solely liable for, and shall pay when due, all Sale Expenses as well as all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Stores, Store Employees and Merchant's business operations during the Sale, in each case to the extent Merchant is responsible for such Sale Expenses pursuant to Section 3.1.

9.2 Merchant shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes for the Stores to the appropriate taxing authorities. Merchant shall collect all sales taxes and Merchant shall pay the same to the appropriate taxing authorities in accordance with the applicable law.

9.3 Merchant shall indemnify and hold Consultant and its agents, employees, principals and Supervisor harmless from and against any and all damages, fines, penalties, losses, claims or expenses (including, without limitation, reasonable attorneys' fees) that Consultant may incur or sustain arising out of Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law or to pay any liability referred to in Section 10.1 hereof.

9.4 Merchant shall use all reasonable efforts to cause all Store Employees, and all other representatives and agents of Merchant to cooperate fully with Consultant and its Supervisor in connection with the Sale during the Sale Term.

9.5 Merchant shall indemnify and hold Consultant and its agents, employees, principals and Supervisor harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to the (i) negligent acts or omissions of Merchant or its agents, employees, in connection with the Sale, or (ii) the breach by Merchant of any of its obligations under this Agreement.

10.  INSURANCE

10.1 Merchant shall maintain throughout the Sale Term, liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with Merchant's operation of the Stores, and shall cause Consultant to be an additional insured with respect to all such policies. Merchant shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisor.

10.2 Consultant shall maintain throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive public liability and auto liability insurance) covering injuries to

persons and property in or in connection with Consultant's provision of Services at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.

11.    MISCELLANEOUS

11.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

(i)    In the case of Consultant:

Great American Group
21860 Burbank Blvd
Woodland Hills, CA 91367
Attn:  Scott Carpenter and Billy Nichols

With a copy to:

Great American Group, LLC
21860 Burbank Blvd
Woodland Hills CA 91367
Attn.: Alan Forman
Executive Vice President & General Counsel

(ii)    in the case of Merchant:

Hancock Fabrics Inc.
One Fashion Way
Baldwyn, Mississippi 38824
Attn: Dennis Lyons, Senior Vice President & Chief Administrative Officer

11.2    This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California, without reference to any conflict of laws provisions, and the United States Bankruptcy Code to the extent applicable.

11.3    In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

11.4    This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by Merchant and Consultant.

11.5    This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

11.6    This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

11.7    Nothing contained herein shall be deemed to create any relationship between Consultant and Merchant other than that of an independent contractor.  It is stipulated that the parties are not partners or joint venturers.

11.8    If Merchant elects, Consultant shall sell furniture, fixtures and equipment in the Stores (the "FF&E") for a 15% commission subject to the provision outlined as consultant services, of the proceeds generated from the sale of such assets.  Consultant shall have the right to abandon any unsold fixtures at the Stores at the conclusion of the Sale.

11.9    Merchant or Consultant may terminate this Agreement, effective upon three (3) days prior written notice to the other party to this Agreement, if the other party has materially breached this Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the other party does not cure such breach within three (3) days after receipt of written notice of such breach. The terms and conditions of this Section 11 and Sections 1,3,4,5,8,9 and 11 shall survive the expiration or termination of this Agreement.

GREAT AMERICAN GROUP, LLC

By: _____
       Scott K. Carpenter
       President, GA Retail        1/26/15

HANCOCK FABRICS, INC.

By: _____
Its: _____

**EXHIBIT A**
Store Closing List

See Attached

**Store Closure List**

Exhibit A

| Store # | Address | Location | ZIP | Sq Ft | Date Opened | Inventory At Cost |
|---|---|---|---|---|---|---|
| 6001 | 7993 SOUTHTOWN CENTER | MINNEAPOLIS, MN | 55431 | 22,677 | 22037 | $525,032 |
| 2010 | 252 WESTMINSTER DRIVE, SUITE 19 | CARLISLE, PA | 17013 | 7,529 | 42069 | 325,911 |
| 2008 | 1437 E. DIXIE DRIVE, SPACE G-01 | ASHEBORO, NC | 27203 | 13,224 | 41957 | 374,323 |
| 2003 | 349 S. MOUNTAIN AVENUE | UPLAND, CA | 91786 | 8,149 | 41878 | 383,358 |
| 1784 | 942 COMMONWEALTH BOULEVARD | TUPELO, MS | 38804 | 12,200 | 38565 | 527,138 |
| 2007 | 3335 COBB PARKWAY, SUITE 300 | ACWORTH, GA | 30101 | 7,250 | 42089 | 318,094 |
| 1782 | 1500 BROWNS BRIDGE ROAD | GAINESVILLE, GA | 30501 | 12,525 | 38353 | 259,152 |
| 1747 | 63040 N HIGHWAY 97 | BEND, OR | 97701 | 14,175 | 38991 | 397,613 |
| 2006 | 4501 S. LABURNUM, SUITE 110 | RICHMOND, VA | 23231 | 7,578 | 41851 | 432,918 |
| 2001 | 1049 WEST LANE ROAD | MACHESNEY PARK, IL | 61115 | 7,458 | 41543 | 321,600 |
| 1673 | 15735 E. BROADWAY, SUITE 9E | SPOKANE VALLEY, WA | 99037 | 8,057 | 41599 | 345,692 |
| 1797 | 4235 E MCCAIN BLVD | N LITTLE ROCK, AR | 72117 | 12,271 | 40732 | 374,451 |
| 1136 | 119 STONEBROOK PLACE | JACKSON, TN | 38305 | 9,280 | 40026 | 457,356 |
| 1241 | 8051 WEST BROAD STREET | RICHMOND, VA | 23294 | 13,100 | 30437 | 467,118 |
| 1662 | 100 24TH STREET WEST | BILLINGS, MT | 59102 | 12,000 | 35735 | 368,801 |
| 2005 | 4875 KIETZKE LANE | RENO, NV | 89509 | 7,000 | 41881 | 348,865 |
| 1794 | 10150 HUDSON RD #106 | WOODBURY, MN | 55129 | 12,369 | 38508 | 348,730 |
| 1798 | 3189 BUFORD DRIVE, SUITE 1341 | BUFORD, GA | 30519 | 11,088 | 41214 | 337,675 |
| 1714 | 8131 EAST KELLOGG DRIVE | WICHITA, KS | 67207 | 16,869 | 37773 | 359,228 |
| 1387 | 8811 HARDEGAN STREET, #315 | INDIANAPOLIS, IN | 46277 | 14,907 | 38808 | 340,017 |
| 6200 | 7440 S CICERO AVE | CHICAGO, IL | 60629 | 20,559 | 35612 | 201,969 |
| 1761 | 1340 TOWN EAST BOULEVARD | MESQUITE, TX | 75150 | 15,000 | 38292 | 365,478 |
| 1595 | 5836 EAST STATE STREET | ROCKFORD, IL | 61108 | 19,000 | 36617 | 449,252 |
| 1382 | 2524 MIRACLE LANE | MISHAWAKA, IN | 46545 | 16,000 | 32874 | 325,243 |
| 1033 | 6825 E 22ND STREET | TUCSON, AZ | 85710 | 23,500 | 41038 | 310,435 |
| 1174 | 898 BLOSSOM HILL ROAD | SAN JOSE, CA | 95123 | 20,000 | 28672 | 576,034 |
| 1886 | 195 WEST GAUSE BOULEVARD | SLIDELL, LA | 70460 | 13,788 | 37530 | 339,777 |
| 1202 | 1180,1190 & 1200 LEWIS & CLARK PKWY | CLARKSVILLE, IN | 47120 | 12,000 | 41033 | 364,085 |
| 1422 | 628 NE 81ST ST SUITE A | VANCOUVER, WA | 98665 | 9,500 | 33359 | 334,011 |
| 1537 | 3842 CENTER STREET NE | SALEM, OR | 97301 | 12,172 | 35886 | 318,240 |
| 6175 | 952 BRAGG ROAD | FREDERICKSBURG, VA | 22401 | 16,033 | 40704 | 356,439 |
| 2000 | 18700 VETERANS BOULEVARD | PORT CHARLOTTE, FL | 33950 | 7,500 | 41601 | 315,283 |
| 1792 | 9311 COORS BOULEVARD NW | ALBUQUERQUE, NM | 87114 | 12,000 | 38869 | 444,573 |
| 1485 | 4400 ROSWELL RD, SUITE 130 | MARIETTA, GA | 30062 | 8,400 | 34335 | 309,420 |
| 1678 | 1412 MONTAGUE AVE | GREENWOOD, SC | 29649 | 11,915 | 39965 | 389,386 |
| 1171 | 10896 FM 1960 | HOUSTON, TX | 77070 | 14,180 | 28581 | 361,149 |
| 1330 | 1720 OLD FORT PARKWAY, STE 2300A | MURFREESBORO, TN | 37129 | 14,018 | 41346 | 436,670 |
| 1671 | 2515 REDMOND CIRCLE, NW | ROME, GA | 30165 | 12,000 | 37347 | 348,956 |
| 1444 | 109 SHAKESPEARE LANE | COLUMBIA, SC | 29223 | 12,000 | 35725 | 382,420 |
| 1594 | 3848 UNION DEPOSIT RD | HARRISBURG, PA | 17109 | 14,325 | 36557 | 353,767 |
| 1121 | 9168 MANSFIELD ROAD | SHREVEPORT, LA | 71118 | 10,846 | 27273 | 364,055 |
| 1607 | 2249 EAST 17TH STREET | IDAHO FALLS, ID | 83404 | 13,340 | 36739 | 359,482 |
| 1789 | 295 MID RIVERS MALL DRIVE | SAINT PETERS, MO | 63376 | 15,000 | 38657 | 379,691 |
| 1615 | 5905 ATLANTA HIGHWAY | MONTGOMERY, AL | 36117 | 16,000 | 39326 | 412,265 |
| 2002 | 509 N. VALLEY MILLS DRIVE | WACO, TX | 76710 | 9,573 | 41803 | 383,225 |
| 1366 | 908 ELDORADO RD | BLOOMINGTON, IL | 61704 | 12,673 | 32782 | 326,665 |
| 1636 | 6800 P STREET | LINCOLN, NE | 68505 | 30,000 | 33573 | 469,868 |
| 1667 | 115 CONVENIENCE CENTER RD | CHAMPAIGN, IL | 61820 | 16,200 | 37438 | 304,623 |
| 1285 | 3755 BLOOMFIELD RD | MACON, GA | 31206 | 12,000 | 31352 | 370,869 |
| 6185 | 150 WESTGATE MALL | MADISON, WI | 53711 | 15,032 | 34213 | 327,754 |
| 1681 | 2025 W HWY 50 | FAIRVIEW HEIGHTS, IL | 62208 | 12,214 | 37561 | 345,112 |
| 1674 | 600 WEST INDEPENDENCE ST | SHAWNEE, OK | 74804 | 15,000 | 37347 | 342,218 |
| 1268 | 1608 WEST NOB HILL | YAKIMA, WA | 98902 | 12,852 | 30987 | 365,493 |
| 1695 | 1020 W FRANCIS AVENUE | SPOKANE, WA | 99205 | 13,000 | 40087 | 374,490 |
| 6138 | 1939 S MILITARY HWY | CHESAPEAKE, VA | 23920 | 10,125 | 32082 | 327,562 |
| 1025 | 7509 CANTRELL ROAD | LITTLE ROCK, AR | 72207 | 13,000 | 28369 | 452,125 |
| 1460 | 5407 SOUTH BOULEVARD | CHARLOTTE, NC | 28217 | 11,776 | 33909 | 361,452 |
| 1435 | 4750 TAMA STREET,SE | CEDAR RAPIDS, IA | 52403 | 13,497 | 32604 | 388,093 |
| 1249 | 5101 WHITE LANE, SUITE 1A | BAKERSVILLE, CA | 93309 | 16,000 | 40550 | 383,949 |
| 1608 | 75 GOODMAN ROAD WEST | SOUTHAVEN, MS | 38671 | 15,000 | 36800 | 454,050 |
| 1739 | 3190 ATLANTA HIGHWAY | ATHENS, GA | 30606 | 13,420 | 39139 | 334,499 |
| 1659 | 383 EDGEWOOD ROAD, NW | CEDAR RAPIDS, IA | 52405 | 11,200 | 35735 | 352,866 |
| 1647 | 3191 PETERS CREEK PKWAY | WINSTON SALEM, NC | 27127 | 16,294 | 37257 | 285,591 |
| 1204 | 5201 ELZIE ROAD | LOUISVILLE, KY | 40258 | 10,217 | 29556 | 357,711 |
| 1724 | 2700 STATE STREET | BISMARCK, ND | 58503 | 18,000 | 37895 | 413,613 |
| 6104 | 1135 WEST LARPENTEUR | SAINT PAUL, MN | 55113 | 12,000 | 29252 | 305,495 |
| 1624 | 1763 FILLMORE STREET | TWIN FALLS, ID | 83301 | 19,314 | 37043 | 337,355 |
| 6163 | 218 N. FREDERICK AVE | GAITHERSBURG, MD | 20877 | 11,950 | 33239 | 299,146 |
| 1433 | 15048 SAN PEDRO | SAN ANTONIO, TX | 78232 | 12,495 | 33573 | 380,450 |
| 1214 | 1112 S DALE MABRY HWY | TAMPA, FL | 33629 | 12,640 | 29860 | 320,078 |

**EXHIBIT B**
Budget

- ADVERTISING                                    $715,000
- MISCELLANEOUS                                  $30,000
- SUPERVISORS                                    $335,000

**TOTAL**                                        **$1,080,000**

**TOTAL BUDGET FOR STORES ON EXHIBIT A - 70 STORES**

**EXHIBIT C**
**CONSULTANTS FEE SCHEDULE**

- Under 145% of cost – 0.0%
- 145%-149.99% of cost -- 0.20%
- 150%-154.99% of cost – 0.40%
- 155% of cost and above -- 0.60%

## **EXHIBIT 2**

SALE GUIDELINES

# HANCOCK FABRICS, INC.
## SALE GUIDELINES

Notwithstanding anything in the Consulting Agreement,[1] the following procedures shall apply to any store location sales (each a "**Sale**" and collectively, "**Sales**") to be held at the Merchant's Stores.

A.      The Sales shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.      The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.      Within a "shopping center," the Consultant shall not distribute handbills, leaflets, or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located.  Otherwise, the Consultant may solicit customers in the Stores themselves. The Consultant shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.      At the conclusion of the Sales, the Consultant shall vacate the Stores in broom clean condition, and shall leave the locations in the same condition as on the Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 8.2 of the Consulting Agreement; *provided*, *however*, that the Merchant and the Consultant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store.  The Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sales.  Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility, any unsold owned FF&E located at a Store.

E.      All display and hanging signs used by the Consultant in connection with the Sales shall be professionally produced and all hanging signs shall be hung in a professional manner. The Merchant and the Consultant may advertise the Sale as a "store closing," "sale on everything" or similar themed sale. The Merchant and the Consultant shall not use neon or day-glow signs. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  Nothing contained herein shall be construed to create or impose upon the Consultant any additional restrictions not contained in the applicable lease agreement. In addition, the Merchant and the

---

[1]      Capitalized terms used but not defined herein have the meanings used in that certain Consulting Agreement dated as of January 23, 2016, by and between Great American Group, LLC, as consultant, and Hancock Fabrics, Inc., as merchant (the "**Consulting Agreement**").

Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; *provided, however*, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than thirty (30) feet by three (3) feet, but in no case will the banner exceed the width of the store front. In addition, the Merchant and the Consultant shall be permitted to utilize sign walkers, A-frame, interior and exterior banners, and similar signage; *provided, however*, that the use of such sign walkers, A-frame, interior and exterior banners, and similar signage shall be done in a safe and professional manner and otherwise in accordance with these Sale Guidelines.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final." Conspicuous signage shall be posted in the cash register area of each Store to the effect that the manufacturers' warranty, if any, may still exist and customers should consult the packaging materials to see what, if any, manufacturer's warranties are available.

G.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Consultant shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sales. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

I.      The Consultant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to sell owned FF&E located in the Stores during the Sale; *provided, however*, that the FF&E is not the property of the applicable landlord (of which Merchant shall advise Consultant promptly after the Sale Commencement Date). The Consultant may advertise the sale of the owned FF&E consistent with these guidelines. Additionally, the purchasers of any FF&E sold during the sale shall only be permitted to remove the FF&E either through the back shipping areas or through other areas after store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility, any unsold owned FF&E located at a Store.

K.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Consultant, and their respective agents and representatives shall continue to have exclusive and unfettered access to the Stores.

L.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

M.    The rights of landlords for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

N.    The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store within seven (7) business days' notice of the Merchant's receipt of such notice from the Consultant.

O.    If and to the extent that the landlord of any Store affected hereby contends that the Merchant is in breach of or default under these Sale Guidelines, such landlord shall provide at least seven (7) days' written notice, served (i) by facsimile or electronic mail and (ii) by overnight delivery, on the Merchant and its counsel, and the Consultant and the Consultant's counsel, at the following facsimile numbers and addresses:

If to the Merchant:

Hancock Fabrics, Inc.
One Fashion Way
Baldwyn, MS 38824
Attention:  Dennis Lyons, Senior Vice President & Chief Administrative Officer
Email:  dlyons@hancockfabrics.com

With copies to:

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Attention:  Stephen H. Warren and Jennifer Taylor
Fax:  (213) 430-6407
Email:  swarren@omm.com; jtaylor@omm.com

Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Attention:  Mark D. Collins and Michael J. Merchant
Fax:  (302) 498-7701
Email:  collins@rlf.com; merchant@rlf.com

If to the Consultant:

Great American Group
21860 Burbank Blvd.
Woodland Hills, CA 91367
Attn:  Scott Carpenter and Billy Nichols
Fax:  (818) 746-9170
Email:  scarpenter@greatamerican.com

With copies to:

B. Riley Financial, Inc.
590 Madison Ave., 29th Floor
New York, NY 10022
Attn:  Alan Forman, Executive Vice President and General Counsel
Email:  aforman@brileyfin.com

**EXHIBIT B**

**CARPENTER DECLARATION**

## DECLARATION OF SCOTT K. CARPENTER, IN CONNECTION WITH SUBMISSION OF CONSULTING AGREEMENT

I, Scott K. Carpenter, declare as follows:

1.      I am the President, Retail Division of Great American Group, LLC ("GAG"). As such, I am duly authorized to execute this Declaration on behalf of GAG.

2.      I submit this Declaration in connection with the submission by GAG of the Consulting Agreement (the "Consulting Agreement") by and between GAG and Hancock Fabrics, Inc., a Delaware corporation, and certain of its affiliates (collectively, "Hancock"). I have been informed that Hancock and its representatives have been engaged in a process of soliciting offers for the liquidation of substantially all of its assets located in 70 stores, and intend to commence a case under Chapter 11 of title 11 of the United States Code which is known as the United States Bankruptcy Code (the "Bankruptcy Code") in the near future.

3.      The Consulting Agreement contemplates the liquidation of designated assets of Hancock pursuant to Section 363 of the Bankruptcy Code. The Consulting Agreement was submitted by GAG to Hancock who solicited bids from several qualified firms.

4.      GAG is a wholly owned subsidiary of B. Riley Financial, Inc.

5.      GACP Finance Co., LLC is the Term Agent under that certain Credit Agreement dated April 22, 2015 between Hancock and, *inter alia*, GACP Finance Co., LLC, as Term Agent and GACP I, LP, as a Term Lender. GACP I, LP is an entity that is managed, but not owned by B. Riley Financial, Inc. or any of its subsidiaries. GACP Finance Co., LLC is an indirect subsidiary of B. Riley Financial, Inc.

6.      To the best of my knowledge, information and belief, GACP I, LP and GACP Finance Co., LLC, had no involvement of any sort in connection with the Consulting Agreement including, without limitation, the approval, negotiation or drafting of the Consulting

- 1 -

Agreement by Hancock or GAG.

## GAG is Disinterested

7.    To the best of my knowledge, information and belief, and except as the facts set

forth hereinbefore may be construed otherwise:

        a.    Neither GAG nor any of its representatives holds or represents an interest adverse to Hancock;

        b.    Neither GAG nor any of its representatives is a creditor or an insider of Hancock;

        c.    Neither GAG nor any of its representatives is or was, within two years before the date hereof, a director, officer or employee of Hancock; and

        d.    Neither GAG nor any of its representatives has an interest materially adverse to the interests of Hancock or of any class of creditors or equity security holders of Hancock, by reason of any direct or indirect relationship to, connection with, or interest in, Hancock, or for any other reason.

8.    Accordingly, I believe that GAG is "disinterested," and does not hold or

represent an interest adverse to Hancock or the bankruptcy estate of Hancock that will be

created upon its filing under Chapter 11 of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 26, 2016

                    FOR GREAT AMERICAN GROUP, LLC:

                    President, Retail Division