## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

HANCOCK FABRICS, INC., et al.,[1]
a Delaware corporation,
                    Debtors.

Chapter 11

Case No. 16-_____ (____)

Joint Administration Proposed

## DEBTORS' MOTION PURSUANT TO
## 11 U.S.C. §§ 105, 363, 365, 503 AND 507 FOR (I) ORDER APPROVING
## (A) BID PROCEDURES, (B) PROCEDURES FOR ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
## (C) RELATED NOTICES AND RELIEF, AND (II) ORDER APPROVING (A) SALE OF
## SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
## ENCUMBRANCES, AND OTHER INTERESTS, (B) ASSUMPTION, ASSIGNMENT,
## AND SALE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## UNDER BANKRUPTCY CODE SECTIONS 363 AND 365, AND (C) RELATED RELIEF

Hancock Fabrics, Inc. ("**Hancock**") and its affiliated debtors and debtors in possession

(collectively, the "**Debtors**" or the "**Company**") hereby submit this motion (the "**Motion**"),

pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, for the entry of (i) an

order, substantially in the form attached hereto as Exhibit A (the "**Bid Procedures Order**"),

(a) authorizing and approving the Bid Procedures (as defined below), (b) authorizing and

approving certain bidding protections to Great American Group, LLC (the "**Back-up Bidder**")

as set forth in that Agency Agreement (the "**Back-up Bid Agreement**") by and between

Hancock and the Back-up Bidder, a copy of which is attached hereto as Exhibit C, (c)

authorizing and approving the form and manner of notice of the Sale Transaction (as defined

below) and scheduling a sale hearing related thereto, and (d) authorizing and approving certain

procedures for the assumption and assignment of executory contracts and unexpired leases; and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwyn, MS 38824.

(ii) an order in the form attached hereto as Exhibit B[2] (the "**Sale Order**") authorizing and approving (a) the sale of the Debtors' inventory and FF&E (excluding the Closing Stores (as defined below))  (collectively, together with any other of the Debtors' other assets sold at Auction, the "**Purchased Assets**") free and clear of liens, claims, interests and encumbrances to the Back-up Bidder pursuant to the Back-up Bid Agreement, or to such other party that is the Successful Bidder at the Auction (each, as defined below), (b) provided that the Successful Bidder at the Auction is the Back-up Bidder or another person or entity acquiring the Purchased Assets for liquidation purposes, the store closing sale guidelines (the "**Sale Guidelines**") attached as Exhibit 2 to the Sale Order, which guidelines will be applicable to all store closing or similar themed sales conducted in connection with the Sale Transaction or during the course of these chapter 11 cases (the "**Store Closing Sales**"), and (c) granting certain related relief with respect to the closing of the Debtors' remaining stores (the "**Store Closing Relief**"); provided that, if the Successful Bidder at the Auction is a going concern bidder (or other bid that includes executory contracts and leases), such Sale Order shall authorize and approve (1) the sale of the Purchased Assets to such successful bidder free and clear of liens, claims, interests and encumbrances, and (2) the assumption and assignment of certain executory contracts and leases. In support of the Motion, the Debtors rely upon and incorporate herein by reference the *Declaration of Dennis Lyons in Support of Chapter 11 Petitions and Request for First Day Relief* (the "**Lyons Declaration**"), which was filed contemporaneously herewith.  In further support of the Motion, the Debtors respectfully represent:

## PRELIMINARY STATEMENT

A variety of factors discussed in detail in the Lyons Declaration have combined to result in the Debtors' need to file the instant cases to reorganize their debt structure in the current

---

[2] The Sale Order will be filed with the Court in advance of the hearing on the Bid Procedures Order.

economic climate and to align their operations to future business needs based on what their customers prefer, including store locations and format. Hancock intends to use these cases to, among other things, execute on one or more options to create value for stakeholders. Hancock is considering all possible options for maximizing stakeholder value and is focusing in particular on the sale of certain portions or all of its business as a going concern.

As discussed below, the Debtors have engaged an investment banker since October 2015 and have conducted an extensive marketing effort. Hancock is considering a broad range of options for the Debtors and their stakeholders with its primary effort being devoted to developing going concern options for the Debtors. Included in the going concern options that have been developed by the Debtors and their investment banker is developing a bid by Hancock's second lien noteholders, other investors, and trade partners (who have each expressed a strong interest in preserving the Company as a going concern). Hancock has participated extensively in ongoing negotiations over the going concern bid and expect that this bid or another going concern bid will be completed by the Auction (as defined below).

However, in order to make sure that the Auction is robust and protects the interests of their stakeholders, the Debtors have accepted a back-up bid from the Back-up Bidder pursuant to the Back-up Bid Agreement (the "**Back-up Bid**"). The Back-up Bid will set a floor for the Auction in the event that a going concern bid has not been fully developed by that time. The Back-up Bidder has agreed to accept a significantly lower break-up fee in the event any overbid is a going concern bid that is a qualified bid received by the required date, allowing the Debtors to complete a going concern transaction without incurring excessive additional cost. At the same time, the Back-up Bid assures the Debtors' senior secured creditors that the sale process will result in the maximization of the value of their collateral. For these reasons, and the reasons

3

more fully set forth herein, the Debtors submit that the relief requested in this Motion is in the best interests of their estates and creditors and request entry of the Bid Procedures Order and, upon the completion of the Auction and the Sale Hearing, the Sale Order.

## JURISDICTION & VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

2.      *First*, the Debtors seek entry of the Bid Procedures Order—as proposed in Exhibit A—pursuant to Bankruptcy Code sections 105, 363, 503, and 507 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 2002-1 and 6004-1:

   a.      approving the bid procedures for the sale of all or substantially all of the Debtors' assets (the "**Bid Procedures**," substantially in the form attached to the Bid Procedures Order as Exhibit 1);

   b.      authorizing and approving certain bidding protections to the Back-up Bidder, including a break-up fee and expense reimbursement, each subject to the occurrence of certain conditions set forth in the Back-up Bid Agreement (namely, the consummation of a higher or better Sale Transaction);

   c.      scheduling an auction, if necessary, (the "**Auction**") for the Purchased Assets to be held on March 11, 2016;

   d.      authorizing and approving procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assumption and Assignment Procedures**");

   e.      scheduling a hearing (the "**Sale Hearing**") on or before March 14, 2016, at which the Court will consider whether to approve either (1) the Back-up

4

Bid Agreement, or (2) such other agreement between the Debtors and the Successful Bidder (as defined below) at the Auction;

f.      approving various deadlines in connection with the foregoing; and

g.      authorizing and approving the form and manner of (1) notice of the Auction and the Sale Hearing, including the notice of the Auction and Sale Hearing in the form attached as <u>Exhibit 2</u> to the Bid Procedures Order (the "**Sale Notice**"), and (2) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors in the form attached as <u>Exhibit 3</u> to the Bid Procedures Order (the "**Notice of Assumption and Assignment**").

3.      *Second*, the Debtors seek entry of the Sale Order—as proposed in <u>Exhibit B</u>—pursuant to Bankruptcy Code sections 105, and 363, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1:

a.      approving the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and other interest (the "**Sale Transaction**");

b.      approving the assumption, assignment, and sale of certain executory contracts and unexpired leases as part of the Sale Transaction, and related cure amounts;

c.      provided that the Successful Bidder at the Auction is the Back-up Bidder or another person or entity acquiring the Purchased Assets for liquidation purposes, authorizing the Sale Guidelines and Store Closing Relief in connection with the closing of the Debtors' remaining stores and liquidation of the Purchased Assets; and

d.      granting related relief.

## BACKGROUND

**A.      Chapter 11 Filings.**

4.      On February 2, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107 and 1108. The Debtors have filed a motion seeking the joint administration of the Debtors' bankruptcy cases. No official committee of unsecured creditors has been appointed in these

cases.

**B.**     **The Debtors' Sale Strategy and Events Leading up to the Sale Transaction.**

5.     On or about October 1, 2015, Lincoln International LLC ("**Lincoln**") was engaged by Hancock to conduct a strategic alternatives process inclusive of possible joint ventures, strategic partnerships or alliances, a sale of the Debtors or assets of the Debtors, or other possible transactions.  In the weeks following its engagement, Lincoln utilized information provided by Hancock to prepare multiple marketing documents, including a single page summary of the company (the "**Teaser**") and a 44-page description of Hancock's operations, management, industry, and key financial information (the "**Confidential Information Presentation**").

6.     During the period between October 23, 2015 and December 4, 2015 (the "**Initial Marketing Period**"), Lincoln contacted 69 parties including strategic purchasers, financial purchasers and persons who had contacted either Hancock or Lincoln.  The parties Lincoln contacted included logical strategic buyers as well as financial investors with a history of investing in the retail industry and in situations involving operational underperformance and potential liquidity challenges.  Of the 69 parties contacted, 28 executed confidentiality agreements with Hancock and subsequently received the Confidential Information Presentation.  On November 6, 2015, Lincoln distributed a letter (the "**Process Letter**") to parties that had shown continued interest in acquiring the Company.  The Process Letters requested parties to submit a written indication of interest by November 18, 2015 or, for certain parties who were delayed in executing a confidentiality agreement, by December 4, 2015.  Despite this broad marketing effort, no written indications of interest were received.  The primary reasons parties declined to pursue a transaction were recent operational performance; the need to rationalize costs and the store base to create a smaller, more profitable base of stores; and, the legacy

6

liabilities and leveraged capital structure encumbering the Debtors and their assets.

7.      The results of the process were provided by Lincoln telephonically to the members of Hancock's Board of Directors during a conference call on December 9, 2015. After subsequent discussions on December 16, 2015, the Board of Directors instructed Lincoln to (i) solicit interest from parties to serve as a stalking horse bidder in a contemplated section 363 sale process and to (ii) solicit interest from liquidation firms to assist the Debtors with store closing or going out of business sales involving stores identified by management for closure. As further described below, since December 16, 2015, Lincoln has contacted or re-contacted approximately 38 parties of whom 25 were contacted during the Initial Marketing Period. Parties that were contacted included the following: (1) parties that indicated interest in an alternative transaction structure during the Initial Marketing Period; (2) existing stakeholders of the Debtors including parties representing a majority of the principal amount of the Debtors' existing Senior Secured Notes due 2017 (the "**Noteholders**"); and (3) firms whose primary business is monetization of assets through going-out-of-business sales. As described below, the process has contemporaneously sought to maximize value through a going concern sale while also ensuring that the value of the assets will be maximized if a going concern sale is not able to be completed.

8.      In order to facilitate and explore going concern bids for the Debtors and their assets under a section 363 sale and determine the relative benefit that a Chapter 11 process could generate for the Debtors' stakeholders, the Debtors' management and its advisors conducted an extensive analysis of each of the Debtors' stores' profitability, costs of carrying inventory in such stores, and the impact closing stores may have on advertising and distribution costs. After extensive analysis and discussion, management ultimately determined that seventy (70) stores (the "**Closing Stores**") should be immediately closed and that going-out-of-business sales should

7

be conducted with the assistance of a national liquidation firm. The Debtors' assets associated with the Closing Stores are not included within the Purchased Assets.

9.    At the same time that the Debtors were completing their analysis of potential store closures, the Debtors' advisors conducted numerous telephonic and in person meetings with a variety of financial and strategic parties in order to cultivate interest in a going concern sale of substantially all of the Debtors' assets. Such meetings included extensive discussions regarding a restructuring with the Noteholders. On January 20, 2016, the Debtors and Lincoln, the Noteholders, and a strategic party interested in acquiring the Debtors' business attended a meeting to discuss the preliminary terms pursuant to which the strategic party and the Noteholders would form an entity to serve as a bidder for the Debtors' business. Discussions between the Noteholders and the strategic party are ongoing, including development of a term sheet describing the structure of a possible transaction with the Debtors. Both the Noteholders and the strategic parties with whom they are working have an extensive knowledge of the Debtors and their operations, which should enable them to quickly develop an actionable proposal. Although the Debtors have not yet received such a proposal, they are optimistic that the Noteholders (or potentially other interested investors) will tender a going concern offer for the Debtors' business.

10.    Pending receipt of a going concern offer, in order to ensure that the Auction is robust, the Debtors have accepted the Back-up Bid from the Back-up Bidder pursuant to the Back-up Bid Agreement, under which the Back-up Bidder has agreed to monetize the inventory of the Debtors' remaining stores that are not planned to be closed. The Back-up Bid will set a floor for the Auction in the event that a going concern bid has not been fully developed by that time. The terms of the Back-up Bid Agreement are discussed in the following section.

## THE PROPOSED SALE TRANSACTION

11.     Pursuant to the Back-up Bid Agreement, the Back-up Bidder will pay to the Debtors a guaranteed amount equal to 108% of the cost value of its inventory (the "**Guaranteed Amount**"). Eighty-five percent (85%) of the Guaranteed Amount will be paid to the Debtors by the Back-up Bidder upon the commencement of the proposed going-out-of-business sales, with the remainder of the Guaranteed Amount paid at the completion of the sales.    Additional proceeds will be realized with the sale of FF&E, which the Back-up Bidder may undertake in exchange for a fee payable to the Debtors.    The Guaranteed Amount is subject to certain downward adjustments that may negatively impact the proceeds actually received by the Debtors.    These adjustments include the difference between the cost and retail price of the Debtors' inventory and the overall level of inventory at the time of the going-out-of-business sales are commenced.    Further, after payment to the Debtors of the Guaranteed Amount, and after payment to the Back-up Bidder of all sale expenses and a fee equal to 10% of the cost value of the inventory, the Debtors will participate equally with the Back-up Bidder in any further sale proceeds.

12.     Further, the Back-up Bidder has agreed to accept a significantly lower break-up fee in the event any overbid is a going concern bid that is a qualified bid received by the required date, allowing the Debtors to complete a potential going concern transaction without incurring excessive additional cost.  At the same time, the Back-up Bid assures the Debtors' senior secured creditors that the proposed sale process will result in the maximization of the value of their collateral while limiting potential risks.    The Debtors have reserved the right to allow the Noteholders to credit bid at the Auction, provided that provision has been made for payment in

9

full in cash,[3] at closing, of the claims of the Debtors' senior secured creditors, under the Prepetition Credit Agreement and the "**DIP Agreement**."[4] The Debtors further reserve the right to require that bids covering substantially all assets of the Debtors' estates provide for payment in full of the Debtors' allowed administrative expense claims.

13.    The Back-up Bid Agreement has been negotiated at arm's-length by the Debtors and the Back-up Bidder, and will serve as a baseline from which all prospective bidders will negotiate. Pursuant to the Back-up Bid Agreement, subject to the terms of the proposed Bid Procedures, the Debtors have agreed to sell and the Back-up Bidder has agreed to purchase all or substantially all of the Debtors' inventory and FF&E (excluding the Closing Stores). The Back-up Bid Agreement does not contemplate the assumption or assignment of any executory contracts or unexpired leases of real property.

14.    Any sale to or through the Back-up Bidder or any other Successful Bidder that intends to liquidate the Purchased Assets shall be completed pursuant to the Sale Guidelines and the Sale Closing Relief. In the event the Successful Bidder at the Auction acquires the Purchased Assets as a going concern, without the intention of closing any stores or liquidating any of the Debtors' inventory or FF&E, such Sale Guidelines and the Sale Closing Relief shall not be sought as part of the Debtors' request for approval of a Sale Transaction.

15.    The Bid Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments. As explained therein, the Back-up Bid Agreement includes provisions for the payment of a break-up fee and capped expense reimbursements as administrative expenses. Significantly, the Back-up Bidder has agreed to a fee structure whereby

---

[3] This includes, without limitation, all principal, interest, fees (including all early termination fees), costs, and expenses owing under the DIP Agreement.

[4] The "**DIP Agreement**" is that *Debtor-in-Possession Credit Agreement* dated on or about February 2, 2016, among Hancock as the Lead Borrower, Wells Fargo Bank, National Association, as Administrative Agent, Collateral Agent and Swing Line Lender, and GACP Finance Co., LLC, as Term Agent.

it would be entitled to a smaller break-up fee concerning a going concern sale transaction.

16.    The Back-up Bid Agreement includes various customary representations, warranties and covenants by and from the applicable Debtors and the Back-up Bidder, as well as certain conditions to closing and rights of termination.    Furthermore, the Back-up Bid Agreement includes covenants, conditions and termination rights related to the Debtors' chapter 11 cases.  The Sale Transaction contemplated by the Back-up Bid Agreement is subject to approval by the Bankruptcy Court and entry of the Bid Procedures Order and Sale Order.

17.    Certain material terms of the Back-up Bid Agreement are described below:[5]

    a.    <u>Purchased Assets</u>.    Inventory located at the Debtors' stores and distribution center, free and clear of all liens, claims, encumbrances, and other interests subject to the exclusions set forth therein.[6]  The Back-up Bidder also has the right to dispose of the Debtors' FF&E for a fee.

    b.    <u>Purchase Price</u>.  The Back-up Bidder shall pay the Debtors a guaranteed amount equal to 108% of the cost value of inventory (subject to certain adjustments) plus expenses of the sale, and a fee if the Back-up Bidder elects to dispose of the Debtors' FF&E.  Any proceeds from the sale of inventory by the Back-up Bidder in excess of the guaranteed amount, expenses and a 10% fee payable to the Back-up Bidder will be split 50/50 by the Back-up Bidder and the Debtors (the amounts payable to the Debtors under the Back-up Bid Agreement, the "**Purchase Price**").[7]

    c.    <u>Termination Payment/Expense Reimbursement</u>. If the Back-up Bid Agreement is terminated under certain circumstances, including as a result

---

[5] In the event of any inconsistencies between the provisions of the Back-up Bid Agreement and the general description of such agreement in this Motion, the Back-up Bid Agreement shall control.  Capitalized terms not otherwise defined herein shall have them meanings afforded to them in the Back-up Bid Agreement.

[6] The Debtors have reserved all rights concerning the designation of the inventory that comprises the Purchased Assets, including the right to assert that any putative consignment inventory constitutes property of the Debtors' estates and could therefore be included with the Purchased Assets. *See also Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Putative Consignment Vendors and Granting Related Relief.*

[7] The Back-up Bid Agreement has certain provisions concerning the treatment of property that the Debtor has designated as "consignment goods." Such designation is not binding on the Debtors for any other purpose, and no third party has any third party beneficiary rights therein.  The Debtors reserve all rights concerning any estate property, none of which are waived hereby or in the Back-up Bid Agreement.  Without limiting the generality of the foregoing, the Debtors reserve the right to challenge and avoid any putative interest in property of the estate (including consignments), notwithstanding anything to the contrary, and to the extent such interests constitute property of the Debtors' estates, to sell them pursuant to the Bid Procedures to any Successful Bidder (including but not limited to the Back-up Bidder).

11

of the sale of all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more persons other than the Back-up Bidder, including in accordance with the Bid Procedures (such event being an "Alternative Transaction"), the Back-up Bid Agreement provides for the payment to the Back-up Bidder of a break-up fee of (i) $180,000 in the event that the Debtors have designated a going concern bidder as the Initial Highest Bidder (as defined below) for the sale of its business as of the commencement of the Auction or (ii) $700,000 in the event that no such going concern bidder has been designated as of the commencement of the Auction (the "Termination Payment"), plus the customary, reasonable and documented third party fees, costs and expenses incurred by the Back-up Bidder in connection with the Sale Transaction (including legal fees) up to a maximum of $100,000 (the "Expense Reimbursement").

d.      Overbids.  The Back-up Bidder has agreed to keep its Back-up Bid in place to the extent it is overbid at the Auction.

e.      Bankruptcy Milestones.  The Court must enter the Bid Procedures Order on or prior to February 16, 2016.  The Court must enter the Sale Order on or before March 14, 2016.

f.      Sale Period.  The sale will commence on the first day following the entry of the Sale Order and shall be completed no later than June 30, 2016.

18.    In addition to the material terms of the Back-up Bid Agreement, described above, in accordance with Local Bankruptcy Rule 6004-1(b)(iv), the Debtors highlight the following with respect to the Back-up Bid Agreement and proposed Sale Transaction:

a.      No Sale to an Insider.  The Back-up Bidder is not an insider of the Debtor within the meaning set forth in Bankruptcy Code section 101(31).

b.      Agreements with Management.  No agreements with management have been entered into in connection with the Back-up Bid Agreement.

c.      Releases.  The proposed Sale Order provides that the Back-up Bidder shall have no liability for any claims or interests relating to any Purchased Assets acquired or sold pursuant to the Back-up Bid Agreement or the sale and transfer of any Purchased Assets. (Back-up Bid Agreement § 7.7).

d.      Public Auction.  As set forth herein, the Debtors are pursuing a public sale of the Purchased Assets subject to a competitive bid process in accordance with industry standards.

e.    Closing and Other Deadlines.   The Back-up Bid Agreement includes certain sale milestones and closing deadlines, as described in Paragraph 14(e) of this Motion. (Back-up Bid Agreement § 16.11).

f.    Good Faith Deposit.  The Back-up Bidder has not provided a good faith deposit.

g.    Interim Agreements with Proposed Buyer.  The Debtors and the Back-up Bidder have entered into that certain Consulting Agreement pursuant to which the Back-up Bidder has separately agreed to conduct going out of business sales in 70 of the Debtors' stores (the Closing Stores).   The Debtors have otherwise not entered into any interim agreement or arrangement with the Back-up Bidder.  *See also Declaration of Scott Carpenter in Connection with Submission of Consulting Agreement.*

h.    Use of Proceeds.  Upon closing of the Sale Transaction, all sale proceeds will be paid over to Wells Fargo Bank, N.A. as agent under the Debtors' debtor-in-possession credit   facility,   subject   to   all   liens,   claims, encumbrances, and other interests in the same amount and priority as they attached to the Purchased Assets prior to Closing.

i.    Tax Exemption.  No provision of the Back-up Bid Agreement addresses the use of tax exemptions.

j.    Sale of Avoidance Actions.  Under the Back-up Bid Agreement, the Back-up Bidder is not acquiring any of the Debtors' claims arising under Sections 544, 546, 547, 548 or 548 of the Bankruptcy Code or similar state laws, provided that the Debtors reserve the right to sell such assets as part of a going concern transaction.

k.    Requested Findings as to Successor Liability.  The proposed Sale Order and the Back-up Bid Agreement limit the Back-up Bidders' successor liability. (Back-up Bid Agreement § 1.1(m)).

l.    Relief from Bankruptcy Rule 6004(h).  The Bid Procedures Order and the Sale Order provide for relief from Bankruptcy Rule 6004(h).

## THE BID PROCEDURES

19.    By this Motion, the Debtors request entry of the Bid Procedures Order, which will, among other things, establish the following timeline:[8]

---

[8] Capitalized terms used but not defined in this "The Bid Procedures" section have the meanings ascribed to them in the Bid Procedures.

| Proposed Sale Timeline | |
|---|---|
| Sale Notice Publication Deadline | February 18, 2016, at 5:00 p.m. (EDT) |
| Deadline to Serve Sale Notice | February 18, 2016, at 5:00 p.m. (EDT) |
| Deadline to Serve Notice of Assumption and Assignment | February 25, 2016, at 5:00 p.m. (EDT) |
| Assumption and Assignment Objection Deadline | March 7, 2016, at 4:00 p.m. (EDT) |
| Sale Objection Deadline | March 7, 2016, at 4:00 p.m. (EDT) |
| Bid Deadline | March 9, 2016, at 5:00 p.m. (EDT) |
| Deadline to Notify Qualified Bidders | March 10, 2016, at 5:00 p.m. (EDT) |
| Auction (if necessary) | March 11, 2016, at 9:30 a.m. (EDT) |
| Sale Reply Deadline | March 11, 2016, at 5:00 p.m. (EDT) |
| Deadline to File/Notice Auction Results | March 12, 2016, at 5:00 p.m. (EDT) |
| Sale Hearing | March 14, 2016, at 10:00 a.m. (EDT) |

20.     The Bid Procedures are designed to ensure an efficient and orderly sale process that will maximize value for the Debtors' estates.  The Bid Procedures describe, among other things, the procedures for parties to conduct due diligence, the requirements to constitute a qualified bid for a Sale Transaction, the conduct of any auction, the selection and approval of any ultimately successful bidders, and related deadlines.  The Debtors submit that this bidding process affords them a sufficient opportunity to pursue a robust sale that will maximize the value of their assets for the benefit of their estates.

21.     <u>Determination by the Debtors</u>.  The Debtors, in consultation with any official committee of unsecured creditors appointed in this chapter 11 case (the "<u>Committee</u>") and the "<u>Secured Lenders</u>",[9] will (a) coordinate the efforts of Potential Bidders (as defined below) in

---

[9] The "<u>Secured Lenders</u>" consist of (i) Wells Fargo Bank, N.A. and GACP Finance Co., LLC under that Credit

14

conducting their respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to acquire the Purchased Assets, and (d) make such other determinations as are provided in the Bid Procedures. Neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person who is not a Potential Bidder and may take steps to ensure their confidential market information.

22.    <u>Diligence</u>.    Upon execution of a confidentiality agreement containing terms satisfactory to the Debtors, any prospective bidder identified by the Debtors as reasonably likely to be a Qualified Bidder (a "<u>Potential Bidder</u>") that wishes to conduct due diligence on any of the Purchased Assets may be granted access to material information regarding such Purchased Assets; <u>provided</u>, <u>however</u>, if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Potential Bidder any trade secrets or proprietary information.

23.    <u>Bid Deadline</u>. Any person or entity interested in participating in the Auction must submit, in writing, a Qualified Bid (as defined below) on or before March 9, 2016, at 5:00 p.m. (prevailing Eastern Time) (the "<u>Bid Deadline</u>") in writing (including via email), to the attorneys for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071

---

Agreement dated as of April 22, 2015 (the "<u>Prepetition Credit Agreement</u>"), by and between Wells Fargo Bank, N.A. and GACP Finance Co., LLC, on the one hand, and the Debtors, on the other hand; and (ii) (a) Deutsche Bank National Trust Company, as trustee under that Indenture dated as of November 20, 2012 for those Floating Rate Series A Secured Notes Due 2017 (the "<u>2017 Notes Indenture</u>"), and (b) the Noteholders. Notwithstanding anything herein to the contrary, any information provided by the Debtors to GACP Finance Co., LLC in connection with these Bid Procedures (unless such information is available to the general public) shall only be available to and reviewed by GACP Finance Co., LLC's counsel or advisors of record, and such counsel or advisors may provide summaries of the material terms of such information (but not the identity of any bidder) to GACP Finance Co., LLC. GACP Finance Co., LLC shall not provide any such information to or confer with any individuals or advisors that are acting on behalf of the Back-up Bidder in connection with any Sale Transaction, the Bid Procedures, or the Auction. GACP Finance Co., LLC's agreement to the above terms shall be deemed confirmed by GACP Finance Co., LLC's lack of objection to this Motion. Further, to the extent Wells Fargo Bank, N.A., Deutsche Bank National Trust Company or any of the Noteholders submit a Qualified Bid for the Purchased Assets, then such Secured Lender shall not be consulted with in connection with the Bid Procedures or the Auction, and shall not receive any information in connection with the Bid Procedures or the Auction except as made available as a Qualified Bidder or that is available to the general public.

15

(Attn: Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.) (Email: swarren@omm.com, krinehart@omm.com, jtaylor@omm.com), and to Lincoln International, 633 W. Fifth Street, Suite 6650, Los Angeles, CA 90071 (Attn: Alex Stevenson) (astevenson@lincolninternational.com). The Debtors, in consultation with any Committee and the Secured Lenders, may extend the Bid Deadline, provided that they promptly notify the Back-up Bidder and all Potential Bidders of any such extension.

24. <u>Bid Requirements</u>.

    a.    All bids must be accompanied by a letter from the Potential Bidder:

        i.    offering to acquire some or all of the Purchased Assets (including through a going concern bid) on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Back-up Bid Agreement, accompanied, as attachments to the letter, by (i) a duly executed asset purchase agreement (the "<u>Modified Agreement</u>") and, unless the bid is to acquire the Purchased Assets as a going concern, (ii) the Modified Agreement marked to show any proposed amendments and modifications to the Back-up Bid Agreement and its schedules and exhibits (the "<u>Marked Agreement</u>");

        ii.    agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (1) the closing of the sale of the Purchased Assets, (2) the withdrawal of the Purchased Assets for sale by the Debtors, or (3) 30 days after the Sale Hearing;

        iii.    offering to pay by credit bid, cash, or a combination of credit bid and cash a price greater than the aggregate consideration offered by the Back-up Bidder pursuant to the Back-up Bid Agreement by the amount of at least $250,000 over and above the aggregate of the Purchase Price, the Termination Payment, and the Expense Reimbursement; provided that any bid (including any credit bid) must provide for the payment of the Termination Payment and Expense Reimbursement in cash; <u>provided</u>, <u>that</u>, any credit bid by the Noteholders is subject to provision having been made for payment in full in cash,[10] at closing, of the claims of the Debtors' senior secured creditors, under the Prepetition Credit Agreement

---

[10] This includes, without limitation, all principal, interest, fees (including all early termination fees), costs, and expenses owing under the DIP Agreement.

and the DIP Agreement, unless the Debtors' senior secured creditors consent to alternative treatment, and the Debtors further reserve the right to require that bids covering substantially all assets of the Debtors' estates provide for payment in full of the Debtors' allowed administrative expense claims;

iv.    offering to pay the Cure Costs (as defined below) for any Acquired Contracts that the Potential Bidder intends to be assigned to it as part of any Sale Transaction;

v.    not requesting or entitling the Potential Bidder to any transaction or break-up fee, termination payment, expense reimbursement, or similar type of payment;

vi.    fully disclosing the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, and disclosing any connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and any officer or director of the foregoing;

vii.    stating that the Potential Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement;

viii.    containing such financial and other information that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement, including, without limitation, Adequate Assurance Information (as defined below) for any contracts or leases being assigned in connection with the proposed sale of the Purchased Assets;

ix.    not containing any due diligence or financing contingencies of any kind;

x.    containing evidence that the Potential Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Purchased Assets, which evidence is satisfactory to the Debtors in their sole discretion; and

xi.    including evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified Agreement.

17

b.    Subject to the Bid Procedures, Potential Bidders who are secured creditors (including the Secured Lenders) may make one or more credit bids of some or all of their secured claims to the full extent permitted by Bankruptcy Code section 363(k); provided, however, any bid must include a cash component sufficient to satisfy the obligations set forth in Paragraph 23(a)(iii), at closing, and be in the best interests of the estates as determined by the Debtors in their discretion.    To the extent that there is a cash component to any bid (whether submitted by a secured creditor or any other bidder for all or any portion of the Purchased Assets), such bid must be accompanied by (a) a certified check or wire transfer in the amount of not less than 10% of the aggregate cash component of the proposed purchase price payable to the order of the Debtor (a "Good Faith Deposit") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (provided, however, that the closing of the Sale Transaction shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors may reasonably request.    The Debtors reserve the right to reject credit bids in their discretion.    All Good Faith Deposits shall be held in a segregated account by the Debtors until no later than ten (10) days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the Bid Procedures, unless the bidder has been selected as the Successful Bidder or the Secondary Bidder (as defined below).

c.    The Debtors, in consultation with any Committee and the Secured Lenders, will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above.    A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."    The Debtor, in consultation with any

18

Committee and the Secured Lenders, will determine whether each bid meets the requirements of a Qualified Bid. The Debtors will notify bidders, along with any Committee, whether their bids are Qualified Bids by no later than March 10, 2016, at 5:00 p.m. (prevailing Eastern Time). The Back-up Bid Agreement is a Qualified Bid, and the Back-up Bidder is a Qualified Bidder, for all purposes and requirements pursuant to the Bid Procedures, notwithstanding the requirements that Potential Bidders must satisfy to be a Qualified Bidder.

        d.      The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (i) the amount of the Qualified Bid; (ii) the risks and timing associated with consummating a transaction with the Potential Bidder; (iii) any included or excluded assets or executory contracts and leases; and (iv) any other factors that the Debtors may deem relevant to a Sale Transaction in consultation with any Committee and the Secured Lenders.

        e.      The Debtors, in their business judgment, and in consultation with any Committee and the Secured Lenders, reserve the right to reject any bid if the bid is not a Qualified Bid or because the bid:

        i.      is on terms that are more burdensome or conditional than the terms of the Back-up Bid Agreement;

        ii.      requires any indemnification of such Potential Bidder in its Modified Agreement;

        iii.      is not received by the Bid Deadline;

        iv.      is subject to any contingencies (including representations, warranties, covenants, and timing requirements) or any other conditions precedent to such party's obligation to acquire the Purchased Assets that the Debtors, in consultation with any Committee and the Secured Lenders, determine to not be in the best interests of the estates, other than as may be included in the Back-up Bid Agreement; provided that the Debtors will not accept any bid that includes any financing or diligence contingencies; or

> v.      does not meet any requirement set forth above.

25.    <u>Auction Participation</u>.

    a.      At least one business day prior to the Auction, each Qualified Bidder must inform the Debtors whether it intends to participate in the Auction. The Debtors will promptly thereafter inform each Qualified Bidder that has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that may participate in the Auction.

    b.      If the Debtors do not receive any Qualified Bids other than the Back-up Bid Agreement, it will not hold an Auction, the Back-up Bid Agreement will be the Successful Bid and the Back-up Bidder will be named the Successful Bidder. In the event that the Debtors receive more than one Qualified Bids, the Debtors will conduct the Auction. The Auction, if required, will be conducted at the offices of the Debtors' co-counsel, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, on March 11, 2016, at 9:30 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders and the advisors to the Committee. The Auction will be conducted pursuant to the following rules, provided that, at the Auction, the Debtors, in consultation with any Committee and the Secured Lenders, may announce additional procedural rules for conducting the Auction so long as the rules are not inconsistent with the Bid Procedures:

> i.      The Debtors will have the right to conduct any number of Auctions on the date of the Auction to accommodate Qualified Bids for any combination of the Purchased Assets (or additional assets) that the Debtors, in their business judgment, determine is in the best interest of the Debtors' estates, in consultation with any Committee and the Secured Lenders. The Debtors, in consultation with any Committee and the Secured Lenders, have the right to adjourn or cancel the Auction at or prior to the Auction. The Qualified Bidders must appear in person at the Auction or through a duly authorized representative. Only the Qualified Bidders will be entitled to make any subsequent bids at the Auction. Each

20

Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale. The Debtors are under no obligation to sell assets other than Purchased Assets but may elect to do so.

ii.    Bidding will commence at the amount of the Qualified Bid that the Debtors, in consultation with any Committee and the Secured Lenders, determine in their business judgment to be the highest or best Qualified Bid (the "**Initial Highest Bid**"). Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Initial Highest Bid(s), in increments of at least $250,000 (or such other amounts determined by the Debtors at the Auction). The Back-up Bidder shall have the ability to credit bid at the Auction the amount of the Termination Payment and the Expense Reimbursement (which will be appropriately considered by the Debtors when determining the net benefit to the estate of the bid).

iii.    The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, and in consultation with any Committee and the Secured Lenders, to announce reductions or increases in minimum incremental bids at any time during the Auction. Each Qualified Bidder will have the right to submit additional bids and make additional modifications to the Back-up Bid Agreement or Modified Agreement, as applicable, at the Auction to improve its bids. The Auction shall continue until there is only one offer that the Debtors determine, subject to Bankruptcy Court approval, is the highest or best offer submitted at the Auction (the "**Successful Bid**", and the bidder of such Successful Bid being the "**Successful Bidder**") from the Qualified Bidders and the Back-up Bidder.

iv.    On or before March 12, 2016, at 5:00 p.m. ET, the Debtors will cause the results of the Auction, including a copy of the Successful Bid(s), to be published on the website of the Debtors' Court-approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics.

v.    At the completion of the Auction, the Debtors, in consultation with any Committee and the Secured Lenders, will determine which Qualified Bidder(s) have submitted the Successful Bid(s) for the Purchased Assets. Such Qualified Bidder(s) will become the Successful Bidder(s) and will have such rights and responsibilities of a purchaser, as set forth, (a) if the Back-up Bidder is the Successful Bidder, in the Back-up Bid Agreement, or (b) if another Qualified Bidder is the Successful Bidder, in the Modified

Agreement, each as it (or they) may have been modified during the Auction.

vi.     The Debtors will request at the Sale Hearing that the Court authorize the Debtors to consummate the Sale Transaction(s) with the Successful Bidder. All Qualified Bidders at the Auction will be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction.

26.     Secondary Bidder. If an Auction is conducted, the Qualified Bidder with the next highest or otherwise next best Qualified Bid for the Purchased Assets at the Auction (the "Secondary Bid") will be required to serve as the back-up bidder (the "Secondary Bidder") for such Purchased Assets and keep such Secondary Bid open and irrevocable until the first to occur of (i) 45 days after the completion of the Auction, (ii) consummation of the transaction with the Successful Bidder, or (iii) the Secondary Bidder's receipt of notice from the Debtors of the release by the Debtors of the Secondary Bidder's obligations. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on its part or otherwise, the Secondary Bidder will be deemed the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Secondary Bidder without further order of the Court; provided, however, if the Sale Order does not approve the Sale Guidelines and Store Closing Relief, then the Debtors shall obtain such relief from the Court prior to being able to consummate the sale with the Back-up Bidder.

27.     Return of Good Faith Deposits. Good Faith Deposits shall be returned without interest to each bidder not selected by the Debtors as the Successful Bidder or the Secondary Bidder by no later than the tenth business day following the conclusion of the Auction. The Good Faith Deposit of the Secondary Bidder shall be held by the Debtors until ten (10) business

22

days after the closing of the Sale Transaction with the Successful Bidder or termination of the

Secondary Bid as provided above.

28.     The Debtors may, in their discretion and subject to the exercise of their business

judgment and in consultation with any Committee and the Secured Lenders, make alterations to

the Bid Procedures or terminate discussions with any and all prospective acquirers at any time

and without specifying the reasons therefor, including changes so as to modify deposit amounts

and to modify or eliminate the requirements with respect to Secondary Bidders—but only to the

extent not materially inconsistent with the Bid Procedures.  For the avoidance of any doubt, the

Debtors reserve the right, in consultation with any Committee and the Secured Lenders, to adopt

"blind bidding," and to require any bidder to submit its highest or otherwise best bid, during the

final round of bidding.

<u>**ASSUMPTION AND ASSIGNMENT PROCEDURES**</u>

29.     To facilitate a Sale Transaction, the Debtors propose the following procedures for

notifying counterparties to executory contracts and unexpired leases of potential cure amounts

should the Debtors seek to assume and assign such contracts and leases:

     i.     <u>**Notice of Assumption and Assignment**</u>:  On or before February 25, 2016, the Debtors will file with the Court and serve via first-class United States mail on all counterparties to any of the Debtors' executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with the Sale Transaction (the "**Designated Contracts**") and all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "**Contract Notice Parties**") a notice of assumption, assignment, and sale substantially in the form of the Notice of Assumption and Assignment attached to the Bid Procedures Order as <u>Exhibit 3</u>.

    ii.     The Notice of Assumption and Assignment will include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "**Cure Costs**") for each Designated Contract.  The Debtors reserve the right to supplement the list of Designated Contracts and provide additional Notices of Assumption and Assignment for previously omitted Designated Contracts prior to the execution of a definitive agreement for a Sale

23

Transaction in accordance with such agreement, and to remove a Designated Contract from the list of Acquired Contracts (defined below) at any time before the closing of the Sale Transaction. The Successful Bidder shall be responsible for payment of any Cure Costs.

iii.    Although the Debtors will make a good-faith effort to identify all Designated Contracts that might be assumed and assigned in connection with a Sale Transaction, the Debtors may identify other executory contracts or unexpired leases that they desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Bid Procedures Order, the Debtors identify additional executory contracts or unexpired leases to be assumed and assigned to the Successful Bidder, the Debtors will serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each supplemental Designated Contract at the last known address available to the Debtors by no later than ten days before the proposed effective date of the assignment. Each Supplemental Notice of Assumption and Assignment will set forth (i) the name and address of the Designated Contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder to withdraw such request for assumption and assignment of the Designated Contract prior to the closing of the applicable Sale Transaction), (iii) identification of the Designated Contract, and (iv) the Cure Costs, if any.

iv.    Each Supplemental Notice of Assumption and Assignment that identifies a Designated Contract that was not previously designated to be assumed, assigned, and sold or that reduces the Debtors' calculation of the Cure Costs will provide a deadline of not less than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment by which the counterparty to any such Designated Contract may object to (a) its listing as a Designated Contract and (b) the Debtors' calculation of the Cure Costs.

v.    The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not obligate the Debtors to assume such Designated Contract or the Successful Bidder to take assignment of such Designated Contract. Only those Designated Contracts that constitute acquired contracts pursuant to a Successful Bidder's Modified Agreement, will be assumed, assigned, and sold to the Successful Bidder.

vi.    **Objections to Assumption and Assignment**: Any counterparty to a Designated Contract must file and serve on the Objection Recipients (as defined below) any objections to (a) the proposed assumption, assignment, and sale of the applicable Designated Contract (and must state in its

24

objection, with specificity, the legal and factual basis thereof) and (b) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than March 7, 2016, at 4:00 p.m. (prevailing Eastern Time) (the "**Assumption and Assignment Objection Deadline**" and, together with the Sale Objection Deadline (as defined below), the "**Objection Deadlines**").

vii.    If a counterparty to a Designated Contract files a timely objection asserting a higher cure than the maximum Cure Costs set forth in the Notice of Assignment and Assumption (or Supplemental Notice of Assumption and Assignment), and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing or such later hearing date that the parties agree is acceptable. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under a Designated Contract, if it is ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed, assigned, and sold to it in connection with the Sale Transaction (an "**Acquired Contract**"), will be heard at the Sale Hearing or such later hearing date that the parties agree is acceptable.

viii.   If the counterparty to a Designated Contract does not timely file and serve an objection, such counterparty will be deemed to have consented to the assumption, assignment and sale of the Designated Contract to a Successful Bidder as an Acquired Contract, notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale, except with respect to the adequate assurance of future performance by such Successful Bidder. Any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing. The Cure Costs set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment and sale of the Designated Contract and the Cure Costs, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

30.    If the Debtors receive any Qualified Bids that contemplate the assumption, assignment and sale of any Designated Contract, within one (1) business day of the Debtors'

25

receipt of such Qualified Bid, the Debtors shall provide counterparties to the Designated Contracts with Adequate Assurance Information (as defined below) with respect to the Qualified Bidder by overnight mail and email (if available). **"Adequate Assurance Information"** means information including (a) information about the purchaser's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (b) a description of the intended use of the premises (if applicable), (c) the exact name of the proposed assignee, (d) the proposed form of order authorizing the assumption and assignment of the Designated Contracts, and (e) such additional information regarding the potential purchaser as the Debtors may elect to include. Any counterparty to a Designated Contract may object to the Adequate Assurance Information in connection with a Sale Transaction at or before the Sale Hearing.

31.    If a Successful Bidder other than the Back-up Bidder prevails at the Auction, then: (i) as soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a notice that (a) identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Designated Contracts, (b) lists any modifications to the Cure Costs, and (c) notifies the counterparties to any Designated Contracts whether there has been any change to the decision to assume and assign such Designated Contracts; and (ii) solely to the extent such notice identifies any change in information relating to the assumption and assignment of such Designated Contracts, the deadline to file and serve an objection to the assumption and assignment of the Designated Contracts shall be extended such that any such objections to any such change in information may be asserted at or before the Sale Hearing; provided that the deadline to object to Cure Costs (to the extent unmodified) shall not be extended.

26

## SALE NOTICE PROCEDURES

32.     Within two (2) business days after entry of the Bid Procedures Order, the Debtors will provide notice, substantially in the form of the Sale Notice attached to the Bid Procedures Order as Exhibit 2 of the Bid Procedures Order, the Auction, the Objection Deadlines, and the Sale Hearing by first-class United States mail to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Wells Fargo Bank, National Association, as Administrative Agent; (iv) counsel to GACP Finance Company, LLC, as Term Agent; (v) counsel to Deutsche Bank National Trust Company, as trustee under the 2017 Notes Indenture; (vi) John A. Bicks, Esq., K&L Gates, as counsel to certain Noteholders; (vii) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets during the previous six (6) months; (viii) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Purchased Assets (for which identifying information and addresses are available to the Debtors); (ix) all non-Debtor parties to the Designated Contracts; (x) any governmental unit known to the Debtors to have a claim in these cases; (xi) the Office of the Attorney General in each state in which the Debtors operate; (xii) the Office of the Delaware Secretary of State; (xiii) the Delaware State Treasury; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; and (xvi) all parties that have requested notice in these cases under Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

33.     By February 18, 2016, the Debtors shall cause a summary version of the Sale Notice to be published (a) in the *Wall Street Journal*, and, in the Debtors' sole discretion, any other publication designed to provide effective notice of the Auction and Bid Procedures, and (b) on the website of the Debtors' Court-approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics.

27

34.     The Debtors submit that the proposed Sale Notice, along with the procedures for providing notice of this Motion, the Auction, the Assumption and Assignment Procedures, and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto. Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

35.     Any and all objections, if any, to any Sale Transaction (except for objections to the Adequate Assurance Information, the Auction, and the selection and identity of the Successful Bidder), must be filed by March 7, 2016, at 4:00 p.m. (prevailing Eastern Time) (the **"Sale Objection Deadline"**) and be served on (i) the Office of the United States Trustee for the District of Delaware; (ii) co-counsel to the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.); (iv) counsel to the Committee; (v) counsel to Wells Fargo Bank, National Association, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq.); (vi) counsel to GACP Finance Company, LLC, Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Andrew Tenzer, Esq.); (vii) counsel to Deutsche Bank National Trust Company, Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, NY 10271 (Attn: Margery A. Colloff, Esq.); (viii) counsel to certain of the Noteholders, K&L Gates, 599 Lexington Avenue, New York, NY 10022 (Attn: John A. Bicks, Esq.); and (ix) counsel to the Back-up Bidder (collectively, the **"Objection Recipients"**). All replies to such objections must be filed by March 11, 2016, at 5:00 p.m. (prevailing Eastern

Time).  All objections to the Auction and the selection and identity of the Successful Bidder may be asserted at the Sale Hearing.

36.    Any party failing to timely file an objection to the Sale Transaction will be forever barred from objecting and will be deemed to have consented to the Sale Transaction, including the transfer of the Debtors' right, title, and interest in, to and under the Purchased Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with a definitive agreement for a Sale Transaction.

## LEGAL BASIS FOR RELIEF REQUESTED

**A.    Approval of the Sale and Bid Procedures is Warranted Under Bankruptcy Code Section 363.**

37.    Bankruptcy Code section 363 provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).    Section 363 does not provide a standard establishing the appropriate circumstances for bankruptcy courts to authorize the sale of a debtor's assets.  Courts, however, have held that such a sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business purpose" for the sale. *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (Bankr. D. Del. 1999) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)).    The business judgment rule creates a "presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005) (citations omitted); *see also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware's business judgment rule principles have "vitality by analogy" in chapter 11).

38.    Once a court is satisfied that there is a sound business reason justifying the sale, the court must also determine that adequate and reasonable notice has been provided to interested parties, that the sale price is fair and reasonable, and that the purchaser is proceeding in good faith. *In re Delaware & Hudson Ry Co.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987)).

39.    The Debtors have sound business justifications for seeking to sell the Purchased Assets in accordance with the Bid Procedures.  In the Debtors' judgment, the best opportunity to maximize value and recoveries for the Debtors' estates is to sell the Purchased Assets in a single section 363 sale, as contemplated by this Motion.    Prior to the commencement of these bankruptcy cases, the Debtors and their advisors conducted an extensive marketing process for the Purchased Assets.  The Debtors were unable to secure a going concern bid for their assets prior to the Petition Date.  The Back-up Bidder's offer to liquidate all or substantially all of the Debtors' inventory and FF&E (excluding the Closing Stores) pursuant to the Back-up Bid Agreement was the most economically attractive offer available to the Debtors at the time.  As a result, any Sale Transaction pursuant to the terms of the Back-up Bid Agreement, or if a third party acquires the Purchased Assets after the Auction, will allow the Debtors to maximize the return on assets for the benefit of the Debtors' estates and creditors.

40.    At the Sale Hearing, the Debtors will provide evidence that the sale price for the Purchased Assets to be sold to the Back-up Bidder pursuant to the Back-up Bid Agreement is fair and reasonable by showing that the Back-up Bid Agreement is the product of the Debtors'

extensive marketing efforts, and was entered into after good faith, arm's-length negotiations. Further, the Debtors will provide evidence that, if the Back-up Bidder is not the Successful Bidder, then the Successful Bidder(s) made the highest or best offer for the Purchased Assets. Lincoln will ensure that any sale of the Purchased Assets reflects their fair market value by continuing to actively market the Purchased Assets and make information available to interested purchasers until the Bid Deadline. Moreover, the Bid Procedures are designed to encourage as many bidders as possible to put forth their best offers, thus increasing the potential for the Debtors' assets to be sold for a value in excess of that agreed to under the Back-up Bid Agreement, including on a going concern basis.

41.    At the Sale Hearing, the Debtors will also present evidence that the Back-up Bid Agreement, or any Modified Agreement if the Back-up Bidder is not the Successful Bidder, was the product of fairly negotiated, arm's-length transactions in which the Successful Bidder(s) acted in good faith, and, therefore, that the protections of Bankruptcy Code section 363(m) should apply.

42.    Further, any sale to or through the Back-up Bidder or any other Successful Bidder that intends to liquidate the Purchased Assets shall be completed pursuant to the Sale Guidelines and the Sale Closing Relief. In the event the Successful Bidder at the Auction acquires the Purchased Assets as a going concern, without the intention of closing any stores or liquidating any of the Debtors' inventory or FF&E, such Sale Guidelines and the Sale Closing Relief shall not be sought as part of the Debtors' request for approval of a Sale Transaction.

43.    Accordingly, the Debtors request that the Court approve the proposed Sale Transaction set forth herein.

**B.    The Court Should Approve the Bid Protections Provided for Under the Bid Procedures and Back-up Bid Agreement.**

31

44.     The Debtors are requesting, in connection with the Bid Procedures Order, certain bid protections for the Back-up Bidder, such as (a) the provision of a Termination Payment and Expense Reimbursement to be paid to the Back-up Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, and (b) the initial overbid requirement and the subsequent bidding increments (together with the Termination Payment and Expense Reimbursement, the "**Bid Protections**").

45.     The Third Circuit has identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206–07 (3d Cir. 2010). Second, if the availability of a break-up fee and expense reimbursement were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *In re Reliant Energy*, 594 F.3d at 206-07; *In re O'Brien*, 181 F.3d at 537.

46.     In *In re O'Brien*, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.      the presence of self-dealing or manipulation in negotiating the break-up fee;

b.      whether the fee harms, rather than encourages, bidding;

c.      the reasonableness of the break-up fee relative to the purchase price;

d.      whether the unsuccessful bidder placed the estate property in a "sales

32

configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

f.    the correlation of the fee to a maximum of value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors oppose the break-up fee.

*See In re O'Brien*, 181 F.3d at 536.

47.    The Debtors believe that the Bid Protections collectively provide the Debtors' estates with the types of benefits generally recognized by the Third Circuit and, therefore, should be approved. The Debtors and their advisors engaged in an extensive marketing process prior to the commencement of these bankruptcy cases, and the Back-up Bid Agreement represents the best offer for the purchase of the Purchased Assets to be sold pursuant thereto. The Bid Procedures were a necessary and material inducement to retain the Back-up Bidder. Without the Bid Procedures, the Debtors do not believe the Back-up Bidder would have agreed to acquire any of the Purchased Assets on similar terms and price as provided in the Back-up Bid Agreement. Moreover, by inducing the Back-up Bidders to hold their offers open as a baseline from which other potential purchasers can submit higher and/or better offers, the Bid Protections serve to encourage more competitive bidding and, in turn, will increase the likelihood that the Purchase Price of the Debtors' assets will reflect their true worth. Further, the Back-up Bidder has agreed to reduce its Termination Payment in the event the Debtors are able to designate a going concern bidder as the Initial Highest Bidder for the sale of Debtors' assets on a going concern basis prior to the Auction. As such, the Bid Protections will enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

33

48.     Furthermore, the Debtors believe that the Bid Protections are well within market and fair and reasonable in amount, especially where each Termination Payment will be paid out of the proceeds of any competing transaction that is consummated.  Similar types of bid protections have been approved by this Court.  *See, e.g.*, *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG), Docket No. 911 (Bankr. D. Del. Dec. 4, 2015); *In re Magic Brands, LLC*, Case No. 10-11310 (BLS), Docket No. 267 (Bankr. D. Del. May 18, 2010); *In re Spheris, Inc.*, Case No. 10- 10352 (KG), Docket No. 122 (Bankr. D. Del. Feb. 23, 2010); *In re Anchor Blue Retail Grp., Inc.*, Case No. 09-11770 (PJW), Docket No. 137 (Bankr. D. Del. June 12, 2009); *In re Sharper Image Corp.*, Case No. 08-10322 (KG), Docket No. 244 (Bankr. D. Del. Mar. 12, 2008); *In re Tweeter Home Entm't Grp., Inc.*, Case No. 07-10787 (PJW), Docket No. 211 (Bankr. D. Del. June 27, 2007); *In re Radnor Holdings Corp.*, Case No. 06-10894 (PJW), Docket No. 277 (Bankr. D. Del. Sept. 22, 2006); *In re Riverstone Networks, Inc.*, Case No. 06-10110 (CSS), Docket No. 80 (Bankr. D. Del. Feb. 24, 2006).

49.     For the foregoing reasons, the Debtors respectfully request that this Court authorize the Bid Protections.

**C.     The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests.**

50.     Under Bankruptcy Code section 363(f), a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

(1)     "applicable nonbankruptcy law permits sale of such property free and clear of such interest";

(2)     "such entity consents";

(3)     "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property";

34

(4)    "such interest is in bona fide dispute"; or

(5)    "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f).

51.    Because section 363(f) is stated in the disjunctive, only one of the five listed conditions must be met when selling property of the estate. *See Folger Adam Sec. Inc. v. De Matteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (noting that a debtor is authorized to sell property free and clear of "any interest" if any one of the five prescribed conditions under section 363(f) is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988). A debtors has broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

52.    The Debtors submit that the Sale Transaction will satisfy one or more conditions of Bankruptcy Code section 363(f). For example, the sale will satisfy section 363(f)(2) with respect to any entity with an interest in the Purchased Assets that expressly consents to the Sale Transaction or does not object to the applicable Sale Transaction and thus is deemed to consent to it. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent."); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Here, the Debtors' senior secured lenders and Noteholders have expressly consented to the Sale Transaction on the condition that the proceeds

35

of the Sale Transaction, up to the amount of their senior secured claim, be either (i) administered as provided in the DIP Agreement, or (ii) after satisfaction of the senior secured claims, held by the Debtors with the Noteholders' liens attaching thereto to the same extent and priority as such liens have attached to the Purchased Assets as of the Petition Date and subject to the terms of the interim or final (as applicable) *Order Under 11 U.S.C. §§ 105, 351,362, and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* regarding the cash collateral of the Noteholders.

53.    Alternatively, the Debtors may sell the Purchased Assets free and clear of any other interests under section 363(f)(1) because applicable nonbankruptcy law permits sale of the Purchased Assets free and clear of such interests or under section 363(f)(5) because entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.

54.    Accordingly, the Debtors request authority to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests.

**D.    The Court Should Approve the Proposed Sale Guidelines the Store Closing Relief.**

a.    The Sale Guidelines Should be Approved.

55.    In the event the Debtors seek to complete a Sale Transaction with the Back-up Bidder or any other Successful Bidder that intends to liquidate the Purchased Assets, the Debtors seek authority for any store closings and liquidation of the Debtors' inventory and FF&E to be completed pursuant to the Sale Guidelines and the Sale Closing Relief. As set forth in greater detail below, many Liquidation Laws (as defined below) require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing and liquidation sales. Therefore, although all applicable state and local health and safety and consumer protection laws in connection with any Store Closing Sales, the Debtors seek a waiver of compliance with the

36

Liquidation Laws and instead request the authority to conduct such sales in accordance with the Sale Guidelines attached as Exhibit 2 to the proposed Sale Order, which procedures and guidelines are typical of and consistent with the procedures approved in other chapter 11 cases, and are the same or substantially similar as are being proposed in connection with the Debtors' Closing Stores.

56.    The Debtors developed the Sale Guidelines with the intent to provide a means of controlling the administrative burdens on their estates that are associated with complying with the Liquidation Laws, while at the same time protecting the interests of their landlords and the applicable governmental agencies enforcing such laws. Accordingly, the Debtors submit that the Sale Guidelines adequately address any concerns that their landlords or the governmental agencies may raise with respect to the present Store Closing Sales and any similarly themed sales conducted during these chapter 11 cases, and therefore, the requested relief below seeking the waiver of Liquidation Laws should be approved.

      b.    <u>Strict Compliance with the Liquidation Laws Should be Waived</u>.

57.    Certain states in which the Debtors' remaining stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales and similarly themed sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "**Liquidation Laws**"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized, however, then a company need not comply with these Liquidation Laws.

37

58.     The Debtors, therefore, request that the Court authorize any Successful Bidder (to the extent applicable) to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Laws. As part of the proposed Sale Order, the Debtors will request that the Court retain jurisdiction over the Store Closing Sales, thus permitting this Court to supervise the Store Closing Sales. The Store Closing Sales are legitimate methods by which the Debtors can maximize the return from the sale of the Purchased Assets for the benefit of their estates and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

59.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code.' . . . '[A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

60.     While preemption of state law is not always appropriate, preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.[11]     *See Baker & Drake, Inc. v. Public Serv. Comm'n of*

---

[11] Subject to the terms of the Sale Order, the Debtors will comply with applicable state and local public health and safety laws ("**Safety Laws**"), and applicable tax, labor, employment, environmental, and

*Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.*, 91 B.R. 190, 196–97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Laws. *See* 11 U.S.C. § 105(a).

61.    In the instant cases, the Liquidation Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of creditors.

62.    Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. *See, e.g.*, *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bank. D. Del. Oct. 15, 2015); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) (ordering that that the debtors were authorized to conduct store closing sales in accordance with the order "without the necessity of further showing compliance" with liquidation laws); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that that the debtor was authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent

consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, **"General Laws"**).

with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

63.    Importantly, given the proposed supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales and similarly themed sales. The Debtors only request that this Court authorize the the Store Closing Sales to be completed without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as store closings or similar type sales. The Debtors and the Successful Bidder shall be bound by and comply with remaining statutes and regulations, such as the Safety Laws and General Laws.

64.    It is also necessary that any action by any lessor or any federal, state, or local agency, department, or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined. *See Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981), cert. denied, 454 U.S. 1162 (1982) (holding that an attempt to enforce state regulations governing

40

liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

65.    The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales. The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales. As noted above and as set forth in the Sale Order, the Debtors fully intend to be bound by and comply with all Safety Laws and General Laws and will require that the Successful Bidder do the same.

     c.     <u>The Court Should Waive any Restrictions in the Leases as Unenforceable.</u>

66.    Certain of the leases governing the premises of the Closing Stores (the "**Leases**") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); *In re R. H. Macy & Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct going-out-of-business sale).

67.     In addition, this Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

68.     As such, to the extent that such provisions or restrictions exist in any of the Leases of the Debtors' stores, such landlords may not interfere with or otherwise seek to restrict the Debtors and/or the Successful Bidder from conducting the Store Closing Sales or any other similarly themed sale conducted during these chapter 11 cases. Accordingly, the Debtors request that the Court authorize the Successful Bidder to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

      d.     The Store Closing Sales Should be Exempt from Any "Fast Pay" Laws.

69.     Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the **"Fast Pay Laws"**). In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of the Store Closing Sales contemplated by any Sale Transaction to the Back-up Bidder or any other Successful Bidder that contemplates the liquidation of the Purchased Assets will result

42

in a substantial numbers of employees being terminated during the Store Closing Sales.  The Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

70.    As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

71.    Under ordinary circumstances, the Debtors were often able to pay individual store-level employees from the register at a store location upon termination and reconcile the payment amount after-the-fact.  However, given the number of employees that will be terminated during the Store Closing Sales, this will be impossible.  Thus, it will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing.  With employee terminations on the scale necessitated by the Store Closing Sales and any similarly themed sales, this process could easily take several days.

72.    To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances.  If the Debtors are required to comply with these state laws and regulations, their efforts to wind down their operations and stem unnecessary payroll costs will be hampered tremendously.  Indeed, if forced to comply, the Debtors will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Store Closing Sale or any similarly themed sale while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates.  Both of these choices will provide no benefit to the Debtors' estates and will only increase the

43

administrative costs of conducting the Store Closing Sales and any similarly themed sales during these cases.

73.    Accordingly, the Debtors respectfully submit that in this instance, the Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements. *See, e.g., Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); *Filene's Basement, LLC*, Case No. 11-13511(KJC) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same); *see also In re Borders Grp., Inc.*, Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

**E.    Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases Should Be Authorized.**

74.    Under Bankruptcy Code section 365(a), a debtor in possession may, subject to the court's approval, assume or reject any executory contract or unexpired lease of a debtor.    11 U.S.C. § 365(a). The standard governing approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). In this context, the business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. at 596). Imposing more exacting scrutiny would slow the administration of a debtor's

44

estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, to assume an executory contract under Bankruptcy Code section 365(b), a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

75.    Once an executory contract is assumed, the debtor may elect to assign the contract. *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

76.    Under Bankruptcy Code section 365(f), "[t]he trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success). Further, Bankruptcy Code section 365(b)(3)

provides a list of specific requirements in order for a debtor and assignee of a "lease of real property in a shopping center" to satisfy the burden of providing adequate assurance of future performance under such lease.

77.     To facilitate and effectuate the Sale Transaction, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption, assignment, and sale of the Acquired Contracts to the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Acquired Contracts be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s), notwithstanding any provisions in the Acquired Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3), that prohibit such assignment.

78.     The counterparties to the Acquired Contracts will have sufficient opportunity to file an objection to the proposed Cure Costs.  If there is no objection to particular Cure Costs, those Cure Costs will be binding on the applicable contract or lease counterparty.  The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors determine that a particular contract is not truly executory and does not need to be cured to transfer the Purchased Assets to the Successful Bidder(s).

79.     Cure Costs disputed by any counterparties, with respect to any Acquired Contracts to be assumed and assigned to the Successful Bidder(s) at the Closing (as defined in the Bid Procedures), will be resolved by the Court at the Sale Hearing.

80.     In addition, the Debtors request that any party to a Designated Contract that does not timely file and serve an objection to the assumption, assignment, and sale of the Designated

RLF1 13827756v.1

Contract, be deemed to consent to the treatment of its executory contract and/or unexpired lease under Bankruptcy Code section 365 of the Bankruptcy Code. *See In re Decora Indus.*, 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabeel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). The Debtors also request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assumption or assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), (f).

**F.      Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**.

81.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Purchased Assets, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

82.      The Debtors will provide notice of this Motion via overnight mail to: (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee, if one is appointed; (iii) the holders of the 30 largest unsecured claims against the Debtors on a

47

consolidated basis; (iv) counsel to Wells Fargo Bank, National Association, as Administrative Agent; (v) counsel to GACP Finance Company, LLC, as Term Agent; (vi) counsel to Deutsche Bank National Trust Company, as trustee under the 2017 Notes Indenture; (vii) counsel to certain secured noteholders, K&L Gates LLP, 599 Lexington Avenue, New York, New York 10022-6030 (Attn: John A. Bicks, Esq.); (viii) on the Attorney General's office (to the division of consumer protection or similar authority) for each state where the Store Closing Sales are being held; (ix) the Debtors' landlords of the Stores; (x) the Internal Revenue Service; (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002(i); and (xii) all entities, according to the Debtors' books and records and to the Debtors' actual knowledge, that might assert a lien, claim, encumbrance, or other interest in the Purchased Assets. A copy of this Motion is also available on the Debtors' case website at www.kccllc.net/hancockfabrics.

48

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bid

Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) enter, upon

conclusion of the Sale Hearing, the Sale Order, and (iii) grant the Debtors such other and further

relief as is just and proper.

Dated:    February 2, 2016
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* pending)
Jennifer Taylor (*pro hac vice* pending)
Karen Rinehart (*pro hac vice* pending)
400 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407

Andrew M. Parlen (*pro hac vice* pending)
Michael F. Lotito (*pro hac vice* pending)
Times Square Tower
Seven Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Attorneys for the Debtors and Debtors in Possession

# EXHIBIT A

## Proposed Bid Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HANCOCK FABRICS, INC., <u>et al.</u>, [1] a Delaware corporation, Debtors. | Case No. 16-_____  (____) |
| | Joint Administration Proposed |

**ORDER APPROVING
(A) BID PROCEDURES, (B) PROCEDURES FOR
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (C) RELATED NOTICES AND RELIEF**

Upon the Motion, dated February 2, 2016, 2016 [D.I. ___] (the "**Motion**"),[2] of Hancock Fabrics, Inc. ("**Hancock**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), for an order pursuant to sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Practice and Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"):

    a.    approving the bid procedures for the sale of all or substantially all of the Debtors' assets (the "**Bid Procedures**," substantially in the form attached hereto as <u>Exhibit 1</u>);

    b.    authorizing and approving certain bidding protections to the Back-up Bidder, including a break-up fee and expense reimbursement, each subject to the occurrence of certain conditions set forth in the applicable Back-up Bid Agreement (namely, the consummation of a higher or better Sale Transaction);

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwin, MS 38824.

[2] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Motion.

c.     scheduling an auction, if necessary, (the "**Auction**") for the Purchased Assets to be held on March 11, 2016;

d.     authorizing and approving procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assumption and Assignment Procedures**");

e.     scheduling a hearing (the "**Sale Hearing**") on March 14, 2016, at which the Court will consider whether to approve either (1) the Back-up Bid Agreement, or (2) such other agreement between the Debtors and the Successful Bidder (as defined below) at the Auction;

f.     approving various deadlines in connection with the foregoing; and

g.     authorizing and approving the form and manner of notice of the Auction, the Sale Hearing, and the Assumption and Assignment Procedures, including the (1) notice of the Auction and Sale Hearing in the form attached hereto as Exhibit 2 (the "**Sale Notice**"), and (2) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors in the form attached hereto as Exhibit 3 (the "**Notice of Assumption and Assignment**");

and the Court having determined that notice of the Motion was adequate and sufficient; and all such parties having been afforded due process and an opportunity to be heard with respect to the Motion and all the relief requested therein; and the Court having reviewed and considered: (a) the Motion; (b) the objections and responsive pleadings filed in connection with the Motion, if any; and (c) the representations of counsel made, and the evidence proffered, at the hearing to approve the Motion (the "**Bid Procedures Hearing**"); and the Bid Procedures Hearing having been held, and after due deliberation and sufficient cause appearing therefor, hereby finds and determines that:

A.     This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

B.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. The entry of this Order is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

C.    The notice of the Motion, the Bid Procedures Hearing, and the proposed entry of this Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Accordingly, no further notice of the Motion, the Bid Procedures Hearing, or this Order is necessary or required.

D.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bid Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

E.    The Debtors have articulated good and sufficient reasons for the Court to (i) approve the Bid Procedures and Bid Protections, (ii) approve the Assumption and Assignment Procedures, (iii) establish a date for the Auction and the Sale Hearing, (iv) approve the form and manner of notice of the Auction, the Sale Hearing, and the Assumption and Assignment Procedures; and (v) grant related relief. Such good and sufficient reasons were set forth in the Motion and on the record at the Bid Procedures Hearing, are incorporated by reference herein and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.    The proposed Sale Notice and the proposed Notice of Assumption and Assignment are each calculated, respectively, to provide adequate notice concerning the proposed sale of the Purchased Assets, the proposed assumption, assignment, and sale of the Debtors' executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with the Sale Transaction (the "**Designated Contracts**"), and

3

will provide due and adequate notice of the relief sought in the Motion.

G.    The Termination Payment and Expense Reimbursement to be paid to the Back-up Bidder pursuant to the terms of the Back-up Bid Agreement and in the event of an Alternative Transaction, are each:  (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Back-up Bidder; (iii) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions; (iv) the product of good faith, arm's-length negotiations between the Debtors and the Back-up Bidder; and (v) necessary to induce the Back-up Bidder to continue to pursue the Sale Transaction.  Moreover, the Bid Protections are an essential inducement and condition relating to the Back-up Bidder's entry into, and continuing obligations under, the Back-up Bid Agreement.  The Bid Protections induced the Back-up Bidder to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders can rely.  The Back-up Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price for the Purchased Assets will be received.  Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

H.    The Debtors have demonstrated that the Bid Procedures are fair, reasonable, and appropriate and are designed to maximize the value of the Debtors' estates.

I.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

4

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors may proceed with a Sale Transaction in accordance with the Bid Procedures, and are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures in accordance with the following timeline:

| Proposed Sale Timeline | |
| --- | --- |
| Sale Notice Publication Deadline | February 18, 2016, at 5:00 p.m. (ET) |
| Deadline to Serve Sale Notice | February 18, 2016, at 5:00 p.m. (ET) |
| Deadline to Serve Notice of Assumption and Assignment | February 25, 2016, at 5:00 p.m. (ET) |
| Assumption and Assignment Objection Deadline | March 7, 2016, at 4:00 p.m. (ET) |
| Sale Objection Deadline | March 7, 2016, at 4:00 p.m. (ET) |
| Bid Deadline | March 9, 2016, at 5:00 p.m. (ET) |
| Deadline to Notify Qualified Bidders | March 10, 2016, at 5:00 p.m. (ET) |
| Auction (if necessary) | March 11, 2016, at 9:30 a.m. (ET) |
| Sale Reply Deadline | March 11, 2016, at 5:00 p.m. (ET) |
| Deadline to File/Notice Auction Results | March 12, 2016, at 5:00 p.m. (ET) |
| Sale Hearing | [March 14, 2016], at 10:00 a.m. (ET) |

3.      The Bid Procedures attached hereto as Exhibit 1 are hereby approved in their entirety and incorporated herein by reference, and the Debtors are authorized, in consultation with any Committee and the Secured Lenders, to take any and all actions necessary or appropriate to implement the Bid Procedures.  Notwithstanding the foregoing, the consummation of any Sale Transaction is subject to the entry of the Sale Order.

4.      The process for submitting Qualified Bids is fair, reasonable and appropriate and

5

is designed to maximize recoveries for the benefit of the Debtors' estates, creditors and other parties in interest. Any disputes as to the selection of Qualified Bid(s), Initial Highest Bid(s) and/or Successful Bid(s) (all as defined in the Bid Procedures) shall be resolved by this Court.

5.    The deadline for submitting a Qualified Bid shall be March 9, 2016 at 5:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

6.    The Debtors are authorized to conduct the Auction in accordance with the Bid Procedures in the event they receive one or more timely and acceptable Qualified Bids, other than the Back-up Bidder's bid in the form of the Back-up Bid Agreement. The Auction is necessary to ensure that the Debtors receive the highest or best purchase offer for their assets, thus maximizing the value of the Debtors' estates.

7.    The Back-up Bid Agreement is a Qualified Bid, and the Back-up Bidder is a Qualified Bidder, for all purposes and requirements pursuant to the Bid Procedures, notwithstanding the requirements that Potential Bidders must satisfy to be a Qualified Bidder.

8.    The form of Sale Notice attached hereto as Exhibit 2 is hereby approved.

9.    Within two (2) business days after the Court enters this Order, the Debtors (or their agents) shall serve the Sale Notice by first-class United States mail to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Wells Fargo Bank, National Association, as Administrative Agent; (iv) counsel to GACP Finance Company, LLC, as Term Agent; (v) counsel to Deutsche Bank National Trust Company, as trustee under the 2017 Notes Indenture; (vi) John A. Bicks, Esq., K&L Gates, as counsel to certain Noteholders; (vii) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets during the previous six (6) months; (viii) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Purchased Assets (for which identifying information and addresses are available to

the Debtors); (ix) all non-Debtor parties to the Designated Contracts; (x) any governmental unit known to the Debtors to have a claim in these cases; (xi) the Office of the Attorney General in each state in which the Debtors operate; (xii) the Office of the Delaware Secretary of State; (xiii) the Delaware State Treasury; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) all parties that have requested notice in these cases under Bankruptcy Rule 2002; and (xiix) all other persons as directed by the Court (collectively, the "**Sale Notice Parties**").

10.     By February 18, 2016, the Debtors (or their agents) shall cause a summary version of the Sale Notice to be published (a) in the *Wall Street Journal*, and in the Debtors' sole discretion, any other publication designed to provide effective notice of the Auction and Bid Procedures, and (b) on the website of the Debtors' Court-approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics.

11.     Service of the Sale Notice as approved and set forth herein shall be deemed proper, due, timely, good, and sufficient notice of, among other things, the entry of this Order, the Bid Procedures, the Auction, the Sale Hearing, the Objection Deadlines, and the proposed Sale Transaction, including the transfer of the Debtors' right, title and interest in, to and under the Purchased Assets free and clear of any and all liens, claims, encumbrances, and other interests, and no other or further notice is necessary.

12.     The form of Notice of Assumption and Assignment attached hereto as Exhibit 3 and the following "**Assumption and Assignment Procedures**" are approved:

a.      On or before February 25, 2016, the Debtors will file with the Court and serve via first-class United States mail on all counterparties to any of the Debtors' executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with the Sale Transaction (the "**Designated Contracts**") and all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "**Contract Notice Parties**") the Notice of

7

Assumption and Assignment.

b.    The Notice of Assumption and Assignment will include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "**Cure Costs**") for each Designated Contract. The Debtors reserve the right to supplement the list of Designated Contracts and provide additional Notices of Assumption and Assignment for previously omitted Designated Contracts prior to the execution of a definitive agreement for a Sale Transaction in accordance with such agreement, and to remove a Designated Contract from the list of Acquired Contracts (defined below) at any time before the closing of the Sale Transaction.

c.    As soon as possible after the conclusion of the Auction, the Debtors shall provide all counterparties to the Designated Contracts with information regarding the Successful Bidder's ability to perform under the Designated Contracts if it is the Successful Bidder, which information may include (1) information about the purchaser's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (2) a description of the intended use of the premises (if applicable), (3) the exact name of the proposed assignee, (4) the proposed form of order authorizing the assumption and assignment of the Designated Contracts, and (5) such additional information regarding the potential purchaser as the Debtors may elect to include (collectively, the "**Adequate Assurance Information**").

d.    At any time after the entry of this Order, if the Debtors identify additional executory contracts or unexpired leases to be assumed and assigned to the Successful Bidder, the Debtors will serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each supplemental Designated Contract at the last known address available to the Debtors by no later than ten days before the proposed effective date of the assignment. Each Supplemental Notice of Assumption and Assignment will set forth (i) the name and address of the Designated Contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder to withdraw such request for assumption and assignment of the Designated Contract prior to the closing of the applicable Sale Transaction), (iii) identification of the Designated Contract, (iv) the Cure Costs, if any, and (v) Adequate Assurance Information.

e.    Each Supplemental Notice of Assumption and Assignment that identifies a Designated Contract that was not previously designated to be assumed, assigned, and sold or that reduces the Debtors' calculation of the Cure Costs will provide a deadline of not less than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment by

8

which the counterparty to any such Designated Contract may object to (a) its listing as a Designated Contract and (b) the Debtors' calculation of the Cure Costs.

f.      The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not obligate the Debtors to assume such Designated Contract or the Successful Bidder to take assignment of such Designated Contract. Only those Designated Contracts that constitute Acquired Contracts (as defined below) pursuant to the Back-up Bid Agreement, or if the Back-up Bidder is not the Successful Bidder, pursuant to a Successful Bidder's Modified Agreement, will be assumed, assigned, and sold to the Successful Bidder.

g.      Any counterparty to a Designated Contract must file and serve on the Objection Recipients (as defined below) any objections to (a) the proposed assumption, assignment, and sale of the applicable Designated Contract (and must state in its objection, with specificity, the legal and factual basis thereof) and (b) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than March 7, 2016, at 4:00 p.m. (prevailing Eastern Time) (the "**Assumption and Assignment Objection Deadline**" and, together with the Sale Objection Deadline (as defined below), the "**Objection Deadlines**").

h.      If a counterparty to a Designated Contract files a timely objection asserting a higher cure than the maximum Cure Costs set forth in the Notice of Assignment and Assumption (or Supplemental Notice of Assumption and Assignment), and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing or such later hearing date that the parties agree is acceptable. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under a Designated Contract, if it is ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed, assigned, and sold to it in connection with the Sale Transaction (an "**Acquired Contract**"), will be heard at the Sale Hearing or such later hearing date that the parties agree is acceptable.

i.      If the counterparty to a Designated Contract does not timely file and serve an objection, such counterparty will be deemed to have consented to the assumption, assignment and sale of the Designated Contract to a Successful Bidder as an Acquired Contract, notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale, except with respect to the adequate assurance of future performance by such Successful Bidder. Any objections to a Successful Bidder's proposed

9

form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing. The Cure Costs set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment and sale of the Designated Contract and the Cure Costs, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

13.     If the Debtors receive any Qualified Bids that contemplate the assumption, assignment and sale of any Designated Contract, within one (1) business day of the Debtors' receipt of such Qualified Bid, the Debtors shall provide counterparties to the Designated Contracts with Adequate Assurance Information with respect to the Qualified Bidder by overnight mail and email (if available). Any counterparty to a Designated Contract may object to the Adequate Assurance Information in connection with a Sale Transaction at or before the Sale Hearing.

14.     If a Successful Bidder other than the Back-up Bidder prevails at the Auction, then: (i) as soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a notice that (a) identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Designated Contracts, (b) lists any modifications to the Cure Costs, and (c) notifies the counterparties to any Designated Contracts whether there has been any change to the decision to assume and assign such Designated Contracts; and (ii) solely to the extent such notice identifies any changes in information relating to the assumption and assignment of such Designated Contracts, the deadline to file and serve an objection to the assumption and assignment of the Designated Contracts shall be extended such that any such objections to any such change in information may be asserted at or before the Sale Hearing; provided that the deadline to object to Cure Costs (to the extent unmodified) shall not be

10

extended.

15.    In combination with the Sale Notice, the Notice of Assumption and Assignment (i) contains the type of information required under Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1 that is currently known to the Debtors and (ii) is reasonably calculated to provide due, adequate and timely notice to all counterparties of (a) the potential assumption and assignment of the Designated Contracts and rights thereunder, (b) the maximum amount and manner offered to satisfy the Cure Costs, and (c) the deadline to file objections to such assumption and assignment, applicable Cure Costs, the existence of any defaults, and adequate assurance of future performance.  Service of the Notice of Assumption and Assignment as approved and set forth herein shall be deemed proper, due, timely, good, and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

16.    Any and all objections, if any, to any Sale Transaction (other than those objections otherwise specifically referenced herein and except for objections to the Auction and the selection and identity of the Successful Bidder) must be filed by March 7, 2016, at 4:00 p.m. (prevailing Eastern Time) (the "**Sale Objection Deadline**") and be served on (i) the Office of the United States Trustee for the District of Delaware; (ii) co-counsel to the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: : Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.); (iv) counsel to the Committee; (v) counsel to Wells Fargo Bank, National Association, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq.); (vi) counsel to GACP

11

Finance Company, LLC, Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Andrew Tenzer, Esq.); (vii) Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, NY 10271 (Attn: Margery A. Colloff, Esq.); (viii) counsel to certain of the Noteholders, K&L Gates, 599 Lexington Avenue, New York, NY 10022 (Attn: John A. Bicks, Esq.); and (ix) counsel to the Back-up Bidder (collectively, the "**Objection Recipients**"). All replies to such objections must be filed by March 11, 2016, at 5:00 p.m. (prevailing Eastern Time). All objections to the Auction and the selection and identity of the Successful Bidder may be asserted at the Sale Hearing.

17.     Any party failing to timely file an objection by the applicable deadline shall be forever barred from objecting and shall be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title, and interest in, to and under the Purchased Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with a definitive agreement for a Sale Transaction(s).

18.     Any party desiring to submit a bid for the Debtors' right, title and interest in, to and under any of the Purchased Assets must comply with the Bid Procedures. Notwithstanding the foregoing, each of the Secured Lenders shall be deemed a Qualified Bidder.

19.     Subject to the Bid Procedures, secured creditors may submit a credit bid for the Purchased Assets by the Bid Deadline, as set forth in the Bid Procedures; provided, however, any credit bid by the Noteholders is subject to provision having been made to pay in full in cash, at closing, the claims of the Debtors' senior secured creditors, under the Prepetition Credit Agreement and the DIP Agreement, unless the Debtors' senior secured creditors consent to alternative treatment. Further, the Debtors may require that bids covering substantially all assets of the Debtors' estates provide for payment in full of the Debtors' allowed administrative expense claims.

12

20.     To the extent that one or more timely and acceptable Qualified Bids are received on or before the Bid Deadline, the Debtors shall conduct an Auction on March 11, 2016, at 9:30 a.m. (prevailing Eastern Time) at the offices of the Debtors' co-counsel, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801. The Debtors shall have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for any combination of the Purchased Assets that the Debtors, in their business judgment, determine is in the best interests of the Debtors' estates, in consultation with any Committee and the Secured Lenders. The Debtors have the sole right to adjourn or cancel the Auction at or prior to the Auction.

21.     The Debtors may, in their discretion and subject to the exercise of their business judgment and in consultation with any Committee and the Secured Lenders, make non-material alterations to these Bid Procedures and/or terminate discussions with any and all prospective acquirers at any time and shall state the reasons therefor on the record at any Auction.

22.     If the Debtors do not receive any Qualified Bids other than the Back-up Bid Agreement, the Debtors will not hold an Auction, the Back-up Bid Agreement will be the Successful Bid, and the Back-up Bidder will be named the Successful Bidder.

23.     The Sale Hearing shall be held on [March 14, 2016, at 10:00 a.m.] (prevailing Eastern Time) in the courtroom of the Honorable [_____], United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, [__] Floor, Courtroom [__], Wilmington, Delaware 19801.

24.     The Debtors are authorized to pay, without further order of the Court, to the Back-up Bidder the Termination Payment and Expense Reimbursement in the event that such Termination Payment and Expense Reimbursement is payable under the terms of the Back-up Bid Agreement, on the terms set forth in the Back-up Bid Agreement. The Termination Payment

13

and the Expense Reimbursement shall be paid as administrative expenses of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and the Back-up Bidder shall be entitled to first priority priming lien on the proceeds of the Alternative Transaction until such Termination Payment and Expense Reimbursement are paid in full.

25.    Copies   of   the   Bid   Procedures   may   be   downloaded   at https://www.kccllc.net/hancockfabrics.com or obtained upon written receipt of a request to Hancock Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, Tel: (866) 647-1733.

26.    The Back-up Bid Agreement has certain provisions concerning the treatment of property that the Debtor has designated as "consignment goods." Such designation shall not be binding on the Debtors for any other purpose, and no third party has any third party beneficiary rights in the Back-Up Bid Agreement. The Debtors' rights concerning any estate property are hereby reserved, none of which are waived hereby or in the Back-up Bid Agreement. Without limiting the generality of the foregoing, the Debtors reserve the right to challenge and avoid any putative interest in property of the estate (including consignments), notwithstanding anything herein to the contrary, and to the extent such interests constitute property of the Debtors' estates, to sell them pursuant to the Bid Procedures to any Successful Bidder (including but not limited to the Back-up Bidder).

27.    Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. To the extent applicable, the stays described in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

28.    The terms of this Order shall control to the extent of any conflict with the Motion.

14

29.     All Potential Bidders and Qualified Bidders shall be deemed to have consented to the core jurisdiction of this Court, and waived any right to jury trial in connection with any disputes relating to the Auction, the sale or marketing of the Purchased Assets, and the construction and enforcement of the Back-up Bid Agreement or any Alternative Transaction.

30.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Date: _____, 2016
      Wilmington, Delaware

                                       UNITED STATES BANKRUPTCY JUDGE

15

# **EXHIBIT 1**

## **Bid Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HANCOCK FABRICS, INC., et al.,[1]<br>a Delaware corporation,<br>        Debtors. | Chapter 11<br><br>Case No. 16-_____ (\_\_\_\_)<br><br>Joint Administration Proposed |

## BID PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY
## ALL OF THE DEBTORS' ASSETS

       Hancock Fabrics, Inc. ("Hancock"), and its affiliated debtors and debtors in possession (collectively, the "Debtors"), set forth the following bid procedures (the "Bid Procedures") to be employed in connection with an auction, if the Debtors receive one or more Qualified Bid (in addition to the Back-up Bid Agreement (as defined below)) (the "Auction") for the sale of all or substantially all of the Debtors' assets (excluding any closing stores). The Debtors contemplate consummating a sale of the Debtors' inventory and FE&E (excluding from any closing stores) (collectively, together with any other assets sold at Auction, the "Purchased Assets") pursuant to the terms and conditions set forth in that Agency Agreement (the "Back-up Bid Agreement") by and between the Debtors and Great American Group, LLC (the "Back-up Bidder"), subject to the below Bid Procedures, pursuant to which the Debtors seek to sell the Purchased Assets to any Successful Bidder (as defined below) (any sale of the Purchased Assets constituting a "Sale Transaction"). After the Auction (if necessary), the Debtors shall seek entry of an order (the "Sale Order") from the United States Bankruptcy Court for the District of Delaware (the "Court") authorizing and approving a Sale Transaction to the Successful Bidder on terms and conditions consistent with the Back-up Bid Agreement (as modified solely to the extent accepted by the Debtors, in consultation with any Committee (as defined below) and the "Secured Lenders"[2]) and in accordance with these Procedures. These Bid Procedures have been approved

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwin, MS 38824.

[2] The "Secured Lenders" consist of (i) Wells Fargo Bank, N.A. and GACP Finance Co., LLC under that Credit Agreement dated as of April 22, 2015 (the "Prepetition Credit Agreement"), by and between Wells Fargo Bank, N.A. and GACP Finance Co., LLC, on the one hand, and the Debtors, on the other hand; and (ii) (a) Deutsche Bank National Trust Company, as trustee under that Indenture dated as of November 20, 2012 for those Floating Rate Series A Secured Notes Due 2017 (the "2017 Notes Indenture"), and (b) the holders of notes issued under the 2017 Notes Indenture (the "Noteholders"). Notwithstanding anything herein to the contrary, any information provided by the Debtors to GACP Finance Co., LLC in connection with these Bid Procedures (unless such information is available to the general public) shall only be available to and reviewed by GACP Finance Co., LLC's counsel or advisors of record, and such counsel or advisors may provide summaries of the material terms of such information (but not the identity of any bidder) to GACP Finance Co., LLC. GACP Finance Co., LLC shall not provide any such information to or confer with any individuals or advisors that are acting on behalf of the Back-up Bidder in connection with any Sale Transaction, the Bid Procedures, or the Auction. GACP Finance Co., LLC's agreement to the above terms shall be deemed confirmed by GACP Finance Co., LLC's lack of objection to this Motion. Further, to the extent Wells Fargo Bank, N.A., Deutsche Bank National Trust Company or any of the Noteholders submit a Qualified Bid for the Purchased Assets, then such Secured Lender shall not be consulted with in connection with the Bid Procedures or the Auction, and shall not receive any information in connection with the Bid Procedures

and authorized pursuant to the *Order Approving (A) Bid Procedures (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Notices and Relief* (the "Bid Procedures Order"), entered by the Bankruptcy Court on [_____], 2016.

## 1.    Approvals

The proposed Sale Transaction shall in all respects be subject to approval by the Court and in compliance with: (i) the applicable provisions of the Bankruptcy Code; (ii) the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (iii) the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (iv) other applicable rules and law, and orders of the Bankruptcy Court.

## 2.    Assets to be Sold

The Purchased consist primarily of the Debtors' inventory and FF&E associated with stores currently operated by the Debtors throughout the country.  The Debtors reserve the right to sell at Auction any combination of assets or additional assets.[3]

## 3.    Diligence

Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the Debtors, any prospective bidder (each, a "Potential Bidder") identified by the Debtors as reasonably likely to be a Qualified Bidder (as defined herein) that wishes to conduct due diligence on any of the Purchased Assets may be granted access to material information regarding such Purchased Assets, provided that, if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Potential Bidder any trade secrets or proprietary information.

None of the Debtors, their affiliates, or any of their respective representatives is obligated to furnish any information relating the respective Debtors other than to a Potential Bidder and may refuse to provide or continue to provide any such information to a Potential Bidder or other entity for any reason whatsoever.  If the Debtors determine that a Potential Bidder does not constitute a Qualified Bidder, then such Potential Bidder shall not be entitled to receive due diligence access or additional non-public information.

## 4.    Bid Deadline

Any person or entity interested in participating in the Auction must submit, in writing, a Qualified Bid (as defined below) on or before [_____], 2016, at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") in writing (including by email), to the attorneys for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.) (Email: swarren@omm.com, krinehart@omm.com, jtaylor@omm.com), and to Lincoln International, 633 W. Fifth Street, Suite 6650, Los Angeles, CA 90071 (Attn: Alex Stevenson) (astevenson@lincolninternational.com).  The Debtors may extend the Bid Deadline, provided that they promptly notify the Back-up Bidder and all Potential Bidders of any such extension.  A

---

or the Auction except as made available as a Qualified Bidder or that is available to the general public.

[3] The Debtors have reserved all rights concerning the designation of the inventory that comprises the Purchased Assets, including the right to assert that any putative consignment inventory constitutes property of the Debtors' estates and could therefore be included with the Purchased Assets. *See also Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Putative Consignment Vendors and Granting Related Relief.*

2

copy of all Qualified Bids will be provided on a "professionals' eyes only" basis to the advisors to the Committee and the administrative agents for the Debtors' secured lenders by [                    ], 2016, at 5:00 p.m. (prevailing Eastern Time), which deadline is subject to extension if the Bid Deadline is extended.

5.    **Termination Payment & Expense Reimbursement**.

The Debtors have entered into a Back-up Bid Agreement with the Back-up Bidder, governing the purchase of all or substantially all of the Debtors' inventory by the Back-up Bidder, subject to the Bid Procedures set forth herein. The purchase price under the Back-up Bid Agreement consists of 108% of the cost value of the Debtors' inventory (subject to adjustment pursuant to the Back-up Bid Agreement), any fee payable to the Debtors in connection with any election by the Back-up Bidder to sell the Debtors' FF&E, and any other proceeds from the sale of the Purchased Assets pursuant to the Back-up Bid Agreement (the "Purchase Price"). The Back-up Bid Agreement provides that the Back-up Bidder shall be entitled to recover, from the proceeds of any sale, transfer, lease, or other disposition of, directly or indirectly all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more persons other than the Back-up Bidder, including in accordance with the Bid Procedures, an amount of cash equal to (i) $180,000 in the event that the Debtors have designated a going concern bidder as the Initial Highest Bidder (as defined below) for the sale of its business as of the commencement of the Auction or (ii) $700,000 in the event that no such going concern bidder has been designated as of the commencement of the Auction (the "Termination Payment"), and reimbursement of the Back-up Bidder's reasonable, documented, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the Sale Transaction contemplated by the Back-up Bid Agreement, up to a maximum amount of $100,000 (the "Expense Reimbursement"). The amount of the Termination Payment and Expense Reimbursement may be considered by the Debtors in determining the highest or otherwise best bid and the net value that the Debtors and their estate will realize at any Auction.

6.    **Qualified Bids**

To participate in the bidding process and be deemed a "Qualified Bidder," each Potential Bidder must submit a "Qualified Bid" by the Bid Deadline. To constitute a Qualified Bid, a bid must be accompanied by a letter from the Potential Bidder:

     i.     offering to acquire some or all of the Purchased Assets (including through a going concern bid) on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Back-up Bid Agreement, accompanied, as attachments to the letter, by (i) a duly executed asset purchase agreement (the "Modified Agreement") and (ii) the Modified Agreement marked to show any proposed amendments and modifications to the Back-up Bid Agreement and its schedules and exhibits (the "Marked Agreement");

     ii.     agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (1) the closing of the sale of the Purchased Assets, (2) the withdrawal of the Purchased Assets for sale by the Debtors, or (3) 30 days after the Sale Hearing;

     iii.     offering to pay by credit bid, cash, or a combination of credit bid and cash a price greater than the aggregate consideration offered by the Back-up

3

Bidder pursuant to the Back-up Bid Agreement by the amount of at least $250,000 over and above the aggregate of the Purchase Price, the Termination Payment, and the Expense Reimbursement; provided that any bid (including any credit bid) must provide for the payment of the Termination Payment and Expense Reimbursement in cash; provided, that, any credit bid by the Noteholders is subject to provision having been made for payment in full in cash,[4] at closing, the claims of the Debtors' senior secured creditors, under the Prepetition Credit Agreement and the "DIP Agreement"[5], unless the Debtors' senior secured creditors consent to alternative treatment, and the Debtors further reserve the right to require that bids covering substantially all assets of the Debtors' estates provide for payment in full of the Debtors' allowed administrative expense claims;

iv.    offering to pay the Cure Costs (as defined below) for any Acquired Contracts that the Potential Bidder intends to be assigned to it as part of any Sale Transaction;

v.    not requesting or entitling the Potential Bidder to any transaction or break-up fee, termination payment, expense reimbursement, or similar type of payment;

vi.    fully disclosing the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, and disclosing any connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and any officer or director of the foregoing;

vii.    stating that the Potential Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement;

viii.    containing such financial and other information that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement, including, without limitation, including, without limitation, "Adequate Assurance Information"[6] for any contracts or leases being assigned in connection with the proposed sale of the Purchased Assets;

---

[4] This includes, without limitation, all principal, interest, fees (including all early termination fees), costs, and expenses owing under the DIP Agreement.

[5] The "DIP Agreement" is that Debtor-in-Possession Credit Agreement dated on or about February 2, 2016, among Hancock as the Lead Borrower, Wells Fargo Bank, National Association, as Administrative Agent, Collateral Agent and Swing Line Lender, and GACP Finance Co., LLC, as Term Agent.

[6] "Adequate Assurance Information" means information including (a) information about the purchaser's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (b) a description of the intended use of the premises (if applicable), (c) the exact name of the proposed assignee, (d) the proposed form of order authorizing the assumption and assignment of the Designated Contracts, and (e) such additional information regarding the potential purchaser as the Debtors may elect to include.

4

ix.      not containing any due diligence or financing contingencies of any kind;

x.      containing evidence that the Potential Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Purchased Assets, which evidence is satisfactory to the Debtors in their sole discretion; and

xi.      including evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified Agreement.

Subject to the Bid Procedures, Potential Bidders who are secured creditors (including the Senior Lenders) may make one or more credit bids of some or all of their secured claims to the full extent permitted by Bankruptcy Code section 363(k); provided, however, any bid must include a cash component sufficient to satisfy the obligations set forth in Subsection (iii) above. To the extent that there is a cash component to any bid, such bid must be accompanied by (a) a certified check or wire transfer in the amount of not less than 10% of the aggregate proposed purchase price payable to the order of Hancock (a "Good Faith Deposit") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (provided, however, that the closing of the Sale Transaction shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors may reasonably request. All Good Faith Deposits shall be held in a segregated account by Hancock until no later than ten (10) days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the Bid Procedures, unless the bidder has been selected as the Successful Bidder or the Back-Up Bidder (as defined below).

The Debtors shall make a determination, in consultation with any Committee and the Secured Lenders, regarding whether a bid is a Qualified Bid and shall notify bidders, along with the advisors to the Committee, [                ], whether their bids have been determined to be Qualified Bids by no later than [            ], 2016, at 5:00 p.m. (prevailing Eastern Time). The Back-up Bidder is deemed a Qualified Bidder, and the Back-up Bid Agreement and the transactions contemplated thereby is deemed a Qualified Bid.

The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (i) the amount of the Qualified Bid; (ii) the risks and timing associated with consummating a transaction with the Potential Bidder; (iii) any included or excluded assets or executory contracts and leases; and (iv) any other factors that the Debtors may deem relevant to a Sale Transaction in consultation with any Committee and the Secured Lenders.

## 7.    Auction, Auction Procedures, and Overbids

At least one business day prior to the Auction, each Qualified Bidder must inform the Debtors whether it intends to participate in the Auction. The Debtors will promptly thereafter inform each Qualified Bidder that has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that may participate in the Auction.

If the Debtors do not receive any Qualified Bids other than the Back-up Bid Agreement, it will not hold an Auction, the Back-up Bid Agreement will be the Successful Bid and the Back-up Bidder will be named the Successful Bidder. In the event that the Debtors receive more than one Qualified Bid, the Debtors will conduct the Auction. The Auction, if required, will be

conducted at the offices of the Debtors' co-counsel, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, on [_____], 2016, at 9:30 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders and the advisors to the Committee.

The Auction will be conducted pursuant to the following rules, provided that, at the Auction, the Debtors, in consultation with any Committee and the Secured Lenders, may announce additional procedural rules for conducting the Auction so long as the rules are not inconsistent with the Bid Procedures:

i.      The Debtors will have the right to conduct any number of Auctions on the date of the Auction to accommodate Qualified Bids for any combination of the Purchased Assets that the Debtors, in their business judgment, determine is in the best interest of the Debtors' estates, in consultation with any Committee and the Secured Lenders. The Debtors, in consultation with any Committee and the Secured Lenders, have the right to adjourn or cancel the Auction at or prior to the Auction. The Qualified Bidders must appear in person at the Auction or through a duly authorized representative. Only the Qualified Bidders will be entitled to make any subsequent bids at the Auction. Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale. The Debtors are under no obligation to sell assets other than the Purchased Assets but may elect to do so.

ii.     Bidding will commence at the amount of the Qualified Bid that the Debtors, in consultation with any Committee and the Secured Lenders, determine in their business judgment to be the highest or best Qualified Bid (the "Initial Highest Bid"). Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Initial Highest Bid(s), in increments of at least $$250,000 (or such other amounts determined by the Debtors at the Auction). In addition to the credit bid provided for as a portion of the purchase price under the Back-up Bid Agreement, the Back-up Bidder shall have the ability to credit bid at the Auction the amount of the Termination Payment and the Expense Reimbursement (which will be appropriately considered by the Debtors when determining the net benefit to the estate of the bid).

iii.    The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, and in consultation with any Committee and the Secured Lenders, to announce reductions or increases in minimum incremental bids at any time during the Auction. Each Qualified Bidder will have the right to submit additional bids and make additional modifications to the Back-up Bid Agreement or Modified Agreement, as applicable, at the Auction to improve its bids. The Auction shall continue until there is only one offer that the Debtors determine, subject to Bankruptcy Court approval, is the highest or best offer submitted at the Auction (the "Successful Bid", and the bidder of such

6

Successful Bid being the "Successful Bidder") from the Qualified Bidders and the Back-up Bidder.

iv.     On or before [_____], 2016, the Debtors will cause the results of the Auction, including a copy of the Successful Bid(s), to be published on the website of the Debtors' Court-approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics.

v.      At the completion of the Auction, the Debtors, in consultation with any Committee and the Secured Lenders, will determine which Qualified Bidder(s) have submitted the Successful Bid(s) for the Purchased Assets. Such Qualified Bidder(s) will become the Successful Bidder(s) and will have such rights and responsibilities of a purchaser, as set forth, (a) if the Back-up Bidder is the Successful Bidder, in the Back-up Bid Agreement, or (b) if another Qualified Bidder is the Successful Bidder, in the Modified Agreement, each as it (or they) may have been modified during the Auction.

vi.     The Debtors will request at the Sale Hearing that the Court authorize the Debtors to consummate the Sale Transaction(s) with the Successful Bidder.  All Qualified Bidders at the Auction will be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction.

Bids made after the close of the Auction shall not be considered by the Debtors.  All Qualified Bidders at the Auction will be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction.

On or before [_____], 2016, the Debtors shall cause the results of the Auction, including a copy of the Successful Bid(s), to be published on the website of the Debtors' Court approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics.

## 8.    Back-Up Bidder and Return of Good Faith Deposits

If an Auction is conducted, the Qualified Bidder with the next highest or otherwise next best Qualified Bid for the Purchased Assets at the Auction (the "Back-Up Bid") will be required to serve as the back-up bidder (the "Back-Up Bidder") for such Purchased Assets and keep such Back-Up Bid open and irrevocable until the first to occur of (i) forty-five (45) days after the completion of the Auction, (ii) consummation of the transaction with the Successful Bidder, or (iii) the Back-Up Bidder's receipt of notice from the Debtors of the release by the Debtors of the Back-Up Bidder's obligations.  Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on its part or otherwise, the Back-Up Bidder will be deemed the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court; provided, however, if the Sale Order does not approve the "Sale Guidelines" and "Store Closing Relief" (as defined in the Sale Order), then the Debtors shall obtain such relief from the Court prior to being able to consummate the sale with the Back-Up Bidder.

7

Except as provided herein, Good Faith Deposits shall be returned without interest to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the tenth business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until ten (10) business days after the closing of the Sale Transaction with the Successful Bidder or termination of the Back-Up Bid as provided above.

## 9.    **Reservation of Rights**

The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment and in consultation with any Committee and the Secured Lenders, to make non-material alterations to these Bid Procedures, including the Auction, and/or terminate discussions with any and all prospective acquirers at any time and without specifying the reasons therefor, but only to the extent not materially inconsistent with the Bid Procedures, but including changes so as to modify deposit amounts and to modify or eliminate the requirements with respect to Back-Up Bidders—but only to the extent not materially inconsistent with the Bid Procedures. For the avoidance of any doubt, the Debtors reserve the right, in consultation with any Committee and the Secured Lenders, to adopt "blind bidding," and to require any bidder to submit its highest or otherwise best bid, during the final round of bidding.

## 10.    **Sale Hearing**

The Successful Bid will be subject to approval by the Bankruptcy Court. The Sale Hearing will take place on [_____], 2016, at 10:00 a.m. (prevailing Eastern Time) before the Honorable [_____], United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, [__] Floor, Courtroom [__], Wilmington, Delaware 19801. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court on the date scheduled for the Sale Hearing or on the Court's docket.

The Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by order of the Bankruptcy Court.

8

**EXHIBIT 2**

**Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HANCOCK FABRICS, INC., et al.,[1] a Delaware corporation, Debtors. | Case No. 16-_____  (____) |
| | Joint Administration Proposed |

## NOTICE OF AUCTION AND SALE HEARING

PLEASE TAKE NOTICE that on [_____], 2016, Hancock Fabrics, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"), each filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that on [_____], 2016, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the *Order Approving (A) Bid Procedures (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Notices and Relief* [D.I. __] (the "Bid Procedures Order").[2] The Bid Procedures Order established or authorized (i) an auction date for the sale of all or substantially all of the Debtors assets (excluding any closing stores); (ii) the provision of certain bid protections ("Bid Protections") in connection with an Agent Agreement (the "Back-up Bid Agreement") by and between the Debtors and Great American Group, LLC (the "Back-up Bidder"), pursuant to which the Debtors have agreed to sell and the Back-up Bidder has agreed to purchase the Debtors' inventory and FE&E (excluding from any closing stores) (collectively, together with any other assets sold at Auction, the "Purchased Assets"); and (iii) a final hearing (the "Sale Hearing") to approve the sale of those Purchased Assets set forth in the Back-up Bid Agreement to the Back-up Bidder or the Purchased Assets to any third party that submits a higher and better offer for the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests (the "Sale Transaction"), as more fully described in the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 for (i) Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Related Notices and Relief, and (ii) Order Approving (A) Sale of All or Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases Under Bankruptcy Code Sections 363 and 365, and (C) Related Relief* [D.I. __] (the "Sale Motion").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwin, MS 38824.

[2] Capitalized terms not otherwise defined herein shall have them meanings afforded to them in the Bid Procedures Order.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bid Procedures Order, if the Debtors receive one or more timely and acceptable Qualified Bids (as defined in the Bid Procedures Order) for the Purchased Assets (other than the Back-up Bid Agreement), the Auction will take place on [_____], 2016, at 9:30 a.m. (prevailing Eastern Time) at the offices of the Debtors' co-counsel, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, or such other location as designated by the Debtors in a notice to all Qualified Bidders. Only the Debtors, Qualified Bidders, the Committee, [_____] and their respective advisors will be entitled to attend the Auction, and only parties that have submitted a Qualified Bid, as set forth in the Bid Procedures Order, by no later than [_____], 2016, at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") may bid at the Auction. Any and all other creditors interested in attending the Auction must provide the Debtors with notice of their intent to attend the Auction no later than ten (10) days before the Auction by sending a fax or e-mail to counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); Email: swarren@omm.com, krinehart@omm.com, jtaylor@omm.com; Fax: 213-430-6407). The Debtors may object to and request a hearing regarding the attendance of any particular creditor at the Auction. Any party that wishes to take part in this process and submit a bid for the Purchased Assets must submit its competing bid prior to the Bid Deadline and in accordance with the Bid Procedures.

PLEASE TAKE FURTHER NOTICE that the Debtors shall have the right to conduct any number of Auctions on that date to accommodate Qualified Bids for combinations of the Purchased Assets that the Debtors, in their business judgment, determine is in the best interest of the Debtors' estates. The Debtors have the right to adjourn or cancel the Auction at or prior to the Auction.

PLEASE TAKE FURTHER NOTICE that the Debtors intend to apply the net proceeds from the Sale Transaction, free and clear of all liens, claims, encumbrances, and other interests in accordance with the Debtors' Debtor-in-Possession Credit Agreement.

**PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of the sale of the Purchased Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims, encumbrances and other interests in accordance with Bankruptcy Code section 363(f), will be held before the Honorable [_____], United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, [__] Floor, Courtroom [__], Wilmington, Delaware 19801 on [_____], at 10:00 a.m. (prevailing Eastern Time), or at such other time as the Court is available.**

PLEASE TAKE FURTHER NOTICE that any objections to the Sale Transaction, if any, must be filed and served so as to be actually received by the Objection Recipients (as defined below) no later than [_____], 2016, at 10:00 a.m. (prevailing Eastern Time).

PLEASE TAKE FURTHER NOTICE that the "Objection Recipients" are (i) the Office of the United States Trustee for the District of Delaware; (ii) co-counsel to the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: : Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE

19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.); (iv) counsel to the Committee; (v) counsel to Wells Fargo Bank, National Association, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq.); (vi) counsel to GACP Finance Company, LLC, Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Andrew Tenzer, Esq.); (vii) Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, NY 10271 (Attn: Margery A. Colloff, Esq.); (viii) counsel to certain of the Noteholders, K&L Gates, 599 Lexington Avenue, New York, NY 10022 (Attn: John A. Bicks, Esq.); and (ix) counsel to the Back-up Bidder.

**PLEASE TAKE FURTHER NOTICE THAT UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE SALE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

PLEASE TAKE FURTHER NOTICE that this Notice of Auction Sale Hearing is subject to the fuller terms and conditions of the Sale Motion and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Purchased Assets and/or copies of any related document, including the Sale Motion, the Back-up Bid Agreement, or the Bid Procedures Order, may make a written request to: (i) O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); Email: swarren@omm.com, krinehart@omm.com, jtaylor@omm.com; Fax: 213-430-6407); (ii) co-counsel for the Debtors, Richards, Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq., Email: collins@rlf.com and mmerchant@rlf.com; Fax: (302) 651-7701). In addition, copies of the Sale Motion, the Back-up Bid Agreement, the Bid Procedures Order and this Notice may be examined by interested parties (i) free of charge at the website established for these chapter 11 cases by the Debtors' Court approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics, or (ii) on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.deb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

3

Dated:      [_____], 2016
            Wilmington, Delaware

                                      **RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* pending)
Jennifer Taylor (*pro hac vice* pending)
Karen Rinehart (*pro hac vice* pending)
400 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407

Andrew M. Parlen (*pro hac vice* pending)
Michael F. Lotito (*pro hac vice* pending)
Times Square Tower
Seven Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Attorneys for the Debtors and Debtors in Possession

4

# EXHIBIT 3

**Assumption and Assignment Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HANCOCK FABRICS, INC., et al., [1]<br>a Delaware corporation,<br>Debtors. | Chapter 11<br><br>Case No. 16-_____ (____)<br><br>Joint Administration Proposed |

### NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WHICH MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO

**YOU ARE RECEIVING THIS NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WHICH MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO (THE *"NOTICE OF ASSUMPTION AND ASSIGNMENT"*) BECAUSE YOU MAY BE A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH HANCOCK FABRICS, INC. OR ONE OR MORE OF ITS AFFILIATED DEBTORS (COLLECTIVELY, THE *"DEBTORS"*). PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS DESCRIBED HEREIN.**

PLEASE TAKE NOTICE that on [_____], 2016, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered *Order Approving (A) Bid Procedures (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Notices and Relief* [D.I. __] (the "Bid Procedures Order").[2] The Bid Procedures Order set forth certain procedures (the "Bid Procedures") in connection with the sale of all or substantially all of the Debtors' assets (the "Sale Transaction").

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bid Procedures Order, the Debtors have established procedures for the assumption, assignment and sale of certain executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with the Sale Transaction (collectively, the "Designated Contracts") to a potential purchaser and the determination of related Cure Costs (as defined below). The Debtors are parties to numerous Designated Contracts and, in accordance with the Bid Procedures Order,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hancock Fabrics, Inc. (0905), Hancock Fabrics, LLC (9837), Hancock Fabrics of MI, Inc. (5878), hancockfabrics.com, Inc. (9698), HF Enterprises, Inc. (7249), HF Merchandising, Inc. (8522) and HF Resources, Inc. (9563). The Debtors' corporate headquarters is located at One Fashion Way, Baldwin, MS 38824.

[2] Capitalized terms not otherwise defined herein shall have them meanings afforded to them in the Bid Procedures Order.

hereby file this notice identifying (i) the Designated Contracts, which may be assumed and assigned to the Successful Bidder in connection with the Sale Transaction and, (ii) the proposed amounts, if any, the Debtors believe are owed to the counterparty to the Designated Contract to cure any defaults or arrears existing under the Designated Contract (the "Cure Costs"), both as set forth on Exhibit A attached hereto.

PLEASE TAKE FURTHER NOTICE that the hearing to approve the sale of the Debtors' assets (the "Sale Hearing") before the Honorable [_____], United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, [__] Floor, Courtroom [__], Wilmington, Delaware 19801, has been set for [_____], 2016, at 10:00 a.m. (prevailing Eastern Time).

PLEASE TAKE FURTHER NOTICE that the listing of a Designated Contract on Exhibit A does not constitute an admission that the agreement is an executory contract or unexpired lease as contemplated by Bankruptcy Code section 365(a) or that the Debtors have any liability thereunder, and the Debtors expressly reserve all of their rights, claims, causes of action and defenses with respect to the Designated Contracts listed on Exhibit A.

PLEASE TAKE FURTHER NOTICE that any objections to the assumption, assignment, and sale of any Designated Contract identified in this notice (except with respect to the adequate assurance of future performance by any successful bidders), including to the Cure Costs set forth in Exhibit A must be (i) in writing, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Recipients (as defined below) by [_____], 2016, at 4:00 p.m. (prevailing Eastern Time) (the "Assignment and Assumption Objection Deadline"). Any such objections must set forth the proposed assumption, assignment, and sale of the Designated Contracts (and must state, with specificity, the legal and factual basis thereof) and, if applicable, the proposed Cure Costs (and must state, with specificity, what Cure Costs are required with appropriate documentation in support thereof). Other than the Cure Costs listed on Exhibit A, the Debtors are not aware of any amounts due and owing under the Designated Contracts listed therein.

PLEASE TAKE FURTHER NOTICE that the "Objection Recipients" are (i) the Office of the United States Trustee for the District of Delaware; (ii) co-counsel to the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071 (Attn: : Stephen H. Warren, Esq., Karen Rinehart, Esq., and Jennifer Taylor, Esq.); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.); (iv) counsel to the Committee; (v) counsel to Wells Fargo Bank, National Association, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq.); (vi) counsel to GACP Finance Company, LLC, Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Andrew Tenzer, Esq.); (vii) Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, NY 10271 (Attn: Margery A. Colloff, Esq.); (viii) counsel to certain of the Noteholders, K&L Gates, 599 Lexington Avenue, New York, NY 10022 (Attn: John A. Bicks, Esq.); and (ix) counsel to Great American Group, LLC (the "Back-up Bidder").

**PLEASE TAKE FURTHER NOTICE THAT IF A COUNTERPARTY TO A DESIGNATED CONTRACT FILES A TIMELY OBJECTION ASSERTING A HIGHER CURE AMOUNT THAN THE MAXIMUM CURE COSTS SET FORTH IN THIS**

2

NOTICE OF ASSUMPTION AND ASSIGNMENT, AND THE PARTIES ARE UNABLE TO CONSENSUALLY RESOLVE THE DISPUTE PRIOR TO THE SALE HEARING, THE AMOUNT TO BE PAID OR RESERVED WITH RESPECT TO SUCH OBJECTION WILL BE DETERMINED AT THE SALE HEARING.  ALL OTHER OBJECTIONS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF THE DEBTORS' RIGHT, TITLE AND INTEREST IN, TO AND UNDER THE DESIGNATED CONTRACTS WILL BE HEARD AT THE SALE HEARING.

**PLEASE TAKE FURTHER NOTICE** that if the counterparty to a Designated Contract does not timely file and serve an objection by the Assignment and Assumption Objection Deadline, such counterparty will be deemed to have consented to the assumption, assignment and sale of the Designated Contract to a Successful Bidder, notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption, assignment, sale, and/or Cure Costs set forth in Exhibit A, except with respect to the adequate assurance of future performance by the Successful Bidder(s).  Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing. The Cure Costs set forth in the Notice of Assumption and Assignment will be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment and sale of the Designated Contract and the Cure Costs and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

PLEASE TAKE FURTHER NOTICE that, in connection with the Sale Transaction, the Debtors will post on the website of the Debtors' Court approved claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/hancockfabrics, on or before [_____], 2016, information regarding the Back-up Bidder's ability to perform under the Designated Contracts if it is the Successful Bidder, which information may include (1) information about the purchaser's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (b) a description of the intended use of the premises (if applicable), (3) the exact name of the proposed assignee, (4) the proposed form of order authorizing the assumption and assignment of the Designated Contracts, and (5) such additional information regarding the potential purchaser as the Debtors may elect to include (collectively, the "Adequate Assurance Information").  In addition, if a Successful Bidder other than the Back-up Bidder prevails at the Auction, then: (i) as soon as possible after the conclusion of the Auction, the (1) Debtors shall file with the Bankruptcy Court a notice that (a) identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Designated Contracts, (b) lists any modifications to the Cure Costs, and (c) notifies the counterparties to any Designated Contracts whether there has been any change to the decision to assume and assign such Designated Contracts, and (2) the Debtors shall provide counterparties to the Designated Contracts with Adequate Assurance Information with respect to the Successful Bidder; and (ii) the deadline to file and serve an objection to the assumption and assignment of the Designated Contracts shall be extended to one day prior to Sale Hearing at 12:00 p.m. ET; provided that the deadline to object to Cure Costs (to the extent unmodified) shall not be extended.

3

PLEASE TAKE FURTHER NOTICE that although the Debtors have made a good faith effort to identify all Designated Contracts that might be assumed and assigned in connection with a Sale Transaction, the Debtors may identify other executory contracts or unexpired leases that they desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Bid Procedures Order, the Debtors identify additional executory contracts or unexpired leases to be assumed and assigned to the Successful Bidder(s), the Debtors will serve a supplemental notice of assumption and assignment (the "Supplemental Notice of Assumption and Assignment") by electronic transmission, hand delivery, or overnight mail on (i) the counterparty to each supplemental Designated Contract at the last known address available to the Debtors and (ii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 by no later than ten days before the proposed effective date of the assignment. Each Supplemental Notice of Assumption and Assignment will set forth (i) the name and address of the contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder(s) to withdraw such request for assumption and assignment of the contract prior to the closing of the applicable Sale Transaction), (iii) identification of the Contract, (iv) the Cure Costs, if any, and (v) Adequate Assurance Information.

PLEASE TAKE FURTHER NOTICE that this Notice of Assumption and Assignment is subject to the fuller terms and conditions of the Sale Motion and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties with questions regarding the proposed assumption, assignment, and sale procedures contained herein should contact the Debtors' counsel at the contact information provided below.

The inclusion of a Designated Contract on Exhibit A does not mean that such Designated Contract will be assumed or assigned in connection with any Sale Transaction or that the Debtors or any Successful Bidder will make any cure payment in connection with such Designated Contract.

RLF1 13827756v.1

Dated:    [_____], 2016
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* pending)
Jennifer Taylor (*pro hac vice* pending)
Karen Rinehart (*pro hac vice* pending)
400 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407

Andrew M. Parlen (*pro hac vice* pending)
Michael F. Lotito (*pro hac vice* pending)
Times Square Tower
Seven Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Attorneys for the Debtors and Debtors in Possession

# EXHIBIT A

## Designated Contracts and Proposed Cure Costs

## **EXHIBIT B**

### **Sale Order**

[The Sale Order will be filed with the Court in advance of the hearing on the Bid Procedures Order]

## **EXHIBIT C**

**Back-up Bid Agreement**

**Exhibit 1**
**LIST OF STORES**
[To Come]