**Exhibit A**
**(DIP Credit Agreement)**

**Execution Version**

---

### DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of February 2, 2016

among

**HANCOCK FABRICS, INC.,**

as the Lead Borrower

for

the Borrowers Named Herein,

the Guarantors Named Herein,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

as Administrative Agent, Collateral Agent and Swing Line Lender,

**GACP FINANCE CO., LLC,**

as Term Agent,

and

the Lenders Party Hereto

---

Table of Contents

Page

Article I DEFINITIONS AND ACCOUNTING TERMS ................................................................. 1
    1.01    Defined Terms ................................................................................ 2
    1.02    Other Interpretive Provisions ...................................................... 59
    1.03    Accounting Terms ....................................................................... 60
    1.04    Reserved ....................................................................................... 60
    1.05    Times of Day ............................................................................... 60
    1.06    Letter of Credit Amounts ............................................................ 60
    1.07    Currency Equivalents Generally ................................................. 60

Article II THE COMMITMENTS AND CREDIT EXTENSIONS ............................................. 61
    2.01    Loans; Reserves .......................................................................... 61
    2.02    Borrowings, Conversions and Continuations of Loans ............. 62
    2.03    Letters of Credit .......................................................................... 64
    2.04    Swing Line Loans ........................................................................ 73
    2.05    Prepayments; Pre-Petition Obligations ..................................... 76
    2.06    Termination or Reduction of Commitments ............................... 78
    2.07    Repayment of Loans ................................................................... 79
    2.08    Interest ......................................................................................... 79
    2.09    Fees .............................................................................................. 80
    2.10    Computation of Interest and Fees ............................................... 80
    2.11    Evidence of Debt ......................................................................... 80
    2.12    Payments Generally; Agent's Clawback .................................... 81
    2.13    Sharing of Payments by Lenders ................................................ 83
    2.14    Settlement Amongst Lenders ...................................................... 84
    2.15    Release ......................................................................................... 84
    2.16    Waiver of any Priming Rights .................................................... 85

Article III TAXES, YIELD PROTECTION AND ILLEGALITY;  APPOINTMENT OF
LEAD BORROWER ........................................................................................................... 85
    3.01    Taxes ............................................................................................ 85
    3.02    Illegality ...................................................................................... 88
    3.03    Inability to Determine Rates ....................................................... 88
    3.04    Increased Costs; Reserves on LIBO Rate Loans ....................... 88
    3.05    Compensation for Losses ............................................................ 90

7143386v10

Table of Contents

| | | Page |
|---|---|---|
| 3.06 | **Mitigation Obligations; Replacement of Lenders** | 91 |
| 3.07 | **Survival** | 91 |
| 3.08 | **Designation of Lead Borrower as Borrowers' Agent** | 91 |
| Article IV | CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | 92 |
| 4.01 | **Conditions of Initial Credit Extension** | 92 |
| 4.02 | **Conditions to all Credit Extensions** | 95 |
| Article V | REPRESENTATIONS AND WARRANTIES | 97 |
| 5.01 | **Existence, Qualification and Power** | 97 |
| 5.02 | **Authorization; No Contravention** | 97 |
| 5.03 | **Governmental Authorization; Other Consents** | 97 |
| 5.04 | **Binding Effect** | 98 |
| 5.05 | **Financial Statements; No Material Adverse Effect** | 98 |
| 5.06 | **Litigation** | 99 |
| 5.07 | **No Default** | 99 |
| 5.08 | **Ownership of Property; Liens** | 99 |
| 5.09 | **Environmental Compliance** | 100 |
| 5.10 | **Insurance** | 101 |
| 5.11 | **Taxes** | 101 |
| 5.12 | **ERISA Compliance** | 101 |
| 5.13 | **Subsidiaries; Equity Interests** | 102 |
| 5.14 | **Margin Regulations; Investment Company Act** | 102 |
| 5.15 | **Disclosure** | 102 |
| 5.16 | **Compliance with Laws** | 103 |
| 5.17 | **Intellectual Property; Licenses, Etc** | 103 |
| 5.18 | **Labor Matters** | 103 |
| 5.19 | **Security Documents** | 104 |
| 5.20 | **Reserved** | 105 |
| 5.21 | **Deposit Accounts; Credit Card Arrangements** | 105 |
| 5.22 | **Brokers** | 105 |
| 5.23 | **Customer and Trade Relations** | 105 |
| 5.24 | **Material Contracts** | 105 |
| 5.25 | **Casualty** | 105 |

Table of Contents

|  |  | Page |
|---|---|---|
| 5.26 | **Bankruptcy Matters** | 106 |
| Article VI | AFFIRMATIVE COVENANTS | 106 |
| 6.01 | **Financial Statements** | 107 |
| 6.02 | **Certificates; Other Information** | 108 |
| 6.03 | **Notices** | 110 |
| 6.04 | **Payment of Obligations** | 112 |
| 6.05 | **Preservation of Existence, Etc** | 112 |
| 6.06 | **Maintenance of Properties** | 112 |
| 6.07 | **Maintenance of Insurance** | 113 |
| 6.08 | **Compliance with Laws** | 114 |
| 6.09 | **Books and Records; Accountants** | 114 |
| 6.10 | **Inspection Rights** | 115 |
| 6.11 | **Use of Proceeds** | 116 |
| 6.12 | **Additional Loan Parties** | 116 |
| 6.13 | **Cash Management** | 117 |
| 6.14 | **Information Regarding the Collateral** | 119 |
| 6.15 | **Physical Inventories** | 119 |
| 6.16 | **Environmental Laws** | 120 |
| 6.17 | **Further Assurances** | 120 |
| 6.18 | **Compliance with Terms of Leaseholds** | 121 |
| 6.19 | **Material Contracts** | 121 |
| 6.20 | **Designation of Senior Debt** | 121 |
| 6.21 | **Credit Card Processors** | 121 |
| 6.22 | **Retention of Consultants; Communication with Accountants and Other Financial Advisors** | 122 |
| 6.23 | **Performance within Budget** | 123 |
| 6.24 | **Permitted Sales Process; Agency Agreement** | 123 |
| 6.25 | **Additional Bankruptcy Related Affirmative Covenants** | 125 |
| 6.26 | **Leases** | 125 |
| 6.27 | **Financing Orders** | 125 |
| Article VII | NEGATIVE COVENANTS | 125 |
| 7.01 | **Liens** | 126 |
| 7.02 | **Investments** | 126 |

iii

7143386v10

Table of Contents

|  |  | Page |
|---|---|---|
| 7.03 | **Indebtedness; Disqualified Stock** | 126 |
| 7.04 | **Fundamental Changes** | 126 |
| 7.05 | **Dispositions** | 126 |
| 7.06 | **Restricted Payments** | 126 |
| 7.07 | **Prepayments of Indebtedness and Payments of Specified Subordinated Indebtedness** | 126 |
| 7.08 | **Change in Nature of Business** | 126 |
| 7.09 | **Transactions with Affiliates** | 126 |
| 7.10 | **Burdensome Agreements** | 127 |
| 7.11 | **Use of Proceeds** | 127 |
| 7.12 | **Amendment of Material Documents** | 127 |
| 7.13 | **Fiscal Year** | 128 |
| 7.14 | **Deposit Accounts; Credit Card Processors** | 128 |
| 7.15 | **Reserved** | 128 |
| 7.16 | **Designation of Senior Debt** | 128 |
| 7.17 | **Reclamation Claims** | 128 |
| 7.18 | **Bankruptcy Related Negative Covenants** | 128 |
| 7.19 | **Professional Fee Escrow Account** | 129 |
| Article VIII | EVENTS OF DEFAULT AND REMEDIES | 129 |
| 8.01 | **Events of Default** | 129 |
| 8.02 | **Remedies Upon Event of Default** | 135 |
| 8.03 | **Application of Funds** | 135 |
| Article IX | THE AGENT | 138 |
| 9.01 | **Appointment and Authority** | 138 |
| 9.02 | **Rights as a Lender** | 138 |
| 9.03 | **Exculpatory Provisions** | 138 |
| 9.04 | **Reliance by the Agent and the Term Agent** | 139 |
| 9.05 | **Delegation of Duties** | 140 |
| 9.06 | **Resignation of Agent** | 140 |
| 9.07 | **Non-Reliance on Agent or Term Agent and Other Lenders** | 141 |
| 9.08 | **Reserved** | 141 |
| 9.09 | **Reserved** | 141 |
| 9.10 | **Collateral and Guaranty Matters** | 142 |

7143386v10

Table of Contents

|  |  | Page |
|---|---|---|
| **9.11** | **Notice of Transfer** | 142 |
| **9.12** | **Reports and Financial Statements** | 142 |
| **9.13** | **Agency for Perfection** | 143 |
| **9.14** | **Indemnification of Agent and Term Agent** | 143 |
| **9.15** | **Relation among Lenders** | 144 |
| **9.16** | **Defaulting Lender** | 144 |
| **Article X MISCELLANEOUS** | | 147 |
| **10.01** | **Amendments, Etc** | 147 |
| **10.02** | **Notices; Effectiveness; Electronic Communications** | 149 |
| **10.03** | **No Waiver; Cumulative Remedies** | 151 |
| **10.04** | **Expenses; Indemnity; Damage Waiver** | 151 |
| **10.05** | **Payments Set Aside** | 153 |
| **10.06** | **Successors and Assigns** | 153 |
| **10.07** | **Treatment of Certain Information; Confidentiality** | 158 |
| **10.08** | **Right of Setoff** | 159 |
| **10.09** | **Interest Rate Limitation** | 159 |
| **10.10** | **Counterparts; Integration; Effectiveness** | 159 |
| **10.11** | **Survival** | 160 |
| **10.12** | **Severability** | 160 |
| **10.13** | **Replacement of Lenders** | 160 |
| **10.14** | **Governing Law; Jurisdiction; Etc** | 161 |
| **10.15** | **Waiver of Jury Trial** | 162 |
| **10.16** | **No Advisory or Fiduciary Responsibility** | 162 |
| **10.17** | **USA PATRIOT Act Notice** | 163 |
| **10.18** | **Foreign Asset Control Regulations** | 163 |
| **10.19** | **Time of the Essence** | 164 |
| **10.20** | **Designation of Senior Debt** | 164 |
| **10.21** | **Press Releases** | 164 |
| **10.22** | **Additional Waivers** | 164 |
| **10.23** | **No Strict Construction** | 166 |
| **10.24** | **Attachments** | 166 |
| **10.25** | **Keepwell** | 166 |

## Table of Contents

Page

**10.26** **Conflict**................................................................................................ 166

7143386v10

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 1.03 | Interlender Provisions |
| 1.04 | Rollover Letters of Credit |
| 1.05 | Block Relief Amount |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties; Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.11 | Federal, State and Other Material Tax Returns and Reports |
| 5.13 | Subsidiaries; Equity Interests |
| 5.17 | Intellectual Property Matters |
| 5.18 | Labor Matters |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Swing Line Loan Notice |
| C-1 | Revolving Note |
| C-2 | Swing Line Note |
| C-3 | Term Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Borrowing Base Certificate |
| G | Credit Card Notification |
| H | DDA Notification |
| I | Cash Management Order |
| J | Interim Financing Order |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of February __, 2016, among HANCOCK FABRICS, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Lead Borrower"), the Persons named on Schedule 1.01 hereto (collectively, together with the Lead Borrower, the "Borrowers"), the Persons named on Schedule 1.02 hereto (collectively, the "Guarantors"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), WELLS FARGO BANK, NATIONAL ASSOCIATION, as Agent and Swing Line Lender, and GACP FINANCE CO., LLC, as Term Agent.

On February 2, 2016 (the "Petition Date"), the Lead Borrower and the other Loan Parties commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case number(s) [_____] (collectively, the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Lead Borrower and the other Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrowers have requested, and the Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a senior secured credit facility in an aggregate principal amount not to exceed $100,000,000 in order to (a) repay the Pre-Petition Obligations as provided herein, (b) fund the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance), (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrowers and the other Loan Parties during the pendency of the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance).

The Borrowers and the other Loan Parties desire to secure the Obligations under the Loan Documents by granting to the Agent, on behalf of itself and the other Credit Parties, a security interest in and liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and in the Interim Financing Order (or the Final Financing Order when applicable).

All Obligations of the Loan Parties to the Agent and the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, secured by the Agent's security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral and entitled to super-priority administrative claim status under the Bankruptcy Code as provided herein and in the Financing Orders.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01   Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which (i) is not an Affiliate of the Approved Foreign Vendor or any Loan Party and (ii) is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent in its Permitted Discretion, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent), and (e) is on terms otherwise reasonably acceptable to the Agent.

"Accommodation Payment" as defined in Section 10.22(d).

"Account" means "accounts" as defined in the UCC and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger, amalgamation or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person or of any business unit of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Adjusted LIBO Rate" means:

(a)      for any Interest Period with respect to any LIBO Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (i) the LIBO Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate; and

(b)    for any interest rate calculation with respect to any Base Rate Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of one percent) equal to (i) the LIBO Rate for an Interest Period commencing on the date of such calculation and ending on the date that is thirty (30) days thereafter multiplied by (ii) the Statutory Reserve Rate.

The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

"Adjusted Revolving Borrowing Base" means the Revolving Borrowing Base, without giving effect to the Availability Block and the Term Loan Push Down Reserve.

"Administrative Agent" means Wells Fargo in its capacity as Administrative Agent under any of the Loan Documents, or any successor thereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (b) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (c) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (d) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agency Agreement" means that certain Agency Agreement entered into by and between the Lead Borrower and Great American Group, LLC, with respect to the "going out of business" sales with respect to 185 stores dated as of January 26, 2016, as amended or modified with the prior written consent of the Agent after consultation with the Term Agent.

"Agent" means Wells Fargo in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto, in such capacities.

"Agent Parties" shall have the meaning specified in Section 10.02(c).

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the Revolving Lenders.  As of the Closing Date, the Aggregate Revolving Commitments are $80,000,000.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Allocable Amount" has the meaning specified in Section 10.21(d).

-3-

"Applicable Commitment Fee Percentage" means one half of one percent (0.50%).

"Applicable Lenders" means the Required Lenders, the Required Revolving Lenders, the Required Term Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means:

| Applicable Margin for Base Rate Loans | Letter of Credit Fee |
|---|---|
| 1.50% | 2.50% |

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Commitment at such time, (b) with respect to any Term Lender at any time, the portion of the Term Loan represented by the outstanding principal balance of such Term Lender's Term Loan at such time, or (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment and the outstanding principal balance of such Lender's Term Loan at such time, in each case as the context provides. If the commitment of each Lender to make Loans and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender shall be determined based on the Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraisal Percentage" means ninety percent (90%).

"Appraised Value" means, with respect to Eligible Inventory, Eligible Domestic In-Transit Inventory and Eligible Foreign In-Transit Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory, Eligible Domestic In-Transit Inventory or Eligible Foreign In-Transit Inventory, as applicable, as set forth in the inventory stock ledger of the Borrowers, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent, which appraisal is in form and substance reasonably satisfactory to the Agent.

"Approved Budget" shall mean the debtor-in-possession thirteen (13) week budget prepared by the Lead Borrower and furnished to the Agent and the Term Agent on or before the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(f) which budget shall include a weekly cash budget, including information on a line item basis as to (w) projected Inventory amounts,

(x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Agent, the Term Agent and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), and (z) a calculation of Availability.

"Approved Budget Variance Report" shall mean a weekly report provided by the Lead Borrower to the Agent and Term Agent in accordance with Section 6.01(f): (i) showing by line item actual receipts for both inventory and revenues, actual disbursement amounts, cash on hand, actual invoiced and unpaid professional fees (other than counsel for the Agent, the Term Agent and the Lenders) and Availability as of Sunday of each week on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis at all times thereafter, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include or be accompanied by explanations for all material variances, and (ii) certified by a Responsible Officer of the Lead Borrower.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its Permitted Discretion, (b) has received timely payment or performance of all obligations owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in full compliance with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Liquidator" shall mean a professional liquidator, broker or other advisor acceptable to the Agent it being agreed that each of the professional liquidators contacted in connection with the Initial Store Closings are acceptable to Agent.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a

-5-

balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries for the Fiscal Year ended January 25, 2014, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Lead Borrower and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a)     the Revolving Loan Cap

        minus

(b)     the Total Revolving Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable are being paid within stated invoice terms or as permitted in the ordinary course of Borrowers' business consistent with past practices (absent which the Agent may establish a Reserve therefor).

"Availability Block" means the greater of (a) ten percent (10%) of the Adjusted Revolving Borrowing Base and (b) $7,500,000.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Revolving Lender to make Committed Revolving Loans and of the obligation of the Issuing Bank to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (i) to reflect the impediments to the Agent's ability to realize upon the Collateral, (ii) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, including without limitation, amounts entitled to priority under Section 503(b) of the Bankruptcy Code, as reasonably determined by the Agent, (iii) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (iv) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (A) rent to the extent claims in respect thereof may have priority over the interests of the Agent in the Collateral; (B) customs duties, and other costs to release Inventory which is being imported into the United States; (C) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (D) salaries, wages and benefits due to

-6-

employees of any Borrower; (E) Customer Credit Liabilities; (F) Customer Deposits; (G) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (H) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (I) amounts due to vendors on account of consigned goods or on account of purchase money or "floor plan financing" payables; (J) royalties payable in respect of licensed merchandise; (K) Cash Management Reserves; (L) Bank Product Reserves; (M) Realty Reserves; (N) the Carve-Out Reserve; and (O) Consultant Fee Reserve.

"Average Daily Availability" means, as of any date of determination, the average daily Availability for the immediately preceding calendar month.

"Baldwyn Real Estate" shall mean the Real Estate of Lead Borrower located at One Fashion Way, Baldwyn, Mississippi.

"Bank Products" means any services of facilities provided to any Loan Party by the Agent, any Revolving Lender or any of their respective Affiliates or branches (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, (e) credit or debit cards, (f) purchase cards, and (g) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Product Reserves" means such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Base Rate"  means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate for an Interest Period of three (3) months plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo as its "prime rate." The "prime rate" is a rate set by Wells Fargo based upon various factors including Wells Fargo's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Wells Fargo shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Bidding Procedures Motion" has the meaning provided in Section 6.25(a)(i).

"Bidding Procedures Order" has the meaning provided in Section 6.25(b).

"Block Relief Amount" means the dollar amount for the then applicable week as set forth on Schedule 1.05 annexed hereto.

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Revolving Credit Borrowing, a Swing Line Borrowing or the Term Borrowing, as the context may require.

"Borrowing Base" means each of the Revolving Borrowing Base and the Term Loan Borrowing Base.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit F hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent and the Term Agent.

"Business" means a retailer of fashion and home decorating textiles, crafts, sewing accessories, needlecraft supplies and sewing machines.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means, collectively, the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C.

§1930(a) and Section 3717 of title 31 of the United States Code, plus (ii) the aggregate amount of unpaid fees and expenses of the Debtors' and Statutory Committee's professionals, in each case retained in the Chapter 11 Case by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327(a) or 1103(a) of the Bankruptcy Code, to the extent such fees and expenses are (A) allowed and payable pursuant to an order of the Bankruptcy Court (which order has not been reversed, vacated or stayed), (B) incurred prior to the delivery of a Carve-Out Trigger Notice, and (C) limited to the amounts set forth in the Approved Budget as of any applicable date of determination, to the extent such amounts have been funded into the Professional Fee Escrow Account prior to the delivery of the Carve-Out Trigger Notice, plus (iii) $100,000 for fees, costs and expenses of such professionals from and after the delivery of a Carve-Out Trigger Notice (the "Post Trigger Notice Carve Out Amount"), plus (iv) the Success Fee.

"Carve-Out Reserve" means the amount set forth in clause (iii) of the definition of Carve-Out plus the Success Fee (in an amount determined by the Agent in its Permitted Discretion).

"Carve-Out Trigger Notice" means a written notice by the Agent to lead counsel for the Loan Parties, any Statutory Committee and the U.S. Trustee following the occurrence of an Event of Default, expressly stating that no additional Committed Revolving Loans may be requested to fund the Carve-Out.

"Case Professionals" means the Loan Parties' and any Statutory Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Collateral Account" means a blocked, non-interest bearing account established by one or more of the Loan Parties with Wells Fargo, and under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(k) or Section 8.02(c).

"Cash Collateralize" has the meaning specified in Section 2.03(k). Derivatives of such term have corresponding meanings.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent after consultation with the Term Agent in its Permitted Discretion, which, among other matters, authorizes the Loan Parties to use their cash management system, substantially in the form of Exhibit I or another form satisfactory to the Agent.

"Cash Management Reserves" means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

7143386v10

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by the Agent, any Revolving Lender or any of their respective Affiliates or branches in respect of (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, and (c) credit card processing services.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)    (x) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of more than fifty percent (50%) of the economic interests of the Lead Borrower or of the Equity Interests of the Lead Borrower entitled to vote for members of the board of directors or equivalent governing body of the Lead Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right) and (y) such event shall result in a such person or group affecting a change in the governance or management of the Company that is adverse to the interests of the Lenders as determined by the Agent in its Permitted Discretion; or

(b)     during any period of twenty-four (24) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Lead Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     the Lead Borrower fails at any time to own, directly or indirectly, one hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances and Liens in favor of the Agent), except where such failure is as a result of a transaction expressly permitted by the Loan Documents.

"Chapter 11 Case" has the meaning specified in the Recitals hereto.

"Closing Date" means the first date all the conditions precedent in Sections 4.01 and 4.02 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" and "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent, provided that "Collateral" shall not include any Excluded Property.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party with respect to the applicable Collateral.

"Collateral Agent" means Wells Fargo, acting in such capacity for its own benefit and the ratable benefit of the other Credit Parties, or any successor thereto.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the Issuing Bank.

"Commitment" means, as to each Lender, such Lender's Revolving Commitment or Term Commitment, as applicable.

"Committed Loan Notice" means a notice of (a) a Revolving Credit Borrowing AND/OR Term Borrowing, (b) a conversion of Committed Revolving Loans and/or Term Loans, from one Type to the other, or (c) a continuation of LIBO Rate Loans, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit A.

"Committed Revolving Loan" has the meaning specified in Section 2.01.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Concentration Account" has the meaning provided in Section 6.13(d).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of ten (10) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender's giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consultant Fee Reserve" means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated fees and expenses due to the Great American Group, LLC pursuant to the Initial Store Closing Agreement.

"Consultants" means the Financial Consultant, Sale Consultant and Real Estate Consultant, as applicable.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers'

7143386v10

purchase journals or the Borrowers' stock ledger. "Cost" includes inventory capitalization costs for imports, but does not include other inventory capitalization costs or other non purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Advance Rate" means ninety percent (90%).

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Receivables" means collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit card or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the credit card agreements.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Term Agent, (iv) each Issuing Bank, (v) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vi) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vii) the successors and permitted assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agent, the Term Agent and their respective Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) counsel for the Term Agent, (C) outside consultants for the Agent, (D) appraisers, (E) commercial finance examinations, and (F) all such out-of-pocket expenses incurred during any workout, restructuring

-13-

or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents, instruments and agreements executed and delivered in connection therewith, or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, or (D) any workout, restructuring or negotiations in respect of any Obligations; (b) with respect to the Issuing Bank, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; (c) all customary fees and charges (as adjusted from time to time) of the Agent and the Term Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith; and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent, the Term Agent, the Issuing Bank or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case such Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrowers, and (c) liabilities in connection with frequent shopping programs of the Borrowers.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services and (b) layaway obligations of the Borrowers.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, the Term Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in Section 6.13(b).

"Debtor Relief Laws" means each of (a) the Bankruptcy Code and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium,

rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees and the Term Loan, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans, plus (iii) two percent (2%) per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus two percent (2%) per annum, (b) when used with respect to Letter of Credit Fees, a rate equal to the rate otherwise applicable thereto plus two percent (2%) per annum, and (c) when used with respect to the Term Loan, an interest rate equal to the Term Loan Interest Rate plus two percent (2%) per annum.

"Defaulting Lender" means any Revolving Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement on the date that it is required to do so under this Agreement (including the failure to make available to the Agent amounts required pursuant to Section 2.14 or to make a required payment in connection with a payment made by the Issuing Bank pursuant to a Letter of Credit), (b) notified the Borrowers, the Agent, or any other Revolving Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Agent) under which it has committed to extend credit, (d) failed, within one (1) Business Day after written request by the Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund any amounts required to be funded by it under this Agreement, (e) otherwise failed to pay over to the Agent or any other Revolving Lender any other amount required to be paid by it under this Agreement on the date that it is required to do so under this Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Revolving Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person

(or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is one hundred and eighty (180) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Lead Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Domestic In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a location inside of the continental United States to either (i) a location of a Borrower that is within the continental United States, or (ii) another location within the continental United States subject to arrangements that comply with the applicable requirements of this Agreement.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"Elavon" means Elavon, Inc. (formerly Nova Information Systems, Inc.), as processor under the Elavon Processor Agreement.

-16-

"Elavon Deposit Account" means that certain deposit account maintained with Bancorp South Bank, with account number ending in -2803 in the name of Lead Borrower, or any replacement account therefor expressly agreed to in advance in writing by the Agent, which replacement account shall be a Blocked Account.

"Elavon Member" means, as of the date hereof, U.S. Bank, National Association, in its capacity as "Member" under the Elavon Processor Agreement and any replacement "Member" thereunder.

"Elavon Processor Agreement" means that certain Payment Device Processing Agreement, dated as of January 6, 2012, among Lead Borrower, Elavon, as processor, and Elavon Member, together with all other agreements, documents and instruments now or at any time hereafter executed and/or delivered in connection therewith.

"Elavon Reserve Account" means that "Reserve Account" identified in the Elavon Processor Agreement as in effect on the date hereof.

"Eligible Assignee" means (a) a Credit Party or any of its branches or Controlled Affiliates; (b) in the case of an assignment of (i) a Revolving Commitment, a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000 or (ii) Term Loans or Term Commitments, a bank, insurance company, or company engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of business; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of credit facilities, and (e) any other Person (other than a natural person) approved by (i) in the case of an assignment of a Revolving Commitment, the Agent, the Issuing Bank and the Swing Line Lender and (ii) subject to the Interlender Provisions, in the case of an assignment of a portion of the Term Loan, the Agent and the Term Agent; provided, that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' branches, Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower or in connection with sales to consumers as part of the Initial Store Closing, and (ii) in each case is acceptable to the Agent in its Permitted Discretion based on, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to, any of clauses (a) through (j) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances

-17-

(including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.  Credit Card Receivables which would otherwise constitute Eligible Credit Card Receivables pursuant to this Section will not be deemed ineligible solely by virtue of the agreements with respect thereto having been entered into by any Guarantor, for the benefit of Borrowers.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)     Credit Card Receivables that do not arise from the actual and bona fide sale and delivery of goods or rendition of services by such Borrower in the ordinary course of the business of such Borrower which transactions are completed in accordance with the terms and provisions contained in any agreements binding on such Borrower or the other party or parties related thereto;

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than (x) Liens granted to the Agent pursuant to the Security Documents, (y) Liens permitted pursuant to clauses (p) and (s) of the definition of Permitted Encumbrances, and (z) Liens with respect to which the Agent has implemented Reserves in its Permitted Discretion);

(d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor of the applicable credit card which is the subject of a proceeding under any Debtor Relief Law;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

-18-

(i)    Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j)    Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible Domestic In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, Domestic In-Transit Inventory:

(a)    which has been shipped from a domestic location for receipt by a Borrower, but which has not yet been delivered to such Borrower, which Domestic In-Transit Inventory has been in transit for ten (10) calendar days or less from the date of shipment of such Inventory;

(b)    for which the purchase order is in the name of a Borrower and title and risk of loss has passed to such Borrower;

(c)    which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(d)    for which payment of the purchase price has been made by the Borrower in cash in advance; and

(e)    which otherwise would constitute Eligible Inventory;

provided, that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible Domestic In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation or stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Foreign In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, Foreign In-Transit Inventory:

(a)    which has been shipped from a foreign location for receipt by a Borrower, but which has not yet been delivered to such Borrower, which Foreign In-Transit Inventory has been in transit for sixty (60) days or less from the date of shipment of such Inventory;

(b)    for which the purchase order is in the name of a Borrower and title and risk of loss has passed to such Borrower;

(c)    for which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of

-19-

title which evidence ownership of the subject Inventory pursuant to a Customs Broker/Carrier Agreement;

(d)    which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(e)    the Foreign Vendor with respect to such Foreign In-Transit Inventory is an Approved Foreign Vendor;

(f)    for which payment of the purchase price has been made by the Borrower or the purchase price is supported by a Commercial Letter of Credit; and

(g)    which otherwise would constitute Eligible Inventory;

provided, that the Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible Foreign In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation or stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible Domestic In-Transit Inventory, Eligible Foreign In-Transit Inventory, and (ii) items of Inventory of a Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrowers' business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by a Borrower or a Borrower does not have good and valid title thereto;

(b)    Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party, including without limitation consigned patterns;

(c)    Inventory (other than Eligible Foreign In-Transit Inventory) that is not located in the United States of America (excluding territories or possessions of the United States);

(d)    Inventory (other than Eligible Domestic In-Transit Inventory and Eligible Foreign In-Transit Inventory) that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit for 7 days or less between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrowers have furnished the Agent with (A) any UCC financing

statements or other documents that the Agent may reasonably determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

(e)     Inventory that is located: (i) in a warehouse or distribution center leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location in its Permitted Discretion, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work in process, remnants, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) has been packed away for sale in the subsequent season; (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)     Inventory that is not subject to a perfected first priority security interest in favor of the Agent;

(h)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)     Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit; or

(k)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement unless the Agent has implemented a Reserve in its Permitted Discretion with respect thereto.

"Eligible Real Estate" means Real Estate deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Revolving Borrowing Base and Term Loan Borrowing Base and which, except as otherwise agreed by Agent, in its Permitted Discretion, satisfies all of the following conditions:

(a)     a Borrower owns such Real Estate in fee simple absolute;

(b)     the Interim Financing Order or the Final Financing Order, as applicable shall have been entered and create valid first and subsisting Liens (subject only to Permitted Encumbrances (other than Liens securing Indebtedness) which may have priority over the Lien of the Agent by operation of Law) on such Real Estate;

7143386v10

(c)      the Agent and the Term Agent shall have received an appraisal setting forth the Fee Simple Value and Leased Value of such Real Estate by a third party professional appraiser reasonably acceptable to the Agent and otherwise in form and substance reasonably satisfactory to the Agent;

(d)      the Real Estate Eligibility Requirements have been satisfied.

Notwithstanding the foregoing only the Baldwyn Real Estate (other than the 11.11 acres of vacant land located at One Fashion Way, Baldwyn Mississippi) shall constitute Eligible Real Estate unless otherwise agreed by the Agent and Term Agent.  Any Real Estate that is not Eligible Real Estate shall nevertheless be part of the Collateral.

"Eligible Store Closing Inventory" means Eligible Inventory located at any Stores subject to the Initial Store Closing Agreement.

"Environmental Compliance Reserve" means, with respect to Eligible Real Estate, any reserve which the Agent, from time to time in its Permitted Discretion establishes as to the Revolving Borrowing Base for estimable amounts that are reasonably likely to be expended by any of the Loan Parties in order for such Loan Party and its operations and property (a) to comply with any notice from a Governmental Authority asserting non-compliance with Environmental Laws, or (b) to correct any such non-compliance with Environmental Laws or to provide for any Environmental Liability.

"Environmental Laws" means any and all federal, state, provincial, territorial, municipal, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests),

-22-

and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Lead Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (b) a complete or partial withdrawal by the Lead Borrower or any ERISA Affiliate from a Multiemployer Plan or notification to the Lead Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (c) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (d) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Lead Borrower or any ERISA Affiliate; or (f) any other event or condition with respect to a Plan that could reasonably be expected to result in liability, other than Unfunded Pension Liability, of any Loan Party in excess of $2,000,000.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Events and Circumstances" has the meaning assigned to such term in the definition of "Material Adverse Effect".

"Excess Real Estate Proceeds" has the meaning provided therefor in Section 2.05(h).

"Excluded Property" has the meaning assigned to such term in the Security Agreement.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap

Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Agent, the Term Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (c) Other Connection Taxes, (d) in the case of a Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Lender's failure or inability (other than solely as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to Section 3.01(a), (e) any U.S. federal, state or local backup withholding Tax, and (f) any U.S. federal withholding Tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan revisions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments, in each case not received in the ordinary course of business.

"Facility Guaranty" means each Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in a form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Factored Receivables" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with Wells Fargo or any of its Affiliates pursuant to a factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"FATCA" means current Section 1471 through 1474 of the Code, including any intergovernmental agreements enacted with respect thereto, or any amended version or successor provision that is substantively similar and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal

Reserve Bank of New York on the Business Day next succeeding such day; <u>provided</u>, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Wells Fargo on such day on such transactions as determined by the Agent.

"Fee Simple Value" means, as of the date of determination, the fair market value of Eligible Real Estate as set forth in the most recent appraisal of Eligible Real Estate  as determined from time to time by an independent professional appraiser engaged by the Agent  in accordance with Section 6.10(d) based upon a fee simple "go-dark" methodology which appraisal shall assume, among other things, a marketing period of no more than twelve (12) months (provided that the Fee Simple Value of Eligible Real Estate shall in no event exceed the maximum amount of the Obligations at any time specified to be secured by a Mortgage, if any, thereon).  As of the Closing Date, the Fee Simple Value of the Baldwyn Real Estate is $12,250,000.

"Final Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent and the Term Agent, in their Permitted Discretion and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent and the Term Agent, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur the Obligations (including, without limitation, the Term Loan), and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financial Consultant" means Clear Thinking Group LLC, or another party reasonably acceptable to the Agent and Lead Borrower.

"Financing Orders" means the Interim Financing Order and Final Financing Order, as applicable.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the Saturday nearest to the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarter shall generally end on the Saturday nearest to the last day of each April, July, October and January of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

-25-

"Fiscal Year" means the fiscal year ending January 30, 2016 and any subsequent period of fifty-two (52) or fifty-three (53) consecutive weeks ending on the Saturday nearest to January 31 of each calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of a Borrower from a location outside of the continental United States to either (i) a location of a Borrower that is within the continental United States, or (ii) another location within the continental United States subject to arrangements that comply with the applicable requirements of this Agreement.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells Foreign In-Transit Inventory to a Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to Foreign In-Transit Inventory of a Borrower purchased from such Foreign Vendor.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GA Fee Letter" means the letter agreement, dated as of the Closing Date, among the Borrowers and the Term Agent.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, local, provincial, territorial or municipal, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

7143386v10

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) the provision of any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or the provision of any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" has the meaning specified in the introductory paragraph hereto and includes each Subsidiary of the Lead Borrower that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

      (a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

      (b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

      (c)     net obligations of such Person under any Swap Contract;

-27-

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business), including any "earn-outs" or similar purchase price adjustments;

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness of such Person;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest), valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any Loan Party under any Loan Document.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Indenture" shall mean that certain Indenture dated as of November 20, 2012 between Deutsche Bank National Trust Company, as trustee, and the Lead Borrower, as issuer, in respect of the Floating Rate Series A Secured Notes Due 2017.

"Information" has the meaning specified in Section 10.07.

"Initial Store Closing" means the closing of 70 Stores and the sale of Inventory and Equipment located at such Stores in accordance with the Initial Store Closing Agreement.

"Initial Store Closing Agreement" means that certain Consulting Agreement entered into by and between the Lead Borrower and Great American Group, LLC dated as of January 23, 2016, with respect to the Initial Store Closing as amended or modified with the prior written consent of the Agent.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service

marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights; unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; mask works; customer lists, license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercompany Royalty Accounts" shall mean, collectively, the following bank accounts maintained at Wells Fargo Bank: (a) the bank account of HF Resources, Inc. bearing account number ending in -3008 and (b) the bank account of HF Enterprises, Inc. bearing account number ending in -2999.

"Intercompany Subordination Agreement" shall mean the Intercompany Subordination Agreement executed by the Lead Borrower and each of its Subsidiaries from time to time and in form and substance reasonably satisfactory to the Agent.

"Interest Payment Date" means, (a) as to any LIBO Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided, however, that if any Interest Period for a LIBO Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan), the first day after the end of each month and the Maturity Date.

"Interest Period" means, as to each LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter, as selected by the Lead Borrower in its Committed Loan Notice; provided, that:

      (i)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

      (ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

      (iii)   no Interest Period shall extend beyond the Maturity Date; and

7143386v10

(iv)     notwithstanding the provisions of clause (iii), no Interest Period shall have a duration of less than one (1) month, and if any Interest Period applicable to a LIBO Borrowing would be for a shorter period, such Interest Period shall not be available hereunder.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, substantially in the form attached hereto as Exhibit J and/or otherwise in form and substance satisfactory to the Agent and the Term Agent in their discretion, together with all extension, modifications, and amendments thereto approved by the Agent and Term Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Interlender Provisions" means the interlender provisions set forth on Schedule 1.03 dated as of the date hereof among the Agent, the Term Agent and the Credit Parties, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

(a)     obsolescence;

(b)     seasonality;

(c)     shrink;

-30-

(d)     change in Inventory mix;

(e)     markdowns (both permanent and point of sale);

(f)     retail markons and markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(g)     out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person of or in another Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, net of any cash returns actually received by such Person on account of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the Issuing Bank and a Borrower (or any Subsidiary thereof) or in favor of the Issuing Bank and relating to any such Letter of Credit.

"Issuing Bank" means Wells Fargo in its capacity as issuer of Letters of Credit hereunder or any successor issuer of Letters of Credit hereunder (which successor may only be a Revolving Lender selected by the Lead Borrower and reasonably acceptable to the Agent in its discretion) and Wells Fargo with respect to the Rollover Letters of Credit.  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of the Issuing Bank and/or for such Affiliate or branch to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "Issuing Bank" shall include any such Affiliate or branch with respect to Letters of Credit issued by such Affiliate or branch.

"Joinder" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

7143386v10

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, federal, state, provincial, municipal and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"Lead Borrower" has the meaning assigned to such term in the preamble to this Agreement.

"Lease" means any agreement in respect of Real Estate, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Extension Order" has the meaning assigned to such term in Section 6.26(b).

"Leased Value" means, as of the date of determination, the fair market value of Eligible Real Estate as set forth in the most recent appraisal of Eligible Real Estate as determined from time to time by an independent professional appraiser engaged by the Agent in accordance with Section 6.10(d) based upon a leased value methodology which appraisal shall assume, among other things, a marketing period of no more than twelve (12) months (provided that the Leased Value of Eligible Real Estate shall in no event exceed the maximum amount of the Obligations at any time specified to be secured by a Mortgage, if any, thereon). As of the Closing Date, the Leased Value of the Baldwyn Real Estate is $19,500,000.

"Lender" means, individually, a Revolving Lender or a Term Lender (and, as the context requires, the Swing Line Lender), and, collectively, all such Persons.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder and each Rollover Letter of Credit.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Issuing Bank.

"Letter of Credit Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

-32-

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in <u>Section 2.03(i)</u>.

"Letter of Credit Indemnified Costs" has the meaning specified in <u>Section 2.03(f)</u>.

"Letter of Credit Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.06</u>. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Letter of Credit Related Person" has the meaning specified in <u>Section 2.03(f)</u>.

"Letter of Credit Sublimit" means an amount equal to $15,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments. A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; <u>provided</u>, <u>however</u>, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Revolving Commitments.

"LIBO Borrowing" means a Revolving Credit Borrowing or Term Borrowing comprised of LIBO Rate Loans.

"LIBO Rate" means the rate per annum rate as reported on Reuters Screen LIBOR01 Page (or any successor page) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with the Agreement (and, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero), which determination shall be made by Agent and shall be conclusive in the absence of manifest error. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Wells Fargo and with a term equivalent to such Interest Period would be offered to Wells Fargo by major banks in the London interbank Eurodollar market in which Wells Fargo participates at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period. With respect to all Term Loans, the LIBO Rate shall not be less than 1.70%.

"LIBO Rate Loan" means a Committed Revolving Loan or portion of the Term Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent regarding the Collateral, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Liquidation Stalking Horse Bid" means the bid submitted by Great American Group, LLC as set forth in the Agency Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Revolving Loan, a Swing Line Loan or a Term Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the GA Fee Letter, the Wells Fargo Fee Letter, the Post-Closing Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Interlender Provisions, the Intercompany Subordination Agreement, each Facility Guaranty, the Financing Orders and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any Cash Management Services and Bank Products provided by the Agent or any of its Affiliates or branches, each as amended and in effect from time to time.

"Loan Parties" means, collectively, each Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Loan Party or the Lead Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent, the Term Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual

7143386v10

event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court), (ii) events specifically described in the Declaration of Dennis Lyons in Support of Chapter 11 Petitions and First Day Motions, dated on or about the date hereof and (iii) the incurrence of any claim or liability that is Pre-Petition, unsecured and junior in priority to the Obligations (each of the foregoing clauses (i), (ii) and (iii), collectively, the "Events and Circumstances"), will each not be deemed to have a Material Adverse Effect.

"Material Contract" means, with respect to any Person, (a) each contract or other agreement (other than the Loan Documents), written or oral, to which such Person is a party involving aggregate consideration payable to or by such Person of $1,000,000 or more in any Fiscal Year and (b) any other contract or other agreement (other than the Loan Documents), whether written or oral, to which such Person is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $750,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the earliest of (a) six (6) months after the Petition Date, subject to extension by consent of Lead Borrower, each Lender, the Agent and the Term Agent, but in no event later than nine (9) months after the Petition Date, (b) thirty (30) calendar days after the Petition Date if the Final Financing Order is not entered, (c) the effective date of a Chapter 11 plan of reorganization, (d) the date of consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (e) the date of acceleration of the loans and the termination of the DIP Commitments upon the occurrence of an Event of Default, and (f) the filing of a motion by the Loan Parties seeking dismissal of the Chapter 11 cases, the dismissal of the Chapter 11 cases, the filing of a motion by the Loan Parties seeking to convert the Chapter 11 cases to a case under Chapter 7, the conversion of the Chapter 11 cases to Chapter 7, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 cases.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means each and every fee and leasehold mortgage or deed of trust, security agreement and assignment by and between the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Agent.

7143386v10

"Mortgage Policy" has the meaning specified in the definition of Real Estate Eligibility Requirements.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior or pari passu to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates) and (C) taxes paid in connection with such transaction; and

(b)    with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) (x) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith and (y) taxes paid in connection therewith.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Note" means (a) a Revolving Note, (b) a Term Note and (c) the Swing Line Note, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such

7143386v10

proceeding, and (b) any Other Liabilities; provided that the Obligations shall not include any Excluded Swap Obligations.

"Organization Documents" means, (a) with respect to any corporation, the certificate and/or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity; and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to any recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Liabilities" means any obligation on account of (a) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (b) any transaction with the Agent, any Lender or any of their respective Affiliates or branches that arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to any assignment.

"Outstanding Amount" means (i) with respect to Committed Revolving Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Revolving Loans and Swing Line Loans, as the case may be, occurring on such date; (ii) with respect to any Letter of Credit Obligations on any date, the amount of such Letter of Credit Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the Letter of Credit Obligations as of such date, and (iii) with respect to Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of Term Loans occurring on such date.

-37-

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in <u>Section 10.06(d)</u>.

"Participant Register" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable (from the perspective of a secured, asset-based revolving lender in the retail industry or a secured, asset-based term loan lender, as applicable) business judgment.

"Permitted Disposition" means any of the following:

    (a)    Dispositions of inventory in the ordinary course of business;

    (b)    reserved;

    (c)    reserved;

    (d)    licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business and existing as of the Closing Date;

    (e)    Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

    (f)    reserved;

    (g)    sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

    (h)    sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party;

    (i)    as long as no Default or Event of Default then exists or would arise therefrom, sales of Real Estate of any Loan Party (or sales of any Person or Persons created to hold such Real Estate or the Equity Interests in such Person or Persons), as long as, (i) the Borrowers shall provide the Agent and the Term Agent with at least ten

7143386v10

(10) days' prior written notice (or such shorter period as may be agreed upon in writing by the Agent and the Term Agent) of the closing date of the proposed sale, (ii) such sale is made for at least the fair market value of such Real Estate, (iii) the Borrowers shall have delivered to the Agent and the Term Agent no less than five days prior to the disposition of such Real Estate true and complete copies of the most current drafts of any documents, instruments or other similar agreements to be entered into or completed by the applicable Borrower(s) in connection with such disposition, such documentation to be in form and substance reasonably acceptable to the Agent and the Term Agent, (iv) with respect to any Eligible Real Estate, the Net Proceeds paid in cash are in an amount at least equal to the sum of the Real Estate Component and clause (B)(iii) of the Term Loan Borrowing Base, (v) the proceeds of such sale are utilized to repay the Obligations in accordance with Section 2.05(h), (vi) the Agent and the Term Agent shall have received from the Borrowers a revised Borrowing Base Certificate, determined as of last Business Day of the weekly or monthly period then most recently completed on a pro forma basis, as applicable pursuant to Section 6.02(c), eliminating therefrom the line items relating to the Real Estate Component and clause (B)(iii) of the Term Loan Borrowing Base and revising the amount of the then outstanding Loans to reflect the prepayment of the Loans with Net Proceeds of such sale-leaseback transaction in accordance with the terms hereof;

(j)      Permitted Sales;

(k)      the Initial Store Closing; and

(l)      subleases of Leases by any Loan Party in the ordinary course of business.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)      deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      reserved;

(f)      easements, servitudes, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any

monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by title commitments or current surveys that, in each case, do not materially interfere with the current use of the real property;

    (g)    Liens existing on the Closing Date and listed on Schedule 7.01;

    (h)    reserved;

    (i)    Liens in favor of the Agent on its own behalf or on behalf of the Lenders and other Credit Parties hereunder;

    (j)    Pre-Petition Liens;

    (k)    statutory Liens of landlords and lessors in respect of rent not in default;

    (l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

    (m)    Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

    (n)    reserved;

    (o)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

    (p)    Pre-Petition liens and adequate protection liens of the trustee for the holders of the Specified Subordinated Indebtedness securing the Specified Subordinated Indebtedness, provided that such liens are junior in rank to the security interests and liens of the Agent and are subject to the Subordination Provisions set forth in Article XI of the Indenture or substantially identical Subordination Provisions;

    (q)    zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower, Guarantor or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property which may be subject thereto;

(r)      liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrowers in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements (as in effect on the date hereof) to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks; and

(s)      adequate protection liens granted under the Financing Orders; and

(t)      Liens in favor of the agent under an agency agreement in connection with a Permitted Sale under clause (ii) of the definition thereof (i) solely with respect to the merchandise and proceeds thereof subject to such Permitted Sale; (ii) which Lien arises solely after payment of the "initial guaranty amount" and the posting of any letter of credit as and when required under such agency agreement; and (iii) which Lien is on terms acceptable to the Agent and Term Agent in their Permitted Discretion.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists at the time of, or would arise from, the incurrence thereof:

(a)      Indebtedness outstanding on the Closing Date and listed on <u>Schedule 7.03</u>;

(b)      Indebtedness of any Loan Party to any other Loan Party; <u>provided</u>, that (i) such Indebtedness shall be subject to, and subordinate in right of payment to, the right of the Credit Parties to receive the prior final payment and satisfaction in full of all of the Obligations pursuant to the Intercompany Subordination Agreement or otherwise on terms and conditions acceptable to Agent, (ii) such Loan Parties shall join the Intercompany Subordination Agreement pursuant to a joinder agreement in form and substance reasonably satisfactory to the Agent, and (iii) such Indebtedness shall not be evidenced by a promissory note or other instrument unless the single original of such note or other instrument is promptly delivered to the Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as the Agent may reasonably require;

(c)      reserved;

(d)      reserved;

(e)      Pre-Petition contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business;

(f)      reserved;

(g)      reserved;

(h)      reserved;

(i)      the Obligations;

7143386v10

(j)     unsecured Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $100,000 at any time outstanding and in each case on terms reasonably acceptable to the Agent;

(k)     Guarantees (other than Liens) of any Indebtedness of any Loan Party that constitutes Permitted Indebtedness;

(l)     Subordinated Indebtedness; and

(m)     the Pre-Petition Obligations.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists at the time of, or would arise from, the making of such Investment:

(a)     reserved;

(b)     reserved;

(c)     reserved;

(d)     reserved;

(e)     reserved;

(f)     Investments existing on the Closing Date and set forth on Schedule 7.02, but not any consensual increase in the amount thereof or any other consensual modification of the terms thereof;

(g)     (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments (x) by any Loan Party and its Subsidiaries in Loan Parties (other than the Lead Borrower) (provided that, in each case, any such Investments comprised of loans or advances shall be subject to the Intercompany Subordination Agreement) and (y) by any Subsidiaries that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(h)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)     Guarantees constituting Permitted Indebtedness;

(j)     reserved;

(k)     advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business for travel, entertainment, relocation and

-42-

analogous ordinary business purposes in an aggregate amount not to exceed $250,000 at any time outstanding; and

(l)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)     the Agent determines to be reasonably necessary or desirable directly or indirectly (i) to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents, including to preserve the Loan Parties' business assets and infrastructure (such as payment of insurance premiums, taxes, necessary supplies, rent and payroll) or which is otherwise for the benefit of the Credit Parties; (ii) to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; (iii) in connection with a Liquidation or the exercise of any rights and remedies, (iv) to fund an orderly liquidation or wind-down of the Loan Parties' assets or business or fund amounts set forth in the Approved Budget (subject to the Permitted Variance), or (v) to pay any other amount chargeable to any Loan Party hereunder; and

(b)     except as set forth in the Interlender Provisions, together with all other Permitted Overadvances then outstanding, shall not (i) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days unless the Required Revolving Lenders otherwise agree, or (ii) exceed at any time five percent (5%) of the Adjusted Revolving Borrowing Base;

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations with respect to Letters of Credit or Section 2.04 regarding the Revolving Lenders' obligations with respect to Swing Line Loans, or (ii) result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; and provided, further, that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"Permitted Prior Liens" means, collectively, Liens permitted by the Pre-Petition Credit Agreement (to the extent any such permitted Liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the obligations under the Pre-Petition Credit Agreement as of the Petition Date) other than, for the avoidance of doubt, Liens securing the Specified Subordinated Indebtedness.

"Permitted Sales" means (i) the sale of all or substantially all of the Loan Parties' business assets (other than those subject to the Initial Store Closing) as a going concern as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code; provided that any going concern sale shall either (x) be for cash consideration to be paid at the

-43-

closing of such sale in an amount in excess of all outstanding Obligations and all Pre-Petition Obligations and shall not be subject to any financing contingencies, or (y) be consented to in writing by the Agent and the Term Agent, or (ii) a transaction or transactions combining the sale of all or substantially all of the Loan Parties' Equipment and Inventory and the permanent closing of all or a portion of the Loan Parties' Stores and the sale of all Collateral located therein through the retention by the Loan Parties of one or more Approved Liquidators, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, which transaction shall be (x) upon terms and conditions of the Agency Agreement, or an overbid received at the auction conducted in accordance with the Bidding Procedures Order, which overbid is substantially on the same terms as the Agency Agreement other than the increased purchase price (y) in the form of an "equity bid" including a payment at closing in an amount in excess of all outstanding Obligations and all Pre-Petition Obligations or (z) consented to in writing by the Agent and the Term Agent. In the case of clauses (i) and (ii) above, all of the proceeds thereof (in an amount up to the outstanding balance of the Pre-Petition Obligations and the Obligations) shall be paid to the Agent for application in accordance with terms and conditions of this Agreement and the Financing Orders.

"Permitted Variance" has the meaning provided in Section 6.23.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Lead Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning specified in Section 6.02.

"Post-Closing Letter" means that certain side letter dated as of the Closing Date among the Loan Parties and the Agent.

"Post-Petition" means the period following the commencement of the Chapter 11 Case.

"Post-Petition Obligations" means Indebtedness of any Loan Party that was incurred or accrued after the commencement of the Chapter 11 Case.

"Pre-Petition" means the period prior to the commencement of the Chapter 11 Case.

"Pre-Petition Agent" means the "Agent" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of April 22, 2015, among the Borrowers, the Guarantors, Wells Fargo Bank, National Association, as administrative agent, collateral agent and swing line lender, GACP Finance Co., LLC, as term

agent, and the lenders from time to time party thereto, as amended prior to and in effect on the Petition Date.

"Pre-Petition Indebtedness" means Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Pre-Petition Liens" means Liens in favor of the Wells Fargo as collateral agent for its benefit and the benefit of the lenders) and other credit parties under the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means all "Obligations" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Reserve" and "Pre-Petition Revolving Loan Balance" each mean, at any date of determination, an amount equal to the outstanding aggregate amount of the "Total Revolver Outstandings", as such term is defined in the Pre-Petition Credit Agreement, plus all interest on and fees related thereto.

"Pre-Petition Term Lender" means the "Term Lender" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Term Loan" means the "Term Loan", as such term is defined in the Pre-Petition Credit Agreement, plus all interest on and fees related thereto.

"Prepayment Event" means:

(a)    any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party other than to another Loan Party (other than Dispositions of the type described in clauses (a), (g) and (h) of the definition of "Permitted Disposition"), including pursuant to a Permitted Sale or Initial Store Closing;

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)    the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan) in the ordinary course of business;

(d)    the incurrence by a Loan Party of any Indebtedness for borrowed money; or

(e)    the receipt by any Loan Party of any Extraordinary Receipts.

-45-

"Professional Fee Escrow Account" means an escrow account established and maintained by the Borrowers solely for the purpose of collecting and paying the Carve-Out as provided in this Agreement, the Financing Orders and orders regarding the payment of fees and expenses of Case Professionals issued by the Bankruptcy Court.

"pro forma" means a pro forma basis in accordance with GAAP and Regulation S-X under the Securities Act of 1933, as amended.

"Public Lender" has the meaning specified in Section 6.02.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Real Estate Advance Rate" means, as of any date of determination:

| Date of Determination | Rate |
|---|---|
| On or before April 21, 2016 | 60% |
| On or after April 22, 2016 and before the Maturity Date | 50% |

"Real Estate Component" means the lesser of (a) the lesser of (i) the Real Estate Advance Rate multiplied by the Fee Simple Value of Eligible Real Estate and (ii) thirty-five percent (35%) multiplied by the Leased Value of Eligible Real Estate, and (b) $7,500,000.

"Real Estate Consultant" means an independent third party real estate advisor reasonably acceptable to the Agent and the Term Agent.

"Real Estate Eligibility Requirements" means, collectively, each of the following:

(a)    (i) the Agent's Lien thereon has been perfected pursuant to the Interim Financing Order or the Final Financing Order, as applicable, and (ii) if required by the Agent the applicable Loan Party has executed and delivered to the Agent a Mortgage reasonably acceptable to the Agent and the Term Agent with respect to any Real Estate intended, by such Loan Party, to be included in Eligible Real Estate;

7143386v10

(b)     such Real Estate is used by a Loan Party for offices or as a distribution center;

(c)     as to any particular property, (i) the Loan Party is in compliance in all material respects with the covenants of such Loan Party set forth in any Mortgage relating to such Real Estate requested by the Agent, and (ii) the Loan Party's representations and warranties set forth in any Mortgage relating to such Real Estate requested by the Agent are true and correct in all material respects, in each case subject to applicable notice and cure periods;

(d)     with respect to any Real Estate owned by a Borrower or any other Loan Party (excluding interests as lessee under a Lease) which is intended by such Borrower or such other Loan Party to be included in Eligible Real Estate, (i) the Agent shall have received fully paid American Land Title Association Lender's Extended Coverage title insurance policies (or marked-up title insurance commitments having the effect of a policy of title insurance) (the "Mortgage Policies") in form and substance, with the endorsements reasonably required by the Agent and the Term Agent (to the extent available at commercially reasonable rates) and in amounts reasonably acceptable to the Agent and the Term Agent, issued, coinsured and reinsured (to the extent reasonably required by the Agent and the Term Agent) by title insurers reasonably acceptable to the Agent and the Term Agent, insuring the Mortgages to be valid first and subsisting Liens on the property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Permitted Encumbrances having priority over the Lien of the Agent under applicable Law or Liens otherwise reasonably acceptable to the Agent and the Term Agent or (ii) the Agent, in its Permitted Discretion, shall be satisfied that substantially equivalent protections have been granted pursuant to the Interim Financing Order or the Final Financing Order, as applicable;

(e)     with respect to any Real Estate owned by a Borrower or any other Loan Party (excluding interests as lessee under a Lease) which is intended by such Borrower or such other Loan Party to be included in Eligible Real Estate and as to which Agent has requested a Mortgage, the Agent and the Term Agent shall have received American Land Title Association/American Congress on Surveying and Mapping form surveys (or such other form of survey as is customarily delivered to secured lenders in the jurisdiction in which such Real Estate is located), for which all necessary fees (where applicable) have been paid, certified to the Agent and the Term Agent and the issuer of the Mortgage Policies in a manner reasonably satisfactory to the Agent and the Term Agent by a land surveyor duly registered and licensed in the states in which the property described in such surveys is located and reasonably acceptable to the Agent and the Term Agent, showing all buildings and other improvements, the location of any easements, parking spaces, rights of way, building set-back lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects reasonably acceptable to the Agent and the Term Agent; provided, however, such requirement shall be met should the applicable Borrower provide a survey and any other such requirements to the title insurer such that

-47-

the Mortgage Policy includes endorsements or such other coverage acceptable to Agent insuring over all general survey exceptions;

(f)     with respect to any Real Estate intended by any Borrower or other Loan Party to be included in Eligible Real Estate as to which the Agent has requested a Mortgage, the Agent and the Term Agent shall have received a Phase I Environmental Site Assessment in accordance with ASTM Standard E1527-05, in form and substance reasonably satisfactory to the Agent and the Term Agent, from an environmental consulting firm reasonably acceptable to the Agent and the Term Agent, which report shall identify recognized environmental conditions and shall to the extent possible quantify any related costs and liabilities associated with such conditions and the Agent and the Term Agent shall be satisfied with the nature and amount of any such matters. The Agent and the Term Agent may, upon the receipt of a Phase I Environmental Site Assessment require the delivery of further environmental assessments or reports to the extent such further assessments or reports are recommended in the Phase I Environmental Site Assessment;

(g)     upon request therefor, the applicable Loan Party shall have delivered to the Agent and the Term Agent either (i) flood certificates certifying that such Real Estate is not in a flood zone or (ii) evidence of flood insurance naming the Agent as mortgagee as required by the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended and in effect, which shall be reasonably satisfactory in form and substance to the Agent and the Term Agent; and

(h)     the applicable Loan Party shall have delivered such other information and documents as may be reasonably requested by the Agent and the Term Agent, including, without limitation, such as may be necessary to comply with FIRREA.

"Realty Reserves" means such reserves as to the Revolving Borrowing Base as the Agent from time to time determines in the Agent's Permitted Discretion as being appropriate to reflect the impediments to the Agent's ability to realize upon any Eligible Real Estate or to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon any Eligible Real Estate.  Without limiting the generality of the foregoing, Realty Reserves may include (but are not limited to) (i) Environmental Compliance Reserves, (ii) reserves for (A) municipal taxes and assessments, (B) insurance premiums, (C) utilities, (D) repairs and maintenance and (E) remediation of title defects, and (iii) reserves for Indebtedness secured by Liens on such Real Estate having priority over the Lien of the Agent.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" means Burr Pilger Mayer, Inc. or such other firm reasonably acceptable to Agent, in each case as specified by the Securities Laws and independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Released Parties" has the meaning provided in Section 2.15.

"Releasing Parties" has the meaning provided in Section 2.15.

"Remedies Notice Period" has the meaning provided in the Interim Financing Order or the Final Financing Order, as applicable.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Committed Revolving Loans or the Term Loan (or a portion thereof), a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the Issuing Bank, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the sum of the Aggregate Revolving Commitments and the then aggregate outstanding principal balance of the Term Loans or, if the Aggregate Revolving Commitments and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than 50% of the sum of the Total Outstandings (with the aggregate amount of each Revolving Lender's risk participation and funded participation in Letter of Credit Obligations being deemed "held" by such Revolving Lender for purposes of this definition); provided that the Revolving Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Revolving Lenders" means, as of any date of determination, at least two Lenders holding more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the commitment of each Revolving Lender to make Committed Revolving Loans and the obligation of the Issuing Bank to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolving Outstandings (with the aggregate amount of each Revolving Lender's risk participation and funded participation in Letter of Credit Obligations and Swing Line Loans being deemed "held" by such Revolving Lender for purposes of this definition); provided, that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders.

"Required Term Lenders" means, as of any date of determination, a Lender or Lenders holding more than fifty percent (50%) of the then outstanding principal balance of the Term Loan.

"Reserves" means all Inventory Reserves, Availability Reserves and Sale-Leaseback Reserves.

-49-

7143386v10

"Responsible Officer" means the chief executive officer, president, chief financial officer, vice president of finance or treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of equity capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments in respect of any capital stock or other Equity Interest made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Reuters Screen LIBOR01 Page" means the display page LIBOR01 on the Reuters service or any successor display page, other published source, information vendor or provider that has been designated by the sponsor of Reuters Screen LIBOR01 page.

"Revolving Borrowing Base" means, at any time of calculation, an amount equal to:

      (a)     the face amount of Eligible Credit Card Receivables <u>multiplied by</u> the Credit Card Advance Rate;

     <u>plus</u>

      (b)     the Cost of Eligible Inventory, other than Eligible Domestic In-Transit Inventory and Eligible Store Closing Inventory, net of Inventory Reserves, <u>multiplied by</u> the Appraisal Percentage, <u>multiplied by</u> the Appraised Value of such Eligible Inventory <u>provided</u>, that in no event shall Eligible Foreign In-Transit Inventory included in Eligible Inventory exceed $7,500,000);

     <u>plus</u>

      (c)     the Real Estate Component;

     <u>plus</u>

      (d)     the Cost of Eligible Domestic In-Transit Inventory net of Inventory Reserves, <u>multiplied by</u> the Appraisal Percentage, <u>multiplied by</u> the Appraised Value of such Eligible Inventory; provided, that in no event shall Eligible Domestic In-Transit Inventory included in this clause (d) exceed the then applicable Block Relief Amount;

<u>plus</u>

(e) the Cost of Eligible Store Closing Inventory, net of Inventory Reserves, <u>multiplied by</u>, the Store Closing Revolving Advance Rate <u>multiplied by</u> the Appraised Value of such Eligible Store Closing Inventory;

<u>minus</u>

(f)    the Term Loan Push Down Reserve;

<u>minus</u>

(g)    the then amount of all other Availability Reserves;

<u>minus</u>

(h)    the Availability Block <u>minus</u> the amount (if such amount is a positive number) equal to (x) Block Relief Amount for the applicable week <u>minus</u> (y) availability created under clause (d) above at such time of calculation.

"Revolving Commitment" means, as to each Revolving Lender, its obligation to (a) make Committed Revolving Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in Letter of Credit Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Committed Revolving Loans of the same Type and, in the case of LIBO Rate Loans which are Committed Revolving Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to <u>Section 2.01</u>.

"Revolving Lender" means each Lender having a Revolving Commitment as set forth on <u>Schedule 2.01</u> hereto or in the Assignment and Acceptance by which such Person becomes a Revolving Lender.

"Revolving Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Revolving Borrowing Base, in each case minus the Pre-Petition Reserve, other than on account of any amounts pursuant to the Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter).

"Revolving Note" means a promissory note made by the Borrowers in favor of a Revolving Lender evidencing the Committed Revolving Loan made by such Revolving Lender, substantially in the form of Exhibit C-1.

"Rollover Letters of Credit" means the Letters of Credit issued and outstanding under the Pre-Petition Credit Agreement including those set forth on Exhibit 1.04.

-51-

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Consultant" means Lincoln International or another party reasonably acceptable to the Agent, the Term Agent and the Lead Borrower.

"Sale Consultant Agreement" means the Sale Consultant's engagement letter dated as of December 30, 2015 as in effect on the Closing Date with the Lead Borrower, in the form delivered to the Agent on or before the Petition Date.

"Sale-Leaseback Reserve" means a reserve in the amount equal to $2,500,000, which the Term Agent, in its discretion, shall have the right to direct the Agent to implement and maintain against the Term Loan Borrowing Base.

"Sale Order" has the meaning set forth in Section 6.24.

"Sale Order Motion" has the meaning set forth in Section 6.24.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002, as amended.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means, collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Mortgages, the DDA Notifications, the Credit Card Notifications, the Financing Orders and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Senior Agency Agreement Liens" means Liens permitted under clause (t) of the definition of Permitted Encumbrances entitled to priority over the Liens granted to the Agent under the Security Documents solely with respect to the merchandise and proceeds thereof subject to the applicable Permitted Sale, securing amounts and on terms acceptable to the Agent and Term Agent each in their discretion.

"Senior Agency Agreement Claims" means superpriority administrative expense claims in favor of the agent under an agency agreement in connection with a Permitted Sale under clause (ii) of the definition thereof which claim arises solely after payment of the "initial guaranty amount" and the posting of any letter of credit as and when required under such agency

agreement; and (ii) which claim is on terms acceptable to the Agent and Term Agent in their Permitted Discretion.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Specified Subordinated Indebtedness" shall mean the Indebtedness incurred in connection with the Floating Rate Series A Secured Notes Due 2017 issued by the Lead Borrower on November 20, 2012, which as of the Closing Date was in the aggregate principal amount of $8,204,000.

"Specified Subordinated Indebtedness Documents" shall mean, collectively, (a) the Indenture, (b) each of the "Notes" issued pursuant to and as defined under the Indenture, (c) each of the "Collateral Documents" entered into pursuant to and under the Indenture, and (d) each of the Indenture Documents as defined in the Indenture as in effect on the date hereof.

"Spot Rate" has the meaning given to such term in Section 1.07 hereof.

"Standard Letter of Credit Practice" means, for the Issuing Bank, any domestic or foreign Law or letter of credit practices applicable in the city in which the Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such Laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the Issuing Bank.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

7143386v10

"Statutory Committee" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing Motion" has the meaning specified in <u>Section 6.24(a)(iii)</u>.

"Store Closing Revolving Advance Rate" means the Appraisal Percentage multiplied the inverse of the projected prevailing discount for the following week applied to such Eligible Inventory, as determined by the Agent in its Permitted Discretion.

"Store Closing Term Advance Rate" means the Term Inventory Advance Rate multiplied the inverse of the projected prevailing discount for the following week applied to such Eligible Inventory, as determined by the Agent in its Permitted Discretion.

"Subordinated Debt Documents" shall mean, collectively, any and all agreements, documents and instruments evidencing or otherwise related to Subordinated Indebtedness permitted under this Agreement, including, without limitation the Specified Subordinated Indebtedness Documents.

"Subordinated Indebtedness" means (a) the Specified Subordinated Indebtedness and (b) all other Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent and the Term Agent.

"Subordination Provisions" means the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, including Article XI of the Indenture.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

-54-

"Success Fee" means the "Sale Success Fee" or "Liquidation Fee" as defined in the Sale Consultant Agreement.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate or branch of a Lender).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Lender" means Wells Fargo, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in Section 2.04(a).

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"Swing Line Note" means the promissory note of the Borrowers substantially in the form of Exhibit C-2, payable to the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $10,000,000 and (b) the Aggregate Revolving Commitments. The Swing Line Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Agent" means GACP Finance Co., LLC, in such capacity, or any successor thereto in such capacity.

"Term Borrowing" means the borrowing of the Term Loan made by each of the Term Lenders on the Term Loan Funding Date pursuant to Section 2.01(a).

"Term Commitment" means, as to each Term Lender, its obligation to make a portion of the Term Loan available to the Borrowers on the Closing Date pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable. As of the Closing Date, the aggregate amount of Term Commitments shall be the lesser of (x) $18,290,416.47, or (y) the outstanding amount of the Pre-Petition Term Loan as of the Term Loan Funding Date.

"Term Inventory Advance Rate" means fifteen percent (15%).

"Term Lender" means each Lender having a Term Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which such Person becomes a Term Lender, or after the making of the Term Loan, each Lender holding any portion of the Term Loan.

"Term Loan" means the term loan made by the Term Lenders to the Borrowers on the Term Loan Funding Date pursuant to Section 2.01(a).

"Term Loan Applicable Margin" means twelve percent (12.00%).

"Term Loan Borrowing Base" means, at any time of calculation, an amount equal to the lesser of:

(A) $18,290,416.67 minus the then amount of the Sale-Leaseback Reserve, if any; or

(B) the sum of:

7143386v10

(i)     the face amount of Eligible Credit Card Receivables multiplied by five percent (5%);

plus

(ii)     the Cost of Eligible Inventory, other than Eligible Domestic In-Transit Inventory and Eligible Store Closing Inventory, net of Inventory Reserves, multiplied by the Term Inventory Advance Rate, multiplied by the Appraised Value of such Eligible Inventory (provided, that in no event shall Eligible Foreign In-Transit Inventory included in Eligible Foreign Inventory exceed $7,500,000);

plus

(iii) the Cost of Eligible Store Closing Inventory, net of Inventory Reserves, multiplied by, the Store Closing Term Advance Rate multiplied by the Appraised Value of such Eligible Store Closing Inventory;

plus

(iv)     the lesser of (a) the lesser of (i) twenty-five point sixty-four percent (25.64%) multiplied by the Leased Value of Eligible Real Estate and (ii) $5,000,000 and (b) $11,600,000 minus the Real Estate Component, provided that at no time shall the sum of the advance rates for the Leased Value of Eligible Real Estate for the Revolving Borrowing Base and the Term Loan Borrowing Base exceed fifty-nine and one-half percent (59.5%);

minus

(v)     the then amount of the Sale-Leaseback Reserve, if any.

"Term Loan Funding Date" means the date, on or no later than one Business Day after the Final Order Entry Date, that the Term Loan is funded pursuant to Section 2.01(a).

"Term Loan Push Down Reserve" means the amount, if any, by which (i) on or before the Term Loan Funding Date, the aggregate outstanding principal balance of the Pre-Petition Term Loan exceeds the Term Loan Borrowing Base, or (ii) on any date after the Term Loan Funding Date, the aggregate outstanding balance of the Term Loan exceeds the Term Loan Borrowing Base as calculated by the Agent based upon the most recent Borrowing Base Certificate delivered to the Agent by the Borrowers.

"Term Note" means a promissory note made by the Borrowers in favor of a Term Lender evidencing the Term Loan made by such Term Lender, substantially in the form of Exhibit C-3.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Revolving Commitments in accordance with the provisions of Section 2.06(a) or (e) hereof.

7143386v10

"Total Outstandings" means the aggregate outstanding principal balance of the Term Loan plus the Total Revolving Outstandings.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Committed Revolving Loans, all Swing Line Loans and all Letter of Credit Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Transaction Fees" means the "Transaction Fees" as defined in the Sale Consultant Agreement.

"Type" means, with respect to a Committed Revolving Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided, further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued).

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, increase in Reserves or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes and directs the Loan Parties to pay certain Pre-Petition wages, benefits and other amounts owing to employees.

"Wells Fargo" means Wells Fargo Bank, National Association and its successors.

"Wells Fargo Fee Letter" means the letter agreement, dated as of the Closing Date, among the Borrowers and the Agent.

**1.02    Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, refinanced, replaced or otherwise modified (subject to any restrictions on such amendments, supplements, refinancings, replacements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in

cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts), providing Cash Collateralization or other collateral as may be requested by the Agent) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, (ii) any Obligations relating to Bank Products (other than Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or Cash Collateralized or otherwise collateralized as may be requested by the Agent, and (iii) any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable provider of such Swap Contracts to remain outstanding without being required to be repaid.

**1.03   Accounting Terms**.

(a)   <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)   <u>Changes in GAAP</u>. If at any time any change in GAAP would affect the computation of any financial requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Term Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent, the Term Agent, and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such requirement made before and after giving effect to such change in GAAP.

**1.04   Reserved**.

**1.05   Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06   Letter of Credit Amounts**. Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**1.07   Currency Equivalents Generally**. Any amount specified in this Agreement (other than in <u>Article II</u>, <u>Article IX</u> and <u>Article X</u>) or any of the other Loan Documents to be in

Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this <u>Section 1.07</u>, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; provided that the Agent may obtain such Spot Rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01    Loans; Reserves**.

(a)      Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make a loan to the Borrowers on the Term Loan Funding Date in a principal amount not to exceed the Term Commitment of such Term Lender. Amounts repaid in respect of the Term Loans may not be reborrowed, and upon each Term Lender's making of such Term Loans, the Term Commitment of such Term Lender shall be terminated. The proceeds of the Term Loan shall be used to refinance and pay off in full the Pre-Petition Term Loan. For the avoidance of doubt, the making of Term Loans and pay off in full the Pre-Petition Term Loan shall be a cash less roll.

(b)      Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Committed Revolving Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Revolving Lender's Applicable Percentage of the Revolving Borrowing Base; subject in each case to the following limitations:

(i)      after giving effect to any Revolving Credit Borrowing, the Total Revolving Outstandings shall not exceed the Revolving Loan Cap,

(ii)      after giving effect to any Revolving Credit Borrowing, the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed the lesser of (x) such Lender's Revolving Commitment and (y) such Lender's Applicable Percentage of the Revolving Borrowing Base, and

(iii)      The Outstanding Amount of all Letter of Credit Obligations shall not at any time exceed the Letter of Credit Sublimit.

7143386v10

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this <u>Section 2.01</u>, prepay under <u>Section 2.05</u>, and reborrow Committed Revolving Loans under this <u>Section 2.01</u>.

(c)     The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to <u>Section 4.01(c)</u> hereof.

(d)     Subject to the Interlender Provisions and <u>Section 10.01</u> hereof, the Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves; <u>provided</u> that the Agent shall be obligated to implement and maintain at all times (i) the Term Loan Push Down Reserve and (ii) the Sale-Leaseback Reserve.

**2.02    Borrowings, Conversions and Continuations of Loans.**

(a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, all Loans shall be Base Rate Loans and the Borrowers shall not have any option to borrow or convert to LIBO Rate Loans.

(b)     Each Revolving Credit Borrowing, each conversion of Committed Revolving Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon the Lead Borrower's irrevocable notice to the Agent, which may be given by telephone. Each such notice must be received by the Agent not later than 1:00 p.m. (i) two (2) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBO Rate Loans or of any conversion of LIBO Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Lead Borrower pursuant to this <u>Section 2.02(b)</u> must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Each Borrowing of, conversion to (in the case of Committed Revolving Loans only) or continuation of LIBO Rate Loans shall be (x) with respect to any Committed Revolving Loan, in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof and (y) with respect to any portion of the Term Loan, in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Lead Borrower is requesting a Revolving Credit Borrowing, a conversion of Committed Revolving Loans from one Type to the other, or a continuation of LIBO Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Committed Revolving Loans to be borrowed, or the principal amount of Committed Revolving Loans to be converted or the principal amount of Committed Revolving Loans or the Term Loan (or portion thereof) to be continued, (iv) the Type of Committed Revolving Loans to be borrowed or to which existing Committed Revolving Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Lead Borrower fails to specify a Type of Committed Revolving Loan in a Committed Loan Notice or if the Lead Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Committed Revolving Loans shall be made as, or converted to,

-62-

Base Rate Loans and the applicable portions of the Term Loan shall be continued as a LIBO Rate Loan with and Interest Period of one (1) month.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.  If the Lead Borrower requests a Borrowing of, conversion to, or continuation of LIBO Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.  Notwithstanding anything to the contrary herein, a Swing Line Loan may not be converted to a LIBO Rate Loan.

(c)     Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans or the Term Loan (or portion thereof), and if no timely notice of a conversion or continuation is provided by the Lead Borrower, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans (in the case of Committed Revolving Loans) or continuation as LIBO Rate Loans with an Interest Period of one (1) month (in the case of a portion of the Term Loan) described in Section 2.02(b).  In the case of a Committed Revolving Borrowing, each Lender shall make the amount of its Committed Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent either by (i) crediting the account of the Lead Borrower on the books of Wells Fargo with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(d)     The Agent, without the request of the Lead Borrower, may advance as a Revolving Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby.  The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.05(d).  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(e)     Each Borrowing of Committed Revolving Loans (other than Swing Line Loans and Extended Loans) shall be made by the Revolving Lenders pro rata in accordance with their respective Applicable Percentage.  The failure of any Revolving Lender to make any Loan shall neither relieve any other Lender of its obligation to fund its Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(f)     Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan.  During the existence of a Default or an Event of Default, no Committed Revolving Loans may be requested

-63-

as, converted to or continued as LIBO Rate Loans without the Consent of the Required Revolving Lenders.

(g)     The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(h)     After giving effect to all Revolving Credit Borrowings, all conversions of Committed Revolving Loans from one Type to the other, and all continuations of Committed Revolving Loans or portions of the Term Loan as the same Type, there shall not be more than five (5) Interest Periods in effect with respect to LIBO Rate Loans.

(i)     The Agent, the Revolving Lenders, the Swing Line Lender and the Issuing Bank shall have no obligation to make any Revolving Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the Issuing Bank and the Borrowers and each Lender and Issuing Bank shall be bound thereby. Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Revolving Loan which is a Base Rate Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(d). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Revolving Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.04 regarding the Revolving Lenders' obligations to purchase participations with respect to Swing Line Loans. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

(a)     Subject to the terms and conditions of this Agreement, upon the request of the Lead Borrower made in accordance herewith, and prior to the Maturity Date, the Issuing Bank agrees to issue a requested Letter of Credit for the account of the Loan Parties. By submitting a request to the Issuing Bank for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that the Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing pursuant to a Letter of Credit Application by a Responsible Officer and delivered to the Issuing Bank and the Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the Issuing Bank not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and the Issuing Bank may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment, renewal, or extension. Each such request shall be

7143386v10

in form and substance reasonably satisfactory to the Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Agent or the Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the Issuing Bank generally requests for Letters of Credit in similar circumstances. The Agent's records of the content of any such request will be conclusive.

(b)     The Issuing Bank shall have no obligation to issue a Letter of Credit if, after giving effect to the requested issuance, (i) the Total Revolving Outstandings would exceed Revolving Loan Cap, (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Revolving Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans would exceed such Lender's Revolving Commitment, or (iii) the Outstanding Amount of the Letter of Credit Obligations would exceed the Letter of Credit Sublimit;

(c)     In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to Section 9.16(b), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers cash collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with Section 9.16(b). Additionally, the Issuing Bank shall have no obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any Law applicable to the Issuing Bank or any request or directive (whether or not having the force of Law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit or request that the Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally, or (C) if the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Agent may agree) or all the Lenders have approved such expiry date.

(d)     Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify the Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank issued any Letter of Credit; provided that (i) until the Agent advises any such Issuing Bank that the provisions of Section 4.02 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as

7143386v10

shall be agreed by the Agent and such Issuing Bank, such Issuing Bank shall be required to so notify the Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Agent and such Issuing Bank may agree. Each Letter of Credit shall be in form and substance reasonably acceptable to the Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars; provided that if the Issuing Bank, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate. If the Issuing Bank makes a payment under a Letter of Credit, the Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Committed Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 4.02 hereof) and, initially, shall bear interest at the rate then applicable to Committed Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Committed Revolving Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the Issuing Bank shall be automatically converted into an obligation to pay the resulting Committed Revolving Loan. Promptly following receipt by the Agent of any payment from the Borrowers pursuant to this paragraph, the Agent shall distribute such payment to the Issuing Bank or, to the extent that the Lenders have made payments pursuant to Section 2.03(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear. The Borrowers and the Loan Parties hereby acknowledge and agree that all Rollover Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Rollover Letters of Credit were issued by the Issuing Bank at the request of the Borrowers on the Closing Date.

(e)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.03(d), each Revolving Lender agrees to fund its Applicable Percentage of any Committed Revolving Loan deemed made pursuant to Section 2.03(d) on the same terms and conditions as if the Borrowers had requested the amount thereof as a Committed Revolving Loan and the Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Revolving Lenders. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of the Issuing Bank or the Revolving Lenders, the Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by the Issuing Bank, in an amount equal to its Applicable Percentage of such Letter of Credit, and each such Lender agrees to pay to the Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of any Letter of Credit Disbursement made by the Issuing Bank under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each Letter of Credit Disbursement made by the Issuing Bank and not reimbursed by Borrowers on the date due as provided in Section 2.03(d), or of any reimbursement payment that is required to be refunded (or that the Agent or the Issuing Bank elects, based upon the advice of counsel, to refund) to the Borrowers for any reason. Each Revolving Lender acknowledges and agrees that its obligation

-66-

to deliver to the Agent, for the account of the Issuing Bank, an amount equal to its respective Applicable Percentage of each Letter of Credit Disbursement pursuant to this Section 2.03(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of a Default or Event of Default or the failure to satisfy any condition set forth in Section 4.02 hereof.  If any such Lender fails to make available to the Agent the amount of such Lender's Applicable Percentage of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Agent (for the account of the Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

        (f)      Each Borrower agrees to indemnify, defend and hold harmless each Credit Party (including the Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by Law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by Section 3.01) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

        (i)      any Letter of Credit or any pre-advice of its issuance;

        (ii)      any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

        (iii)      any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

        (iv)      any independent undertakings issued by the beneficiary of any Letter of Credit;

        (v)      any unauthorized instruction or request made to the Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

        (vi)      an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

        (vii)      any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

7143386v10

(viii)    the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)    the Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. The Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.03(f). If and to the extent that the obligations of the Borrowers under this Section 2.03(f) are unenforceable for any reason, the Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable Law. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)    The liability of the Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that are caused directly by the Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. The Issuing Bank shall be deemed to have acted with due diligence and reasonable care if the Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. The Borrowers' aggregate remedies against the Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrowers to the Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.03(d), plus interest at the rate then applicable to Base Rate Loans hereunder. The Borrowers shall take action to avoid and mitigate the amount of any damages claimed against the Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by the Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the Issuing Bank to effect a cure.

7143386v10

(h)     The Borrowers shall be responsible for preparing or approving the final text of the Letter of Credit as issued by the Issuing Bank, irrespective of any assistance the Issuing Bank may provide such as drafting or recommending text or by the Issuing Bank's use or refusal to use text submitted by the Borrowers. The Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, the Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want such Letter of Credit to be renewed, the Borrowers will so notify the Agent and the Issuing Bank at least 15 calendar days before the Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)     The Borrowers' reimbursement and payment obligations under this Section 2.03 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)     any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)     payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)     the Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)     the Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)     the existence of any claim, set-off, defense or other right that any Loan Party or any of their Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, the Issuing Bank or any other Person;

(vi)     any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.03(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the Issuing Bank, the beneficiary or any other Person; or

(vii)     the fact that any Default or Event of Default shall have occurred and be continuing;

-69-

7143386v10

provided, however, that subject to <u>Section 2.03(g)</u> above, the foregoing shall not release the Issuing Bank from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to the Issuing Bank arising under, or in connection with, this <u>Section 2.03</u> or any Letter of Credit.

(j)     Without limiting any other provision of this Agreement, the Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and the Issuing Bank's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse the Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)     honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)     honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)     acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)     the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)     acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)     any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrowers;

(vii)     any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

7143386v10

(viii)   assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)   payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)   acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)   honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the Issuing Bank if subsequently the Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)   dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)   honor of a presentation that is subsequently determined by the Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)   Upon the request of the Agent, (i) if the Issuing Bank has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an Letter of Credit Obligation that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any Letter of Credit Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all Letter of Credit Obligations. Sections 2.05 and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.03, Section 2.05 and Section 8.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the Issuing Bank and the Revolving Lenders, as collateral for the Letter of Credit Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all Letter of Credit Obligations (other than Letter of Credit Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which Letter of Credit Obligations shall be Cash Collateralized in an amount equal to 115% of the Outstanding Amount of such Letter of Credit Obligations), pursuant to documentation in form and substance reasonably satisfactory to the Agent and the Issuing Bank (which documents are hereby Consented to by the Lenders). The Borrowers hereby grant to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in a Cash Collateral Account. If at any time the Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all Letter of Credit Obligations, the Borrowers will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding

Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the Issuing Bank and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(l)      The Borrowers shall pay to the Agent, for the account of each Revolving Lender in accordance with its Applicable Percentage, a Letter of Credit fee (the "Letter of Credit Fee") (i) for each Standby Letter of Credit, equal to the Applicable Margin with respect thereto <u>times</u> the daily Stated Amount under each such Standby Letter of Credit (whether or not such maximum amount is then in effect under such Standby Letter of Credit) for the period during which such Standby Letter of Credit is outstanding, and (ii) for each Commercial Letter of Credit, equal to Applicable Margin with respect thereto times the daily Stated Amount under each such Commercial Letter of Credit (whether or not such maximum amount is then in effect under such Commercial Letter of Credit) for the period during which such Commercial Letter of Credit is outstanding. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) due and payable on the first day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in Section 2.08(b) hereof.

(m)      In addition to the Letter of Credit Fees as set forth in Section 2.03(l) above, the Borrowers shall pay immediately upon demand to the Agent for the account of the Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.02(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.03(m)): (i) a fronting fee which shall be imposed by the Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, _plus_ (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, the Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(n)      Unless otherwise expressly agreed by the Issuing Bank and the Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(o)      The Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of

-72-

Credit as fully as if the term "Agent" as used in Article IX included the Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Bank.

(p)    In the event of a direct conflict between the provisions of this Section 2.03 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03 shall control and govern.

### 2.04    Swing Line Loans.

(a)    The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender may, in reliance upon the agreements of the other Revolving Lenders set forth in this Section 2.04, make loans (each such loan, a "Swing Line Loan") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Revolving Loans and Letter of Credit Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Revolving Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Revolving Outstandings shall not exceed Revolving Loan Cap, and (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Letter of Credit Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Revolving Commitment or such Lender's Applicable Percentage of the Revolving Borrowing Base; provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04.  Each Swing Line Loan shall bear interest only at the rate applicable to Base Rate Loans.  Immediately upon the making of a Swing Line Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage multiplied by the amount of such Swing Line Loan.  The Swing Line Lender shall have all of the benefits and immunities (A) provided to the Agent in Article IX. with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it or proposed to be made by it as if the term "Agent" as used in Article IX. included the Swing Line Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Swing Line Lender.

(b)    Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Agent, which may be given by telephone. Each such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which

-73-

shall be a Business Day. Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Agent (by telephone or in writing) that the Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Agent (by telephone or in writing) of the contents thereof. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Agent at the request of the Required Revolving Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender may, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Lead Borrower on the books of the Swing Line Lender in immediately available funds.

      (c)    <u>Refinancing of Swing Line Loans</u>.

      (i)    The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Revolving Lender make a Base Rate Loan in an amount equal to such Revolving Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Revolving Loan Cap and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Lead Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Agent. Each Revolving Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Agent in immediately available funds for the account of the Swing Line Lender at the Agent's Office not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount. The Agent shall remit the funds so received to the Swing Line Lender.

      (ii)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Lender's payment to the Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)    If any Revolving Lender fails to make available to the Agent for the account of the Swing Line Lender any amount required to be paid by such Revolving Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Revolving Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in the relevant Revolving Credit Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Revolving Lender (through the Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Lender's obligation to make Committed Revolving Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or an Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Revolving Lender's obligation to make Committed Revolving Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Revolving Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Revolving Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount

7143386v10

is returned, at a rate per annum equal to the Federal Funds Rate. The Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)  Interest for Account of Swing Line Lender. The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans. Until each Revolving Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Revolving Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)  Payments Directly to Swing Line Lender. The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

### 2.05  Prepayments; Pre-Petition Obligations.

(a)  The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Committed Revolving Loans in whole or in part without premium or penalty; provided, that (i) such notice must be received by the Agent not later than 1:00 p.m. (A) three (3) Business Days prior to any date of prepayment of LIBO Rate Loans and (B) on the date of prepayment of Base Rate Loans; and (ii) any prepayment of LIBO Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Committed Revolving Loans to be prepaid and, if LIBO Rate Loans, the Interest Period(s) of such Committed Revolving Loans. The Agent will promptly notify each Revolving Lender of its receipt of each such notice, and of the amount of such Revolving Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the Committed Revolving Loans of the Revolving Lenders in accordance with their respective Applicable Percentages.

(b)  The Borrowers may, upon irrevocable notice from the Lead Borrower to the Swing Line Lender (with a copy to the Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided, that (i) such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)  Reserved.

(d)     If for any reason the Total Revolving Outstandings (including any Permitted Overadvances) at any time exceed the Revolving Loan Cap as then in effect, the Borrowers shall immediately prepay the Committed Revolving Loans, the Swing Line Loans and/or Cash Collateralize the Letter of Credit Obligations in an aggregate amount equal to such excess; provided, however, that the Borrowers shall not be required to Cash Collateralize the Letter of Credit Obligations pursuant to this Section 2.05(d) unless, after the prepayment in full of the Committed Revolving Loans, the Total Revolving Outstandings (including any Permitted Overadvances) exceed the Revolving Loan Cap as then in effect.

(e)     The Borrowers shall, in accordance with Section 2.05(g)] prepay the Pre-Petition Revolving Loan Balance, the Committed Revolving Loans and the Swing Line Loans and Cash Collateralize the Letter of Credit Obligations (upon the request of the Agent), with the proceeds and collections received pursuant to the provisions of Section 6.13 hereof.

(f)     The Borrowers shall, in accordance with Section 2.05(g), prepay the Committed Revolving Loans and the Swing Line Loans and, if a Default or an Event of Default has occurred and is continuing, Cash Collateralize the Letter of Credit Obligations (upon the request of the Agent) in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event not relating to the Baldwyn Real Estate Sale-Leaseback permitted hereunder.

(g)     Prepayments made pursuant to Section 2.05 (e), (f) and (i) and from the Excess Real Estate Proceeds, shall be applied as follows: first, to pay any fees, indemnities or expense reimbursements then due to Agent, Revolving Lenders and Issuing Bank from any Borrower or Guarantor; second, to pay interest then due in respect of any Pre-Petition Revolving Loans; third, to pay principal in respect of Permitted Overadvances; fourth, to pay principal in respect of the Pre-Petition Revolving Loans; fifth, to pay interest then due in respect of Committed Revolving Loans (and including any Permitted Overadvances) and Letter of Credit Obligations; sixth, to pay principal in respect of the Committed Revolving Loans; seventh, if a Default or Event of Default has occurred and is continuing Cash Collateralize the Letter of Credit Obligations (upon request of Agent); eighth, to pay any fees or expense reimbursements then due to Term Agent or Term Lenders from any Borrower or Guarantor; ninth, to pay interest then due with respect to the Term Loan; and tenth, so long as no Default or Event of Default has occurred and is continuing, to the Borrowers' operating account. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the Issuing Bank or the Lenders, as applicable.

(h)     The Borrowers shall prepay the Loans with the Net Proceeds received by a Loan Party from the sale or other disposition of the Baldwyn Real Estate, which Net Proceeds shall be applied in the following order: first, to the outstanding Committed Revolving Loans in an amount equal to the Real Estate Component included in the Revolving Borrowing Base, second, to the Term Loan in an amount equal to the amount set forth in clause (B)(iii) of the Term Loan Borrowing Base, and, third, the amount remaining, if any, (the "Excess Real Estate Proceeds"), in accordance with Section 2.05(g).

(i)     Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the Issuing Bank or the Lenders, as applicable.

(j)     No later than one (1) Business Day after the Final Order Entry Date, the Borrowers shall pay in full (i) with the proceeds of Committed Revolving Loans hereunder, the total outstanding amount of the Pre-Petition Revolving Loan Balance, and (ii) with the proceeds of the Term Loan, the total outstanding amount of the Pre-Petition Term Loan together with additional amounts due under Section 2.09 of the Pre-Petition Credit Agreement.

**2.06    Termination or Reduction of Commitments**.

(a)     Subject to <u>Section 2.09(b)</u>, the Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, terminate the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; provided, that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof, and (iii) the Borrowers shall not terminate or reduce (A) the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of Letter of Credit Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit.

(b)     If, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Revolving Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

(c)     The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit or the Aggregate Revolving Commitments under this <u>Section 2.06</u>.  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, commitment fees, Letter of Credit Fees and fees under <u>Section 2.09(b)</u>) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

(d)     The Term Commitment of each Term Lender shall automatically terminate upon such Term Lender's funding of its portion of the Term Loan, which shall occur no later than the Term Loan Funding Date.

7143386v10

(e)     The Revolving Commitment of each Revolving Lender shall automatically terminate upon the consummation of a Permitted Sale.

**2.07    Repayment of Loans**.

(a)     The Borrowers shall repay to the Revolving Lenders on the Termination Date the aggregate principal amount of Committed Revolving Loans outstanding on such date.

(b)     To the extent not previously paid, the Borrower shall repay the outstanding balance of the Swing Line Loans on the Termination Date.

(c)     Subject to clause (d) below, the Borrowers shall repay to the Term Lenders on the Termination Date the aggregate principal amount of the Term Loan outstanding on such date, along with accrued but unpaid interest and all other Obligations outstanding with respect to the Term Loan, including fees under Section 2.09(b).

(d)     Except as set forth in Section 8.03 or Section 2.05, the Borrowers shall not make any principal payments on account of the Term Loan until Borrowers' Obligations to the Pre-Petition Revolving Lenders and the Revolving Lenders shall have been paid in full in immediately available funds and the Revolving Commitments as to all Revolving Lenders shall have been terminated.

**2.08    Interest**.

(a)     Subject to the provisions of Section 2.08(b) below, (i) each Committed Revolving Loan which is a LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Margin; (ii) each Committed Revolving Loan which is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin; (iii) each portion of the Term Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Term Loan Applicable Margin; and (iv) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)

(i)     If any Event of Default exists, then (A) the Agent may, and upon the request of the Required Revolving Lenders shall, notify the Lead Borrower that all Committed Revolving Loans and all other Obligations with respect thereto shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws, and (B) the Term Agent may, and upon the request of the Required Term Lenders shall, notify the Lead Borrower that the Term Loan and all other Obligations with respect thereto shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter

-79-

such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.09    Fees.** In addition to certain fees described in subsections (l) and (m) of Section 2.03:

(a)    Commitment Fee. The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Applicable Percentage, a commitment fee equal to the Applicable Commitment Fee Percentage times the actual daily amount by which the Aggregate Revolving Commitments exceed the Total Revolving Outstandings (other than Swing Line Loans). The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be calculated and due and payable monthly in arrears on the first day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.

(b)    Other Fees. The Borrowers shall pay to the Agent and the Term Agent fees in the amounts and at the times specified in the Wells Fargo Fee Letter and the GA Fee Letter, respectively. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees.** All computations of fees and interest with respect to the LIBO Rate shall be made on the basis of a 360-day year and actual days elapsed. All other computations of fees and interest shall be computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided, that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt.**

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of

-80-

the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Revolving Loans or portion of the Term Loan, as applicable, in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     In addition to the accounts and records referred to in Section 2.11(a), each Revolving Lender and the Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Revolving Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Revolving Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

(c)     Agent shall render monthly statements regarding the Loan Account to the Lead Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Credit Parties unless, within thirty (30) days after receipt thereof by the Lead Borrower, the Lead Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback.**

(a)     General. All payments to be made by the Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)

-81-

(i)    Funding by Revolving Lenders; Presumption by Agent.  Unless the Agent shall have received notice from a Revolving Lender prior to the proposed date of any Revolving Credit Borrowing of LIBO Rate Loans (or in the case of any Revolving Credit Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Revolving Lender will not make available to the Agent such Revolving Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Revolving Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Revolving Credit Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Revolving Lender has not in fact made its share of the applicable Revolving Credit Borrowing to the Agent, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Revolving Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Committed Revolving Loans comprising Base Rate Loans.  If the Borrowers and such Revolving Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Revolving Lender pays its share of the applicable Revolving Credit Borrowing to the Agent, then the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in such Revolving Credit Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to the Agent.

(ii)    Payments by Borrowers; Presumptions by Agent.  Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the Issuing Bank, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Term Lenders hereunder to make the Term Loan and the obligations of the Revolving Lenders hereunder to make Committed Revolving Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments hereunder are several and not joint.  The failure of any Term Lender to make its portion of the Term Loan or of any Revolving Lender to make any Committed Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Term Lender or Revolving Lender (as applicable) of its corresponding obligation to do so on such date, and no Term Lender or Revolving Lender (as applicable) shall be responsible for the failure of any other Term Lender or Revolving Lender (as applicable) to so make its portion of the Term Loan or its Committed Revolving Loan (as applicable), to purchase its participation or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in (a) any Revolving Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein, or (b) a Term Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of the Term Loan greater than its pro rata share thereof as provided herein, (including, in each case, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Revolving Lenders or Term Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03; provided, that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of

-83-

or sale of a participation in any of its portion of the Term Loan, its Committed Revolving Loans or subparticipations in Letter of Credit Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

### 2.14    Settlement Amongst Lenders.

(a)    The amount of each Revolving Lender's Applicable Percentage of outstanding Committed Revolving Loans (including outstanding Swing Line Loans) shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans (including Swing Line Loans) and repayments of Committed Revolving Loans (including Swingline Loans) received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)    The Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans and Swing Line Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Revolving Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

### 2.15    Release.    Subject to the terms of the Interim Financing Order or the Final Financing Order, as applicable, each Loan Party hereby acknowledges that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Loan Parties' liability to repay the Credit Parties as provided in this Agreement and the Pre-Petition Credit

7143386v10

Agreement or to seek affirmative relief or damages of any kind or nature from any Credit Party or any "Credit Party" (as defined in the Pre-Petition Credit Agreement). Subject to the terms of the Interim Financing Order or the Final Financing Order, as applicable, each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Credit Party and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Pre-Petition Credit Agreement and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, in each case other than the obligations of the Released Parties arising under this Agreement and the other Loan Documents.

**2.16    Waiver of any Priming Rights.**  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations or Pre-Petition Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations or Pre-Petition Obligations, or to approve a claim of equal or greater priority than the Obligations or Pre-Petition Obligations, other than as set forth in a Financing Order.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent, the Term Agent, the

7143386v10

applicable Lender or the Issuing Bank, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay and remit the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    <u>Payment of Other Taxes by the Loan Parties</u>.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay and remit any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent, the Term Agent, each Lender and the Issuing Bank, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or remitted by the Agent, the Term Agent, such Lender or the Issuing Bank, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment, remittance or liability delivered to the Lead Borrower by a Lender or the Issuing Bank (with a copy to the Agent), or by the Agent or the Term Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment or remittance of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, the Lead Borrower shall deliver to the Agent and the Term Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or remittance, a copy of the return reporting such payment or remittance or other evidence of such payment reasonably satisfactory to the Agent or the Term Agent, as applicable.

(e)    <u>Status of Lenders.</u>  Any Foreign Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which any Loan Party is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender, if requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and

-86-

from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

> (i)      duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States is a party,

> (ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

> (iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable,

> (iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, Form W-9, and/or other certification from each beneficial owner as applicable, or

> (v)      any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made.

> (f)      FATCA.  If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Agent (A) a certification signed by an authorized person and/or (B) other documentation reasonably requested by the Lead Borrower and the Agent sufficient for the Agent and the Lead Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such applicable reporting requirements.

> (g)      Treatment of Certain Refunds.  If the Agent, the Term Agent, any Lender or the Issuing Bank determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid or remitted additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, the Term Agent, such Lender or the Issuing Bank, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund),

-87-

provided that the Loan Parties, upon the request of the Agent, the Term Agent, such Lender or the Issuing Bank, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent, the Term Agent, such Lender or the Issuing Bank in the event the Agent, the Term Agent, such Lender or the Issuing Bank is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Agent, the Term Agent, any Lender or the Issuing Bank to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**. If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Lead Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Revolving Credit Borrowing of Base Rate Loans in the amount specified therein.

**3.04    Increased Costs; Reserves on LIBO Rate Loans**.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for

the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or the Issuing Bank;

    (ii) subject any Lender or the Issuing Bank to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or the Issuing Bank in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the Issuing Bank); or

    (iii) impose on any Lender or the Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount), then, upon request of such Lender or the Issuing Bank, the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

    (b) Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any Lending Office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

    (c) Certificates for Reimbursement.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error. The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

7143386v10

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to the foregoing provisions of this <u>Section 3.04</u> for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    <u>Reserves on LIBO Rate Loans</u>.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Lead Borrower shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**3.05    Compensation for Losses**.  Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Lead Borrower; or

(c)    any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to <u>Section 10.13</u>;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at

the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

**3.06**    **Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrowers are required to indemnify any Lender or pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 10.13.

**3.07**    **Survival**. All of the Loan Parties' obligations under this Article III shall survive termination of the Aggregate Revolving Commitments and repayment of the Term Loan, the Committed Revolving Loans, the Swing Line Loans, and all other Obligations hereunder.

**3.08**    **Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement. As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower. In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.