(c)     The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension. Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension**. The obligation of the Issuing Bank and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)     The Agent's and the Term Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent, the Term Agent and the Lenders:

(i)     executed counterparts of this Agreement sufficient in number for distribution to the Agent, the Term Agent, each Lender and the Lead Borrower;

(ii)     a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)     copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     customary opinions, in each case addressed to the Agent, the Term Agent and each Lender, of O'Melveny & Myers LLP, counsel to the Loan Parties, as to such matters concerning the Loan Parties and the Loan Documents as the Agent and the Term Agent may reasonably request;

7143386v10

(vi)    a certificate (or certificates) signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that except with respect to the filing of the Chapter 11 Case and those resulting from the Events and Circumstances, there has been no event or circumstance since the date of the Current Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)    Reserved;

(ix)    the Security Agreement and certificates evidencing any Equity Interests being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(x)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xi)    appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent and the Term Agent of all Inventory of the Loan Parties, the results of which are satisfactory to the Agent and the Term Agent;

(xii)    results of searches or other evidence reasonably satisfactory to the Agent and the Term Agent (in each case dated as of a date reasonably satisfactory to the Agent and the Term Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent and the Term Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent and the Term Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xiii)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and the Financing Orders, and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent; and

(xiv)    such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)     After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby and (iii) all Letters of Credit to be issued at, or immediately subsequent to, such establishment, Availability (without giving effect to the Availability Block) shall be not less than $5,990,416.

(c)     The Agent and the Term Agent shall have received a Borrowing Base Certificate dated the Closing Date and giving effect to the transactions contemplated to occur on the Closing Date, with Collateral relating to the period ended on the immediately preceding Saturday, and executed by a Responsible Officer of the Lead Borrower.

(d)     Reserved.

(e)     Reserved.

(f)     The Agent and the Term Agent shall have received and be reasonably satisfied with (i) the initial Approved Budget and (ii) such other information (financial or otherwise) reasonably requested by the Agent and the Term Agent.

(g)     Reserved.

(h)     There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i)     There shall not have occurred any default of any Material Contract of any Loan Party, other than defaults under Material Contracts arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code.

(j)     The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(k)     All fees and reasonable and documented expenses required to be paid to the Agent and the Term Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(l)     The Borrowers shall have paid all reasonable and documented fees, charges and disbursements of counsel to the Agent and counsel to the Term Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers, the Agent and the Term Agent).

(m)     The Agent, the Term Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know

-94-

your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(n)    Reserved.

(o)    The Agent and the Lenders shall have received evidence that the Loan Parties filed a motion on the Petition Date seeking to retain the Financial Consultant and Sale Consultant on terms reasonably satisfactory to the Agent.

(p)    (i) The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order, (ii) none of such orders shall have been stayed, vacated or reversed (in whole or in part), (iii) the Cash Management Order shall not have been amended or modified other than with the consent of the Agent in consultation with the Term Agent, in their Permitted Discretion, and (iv) the Interim Financing Order and the Wage Order shall not have been amended or modified other than with the consent of the Agent, in its Permitted Discretion.

(q)    The Bidding Procedures Motion and Sale Order Motion shall have been filed.

(r)    The Agent shall have received evidence that the Lead Borrower has entered into the Agency Agreement and Initial Store Closing Agreement each on terms reasonably satisfactory to the Agent.

(s)    The Agent and the Lenders shall have received evidence that the Loan Parties filed a motion on the Petition Date seeking approval of the Initial Store Closing Agreement.

(t)    The Closing Date shall have occurred on or before February 4, 2016.  The Agent shall notify the Lead Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding on the Loan Parties.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Revolving Loans to the other Type, or a continuation of LIBO Rate Loans) and each Issuing Bank to issue each Letter of Credit is subject to the following conditions precedent:

(a)    The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on

-95-

and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01;

(b)      No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)      The Agent and, if applicable, the Issuing Bank or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)      The Agent shall have received the most-recent Borrowing Base Certificate delivered in accordance with the terms hereof, updated to reflect such proposed Credit Extension;

(e)      No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred or would result from such proposed Credit Extension;

(f)      No Overadvance shall result from such Credit Extension;

(g)      Neither the Interim Financing Order nor the Final Financing Order, as applicable, shall have been (i) stayed, vacated or reversed (in whole or in part), or (iii) amended or modified other than with the consent of the Agent and the Term Agent, in their Permitted Discretion; and

(h)      Each Credit Extension shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance) and to fund the Post Trigger Carve Out Amount when and if due.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Revolving Loans to the other Type or a continuation of LIBO Rate Loans) submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but, until the Required Revolving Lenders otherwise direct the Agent to cease making Committed Revolving Loans and direct the Issuing Bank to cease issuing Letters of Credit, the Revolving Lenders will fund their Applicable Percentage of all Committed Revolving Loans and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

7143386v10

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation (b) subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the Interim Financing Order and the Final Financing Order, as applicable has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state (or country, province or territory) of incorporation or organization, its state (or country, province or territory) of incorporation or organization and the state (or country, province or territory) of the location of its chief executive office, organization type, organization number, if any, issued by its state (or province or territory) of incorporation or organization, and its federal employer identification number or similar number(s).

**5.02    Authorization; No Contravention.**  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents.**  Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security

7143386v10

Documents (including the first priority nature thereof), or (b) filings with the SEC pursuant to the Securities Laws or (c) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect.** This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Lead Borrower and its Subsidiaries as of the date thereof to the extent required by GAAP, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited Consolidated balance sheet of the Lead Borrower and its Subsidiaries dated October 25, 2014, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Reserved.

(d)    To the best knowledge of the Lead Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent, the Term Agent or the Lenders, (ii) of the Borrowing Base, or (iii) of the assets, liabilities, financial condition or results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis.

(e)    The Consolidated forecasted balance sheet, statements of income, cash flows and Availability model that the Lead Borrower and its Subsidiaries delivered pursuant to Section 6.01(c) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable and fair in light of the conditions existing at the time of delivery of such forecasts.

-98-

**5.06    Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in Schedule 5.06, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and since the Closing Date, there has been no material adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on Schedule 5.06.

**5.07    No Default.** No Loan Party or any Subsidiary is in default under or with respect to any material provision of any Material Contract or any Material Indebtedness, other than defaults under Material Contracts or any Material Indebtedness arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code or that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens.**

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, subject to Permitted Encumbrances. Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state, province or territory) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon, in each case as of the Closing Date. Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof, in each case except as could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(c)    Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries as of the Closing Date, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances, or such Liens set forth on Schedule 7.01.

(d)    Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date (other than intercompany Investments and Investments having a value of less than $50,000), showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e)    Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date (other than intercompany Indebtedness and Indebtedness not in excess of $250,000 in principal amount), showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance.**

(a)    Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, in each case, which adversely affects or could reasonably be expected to adversely affect in any material respect any Loan Party or its or their business, operations or assets or any properties at which such Loan Party has transported, stored or disposed of any Hazardous Materials.

(c)    Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

-100-

**5.10    Insurance.** The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiaries operate. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.** The Loan Parties and their Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed other than those specifically disclosed on Schedule 5.11, and unless the failure to do so is permitted by the Bankruptcy Code and no Lien could arise as a result of the failure to make such payment have paid all federal, state and other material Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed, registered or recorded and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance.**

(a)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Lead Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b)    There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    Except as could not reasonably be expected to result in material liability to any Loan Party, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a

-101-

Multiemployer Plan; and (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

    **5.13    Subsidiaries; Equity Interests**. As of the Closing Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances. Except as set forth in Schedule 5.13, as of the Closing Date there are no outstanding rights to purchase any Equity Interests in any Subsidiary. As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and the Liens permitted pursuant to clause (p) of the definition of Permitted Encumbrances. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

    **5.14    Margin Regulations; Investment Company Act**.

        (a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

        (b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

    **5.15    Disclosure**. Each Loan Party has disclosed to the Agent, the Term Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent, the Term Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under

-102-

which they were made, not misleading; provided, that with respect to projected financial information and the Approved Budget, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws.** Except to the extent non-performance thereof is permitted by the Bankruptcy Code, each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.17    Intellectual Property; Licenses, Etc.** The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person in any material respect. To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person in any material respect. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.** There are no significant strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened, except as could not reasonably be expected to have a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, provincial, territorial, municipal, local or foreign Law dealing with such matters in all material respects. No Loan Party or any of its Subsidiaries has incurred any significant liability or obligation under the Worker Adjustment and Retraining Act or similar federal, state, provincial, territorial, municipal, local or foreign Law. All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or employment agreement (other than employment agreements which are not required to be filed with the SEC pursuant to the Securities Laws). As of the Closing Date there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. As of the Closing Date there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be

-103-

filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

### 5.19    Security Documents.

(a)    The Financing Orders create in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement). The financing statements, releases and other filings are in appropriate form and have been filed in the offices specified in Schedule II of the Security Agreement. Upon entry of the Interim Financing Order (and the subsequent entry of the Final Financing Order) the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made), in each case prior and superior in right to any other Person. Assuming the entry of the Financing Orders, filings of UCC-1 financing statements and/or the obtaining of "control" (as defined in the UCC) of Collateral is not required to create or perfect a legal, valid, continuing and enforceable security interest in the Collateral.

(b)    Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, when the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office, as applicable (or any substitute or successor agency), and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property of the Loan Parties in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

(c)    Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the Mortgages, if any, create in favor of the Agent, for the benefit of the Secured Parties referred to herein and subject to Permitted Encumbrances, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Subject to the entry of the Interim Financing Order, upon the filing or recording of the Mortgages with the

appropriate Governmental Authorities, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Mortgaged Property that may be perfected by such filing (including without limitation the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person other than Liens permitted pursuant to clause (q) of the definition of Permitted Encumbrances.

**5.20    Reserved.**

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)    Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)    Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers.**  No broker or finder brought about the obtaining, making or closing of the Loans or financing transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations.**  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any adverse modification or change in the business relationship of any Loan Party with any supplier, in each case except as could not reasonably be expected to have a Material Adverse Effect.

**5.24    Material Contracts.**  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent and the Term Agent on or before the Closing Date.  The Loan Parties have not received any notice of the intention of any other party thereto to terminate any Material Contract as a result of a breach or default by a Loan Party thereunder (other than any notice as to a termination that would be voided or invalidated under the bankruptcy code).

**5.25    Casualty.**  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    Bankruptcy Matters**.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Borrowers shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)    After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than the Carve-Out up to, at any date of determination, the amounts in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve and Senior Agency Agreement Claims, if any) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to the Carve-Out up to, at any date of determination, the amounts actually in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve, the Senior Agency Agreement Liens and the Permitted Prior Liens.

(d)    The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to the Final Order Entry Date) or the Final Financing Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Credit Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, under the other Loan Documents or under applicable law, without further application to or order by the Bankruptcy Court.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification

7143386v10

obligations for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

     **6.01**    **Financial Statements**. Deliver to the Agent and the Term Agent, in form and detail satisfactory to the Agent and the Term Agent:

      (a)    Reserved;

      (b)    as soon as available, but in any event within forty-five (45) days after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter, and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

      (c)    as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Months of each fiscal year of the Lead Borrower, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, and cash flows for such Fiscal Month, and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous fiscal year, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

      (d)    as soon as available, but in any event no more than thirty (30) days after the end of each Fiscal Year of the Lead Borrower, forecasts prepared by management of the Lead Borrower, which are reasonably satisfactory to the Agent and the Term Agent, of Consolidated balance sheets and statements of income or operations and cash flows of the Lead Borrower and its Subsidiaries on a monthly basis for such Fiscal Year (including the Fiscal Year in which the Maturity Date occurs), and, as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.

      (e)    Reserved.

(f)    (i)    The Approved Budget may be updated, modified or supplemented (with the consent and/or at the reasonable request of the Agent and Term Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Agent and Term Agent in their Permitted Discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the tenth (10th) week of the initial Approved Budget, the Debtors shall submit a budget for the next successive thirteen week period to the Agent and the Term Agent, which budget shall be in form and substance reasonably acceptable to the Agent and the Term Agent and approved by the Agent and the Term Agent, each in their Permitted Discretion; provided, further, that in the event that the Agent and the Term Agent, on the one hand, and the Borrowers, on the other hand, cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated. Each Approved Budget delivered to the Agent and the Term Agent shall be accompanied by such supporting documentation as requested by the Agent and the Term Agent in their Permitted Discretion. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to the Agent and the Term Agent in their Permitted Discretion.

(ii)    On or before Wednesday of each week, commencing with the first week following the Closing Date, the Lead Borrower shall deliver to the Agent and Term Agent an Approved Budget Variance Report.

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of the Lead Borrower and its Subsidiaries by furnishing the Lead Borrower's Form 10-K or 10-Q, as applicable, filed with the SEC (provided, that such documents shall be deemed furnished if made available on the internet via EDGAR, or any successor system of the SEC, or via the Lead Borrower's website on the Internet at http://www.hancockfabrics.com/), to the extent the required information is contained in such filings.

**6.02    Certificates; Other Information.** Deliver to the Agent and the Term Agent, in form and detail satisfactory to the Agent and the Term Agent:

(a)    concurrently with the delivery of the financial statements referred to in Sections 6.01(b) and (c), (i) a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP and (ii) a copy of management's discussion and analysis with respect to such financial statements delivered pursuant to Sections 6.01(a) and (b);

(b)    on Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business on the immediately preceding Saturday, (provided that the Appraised Value percentage applied to the Eligible Inventory and the Fee Simple Value or Leased Value percentage, as applicable, applied to the Eligible Real Estate set forth in each Borrowing Base

-108-

Certificate shall be the percentage set forth in the most recent appraisals obtained by the Agent pursuant to Section 6.10 hereof for the applicable week in which such Borrowing Base Certificate is delivered), and each Borrowing Base Certificate is to be certified as complete and correct by a Responsible Officer of the Lead Borrower and accompanied by the most-recent reports of Eligible Credit Card Receivables and Eligible Inventory prepared by the Borrowers (which reports shall be updated on a weekly basis);

        (c)      promptly and in any event within three (3) Business Days after receipt thereof by any Loan Party, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

        (d)      promptly and in any event within three (3) Business Days after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

        (e)      the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

        (f)      promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement, in each case constituting Material Indebtedness, and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

        (g)      as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, the Term Agent or any Lender through the Agent, may reasonably specify;

        (h)      promptly and in any event within three (3) Business Days after the Agent's or the Term Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

        (i)      promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or

7143386v10

any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect;

(j)     as soon as available, but in any event within forty-five (45) days after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower, a report describing in reasonable detail any Intellectual Property which during such Fiscal Quarter was acquired, registered or for which applications for registration were filed by any Loan Party or any Subsidiary thereof and any statement of use or amendment to allege use with respect to intent-to-use trademark applications, in each case in the United States or in any foreign jurisdiction; and

(k)     promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent, the Term Agent or any Lender through the Agent may from time to time reasonably request.

The Loan Parties hereby acknowledge that (a) the Agent and/or the Term Agent may make available to the Lenders and the Issuing Bank materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Agent, the Term Agent, the Issuing Bank and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent and the Term Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

**6.03    Notices.** Promptly notify the Agent and the Term Agent:

(a)     of the occurrence of any Default or Event of Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     of any material breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof, other than breaches or defaults arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;

(d)      of any material dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any material litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)      of the occurrence of any ERISA Event or the determination that any Pension Plan is considered to be an "at-risk" plan, or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 or 305 of ERISA;

(f)      of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)      of any change in any Loan Party's chief executive officer or chief financial officer;

(h)      of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)      of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)      of the filing of any Lien for unpaid Taxes in excess of $100,000 against any Loan Party;

(k)      of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)      of any failure by any Loan Party to pay rent or any other amounts due at (A) any distribution centers or warehouses; or (B) any of such Loan Party's locations when such rent or such other amounts first came due Post-Petition, unless such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(m)      in advance in writing of any proposed material amendment to the Elavon Processor Agreement (it is understood and agreed that any amendment to Section 4 of the Elavon Processor Agreement, any grant of the security interests and liens made by Lead Borrower thereunder or in respect thereof or the obligations secured by such security interests and liens shall be deemed to be a material amendment to the Elavon Processor Agreement) and/or replacement of the Elavon Member;

(n)      the receipt or delivery of any notice (including, without limitation, any notice of any breach or alleged breach) under the Initial Store Closing Agreement, Agency Agreement or  any agency agreement, asset purchase agreement or other contract relating to a Permitted Sale by any party thereto; and

-111-

(o)    the termination, discharge or resignation of any of the Consultants.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

    **6.04**  **Payment of Obligations**.

        (a)    Subject to the provisions of the Bankruptcy Code, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (i) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (ii) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (iii) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (v) the validity or amount thereof is being contested in good faith by appropriate proceedings, (w) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (x) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (y) no Lien has been filed with respect thereto and (z) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement. For the avoidance of doubt, nothing herein requires payment of any obligation subject to the automatic stay of the Bankruptcy Code.

        (b)    Within one (1) Business Day after the Final Order Entry Date, pay in full all of the Pre-Petition Obligations in accordance with Section 2.05(j).

    **6.05**  **Preservation of Existence, Etc**. Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Sections 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

    **6.06**  **Maintenance of Properties**. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

7143386v10

### 6.07    Maintenance of Insurance.

(a)      Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent and the Term Agent not Affiliates of the Loan Parties insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent and the Term Agent.

(b)      Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent and the Term Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent or Term Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)      Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)      Cause business interruption policies, if any, to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Term Agent or any other Credit Party shall be a co-insurer and (iii) such other provisions as the Agent or the Term Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)      Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)      Deliver to the Agent and the Term Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent and the Term Agent, including an insurance binder) together with evidence satisfactory to the Agent and the Term Agent of payment of the premium therefor.

(g)      If at any time the area in which any Eligible Real Estate is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as is reasonable and customary for companies engaged in the Business, and otherwise

comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as is reasonable and customary for companies engaged in the Business.

(h)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will, upon request by the Agent or the Term Agent, furnish the Agent and the Term Agent certificates evidencing renewal of each such policy.

(i)     Permit any representatives that are designated by the Agent and the Term Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby, upon reasonable notice and at reasonable times.

(j)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08     Compliance with Laws.** Except to the extent non-compliance is permitted under the Bankruptcy Code, comply (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18.

**6.09     Books and Records; Accountants.**

(a)     (i) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity

with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    At all times retain a Registered Public Accounting Firm and instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent.

### 6.10    Inspection Rights.

(a)    Permit representatives and independent contractors of the Agent and the Term Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent (and the Term Agent may accompany the Agent) or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or an Event of Default exists the Agent and the Term Agent (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice and as often as may be desired.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including field examiners, investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such commercial finance examinations as the Agent in its Permitted Discretion deems necessary or appropriate.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to inventory appraisals as the Agent in its Permitted Discretion deems necessary or appropriate. The appraisals shall be in form, scope and methodology acceptable to the Agent in its Permitted Discretion.

(d)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals retained by the Agent, to conduct appraisals of the Real Estate included in the Revolving Borrowing Base and Term Loan Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to appraisals of each parcel of Real Estate included in the Revolving Borrowing Base and Term Loan Borrowing Base. The

-115-

appraisals shall be in form, scope and methodology acceptable to the Agent in its Permitted Discretion.

(e)     Permit the Agent, from time to time, to engage a geohydrologist, an independent engineer or other qualified consultant or expert, reasonably acceptable to the Agent, at the expense of the Loan Parties, to undertake Phase I environmental site assessments during the term of this Agreement of the Eligible Real Estate, provided that such assessments may only be undertaken (i) during the continuance of a Default or an Event of Default or (ii) if a Loan Party receives any notice or obtains knowledge of (A) any potential or known release of any Hazardous Materials at or from any Eligible Real Estate, notification of which must be given to any Governmental Authority under any Environmental Law, or notification of which has, in fact, been given to any Governmental Authority, or (B) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental health or safety matter affecting any Loan Party or any Eligible Real Estate from any Person (including, without limitation, the Environmental Protection Agency). Environmental assessments may include detailed visual inspections of the Real Estate, including, without limitation, any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as are reasonably necessary for a determination of the compliance of the Real Estate and the use and operation thereof with all applicable Environmental Laws. The Borrowers will, and will cause each of their Subsidiaries to, cooperate in all respects with the Agent and such third parties to enable such assessment and evaluation to be timely completed in a manner reasonably satisfactory to the Agent.

**6.11    Use of Proceeds.** Use the proceeds of the Credit Extensions (a) on the Closing Date, for the payment of transaction expenses in connection with this Agreement; and (b) after the Closing Date (i) to finance the payoff of the Pre-Petition Obligations in accordance with Section 2.05(j) on the Final Order Entry Date, (ii) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business and subject to the Approved Budget (subject to the Permitted Variance) or as otherwise approved by the Lenders, (iii) prior to the delivery of a Carve-Out Trigger Notice, to fund through deposits into the Professional Fee Escrow Account, and (iv) for general corporate purposes of the Loan Parties, in each case to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance) and the Loan Documents.

**6.12    Additional Loan Parties.** Notify the Agent at the time that any Person becomes a Subsidiary and, in each case promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC or a Subsidiary of a CFC, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets (other than Excluded Property) of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in this clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge

-116-

such Equity Interests and promissory notes evidencing such Indebtedness as Collateral (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary to be pledged may be limited to 66% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary and if such Subsidiary is a Subsidiary of a CFC, no Equity Interests may be pledged, and such time period may be extended based on local law or practice), in each case in form, content and scope reasonably satisfactory to the Agent and the Term Agent. In no event shall compliance with this <u>Section 6.12</u> waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this <u>Section 6.12</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.13    Cash Management.**

(a)    Upon and to the extent requested by the Agent:

(i)    deliver to the Agent copies of notifications (each, a "<u>Credit Card Notification</u>") substantially in the form attached hereto as <u>Exhibit G</u> which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on <u>Schedule 5.21(b)</u>; and

(ii)    enter into a Blocked Account Agreement reasonably satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "<u>Blocked Accounts</u>").

(b)    At the request of the Agent, deliver to the Agent copies of notifications (each, a "<u>DDA Notification</u>") substantially in the form attached hereto as <u>Exhibit H</u> which have been executed on behalf of such Loan Party and delivered to each depository institution listed on <u>Schedule 5.21(a)</u>.

(c)    The Loan Parties shall ACH or wire transfer to a Blocked Account:

(i)    no less frequently than daily (and whether or not there are then any outstanding Obligations), all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(ii)    no less frequently than daily, all payments due from Credit Card Issuers and Credit Card Processors and proceeds of all credit card charges;

(iii)    no less frequently than daily, all available cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)    no less frequently than daily, all proceeds of Accounts; and

(v)    no less frequently than daily, all Net Proceeds, and all other cash payments of any kind received by a Loan Party from any Person or from any source or on

-117-

account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(d)     Each Blocked Account Agreement (other than the Blocked Account Agreement(s) applicable to the Concentration Account) shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Lead Borrower at Wells Fargo or another financial institution acceptable to the Agent (the "Concentration Account"), all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

(i)     the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank);

(ii)     all amounts required to be deposited into Blocked Accounts pursuant to clause (c) above; and

(iii)     any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event.

(e)     The Concentration Account and the Elavon Deposit Account shall at all times be under the sole dominion and control of the Agent. The Agent shall cause all funds on deposit in the Concentration Account and the Elavon Deposit Account to be applied to the Obligations in the order proscribed in either Section 2.05(g), Section 2.05(i) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account and the Elavon Deposit Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations. In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or the Elavon Deposit Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(f)     Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(g)     If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.21(a).

-118-

(h)     Each Borrower shall cause Elavon Processor to deposit into the Elavon Deposit Account or the Concentration Account all amounts payable by Elavon Processor to any Borrower, such deposits to occur at least twice per calendar week by wire transfer or other electronic funds transfer. All amounts in the Elavon Deposit Account in excess of $200,000 in the aggregate shall be transferred by wire transfer or other electronic funds transfer on each Business Day to the Concentration Account as provided in Section 6.13(c).

(i)     Borrowers shall, and shall cause each of their Subsidiaries to, transfer any funds released from the Elavon Reserve Account, on the day such funds are released therefrom, to the Concentration Account as provided in Section 6.13(c), by wire transfer or other electronic funds transfer.

(j)     All amounts in each Intercompany Royalty Account shall be sent by wire transfer or other electronic funds transfer on each Business Day to the Concentration Account as provided in Section 6.13(c).

(k)     Notwithstanding anything to the contrary herein, during the period between the Closing Date and payment in full of the Total Revolver Outstandings, all funds on deposit in the Concentration Account shall be applied to the Pre-Petition Revolving Loan Balance.

**6.14    Information Regarding the Collateral**. Furnish to the Agent and the Term Agent at least ten (10) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's registered office, chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state or jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

**6.15    Physical Inventories**.

(a)     Cause not less than one (1) physical inventory to be undertaken at the expense of the Loan Parties (i) at each Store, every twelve (12) to fourteen (14) month period conducted by a nationally recognized firm satisfactory to the Agent, (ii) at the distribution center, every twelve (12) month period conducted by a nationally recognized firm or other Person satisfactory to the Agent in its Permitted Discretion, provided, that employees of the Loan Parties may conduct physical inventories unless the Agent in its Permitted Discretion requires the Loan Parties to retain a third party to conduct same and (iii) periodic cycle counts at all other locations conducted by the Borrowers, in each case consistent with past practices, and following such methodology as is consistent with the methodology used in the immediately preceding inventory

7143386v10

or as otherwise may be satisfactory to the Agent. The Agent and the Term Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Lead Borrower, within fifteen (15) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

**6.16     Environmental Laws.** (a) Conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17     Further Assurances.**

(a)     Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof and other than Excluded Assets), notify the Agent and the Term Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed

-120-

to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

>    (c)    Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

>    (d)    Upon the request of the Agent, cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds.** Except as otherwise expressly permitted hereunder or to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Case and the effect thereof, (a) make all payments of Post-Petition Obligations other than amounts being contested in good faith by appropriate proceedings being diligently conducted and, subject to the Bankruptcy Code, otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, and, except following completion of the Initial Store Closing and Permitted Sales, keep such Leases in full force and effect, (b) except in connection with the Initial Store Closing and Permitted Sales, not allow such Leases to lapse (other than in the ordinary course of business) or be terminated (other than in the ordinary course of business) or any rights to renew such Leases to be forfeited or cancelled (other than in the ordinary course of business), (c) notify the Agent of any material default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts.** Except to the extent non-performance thereof is permitted by the Bankruptcy Code and other than the filing of the Chapter 11 Case and the effect thereof, (a) perform and observe all of the material Post-Petition Obligations of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect except to the extent such Material Contract terminates in the ordinary course of business, (c) enforce each such Material Contract in accordance with its terms as deemed appropriate by its Responsible Officer in its reasonable business judgment, (d) take all such action to such end as may be from time to time reasonably requested by the Agent, (e) upon reasonable request of the Agent or the Term Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20    Designation of Senior Debt.** Designate all Obligations as "Credit Facility Debt", and the credit facility provided hereunder as the "Credit Facility", in each case under, and as defined in, the Indenture and all supplemental indentures thereto.

**6.21    Credit Card Processors.** The Lead Borrower will, and will cause its Subsidiaries to (a) comply in all material respects with all obligations of such Person under each credit card processing agreement to which such Person is a party, (b) maintain each credit card processing agreement set forth on Schedule 5.21(b) and each credit card processing agreement

7143386v10

entered into after the Effective Date in full force and effect (except to the extent such Person elects to terminate the same and so notifies the Agent) and take or cause to be taken all actions necessary to maintain, preserve and protect the rights and interests of the Agent in all material respects with respect to all such agreements, and (c) promptly notify the Agent of the entry by such Person into any credit card processing agreement with any Credit Card Processor or Credit Card Issuer after the Effective Date and deliver a Credit Card Notification with respect to each such Credit Card Processor or Credit Card Issuer contemporaneously with the entry by such Person into such credit processing agreement.

### 6.22    Retention of Consultants; Communication with Accountants and Other Financial Advisors.

(a)    The Agent and the Term Agent shall have received evidence by no later than (i) the Petition Date, that the Loan Parties have filed motions seeking to retain the Financial Consultant and Sale Consultant; and (ii) on or before February 12, 2016, the Loan Parties shall have filed motions on terms and conditions reasonably satisfactory to the Agent and Term Agent seeking to retain the Real Estate Consultant. The terms and scope of the engagement of and responsibilities of the Consultants shall be acceptable to the Agent in its Permitted Discretion and, without limiting the foregoing, the engagement shall grant the Agent and Term Agent the right to communicate directly with the Consultants and authorize and direct the Consultants to communicate directly with the Agent or Term Agent and to furnish the Agent and Term Agent with such information as the Agent or Term Agent may reasonably request, together with copies of all material written materials provided to the board of directors of the Loan Parties by such Consultant. Subject to Bankruptcy Court approval, to be obtained by no later than thirty five (35) days after the Petition Date in the case of the Financial Consultant and Sale Consultant, and no later than thirty (30) days after the filing of the motion referred to in clause (ii) above in the case of the Real Estate Consultant, the Loan Parties shall continue to retain the Consultants, the scope and terms of each such engagement to be reasonably satisfactory to the Agent. There shall be no material modifications to the terms (excluding any decreases in compensation but including any other modification in compensation) of the engagement of the Consultants without the Consent of the Agent and Term Agent. Until such time as all Pre-Petition Obligations and all Obligations have been repaid in full (or Cash Collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Lead Borrower shall continue to retain (i) the Financial Consultant and Sale Consultant to assist the Loan Parties with a Permitted Sale, with the preparation of the Approved Budget and the other financial and Collateral reporting required to be delivered to the Agent pursuant to this Agreement, and approval of all requests for Borrowing and all disbursements by the Borrowers, and (ii) the Real Estate Consultant to assist the Loan Parties in connection with real estate matters (including, without limitation, negotiations in respect of leases and sales of owned Real Property).

(b)    The Lead Borrower authorizes the Agent and the Term Agent to communicate directly with the Loan Parties' independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Consultants), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agent and Term Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party. The

-122-

7143386v10

Lead Borrower acknowledges and agrees that (i) the Loan Parties and their representatives will cooperate fully with the Consultants and any Lender Group Consultant, if any, (ii) the Consultants and any Lender Group Consultant shall be granted full and complete access to the Loan Parties' books and records, (iii) the Agent, Term Agent and the Lenders are authorized to communicate directly with the Consultants and the Consultants are authorized to communicate directly with the Agent, Term Agent and the Lenders, regarding all matters relating to the services to be rendered by the Consultants to the Loan Parties, including, without limitation, to discuss all financial reports, business information, findings and recommendations of such Consultant, and (v) the Consultants are authorized to provide the Agent and Term Agent and the Lenders with all reports and other information (including, without limitation, all marketing materials and indications of interest) prepared or reviewed by the Consultants.  If requested by the Agent, the Consultants shall provide the Agent with a weekly update regarding the status of its efforts on behalf of the Loan Parties.

(c)    Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Agent, the Term Agent, Issuing Bank and the Lenders, as the Agent may determine to be necessary or appropriate, in its sole discretion.  Each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation with any Lender Group Consultant (including, without limitation, providing unfettered access to such Loan Party's business, books and records and senior management; (ii) all costs and expenses of any such Lender Group Consultant shall be expenses required to be paid by the Loan Parties under Section 10.04 hereof; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

**6.23    Performance within Budget**.  At all times following the Closing Date, strictly perform in accordance with the Approved Budget, including having made all scheduled payments to the Pre-Petition Lenders and Lenders as applicable as and when required, subject to the following (the "Permitted Variance"): (a) the Borrowers' actual sales and cash receipts shall not be less than 85% of the projected amounts set forth in the Approved Budget, (b) the Borrowers' actual expenses and cash expenditures shall not be greater than 115% of the projected amounts set forth in the Approved Budget on an aggregate basis (other than with respect to professional fees and expenses, which shall be tested on a separate aggregate basis), and (c) the Borrowers' Inventory shall not be less than 90% of the projected amounts set forth in the Approved Budget.  Each of the foregoing covenants shall be tested on Sunday of each week (commencing with the first (1st) week after the Petition Date) on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis, pursuant to the Approved Budget Variance Report delivered by the Lead Borrower to the Agent in accordance with Section 6.01(d).

**6.24    Permitted Sales Process; Agency Agreement.**

(a)    On the Petition Date, the Loan Parties shall have filed the following motions in the Chapter 11 Case with the Bankruptcy Court, each in form and substance acceptable to the Agent:

(i) A motion (the "Bidding Procedures Motion") requesting an order from the Bankruptcy Court approving bidding procedures relating to the Agency Agreement and approving the Liquidation Stalking Horse Bid with respect thereto, including the bidding protections set forth therein;

(ii) A motion (the "Sale Order Motion") (which may be combined with the Bidding Procedures Motion) requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Loan Parties to consummate the Permitted Sale and, if applicable, authorizing the conduct of "going out of business" sales at the Loan Parties' applicable locations pursuant to the Liquidation Stalking Horse Bid; and

(iii) A motion (the "Store Closing Motion") requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Loan Parties to enter into the Initial Store Closing Agreement and conduct the Initial Store Closings.

(b) On or before thirty five (35) days after the Petition Date, the Bankruptcy Court shall have issued an order authorizing the retention by the Loan Parties of the Sale Consultant and Financial Consultant.

(c) On or before February 22, 2016, the Bankruptcy Court shall have entered an order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures Motion and approving the Liquidation Stalking Horse Bid, which Bidding Procedures Order shall be in form and substance acceptable to the Agent and the Term Agent;

(d) On or before March 18, 2016, the Loan Parties shall have received qualifying bids in accordance with the Bidding Procedures Order;

(e) To the extent any qualifying bids are received, on or before March 22, 2016, the Loan Parties shall have completed an auction for a Permitted Sale of substantially all of the assets of the Loan Parties;

(f) On or before March 23, 2016, the Bankruptcy Court shall have entered one or more orders (the "Sale Order") approving a Permitted Sale as requested in the Sale Order Motion, which Sale Order shall be in form and substance acceptable to the Agent and, if applicable, authorizing the conduct of "going out of business" sales at the Loan Parties' applicable locations pursuant to the applicable Initial Store Closing Agreement; and

(g) On or before March 24, 2016, the Loan Parties shall have closed on the Permitted Sale approved pursuant to the Sale Order.

(h) In the event that the Permitted Sale approved pursuant to the Sale Order does not provide for the sale of the Loan Parties' owned Real Property, then on or before June 30, 2016, the Loan Parties shall have consummated a sale of the Real Property on terms satisfactory to the Agent.

(i)     On or before February 8, 2016 the Bankruptcy Court shall have entered an order approving the Initial Store Closing Agreement as requested in the Store Closing Motion, which order shall be in form and substance acceptable to the Agent.

**6.25    Additional Bankruptcy Related Affirmative Covenants.**

(a)     The Loan Parties shall provide the Agent and the Term Agent with a status report and such other updated information relating to a Permitted Sale as may be reasonably requested by the Agent or the Term Agent, in form and substance reasonably acceptable to the Agent and the Term Agent.

(b)     If an Event of Default has occurred and is continuing and the Agent has accelerated the repayment of the Obligations pursuant to Section 8.02, at the request of the Agent, the Loan Parties shall promptly engage an Approved Liquidator or Approved Liquidators on terms and conditions acceptable to the Agent in its Permitted Discretion.

(c)     The Loan Parties shall fund the Professional Fee Escrow Account on a weekly basis in accordance with the Approved Budget.

**6.26    Leases.**

(a)     The Loan Parties shall pay all Post-Petition Obligations under the leases of real property and licenses of Intellectual Property, if any, as required by the Bankruptcy Code or the Bankruptcy Court, except to the extent (i) any Loan Party is contesting any such obligations in good faith by appropriate proceedings, (ii) such Loan Party has established proper reserves as required under GAAP, and (iii) the nonpayment of which does not result in the imposition of a Lien.  No Loan Party may reject any of its leases without the prior written consent of the Agent and the Term Agent (such consent not to be unreasonably withheld or delayed).  The assumption or rejection of any lease shall be conducted in a manner consistent with a maximization of the value of the assets of the Loan Parties.

(b)     On or before the date that is 35 days after the Petition Date, the Loan Parties shall have filed a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before 75 days after the Petition Date, the Bankruptcy Court shall have entered the Lease Extension Order.

**6.27    Financing Orders.**  The Loan Parties shall comply with the Financing Orders, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Agent and the Term Agent.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

-125-

**7.01    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments.**  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock.**  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness or (b) issue Disqualified Stock.

**7.04    Fundamental Changes.**  Merge, amalgamate, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing).

**7.05    Dispositions.**  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments.**  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

      (a)      each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party, and each Loan Party may make Restricted Payments to the Lead Borrower;

      (b)      reserved; and

      (c)      reserved.

**7.07    Prepayments of Indebtedness and Payments of Specified Subordinated Indebtedness.**  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than (x) Indebtedness under the Pre-Petition Credit Agreement in accordance with the terms and conditions herein, (y) the Committed Revolving Loans and all Obligations related thereto), and (z) as set forth in the Approved Budget (subject to the Permitted Variance) or make any payment in violation of any subordination terms of any Subordinated Indebtedness.

**7.08    Change in Nature of Business.**  Engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates.**  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary

course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Lead Borrower to any officer, director, employee or consultant of the Lead Borrower or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Lead Borrower or any of its Subsidiaries, (f) any issuances of securities of the Lead Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Lead Borrower) of the Lead Borrower or any of its Subsidiaries, and (g) transactions permitted under Section 7.04, 7.06 and 7.07.

     **7.10    Burdensome Agreements**. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or the Pre-Petition Credit Agreement) that limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

     **7.11    Use of Proceeds**. Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

     **7.12    Amendment of Material Documents**. Amend, modify, supplement, alter or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties in any material respect, (b) any Subordinated Debt Document (other than the Specified Subordinated Indebtedness Documents) in a manner adverse to the Credit Parties, or (c) any Material Contract or any Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder) to the extent that such amendment, alteration, modification or waiver of such Material Contract or Material Indebtedness would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect; or (d) the Specified Subordinated Indebtedness Documents, without the prior written consent of the Agent.

7143386v10

**7.13    Fiscal Year.**  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors.**  Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(b) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent. No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 and 6.21 hereof.

**7.15    Reserved.**

**7.16    Designation of Senior Debt.**  Designate any Indebtedness (other than the Indebtedness under the Loan Documents) of any Loan Party or any of its Subsidiaries as "Credit Facility Debt" (or any similar term) or designate any other credit facility (other than the credit facility under the Loan Documents) of any Loan Party or any of its Subsidiaries as the "Credit Facility" (or any similar term), in each case under, and as defined in, the Indenture or any supplemental indentures thereto.

**7.17    Reclamation Claims.**  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or agree to allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $10,000, except for returns with respect to Inventory that is (x) subject to a valid consignment agreement, (y) that does not constitute Eligible Inventory, and (z) to the extent consented to by the Agent.

**7.18    Bankruptcy Related Negative Covenants.**  No Loan Party shall seek, consent to, or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any Leases (other than the "dark stores" or locations of the Initial Store Closing or in connection with a Permitted Sale) of any Loan Party without the Agent's prior consent;

(b)    Any modification, stay, vacation or amendment to the Financing Orders to which the Agent and the Term Agent have not consented in writing;

(c)    A priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations and the Pre-Petition Obligations except as set forth in the Financing Orders;

-128-

(d)     Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations or Pre-Petition Liens including any adequate protection Liens except as set forth in the Financing Orders;

(e)     Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(f)     Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Obligations and Pre-Petition Indebtedness reflected in the Approved Budget (subject to the Permitted Variance)) incurred prior to the Petition Date or except as set forth in the Financing Orders the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(g)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**7.19    Professional Fee Escrow Account.** Until all of the Pre-Petition Obligations and the Obligations have been paid in full, in cash, and all applicable Commitments to lend have terminated, pay the fees and expenses (other than the Transaction Fees, which shall be paid as set forth below) of the any Case Professionals from any source other than (i) the Professional Fee Escrow Account or (ii) any retainers paid prior to the Petition Date and held by such Case Professional or (iii) Post Trigger Notice Carve Out Amount to the extent not previously funded into the Professional Fee Escrow Account. Notwithstanding anything to the contrary contained in this Agreement, any other Loan Documents or the Approved Budget, as applicable, none of the Credit Parties shall be responsible for funding into the Professional Fee Escrow Account any of the Transaction Fees or similar fees payable to the Sale Consultant or any other "success" fees payable to any investment banker, and, subject to the immediately succeeding sentence, in no event shall any such amounts be paid out of the Carve-Out or any funds in the Professional Fee Escrow Account. Notwithstanding the foregoing, the Success Fee shall be deemed part of the Carve-Out, provided that the Success Fees shall be paid solely from the proceeds of a Permitted Sale and not from the Professional Fee Escrow Account and shall not reduce the amounts available in the Budget for the Carve-Out or the Post Trigger Notice Carve Out Amount. No Plan shall fail to provide for the payment in full of any outstanding Transaction Fees on the effective date thereof. No Financing Transaction (as defined in the Sale Consultant Agreement) shall fail to provide for payment in full of the Financing Success Fee (as defined in the Sale Consultant Agreement) on the closing date thereof. For the avoidance of doubt, none of the provisions of this Agreement or any other Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers paid prior to the Petition Date and held by such Case Professional.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.** Any of the following shall constitute an Event of Default:

-129-

(a) <u>Non-Payment</u>. The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any Letter of Credit Obligation, or deposit any funds as Cash Collateral in respect of Letter of Credit Obligations or of any of the Pre-Petition Obligations, or (ii) any interest on any Loan, on any Letter of Credit Obligation or on any Pre-Petition Obligation, or (iii) any fee due hereunder, or any other amount payable hereunder or under any other Loan Document or the Interim Financing Order or Final Financing Order; or

(b) <u>Specific Covenants</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.10, 6.11, 6.12, 6.13, 6.14, 6.22, 6.23, 6.24, 6.25, 6.26, 6.27, 6.28, or Article VII; or

(c) <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) days; or

(d) <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e) <u>Cross-Default</u>. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-petition or unstayed Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) after giving effect to any grace period, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is, after giving effect to any grace period, to cause, or to permit the holder or holders of such post-petition or unstayed Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $750,000; or

(f) Reserved; or

-130-

(g)     Attachment. Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person; or

(h)     Judgments; Settlements. (i) There is entered against any Loan Party or any Subsidiary thereof (A) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $750,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (B) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (I) enforcement proceedings are commenced by any creditor upon such judgment or order, or (II) there is a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect, or (ii) any Loan Party or any Subsidiary thereof enters into one or more settlements that results in the payment of money by such Loan Party or Subsidiary in an aggregate amount (as to all such settlements) exceeding $750,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the claim and does not dispute coverage); or

(i)     ERISA. (i) An ERISA Event occurs with respect to a Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount resulting in any liability to any Loan Party which would reasonably likely result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents. (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations and the Pre-Petition Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral with a fair market value in excess of $250,000 with the perfection and priority required by the applicable Security Document; or

(k)     Change of Control. There occurs any Change of Control; or

(l)     Cessation of Business. Except as otherwise expressly permitted hereunder, any Loan Party shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

7143386v10

(m)     Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)     Indictment.  The indictment or institution of any legal process or proceeding against any Loan Party or any Subsidiary thereof, under any federal, state, provincial, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(o)     Guaranty.  The termination or attempted termination or revocation of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(p)     Elavon Offset.  Elavon or Elavon Member shall exercise any right of offset, deduction, chargeback or withdraw against any deposit account or securities account of any Borrower or any Guarantor other than from the Elavon Deposit Account or the Elavon Reserve Account (except any of the foregoing that is voided or stayed pursuant to the automatic stay); or

(q)     Enforceability of Subordination Provisions.  (i) The Subordination Provisions shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

(r)     Chapter 11 Case.  The occurrence of any of the following in the Chapter 11 Case:

(i)     except in connection with a Permitted Sale, any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Pre-Petition Obligations and the Obligations on the closing of such sale;

(ii)     other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to

-132-

prohibit Agent, the Term Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case; or (E) any other action or actions adverse to the interest of the Agent the Term Agent, the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral; provided that seeking relief specifically set forth in the Financing Orders from the Bankruptcy Court during the "Remedies Notice Period" shall not constitute an Event of Default under this clause (r)(ii);

      (iii)    (A) other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent and the Term Agent do not consent or otherwise agree to treatment of the respective claims of the Agent and the Lenders, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent and the Term Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent and the Term Agent;

      (iv)    the entry of an order in the Chapter 11 Case confirming a plan that (A) is not acceptable to the Agent and Term Agent in their discretion (it being agreed that a plan that satisfies the Obligations and the Pre-Petition Obligations (if any) in full in cash on the effective date thereof is acceptable to the Agent and Term Agent) or (B) does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Pre-Petition Obligations and the Obligations under this Agreement on or before the effective date of such plan or plans;

      (v)    the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Credit Agreement or the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the Agent or the Term Agent;

      (vi)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within 30 days of the Petition Date;

      (vii)    except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by the Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;

      (viii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

7143386v10

(ix)    the filing of a motion by a Loan Party or any holder of the Specified Subordinated Indebtedness or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or, other than a Permitted Sale, the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Pre-Petition Obligations and the Obligations, and termination of the Commitments on the effective date of such plan or the closing of such sale;

(x)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 (or $500,000 in the aggregate) or more, or (2) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xii)    the commencement of a suit or action against the Agent, any Lender or any other Credit Party by or on behalf of any Loan Party, or its bankruptcy estates;

(xiii)    the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Pre-Petition Credit Agreement;

(xiv)    the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court;

(xv)    the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Agent may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date;

(xvi)    the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent, the Lenders and Pre-Petition Agent except as set forth in the Financing Orders; or

(xvii)  the failure of any Loan Party or other Person to perform any of its obligations under the Agency Agreement, the Bidding Procedures Order or the Sale Order.

**8.02    Remedies Upon Event of Default.**  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions upon the expiration of the "Remedies Notice Period" referred to in the Financing Orders:

(a)    declare the Revolving Commitments of each Revolving Lender to make Committed Revolving Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, whereupon such Revolving Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, and all Pre-Petition Obligations, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Loan Parties Cash Collateralize the Letter of Credit Obligations; and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents, the Pre-Petition Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or the Pre-Petition Loan Documents or any instrument pursuant to which the Obligations or the Pre-Petition Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds.**  After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to <u>Section 8.02</u>), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

<u>First</u>, to the payment in full of the Pre-Petition Revolving Loan Balance including funding of the indemnity accounts;

<u>Second</u>, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts

-135-

(including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent, in its capacity as such and Credit Party Expenses of the Term Agent after the commencement of proceeding under any Debtor Relief Law in an amount not to exceed $100,000 in the aggregate or such greater amounts approved by Agent;

Third, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Revolving Lenders and the Issuing Bank (including Credit Party Expenses to the respective Revolving Lenders and the Issuing Bank and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Third payable to them;

Fourth, to the extent not previously reimbursed by the Revolving Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances and Unintentional Overadvances;

Fifth, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

Sixth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations (other than the Other Liabilities and Obligations owing to the Term Lenders), and fees (including Letter of Credit Fees), ratably among the Revolving Lenders and the Issuing Bank in proportion to the respective amounts described in this clause Sixth payable to them;

Seventh, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

Eighth, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to the Agent for the account of the Issuing Bank, to Cash Collateralize that portion of Letter of Credit Obligations comprised of the aggregate undrawn amount of Letters of Credit;

Tenth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations for which a claim has been asserted against the Agent, the Issuing Bank or a Revolving Lender), but excluding (i) the Term Loan, (ii) any Other Liabilities, and (iii) Overadvances that are not Permitted Overadvances or Unintentional Overadvances), ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them;

Eleventh, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured by the Security Documents, ratably among

the Credit Parties in proportion to the respective amounts described in this clause Eleventh held by them;

Twelfth, to payment of that portion of the obligations arising from Bank Products but excluding Bank Products in excess of $500,000 or to the extent a Bank Product Reserve has not been implemented;

Thirteenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Pre-Petition Term Loan and other Obligations and fees owing to the Term Lenders (excluding principal of the Pre-Petition Term Loan), ratably among the Pre-Petition Term Lenders in proportion to the respective amounts described in this clause Thirteenth payable to them;

Fourteenth, to payment of that portion of the Obligations constituting unpaid principal of the Pre-Petition Term Loan and all other Obligations related to the Pre-Petition Term Loan, ratably among the Pre-Petition Term Lenders in proportion to the respective amounts described in this clause Fourteenth held by them;

Fifteenth, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Term Agent and amounts payable under Article III) payable to the Term Agent, in its capacity as such;

Sixteenth, to payment of that portion of the Obligations  constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Term Lenders (including Credit Party Expenses to the respective Term Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Sixteenth payable to them;

Seventeenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loan and other Obligations and fees owing to the Term Lenders, ratably among the Term Lenders in proportion to the respective amounts described in this clause Seventeenth payable to them;

Eighteenth, to payment of that portion of the Obligations constituting unpaid principal of the Term Loan and all other Obligations related to the Term Loan, ratably among the Term Lenders in proportion to the respective amounts described in this clause Eighteenth held by them;

Nineteenth, to payment of that portion of the obligations arising from Bank Products not paid pursuant to clause Twelfth; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Ninth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as

Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority**.

(a)        Each of the Lenders and the Swing Line Lender hereby irrevocably appoints Wells Fargo to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations and appearing in the Chapter 11 Case on behalf of the Lenders), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent, the Term Agent, the Lenders and the Issuing Bank, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b)        Each of the Term Lenders hereby irrevocably appoints GACP Finance Co., LLC to act on its behalf as the Term Agent hereunder and under the other Loan Documents and authorizes the Term Agent to take such actions on its behalf and to exercise such powers as are delegated to the Term Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Term Agent and the Term Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender**. The Person serving as the Agent or the Term Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent or the Term Agent and the terms "Revolving Lender" or "Revolving Lenders" and "Term Lender" or "Term Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent or the Term Agent, as applicable, hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**. Neither the Agent nor the Term Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent and the Term Agent:

(a)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)        shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or

-138-

by the other Loan Documents that the Agent or the Term Agent is required to exercise as directed in writing by the Applicable Lenders, provided that neither the Agent nor the Term Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent or the Term Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or the Term Agent or any of their respective Affiliates in any capacity.

Neither the Agent nor the Term Agent shall be liable for any action taken or not taken by it (i) with the Consent or at the request of the Applicable Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent or the Term Agent, as applicable, shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

Neither the Agent nor the Term Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent or the Term Agent, as applicable, by the Loan Parties, a Lender or the Issuing Bank. Upon the occurrence of a Default or Event of Default, the Agent or the Term Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent or the Term Agent shall have received such direction, the Agent or the Term Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent or the Term Agent be required to comply with any such directions to the extent that the Agent or the Term Agent believes that its compliance with such directions would be unlawful.

Neither the Agent nor the Term Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent or the Term Agent.

**9.04    Reliance by the Agent and the Term Agent.**  The Agent and the Term Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not

limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent and the Term Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Agent and the Term Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Agent or the Term Agent shall have received written notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Agent and the Term Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**. The Agent and the Term Agent may perform any and all of their respective duties and exercise their respective rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent or the Term Agent. The Agent or the Term Agent, and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent, the Term Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent or the Term Agent.

**9.06    Resignation of Agent**. The Agent or the Term Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation (a) from the Agent, the Required Lenders shall have the right, in consultation with the Lead Borrower (other than after the occurrence and during the continuance of an Event of Default), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or (b) from the Term Agent, the Required Term Lenders shall have the right, in consultation with the Lead Borrower (other than after the occurrence and during the continuance of an Event of Default), to appoint a successor, which shall be a Term Loan Lender, or an Affiliate of any such Term Loan Lender or which would qualify as an Eligible Assignee. If no such successor shall have been so appointed by the Required Revolving Lenders or the Required Term Lenders, as applicable, and shall have accepted such appointment within thirty (30) days after the retiring Agent or Term Agent gives notice of its resignation, then the retiring Agent or Term Agent may, on behalf of the Revolving Lenders and the Issuing Bank (in the case of the Agent) or on behalf of the Term Lenders (in the case of the Term Agent), appoint a successor Agent or Term Agent, as applicable, meeting the qualifications set forth above; provided, that if the Agent or the Term Agent, as applicable, shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent or Term Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the Issuing Bank under any of the Loan Documents, the retiring Agent shall continue to hold such

collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent or the Term Agent, as applicable, shall instead be made by or to each Lender and the Issuing Bank directly, until such time as the Applicable Lenders appoint a successor Agent or Term Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent or Term Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent of Term Agent, and the retiring Agent or Term Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent or Term Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's or Term Agent's resignation hereunder (including pursuant to Section 8.02(b) and this Section 9.06) and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent or Term Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent or Term Agent was acting in such capacity hereunder.

Any resignation by Wells Fargo as Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender and the resignation of Wells Fargo as Issuing Bank. Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and Swing Line Lender, (b) the retiring Issuing Bank and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

**9.07    Non-Reliance on Agent or Term Agent and Other Lenders**. Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Agent, the Term Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent, the Term Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    Reserved.**

**9.09    Reserved**.

-141-

**9.10    Collateral and Guaranty Matters.** The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any transfer or sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)    to release any Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty and the other Loan Documents to which it is a party, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11    Notice of Transfer.** The Agent and the Term Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.12    Reports and Financial Statements.** By signing this Agreement, each Lender:

(a)    agrees to furnish the Agent at such frequency as the Agent may reasonably request with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender;

(b)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

7143386v10

(c)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Term Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of Loans or Letters of Credit; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Term Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent, the Term Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13    Agency for Perfection.**  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent, the Term Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession. Should the Term Agent or any Lender (other than the Agent) obtain possession of any such Collateral, the Term Agent or such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent and Term Agent.**

(a)    Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent, the Issuing Bank and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, the Issuing Bank and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, the Issuing Bank and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

7143386v10

expenses or disbursements resulting from the Agent's, the Issuing Bank's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

(b)     Without limiting the obligations of the Loan Parties hereunder, the Term Lenders hereby agree to indemnify the Term Agent and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Term Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Term Agent and its Related Parties in connection therewith; provided, that no Term Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Term Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

**9.15    Relation among Lenders.** The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent and the Term Agent) authorized to act for, any other Lender.

**9.16    Defaulting Lender.**

(a)     Notwithstanding the provisions of Section 2.14 hereof, the Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Agent shall transfer any such payments (i) first, to the Swing Line Lender to the extent of any Swing Line Loans that were made by the Swing Line Lender and that were required to be, but were not, paid by the Defaulting Lender, (ii) second, to the Issuing Bank, to the extent of the portion of a payment on account of Letters of Credit that was required to be, but was not, paid by the Defaulting Lender, (iii) third, to each Non-Defaulting Lender ratably in accordance with their Revolving Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Committed Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (iv) to the Cash Collateral Account, the proceeds of which shall be retained by the Agent and may be made available to be re-advanced to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of the Committed Revolving Loans (or other funding obligations) hereunder, and (v) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender. Subject to the foregoing, the Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Applicable Percentages

-144-

in connection therewith) and for the purpose of calculating the fee payable under Section 2.09(a), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Revolving Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01(a) through (c). The provisions of this Section 9.16 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Agent, the Issuing Bank, and the Borrowers shall have waived, in writing, the application of this Section 9.16 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by the Agent pursuant to Section 9.16(b) shall be released to the Borrowers). The operation of this Section 9.16 shall not be construed to increase or otherwise affect the Revolving Commitment of any Revolving Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Agent, the Issuing Bank, the Swing Line Lender, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Agent, to arrange for a substitute Revolving Lender to assume the Revolving Commitment of such Defaulting Lender, such substitute Revolving Lender to be reasonably acceptable to the Agent. In connection with the arrangement of such a substitute Revolving Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Revolving Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Applicable Percentage of its participation in the Letters of Credit); provided, that any such assumption of the Revolving Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 9.16 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 9.16 shall control and govern.

(b)     If any Swing Line Loan or Letter of Credit is outstanding at the time that a Revolving Lender becomes a Defaulting Lender then:

(i)     such Defaulting Lender's participation interest in any Swing Line Loan or Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (x) the Outstanding Amount sum of all Non-Defaulting Lenders' Credit Extensions after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders'

Revolving Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(ii)    if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrowers shall within one (1) Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's participation in any outstanding Swing Line Loans (after giving effect to any partial reallocation pursuant to clause (b)(i) above) and (y) second, cash collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause (b)(i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such Letter of Credit Obligations are outstanding; provided, that the Borrowers shall not be obligated to cash collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also the Issuing Bank;

(iii)    if the Borrowers cash collateralize any portion of such Defaulting Lender's participation in Letters of Credit pursuant to this Section 9.16(b), the Borrowers shall not be required to pay any Letter of Credit Fees to the Agent for the account of such Defaulting Lender pursuant to Section 2.03 with respect to such cash collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is cash collateralized;

(iv)    to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this Section 9.16(b), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.03 shall be adjusted in accordance with such reallocation;

(v)    to the extent any Defaulting Lender's participation in Letters of Credit is neither cash collateralized nor reallocated pursuant to this Section 9.16(b), then, without prejudice to any rights or remedies of the Issuing Bank or any Revolving Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.03 with respect to such portion of such participation shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's participation is cash collateralized or reallocated;

(vi)    so long as any Revolving Lender is a Defaulting Lender, the Swing Line Lender shall not be required to make any Swing Line Loan and the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Applicable Percentage of such Swing Line Loans or Letter of Credit cannot be reallocated pursuant to this Section 9.16(b) or (y) the Swing Line Lender or the Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Lender or the Issuing Bank, as applicable, and the Borrowers to eliminate the Swing Line Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Line Loans or Letters of Credit; and

-146-

(vii)    The Agent may release any cash collateral provided by the Borrowers pursuant to this Section 9.16(b) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Applicable Percentage of any Letter of Credit disbursement that is not reimbursed by the Borrowers pursuant to Section 2.03.

## ARTICLE X
## MISCELLANEOUS

**10.01  Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)    (as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (v) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that (i) only the Consent of the Required Revolving Lenders shall be necessary to waive any obligation of the Borrowers to pay interest on the Committed Revolving Loans and the Swing Line Loans or Letter of Credit Fees at the Default Rate and (ii) only the Consent of the Required Term Lenders shall be necessary to waive any obligation of the Borrowers to pay interest on the Term Loan at the Default Rate;

(d)    (i) as to any Lender, change Section 2.12(a) or Section 2.13 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender or (ii) change Section 8.03 or Schedule 1.03 without the written Consent of each Lender;

(e)    change any provision of this Section 10.01 or the definition of "Applicable Lenders", "Required Lenders", "Required Revolving Lenders", "Required Term Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender included in any such definition;

7143386v10

(f)       except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)       except as set forth in the Interlender Provisions, release all or substantially all of the Collateral from the Liens of the Security Documents (including, without limitation, in connection with the exercise of remedies pursuant to Section 8.02 or otherwise) without the written Consent of each Lender;

(h)       increase the Aggregate Revolving Commitments or increase the principal amount of the Term Loan without the written Consent of each Lender;

(i)       subject to the Interlender Provisions change the definition of the terms "Borrowing Base", "Revolving Borrowing Base" "Term Loan Borrowing Base" or "Availability Block" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender; provided, that subject to the Interlender Provisions the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves other than the Term Loan Push Down Reserve and Sale Leaseback Reserve;

(j)       modify the definition of Permitted Overadvance or Unintentional Overadvance so as to increase the amount thereof or the time period for which a Permitted Overadvance or Unintentional Overadvance may remain outstanding without the written Consent of each Lender;

(k)       except as expressly permitted herein, in any other Loan Document or in accordance with the Interlender Provisions, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents to any other Indebtedness or Lien, as the case may be, without the written Consent of each Lender; and

(l)       without the consent of the Required Revolving Lenders and Required Term Lenders:

(i)       reserved;

(ii)       amend the definition of Eligible Assignees, Permitted Disposition (subject to the Interlender Provisions) or Pre-Petition Reserve, Pre-Petition Revolving Loan Balance or Sale-Leaseback Reserve;

(iii)       amend Section 2.01(a), Section 2.05, Section 2.16, Section 5.26, Section 6.23, Section 6.24, Section 6.25, Section 6.26, Section 6.27, Section 6.28, Section 7.05, clauses (b) or (c) of Section 7.07, Section 7.17, Section 7.18, Section 7.19, Section 9.14 (in a manner adverse to any Term Lender), Section 9.16 (in a manner adverse to any Term Lender), Section 10.04 (in a manner adverse to any Term Lender), Section 10.06(a), or clauses (i)(B) and (iii) of Section 10.06(b);

provided, further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the Issuing Bank in addition to the Lenders required above, affect the rights or duties of the

-148-

Issuing Bank under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Term Agent in addition to the Lenders required above, affect the rights or duties of the Term Agent under this Agreement or any other Loan Document; (v) the GA Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto; (vi) the Wells Fargo Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto; and (vii) the provisions of this Section 10.01 shall not (subject to the Interlender Provisions) limit the discretion of the Agent to change, establish or eliminate any Reserves or abrogate the obligation of the Agent to maintain the Term Loan Push Down Reserve and Sale-Leaseback Reserve, if any, in accordance with the terms hereof. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in its capacity as a Lender, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

### 10.02   Notices; Effectiveness; Electronic Communications.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Loan Parties, the Agent, the Term Agent, the Issuing Bank or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be

deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

      (b)    <u>Electronic Communications</u>. Notices and other communications to the Loan Parties, the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to <u>Article II</u> if such Lender or the Issuing Bank, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

      Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

      (c)    <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent, the Term Agent or any of their Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; <u>provided</u>, <u>however</u>, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

-150-

(d)    Change of Address, Etc. Each of the Loan Parties, the Agent, the Term Agent, the Issuing Bank and the Swing Line Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agent, the Term Agent, the Issuing Bank and the Swing Line Lender. In addition, each Lender agrees to notify the Agent and the Term Agent from time to time to ensure that the Agent and the Term Agent each has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent, Issuing Bank and Lenders. The Agent, the Term Agent, the Issuing Bank and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, the Term Agent, the Issuing Bank, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties. All telephonic notices to and other telephonic communications with the Agent or the Term Agent may be recorded by the Agent or the Term Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies**. No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04  Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses. The Borrowers shall pay all Credit Party Expenses.

(b)    Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent, the Term Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan

-151-

Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent and the Term Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any Related Party of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee or its Related Party for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    Reimbursement by Lenders. Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, and each Term Lender severally agrees to pay to the Term Agent or such Related Party (or any such sub-agent thereof) such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent), the Term Agent (or any such sub-agent), or the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent), the Term Agent (or any such sub-agent), or the Issuing Bank in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

-152-

(d)    <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>.  All amounts due under this Section shall be payable on demand therefor.

(f)    <u>Survival</u>.  The agreements in this Section shall survive the resignation of any Agent, the Term Agent and the Issuing Bank, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05  Payments Set Aside.**  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, (b) each Revolving Lender and the Issuing Bank severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Revolving Commitments or the Committed Revolving Loans so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect, and (c) each Term Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Term Loan so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the Issuing Bank under clauses (b), (c) and (d) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06  Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors

-153-

and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent, the Term Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this Section 10.06(b), participations in Letter of Credit Obligations and in Swing Line Loans) at the time owing to it); <u>provided</u>, that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)     In any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $10,000,000 and minimum increments of $1,000,000 in excess thereof with respect to Committed Revolving Loans, and not less than $1,000,000 and minimum increments of $1,000,000 in excess thereof with respect to the Term Loan, unless each of the Agent, the Term Agent (with respect to the Term Loan) and, so long as no Default or Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitments assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     reserved; and

(B)     the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Revolving Commitment and/or Committed Revolving Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of the Issuing Bank (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding);

(D)     the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignments in respect of the assignment of any Revolving Commitment and/or Committed Revolving Loans; and

(E)     the consent of the Term Agent and the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of the Term Loan (or any portion thereof) if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which shall be paid by the assigning Lender), provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; provided, further, that no such fee shall be due in connection with an assignment to a Lender, an Affiliate of a Lender or an Approved Fund. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights

7143386v10

and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent, the Term Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower, the Term Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in Letter of Credit Obligations and/or Swing Line Loans) owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Term Agent, the Lenders and the Issuing Bank shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

-156-

In the event that a Lender sells participations to any Person, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register on which it enters the name of all participants in the Loans held by it (and the principal amount and stated interest thereon) and the portion of such Loans and the portion of such participations that is subject to such participations (the "Participant Register").  A Loan (and the note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Resignation as Issuing Bank or Swing Line Lender after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Wells Fargo (or any other Issuing Bank) assigns all of its Revolving Commitment and Committed Revolving Loans pursuant to subsection (b) above, (i) upon thirty (30) days' notice to the Lead Borrower and the Revolving Lenders, Wells Fargo (or such other Issuing Bank, as applicable) may resign as Issuing Bank and/or (ii) upon thirty (30) days' notice to the Lead Borrower, Wells Fargo may resign as Swing Line Lender.  In the event of any such resignation as Issuing Bank or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Revolving Lenders a successor Issuing Bank or Swing Line Lender hereunder in accordance with the terms hereof; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Wells Fargo (or such other Issuing Bank, as applicable) as Issuing Bank or Wells Fargo as Swing Line Lender, as the case may be.  If Wells Fargo (or such other Issuing

-157-

Bank, as applicable) resigns as Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit issued by it outstanding as of the effective date of its resignation as Issuing Bank and all Letter of Credit Obligations with respect thereto (including the right to require the Revolving Lenders to make Base Rate Loans pursuant to Section 2.03(c)). If Wells Fargo resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Revolving Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the appointment of a successor Issuing Bank and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank or Swing Line Lender, as the case may be, and (b) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Wells Fargo (or such other Issuing Bank, as applicable) to effectively assume the obligations of Wells Fargo (or such other Issuing Bank, as applicable) with respect to such Letters of Credit.

**10.07  Treatment of Certain Information; Confidentiality.** Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the

7143386v10

same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08   Right of Setoff.**  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, the Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the Issuing Bank or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Bank, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the Issuing Bank shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or the Issuing Bank different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.  Each Lender and the Issuing Bank agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent, the Term Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent, the Term Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties

7143386v10

relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent or the Term Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 10.04.

**10.12  Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13  Replacement of Lenders.** If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

-160-

(a)    the Agent shall have been paid the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14  Governing Law; Jurisdiction; Etc.**

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURTS.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

7143386v10

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT OR THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15  Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16  No Advisory or Fiduciary Responsibility.** In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and

-162-

conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17  USA PATRIOT Act Notice.** Each Lender that is subject to the Act (as hereinafter defined) and the Agent and the Term Agent (in each case for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender, the Agent or the Term Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**10.18  Foreign Asset Control Regulations.** Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by

7143386v10

Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19   Time of the Essence.** Time is of the essence of the Loan Documents.

**10.20   Designation of Senior Debt.** All Obligations shall be "Credit Facility Debt", and the credit facility provided herein shall be the "Credit Facility", in each case for purposes of and as defined in the Indenture and all supplemental indentures thereto.

**10.21   Press Releases.**

(a)      Each Credit Party and each Loan Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent, the Term Agent, any other Credit Party or their respective Affiliates when referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent, the Term Agent or such other Credit Party, as applicable, and without the prior written consent of the Agent, the Term Agent or such other Credit Party, as applicable, unless (and only to the extent that) such Credit Party, Loan Party or Affiliate thereof is required to do so under applicable Law and then, in any event, such Credit Party, Loan Party or Affiliate thereof will consult with the Agent, the Term Agent or such other Credit Party, as applicable, before issuing such press release or other public disclosure other than as required by applicable Law.

(b)      Each Loan Party consents to the publication by the Agent, the Term Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent or the Term Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent, the Term Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. Each of the Agent and the Term Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.22   Additional Waivers.**

(a)      The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

-164-

(b)     The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several

-165-

obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.23    No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24    Attachments**. The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.25    Keepwell**. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Facility Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.25 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.25, or otherwise under the Facility Guaranty, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Section 10.25 constitute, and this Section 10.25 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**10.26    Conflict**. The Loan Parties, the Agent, the Term Agent and the Lenders acknowledge that the exercise of certain of the Agent's and the Term Agent's rights and remedies hereunder may be subject to, and restricted by, the Interlender Provisions. Except as specified herein, nothing contained in the Interlender Provisions shall be deemed to modify any requirement or shall be deemed to modify any of the provisions of this Agreement and the other

Loan Documents, which, among the Loan Parties, the Agent, the Term Agent and the Lenders shall remain in full force and effect.  In the event of any conflict between the terms of this Agreement and the Interlender Provisions, the terms of the Interlender Provisions shall govern and control.

[Signature Pages Follow.]

7143386v10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

BORROWERS:

**HANCOCK FABRICS, INC.**
**HF MERCHANDISING, INC.**
**HANCOCK FABRICS OF MI, INC.**

By: _____
Name: Dennis Lyons
Title:   Senior Vice President and Chief
         Administrative Officer

**HANCOCK FABRICS, LLC**

By: _____
Name: Dennis Lyons
Title:   Manager

**HANCOCKFABRICS.COM, INC.**

By: _____
Name: Dennis Lyons
Title:   President

GUARANTORS:

**HF ENTERPRISES, INC.**
**HF RESOURCES, INC.**

By: _____
Name: Rebecca Flick
Title:   Vice President and Assistant Secretary

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent

By: _____
Name: Joseph Burt
Title: Director

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Issuing Bank, as a Revolving Lender and Swing Line Lender

By: _____

Name: Joseph Burt

Title: Director

**GACP FINANCE CO., LLC**
as Term Agent

By: _____

Name:    Grace Wang

Title:    Senior Vice President

**GACP I, LP,**
as a Term Lender

By: _____
Name:    Grace Wang
Title:    Senior Vice President

**Interlender Provisions**

Notwithstanding anything contained in the Agreement to the contrary, the Agent, Term Agent the Lenders and Loan Parties hereby agree with respect to certain of their respective rights and obligations under the Agreement as follows:

1.    **Purchase Option with Respect to the Revolving Loan Claims**.

      (a)    Subject to Section 2(g) of this Schedule 1.03 to the Agreement, if (i) the Agent shall notify the Term Agent of its intention to (by itself or at the direction of the Required Lenders), sell, lease, license or dispose of a Material Portion of the Collateral whether by private or public sale (any of the foregoing referred to herein as a "**Sale**"), in accordance with Section 4 of this Schedule 1.03 to the Agreement; provided that any notice from the Agent to the Term Agent of the Agent's intention to conduct such a Sale shall be delivered by the Agent to the Term Agent no less than 10 days prior to the commencement of any such Sale, (ii) the principal amount of the Obligations shall have been accelerated, (iii) a Collateral Enforcement Action shall have occurred that is not otherwise set forth in clauses (i) through (ii) (each of the foregoing events described in clauses (i) through (iii) herein above referred to herein as a "**Purchase Option Event**"), or (iv) the Agent does not exercise its enforcement rights and remedies as directed by the Term Agent in accordance with the terms set forth in Section 6 of this Schedule 1.03 to the Agreement as a result of a determination that such actions are not permitted by the Loan Documents or applicable law or would result in liability to the Agent or the Lenders to any Loan Party or other Person, in each case as further described in clauses (a) and (b) of Section 6 of this Schedule 1.03 to the Agreement (the "**Agent Determinations**" and together with the Purchase Option Events, each a "**Revolving Loan Purchase Option Event**"), the Term Lenders shall have the opportunity to purchase all (but not less than all) of the Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement; provided, that such option shall expire if the applicable Term Lenders fail to deliver a written notice (a "**Purchase Notice**") to the Agent within ten (10) days following the first date the Term Agent obtains knowledge of the occurrence of a Revolving Loan Purchase Option Event, which Purchase Notice shall (A) be signed by the applicable Term Lenders committing to such purchase (the "**Purchasing Creditors**") and indicate the percentage of the Revolving Loan Claims to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the Revolving Loan Claims) and (B) state that (1) it is a Purchase Notice delivered pursuant to this Section 1 of Schedule 1.03 to the Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Purchase Notice by the Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) days after the Purchase Notice was received by the Agent (such ten (10) day period, the "**Purchase Period**") to purchase all (but not less than all) of the Revolving Loan

Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement (the date of such purchase, the "**Purchase Date**").

(b)     On the Purchase Date, the Agent and the other Revolving Loan Secured Parties shall, subject to any required approval of any Governmental Authority, in each case then in effect, if any, sell to the Purchasing Creditors all (but not less than all) of the Revolving Loan Claims. On such Purchase Date, the Purchasing Creditors shall (i) pay to the Agent, for the benefit of the Revolving Loan Secured Parties, as directed by the Agent, in immediately available funds the full amount (at par) of all Revolving Loan Claims then outstanding together with all accrued and unpaid interest and fees thereon (excluding any prepayment fee, prepayment premium or early termination fee not then due under the Loan Documents other than as provided below), all in the amounts specified by the Agent and determined in good faith in accordance with the Loan Documents or other applicable documents, (ii) furnish such amount of cash collateral in immediately available funds as the Agent determines is reasonably necessary to secure the Revolving Loan Secured Parties on terms reasonably satisfactory to the Agent in connection with any (x) Asserted Indemnification Claims and (y) all Letter of Credit Obligations but not in any event in an amount greater than 105% of the Outstanding Amount of all Letter of Credit Obligations (other than Letter of Credit Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which Letter of Credit Obligations shall be cash collateralized in an amount equal to 115% of the Outstanding Amount of such Letter of Credit Obligations), and (iii) agree to reimburse the Revolving Loan Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the Revolving Loan Claims under the Agreement and as to which the Agent and Revolving Loan Secured Parties have not yet received final payment as of the Purchase Date. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the Agent (for the benefit of the applicable Revolving Loan Secured Parties) as the Agent shall have specified in writing to the Term Agent. Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the applicable Purchasing Creditors to the bank account designated by the Agent are received in such bank account prior to 1:00 p.m., Eastern time, and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the Agent are received in such bank account after 1:00 p.m., Eastern time.

(c)     Any purchase pursuant to the purchase option set forth in this Section 1 of Schedule 1.03 to the Agreement shall, except as provided below, be expressly made without representation or warranty of any kind by the Agent or the other Revolving Loan Secured Parties as to the Revolving Loan Claims, the Collateral or otherwise, and without recourse to the Agent and the other Revolving Loan Secured Parties as to the Revolving Loan Claims, the Collateral or otherwise, except that the Agent and each of the Revolving Loan Secured Parties, as to itself

only, shall represent and warrant only as to (i) the principal amount of the Revolving Loan Claims being sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Revolving Loan Claims being sold by it, and (iii) that such Person has the right to assign the Revolving Loan Claims being assigned by it and its assignment agreement has been duly authorized by it.

(d)     In connection with any purchase of Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement, each Revolving Loan Secured Party agrees to enter into and deliver to the Purchasing Creditors on the Purchase Date, as a condition to closing, an assignment agreement in a form reasonably acceptable to the Agent and the Term Agent and, at the expense of the Loan Parties, each of the Revolving Loan Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or note powers), then in such Revolving Loan Secured Party's possession or in the possession of its agent or bailee, or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Revolving Loan Secured Party or its agent or bailee then has control, as the case may be, to any Person designated by the Term Agent to act as the successor Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to any Person designated by the Term Agent to act as the successor Agent. Upon the consummation of the purchase of the Revolving Loan Claims pursuant to this Section 1 of Schedule 1.03 to the Agreement, the Agent shall be deemed to have resigned as an "agent" or "administrative agent" or "collateral agent" (or any similar role) for the Secured Parties under the Loan Documents; provided that the Agent (and all other agents under the Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" under the Agreement.

(e)     Notwithstanding the foregoing purchase of the Revolving Loan Claims by the Purchasing Creditors, the Revolving Loan Secured Parties shall retain, on an unsecured basis, those contingent indemnification obligations and other obligations under the Loan Documents which by their express terms would survive any repayment of the Revolving Loan Claims.

(f)     Anything contained in this Section 1 of Schedule 1.03 to the Agreement to the contrary notwithstanding, in the event that any Purchasing Creditor receives any prepayment fee, prepayment premium or early termination fee under the Loan Documents (as in effect on the date hereof) or otherwise, in cash, within 180 days following the Purchase Date, then such Purchasing Creditor shall pay a supplemental purchase price in respect of its purchase of the Revolving Loan Claims under this Section 1 of Schedule 1.03 to the Agreement in an amount equal to the portion of such prepayment fee, prepayment premium, or early termination fee to which the Revolving Loan Secured Parties would have otherwise been entitled had the purchase under this Section 1 of Schedule 1.03 to the Agreement not occurred. The Purchasing Creditors agree not to amend or waive the terms of the Loan Documents as in effect on the Purchase Date in

- 3 -

respect of any prepayment fee, prepayment premium or early termination fee contained therein or assign any rights to such prepayment fee, prepayment premium or early termination fee following any purchase by the Purchasing Creditors of the Revolving Loan Claims pursuant to the terms hereof.

(g)    In the event that (A) all Letters of Credit are terminated or returned to the Issuing Bank for cancellation and all of the un-reimbursed obligations in respect of the Letters of Credit are paid and satisfied in full in cash (or other consideration acceptable to the Revolving Loan Secured Parties) after purchase by the Purchasing Creditors of the Revolving Loan Claims, the Agent, on behalf of the Revolving Loan Secured Parties, shall return to such Purchasing Creditors any remaining cash collateral referred to in Section 1(b)(y) of this Schedule 1.03 to the Agreement and (B) all Asserted Indemnification Claims are (x) waived, dismissed or otherwise cease to exist to the reasonable satisfaction of the Agent, or (y) paid and satisfied in full in cash (or other consideration acceptable to the Revolving Loan Secured Parties) after the purchase by the Purchasing Creditors of the Revolving Loan Claims, the Agent, on behalf of the Revolving Loan Secured Parties, shall return to such Purchasing Creditors any remaining cash collateral referred to in Section 1(b)(x) of this Schedule 1.03 to the Agreement.

(h)    Anything contained in this Section 1 of Schedule 1.3 of the Agreement to the contrary notwithstanding, each Term Secured Party agrees that no Term Secured Party shall have the right to exercise the purchase option set forth in this Section 1 of Schedule 1.3 unless, simultaneously with the consummation of such purchase on the Purchase Date, the "Purchasing Creditors" (as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) purchase 100% of the "Revolving Loan Claims" (as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) in accordance with Section 1 of Schedule 1.3 to the Pre-Petition Credit Agreement.

2.    **Purchase Option with Respect to the Term Loan**.

(a)    If any Purchase Option Event shall occur, the Revolving Lenders shall have the opportunity to purchase all (but not less than all) of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement; provided, that such option shall expire if the applicable Revolving Lenders fail to deliver a written notice (a "**Term Purchase Notice**") to the Term Agent within ten (10) days following the first date the Agent obtains knowledge of the occurrence of a Purchase Option Event, which Term Purchase Notice shall (A) be signed by the applicable Revolving Lenders committing to such purchase (the "**Term Purchasing Creditors**") and indicate the percentage of the Term Loan Claims to be purchased by each Term Purchasing Creditor (which aggregate commitments must add up to 100% of the Term Loan Claims) and (B) state that (1) it is a Term Purchase Notice delivered pursuant to this Section 2 of Schedule 1.03 to the Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Term Purchase Notice by the Term Agent, the Term Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10)

- 4 -

days after the Term Purchase Notice was received by the Term Agent (such ten (10) day period, the "**Term Purchase Period**") to purchase all (but not less than all) of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement (the date of such purchase, the "**Term Purchase Date**").

(b)   On the Term Purchase Date, the Term Secured Parties shall, subject to any required approval of any Governmental Authority, in each case then in effect, if any, sell to the Term Purchasing Creditors all (but not less than all) of the Term Loan Claims. On such Term Purchase Date, the Term Purchasing Creditors shall (i) pay to the Term Agent, for the benefit of the applicable Term Secured Parties, as directed by the Term Agent, in immediately available funds the full amount (at par) of all Term Loan Claims then outstanding together with all accrued and unpaid interest and fees thereon (excluding any prepayment fee, prepayment premium or early termination fee not then due under the Loan Documents other than as provided below), all in the amounts specified by the Term Agent and determined in good faith in accordance with the Loan Documents or other applicable documents. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the Term Agent (for the benefit of the applicable Term Secured Parties) as the Term Agent shall have specified in writing to the Agent. Interest and fees shall be calculated to but excluding the Term Purchase Date if the amounts so paid by the applicable Term Purchasing Creditors to the bank account designated by the Term Agent are received in such bank account prior to 1:00 p.m., Eastern time, and interest shall be calculated to and including such Term Purchase Date if the amounts so paid by the Term Purchasing Creditors to the bank account designated by the Term Agent are received in such bank account after 1:00 p.m., Eastern time.

(c)   Any purchase pursuant to the purchase option set forth in this Section 2 to Schedule 1.03 to the Agreement shall, except as provided below, be expressly made without representation or warranty of any kind by the Term Secured Parties as to the Term Loan Claims, the Collateral or otherwise, and without recourse to the Term Secured Parties as to the Term Loan Claims, the Collateral or otherwise, except that the Term Agent and each Term Secured Party, as to itself only, shall represent and warrant only as to (i) the principal amount of the Term Loan Claims sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Term Loan Claims being sold by it, and (iii) that such Person has the right to assign the Term Loan Claims being assigned by it and its assignment agreement has been duly authorized by it.

(d)   In connection with any purchase of Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement, each Term Secured Party agrees to enter into and deliver to the Term Purchasing Creditors on the Term Purchase Date, as a condition to closing, an assignment agreement in a form reasonably acceptable to the Agent and the Term Agent and, at the expense of the Loan Parties, each of the Term Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock

powers or note powers), then in such Term Secured Party's possession or in the possession of its agent or bailee (if any), or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Term Secured Party or its agent or bailee then has control, as the case may be, to any Person designated by the Agent to act as the successor Term Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to any Person designated by the Agent to act as the successor Term Agent. Upon the consummation of the purchase of the Term Loan Claims pursuant to this Section 2 of Schedule 1.03 to the Agreement, the Term Agent shall be deemed to have resigned as an "agent" (or any similar role) for the Term Lenders under the Loan Documents; provided that the Term Agent (and all other agents under the Agreement) shall be entitled to all of the rights and benefits of a former "agent", if any, under the Agreement.

(e)     Notwithstanding the foregoing purchase of the Term Loan Claims by the Term Purchasing Creditors, the Term Secured Parties shall retain, on an unsecured basis, those contingent indemnification obligations and other obligations under the Loan Documents which by their express terms would survive any repayment of the Term Loan Claims.

(f)     Anything contained in this Section 2 of Schedule 1.03 to the Agreement to the contrary notwithstanding, in the event that any Term Purchasing Creditor receives any prepayment fee, prepayment premium or early termination fee under the Loan Documents (as in effect on the date hereof), or otherwise, in cash, within 180 days following the Term Purchase Date, then such Term Purchasing Creditor shall pay a supplemental purchase price in respect of its purchase of the Term Loan Claims under this Section 2 of Schedule 1.03 to the Agreement in an amount equal to the portion of such prepayment premium to which the Term Secured Parties would have otherwise been entitled had the purchase under this Section 2 of Schedule 1.03 to the Agreement not occurred. The Term Purchasing Creditors agree not to amend or waive the terms of the Loan Documents as in effect on the Term Purchase Date in respect of any prepayment fee, prepayment premium or early termination fee contained therein following or assign any rights to such prepayment fee, prepayment premium or early termination fee following any purchase by the Term Purchasing Creditors of the Term Loan Claims pursuant to the terms hereof.

(g)     In the event that a Term Purchase Notice and a Purchase Notice are both delivered within the applicable required time periods set forth in Sections 1 and 2 of this Schedule 1.03 to the Agreement, the Term Purchase Notice shall receive priority and a Term Purchase Period shall be deemed to have commenced in accordance with the terms set forth in Section 2(a) of this Schedule 1.03 to the Agreement, such that the right to exercise the purchase option with respect to any other Secured Party's Obligations (as applicable) shall vest solely in the Term Purchasing Creditors pursuant to the terms set forth in this Section 2 of

7143386v10

Schedule 1.03 of the Agreement and the Purchase Notice that shall have been delivered shall be deemed null and void and of no force and effect.

3. **Insolvency Proceedings**.

(a) General Application. The terms set forth in this Schedule 1.03 to the Agreement shall be applicable to the Chapter 11 Case and all converted or succeeding cases in respect thereof, and all references herein to any Borrower or other Loan Party shall be deemed to apply to the trustee for any such Borrower or Loan Party and such Borrower or Loan Party as a debtor-in-possession. The relative rights of the Secured Parties in or to any distributions from or in respect of any Collateral or proceeds of Collateral shall continue after the institution of any case under any Debtor Relief Law, including without limitation, the Chapter 11 Case, involving any Borrower or any other Loan Party, including without limitation, all converted or succeeding cases in respect thereof, on the same basis as prior to the date of such institution, subject to any court order approving the financing of, or use of cash collateral by, any Borrower or any other Loan Party as debtor-in-possession.

(b) Reserved.

(c) Relief from Stay. Each Term Secured Party agrees not to (i) seek (or support any other person seeking) relief from the automatic stay or any other stay in any case under Debtor Relief Law in respect of the Collateral, without the prior written consent of the Agent, or (ii) oppose any request by the Agent or any Revolving Lender to seek relief from the automatic stay or any other stay in any case under Debtor Relief Law in respect of the Collateral.

(d) Reorganization Securities. Notwithstanding anything herein to the contrary, Term Secured Parties may receive and retain Permitted Reorganization Securities under a confirmed plan of reorganization or similar dispositive restructuring plan (each, a "**Plan**") if the Revolving Loan Secured Parties have received Debt Reorganization Securities or other consideration acceptable to the Revolving Loan Secured Parties in their sole discretion of a value determined by the Agent as of the effective date of a Plan equal to the allowed amount of the Revolving Loan Secured Claims as determined by the Agent. Each Term Secured Party hereby agrees that such Term Secured Party shall not propose or support any Plan that is inconsistent with the priorities set forth in the Agreement (including this Schedule 1.03).

4. **Release of Liens and Collateral**. Notwithstanding Section 10.01 of the Agreement or anything else to the contrary in the Agreement, the Term Agent on behalf of itself and each Term Secured Party, agrees in its capacity as a secured creditor that neither it nor they will raise any objection to, or oppose, and shall be deemed to have consented to any private or public sale of all or any portion of the Collateral (and any post-petition or post-filing assets subject (whether conducted by the Agent or a Loan Party with the consent of the Agent) to adequate protection Liens or comparable Liens under any Debtor Relief

- 7 -

Law in favor of the Agent) free and clear of any Liens and other claims (a) at any time after the occurrence and during the continuance of an Event of Default under the Agreement and with the consent of the Agent; provided, however that after the occurrence and during the continuance of an Event of Default under the Agreement and prior to the commencement of any case under Debtor Relief Law (including without limitation, the Chapter 11 Case), any (x) material sale of Inventory not in the ordinary course of business shall be conducted by a nationally recognized liquidator of recognized standing approved by the Agent and (y) sale of all or substantially all of the Borrowers' assets and businesses as a "going concern" shall be (1) conducted on not less than 10 days' prior written notice to the Term Agent, and (2) in no event shall the purchaser in such going concern sale be any Loan Party or any of their respective Affiliates, (b) under Section 363 of the Bankruptcy Code or other similar Debtor Relief Law if the Agent has consented to such sale or disposition of such Collateral, and in connection with each of the foregoing clauses (a) and (b) herein above, each Term Secured Party hereby irrevocably authorizes the Agent to release any Lien on any of the Collateral; provided that, (i) any Lien of the Agent on such Collateral attaches to the net cash proceeds of such sale or other disposition and (ii) such net cash proceeds are applied to repayment of the Obligations in accordance with <u>Section 8.03</u> of the Agreement. Notwithstanding the foregoing, after the commencement of a case under Debtor Relief Law (including without limitation, the Chapter 11 Case) any Term Secured Party may raise any objections to any such sale or disposition of assets that could be raised by any other creditor of the applicable Loan Party whose claims are not secured by any Liens on the Collateral; provided, that such objections are not based on their status as secured creditors (without limiting the foregoing, no Term Secured Party may raise any objection based on the rights afforded by Section 363(e) and (f) of the Bankruptcy Code to secured creditors with respect to Liens granted to the Agent in respect of such assets or on the basis of any rights of the Term Secured Parties as a secured creditor, if any, whether directly or indirectly, with respect to the Liens held for their benefit by the Agent).

5.    **Reserves; Discretionary Rights; Calculation of the Borrowing Base; Permitted Overadvances and Assignments**.

(a)    As among the Lenders, the Agent and the Term Agent, nothing contained herein shall limit, restrict or impair the discretionary rights and ability of the Agent to impose or establish any and all Reserves and to thereafter reduce or eliminate such Reserves or to determine the eligibility of Collateral for inclusion in the calculation of the Revolving Borrowing Base or Term Loan Borrowing Base (or any component definition thereof). With respect to all Reserves in effect on the Closing Date, the Agent agrees (unless the Term Agent otherwise agrees) to impose a methodology no less restrictive than that used as of the Closing Date in determining such Reserves (and, for the avoidance of doubt, it being understood that notwithstanding the preservation of a methodology that is no less restrictive, the Dollar amount of such Reserves may fluctuate from time to time after the Closing Date). The Agent, unless otherwise agreed by the Term Agent, shall implement and maintain the Term Loan Push Down Reserve, the Sale Lease Back Reserve and the Carve-Out Reserve, if any, in accordance with the terms and

7143386v10

conditions of the Agreement. With respect to other Reserves implemented after the Closing Date, prior to the reduction or termination of such Reserve, the Agent shall consult with the Term Agent at least two (2) Business Days prior to such reduction or termination, provided further that if Wells Fargo or one of its Affiliates is no longer the Agent the successor Agent shall not remove or decrease any Reserve imposed after the Closing Date unless (i) the circumstance which gave rise to such Reserve no longer exists or (ii) the reduction is due to mathematical calculations in the amount of such Reserve, without the consent of the Term Agent which consent shall not be unreasonably withheld or delayed.

(b)     Each of the parties hereto agrees that (i) in all cases, the determination of the Revolving Borrowing Base (and all component definitions thereof), the Term Loan Borrowing Base (and all component definitions thereof), the Permitted Overadvances (and all component definitions thereof) shall be based upon the most recent Borrowing Base Certificate received by the Agent pursuant to the Agreement prior to the funding of any Committed Revolving Loan, Swing Line Loan or the issuance, renewal or amendment of a Letter of Credit (it being understood and agreed that the use of cash collateral in any case under any Debtor Relief Law (including, without limitation, the Chapter 11 Case) shall not constitute a funding of a Loan or other advance) and (ii) the Agent shall have a two (2) Business Day period of time to implement such Borrowing Base Certificate.

(c)     Reserved.

(d)     Notwithstanding anything contained in the Agreement to the contrary, if at any time Wells Fargo or its Affiliate is not the Agent, the amount of the Permitted Overadvances permitted by clause (b)(ii) of the definition thereof shall be equal to one (1%) percent of the Revolving Borrowing Base.

(e)     Notwithstanding Section 10.06(b)(iii)(E) of the Agreement, the consent of the Agent shall not be required in connection with the assignment of the Term Loan (or any portion thereof ) at any time Wells Fargo or its Affiliate (i) is not the Agent; and (ii) does not hold more than fifty (50%) percent of (x) the Aggregate Revolving Commitments or (y) if the Aggregate Revolving Commitments have been terminated, the Total Outstandings.

6.     **Exercise of Remedies**. Upon the satisfaction of the Directed Enforcement Conditions, the Term Agent may direct the Agent to (and the Agent shall, upon such direction), commence and diligently pursue in good faith the exercise of the Agent's enforcement rights or remedies against, and take action to enforce its Liens on, the Collateral, to the extent that the Agent is permitted to exercise such rights and remedies by the terms of the Loan Documents and/or under applicable law; provided that, in the case of each of the foregoing, (a) in the good faith determination of the Agent, taking such enforcement action is permitted under the terms of the Loan Documents and applicable law, (b) in the good faith determination of the Agent, taking such enforcement action will not result in any liability of the Agent or the Lenders to any Loan Party or any other Person, and

(c) the Agent shall be entitled to all of the benefits of <u>Sections 9.03, 9.05, 9.14 and 10.04</u> of the Agreement in connection with taking such enforcement action.

7. **Credit Bid**. Each of the parties hereto hereby agrees that the Term Agent on behalf of itself and the other Term Secured Parties may direct the Agent to, on behalf of the Term Secured Parties, credit bid the Term Loan Claims in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of any other Debtor Relief Law), and the Agent agrees to take such direction from the Term Agent and not object thereto, in each case so long as the Revolving Loan Claims (together with all "Revolving Loan Claims" as defined in Schedule 1.3 to the Pre-Petition Credit Agreement) shall be paid in full in cash upon the effectiveness of any such sale under Section 363 of the Bankruptcy Code. In addition, the Agent on behalf of itself and the other Revolving Loan Secured Parties may credit bid the Revolving Loan Claims in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Law) and the Term Secured Parties agree not to object to such credit bid, so long as such credit bid does not exceed the amount of the obligations consisting of the Revolving Loan Claims (it being acknowledged and agreed that, in connection therewith, the Agent may also credit bid any "Revolving Loan Claims" as defined in Schedule 1.3 to the Pre-Petition Credit Agreement). The parties hereto agree that in the event the Agent takes any action to credit bid the Term Loan Claims upon the direction of the Term Agent on behalf of itself and the other Term Loan Secured Parties, that the Agent shall be entitled to all of the benefits of <u>Sections 9.03, 9.14 and 10.04</u> of the Agreement in connection with such action.

8. **Standing**. The Agent and the other Revolving Secured Parties each agree that, in any case under Debtor Relief Law (including, without limitation, the Chapter 11 Case), the Term Secured Parties shall have standing to take any action not expressly prohibited hereunder or otherwise inconsistent herewith, and in furtherance thereof, that in connection with any case under Debtor Relief Law (including, without limitation, the Chapter 11 Case), the Agent shall not, on its behalf or on behalf of the Required Lenders, raise any objection on the grounds of a lack of standing of the Term Secured Parties (other than to the extent such action is expressly prohibited hereunder or otherwise inconsistent herewith) (a) in the assertion by the Term Secured Parties of any rights or remedies available to unsecured creditors (including, without limitation, the right to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Loan Parties arising under the Loan Documents, any case under Debtor Relief Law or applicable non-bankruptcy law), (b) under Section 4 of this Schedule 1.03 to the Agreement, and (c) to vote on any plan of reorganization, arrangement or compromise or any proposal, file any proof of claim, make other filings and make any arguments and motions in any case under Debtor Relief Law. In the event that any Term Secured Party or the Term Agent becomes a judgment lien creditor in respect of any Collateral securing the Obligations as a result of the enforcement of its rights as an unsecured creditor, such judgment lien shall be subordinated to any Lien on such Collateral securing the Revolving Loan Claims on the same basis and to the same extent as the Liens on the Collateral of the Agent securing the Term Loan Claims are subordinated (including with respect to the Proceeds thereof being subject to <u>Sections</u>

<u>2.05 and 8.03</u> to those Liens securing the Revolving Loan Claims under the Agreement and this Schedule 1.03 to the Agreement.

9.    **Avoidance; Reinstatement of Obligations; Clawback.**  If a Revolving Loan Secured Party or a Term Secured Party received payment or property on account of a Revolving Loan Claim or Term Loan Claim, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside or otherwise required to be transferred to a trustee, receiver or the estate of any Loan Party (in each instance, to the extent required by law, a "**Recovery**"), then, to the extent of the Recovery, the Revolving Loan Secured Parties or the Term Secured Parties intended to have been satisfied by the payment will be reinstated as the Revolving Loan Claims or the Term Loan Claims, as applicable, on the date of Recovery, and no payment with respect to, or discharge of the Revolving Loan Claims or the Term Loan Claims, as applicable, will be deemed to have occurred for all purposes hereunder.  If the Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Loan Parties from the date of reinstatement.  Upon such reinstatement of the Obligations, each Term Secured Party will deliver to the Agent on behalf of each Revolving Loan Secured Party any Collateral or proceeds thereof received between the payment or discharge of the Obligations to effect the reinstatement required pursuant to the terms hereof.  No Term Secured Party may benefit from a Recovery, and subject to Section 3(d) of this Schedule 1.03 to the Agreement with respect to any Term Secured Party's receipt of any Permitted Reorganization Securities, any distribution made to a Term Secured Party as a result of a Recovery will be paid over to the Agent for application to the Revolving Loan Claims in accordance with <u>Section 8.03</u> of the Agreement.

If in connection with any Permitted Sale under clause (ii) of the definition thereof, the agent under any agency agreement with respect to such Permitted Sale is entitled to recover from the Agent or any Lender any amounts paid by such agent in accordance with any agency agreement (a "**Clawback**"), the Term Lender acknowledges and agrees that it shall be responsible for refunding such amounts up to the amount of any payments received by the Term Lender with respect to the Term Loan as of the date of such Clawback.

10.    **Resignation of Agent**

Upon irrevocable payment in full of the Total Revolving Outstandings  and the Total Revolving Outstandings  under the Pre-Petition Credit Agreement, in each case, in accordance with the terms of this Agreement and the pre-Petition Credit Agreement, as applicable : (i) Wells Fargo shall be deemed to have resigned as the Agent and the Term Agent shall be deemed to be the successor Agent for all purposes, in each case, without any action by any party hereto; (ii) the Term Agent shall receive any further agency fees for acting as Agent under the Loan Documents; (iii) the Loan Parties hereby waive any notice requirement provided for under the Loan Documents in respect of such automatic resignation or appointment; (iv) the Borrower hereby consents to such automatic appointment of the Term Agent as successor Agent; (v) the Term Agent hereby accepts

such automatic appointment; (vi) each party hereto agrees to execute any documentation reasonably necessary to evidence such succession (provided that the Term Agent shall bear no responsibility for any actions taken or omitted to be taken by the Wells Fargo); (viii) the parties hereto acknowledge and agree that the Term Agent shall bear no responsibility for any actions taken or omitted to be taken by the Wells Fargo; (ix) the parties hereto hereby confirm that the Term Agent would succeed to the rights and obligations of the Administrative Agent and shall become vested with all of the rights, powers, privileges and duties of the Administrative Agent under each of the Loan Documents, and Wells Fargo will be discharged from all of its duties and obligations as Administrative Agent; and (xi) Wells Fargo shall continue to be entitled to the provisions of Section 9.14 and 10.04 of the Agreement. Immediately upon the occurrence of a Recovery with respect to a Revolving Loan Secured Party Wells Fargo shall automatically and without further action of any party be deemed to be the Agent hereunder for all purposes and the Term Agent shall automatically be deemed to have resigned as Agent, in such case Well Fargo shall have no responsibility for any actions taken or omitted to be taken by the Term Agent.

11. **Amendments to this Schedule 1.03 to the Agreement; Third Party Beneficiaries**.

    (a)    No amendment or waiver of the specific terms set forth in this Schedule 1.03 to the Agreement, nor any consent to any departure by any of the Agent, the Revolving Loan Secured Parties, the Term Agent or the Term Secured Parties shall be effective, unless it is in a written agreement executed by the Agent and the Term Agent and then such waiver or consent shall only be effective in the specific instance and for the specific purpose for which given; provided that such amendment or agreement solely with respect to this Schedule 1.03 to the Agreement as between the Agent and the Term Agent shall not operate to modify or amend any provision of the Agreement, unless any Borrower otherwise agrees.

    (b)    The terms set forth on this Schedule 1.03 to the Agreement are solely for the benefit of the Revolving Loan Secured Parties and the Term Secured Parties. No other Person (including any Loan Party, any Subsidiary of any Loan Party or any Affiliate of any Loan Party) shall be deemed to be a third party beneficiary of the terms set forth in this Schedule 1.03 to the Agreement.

*[Remainder of Page Intentionally Left Blank.]*

7143386v10

## Definitions for Purposes of Schedule 1.03 to the Agreement

Unless otherwise defined in Schedule 1.03 or herein, terms used in this Schedule 1.03 or herein shall have the meaning ascribed to such terms in the Agreement. In addition, as used in Schedule 1.03 or herein the following terms shall have the following meanings:

"Agent Determinations" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Asserted Indemnification Claim" shall mean any matters or circumstances for which notice has been furnished to, demand has been made upon, or asserted against the applicable Agent or any Secured Party, whether in writing or threatened orally, that the applicable Agent has determined could reasonably be expected to result in direct or actual damages and expenses to the applicable Agent or any applicable Secured Party and which are subject to indemnification by the Loan Parties pursuant to the terms of the Agreement.

"Collateral Enforcement Action" shall mean any of (i) the date of termination of the Commitments or acceleration pursuant to Section 8.02 or the Maturity Date (ii) the taking of any action to enforce or realize upon any Lien with respect to a material portion of the Collateral, including without limitation, the institution or conduct of any private or judicial foreclosure or sale proceedings or the noticing of any public or private sale or other disposition pursuant to Article 9 of the UCC in each case with respect to a material portion of the Collateral, or (iii) the sale or disposition of all or substantially all of the Collateral.

"Debt Reorganization Securities" means Reorganization Securities that consist of debt obligations of the reorganized debtor.

"Directed Enforcement Conditions" shall mean, each of the following conditions: (a) an Event of Default has occurred and is continuing under the Agreement and such Event of Default has not been waived by the Agent or the Required Lenders in accordance with the terms of the Agreement or this Schedule 1.03 to the Agreement, (b) the Inaction Period shall have expired, and (c) the Agent shall not have commenced and be diligently pursuing in good faith the exercise of its enforcement rights and remedies against all or a material portion of the Collateral (including, without limitation, any action to enforce its Liens on the Collateral) pursuant to, and in accordance with the terms of the Agreement and the other Loan Documents.

"Inaction Period" shall mean the period of time commencing upon the date of the Agent's receipt of a written notice (in accordance with the notice provisions in the Agreement) from the Term Agent that an Event of Default has occurred and is continuing under the Agreement and has not been waived in accordance with the terms of this Agreement or this Schedule 1.03 to the Agreement and ending on the date which is (a) so long as Wells Fargo or its Affiliate is the Agent, sixty (60) days or (b) any other time, thirty (30) days, in each case after the date of receipt of such notice; provided that such Inaction Period shall be tolled for any period that the Secured Parties are stayed or otherwise prohibited by law or court order from exercising remedies with respect to the Collateral. Such written notice from the Term Agent to the Agent shall reference the Agreement and declare that the "Inaction Period" has commenced.

7143386v10

"Material Portion" shall mean Collateral with an aggregate book value as set forth in the Borrowers' ledger as determined from time to time in accordance with an independent appraisal satisfactory to the Agent exceeding an amount equal to fifty percent (50%) of the book value of the Collateral immediately prior to such sale.

"Non-Debt Reorganization Securities" means Reorganization Securities which are not Debt Reorganization Securities.

"Permitted Reorganization Securities" means (a) Debt Reorganization Securities that are subject to an intercreditor agreement or agreement among lenders that is substantially consistent with the terms and substance of this Agreement (including, this Schedule 1.03 to the Agreement and Section 10.01 of the Credit Agreement), and (b) Non-Debt Reorganization Securities.

"Plan" has the meaning set forth in Section 3(d) of this Schedule 1.03 to the Agreement.

"Purchase Date" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Notice" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Option Event" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchase Period" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Purchasing Creditors" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Recovery" has the meaning set forth in Section 9 of this Schedule 1.03 to the Agreement.

"Reorganization Securities" means any notes, equity interests, or other securities (whether debt, equity, or otherwise) issued by a reorganized debtor that are distributed pursuant to a Plan on account of the Obligations in any case under any Debtor Relief Law of a Loan Party (including, without limitation, the Chapter 11 Case).

"Revolving Loan Claims" shall mean any and all Obligations owing by any Loan Party to any of the Revolving Secured Parties arising under the Loan Documents or any agreement with respect to Bank Products or any Cash Management Services, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law.

"Revolving Loan Purchase Option Event" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

7143386v10

"Revolving Loan Secured Claims" shall mean any portion of the Revolving Loan Claims that would not be an unsecured claim under Section 506(a) of the Bankruptcy Code (or any similar provision of other Debtor Relief Law) assuming that the Revolving Loan Claims are secured by Liens on the Collateral that are prior to the Liens securing the Term Loan Secured Claims.

"Revolving Loan Secured Parties" shall mean, collectively, (a) the Agent, (b) the Revolving Lenders, (c) Swing Line Lender, (d) the Issuing Bank, (e) the Agent, any Revolving Lender or any of their Affiliates who provide Cash Management Services or Bank Products.

"Sale" has the meaning set forth in Section 1(a) of this Schedule 1.03 to the Agreement.

"Secured Parties" shall mean (x) Revolving Loan Secured Parties, and (y) Term Secured Parties as applicable.

"Term Loan Claims" shall mean all Obligations owing by any Loan Party to any of the Term Secured Parties arising under the Loan Documents.

"Term Loan Secured Claims" shall mean any portion of the Term Loan Claims that would not be an unsecured claim under Section 506(a) of the Bankruptcy Code (or any similar provision of other Debtor Relief Law) assuming that the Revolving Loan Claims are secured by Liens on the Collateral that are prior to the Liens securing the Term Loan Claims.

"Term Purchasing Creditors" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Date" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Notice" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Purchase Period" has the meaning set forth in Section 2(a) of this Schedule 1.03 to the Agreement.

"Term Secured Parties" shall mean the Term Agent and the Term Lenders.

- 15 -