February 2, 2016

Hancock Fabrics, Inc.
One Fashion Way
Baldwyn, MS 38824

Debtor-In-Possession Credit Agreement

WELLS FARGO FEE LETTER

Ladies and Gentlemen:

Reference is made to the Debtor-In-Possession Credit Agreement dated as of February 2, 2016 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), by and among (i) Hancock Fabrics, Inc., a Delaware corporation, for itself and as Lead Borrower (in such capacity, the "Lead Borrower") for the other Borrowers party thereto from time to time (individually, a "Borrower" and, collectively, the "Borrowers"), (ii) the Borrowers party thereto from time to time, (iii) the Guarantors party thereto from time to time, (iv) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "Agent") for its own benefit and the benefit of the other Credit Parties referred to therein, (v) Wells Fargo Bank, National Association, as Swing Line Lender, (vi) GACP Finance Co., LLC, as term agent (in such capacity, the "Term Agent"), and (vii) the lenders from time to time party thereto (individually, a "Lender" and, collectively, the "Lenders"). All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

This letter is the "Wells Fargo Fee Letter" referred to in the Credit Agreement. In connection with, and in consideration of the agreements contained in, the Credit Agreement and the other Loan Documents, the Lead Borrower, on behalf of itself and the other Borrowers, and the Agent hereby agree as follows:

1. DIP Closing Fee. The Borrowers shall pay to the Agent for the account of the Revolving Lenders, a closing fee in the amount of $800,000 (the "DIP Closing Fee"), which shall be fully earned by the Agent from the Borrowers on the Closing Date. $400,000 of the DIP Closing Fee shall be due and payable in full by the Borrowers to the Agent on the Closing Date and the remaining $400,000 shall be due and payable in full by the Borrowers to the Agent upon the earlier of (a) March 18, 2016 and (b) upon the consummation of a Permitted Sale, provided, that the payment of such remaining $400,000 shall be waived in the event that each of the following conditions have been satisfied on or prior to March 18, 2016: irrevocable payment in full in cash of (i) the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) plus all interest on and fees related thereto, (ii) the Total Revolving Outstandings, and all interest accrued and unpaid thereon, and (iii) any other Obligations related to the foregoing.

2.  Collateral Monitoring Fee. The Borrowers shall pay a collateral monitoring fee of $25,000 per annum, payable to the Agent in advance on the Closing Date and annually on the first day of the month following each anniversary thereof for so long as any obligation shall be outstanding under the Credit Agreement or the other Loan Documents or any Lender shall have any commitment thereunder. The Collateral Monitoring Fee shall be fully earned on the Closing Date and payable in accordance with the terms hereof.

3.  Revolver Early Termination Fee. The Borrowers hereby acknowledge and agree that, (a) the Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter (as defined in the Pre-Petition Credit Agreement)) in the amount of $2,000,000 (the "Revolver Early Termination Fee") is fully earned, due and payable and (b) prior to the Petition Date, the Borrowers shall be deemed to have paid to the Pre-Petition Agent for the account of each Revolving Lender (as defined in the Pre-Petition Credit Agreement), the Revolver Early Termination Fee from the proceeds of a Committed Revolving Loan (as defined in the Pre-Petition Credit Agreement) made by the Pre-Petition Agent pursuant to Section 2.02(d) of the Pre-Petition Credit Agreement. The Pre-Petition Agent, on behalf of itself and each Revolving Lender (as defined in the Pre-Petition Credit Agreement), hereby agrees that, on and as of the date of the entry of the Final Financing Order satisfying the conditions below, the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) shall be reduced by $750,000 of such Revolver Early Termination Fee in the event that each of the following conditions have been satisfied (as determined by the Pre-Petition Agent) on or prior to March 5, 2016: (x) the entry by the Bankruptcy Court of the Final Financing Order, (y) the irrevocable payment in full in cash of the Total Revolving Outstandings (as such term is defined in the Pre-Petition Credit Agreement) (which may occur pursuant to the roll up of the Pre-Petition Committed Revolving Loans and Letters of Credit into the Obligations under the Credit Agreement) plus all interest on and fees related thereto, and (z) pursuant to such Final Financing Order, the Borrowers and any Committee (as defined in the Final Financing Order) shall (A) agree that any and all Challenges (as defined in the Final Financing Order) shall be deemed to be forever waived, released and barred, (B) agree that all findings, Debtors' Stipulations (as defined in the Final Financing Order), waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Senior Creditors' (as defined in the Final Financing Order) claims, liens, and interests shall be of full force and effect and forever binding upon the Borrowers, the Borrowers' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Cases and any Successor Cases (each as defined in the Interim Financing Order or the Final Financing Order, as applicable); (C) agree that any and all claims or causes of action against any of the Borrowers or the Prepetition Senior Creditors relating in any way to the Borrowers or the Prepetition Senior Credit Documents (as defined in the Final Financing Order) shall be forever waived and released by the Borrowers' estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases; and (D) release, discharge and acquit the Agent and each other Credit Party and their affiliates, directors, agents and employees and their respective assigns, from all obligations to the Loan Parties (and their respective successors and assigns) and from any and all claims, demands, debts, accounts contracts, liabilities, actions and

causes of actions, whether in law or in equity, arising out of any action taken in connection with the Credit Agreement and the other Loan Documents.

4. <u>General</u>. All fees payable under this Wells Fargo Fee Letter constitute compensation for services rendered and do not constitute interest or a charge for the use of money. Except as expressly provided herein, all fees payable hereunder will be paid in immediately available funds, shall be non-refundable in all circumstances, and shall not be subject to any rebate or reduction by way of setoff or counterclaim. All fees received by the Agent for the Agent's benefit hereunder may be shared among the Agent and its affiliates as it may determine in its sole discretion.

Prior to the filing of the Chapter 11 Case, the Borrowers agree to keep the terms of this Wells Fargo Fee Letter confidential and not to disclose the same to any other person, without the prior written consent of the Agent, other than to (a) Borrowers' officers, directors, employees, accountants, attorneys, and other advisors, agents and representatives, and then only on a confidential basis in connection with the transactions contemplated hereby (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of the terms of this Wells Fargo Fee Letter and instructed to keep such terms confidential, and the Borrowers shall be responsible for any breach of such confidentiality by any person described in this clause (a), and (b) as required by applicable laws or compulsory legal process (in which case Borrowers agree, to the extent permitted, to inform the Agent promptly thereof). Notwithstanding the foregoing, in connection with the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, the Borrowers may disclose the amounts of the fees herein, terms of this letter and parties hereto to the parties in interest in the Chapter 11 Case and to the Bankruptcy Court.

This Wells Fargo Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. **THIS WELLS FARGO FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.** This Wells Fargo Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Wells Fargo Fee Letter by electronic transmission shall be effective as delivery of a manually executed counterpart of this Wells Fargo Fee Letter. Section headings used herein are for convenience of reference only, are not part of this Wells Fargo Fee Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Wells Fargo Fee Letter.

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Wells Fargo Fee Letter shall become a binding agreement between us.

**[SIGNATURE PAGES FOLLOW]**

Very truly yours,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent

By: _____
Name: Joseph Burt
Title: Director

ACCEPTED AND AGREED TO
as of the date first above written:

**HANCOCK FABRICS, INC.**

By:
Name: Dennis Lyons
Title:   Senior Vice President and Chief
          Administrative Officer

**EXECUTION VERSION**

---

SECURITY AGREEMENT

by

HANCOCK FABRICS, INC.

as Lead Borrower

and

THE OTHER BORROWERS AND GUARANTORS PARTY HERETO
FROM TIME TO TIME

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Collateral Agent

Dated as of February 2, 2016

---

TABLE OF CONTENTS

Page

PREAMBLE........................................................................................................1

RECITALS ........................................................................................................1

AGREEMENT .....................................................................................................2

ARTICLE I DEFINITIONS AND INTERPRETATION.

SECTION 1.1.    Definitions.........................................................................2
SECTION 1.2.    Interpretation.......................................................................6
SECTION 1.3.    Information Certificate.............................................................6

ARTICLE II GRANT OF SECURITY AND SECURED OBLIGATIONS.

SECTION 2.1.    Pledge; Grant of Security Interest...............................................7
SECTION 2.2.    Secured Obligations................................................................8
SECTION 2.3.    Security Interest.. .................................................................8

ARTICLE III PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES; USE OF COLLATERAL.

SECTION 3.1.    Delivery of Certificated Securities Collateral..............................9
SECTION 3.2.    Perfection of Uncertificated Securities Collateral.. ......................10
SECTION 3.3.    Financing Statements and Other Filings; Maintenance of
                Perfected Security Interest.. .............................................10
SECTION 3.4.    Other Actions.......................................................................11
SECTION 3.5.    Supplements; Further Assurances..............................................13
SECTION 3.6.    Joinder of Additional Grantors.. .............................................13

ARTICLE IV REPRESENTATIONS, WARRANTIES AND COVENANTS.

SECTION 4.1.    Title....................................................................................14
SECTION 4.2.    Limitation on Liens; Defense of Claims; Transferability of
                Collateral............................................................................14
SECTION 4.3.    Chief Executive Office; Change of Name; Jurisdiction of
                Organization........................................................................14
SECTION 4.4.    Location of Inventory and Equipment..........................................15
SECTION 4.5.    Condition and Maintenance of Equipment.. ...................................15
SECTION 4.6.    Due Authorization and Issuance.. .............................................15
SECTION 4.7.    No Conflicts, Consents, etc......................................................16

Page

SECTION 4.8.    Collateral..................................................................................................16
SECTION 4.9.    Insurance...................................................................................................16
SECTION 4.10.    [Reserved]................................................................................................17
SECTION 4.11.    [Reserved]................................................................................................17

ARTICLE V CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL.

SECTION 5.1.    Pledge of Additional Securities Collateral.............................................17
SECTION 5.2.    Voting Rights; Distributions; etc...........................................................17
SECTION 5.3.    Organization Documents........................................................................18
SECTION 5.4.    Defaults, Etc............................................................................................18
SECTION 5.5.    Certain Agreements of Grantors As Issuers and Holders of Equity
                 Interests....................................................................................................18

ARTICLE VI CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY
COLLATERAL.

SECTION 6.1.    Grant of License.......................................................................................19
SECTION 6.2.    Registrations...........................................................................................19
SECTION 6.3.    No Violations or Proceedings..................................................................20
SECTION 6.4.    Protection of Collateral Agent's Security...............................................20
SECTION 6.5.    After-Acquired Property..........................................................................21
SECTION 6.6.    Modifications...........................................................................................21
SECTION 6.7.    Litigation.................................................................................................21
SECTION 6.8.    Third Party Consents...............................................................................22

ARTICLE VII CERTAIN PROVISIONS CONCERNING ACCOUNTS.

SECTION 7.1.    Special Representations and Warranties..................................................22
SECTION 7.2.    Maintenance of Records..........................................................................22
SECTION 7.3.    Legend.....................................................................................................23
SECTION 7.4.    Modification of Terms, Etc......................................................................23
SECTION 7.5.    Collection.................................................................................................24

ARTICLE VIII REMEDIES.

SECTION 8.1.    Remedies..................................................................................................24
SECTION 8.2.    Notice of Sale..........................................................................................26
SECTION 8.3.    Waiver of Notice and Claims...................................................................26
SECTION 8.4.    Certain Sales of Collateral......................................................................26
SECTION 8.5.    No Waiver; Cumulative Remedies...........................................................27
SECTION 8.6.    Certain Additional Actions Regarding Intellectual Property..................28
SECTION 8.7.    Application of Proceeds...........................................................................28

-ii-

Page

ARTICLE IX MISCELLANEOUS.

SECTION 9.1.    Concerning Collateral Agent.. ................................................................28
SECTION 9.2.    Collateral Agent May Perform; Collateral Agent Appointed
                Attorney-in-Fact...............................................................................29
SECTION 9.3.    Expenses.. ..........................................................................................30
SECTION 9.4.    Continuing Security Interest; Assignment..............................................30
SECTION 9.5.    Termination; Release.. ........................................................................30
SECTION 9.6.    Modification in Writing.. ......................................................................31
SECTION 9.7.    Notices.. ..............................................................................................31
SECTION 9.8.    GOVERNING LAW.............................................................................32
SECTION 9.9.    CONSENT TO JURISDICTION; SERVICE OF PROCESS;
                WAIVER OF JURY TRIAL................................................................32
SECTION 9.10.   Severability of Provisions.....................................................................33
SECTION 9.11.   Execution in Counterparts; Effectiveness...............................................33
SECTION 9.12.   No Release.. ........................................................................................33
SECTION 9.13.   Obligations Absolute.. ..........................................................................34
SECTION 9.14.   Credit Agreement and Agreement Among Lenders.. ...............................34

SIGNATURES

EXHIBIT 1       Form of Securities Pledge Amendment
SCHEDULE I      Intercompany Notes
SCHEDULE II     Filings, Registrations and Recordings
SCHEDULE III    Pledged Interests

## SECURITY AGREEMENT

This SECURITY AGREEMENT dated as of February 2, 2016 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Security Agreement"), is made by (i) HANCOCK FABRICS, INC., a Delaware corporation having an office at One Fashion Way, Baldwyn, Mississippi, MS 38824 as lead borrower for itself and the other Borrowers (as defined below) (the "Lead Borrower"), (ii) THE OTHER BORROWERS LISTED ON THE SIGNATURE PAGES HERETO (together with the Lead Borrower, the "Original Borrowers") OR FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Borrowers," and together with the Original Borrowers, the "Borrowers"), and (iii) THE GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO (the "Original Guarantors") AND THE OTHER GUARANTORS FROM TIME TO TIME PARTY HERETO BY EXECUTION OF A JOINDER AGREEMENT (the "Additional Guarantors," and together with the Original Guarantor, the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, having an office at One Boston Place, 18th Floor, Boston, Massachusetts 02108, in its capacity as collateral agent for the Credit Parties (as defined in the Credit Agreement defined below) pursuant to the Credit Agreement (as defined below), as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Collateral Agent").

## R E C I T A L S :

A.    The Borrowers, the Guarantors, the Lenders (as defined in the Credit Agreement) from time to time party thereto, the Collateral Agent, Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Administrative Agent") and as Swing Line Lender and GACP Finance Co., LLC, as Term Agent, in connection with the execution and delivery of this Security Agreement, have entered into that certain Debtor-In-Possession Credit Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

B.    The Guarantors have, pursuant to that certain Guaranty dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty"), among other things, unconditionally guaranteed the Guaranteed Obligations (as defined in the Guaranty).

C.    The Borrowers and the Guarantors will receive substantial benefits from the execution, delivery and performance of the Obligations and the Guaranteed Obligations (as defined in the Guaranty) and each is, therefore, willing to enter into this Security Agreement.

D.    This Security Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Credit Parties to secure the payment and performance of all of the Secured Obligations (as hereinafter defined).

E.    It is a condition to the obligations of the Lenders to make the Loans under the Credit Agreement and a condition to the Issuing Bank issuing Letters of Credit under the Credit Agreement that each Grantor execute and deliver the applicable Loan Documents, including this Security Agreement.

A G R E E M E N T :

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Collateral Agent hereby agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.    Definitions.

(a)    Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b)    Capitalized terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

(c)    The following terms shall have the following meanings:

"Additional Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Administrative Agent" shall have the meaning assigned to such term in Recital A hereof.

"Avoidance Actions" shall have the meaning assigned to such term in the Interim Financing Order or Final Financing Order, as applicable and then in effect.

"Borrowers" shall have the meaning assigned to such term in the Preamble hereof.

"Claims" shall mean any and all property taxes and other taxes, assessments and special assessments, levies, fees and all governmental charges imposed upon or assessed against, and all claims (including, without limitation, landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law) against, all or any portion of the Collateral.

"Collateral" shall have the meaning assigned to such term in SECTION 2.1 hereof.

2

"Collateral Agent" shall have the meaning assigned to such term in the Preamble hereof.

"Control" shall mean (i) in the case of each DDA, "control," as such term is defined in Section 9-104 of the UCC, and (ii) in the case of any security entitlement, "control," as such term is defined in Section 8-106 of the UCC.

"Control Agreements" shall mean, collectively, the Blocked Account Agreements and the Securities Account Control Agreements.

"Copyrights" shall mean, collectively, with respect to each Grantor, all copyrights (whether statutory or common Law, whether established or registered in the United States or any other country or any political subdivision thereof whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Grantor, in each case, whether now owned or hereafter created or acquired by or assigned to such Grantor, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Distributions" shall mean, collectively, with respect to each Grantor, all Restricted Payments from time to time received, receivable or otherwise distributed to such Grantor in respect of or in exchange for any or all of the Pledged Interests or Intercompany Notes.

"Excluded Property" shall mean the following:

(a)    any license, contract or permit held by any Grantor (i) that validly prohibits the creation by such Grantor of a security interest therein or thereon or (ii) to the extent that applicable Law prohibits the creation of a security interest therein or thereon; and

(b)    any Intellectual Property Collateral consisting of intent-to-use trademark applications, for which the creation by a Grantor of a security interest therein is prohibited without the consent of third party or by applicable Law;

provided, however, that in each case described in clauses (a) and (b) of this definition, such property shall constitute "Excluded Property" only to the extent and for so long as such license, contract, permit, or applicable Law validly prohibits the creation of a Lien on such property in favor of the Collateral Agent and, upon the termination of such prohibition (howsoever occurring), such property shall cease to constitute "Excluded Property"; provided further, that "Excluded Property" shall not include (i) any assets that

3

are of the type that may be eligible for inclusion in the Borrowing Base, or (ii) the right to receive any proceeds arising therefrom or any other rights referred to in Sections 9-406(f), 9-407(a), 9-408(a) or 9-409 of the UCC or any Proceeds, substitutions or replacements of any Excluded Property (unless such Proceeds, substitutions or replacements would otherwise constitute Excluded Property).

"Goodwill" shall mean, collectively, with respect to each Grantor, the goodwill connected with such Grantor's business including, without limitation, (i) all goodwill connected with the use of and symbolized by any of the Intellectual Property Collateral in which such Grantor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any Person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Grantor's business.

"Grantor" shall have the meaning assigned to such term in the Preamble hereof.

"Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Guaranty" shall have the meaning assigned to such term in Recital B hereof.

"Information Certificate" shall mean that certain information certificate dated as of the date hereof, executed and delivered by the Grantors in favor of the Collateral Agent for the benefit of the Credit Parties, and each other Information Certificate (which shall be in form and substance reasonably acceptable to the Collateral Agent) executed and delivered by the applicable Borrower or Guarantor in favor of the Collateral Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of a Joinder executed in accordance with SECTION 3.6 hereof, in each case, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time in accordance with the Credit Agreement.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Licenses and Goodwill associated with the foregoing.

"Intercompany Notes" shall mean, with respect to each Grantor, all intercompany notes described on Schedule I hereto and each intercompany note hereafter acquired by such Grantor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Lead Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"Letters of Credit" unless the context otherwise requires, shall have the meaning given to such term in the UCC.

4

"Licenses" shall mean, collectively, with respect to each Grantor, all license and distribution agreements with any other Person with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Grantor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"Patents" shall mean, collectively, with respect to each Grantor, all patents issued or assigned to and all patent applications made by such Grantor (whether established or registered or recorded in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Pledged Interests" shall mean, collectively, with respect to each Grantor, all Equity Interests owned by such Grantor in any issuer now existing or hereafter acquired or formed, including, without limitation, all such Equity Interests in such issuer described in Schedule III hereof, and all such Equity Interests in any successor corporation or interests or certificates of any successor limited liability company, partnership or other entity formed by or resulting from any consolidation, merger or amalgamation in which any Person listed in Section I of the Information Certificate is not the surviving entity (other than in connection with a Permitted Disposition under the Credit Agreement), together with all rights, privileges, authority and powers of such Grantor relating to such Equity Interests issued by any such issuer or any such successor Person under the Organization Documents of any such issuer or any such successor Person, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Grantor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Grantor in any manner, and all other Investment Property owned by such Grantor that represents intercompany Indebtedness or Equity Interests in any Subsidiary of such Grantor; provided, however, that to the extent applicable, Pledged Interests shall not include any Equity Interests constituting more than 66% of the total combined voting power or control of all classes of Equity Interests entitled to vote of any CFC to the extent such pledge would result in a material adverse tax consequence to such Grantor.

"Secured Obligations" shall mean the Obligations (as defined in the Credit Agreement) and the Guaranteed Obligations (as defined in the Guaranty).

"Securities Account Control Agreement" shall mean an agreement in form and substance satisfactory to the Collateral Agent with respect to any Securities Account of a Grantor.

"Securities Act" means the Securities Exchange Act of 1934 and the applicable regulations promulgated by the Securities and Exchange Commission pursuant to such Act.

"Securities Collateral" shall mean, collectively, the Pledged Interests, the Intercompany Notes and the Distributions.

"Security Agreement" shall have the meaning assigned to such term in the Preamble hereof.

"Trademarks" shall mean, collectively, with respect to each Grantor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URLs), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Grantor and all registrations and applications for the foregoing (whether statutory or common Law and whether established or registered in the United States or any other country or any political subdivision thereof), including, without limitation, the Goodwill associated therewith and the registrations and applications listed in Section III of the Information Certificate, together with any and all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including, without limitation, damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 (unless expressly stated otherwise); provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

SECTION 1.2.    Interpretation. The rules of interpretation specified in Article I of the Credit Agreement shall be applicable to this Security Agreement.

SECTION 1.3.    Information Certificate. The Collateral Agent and each Grantor agree that the Information Certificate, and all schedules, amendments and supplements thereto are and shall at all times remain a part of this Security Agreement.

6

## ARTICLE II

### GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.    <u>Pledge; Grant of Security Interest</u>.  As collateral security for the payment and performance in full of all the Secured Obligations, subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), each Grantor hereby pledges, collaterally assigns and grants to the Collateral Agent its successors and permitted assigns, for its benefit and on behalf of and for the ratable benefit of the other Credit Parties, a lien on and security interest in and to all of the right, title and interest of such Grantor in, to and under all personal property and interests in such personal property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "<u>Collateral</u>"), including, without limitation:

(i)     all Accounts;

(ii)    all Goods, including Equipment, Inventory and Fixtures;

(iii)   all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)     all Securities Collateral;

(vi)    all Investment Property;

(vii)   all Intellectual Property Collateral;

(viii)  all Commercial Tort Claims, including, without limitation, those described in Section IV of the Information Certificate;

(ix)    all General Intangibles, including, without limitation, payment intangibles;

(x)     all Deposit Accounts;

(xi)    all Supporting Obligations;

(xii)   all money, cash or cash equivalents;

(xiii)  all credit balances, deposits and other property now or hereafter held or received by or in transit to the Collateral Agent or at any other depository or other institution from or for the account of any Loan Party, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)   all proceeds of leases of real property and all owned real property;

7

    (xv) effective upon the entry of the Final Financing Order, proceeds of all Avoidance Actions;

    (xvi) effective upon the entry of the Final Financing Order, each Grantor's rights under Sections 506(c) and 550 of the Bankruptcy Code;

    (xvii) to the extent not covered by clauses (i) through (xvi) of this sentence, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of any Grantor;

    (xviii) all books, records, and information relating to the Collateral and/or to the operation of any Grantor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

    (xix) to the extent not covered by clauses (i) through (xviii) of this sentence, all other personal property of such Grantor, whether tangible or intangible and all Proceeds and products of each of the foregoing (including, without limitation, all Proceeds of any Real Estate) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

    Each category of Collateral set forth above shall have the meaning set forth in the UCC (to the extent such term is defined in the UCC), it being the intention of Grantors that the description of the Collateral set forth above be construed to include the broadest possible range of assets.

    Notwithstanding anything to the contrary contained in clauses (i) through (xix) above, the security interest created by this Security Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property, and the Grantors shall from time to time at the request of the Collateral Agent give written notice to the Collateral Agent identifying in reasonable detail the Excluded Property and shall provide to the Collateral Agent such other information regarding the Excluded Property as the Collateral Agent may reasonably request.

    SECTION 2.2. <u>Secured Obligations</u>. This Security Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due of the Secured Obligations.

    SECTION 2.3. <u>Security Interest</u>. (a) Each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including, without limitation, (i) the type of organization and any organizational identification number issued to such Grantor, (ii) a description of the Collateral as "all assets of the Debtor, wherever located, whether now owned or hereafter acquired" and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which

8

such Collateral relates. Each Grantor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request, to perfect and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(b)     Each Grantor hereby ratifies its prior authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements or amendments thereto relating to the Collateral if filed prior to the date hereof. Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Security Agreement without the prior written consent of the Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

(c)     Each Grantor hereby further authorizes the Collateral Agent to file filings with the United States Patent and Trademark Office and United States Copyright Office (or any successor office or any similar office in any other country) or other necessary documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by such Grantor hereunder in any Intellectual Property Collateral, without the signature of such Grantor, and naming such Grantor, as debtor, and the Collateral Agent, as secured party.


ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF COLLATERAL


SECTION 3.1.    Delivery of Certificated Securities Collateral. Each Grantor represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the date hereof have been delivered to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and that the Collateral Agent has a perfected first priority security interest therein. Each Grantor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral acquired by such Grantor after the date hereof, shall promptly (and in any event within five (5) Business Days) upon receipt thereof by such Grantor be delivered to and held by or on behalf of the Collateral Agent pursuant hereto. All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent. The Collateral Agent shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder. In addition, the Collateral Agent shall have the right with written notice to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations, accompanied by instruments of transfer or assignment and letters of direction duly executed in blank.

9

SECTION 3.2.   Perfection of Uncertificated Securities Collateral. Each Grantor represents and warrants that the Collateral Agent has a perfected first priority security interest in all uncertificated Pledged Interests pledged by it hereunder that are in existence on the date hereof and that the applicable Organization Documents do not require the consent of the other shareholders, members, partners or other Person to permit the Collateral Agent or its designee to be substituted for the applicable Grantor as a shareholder, member, partner or other equity owner, as applicable, thereto. Each Grantor hereby agrees that if any of the Pledged Interests are at any time not evidenced by certificates of ownership, then each applicable Grantor shall, to the extent permitted by applicable Law and upon the request of the Collateral Agent, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute customary pledge forms or other documents necessary or reasonably requested to complete the pledge and give the Collateral Agent the right to transfer such Pledged Interests under the terms hereof and, provide to the Collateral Agent (for the benefit of the Credit Parties) an opinion of counsel, in form and substance reasonably satisfactory to the Collateral Agent, confirming such pledge and perfection thereof.

SECTION 3.3.   Financing Statements and Other Filings; Maintenance of Perfected Security Interest. Each Grantor represents and warrants that, subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), as of the date hereof, the only filings, registrations and recordings necessary and appropriate to create, preserve, protect, publish notice of and perfect the security interest granted by each Grantor to the Collateral Agent (for the benefit of the Credit Parties) pursuant to this Security Agreement in respect of the Collateral are listed on Schedule II hereto. Each Grantor represents and warrants that all such filings, registrations and recordings have been delivered to the Collateral Agent in completed and, to the extent necessary or appropriate, duly executed form for filing in each governmental, municipal or other office specified in Schedule II. Each Grantor agrees that at the sole cost and expense of the Grantors, (i) such Grantor will maintain the security interest created by this Security Agreement in the Collateral as a perfected first priority security interest and shall defend such security interest against the claims and demands of all Persons (other than with respect to Permitted Encumbrances), (ii) such Grantor shall furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail and (iii) at any time and from time to time, upon the written request of the Collateral Agent, such Grantor shall promptly and duly execute and deliver, and file and have recorded, such further instruments and documents and take such further action as the Collateral Agent may reasonably request, including the filing of any financing statements, continuation statements and other documents (including this Security Agreement) under the UCC (or other applicable Laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Collateral Agent and in such offices (including, without limitation, the United States Patent and Trademark Office and the United States Copyright Office) wherever required by applicable Law in each case to perfect, continue and maintain a valid, enforceable, first priority security interest in the Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against the Grantors and third parties (other than with respect to Permitted Encumbrances), with respect to the Collateral.

SECTION 3.4.    Other Actions.  In order to further evidence the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Collateral, each Grantor represents, warrants and agrees, in each case at such Grantor's own expense, with respect to the following Collateral that:

(a)    Instruments and Tangible Chattel Paper.  As of the date hereof, no amount payable under or in connection with any of the Collateral is evidenced by any Instrument or Tangible Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, the Grantor acquiring such Instrument or Tangible Chattel Paper shall promptly endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may reasonably request from time to time.

(b)    Investment Property.

(i)    As of the date hereof (1) it has no Securities Accounts, and (2) it does not hold, own or have any interest in any certificated securities or uncertificated securities other than those constituting Pledged Interests with respect to which the Collateral Agent has a perfected first priority security interest in such Pledged Interests.

(ii)    If any Grantor shall at any time hold or acquire any certificated securities, other than any securities of any CFC not required to be pledged hereunder, such Grantor shall promptly (a) notify the Collateral Agent thereof and endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank, all in form and substance reasonably satisfactory to the Collateral Agent or (b) deliver such securities into a Securities Account with respect to which a Securities Account Control Agreement is in effect in favor of the Collateral Agent.  If any securities now or hereafter acquired by any Grantor, other than any securities of any CFC not required to be pledged hereunder, are uncertificated, such Grantor shall promptly notify the Collateral Agent thereof and pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (a) grant Control to the Collateral Agent and cause the issuer to agree to comply with instructions from the Collateral Agent as to such securities, without further consent of any Grantor or such nominee, (b) cause a security entitlement with respect to such uncertificated security to be held in a Securities Account with respect to which the Collateral Agent has Control or (c) arrange for the Collateral Agent to become the registered owner of the securities. Grantor shall not hereafter establish and maintain any Securities Account with any Securities Intermediary unless (1) the applicable Grantor shall have given the Collateral Agent ten (10) Business Days' prior written notice of its intention to establish such new Securities Account with such Securities Intermediary, (2) such Securities Intermediary shall be reasonably acceptable to the Collateral Agent and (3) such Securities Intermediary and such Grantor shall have duly executed and delivered a Control Agreement with respect to such Securities Account.  Each Grantor shall accept any cash and Investment Property which are proceeds of the Pledged Interests in trust for the benefit of the Collateral Agent and promptly upon receipt thereof, deposit any cash received by it into an account in which the Collateral Agent has Control, or with respect to any Investment Properties or additional securities, take such actions as required above

11

with respect to such securities. No Grantor shall grant control over any Pledged Interests to any Person other than the Collateral Agent.

(iii)    As between the Collateral Agent and the Grantors, the Grantors shall bear the investment risk with respect to the Investment Property and Pledged Interests, and the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Interests, whether in the possession of, or maintained as a security entitlement or deposit by, or subject to the control of, the Collateral Agent, a Securities Intermediary, any Grantor or any other Person; provided, however, that nothing contained in this SECTION 3.4(b) shall release or relieve any Securities Intermediary of its duties and obligations to the Grantors or any other Person under any Control Agreement or under applicable Law. Each Grantor shall promptly pay all Claims and fees of whatever kind or nature with respect to the Pledged Interests pledged by it under this Security Agreement. In the event any Grantor shall fail to make such payment contemplated in the immediately preceding sentence, the Collateral Agent may do so for the account of such Grantor and the Grantors shall promptly reimburse and indemnify the Collateral Agent for all costs and expenses incurred by the Collateral Agent under this SECTION 3.4(b) and under SECTION 9.3 hereof.

(c)    Electronic Chattel Paper and Transferable Records. As of the date hereof, no amount payable under or in connection with any of the Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction). If any amount payable under or in connection with any of the Collateral shall be evidenced by any Electronic Chattel Paper or any transferable record, the Grantor acquiring such Electronic Chattel Paper or transferable record shall promptly notify the Collateral Agent thereof and shall take such action as the Collateral Agent may reasonably request to vest in the Collateral Agent control under UCC Section 9-105 of such Electronic Chattel Paper or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Collateral Agent agrees with such Grantor that the Collateral Agent will arrange, pursuant to procedures reasonably satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for the Grantor to make alterations to the Electronic Chattel Paper or transferable record permitted under UCC Section 9-105 or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Grantor with respect to such Electronic Chattel Paper or transferable record.

(d)    Letter-of-Credit Rights. If such Grantor is at any time a beneficiary under a Letter of Credit, in excess of $100,000 in face amount, now or hereafter issued in favor of such Grantor (which, for the avoidance of doubt, shall not include any Letter of Credit issued pursuant to the Credit Agreement), such Grantor shall promptly notify the Collateral Agent thereof and such Grantor shall, at the request of the Collateral Agent, pursuant to an agreement in form and

12

substance reasonably satisfactory to the Collateral Agent, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Collateral Agent of, and to pay to the Collateral Agent, the proceeds of any drawing under the Letter of Credit or (ii) arrange for the Collateral Agent to become the beneficiary of such Letter of Credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided in the Credit Agreement.

(e)    Commercial Tort Claims.  As of the date hereof, it holds no Commercial Tort Claims.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim in excess of $250,000 in value, such Grantor shall immediately notify the Collateral Agent in writing signed by such Grantor of the brief details thereof and grant to the Collateral Agent in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.

SECTION 3.5.    Supplements; Further Assurances.  Each Grantor shall take such further actions, and execute and deliver to the Collateral Agent such additional assignments, agreements, supplements, powers and instruments, as the Collateral Agent may in its reasonable judgment deem necessary or appropriate, wherever required by Law, in order to perfect, preserve and protect the security interest in the Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm unto the Collateral Agent or permit the Collateral Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent from time to time upon reasonable request such lists, descriptions and designations of the Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments.  If an Event of Default has occurred and is continuing, the Collateral Agent may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Collateral Agent may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Collateral.  All of the foregoing shall be at the sole cost and expense of the Grantors.  The Grantors and the Collateral Agent acknowledge that this Security Agreement is intended to grant to the Collateral Agent for the benefit of the Credit Parties a security interest in and Lien upon the Collateral and shall not constitute or create a present assignment of any of the Collateral.

SECTION 3.6.    Joinder of Additional Grantors.  The Grantors shall cause each direct or indirect Subsidiary of any Loan Party which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of the Credit Parties pursuant to the provisions of the Credit Agreement, to execute and deliver to the Collateral Agent an Information Certificate and a Joinder, in each case, within fifteen (15) Business Days of the date on which it was acquired or created and, upon such execution and delivery, such Subsidiary shall constitute a "Grantor" for all purposes hereunder with the same force and effect

13

as if originally named as a Grantor herein, including, but limited to, granting the Collateral Agent a security interest in all Securities Collateral of such Subsidiary. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

ARTICLE IV

REPRESENTATIONS, WARRANTIES AND COVENANTS

In addition to, and without limitation of, each of the representations, warranties and covenants set forth in the Credit Agreement and the other Loan Documents, each Grantor represents, warrants and covenants as follows:

SECTION 4.1.    Title. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Collateral Agent pursuant to this Security Agreement or the "Security Agreement" (as defined in the Pre-Petition Credit Agreement) or as are permitted by the Credit Agreement. No Person other than the Collateral Agent has control or possession of all or any part of the Collateral, except as permitted by the Credit Agreement.

SECTION 4.2.    Limitation on Liens; Defense of Claims; Transferability of Collateral. Each Grantor is as of the date hereof, and, as to Collateral acquired by it from time to time after the date hereof, such Grantor will be, the sole direct and beneficial owner of all Collateral pledged by it hereunder free from any Lien or other right, title or interest of any Person other than (i) the Liens and security interest created by this Security Agreement, (ii) Permitted Encumbrances, and (iii) the Carve-Out. Each Grantor shall, at its own cost and expense, defend title to the Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Collateral Agent and the priority thereof against all claims and demands of all Persons, at its own cost and expense, at any time claiming any interest therein adverse to the Collateral Agent or any other Credit Party other than Permitted Encumbrances and the Carve-Out. Other than the commencement and pendency of the Chapter 11 Case, there is no agreement, and no Grantor shall enter into any agreement or take any other action, that would restrict the transferability of any of the Collateral or otherwise impair or conflict with such Grantors' obligations or the rights of the Collateral Agent hereunder. Without limiting the generality of the foregoing, no restrictions on the transferability of the Equity Interests of any issuer described on Schedule III hereof have been imposed by any board of directors of such issuer, whether pursuant to such issuer's Organization Documents or otherwise, and no such restrictions shall hereafter be so imposed without the Collateral Agent's prior written consent.

SECTION 4.3.    Chief Executive Office; Change of Name; Jurisdiction of Organization. (a) The exact legal name, type of organization, jurisdiction of organization, federal taxpayer identification number, organizational identification number and chief executive office of such Grantor is indicated next to its name in Sections I.A. and I.B. of the Information Certificate. Without limitation or duplication of the provisions of Section 6.14 of the Credit Agreement, each Grantor shall furnish to the Collateral Agent at least ten (10) days' prior written

notice of any change in (i) its legal name, (ii) the location of its chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) its identity or type of organization or corporate structure, (iv) its federal taxpayer identification number or organizational identification number or (v) its jurisdiction of organization (in each case, including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction). Such Grantor agrees (A) not to effect or permit any such change unless all filings have been made under the UCC or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral (subject to, with respect to priority, Permitted Encumbrances having priority by operation of law) and (B) to take all action reasonably satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Credit Parties in the Collateral intended to be granted hereunder. Each Grantor agrees to promptly provide the Collateral Agent with certified Organization Documents reflecting any of the changes described in the preceding sentence.

(b)     The Collateral Agent may rely on opinions of counsel as to whether any or all UCC financing statements of the Grantors need to be amended as a result of any of the changes described in SECTION 4.3(a). If any Grantor fails to provide information to the Collateral Agent about such changes on a timely basis, the Collateral Agent shall not be liable or responsible to any party for any failure to maintain a perfected security interest in such Grantor's property constituting Collateral, for which the Collateral Agent needed to have information relating to such changes. The Collateral Agent shall have no duty to inquire about such changes if any Grantor does not inform the Collateral Agent of such changes, the parties acknowledging and agreeing that it would not be feasible or practical for the Collateral Agent to search for information on such changes if such information is not provided by any Grantor.

SECTION 4.4.    Location of Inventory and Equipment. As of the Closing Date, all Equipment and Inventory of such Grantor is located at the chief executive office or such other location listed in Schedule 5.08(b)(1) and Schedule 5.08(b)(2) of the Credit Agreement.

SECTION 4.5.    Condition and Maintenance of Equipment. The Equipment of such Grantor is in good repair, working order and condition, reasonable wear and tear excepted. Each Grantor shall cause the Equipment to be maintained and preserved in good repair, working order and condition, reasonable wear and tear excepted, and shall as quickly as commercially reasonable make or cause to be made all repairs, replacements and other improvements which are necessary in the conduct of such Grantor's business.

SECTION 4.6.    Due Authorization and Issuance. All of the Pledged Interests have been, and to the extent any Pledged Interests are hereafter issued, such shares or other equity interests will be, upon such issuance, duly authorized, validly issued and, to the extent applicable, fully paid and non-assessable. All of the Pledged Interests have been fully paid for, and there is no amount or other obligation owing by any Grantor to any issuer of the Pledged Interests in exchange for or in connection with the issuance of the Pledged Interests or any Grantor's status as a partner or a member of any issuer of the Pledged Interests. None of the

15

Pledged Interests were issued in violation of any preemptive rights or any agreement by which any Grantor or any issuer thereof is bound.

SECTION 4.7.    No Conflicts, Consents, etc.  Subject to the entry of the Interim Financing Order or Final Financing Order, as applicable, no consent of any party (including, without limitation, equity holders or creditors of such Grantor) and no consent, authorization, approval, license or other action by, and no notice to or filing (other than filings with the SEC pursuant to the Securities Laws) with, any Governmental Authority or regulatory body or other Person is required (A) for the grant of the security interest by such Grantor in the Collateral pledged by it pursuant to this Security Agreement or for the execution, delivery or performance hereof by such Grantor, (B) for the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement or (C) for the exercise by the Collateral Agent of the remedies in respect of the Collateral pursuant to this Security Agreement except, in each case, for such consents which have been obtained prior to the date hereof.  Following the occurrence and during the continuation of an Event of Default, if the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Security Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Collateral Agent, such Grantor agrees to use commercially reasonable efforts to assist and aid the Collateral Agent to obtain as soon as commercially practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 4.8.    Collateral.  All information set forth herein, including the schedules annexed hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Credit Party in connection with this Security Agreement, in each case, relating to the Collateral, is accurate and complete in all material respects.  The Collateral described on the schedules annexed hereto constitutes all of the property of such type of Collateral owned or held by the Grantors.

SECTION 4.9.    Insurance.  Such Grantor shall (i) maintain or shall cause to be maintained such insurance as is required pursuant to Section 6.07 of the Credit Agreement; (ii) maintain such other insurance as may be required by applicable Law; and (iii) furnish to the Collateral Agent, upon written request, reasonable information as to the insurance carried.  Each Grantor hereby irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent (and attorney-in-fact), exercisable only after the occurrence and during the continuance of an Event of Default, for the purpose of making, settling and adjusting claims in respect of the Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.  In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or in part relating thereto, the Collateral Agent may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Default or Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Collateral Agent deems advisable.  All sums disbursed by the Collateral Agent in connection with this SECTION 4.9, including

reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by the Grantors to the Collateral Agent and shall be additional Secured Obligations secured hereby.

SECTION 4.10.   [Reserved].

SECTION 4.11.   [Reserved].

## ARTICLE V

## CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.   Pledge of Additional Securities Collateral.  Each Grantor shall, upon obtaining any Pledged Interests or Intercompany Notes of any Person required to be pledged hereunder, accept the same in trust for the benefit of the Collateral Agent and promptly deliver to the Collateral Agent a pledge amendment, duly executed by such Grantor, in substantially the form of Exhibit 1 annexed hereto (each, a "Pledge Amendment"), and the certificates and other documents required under SECTION 3.1 and SECTION 3.2 hereof in respect of the additional Pledged Interests or Intercompany Notes which are to be pledged pursuant to this Security Agreement, and confirming the attachment of the Lien hereby created on and in respect of such additional Pledged Interests or Intercompany Notes.  Each Grantor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Security Agreement and agrees that all Pledged Interests or Intercompany Notes listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder be considered Collateral.

SECTION 5.2.   Voting Rights; Distributions; etc.

(a)      So long as no Event of Default shall have occurred and be continuing, each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the Credit Agreement or any other Loan Document evidencing the Secured Obligations.  The Collateral Agent shall be deemed without further action or formality to have granted to each Grantor all necessary consents relating to voting rights and shall, if necessary, upon written request of any Grantor and at the sole cost and expense of the Grantors, from time to time execute and deliver (or cause to be executed and delivered) to such Grantor all such instruments as such Grantor may reasonably request in order to permit such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to this SECTION 5.2(a).

(b)      Upon the occurrence and during the continuance of any Event of Default, all rights of each Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to SECTION 5.2(a) hereof without any action or the giving of any notice shall immediately cease, and all such rights shall, upon the expiration of the Remedies Notice Period, become vested in the Collateral Agent, which shall thereupon have the sole right

17

to exercise such voting and other consensual rights; provided that the Collateral Agent shall have the right, in its sole discretion, from time to time following the occurrence and during the continuance of an Event of Default to permit such Grantor to exercise such rights under SECTION 5.2(a). After such Event of Default is no longer continuing, each Grantor shall have the right to exercise the voting, managerial and other consensual rights and powers that it would otherwise be entitled to pursuant to SECTION 5.2(a) hereof.

(c)    All rights of each Grantor to receive and retain any and all Distributions are hereby terminated and all such rights are hereby vested in the Collateral Agent, which has the sole right to receive and hold as Collateral such Distributions and apply such Distributions to the Obligations in accordance with the Credit Agreement.

(d)    All Distributions which are received by any Grantor contrary to the provisions of Section 5.2(c) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Grantor and shall immediately be delivered or paid over to the Collateral Agent as Collateral in the same form as so received (with any necessary endorsement).

(e)    Each Grantor shall, at its sole cost and expense, from time to time execute and deliver to the Collateral Agent appropriate instruments as the Collateral Agent may reasonably request in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise pursuant to SECTION 5.2(b) hereof and to receive all Distributions which it is entitled to receive under SECTION 5.2(c) hereof.

SECTION 5.3.    Organization Documents. Each Grantor has delivered to the Collateral Agent true, correct and complete copies of its Organization Documents. The Organization Documents are in full force and effect. No Grantor will terminate or agree to terminate any Organization Documents or make any amendment or modification to any Organization Documents (including electing to treat any Pledged Interests of such Grantor as a security under Section 8-103 of the UCC) except as permitted under the Credit Agreement.

SECTION 5.4.    Defaults, Etc. Such Grantor is not in default in the payment of any portion of any mandatory capital contribution, if any, required to be made under any agreement to which such Grantor is a party relating to the Pledged Interests pledged by it, and such Grantor is not in violation of any other provisions of any such agreement to which such Grantor is a party, or otherwise in default or violation thereunder. No Securities Collateral pledged by such Grantor is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Grantor by any Person with respect thereto, and as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organization Documents and certificates, if any, delivered to the Collateral Agent) which evidence any Pledged Interests of such Grantor.

SECTION 5.5.    Certain Agreements of Grantors As Issuers and Holders of Equity Interests.

18

(a)    In the case of each Grantor which is an issuer of Securities Collateral, such Grantor agrees to be bound by the terms of this Security Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)    In the case of each Grantor which is a partner in a partnership, limited liability company or other entity, such Grantor hereby consents to the extent required by the applicable Organization Documents to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Interests in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Interests to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner or a limited partner or member, as the case may be.

## ARTICLE VI

## CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY COLLATERAL

SECTION 6.1.    Grant of License.  Without limiting the rights of the Collateral Agent as the holder of a Lien on the Intellectual Property Collateral, for the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under Article VIII hereof at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty, rent or other compensation to such Grantor) or other right to use, assign, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Grantor (including, but not limited to, any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, and advertising matter, whether owned by any Grantor or with respect to which any Grantor has rights under license, sublicense, or other agreements (including any License (to the extent permitted by such License))) and to occupy any Real Estate owned or leased by such Grantor, wherever the same may be located, including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.  Upon the reasonable request of the Collateral Agent, in order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office, each Grantor shall execute and deliver to the Collateral Agent one or more short forms of this Security Agreement to further evidence the Collateral Agent's Lien on such Grantor's Patents, Trademarks, or Copyrights.

SECTION 6.2.    Registrations.  Except pursuant to licenses and other user agreements entered into by any Grantor in the ordinary course of business that are listed in Section III of the Information Certificate, on and as of the date hereof (i) each Grantor owns and possesses the right to use, and has done nothing to authorize or enable any other Person to use, any material Trademark listed in Section III of the Information Certificate, and (ii) all material

registrations listed in Section III of the Information Certificate are valid and in full force and effect.

SECTION 6.3.    No Violations or Proceedings.  To each Grantor's knowledge, on and as of the date hereof, there is no violation by others of any right of such Grantor with respect to any Trademark listed in Section III of the Information Certificate, respectively, pledged by it under the name of such Grantor and there are no pending, or to any Grantor's knowledge, threatened infringement, misappropriation or other violation claims or proceedings pending against any Grantor, and no Grantor has received any notice or other communication of any actual or alleged infringement, misappropriation or other violation of any rights of any Person with respect to any Trademark listed in Section III of the Information Certificate, in each case except as could not reasonably be expected to have or result in a Material Adverse Effect. To each Grantor's knowledge, on and as of the date hereof, no holding, decision or judgment has been rendered against such Grantor by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property in any material respect.

SECTION 6.4.    Protection of Collateral Agent's Security.  On a continuing basis, each Grantor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Collateral Agent of (A) any adverse determination in any proceeding in the United States Patent and Trademark Office or the United States Copyright Office with respect to any Patent, Trademark or Copyright necessary for the conduct of business of such Grantor or (B) the institution of any proceeding or any adverse determination in any federal, state or local court or administrative body regarding such Grantor's claim of ownership in or right to use any of the Intellectual Property Collateral material to the use and operation of the Collateral, its right to register such Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain and protect the Intellectual Property Collateral necessary for the conduct of business of such Grantor, (iii) not permit to lapse or become abandoned any Intellectual Property Collateral necessary for the conduct of business of such Grantor, and not settle or compromise any pending or future litigation or administrative proceeding with respect to such Intellectual Property Collateral, in each case except as shall be consistent with commercially reasonable business judgment and, if any Event of Default has occurred and is continuing, with the prior approval of the Collateral Agent (such approval not to be unreasonably withheld), (iv) upon such Grantor's obtaining knowledge thereof, promptly notify the Collateral Agent in writing of any event which may be reasonably expected to materially and adversely affect (A) the value or utility of the Intellectual Property Collateral or any portion thereof material to the use and operation of the Collateral, (B) the ability of such Grantor or the Collateral Agent to dispose of the Intellectual Property Collateral or any portion thereof or (C) the rights and remedies of the Collateral Agent in relation thereto including, without limitation, a levy or threat of levy or any legal process against the Intellectual Property Collateral or any portion thereof, (v) not license the Intellectual Property Collateral other than licenses entered into by such Grantor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the material licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of the Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral intended to be granted to the Collateral Agent for the benefit of the Credit Parties,

20

without the consent of the Collateral Agent, (vi) until the Collateral Agent exercises its rights to make collection, diligently keep adequate records respecting the Intellectual Property Collateral and (vii) furnish to the Collateral Agent from time to time upon the Collateral Agent's reasonable request therefor detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to the Intellectual Property Collateral as the Collateral Agent may from time to time request. Notwithstanding the foregoing, nothing herein shall prevent any Grantor from selling, licensing, disposing of or otherwise using any Intellectual Property Collateral as permitted under the Credit Agreement.

SECTION 6.5.    After-Acquired Property.    If any Grantor shall, at any time before this Security Agreement shall have been terminated in accordance with SECTION 9.4(a), (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, the provisions hereof shall automatically apply thereto and any such item enumerated in clause (i) or (ii) of this SECTION 6.5 with respect to such Grantor shall automatically constitute Intellectual Property Collateral if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Security Agreement without further action by any party. With respect to any federally registered Intellectual Property Collateral, each Grantor within forty-five (45) days of the end of each calendar quarter in which such Intellectual Property Collateral is acquired (a) provide to the Collateral Agent written notice of any of the foregoing and (b) confirm the attachment of the Lien and security interest created by this Security Agreement to any rights described in clauses (i) and (ii) of the immediately preceding sentence of this SECTION 6.5 by execution of an instrument in form reasonably acceptable to the Collateral Agent.

SECTION 6.6.    Modifications.    Each Grantor authorizes the Collateral Agent to modify this Security Agreement by amending Section III of the Information Certificate to include any Intellectual Property Collateral acquired or arising after the date hereof of such Grantor including, without limitation, any of the items listed in SECTION 6.5 hereof.

SECTION 6.7.    Litigation.    Unless there shall occur and be continuing any Event of Default, each Grantor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Grantors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall have the right but shall in no way be obligated to file applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Grantor, the Collateral Agent or the other Credit Parties to enforce the Intellectual Property Collateral and any license thereunder. In the event of such suit, each Grantor shall, at the reasonable request of the Collateral Agent, do any and all lawful acts and execute any and all documents requested by the Collateral Agent in aid of such enforcement and the Grantors shall promptly reimburse and indemnify the Collateral

21

Agent, as the case may be, for all costs and expenses incurred by the Collateral Agent in the exercise of its rights under this SECTION 6.7 in accordance with SECTION 9.3 hereof. In the event that the Collateral Agent shall elect not to bring suit to enforce the Intellectual Property Collateral, each Grantor agrees, at the request of the Collateral Agent, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by others and for that purpose agrees to diligently maintain any suit, proceeding or other action against any Person so infringing necessary to prevent such infringement.

SECTION 6.8.    Third Party Consents. Each Grantor shall use commercially reasonable efforts to obtain the consent of third parties to the extent such consent is necessary or desirable to create a valid, perfected security interest in favor of the Collateral Agent in any Intellectual Property Collateral.

## ARTICLE VII

## CERTAIN PROVISIONS CONCERNING ACCOUNTS

SECTION 7.1.    Special Representations and Warranties. As of the time when each of its Accounts or Credit Card Receivables is included in the Borrowing Base, each Grantor shall be deemed to have represented and warranted that such Account or Credit Card Receivable and all records, papers and documents relating thereto (i) are genuine and correct and in all material respects what they purport to be, (ii) represent the legal, valid and binding obligation of the account debtor, Credit Card Issuer or Credit Card Processor, as applicable, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, evidencing indebtedness unpaid and owed by such account debtor, Credit Card Issuer or Credit Card Processor arising out of the performance of labor or services or the sale, lease, license, assignment or other disposition and delivery of the goods or other property listed therein or out of an advance or a loan, and (iii) are in all material respects in compliance and conform with all applicable material federal, state and local Laws and applicable Laws of any relevant foreign jurisdiction.

SECTION 7.2.    Maintenance of Records. Each Grantor shall keep and maintain at its own cost and expense materially complete records of each Account and Credit Card Receivable, in a manner consistent with prudent business practice, including, without limitation, records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto. Each Grantor shall, at such Grantor's sole cost and expense, upon the Collateral Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Accounts and Credit Card Receivables, including, without limitation, all documents evidencing Accounts and Credit Card Receivables and any books and records relating thereto to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Grantor). Upon the occurrence and during the continuance of any Event of Default, and subject

22

to the Remedies Notice Period, the Collateral Agent may transfer a full and complete copy of any Grantor's books, records, credit information, reports, memoranda and all other writings relating to the Accounts and Credit Card Receivables to and for the use by any Person that has acquired or is contemplating acquisition of an interest in the Accounts and Credit Card Receivables or the Collateral Agent's security interest therein in accordance with applicable Law without the consent of any Grantor. The Collateral Agent shall have the right at any time or times, in the Collateral Agent's name or in the name of a nominee of the Collateral Agent, to verify the validity, amount or any other matter relating to any Accounts, Credit Card Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

SECTION 7.3.    Legend. Each Grantor shall legend, at the request of the Collateral Agent made at any time after the occurrence and during the continuance of any Event of Default and in form and manner reasonably satisfactory to the Collateral Agent, the Accounts and the other books, records and documents of such Grantor evidencing or pertaining to the Accounts with an appropriate reference to the fact that the Accounts have been collaterally assigned to the Collateral Agent for the benefit of the Credit Parties and that the Collateral Agent has a security interest therein.

SECTION 7.4.    Modification of Terms, Etc. No Grantor shall rescind or cancel any indebtedness evidenced by any Account or Credit Card Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such indebtedness except in the ordinary course of business consistent with prudent business practice or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Account or Credit Card Receivable or interest therein except in the ordinary course of business consistent with prudent business practice or in accordance with the Credit Agreement without the prior written consent of the Collateral Agent, not to be unreasonably withheld. Grantors shall notify the Collateral Agent promptly of any assertion of (i) any claims, offsets, defenses or counterclaims by any account debtor, Credit Card Issuer or Credit Card Processor or any disputes with any of such Persons or any settlement, adjustment or compromise thereof, to the extent any of the foregoing exceeds $250,000 in any one case or $500,000 in the aggregate, (ii) all material adverse information relating to the financial condition of any material account debtor, or any Credit Card Issuer or Credit Card Processor and (iii) any event or circumstance which, to the best of any Grantor's knowledge, which would cause the Collateral Agent to consider any then-existing Accounts or Credit Card  Receivables as no longer eligible for inclusion in the Borrowing Base. Grantors shall notify the Collateral Agent of (i) any notice of a material default by such Grantor under any agreement with an account debtor, Credit Card Issuer or Credit Card Processor or of any default which has a reasonable likelihood of resulting in any material account debtor, or any Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to such Grantor, (ii) any notice from any material account debtor, or any Credit Card Issuer or Credit Card Processor that such Person is ceasing or suspending, or will cease or suspend, any present or future payments due or to become due to any Grantor from such Person, or that such Person is terminating or will terminate any of its agreements with any Grantor and (iii) the failure of such Grantor to comply with any material terms of an agreement with any account debtor, Credit Card Issuer or Credit Card Processor or any terms thereof which have a reasonable

23

likelihood of resulting in any material account debtor, or any Credit Card Issuer or Credit Card Processor ceasing or suspending payments to such Grantor.

SECTION 7.5.    Collection. Each Grantor shall cause to be collected from the account debtor, Credit Card Issuer or Credit Card Processor, as applicable, of each of the Accounts or Credit Card Receivables, as and when due in the ordinary course of business consistent with prudent business practice (including, without limitation, Accounts or Credit Card Receivables that are delinquent, such Accounts or Credit Card Receivables to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Account or Credit Card Receivable, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or Credit Card Receivable. The costs and expenses (including, without limitation, attorneys' fees) of collection, in any case, whether incurred by any Grantor, the Collateral Agent or any other Credit Party, shall be paid by the Grantors.

## ARTICLE VIII
## REMEDIES

SECTION 8.1.    Remedies. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may, subject to the Remedies Notice Period, and at the direction of the Required Lenders as set forth in Section 8.02 of the Credit Agreement, shall, from time to time in respect of the Collateral, in addition to the other rights and remedies provided for herein, under applicable Law or otherwise available to it:

(a)    Personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from any Grantor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Grantor's premises where any of the Collateral is located, remove such Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Grantor;

(b)    Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including, without limitation, instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to any Grantor, prior to receipt by any such obligor of such instruction, such Grantor shall segregate all amounts received pursuant thereto in trust for the benefit of the Collateral Agent and shall promptly pay such amounts to the Collateral Agent;

(c)    Sell, assign, grant a license to use or otherwise liquidate, or direct any Grantor to sell, assign, grant a license to use or otherwise liquidate, any and all investments made

24

in whole or in part with the Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(d)      Take possession of the Collateral or any part thereof, by directing any Grantor in writing to deliver the same to the Collateral Agent at any place or places so designated by the Collateral Agent, in which event such Grantor shall at its own expense: (A) forthwith cause the same to be moved to the place or places designated by the Collateral Agent and therewith delivered to the Collateral Agent, (B) store and keep any Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent and (C) while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition. Each Grantor's obligation to deliver the Collateral as contemplated in this SECTION 8.1 is of the essence hereof. Upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by any Grantor of such obligation;

(e)      Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Grantor constituting Collateral for application to the Secured Obligations as provided in SECTION 8.7 hereof;

(f)      Retain and apply the Distributions to the Secured Obligations as provided in ARTICLE V hereof and the Credit Agreement;

(g)      Exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Collateral; and

(h)      Exercise all the rights and remedies of a secured party under the UCC, and the Collateral Agent may also in its sole discretion, without notice except as specified in SECTION 8.2 hereof, sell, assign or grant a license to use the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable. The Collateral Agent or any other Credit Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of any or all of the Collateral at any such sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such Person as a credit on account of the purchase price of any Collateral payable by such Person at such sale. Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives, to the fullest extent permitted by Law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so

25

adjourned. To the fullest extent permitted by Law, each Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree.

SECTION 8.2.    Notice of Sale. Each Grantor acknowledges and agrees that, to the extent notice of sale or other disposition of Collateral shall be required by applicable Law and unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Collateral Agent shall provide such Grantor such advance notice as may be practicable under the circumstances), ten (10) days' prior notice to such Grantor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters. No notification need be given to any Grantor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying (as permitted under Law) any right to notification of sale or other intended disposition.

SECTION 8.3.    Waiver of Notice and Claims. Each Grantor hereby waives, to the fullest extent permitted by applicable Law, notice or judicial hearing in connection with the Collateral Agent's taking possession or the Collateral Agent's disposition of any of the Collateral, including, without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Grantor would otherwise have under law, and each Grantor hereby further waives, to the fullest extent permitted by applicable Law: (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable Law. The Collateral Agent shall not be liable for any incorrect or improper payment made pursuant to this Article VIII in the absence of gross negligence or willful misconduct. Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Grantor therein and thereto, and shall be a perpetual bar both at law and in equity against such Grantor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through or under such Grantor.

SECTION 8.4.    Certain Sales of Collateral.

(a)    Each Grantor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority. Each Grantor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable Law, the Collateral Agent shall have no obligation to engage in public sales.

26

(b)      Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act, and applicable state securities Laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Securities Collateral and Investment Property, to limit purchasers to Persons who will agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities Laws, even if such issuer would agree to do so.

(c)      If the Collateral Agent determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Grantor shall from time to time furnish to the Collateral Agent all such information as the Collateral Agent may reasonably request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Collateral Agent as exempt transactions under the Securities Act and the rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d)      Each Grantor further agrees that a breach of any of the covenants contained in this SECTION 8.4 will cause irreparable injury to the Collateral Agent and the other Credit Parties, that the Collateral Agent and the other Credit Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this SECTION 8.4 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing.

SECTION 8.5.    No Waiver; Cumulative Remedies.

(a)      No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. The remedies herein provided are cumulative and are not exclusive of any remedies provided by law.

(b)      In the event that the Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Security Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case, the Grantors, the Collateral Agent and each other Credit Party shall be restored to their respective

27

former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Collateral Agent and the other Credit Parties shall continue as if no such proceeding had been instituted.

SECTION 8.6.    Certain Additional Actions Regarding Intellectual Property.    If any Event of Default shall have occurred and be continuing, subject to the Remedies Notice Period, upon the written demand of Collateral Agent, each Grantor shall execute and deliver to Collateral Agent an assignment or assignments of the registered Patents, Trademarks and/or Copyrights and such other documents as are necessary or appropriate to carry out the intent and purposes hereof to the extent such assignment does not result in any loss of rights therein under applicable Law.  Within five (5) Business Days of written notice thereafter from Collateral Agent, each Grantor shall make available to Collateral Agent, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of the Event of Default as Collateral Agent may reasonably designate to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Grantor under the registered Patents, Trademarks and/or Copyrights, and such Persons shall be available to perform their prior functions on Collateral Agent's behalf.

SECTION 8.7.    Application of Proceeds.    The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Security Agreement, in accordance with and as set forth in Section 8.03 of the Credit Agreement.

ARTICLE IX

MISCELLANEOUS

SECTION 9.1.    Concerning Collateral Agent.

(a)    The Collateral Agent has been appointed as collateral agent pursuant to the Credit Agreement.  The actions of the Collateral Agent hereunder are subject to the provisions of the Credit Agreement.  The Collateral Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of the Collateral), in accordance with this Security Agreement and the Credit Agreement.  The Collateral Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact.  The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the Credit Agreement.  Upon the acceptance of any appointment as the Collateral Agent by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Security Agreement, and the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under this Security Agreement.  After any retiring Collateral Agent's

28

resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Security Agreement while it was the Collateral Agent.

(b)    The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Collateral Agent, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Collateral Agent nor any of the other Credit Parties shall have responsibility for, without limitation (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Collateral Agent or any other Credit Party has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral. In no event shall the Collateral Agent's or any other Credit Party's responsibility for the custody and preservation of the Collateral in its possession extend to matters beyond the control of such Person, including, without limitation, acts of God, war, insurrection, riot, governmental actions or acts of any corporate or other depository.

(c)    The Collateral Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all matters pertaining to this Security Agreement and its duties hereunder, upon advice of counsel selected by it.

(d)    If any item of Collateral also constitutes collateral granted to Collateral Agent under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, Collateral Agent, in its sole discretion, shall select which provision or provisions shall control.

SECTION 9.2.    Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact. If any Grantor shall fail to perform any covenants contained in this Security Agreement or in the Credit Agreement (including, without limitation, such Grantor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay Claims, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any other obligations of such Grantor with respect to any Collateral) or if any warranty on the part of any Grantor contained herein shall be breached, the Collateral Agent may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that Collateral Agent shall in no event be bound to inquire into the validity of any tax, lien, imposition or other obligation which such Grantor fails to pay or perform as and when required hereby. Any and all amounts so expended by the Collateral Agent shall be paid by the Grantors in accordance with the provisions of SECTION 9.3 hereof. Neither the provisions of this SECTION 9.2 nor any action taken by Collateral Agent pursuant to the provisions of this SECTION 9.2 shall prevent any such failure to observe any covenant contained in this Security Agreement nor any breach of warranty from constituting an Event of Default. Each Grantor hereby appoints the Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, or otherwise,

29

from time to time after the occurrence and during the continuation of an Event of Default in the Collateral Agent's discretion to take any action and to execute any instrument consistent with the terms of the Credit Agreement and the other Security Documents which the Collateral Agent may deem necessary to accomplish the purposes hereof. The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. Each Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 9.3.    Expenses. Each Grantor will upon demand pay to the Collateral Agent and the other Credit Parties the amount of any and all amounts required to be paid pursuant to Section 10.04 of the Credit Agreement.

SECTION 9.4.    Continuing Security Interest; Assignment. This Security Agreement shall create a continuing security interest in the Collateral and shall (i) subject to the entry of the Interim Financing Order or the Final Financing Order, as applicable, be binding upon the Grantors, their respective successors and assigns, and (ii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and the other Credit Parties and each of their respective successors, transferees and assigns. For the avoidance of doubt, upon the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all Liens created by the Security Documents in favor of the Collateral Agent shall be perfected as set forth in such Interim Financing Order or the Final Financing Order, as applicable, notwithstanding any failure to make (or the terms of) any filings in any jurisdiction listed on Schedule II or elsewhere. No other Persons (including, without limitation, any other creditor of any Grantor) shall have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), any Credit Party may assign or otherwise transfer any indebtedness held by it secured by this Security Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Credit Party, herein or otherwise, subject, however, to the provisions of the Credit Agreement.

(a)    Termination; Release. This Security Agreement, the Lien in favor of the Collateral Agent (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall terminate with respect to all Secured Obligations when (i) the Commitments shall have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Secured Obligations shall have been indefeasibly paid in full in cash, and (iii) all Letters of Credit (as defined in the Credit Agreement) shall have (A) expired or terminated and have been reduced to zero, (B) been Cash Collateralized to the extent required by the Credit Agreement, or (C) been supported by another letter of credit in a manner reasonably satisfactory to the Issuing Bank and the Administrative Agent; provided, however, that (A) this Security Agreement, the Lien in favor of the Collateral Agent (for the benefit of itself and the other Credit Parties) and all other security interests granted hereby shall be immediately and automatically reinstated if at any time payment, or any part thereof, of any Secured Obligation is rescinded or must otherwise be restored by any Credit Party or any Grantor upon the bankruptcy or reorganization of any Grantor or otherwise, and (B) in connection with the termination of this Security Agreement, the Collateral Agent may require such indemnities and cash collateral as it

30

shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Secured Obligations that may subsequently be reversed or revoked, (y) any obligations that the Collateral Agent reasonably believes may thereafter arise with respect to the Other Liabilities, and (z) any Secured Obligations that the Collateral Agent reasonably believes may thereafter arise under Section 10.04 of the Credit Agreement.

(b)     The Collateral shall be released from the Lien of this Security Agreement in accordance with the provisions of the Credit Agreement. Upon termination hereof or any release of Collateral in accordance with the provisions of the Credit Agreement, the Collateral Agent shall, upon the request and at the sole cost and expense of the Grantors, assign, transfer and deliver to the Grantors, against receipt and without recourse to or warranty by the Collateral Agent, such of the Collateral to be released (in the case of a release) or all of the Collateral (in the case of termination of this Security Agreement) as may be in possession of the Collateral Agent and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements or releases) acknowledging the termination hereof or the release of such Collateral, as the case may be.

(c)     At any time that the respective Grantor desires that the Collateral Agent take any action described in clause (b) of this (a), such Grantor shall, upon request of the Collateral Agent, deliver to the Collateral Agent an officer's certificate certifying that the release of the respective Collateral is permitted pursuant to clause (a) or (b) of this (a). The Collateral Agent shall have no liability whatsoever to any other Credit Party as the result of any release of Collateral by it as permitted (or which the Collateral Agent in good faith believes to be permitted) by this (a).

SECTION 9.5.    Modification in Writing. No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Grantor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement and unless in writing and signed by the Collateral Agent and the Grantors. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Grantor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Security Agreement or any other document evidencing the Secured Obligations, no notice to or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

SECTION 9.6.    Notices. Unless otherwise provided herein or in the Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to any Grantor, addressed to it at the address of the Lead Borrower set forth in the Credit Agreement and as to the Collateral Agent, addressed to it at the address set forth in the Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other parties hereto complying as to delivery with the terms of this SECTION 9.6.

31

SECTION 9.7.    GOVERNING LAW.  THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 9.8.    CONSENT TO JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING, JURISDICTION, TO THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND, IN EACH CASE, ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURTS.  EACH GRANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS SECURITY AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (A) OF THIS SECTION.  EACH GRANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH GRANTOR AGREES THAT ANY ACTION COMMENCED BY ANY GRANTOR ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY TO THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING, JURISDICTION, MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT OF

32

THE SOUTHERN DISTRICT OF NEW YORK AS THE COLLATERAL AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

(d)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.6.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND WHETHER INITIATED BY OR AGAINST ANY SUCH PERSON OR IN WHICH ANY SUCH PERSON IS JOINED AS A PARTY LITIGANT).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.9.    Severability of Provisions.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 9.10.    Execution in Counterparts; Effectiveness.  This Security Agreement may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Security Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Security Agreement.

SECTION 9.11.    No Release.  Nothing set forth in this Security Agreement shall relieve any Grantor from the performance of any term, covenant, condition or agreement on such Grantor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Collateral Agent or any other Credit Party to perform or observe any such term, covenant, condition or agreement on such Grantor's part to be so performed or observed or shall impose any liability on the Collateral Agent or any other Credit Party for any act or omission on the part of such Grantor relating thereto or for any breach of any representation or warranty on the part of such Grantor contained in this Security Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Collateral or made in connection herewith or

therewith. The obligations of each Grantor contained in this SECTION 9.11 shall survive the termination hereof and the discharge of such Grantor's other obligations under this Security Agreement, the Credit Agreement and the other Loan Documents.

SECTION 9.12.   Obligations Absolute.   Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor;

(b)    any lack of validity or enforceability of the Credit Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(i)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument relating thereto;

(c)    any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(d)    any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of SECTION 9.5 hereof; or

(e)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Grantor (other than the termination of this Security Agreement in accordance with SECTION 9.4(a) hereof).

SECTION 9.13.   Credit Agreement and Agreement Among Lenders. Notwithstanding anything herein to the contrary, the security interest granted to the Collateral Agent, for the benefit of the Credit Parties, herein and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the Credit Agreement, including, but not limited to, the Interlender Provisions.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

34

IN WITNESS WHEREOF, the Grantors and the Collateral Agent have caused this Security Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

HANCOCK FABRICS, INC.
HF MERCHANDISING, INC.
HANCOCK FABRICS OF MI, INC.

By: _____
Name: Dennis Lyons
Title:  Senior Vice President and Chief
        Administrative Officer


HANCOCK FABRICS, LLC

By: _____
Name: Dennis Lyons
Title:  Manager


HANCOCKFABRICS.COM, INC.

By: _____
Name: Dennis Lyons
Title:  President


HF ENTERPRISES, INC.
HF RESOURCES, INC.

By: _____
Name: Rebecca Flick
Title:  Vice President and Assistant Secretary


[Signature Page to Security Agreement]

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as Collateral Agent

By:_____
Name: Joseph Burt
Title: Director

EXHIBIT 1

[Form of]

SECURITIES PLEDGE AMENDMENT

This Securities Pledge Amendment, dated as of _____, is delivered pursuant to SECTION 5.1 of that certain Security Agreement dated as of February __, 2016 (as amended, amended and restated, restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), made by (i) HANCOCK FABRICS, INC., a Delaware corporation, as lead borrower for itself and the other Borrowers (as defined below) (the "Lead Borrower"), (ii) THE BORROWERS party thereto from time to time (together with the Lead Borrower, the "Borrowers"), and (iii) THE GUARANTORS party thereto from time to time (the "Guarantors"), as pledgors, assignors and debtors (the Borrowers, together with the Guarantors, in such capacities and together with any successors in such capacities, the "Grantors," and each, a "Grantor"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, having an office at One Boston Place, 18th Floor, Boston, Massachusetts 02108, in its capacity as collateral agent for the Credit Parties, as pledgee, assignee and secured party (in such capacities and together with any successors in such capacities, the "Collateral Agent"). The undersigned hereby agrees that this Securities Pledge Amendment may be attached to the Security Agreement and that the Pledged Interests and/or Intercompany Notes listed on this Securities Pledge Amendment shall be deemed to be and shall become part of the Collateral and shall secure all Secured Obligations.

PLEDGED INTERESTS

| ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES OR INTERESTS | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|
| | | | | | |

INTERCOMPANY NOTES

| ISSUER | PRINCIPAL AMOUNT | DATE OF ISSUANCE | INTEREST RATE | MATURITY DATE |
| --- | --- | --- | --- | --- |

[_____],
as Grantor

By: _____
     Name:
     Title:

AGREED TO AND ACCEPTED:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
     Name:
     Title:

SCHEDULE I
Intercompany Notes

$42,028,000 Note dated February 2, 1998, as amended, made by HF Merchandising, Inc. for the benefit of HF Resources, Inc.; maturity date February 2, 2016, automatically extends for one-year periods.

$171,368,000 Loan Agreement dated December 22, 1997, as amended, between Hancock Fabrics, Inc. and HF Resources, Inc.; maturity date December 22, 2015, automatically extends for one-year periods.

SCHEDULE II
Filings, Registrations and Recordings

| Grantor Name | Filing Office |
|---|---|
| Hancock Fabrics, Inc. | Delaware |
| HF MERCHANDISING, INC. | Delaware |
| HANCOCK FABRICS OF MI, INC. | Delaware |
| HANCOCKFABRICS.COM, INC. | Delaware |
| Hancock Fabrics, LLC | Delaware |
| HF Resources, Inc. | Delaware |
| HF Enterprises, Inc. | Delaware |

SCHEDULE III
Pledged Interests

| Grantor | Issuer | Type of Organization | # of Shares Owned | Total Shares Outstanding | % of Interest Pledged | Certificate No. (if un-certificated, please so indicate) |
|---|---|---|---|---|---|---|
| Hancock Fabrics, Inc. | Hancock Fabrics of MI, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| Hancock Fabrics, Inc. | hancockfabrics.com, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| Hancock Fabrics, Inc. | HF Resources, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Resources, Inc. | HF Enterprises, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Resources, Inc. | HF Merchandising, Inc. | Corporation | 1,000 | 1,000 | 100 | 1 |
| HF Enterprises, Inc. | Hancock Fabrics, LLC | Limited Liability Company | 1 | 1 | 100 | Uncertificated |

GUARANTY

GUARANTY (this "Guaranty"), dated as of February 2, 2016, is by each of HF ENTERPRISES, INC., a Delaware corporation and HF RESOURCES, INC., a Delaware corporation (each such Person, individually, a "Guarantor" and, collectively, the "Guarantors") in favor of (a) WELLS FARGO BANK, NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "Administrative Agent") for its own benefit and the benefit of the other Credit Parties (as defined in the Credit Agreement referred to below), (b) WELLS FARGO BANK, NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "Collateral Agent") for its own benefit and the benefit of the other Credit Parties, and (c) the other Credit Parties.

WITNESSETH

WHEREAS, reference is made to that certain Debtor-In-Possession Credit Agreement, dated as of February 2, 2016 (as amended, modified, supplemented or restated hereafter, the "Credit Agreement"), by and among, among others, (i) Hancock Fabrics, Inc., a Delaware corporation (the "Lead Borrower"), (ii) the other Borrowers party thereto, (iii) the Guarantors party thereto, (iv) the Administrative Agent, (v) the Collateral Agent, (vi) GACP Finance Co., LLC, as the Term Agent and (vii) the lenders party thereto (the "Lenders"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

WHEREAS, the Lenders have agreed to make Loans to the Borrowers, and the Issuing Bank has agreed to issue Letters of Credit for the account of the Borrowers, pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement.

WHEREAS, each Guarantor acknowledges that it is an integral part of a consolidated enterprise and that it will receive direct and indirect benefits from the availability of the credit facility provided for in the Credit Agreement, from the making of the Loans by the Lenders, and the issuance of the Letters of Credit by the Issuing Bank.

WHEREAS, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit are each conditioned upon, among other things, the execution and delivery by the Guarantors of a guaranty in the form hereof. As consideration therefor, and in order to induce the Lenders to make Loans and the Issuing Bank to issue Letters of Credit, the Guarantors are willing to execute this Guaranty.

Accordingly, each Guarantor hereby agrees as follows:

SECTION 1. Guaranty. Subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order), each Guarantor irrevocably and unconditionally guaranties, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrowers of all Obligations (collectively, the "Guaranteed Obligations"), including all such Guaranteed Obligations which shall or may become due but for the operation of the Bankruptcy Code. Each Guarantor further agrees that

the Guaranteed Obligations may be extended or renewed or amended or restated, in whole or in part, without notice to or further assent from it, and that it will remain bound upon this Guaranty notwithstanding any extension or renewal or amendment or restatement of any Guaranteed Obligation.

SECTION 2.  Guaranteed Obligations Not Affected.  To the fullest extent permitted by applicable Law, each Guarantor waives presentment to, demand of payment from, and protest to, any Loan Party of any of the Guaranteed Obligations, and also waives notice of acceptance of this Guaranty, notice of protest for nonpayment and all other notices of any kind.  To the fullest extent permitted by applicable Law, the obligations of each Guarantor hereunder shall not be affected by (a) the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any Loan Party under the provisions of the Credit Agreement, any other Loan Document or otherwise or against any other party with respect to any of the Guaranteed Obligations, (b) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Guaranty, any other Loan Document or any other agreement, with respect to any Loan Party, any other Person or with respect to the Guaranteed Obligations, (c) the failure to perfect any security interest in, or the release of, any of the Collateral held by or on behalf of the Collateral Agent or any other Credit Party, or (d) the lack of legal existence of any Loan Party or legal obligation to discharge any of the Guaranteed Obligations by any Loan Party for any reason whatsoever, including, without limitation, in any insolvency, bankruptcy or reorganization of any Loan Party.

SECTION 3.  Security.  Each of the Guarantors hereby acknowledges and agrees that the Collateral Agent and each of the other Credit Parties may (a) take and hold security for the payment of this Guaranty and the Guaranteed Obligations and exchange, enforce, waive and release any such security, (b) apply such security and direct the order or manner of sale thereof as they in their sole discretion may determine, and (c) release or substitute any one or more endorsees, the Borrowers, other Guarantors or other obligors, in each case without affecting or impairing in any way the liability of any Guarantor hereunder.

SECTION 4.  Guaranty of Payment.  Each of the Guarantors further agrees that this Guaranty constitutes a guaranty of payment and performance when due of all Guaranteed Obligations and not of collection and, to the fullest extent permitted by applicable Law, waives any right to require that any resort be had by the Collateral Agent or any other Credit Party to any of the Collateral or other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of any Agent or any other Credit Party in favor of any Loan Party or any other Person or to any other guarantor of all or part of the Guaranteed Obligations.  Any payment required to be made by the Guarantors hereunder may be required by any Agent or any other Credit Party on any number of occasions and shall be payable to the Administrative Agent, for the benefit of the Agent and the other Credit Parties, in the manner provided in the Credit Agreement.

SECTION 5.  Indemnification.  Without limiting any of their indemnification obligations under the Credit Agreement or the other Loan Documents, and without duplication of any indemnification provided for under the Credit Agreement or the other Loan Documents, each of the Guarantors, jointly and severally, shall indemnify the Credit Parties and each of their Subsidiaries and Affiliates, and each of their respective stockholders, directors, officers, employees, agents, attorneys, and advisors (each such Person being called an "Indemnitee"),

against, and hold each Indemnitee harmless from, any and all damages, actual out-of-pocket losses, claims, actions, causes of action, settlement payments, obligations, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of, (i) the execution or delivery of this Guaranty, the Credit Agreement or any other Loan Document or any other agreement or instrument contemplated hereby, the performance by the Guarantors of their respective obligations thereunder, or the consummation of the transactions contemplated by the Credit Agreement and the other Loan Documents or any other transactions contemplated hereby or thereby, or (ii) any actual or prospective claim, litigation, investigation or proceeding relating to or arising from any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided, however, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. In connection with any indemnified claim hereunder, the Indemnitee shall be entitled to select its own counsel and the Guarantors shall promptly pay the reasonable fees and expenses of such counsel.

SECTION 6.   No Discharge or Diminishment of Guaranty.   The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Guaranteed Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the Guaranteed Obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Guaranty, the Credit Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 7.   Defenses of Loan Parties Waived.   To the fullest extent permitted by applicable Law, each of the Guarantors waives any defense based on or arising out of any defense of any Loan Party or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Loan Party, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Each Guarantor hereby acknowledges that the Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept

an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Loan Party, or exercise any other right or remedy available to them against any Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent that the Guaranteed Obligations have been indefeasibly paid in full in cash. Pursuant to, and to the extent permitted by, applicable Law, each of the Guarantors waives any defense arising out of any such election and waives any benefit of and right to participate in any such foreclosure action, even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any Loan Party, as the case may be, or any security. Each Guarantor agrees that it shall not assert any claim in competition with any Agent or any other Credit Party in respect of any payment made hereunder in any bankruptcy, insolvency, reorganization, or any other proceeding.

SECTION 8.    Agreement to Pay; Subordination. In furtherance of the foregoing and not in limitation of any other right that the Agent or any other Credit Party has at law or in equity against any Guarantor by virtue hereof, subject to the entry of the Interim Financing Order or Final Financing Order as applicable, upon the failure of any Loan Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each of the Guarantors hereby promises to and will forthwith pay, or cause to be paid, to the Agent or such other Credit Party as designated thereby in cash the amount of such unpaid Guaranteed Obligations. Upon payment by any Guarantor of any sums to any Agent or any other Credit Party as provided above, all rights of such Guarantor against any Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Guaranteed Obligations. In addition, any indebtedness of the Borrowers or any other Loan Party now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior indefeasible payment in full in cash of all of the Guaranteed Obligations. Notwithstanding the foregoing, prior to the occurrence of an Event of Default, the Borrowers or any other Loan Party may make payments to any Guarantor on account of any such indebtedness. After the occurrence and during the continuance of an Event of Default, none of the Guarantors will demand, sue for, or otherwise attempt to collect any such indebtedness until the indefeasible payment in full in cash of the Guaranteed Obligations, termination or expiration of the Commitments, and termination of the Issuing Bank's obligation to issue Letters of Credit under the Credit Agreement. If any amount shall erroneously be paid to any Guarantor on account of (a) such subrogation, contribution, reimbursement, indemnity or similar right or (b) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Agent and the other Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement.

SECTION 9.    Limitation on Guaranty of Guaranteed Obligations. In any action or proceeding with respect to any Guarantor involving any state corporate law, the Bankruptcy Code or any other state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of such Guarantor under SECTION 1 hereof would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under said SECTION

1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Credit Party, any Agent or any other Person, be automatically limited and reduced to the highest amount which is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

SECTION 10. Information. Each of the Guarantors assumes all responsibility for being and keeping itself informed of each Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Agent or the other Credit Parties will have any duty to advise any of the Guarantors of information known to it or any of them regarding such circumstances or risks.

SECTION 11. Termination. This Guaranty (a) shall terminate when (i) the Commitments shall have expired or been terminated, (ii) the principal of and interest on each Loan and all fees and other Guaranteed Obligations shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated or been cash collateralized or backstopped by a letter of credit reasonably acceptable to the Administrative Agent and the Issuing Bank to the extent provided in the Credit Agreement, and (iv) all Letter of Credit Obligations shall have been paid in full, and (b) shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by any Credit Party or any Guarantor upon the bankruptcy or reorganization of any Loan Party or otherwise.

SECTION 12. Costs of Enforcement. Without limiting any of their obligations under the Credit Agreement or the other Loan Documents, and without duplication of any fees or expenses provided for under the Credit Agreement or the other Loan Documents, the Guarantors, jointly and severally, agree to pay on demand all Credit Party Expenses in connection with (i) the administration, negotiation, documentation or amendment of this Guaranty, and (ii) the Agent's and any other Credit Party's efforts to collect and/or to enforce any of the Guaranteed Obligations of the Guarantors hereunder and/or to enforce any of the rights, remedies, or powers of any Agent or any other Credit Party against or in respect of the Guarantors (whether or not suit is instituted by or against any Agent or any other Credit Party).

SECTION 13. Binding Effect; Several Agreement; Assignments. Whenever in this Guaranty any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the Guarantors that are contained in this Guaranty shall bind and inure to the benefit of each of the Guarantors and its respective successors and assigns. Subject to the entry of the Interim Financing Order or the Final Financing Order as applicable, this Guaranty shall be binding upon each of the Guarantors and their respective successors and assigns, and shall inure to the benefit of the Agent and the other Credit Parties, and their respective successors and assigns, except that no Guarantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such attempted assignment or transfer shall be void), except as expressly permitted by this Guaranty or the Credit Agreement. This Guaranty shall be construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

SECTION 14. Waivers; Amendment.

(a)     The rights, remedies, powers, privileges, and discretions of the Agent or any other Credit Party hereunder and under applicable Law (herein, the "Agents' Rights and Remedies") shall be cumulative and not exclusive of any rights or remedies which they would otherwise have. No delay or omission by the Agent or any other Credit Party in exercising or enforcing any of the Agents' Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Agent or any other Credit Party of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Agents' Rights or Remedies, and no express or implied agreement or transaction of whatever nature entered into between the Agent or any other Credit Party and any Person, at any time, shall preclude the other or further exercise of the Agents' Rights and Remedies. No waiver by the Agent or any other Credit Party of any of the Agents' Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. The Agents' Rights and Remedies may be exercised at such time or times and in such order of preference as the Agent or any other Credit Party may determine. The Agents' Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Guaranteed Obligations. No waiver of any provisions of this Guaranty or any other Loan Document or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor or any other Guarantor to any other or further notice or demand in the same, similar or other circumstances.

(b)     Neither this Guaranty nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Agent or any other Credit Party and the Guarantor or Guarantors with respect to whom such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

SECTION 15. Copies and Facsimiles. This instrument and all documents which have been or may be hereinafter furnished by the Guarantors to the Agent or any other Credit Party may be reproduced by the Agent or any other Credit Party by any photographic, microfilm, xerographic, digital imaging, or other process. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business). Any facsimile or other electronic transmission which bears proof of transmission shall be binding on the party which or on whose behalf such transmission was initiated and likewise so admissible in evidence as if the original of such facsimile or other electronic transmission had been delivered to the party which or on whose behalf such transmission was received.

SECTION 16. Governing Law. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT

INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 17. Notices.    All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement, provided that communications and notices to the Guarantors may be delivered to the Lead Borrower on behalf of each of the Guarantors.

SECTION 18. Survival of Agreement; Severability.

(a)    All covenants, agreements, indemnities, representations and warranties made by the Guarantors herein and in the certificates or other instruments delivered in connection with or pursuant to this Guaranty, the Credit Agreement or any other Loan Document shall be considered to have been relied upon by the Agent and the other Credit Parties and shall survive the execution and delivery of this Guaranty, the Credit Agreement and the other Loan Documents and the making of any Loans by the Lenders and the issuance of any Letters of Credit by the Issuing Bank, regardless of any investigation made by any Agent or any other Credit Party or on their behalf and notwithstanding that the Administrative Agent or other Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended, and shall continue in full force and effect until terminated as provided in SECTION 11 hereof.    The provisions of SECTION 5 and SECTION 12 hereof shall survive and remain in full force and effect regardless of the repayment of the Guaranteed Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Guaranty or any provision hereof.

(b)    Any provision of this Guaranty held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 19. Counterparts.    This Guaranty may be executed in counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Guaranty by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Guaranty.

SECTION 20. Rules of Interpretation.    The rules of interpretation specified in Sections 1.02 through 1.05 of the Credit Agreement shall be applicable to this Guaranty.

SECTION 21. Jurisdiction; Consent to Service of Process.

(a)     Each of the Guarantors agrees that any suit for the enforcement of this Guaranty or any other Loan Document shall be brought in the Bankruptcy Court or, if the Bankruptcy Court does not have, or abstains from exercising, jurisdiction, may be brought in the United States District Court of the Southern District of New York, as the Agent may elect in its sole discretion, and consents to the non-exclusive jurisdiction of such courts. Each party to this Guaranty hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum. Each Guarantor irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the Bankruptcy Court or the United States District Court of the Southern District of New York, and in each case, any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty or any other Loan Document, or for recognition or enforcement of any judgment, and each Guarantor hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined, to the fullest extent permitted by applicable law, in such federal court. Each Guarantor hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Nothing in this Guaranty or in any other Loan Document shall affect any right that the Agent or any other Credit Party may otherwise have to bring any action or proceeding relating to this Guaranty or any other Loan Document against any Guarantor or its properties in the courts of any jurisdiction.

(b)     Each of the Guarantors agrees that any action commenced by any Guarantor asserting any claim or counterclaim arising under or in connection with this Guaranty or any other Loan Document shall be brought solely in the Bankruptcy Court or, if the Bankruptcy Court does not have, or abstains from exercising, jurisdiction, solely in the United States District Court of the Southern District of New York, as the Agent may elect in its sole discretion, and consents to the exclusive jurisdiction of such courts with respect to any such action.

(c)     Each party to this Guaranty irrevocably consents to service of process in the manner provided for notices in SECTION 17. Nothing in this Guaranty or any other Loan Document will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.

SECTION 22. Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND WAIVES THE RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM IN RESPECT OF, AND ALL STATUTES OF LIMITATIONS WHICH MAY BE RELEVANT TO, SUCH ACTION OR PROCEEDING; AND WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR

ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT THE AGENT AND THE OTHER CREDIT PARTIES HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION 22.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Guarantors have duly executed this Guaranty as of the day and year first above written.

GUARANTORS:

HF ENTERPRISES, INC.
HF RESOURCES, INC.

By: _____

Name:  Rebecca Flick

Title:   Vice President and Assistant Secretary

[Signature Page to Guaranty]

**Exhibit B**
**(Payoff Letter)**

February 1, 2016

**VIA ELECTRONIC MAIL**
**AND OVERNIGHT COURIER**

Hancock Fabrics, Inc.
One Fashion Way
Baldwyn, Mississippi 38824

Re:    **Events of Default; Notice of Acceleration**

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of April 22, 2015 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), by and among (i) Hancock Fabrics, Inc., for itself and as Lead Borrower (in such capacity, the "Lead Borrower") for the other Borrowers party thereto from time to time (each, individually, a "Borrower" and, collectively, the "Borrowers"), (ii) the Borrowers party thereto from time to time, (iii) the Guarantors party thereto from time to time, (iv) Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "Agent") for its own benefit and the benefit of the other Credit Parties referred to therein, (v) Wells Fargo Bank, National Association, as Swing Line Lender, (vi) GACP Finance Co., LLC, as Term Agent and (vii) the lenders from time to time party thereto (each, individually, a "Lender" and, collectively, the "Lenders"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

The Lead Borrower has informed the Agent that the Borrowers and Guarantors intend imminently to file for relief under chapter 11 of the United States Bankruptcy Code. As you know, one or more Events of Default have occurred and continue to exist under the Credit Agreement.

Please take NOTICE that as a result of the occurrence of the existing Events of Default (a) the Agent hereby declares the Revolving Commitment of each Revolving Lender to make Committed Revolving Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, (b) the Agent hereby declares the unpaid principal amount of all outstanding Committed Revolving Loans, and all interest accrued and unpaid thereon, and any other Obligations related to the foregoing, to be immediately due and payable, and (c) the Term Agent hereby declares the unpaid principal amount of the Term Loan, and all interest accrued and unpaid thereon, and any other Obligations related to the foregoing, to be immediately due and payable.

Please take further NOTICE that, as a result of the occurrence of the Termination Date, the Borrowers are required to pay to the Agent (a) for the account of each Revolving Lender, a Revolver Early Termination Fee (as defined in the Wells Fargo Fee Letter) equal to $2,000,000, which amount shall be paid from the proceeds of a Committed Revolving Loan made by the Agent pursuant to Section 2.02(d) of the Credit Agreement in an amount equal to such Revolver

Early Termination Fee, and (b) for the account of each Term Lender, a Term Loan Prepayment Fee (as defined in the GA Fee Letter) equal to $700,000, which amount shall be paid by adding such amount to the unpaid principal amount of the outstanding Term Loan.

Due to the occurrence of the existing Events of Default and the termination of the Revolving Commitments, please be advised that the Lenders do not intend to fund further advances to the Borrowers under the Credit Agreement. Please note that, to the extent any Lender makes additional extensions of credit to any Loan Party, such credit extensions are strictly discretionary and shall be made in each Lender's sole discretion, shall not establish a course of dealing and shall be without prejudice to such Lender's right to cease making loans or otherwise extend credit to the Loan Parties, and without prejudice to the rights of the Agent to exercise all available rights and remedies under the Loan Documents and applicable law.

**Under the terms of the Loan Documents, the Agent for the benefit of the Lenders, has various rights and remedies that are available following the occurrence of an Event of Default. The Borrowers are hereby notified that Agents and Lenders have not abandoned, waived or deferred any rights or remedies of Agent under the Loan Documents or otherwise at law as a result of the existing Events of Default, and any negotiations and other actions or inaction undertaken in connection with such existing Event of Default shall not constitute a waiver of such existing Events of Default or of the Agents' and Lenders' rights or remedies under the Loan Documents. To the extent that the Agent has delivered any notices of default to the Borrowers, or hereafter delivers any such notices, such notices shall be fully effective and no cure periods, notice periods, or other time periods shall be deemed to be tolled or suspended unless the Agent agrees otherwise in writing. The Agent reserves the right to exercise any rights or remedies under the Loan Documents at any time or from time to time, for any reason whatsoever and notwithstanding the status of any discussions that may have occurred or may occur between the Borrowers, Agents and Lenders.**

**No waiver of the existing Events of Default shall be imputed to the Agents and Lenders, or shall be deemed to exist or arise, by reason of any failure of the Agent to exercise any right or enforce any remedy that it may have as a result of the occurrence of the existing Events of Default or any delays or discussions related thereto, and no modification, amendment, termination or waiver of any of the provisions of the Credit Agreement shall exist or arise or be or become enforceable unless executed by the Agents and Lenders. Neither the "day by day" forbearance nor anything in this letter agreement or in any ongoing discussions or negotiations between the Borrowers, Agents and Lenders shall directly or indirectly (i) defer any enforcement action, (ii) constitute a consent or waiver of any past, present or future Event of Default or other violation of any provisions of the Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Loan Documents or any right, power or remedy of the Agent, or (iv) constitute a course of dealing or other basis for altering any Obligations of the Loan Parties under the Loan Documents.**

The Agent expressly reserves all of its rights, powers and remedies under the Loan Documents or applicable law, including, without limitation, the right at any time (i) to assert the existence of any and all Events of Defaults, (ii) to commence any legal or other action to collect any or all of the Obligations owing under the Loan Documents from the Borrowers, (iii) foreclose or otherwise realize on any or all of the Collateral and/or appropriate, setoff or apply to the payment of any or all of the Obligations under the Loan Documents owing to the Lenders, or (iv) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by the Loan Documents or applicable law.

The above is not a full statement by the undersigned of all the facts, claims or rights involved, all of which are hereby expressly reserved.

[signature pages follow]

Sincerely,

**WELLS FARGO BANK, NATIONAL
ASSOCIATION,** as Administrative Agent and as
Collateral Agent

By:_____

Name: Joseph Burt

Title: Director

**GACP FINANCE CO., LLC,** as Term Agent

By: _____

Name: *Robert A. Couzan*

Title: *Managing Director*

cc:    Sung Pak, Esq. (via e-mail spak@omm.com)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036

Sanjay Thapar, Esq. (via email: sanjaythapar@paulhastings.com)
Paul Hastings LLP
75 East 55th Street
New York, New York 10022

**Exhibit C**
**(Budget)**

Excerpt:  Subject to full Budget 13-week cash flow

**HANCOCK FABRICS**
Forecast DIP Cash Flow v16.3 (2/1/16)

| | Post Petition Filing 2/2016 | 1 | 1 | 1 | 2 |
|---|---|---|---|---|---|
| Fiscal Period | Feb | Feb | Feb | Feb | Mar |
| 4-4-4 Month | 2/6/2016 | 2/13/2016 | 2/20/2016 | 2/27/2016 | 3/5/2016 |
| Week Ending | 1 | 2 | 3 | 4 | 5 |
| Fiscal Week # | Actual | Forecast | Forecast | Forecast | Forecast |
| Forecast/Actual | | | | | |

**I. CASH FLOW**

**Cash Receipts**
| | | | | | |
|---|---|---|---|---|---|
| Payment to Wells Fargo | 4,023,841 | 4,485,351 | 4,003,338 | 3,850,519 | 3,826,279 |
| 70 Store Liquidation Sales | | 643,271 | 2,420,356 | 2,226,185 | 2,922,575 |
| **Total Cash Receipts** | 4,023,841 | 5,128,622 | 6,423,694 | 6,096,705 | 6,748,854 |

**Other Asset Recovery**
| | | | | | |
|---|---|---|---|---|---|
| Asset Recovery - 363 Sale | | | | | |
| Liquidator Reimbursements | | | | | |
| **Total Other Asset Recovery** | - | - | - | - | - |

**Cash Disbursements**
Operating
| | | | | | |
|---|---|---|---|---|---|
| Vendor Payments - Trade | (1,791,391) | (3,295,735) | (3,770,332) | (2,540,843) | (982,056) |
| Vendor Payments - Expense | (325,126) | (686,611) | (600,000) | (942,658) | (1,270,000) |
| Rent and Occupancy | | | | | (2,287,000) |
| Payroll - Stores | (305,204) | (377,926) | (377,825) | (377,926) | (377,826) |
| Payroll - Admin | (546,149) | | (546,149) | | (546,149) |
| Benefits | (162,351) | (184,872) | (99,731) | (141,813) | (122,078) |
| Pension Fund Contribution | | | | | |
| Sales Tax | (7,474) | (179,390) | (1,138,735) | (226,167) | (16,004) |
| Payroll and Other Tax Payments | (306,604) | (149,614) | (327,299) | (105,433) | (318,467) |
| Professional Fees - BK | | | | | |
| Professional Fees - To Escrow | (405,000) | (295,000) | (295,000) | (295,000) | (157,000) |
| Customs/Bank Fees | | | | (5,539) | (42,916) |
| Import Draws/Fees/SBLC | (37,211) | | (22,288) | (46,403) | |
| Liquidator Expenses - 70 Stores | | | (96,209) | (94,974) | (96,216) |
| Other Disbursements | (160,000) | | (451,469) | | |
| Bank Funding | | | | | |
| **Total Operating Cash Disbursements** | (4,116,476) | (4,970,037) | (7,838,556) | (4,979,951) | (5,853,526) |

Financing
| | | | | | |
|---|---|---|---|---|---|
| Principal | | | | | |
| Interest | | | | (593,552) | |
| Fees - Wells Fargo | (425,000) | | | | 750,000 |
| Fees - GA | (87,500) | | | | |
| Miscellaneous | | (2,233,965) | | | |
| **Total Financing Cash Disbursements** | (512,500) | (2,233,965) | - | (593,552) | 750,000 |
| **Total Cash Disbursements** | (4,628,976) | (7,204,002) | (7,838,556) | (5,573,503) | (5,103,526) |
| **Net Cash Flow From Operations** | (605,137) | (2,075,480) | (1,414,861) | 523,202 | 1,645,328 |

**II. REVOLVER - PRE PETITION**
| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | (57,269,711) | (53,245,869) | (48,117,348) | (41,693,654) | (35,597,949) |
| Add: Borrowings | | | | | |
| Less: Repayments | 4,023,841 | 5,128,522 | 6,423,694 | 6,096,705 | 6,748,854 |
| Fees/Adjustments | | | | | 28,849,095 |
| **Ending Revolver Balance** | (53,245,869) | (48,117,346) | (41,693,654) | (35,597,949) | - |

**III. REVOLVER - POST PETITION**
| | | | | | |
|---|---|---|---|---|---|
| Starting Revolver Balance | | (4,628,976) | (11,832,980) | (19,471,535) | (25,045,038) |
| Add: Borrowings | (4,628,976) | (7,204,002) | (7,638,555) | (5,573,503) | (5,103,526) |
| Less: Repayments | | | | | |
| Fees/Adjustments | | | | | (28,849,095) |
| **Ending Revolver Balance** | (4,628,976) | (11,832,980) | (19,471,535) | (25,045,038) | (58,997,658) |

**IV. TERM LOAN**
| | | | | | |
|---|---|---|---|---|---|
| Starting Term Loan Balance | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) |
| Add: Borrowings | | | | | |
| Less: Repayments | | | | | |
| **Ending Term Loan Balance** | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) | (18,290,417) |

**V. CASH IN BANK**
| | | | | | |
|---|---|---|---|---|---|
| Starting Cash in Bank | - | - | - | - | - |
| Add: Cash Receipts | | | | | |
| Less: Disbursements | | | | | |
| Other | | | | | |
| **Ending Cash in Bank** | - | - | - | - | - |

**VI. BORROWING BASE**
| | | | | | |
|---|---|---|---|---|---|
| Accounts receivable | 1,926,410 | 1,467,062 | 2,413,180 | 1,743,437 | 1,929,751 |
| Inventory | 69,547,126 | 64,448,764 | 62,985,707 | 64,127,574 | 63,585,751 |
| Property | 6,925,000 | 6,925,000 | 6,925,000 | 6,925,000 | 6,925,000 |
| Reserves | (6,394,607) | (7,320,330) | (7,491,338) | (7,204,310) | (7,290,652) |
| Borrowing Base (weak in arrears) | 70,522,828 | 65,438,487 | 65,442,559 | 65,491,672 | 65,050,960 |
| Less: Letters Of Credit | | | | | |
| SBLC | 6,936,910 | 4,301,960 | 4,301,960 | 4,301,960 | 4,301,960 |
| Documentary | 101,060 | 101,960 | 79,362 | 32,989 | 32,989 |
| Less: Block | 5,996,899 | 990,000 | (210,000) | 400,000 | 1,600,000 |
| Less: Loan Balance | 57,874,847 | 59,950,328 | 61,155,169 | 60,942,986 | 58,997,658 |
| **Ending Revolver Availability** | 104,517 | 104,549 | 105,020 | 113,747 | 114,353 |

| | | | | | |
|---|---|---|---|---|---|
| MEMO 1: Pro Fee Escrow Account Balance | 405,000 | 700,000 | 995,000 | 1,290,000 | 1,347,000 |

FOOTNOTE: In the event that a higher alternative liquidation bid is accepted by the Company, the parties will discuss in good faith additional payments to GACP.

**The accompanying financial information is based on information provided by Hancock Fabrics, Inc. Clear Thinking Group has not audited or otherwise verified the information provided to us, nor will we provide any assurances concerning the reliability, accuracy, or completeness of any materials provided by or on behalf of Hancock Fabrics, Inc.

**Hancock Fabrics, Inc.**
**Professional Fees Schedule**
*(in 000's)*

Excerpt: Subject to
full Budget
13-week cash flow

| Weekly | Feb-16 | Mar-16 |
|---|---|---|

| PROFESSIONAL FEES/EXP INCURRED: | Post Petition | |
|---|---|---|
| Debtor Legal Counsel | 730 | 540 |
| Debtor Financial Advisor | 285 | 220 |
| Privacy Ombudsman | 15 | 15 |
| Accountants - Tax | - | - |
| Legal-Other | - | - |
| Legal-Sr. Secured - Wells | 101 | 101 |
| Legal-Jr. Secured - Term Loan GA | 75 | 75 |
| Investment Banker | 100 | 350 |
| Real Estate Professional | - | - |
| Bank Audits/Field Exams | 35 | - |
| Creditor Counsel & Financial Adv. | 315 | 210 |
| Note Holders Counsel & Adv | - | - |
| Ch. 11 Liquidating Trustee | - | - |
| United States Trustee | 30 | - |
| Noticing Agent | 110 | 110 |
| **Total Pro Fees - Bankruptcy Related** | **1,796** | **1,621** |

**The accompanying financial information is based on information
provided by Hancock Fabrics, Inc. Clear Thinking Group has not audited
or otherwise verified the information provided to us, nor will we provide
any assurances concerning the reliability, accuracy, or completeness of
any materials provided by or on behalf of Hancock Fabrics, Inc.